**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STATE OF NEW JERSEY and STATE OF NEW YORK,<br><br>     Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF TRANSPORTATION; SEAN DUFFY, in his official capacity as Secretary of Transportation; FEDERAL RAILROAD ADMINISTRATION; DAVID FINK, in his official capacity as Administrator of the Federal Railroad Administration; FEDERAL TRANSIT ADMINISTRATION; MARCUS J. MOLINARO, in his official capacity as Administrator of the Federal Transit Administration; BUILD AMERICA BUREAU; and DR. MORTEZA FARAJIAN, in his official capacity as Executive Director of the Build America Bureau,<br><br>     Defendants. | Case No.<br><br><br><br><br><br>**COMPLAINT** |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**INTRODUCTION**

1. Superstorm Sandy hit the northeast region in 2012 causing death and destruction. Among the storm's many devastating impacts on infrastructure was the massive flooding of the 116-year-old North River Tunnel ("NRT"), a single, two-tube rail tunnel that carries 200,000 rail passengers under the Hudson River every day. For decades, the tunnel had been deteriorating. Sandy not only revealed how dire the tunnel's condition had become but worsened it, leaving behind chemical residues that compromise the NRT's integrity and impair its reliability.

2. The NRT is a critical component of the nation's infrastructure—it supports approximately *twenty percent* of the *nation's* overall economic output and lies at the economic

center of the bustling northeast region. But as the Federal Government has recognized, its condition has become so poor that it now routinely requires emergency maintenance that disrupts services for hundreds of thousands of rail passengers throughout the region.

3.     The solution is straightforward: rail traffic under the Hudson River must be completely overhauled. The Federal Government, as well as New York and New Jersey (the "Plaintiff States" or "States"), have long agreed that there is no conceivable alternative.

4.     Thus, the $16 billion Hudson Tunnel Project (the "Project") was born. The Project was specifically designed to provide long-term resiliency, reliability, and redundancy to the regional and national rail network for the hundreds of thousands of NJ Transit and Amtrak customers who travel daily between New Jersey and New York. Specifically, the Project would (1) create a new Hudson River rail tunnel with two new tracks under the Hudson River connecting to Penn Station and (2) rehabilitate the existing NRT.

5.     The ability to complete the Project depends on federal funding, although the Plaintiff States have long contributed substantial state funds to the Project as well.

6.     The Gateway Development Commission ("GDC") is a corporation that was created by New Jersey and New York through identical statutes.  Early in 2023, New Jersey, New York, Amtrak, and GDC entered into a Project Development Agreement that tasked GDC with the development, design, and construction of the Project. The States and Amtrak committed to contributing one-third of the funding needed to support GDC's operating budget.

7.     Thereafter, the Federal Government pledged billions of dollars to the Project through a series of grant and loan agreements. But on September 30, 2025, without warning, the U.S. Department of Transportation ("DOT") announced a decision to indefinitely suspend

payment of all Project funds (the "September 30 Suspension") pending its review of compliance with certain regulations related to contracting with disadvantaged business enterprises.

8.      On December 1, DOT advised GDC that it would resume disbursing federal funds if GDC certified that it would take certain actions ostensibly related to DOT's review. On December 8, 2025, GDC provided the requested certification, advising the Federal Government by letter that it would take the requested steps. GDC followed up on January 8, 2026, confirming again that it had complied with all of the Federal Government's requests. As of today, DOT has not responded to GDC and has not resumed disbursements as promised, despite GDC promising to do exactly what the Government had requested.

9.      The September 30 Suspension and its implementation violated procedural requirements that govern the circumstances in which DOT and its component agencies can withhold federal disbursements on awarded grants.

10.     Since October 1, 2025, GDC has been forced to use its operating budget and the remainder of its capital account, as well as available credit, to continue funding construction and procurement activity. But that cannot continue forever.

11.     On January 26, 2026, GDC was forced to notify its contractors that all work on the Project must pause on February 6, 2026, unless federal funding resumes.

12.     At risk, of course, is the completion of this much-needed project on which a substantial proportion of the nation's economy depends. The Project is the most essential component of a set of railway projects in the northeast known as the Gateway Program. From 2023 to 2060, the construction and operation of the full Gateway Program is expected to generate and sustain 90,000 jobs and $19.6 billion in economic activity generated by the construction. The success of all these other projects depends on the Project.

13.     Also hanging in the balance are the livelihoods of thousands of people who are working on the Project and the futures of the numerous businesses contracting with GDC to complete the Project.

14.     Why did the Federal Government suddenly suspend the Project if not for regulatory noncompliance or some other statutorily permitted reason? It has done so because President Trump is engaged in political retribution. On October 15, 2025, the President announced on Truth Social:

> Russell Vought is really terminating tremendous numbers of Democrat projects. This is not only jobs, I mean the project in Manhattan, the project in New York. It's billions and billions of dollars that Schumer has worked 20 years to get—it's terminated

Two days later, the President doubled down in another post, stating:

> What we're doing is we're cutting Democrat programs that we didn't want. . . . We're cutting them permanently. We're cutting a $20 billion project that Schumer fought for 15 years to get, and I'm cutting the project. The project is gonna be dead. It is pretty much dead right now.

15.     Suspending the funding for this monumental project based on the President's desire to punish political rivals violates the Administrative Procedure Act many times over. In this Complaint, Plaintiffs New Jersey and New York ask the Court to stay, vacate, declare unlawful, and enjoin the September 30 decision to suspend federal funding for the Project.

## JURISDICTION AND VENUE

16.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States, including the Administrative Procedures Act, 5 U.S.C. § 702.

17.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and (e)(1). Defendants are United States agencies or officers sued in their official capacities. The State of New

York is a resident of this district, and a substantial part of the events or omissions giving rise to this Complaint occurred and continue to occur within the Southern District of New York.

## PARTIES

### A. Plaintiffs

18.     Plaintiff State of New Jersey, represented by and through its Acting Attorney General, Jennifer Davenport, is a sovereign state of the United States. As the State's chief legal officer, the Attorney General is authorized to act on behalf of the State in this matter.

19.     Plaintiff State of New York, represented by and through its Attorney General, Letitia James, is a sovereign state of the United States. As the State's chief legal officer, the Attorney General is authorized to act on behalf of the State in this matter.

### B. Defendants

20.     Defendant United States Department of Transportation ("DOT") is an executive department of the United States with responsibility for planning and coordinating federal transportation projects. 49 U.S.C. § 102(a). DOT is a federal agency and engages in agency action within the meaning of 5 U.S.C. § 702. DOT is responsible for administering federal funding programs at issue in this complaint.

21.     Defendant Sean Duffy is the Secretary of Transportation for the United States and is sued in his official capacity.

22.     Defendant Federal Railroad Administration ("FRA") is an agency within DOT concerned with intermodal transportation. 49 U.S.C. § 103. FRA is responsible for administering federal funding programs at issue in this complaint.

23.     Defendant David Fink is the Administrator of the FRA and is sued in his official capacity.

24.     Defendant Federal Transit Administration ("FTA") is an agency within DOT concerned with fostering the development and revitalization of public transportation systems. 49 U.S.C. § 107. The FTA is responsible for administering federal funding programs at issue in this complaint.

25.     Defendant Marcus J. Molinaro is the Administrator of the FTA and is sued in his official capacity.

26.     Defendant Build America Better Bureau is a bureau within DOT responsible for supporting transportation infrastructure development projects. The Build America Better Bureau is responsible for administering federal funding programs at issue in this complaint.

27.     Defendant Dr. Morteza Farajian is the Executive Director of the Build America Better Bureau and is sued in his official capacity.

## FACTUAL ALLEGATIONS AND LEGAL BACKGROUND

### A. The Critical Need for the Hudson Tunnel Project

28.     The Hudson River rail crossing is a vital economic lifeline for the entire Northeast region. It serves both Amtrak intercity passenger trains traversing through the heavily populated Northeast Corridor between Washington D.C. and Boston, as well as New Jersey Transit commuter trains that shuttle tens of thousands of workers between New Jersey and New York each day.

29.     Each weekday, the Hudson River rail crossing operates approximately 425 trains carrying over 200,000 rail passengers across the Hudson River.

30.     Currently, all Hudson River rail traffic runs through the 116-year-old NRT. The tunnel's age and antiquated standards have long led to suboptimal rail service.

31.     By the mid-1990s, national and state officials recognized the need to strengthen rail capacity beyond the two-tube NRT and reduce bottlenecks between New York and New Jersey.

32.     After Superstorm Sandy hit the region in 2012, the urgent need for comprehensive rehabilitation of the NRT could no longer be ignored. The devastating storm flooded the NRT with millions of gallons of saltwater, accelerating deterioration of the tunnel's concrete, electrical systems, and mechanical components. The residual effects from the storm resulted in short circuiting of the track and frequent delays due to component failures within the tunnel, disrupting service for the over 200,000 weekday passengers.

33.     The storm's damage has further compromised the NRT's reliability. The poor condition of the tunnel has required emergency maintenance that disrupts service for hundreds of thousands of rail passengers throughout the region. The damage is so severe that it can only be addressed through a comprehensive reconstruction of the tunnel.

34.     There is thus an extraordinarily significant economic and safety interest in fortifying and modernizing the most heavily used passenger rail lines in the United States.

**B.  Initial Gateway Program Planning**

35.     The planning for the Gateway Program and what became the Project began in 2011. In that year, Amtrak President Joseph H. Boardman and New Jersey Senators Frank Lautenberg and Robert Menendez first announced the "Gateway Project," a project they described as a necessary part of Amtrak's vision for bringing high-speed rail to the Northeast Corridor. Amtrak agreed to spend $50 million on preliminary engineering and design work and take the lead in finding other funding sources, which would include the states of New Jersey and New York.

36.     In 2016, FRA and New Jersey Transit Corporation ("NJ Transit") announced their intent to prepare an Environmental Impact Study (the "Study") for the Project, which has become the core of the Gateway Program. The Study was necessary to ensure that the Project complied with federal environmental statutes. As part of creating it, FRA and NJ Transit held public

meetings, reached out to stakeholders, and incorporated public feedback. After the draft Study was made publicly available in 2017, the Port Authority of New York and New Jersey ("Port Authority"), a longstanding bi-state entity created by the Plaintiff States, became the project sponsor for the Project.

37.    In the following years, the Project was in the project development phase, meaning that Port Authority identified a specific development plan and completed the environmental review process. Being placed in the project development phase also authorized Port Authority, Amtrak, and NJ Transit to begin incurring costs related to the environmental review and engineering and design activities.

38.    In 2019, to better facilitate the Gateway Program, New Jersey and New York enacted two identical state laws that created the Gateway Development Commission ("GDC"). *See* N.J. Stat. Ann. 32:36; 2019 N.Y. Laws ch. 108; 49 U.S.C. § 24101 note (granting Congressional consent). The GDC is the signatory to the grant agreements that support the Project.

39.    The Gateway Program is made up of two phases designed to strengthen Hudson River rail service and operations. The first phase of the program includes: the replacement of the existing Portal North Bridge; the Project, including the rehabilitation of the existing North River Tunnel ("P5 North River Tunnel Rehabilitation"); and the completion of certain ancillary facilities, including construction of concrete casing at Hudson Yards in Manhattan, New York (P0 Hudson Yards Concrete Casing – Section 3, or "HYCC-3"), and all projects necessary to connect the aforesaid projects to the contiguous Amtrak Northeast Corridor Facilities. N.J. Stat. Ann. § 32:36-3. Phase two of the program includes: the Portal South Bridge Project; the Sawtooth Bridge replacement Project; the Secaucus Loop Project; the Secaucus Junction Renovation and Expansion

Project; the Penn Station South Project; and other related projects, if authorized by New York, New Jersey, and Amtrak.

40.    The Gateway Program started to pick up steam in 2021 after the FTA and FRA completed their environmental review of the Project, issuing a favorable record of decision. In 2022, the Project qualified for federal funding. That same year, GDC became the NEPA Sponsor for the Project and became responsible for ensuring that the Project would meet all federal requirements.

### C. Hudson Tunnel Project Funding

41.    GDC oversees the Project and funds it through a combination of federal and state funding sources.

#### 1. Federal Funding

42.    There are four sources of DOT funding for the Project, all provided by various component agencies within DOT: (i) a Federal-State Partnership grant from the FRA (the "FRA-FSP grant"); (ii)  a Federal Capital Investment Grant Program grant from the FTA (the "FTA CIG grant"); (iii) a Rebuilding American Infrastructure with Sustainability and Equity grant from the FTA (the "RAISE grant"); and (iv) a series of Railroad Rehabilitation and Improvement Financing program ("RRIF") loans from the Build America Bureau. In addition, Amtrak committed $1,016,144,386 to the Project pursuant to the Capital Funding Agreement, dated as of January 16, 2024, between Amtrak and GDC, as amended by the First Amendment to the Capital Funding Agreement, dated as of March 5, 2024 (the "Amtrak Capital Funding Agreement").

##### i.  FRA-FSP Grant

43.    The FRA-FSP Grant Program is outlined in 49 U.S.C. § 24911, which gives the Secretary of Transportation the authority to "develop and implement a program for issuing grants

to applicants . . . to fund capital projects." 49 U.S.C. § 24911(b). The statute outlines the types of eligible projects, project selection criteria, and funding methods and limitations, including that DOT must "create a predictable project pipeline that will assist Amtrak, States, and the public with long-term capital planning" in the Northeast Corridor. *Id.* § 24911(e).

44.    The FRA-FSP Grant Program is funded through various appropriations in the Infrastructure Investment and Jobs Act ("IIJA"), which provides appropriations for grants to Amtrak for Northeast Corridor projects. 117 P.L. 58, 135 Stat. 429 (2021) § 22101(a).

45.    On September 17, 2024, the FRA awarded GDC an FRA-FSP grant for the Project, totaling $3,799,999,820, to be awarded in a phased funding agreement.

46.    Pursuant to 49 U.S.C. § 24911(g)(2)(C)(i), a phased funded agreement can be made up of obligated funds and contingent funds. In Fiscal Year 2024, FRA obligated $1,899,999,917 for the FRA-FSP grant. In Fiscal Year 2025, FRA obligated $949,999,952 for the FRA-FSP grant.

47.    GDC can request the contingent funds by requesting an amendment to the grant agreement. GDC has requested that FRA obligate an additional $949,999,951 in Fiscal Year 2025 funds.

48.    Through August 31, 2025, GDC has received $182,100,000 from this grant.

### ii.    The FTA CIG Grant

49.    The FTA CIG grant is made pursuant to the Secretary's authority under 49 U.S.C. § 5309(b). The FTA CIG grant is also made in accordance with the FTA Circular 5200.1A, Full Funding Grant Agreements Guidance (Dec. 5, 2002). These grants are intended to create a new "minimum operable segment" of public transportation or an "extension to an existing" system, 49 U.S.C. §§ 5309(a)(5), (d), and must be part of an approved transportation plan with a goal "to encourage and promote the safe and efficient management, operation, and development of resilient

surface transportation systems that will serve the mobility needs of people and freight and foster economic growth and development within and between States and urbanized areas and better connect housing and employment," *id.* §§ 5303(a)(1), 5309(d)(2)(A)(ii), 5309(e)(2)(A)(ii).

50.     The FTA CIG grant is funded through funds already appropriated during the term of the IIJA and subsequent authorizations.

51.     On July 8, 2024, the FTA awarded the GDC an FTA CIG grant for the Project, totaling $6,880,000,000 to be awarded in differing amounts for fiscal years 2024-2033. Congress appropriated funding for Fiscal Years 2023 and 2024, and the FTA allocated and obligated $800 million for the Project. Congress appropriated funding for Fiscal Year 2025, and the FTA allocated and obligated $700 million for the Project.

52.     Through August 31, 2025, GDC has received $122,660,000 from this grant.

### iii.   The FTA RAISE Grant

53.     The FTA RAISE grant is authorized by 49 U.S.C. § 6702, which gives the Secretary of Transportation authority to "carry out a program, to be known as the 'Local and Regional Project Assistance Program'" and "to provide for capital investments in surface transportation infrastructure." 49 U.S.C. § 6702(b). The statute outlines the types of eligible projects, funding methods, and funding limitations. The FTA RAISE grant is also governed by the terms and conditions found in RAISE FY2023 FRA General Terms and Conditions.

54.     The FTA RAISE grant is funded by $1.5 billion appropriated to the Local and Regional Project Assistance Program authorized by the IIJA. 117 P.L. 58, 135 Stat. 1413 (2021).

55.     On June 4, 2024, the FTA awarded GDC a FY 2023 RAISE grant in the amount of $25,000,000. This is a single obligation award.

56.     The FTA RAISE grant provided federal funding for the construction of a new approximately 100-foot road bridge to carry Tonnelle Avenue over a new railroad right-of-way for the new Hudson River Tunnel in North Bergen, New Jersey.

### iv. RRIF Loans

57.     The remainder of the federal funding comes from RRIF loans obtained through Build America Bureau's RRIF Program. RRIF loans are authorized by the RRIF Act codified at 49 U.S.C. §§ 22401-22406. Section 22402(a) authorizes the Secretary to provide direct loans for certain types of projects, including those that "enhance public safety," "promote economic development," "enhance service and capacity in the national rail system," and "materially alleviate rail capacity problems which degrade the provision of service to shippers and would fulfill a need in the national transportation system," *Id.* §§ 22402(b), (c).

58.     GDC has received three RRIF loans through this program.

### 2. State Funding

59.     The States and Amtrak have committed to contributing one-third of the funding needed to support GDC's operating budget. This includes GDC staff salaries, administrative costs, and certain professional services.

60.     Separate and apart from GDC's RRIF loan agreements with DOT, GDC has entered into individual funding agreements with New York, New Jersey, and the Port Authority to support repayment of the RRIF loans.

61.     Pursuant to a March 31, 2024, agreement between NJ Transit and GDC (the "NJ Funding Agreement)," NJ Transit has agreed to cover the costs of repaying up to $703,052,143 in borrowed RRIF funds from DOT plus related ancillary costs to finance completion of the Project,

provided that such funds shall not exceed $89,000,000 in any year. Between 2034 and 2073, NJ Transit is expected to make payments in the total amount of $578,908,882.

62. Under the Service Contract, dated March 31, 2024, by and between the People of the State of New York and GDC (the "NY Funding Agreement"), New York has agreed to pay amounts sufficient to repay up to $1,487,018,803 (excluding capitalized interest) in borrowed RRIF funds from DOT plus related ancillary costs to finance completion of the Project. Between 2034 and 2073, New York is expected to make payments in the total amount of $2,695,096,408.

63. Under an April 8, 2024, agreement between the Port Authority and GDC, the Port Authority has agreed to pay amounts sufficient to repay up to $1,870,000,000 (excluding capitalized interest) in borrowed RRIF funds from DOT plus related ancillary costs to finance completion of the Project. Between 2034 and 2069, the Port Authority is expected to make payments in the total amount of $5,072,463,686.

**D. Current State of the Work on the Hudson Tunnel Project**

64. The Project formally broke ground in November 2023.

65. The Project consists of ten interdependent projects or packages, one of which is substantially complete, four of which are in active construction, and five of which are in development. These projects are primarily funded through federal funds.

66. The P4 Tonnelle Avenue Bridge and Utility Relocation is substantially complete.

67. The four in construction are: (1) P1A Palisades Tunnel, (2) EA-1 Hudson River Ground Stabilization, (3) P1B Manhattan Tunnel, and (4) P0 Hudson Yards Concrete Casing – Section 3, which is funded by a separate grant awarded to Amtrak.

68. Each of the five Project packages that are substantially complete or in active construction is summarized below.

69.    *P4 Tonnelle Avenue Bridge and Utility Relocation*. This project began in 2023 and involves relocation of a bridge and utility, and it serves as a staging area for tunnel boring machines in North Bergen, New Jersey. The project was substantially complete in October 2025, but additional construction activities continue until final completion. The Tonnelle Avenue Bridge and Utility Relocation Project has a market case estimate of $47,300,000 paid by both federal and local funds. The FTA RAISE Grant provided $25,000,000 in federal funds for the project. The remaining local share of $22,300,000 was split equally between New Jersey, New York, and Amtrak in an amount equal to $7,433,333.33 for each partner. Due to temporary funding limitations, New Jersey paid $19,000,000, Amtrak paid $3,300,000, and New York paid $0, with the differences "trued up" in the amounts owed under the Amtrak Capital Funding Agreement, the NJ Funding Agreement, and the NY Funding Agreement.

70.    *P1A Palisades Tunnel*. This project began in 2024 and involves the construction of the first mile of the twin tunnels on the New Jersey side of the Hudson River. It includes boring two parallel tunnels approximately 5,100 feet long with an inside diameter of 25 feet 2 inches and six cross passages, as well as furnishing and installing a concrete tunnel lining with a waterproofing membrane. It also involves building the new Hudson County Shaft, which will be used to remove the tunnel boring machines when digging is complete. It is one of the most complicated parts of the Project. For example, the tunnel boring machines had to be specially constructed and could only be constructed at the time the contract was awarded. Prior to the September 30 Suspension, this project was expected to be completed by 2027.

71.    *EA-1 Hudson River Ground Stabilization Project*. This project began in 2024 and involves stabilizing Manhattan's side of the riverbed to allow the tunnel boring machines to excavate while protecting the riverbed ecosystem. Phase one of the project included surveying,

14

design, and construction of a test cofferdam. Phase two involves injecting grout into the silt in the

Hudson River. Prior to the September 30 Suspension, the project was expected to be completed by

2028, with a new tunnel in service by 2035.

72.    *P1B Manhattan Tunnel*. This project began in the spring of 2025 and will build

approximately 700 feet of twin tunnels and protect existing sewer lines and utilities to ensure they

are not disrupted by tunnel boring. The project also includes designing and building an access shaft

at 12th Avenue that will be used to remove the tunnel boring machines that build the portion of the

tunnel under the Hudson River and then converted into a permanent ventilation facility for the new

tunnel. Prior to the September 30 Suspension, this project was expected to be completed by 2029.

73.    *P0 Hudson Yards Concrete Casing – Section 3*. This project began in 2023 and

involves building the last segment of the rail right-of-way under Hudson Yards in Manhattan to

connect the new tunnel to New York Penn Station. As of May 2025, the project was 50% complete

with construction expected to conclude in 2026. The project continues mass dewatering, rock

drilling and excavation, rebar installation, and massive amounts of concrete pouring using cranes

and heavy machinery. The HYCC-3 project is funded by a combination of federal funding—a

$292,000,000 grant from DOT and $259,730,000 from Amtrak—and state funds. New Jersey and

New York are each responsible for contributing the lesser of (i) ten percent of the total final project

cost or (ii) $69,270,000.

74.    As of January 2026, GDC estimates that there are more than 1,000 individual

workers actively working on the Project, hired via more than 150 contractors.

**E.  Suspension of Funding for the Hudson Tunnel Project.**

75.    On September 30, 2025, Defendant Marcus J. Molinaro, Administrator of the FTA,

sent GDC a letter (attached hereto as Exhibit 1) informing GDC that DOT was issuing an interim

final rule ("IFR") removing race- and sex-based presumptions of social and economic disadvantage from its Disadvantaged Business Enterprise ("DBE") program. This IFR (which was not published and effective until a few days later, on October 3, 2025) was a significant change from the regulations in effect when the Project was greenlit. The September 30 letter stated that, "[i]n conjunction with the issuance of the IFR," DOT would be "reviewing the projects it funds," including the Project. It further stated that "the review will commence immediately" and "temporarily impact disbursements for the . . . Project."

76.    The following day, due to the failure of Congress to enact an appropriations bill for federal Fiscal Year 25, the Federal Government entered into a shutdown.

77.    The lapse in appropriations had no effect on federal funding for the Project, which relied on funds that had already been appropriated by Congress.

78.    Hours after the shutdown began, the Director of the Office of Management and Budget announced that the Administration was withholding "roughly $18 billion" for infrastructure projects of importance to New York City—the home of Senate Minority Leader Charles Schumer and House Minority Leader Hakeem Jeffries—including the Project.



79.    That same day, DOT confirmed in a press release that it would be conducting a "quick administrative review" of the Project as well as the Second Avenue Subway and that funding disbursements would not be processed during the pendency of the review.

80.    In bold text, the DOT press release stated: "Thanks to the Chuck Schumer and Hakeem Jeffries shutdown, however, . . . USDOT's review of New York's unconstitutional practices will take more time. Without a budget, the Department has been forced to furlough the civil rights staff responsible for conducting this review. This is another unfortunate casualty of radical Democrats' reckless decision to hold the federal government hostage to give illegal immigrants benefits."

81.    GDC quickly responded to DOT's letter on October 2, acknowledging receipt and providing details of changes made to address non-discrimination obligations.

82.    Despite DOT's claim that it could not conduct its review during the pendency of the shutdown, it replied on October 7, requesting more information.

83.    But then, on October 15, President Trump openly declared that he had decided to "terminat[e]" the tunnel project in a brazen act of political retribution, stating:

> Russell Vought is really terminating tremendous numbers of Democrat projects. This is not only jobs, I mean the project in Manhattan, the project in New York. It's billions and billions of dollars that Schumer has worked 20 years to get—it's terminated.

84.    Two days later, the President reiterated his political motivations:

> [W]hat we're doing is, we're cutting Democrat programs that we didn't want. . . . [W]e're cutting them permanently. We're cutting a $20 billion project that Schumer fought for 15 years to get, and I'm cutting the project. The project is gonna be dead. It is pretty much dead right now.

85.    And just a few days after that, the President declared:

> As of now, it's terminated. . . . And that's up to me. And as of now, it's terminated. It's terminated because the Democrats are so

> foolish—what they've done to the country. I mean, we have the hottest country in the world. There's no country even close. And they just want to do this. There's nothing for them to do. All they have to do is just say, 'let everything continue.' . . . Right now, there is no funding—because it's up to me.

86. Despite the President's comments, GDC continued to work with DOT. On October 21, GDC sent DOT the information that it had requested in its October 7 letter. GDC reaffirmed its commitment to "remain compliant with all applicable laws, regulations, and executive orders as promulgated," and noted that it had "beg[un] to undertake steps to comply with the IFR."

87. The Federal Government shutdown ended on November 13, but DOT did not resume funding to GDC, nor did it hold to its representation that the administrative review would be "quick."

88. DOT's justifications for the September 30 Suspension continued to evolve.

89. On December 1, DOT informed GDC that it had "completed its initial civil rights administrative review" of the Project. Now no longer citing the IFR as the basis for the September 30 Suspension, DOT for the first time invoked the prior version of the DBE regulations at 49 C.F.R. part 26 in effect at the time the grant agreement was concluded.

90. DOT claimed that GDC had violated those regulations because it had "presumed contractors qualified to be a [DBE] if it was women or black, Hispanic, Asian, Native American-owned" without ensuring that the contractors otherwise met the DBE requirements at 49 C.F.R. part 26. DOT noted that "[w]hile membership in a specific minority group previously provided a rebuttable presumption of social and economic disadvantage within the certification process, the business still had to undergo a review by a certifying body to ensure it met all other Federal eligibility standards."

91. DOT stated that it would resume funding to GDC upon its written commitment to taking two remedial actions to ensure its DBE contractors were properly certified, stating:

> DOT intends to resume funding disbursements for the Project if GDC certifies in writing within 30 days of receipt of this letter that it accepts and will abide by the conditions identified in this letter, and affirms it has terminated or will terminate within the time frame identified above any contracts or subcontracts that were awarded to DBE firms without GDC's or its prime contractors' confirmation that the firms had proper DBE certification under the version of 49 CFR part 26 in effect prior to October 3, 2025 or for which GDC does not provide substantiating proof to the Department.

92.     GDC quickly responded in a letter on December 8 and duly certified that it would "fully comply with 49 C.F.R. Part 26 and all applicable federal guidance," including taking the two remedial actions DOT had requested. GDC explained its processes for ensuring that contractors and subcontractors were properly DBE-certified and "committed to undertaking a thorough and exhaustive review of [its] DBE subcontractor population to ensure that each was properly certified."

93.     Despite GDC's compliance with DOT's December 1, 2025 directives, DOT did not resume reimbursements as promised. In fact, DOT never responded to GDC's December 8th letter.

94.     GDC followed up again on January 8, confirming that "no prime contractors were awarded contracts as a DBE" and that it had completed a review of its subcontractors and confirmed that all DBE subcontractors were properly certified as a DBE by a certifying program.

95.     As of today, DOT has still not responded.

96.     GDC has not received disbursements of any of its federal funding streams since October 1, 2025. In the time since October 1, it has used its operating budget and capital account, as well as available credit, to continue funding construction and procurement activity.

97.     On January 27, 2026, GDC announced that it would have insufficient funds to support continued construction on the Project and that contractors would need to suspend work on February 6, 2026, unless federal funding resumes before that date.

98.    When construction pauses, GDC will need to maintain and secure active construction sites. GDC is reserving a limited amount of funds to support these "pause" activities but does not have sufficient funds to continue this indefinitely without obtaining additional resources from the States.

99.    As recently as January 27, 2026, a White House spokesperson declared: "It's Chuck Schumer and Democrats who are standing in the way of a deal for the Gateway Tunnel Project by refusing to negotiate with the Trump administration." He added: "There is nothing stopping Democrats from prioritizing the interests of Americans over illegal aliens and getting this project back on track."

### F.  Injuries to the States

100.    Plaintiff States have suffered and will continue to suffer immense harm from DOT's September 30 Suspension. As Superstorm Sandy made clear, the existing tunnel (the NRT), a lifeline that supports approximately twenty percent of the nation's overall economy and that is particularly essential for Plaintiffs' economies, *is failing*.

101.    There is thus significant harm that stems simply from the suspension of the Project in a vacuum. But suspending the project now, after work has begun, has compounded the injuries.

102.    *First*, although GDC has reserved certain funds to support "pause" activities for a period of time, it cannot sustain this pause indefinitely without support from the States.

103.    Having exhausted other funding sources, GDC must stop active work on February 6, but cannot abandon the Project's many construction sites. To ensure compliance with applicable laws, avoid significant public safety and public health risks, protect against environmental hazards, and ensure that equipment does not fall into disrepair, GDC will still have to pay for certain services to secure and supervise the sites, like site security, maintenance of tunnel boring machines

and other equipment, renting of field offices, and utilities. This limited work costs millions of dollars per week given the massive scale of the Project.

104.    Nor can these costs be avoided by instead terminating construction altogether.  That would require even more money to ensure statutory compliance and mitigate public safety and environmental risks. Among other things, equipment would have to be removed and returned, sites cleaned and restored, and fencing and permanent security measures installed. Such a total demobilization process would cost tens of millions of dollars.

105.    Thus, the States will almost certainly have to incur financial obligations to maintain an active pause. And even if termination of the Project were a possibility, the States likely would have to pay for the costs of demobilizing, which would be hundreds of millions of dollars over one year.

106.    *Second*, although the vast majority of funds for GDC come from the Federal Government, the States already are providing and will continue to provide significant funds despite continued enforcement of the September 30 Suspension because of their financial obligations to GDC under other ancillary agreements.

107.    Most notably, the States are each responsible for paying one-third of GDC's operating costs. Those costs have already increased substantially as a result of the September 30 Suspension. In particular, GDC has incurred the cost of interest payments on the line of credit that it has been forced to draw down and has incurred increased costs for various services that are funded through its operating budget. In addition, because of the September 30 Suspension, there is a risk that interest payments will increase.

108.    The delay in Project completion resulting from the February 6 pause in construction activities will necessarily cause an increase in the total operating costs that the States must pay.

The obligation to pay operating costs terminates upon Project completion, so any extension of the overall timeline for Project completion will extend the period of time during which the States are required to pay operating costs—increasing their overall outlays.

109.   *Third*, suspension of work on the Project will cause a delay in the Project, and a continued suspension risks eventual termination—denying or delaying the benefits that the States sought and expected from their investments in the Project and imposing other collateral costs on the States.

110.   The Project, when combined with other Gateway Program projects, is intended to improve overall reliability and resiliency of critical rail service between New Jersey and New York, including for NJ Transit trains. Any delay in the Project will mean a delay in anticipated benefits to Plaintiff States.

111.   Without the Project, the 116-year old NRT remains at risk of system failures that could result in prolonged service disruptions. Those system failures would directly and immediately impact the ability to move passengers between New Jersey and New York, which would harm the States' economies—economies that rely on a significant workforce of tens of thousands of people from New Jersey and efficient transportation across the Northeast Corridor.

112.   Further, system failures could render the North River Tunnel entirely unusable, which would be catastrophic both because of the costs of repair and the economic damage caused by commuters being unable to access employment and education. This could even cause loss of life or injury if the tunnel loses complete structural integrity.

113.   Any delay in the Project will inevitably lead to more traffic on other public infrastructure in Plaintiff States. Plaintiff States will be responsible for the maintenance of roads

and public transportation that will have to carry the traffic that would have been in the new tunnel, if completed.

114.    NJ Transit has engaged in business planning based on the expectation that the Project would create expanded opportunities for rail service and enable the agency to better serve its goal of providing frequent, regular, and reliable transit for residents. Because the Project would reduce the likelihood of service disruptions that reduce ridership and fare revenue, the Project's completion is expected to result in more ridership and fare revenue than NJ Transit would have realized without the Project. Cancellation or even mere delay of the Project would disrupt and upend these business plans.

115.    *Fourth*, suspension of the Project would devalue State-owned property that was acquired specifically for the Project and prevent its usage for its intended purpose.

116.    Like many massive construction ventures, the Project required access to and occupancy of certain parcels. Under the relevant agreements, for example, NJ Transit is responsible for the acquisition of any New Jersey real estate necessary for the Project's construction efforts. As of September 2025, NJ Transit had acquired at least 115 parcels and easements.

117.    These parcels are in a wide range of locales, ranging from urban centers to wetlands. Many of the parcels—particularly those located in wetlands or other difficult-to-develop environments—have no value to NJ Transit aside from their role in the Project. If the September 30 Suspension continues, NJ Transit will ultimately have to (1) sell the parcels at a price lower than what it paid for them or (2) expend resources remediating and repurposing them to some other, non-contemplated use.

118.     *Fifth*, if the suspension of federal funding persists, the Plaintiff States risk losing the value of their considerable investments in the Project—hundreds of millions of dollars and years of staff time.

119.     New Jersey has invested nearly half a billion dollars into the Project and related efforts, including direct contributions to various construction projects and contributions to GDC's operating costs in 2023, 2024, and 2025. New York has likewise invested over one hundred million dollars into the Project, including its contribution to specific construction projects and its share of GDC's operating costs in 2023, 2024, and 2025.

## COUNT I

### Administrative Procedure Act
### 5 U.S.C. § 706(2) – Contrary to Law

120.     Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding paragraphs.

121.     Defendants include "agenc[ies]" under the APA. 5 U.S.C. § 551(1).

122.     DOT's September 30 Suspension is "final agency action" under the APA. 5 U.S.C. § 551(13).

123.     The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D).

124.     DOT has adopted by regulation OMB guidelines on the administration of federal grants set forth at 2 C.F.R. part 200. 2 C.F.R. § 1201.1.

125.     DOT's September 30 Suspension decision with respect to all grants, including the FRA-FSP grant, the FTA CIG grant, and the RAISE grant, was "not in accordance with law"

because it is directly contrary to 2 C.F.R. § 200.339, which establishes the terms by which granting agencies may interrupt funding to grant recipients. Specifically, this regulation establishes that where a grant recipient "fails to comply with the U.S. Constitution, Federal statutes, regulations, or terms and conditions" of the award, the granting agency may "implement specific conditions" to address those failures. *See* 2 C.F.R. § 200.339. Only once the granting agency has "determine[d] that noncompliance cannot be remedied by imposing specific conditions" can it take the more drastic measure of "[t]emporarily withhold[ing] payments." *Id.* § 200.339(a).  And even then, the agency may only withhold payments until a grant recipient "takes corrective action."  *Id*.

126.    DOT's September 30 Suspension decision was also contrary to 2 C.F.R. § 200.342, which requires that agencies give grant recipients an opportunity to appeal a remedy for noncompliance.

127.    DOT's September 30 Suspension decision is also contrary to 49 C.F.R. part 26, which, like Section 200.339, requires the FTA to have taken procedural steps that it did not take, and did not purport to take, before cutting off funding in its September 30 letter.

128.    By violating 2 C.F.R. § 200.339 and 49 C.F.R. part 26, DOT also acted "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

129.    For these reasons, Plaintiffs are entitled to an order vacating and enjoining the September 30 Suspension and declaring the Suspension unlawful.

## COUNT II

### Administrative Procedure Act
### 5 U.S.C. § 706(2) –Arbitrary and Capricious Agency Action

130.    Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding paragraphs.

131.    Defendants include "agenc[ies]" under the APA. 5 U.S.C. § 551(1).

132.    DOT's September 30 Suspension is "final agency action" under the APA. 5 U.S.C. § 551(13).

133.    The September 30 Suspension is arbitrary and capricious for several reasons.

134.    First, it is arbitrary and capricious because it was not "reasonable and reasonably explained." *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 417 (2021). The "reasoned explanation requirement of administrative law . . . is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019). Agencies may not rely on explanations that are "contrived" or "incongruent with what the record reveals about the agency's priorities and decisionmaking process." *Id.*

135.    Defendants did not offer any reasoned or reasonable explanation for their decision to suspend funding disbursements pending a compliance review. Nothing in the September 30 letter, or the IFR, explained why Defendants were imposing a sanction without a finding of non-compliance while simultaneously conducting a review to assess whether GDC was in compliance.

136.    The Federal Government also failed to consider and address the "serious reliance interests" engendered to "determine whether they [are] significant, and weigh [them] against competing policy concerns." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30, 33 (2020) (citation omitted). It must also consider alternatives to its change in position that are "within the ambit of the existing [policy]." *Id.* at 30 (citation omitted).

137.    Defendants also offered shifting and inconsistent rationales for implementing the September 30 Suspension decision, further confirming that the decision was arbitrary and capricious.

138.    The September 30 decision was also arbitrary and capricious because the Federal Government "has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Guertin v. United States*, 743 F.3d 382, 386 (2d Cir. 2014) (citation omitted). It is evident from the President's and White House's statements, as well as the timing and manner of DOT's ultimate suspension of funding, that this action was a politically motivated attempt to punish and coerce those with whom the President disagrees.

139.    Courts have long emphasized that agency actions are arbitrary and capricious when motivated, as here, by improper political influence emanating from the White House. *See, e.g.*, *Saget v. Trump*, 375 F. Supp. 3d 280, 360 (E.D.N.Y. 2019) ("[T]he evidence shows the White House exerted significant influence over Acting Secretary Duke when she made her TPS decision. . . . A TPS determination should not be a political decision made to carry out political motives. . . . Accordingly, Plaintiffs are likely to succeed in showing Secretary Duke's decision was arbitrary and capricious due to improper political influence."); *Tummino v. Torti*, 603 F. Supp. 2d 519, 544 (E.D.N.Y. 2009) (finding "pressure emanating from the White House" to be an improper basis for agency decisionmaking).

140.    Further, there is no suggestion that Defendants considered the contractual bases for termination or their statutory mandate and reached a reasoned determination prior to reversing course and suspending the federal funding for the Gateway Project, further supporting the conclusion that their action is arbitrary. *See, e.g.*, *Pol'y & Rsch., LLC v. U.S. Dep't of Health & Hum. Servs.*, 313 F. Supp. 3d 62, 83 (D.D.C. 2018) ("Under the most elementary precepts of administrative law, an agency has no choice but to provide a reasoned explanation for its

actions[.]"); *Green & Healthy Homes Initiative, Inc. v. Env't Prot. Agency*, 788 F. Supp. 3d 676, 703 (D. Md. 2025) ("The lack of any reasoned decision-making, or reasoned explanation, is compounded by the fact that the terminations reflect a reversal of EPA's prior policies under which these grants at issue were awarded.").

141.    For these reasons, Defendants have violated 5 U.S.C. § 706(2). Plaintiffs are thus entitled to an order vacating and enjoining the September 30 Suspension and declaring the Suspension unlawful.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray that this Court:

a.    Declare the September 30 Suspension and its implementation unlawful because it violates the APA.

b.    Vacate and set aside the September 30 Suspension and its implementation.

c.    Stay under Section 705 the September 30 Suspension and its implementation.

d.    Preliminarily and permanently enjoining Defendants from enforcing the September 30 Suspension and its implementation.

e.    Award the Plaintiff States their reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

f.    Grant other such relief as this Court may deem proper.

Date: February 3, 2026

Respectfully Submitted,

**JENNIFER DAVENPORT**
ACTING ATTORNEY GENERAL OF NEW JERSEY

By */s/ Jeremy M. Feigenbaum*
Jeremy M. Feigenbaum\*
  *Solicitor General*
Shankar Duraiswamy\*
  *Deputy Solicitor General*
Janine S. Balekdjian\*
Naima Drecker-Waxman\*
Jake Mazeitis\*
Amanda McElfresh\*
Amanda I. Morejón\*
Lauren E. Van Driesen
  *Deputy Attorneys General*

Office of the Attorney General
25 Market Street
Trenton, NJ 08625
Shankar.Duraiswamy@njoag.gov
(862) 350-5800

*Counsel for the State of New Jersey*

\*Pro hac vice application forthcoming

**LETITIA JAMES**
ATTORNEY GENERAL OF NEW YORK

By */s/ Rabia Muqaddam*
Rabia Muqaddam
  *Chief Counsel for Federal Initiatives*
Jessica Ranucci
  *Special Counsel*
Stephen Thompson
  *Special Counsel*

New York Office of the Attorney General
28 Liberty St.
New York, NY 10005
rabia.muqaddam@ag.ny.gov
(212) 617-8883

*Counsel for the State of New York*

29