## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

STATE OF NEW JERSEY and STATE OF NEW YORK,

      Plaintiffs,

      v.

U.S. DEPARTMENT OF TRANSPORTATION, *et al.*,

      Defendants.

No. 26-cv-939

---

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND STAY

---

## **TABLE OF CONTENTS**

**PAGE**

TABLE OF AUTHORITIES ................................................................. ii

INTRODUCTION ............................................................................... 1

BACKGROUND ................................................................................ 3

    A.  Hudson Tunnel Project. ...................................................... 3

    B.  Project Financing. ............................................................... 4

    C.  DOT's September 30 Suspension Decision And GDC's Suspension Order. ...... 5

ARGUMENT ...................................................................................... 8

  I.    THE STATES HAVE STANDING. ...................................... 8

  II.    THIS COURT SHOULD GRANT EMERGENCY RELIEF. ........................... 12

    A.  The States Are Likely To Succeed. .................................... 12

        1. DOT's September 30 Suspension Is Final Agency Action. ...................... 13

        2. DOT's September 30 Suspension Is Contrary to Law. ............................ 14

        3. DOT's September 30 Suspension Was Arbitrary and Capricious. .............. 19

    B.  The Equities Compel Preliminary Relief. ......................... 23

CONCLUSION ................................................................................... 25

LOCAL RULE 7.1(C) CERTIFICATE ............................................... 27

CERTIFICATE OF SERVICE .......................................... **Error! Bookmark not defined.**

# <u>TABLE OF AUTHORITIES</u>

PAGE(S)

**Cases**

*Accardi v. Shaughnessy*,
   347 U.S. 260 (1954) .................................................................................................. 15

*African Cmtys. Together v. Lyons*,
   799 F. Supp. 3d 362 (S.D.N.Y. 2025) ...................................................................... 15

*Air All. Houston v. EPA*,
   906 F.3d 1049 (D.C. Cir. 2018) .................................................................................. 8

*Am. Acad. of Pediatrics v. HHS*,
   No. 25-4505, 2026 WL 80796 (D.D.C. Jan. 11, 2026) ........................................... 22

*Am. Ass'n of Univ. Professors v. Trump*,
   No. 25-7864, 2025 WL 3187762 (N.D. Cal. Nov. 14, 2025) .................................. 17

*Anderson Grp. v. Saratoga Springs*,
   805 F.3d 34 (2d Cir. 2015) ....................................................................................... 10

*Backer ex rel. Freedman v. Shah*,
   788 F.3d 341 (2d Cir. 2015) ....................................................................................... 9

*Bennett v. Spear*,
   520 U.S. 154 (1997) .................................................................................................. 13

*Biden v. Nebraska*,
   600 U.S. 477 (2023) .................................................................................................. 11

*California v. Azar*,
   911 F.3d 558 (9th Cir. 2018) .................................................................................... 24

*Chicago v. DHS*,
   No. 25-5463, 2025 WL 3043528 (N.D. Ill. Oct. 31, 2025) ..................................... 22

*Crowley Gov't Servs., Inc. v. GAO*,
   38 F.4th 1099 (D.C. Cir. 2022) ................................................................................ 12

*Czyzewski v. Jevic Holding Corp.*,
   580 U.S. 451 (2017) .................................................................................................... 8

*Dep't of Com. v. New York*,
    588 U.S. 752 (2019) ............................................................................... 19, 22

*Dep't of Ed. v. California*,
    604 U.S. 650 (2025) ....................................................................................... 12

*DHS v. Regents of Univ. of Cal.*,
    591 U.S. 1 (2020) ............................................................................... 16, 18, 21

*Encino Motorcars v. Navarro*,
    579 U.S. 211 (2016) ....................................................................................... 21

*End Citizens United PAC v. FEC*,
    69 F.4th 916 (D.C. Cir. 2023) ....................................................................... 17

*Fed. Defs. of N.Y. v. Fed. Bureau of Prisons*,
    954 F.3d 118 (2d Cir. 2020) .......................................................................... 15

*Food Mktg. Inst. v. Argus Leader Media*,
    588 U.S. 427 (2019) ......................................................................................... 9

*FPL Energy Marcus Hook v. FERC*,
    430 F.3d 441 (D.C. Cir. 2005) ....................................................................... 21

*Guar. Co. of N. Am. v. Ikhana*,
    941 F.3d 1140 (Fed. Cir. 2019) ..................................................................... 10

*Guertin v. United States*,
    743 F.3d 382 (2d Cir. 2014) .......................................................................... 19

*Hartford Courant Co. v. Carroll*,
    986 F.3d 211 (2d Cir. 2021) .......................................................................... 12

*Harvard Coll. v. HHS*,
    798 F. Supp. 3d 77 (D. Mass. 2025) ............................................................. 22

*Int'l Bd. of Elec. Workers Loc. Union 351 v. Int'l Union of Operating Eng'rs*,
    No. 13-3712, 2013 WL 5719507 (D.N.J. Oct. 21, 2013) .............................. 10

*Iowa Utils. Bd. v. FCC*,
    109 F.3d 418 (8th Cir. 1996) ......................................................................... 24

*Jones v. Niagara Frontier Transp. Auth.*,
    524 F. Supp. 233 (W.D.N.Y. 1981) .............................................................. 24

iii

*Kathrein v. Evanston*,
    636 F.3d 906 (7th Cir. 2011) ........................................................................... 12

*La. Delta Serv. Corps v. Corp. for Nat'l & Community Serv.*,
    No. 25-378, 2025 WL 1787429 (M.D. La. June 27, 2025) ................................. 20

*Launch Alaska v. Dep't of Navy*,
    No. 25-141, 2025 WL 2223744 (D. Alaska Aug. 5, 2025) ................................. 15

*Louisiana v. Biden*,
    622 F. Supp. 3d 267 (W.D. La. 2022) ........................................................ 13, 14

*McMorris v. Carlos Lopez & Assocs.*,
    995 F.3d 295 (2d Cir. 2021) ............................................................................... 9

*Mendez v. Banks*,
    65 F.4th 56 (2d Cir. 2023) ............................................................................... 12

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ........................................................................................... 20

*MTA v. Duffy*,
    784 F. Supp. 3d 624 (S.D.N.Y. 2025) ........................................................ 24, 25

*Mulhern Gas Co. v. Mosley*,
    798 F. Supp. 3d 304 (N.D.N.Y. 2025) .............................................................. 11

*Murthy v. Missouri*,
    603 U.S. 43 (2024) ............................................................................................. 8

*Nemer Jeep-Eagle v. Jeep-Eagle Sales Corp.*,
    992 F.2d 430 (2d Cir. 1993) ............................................................................. 11

*New York v. Trump*,
    133 F.4th 51 (1st Cir. 2025) ............................................................................. 13

*NIH v. Am. Pub. Health Ass'n*,
    145 S. Ct. 2658 (2025) ..................................................................................... 12

*NLRB v. Nexstar Media*,
    133 F.4th 201 (2d Cir. 2025) ........................................................................ 13, 14

*Novin v. Fong*,
    No. 14-1218, 2014 WL 6956923 (N.D. Cal. Dec. 8, 2014) ............................... 11

*Ohio v. EPA,*
603 U.S. 279 (2024) ........................................................................... 19

*Pac. Gas & Elec. Co. v. United States,*
838 F.3d 1341 (Fed. Cir. 2016) ......................................................... 12

*Porwancher v. Nat'l Endowment for the Humanities,*
792 F. Supp. 3d 107 (D.D.C. 2025) ........................................ 15, 17, 18

*Regeneron Pharm. v. HHS,*
510 F. Supp. 3d 29 (S.D.N.Y. 2020) ................................................. 24

*SAM Party of N.Y. v. Kosinski,*
987 F.3d 267 (2d Cir. 2021) ............................................................. 25

*SEC v. Chenery Corp,*
332 U.S. 194 (1947) ......................................................................... 20

*Soc'y Hill Towers Owners' Ass'n v. Rendell,*
210 F.3d 169 (3d Cir. 2000) ............................................................. 12

*U.S. Army Corps of Eng'rs v. Hawkes Co.,*
578 U.S. 590 ..................................................................................... 13

*United States v. New York,*
708 F.2d 92 (2d Cir. 1983) ............................................................... 24

*United States v. Texas,*
599 U.S. 670 (2023) ........................................................................... 8

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,*
429 U.S. 252 (1977) ......................................................................... 10

*Washington v. DOT,*
792 F. Supp. 3d 1147 (W.D. Wash. 2025) ....................................... 11

*Washington v. U.S. Dep't of Com.,*
No. 25-1507, 2025 WL 2978822 (W.D. Wa. Oct. 22, 2025) ............ 15

*WBY v. Chamblee,*
155 F.4th 1242 (11th Cir. 2025) ...................................................... 11

*Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.,*
778 F. Supp. 3d 440 (D.R.I. 2025) ............................................. 13, 14

## Statutes

2019 N.Y. Laws ch. 108 ................................................................................................ 4

2019 N.Y. Laws ch. 108, § 2 ......................................................................................... 4

49 U.S.C. § 24101 (note) ............................................................................................... 4

5 U.S.C. § 705 ......................................................................................................... 12, 25

5 U.S.C. § 706 ......................................................................................................... 14, 15

N.J. Stat. Ann. 27:25-4 .................................................................................................. 11

N.J. Stat. Ann. 32:36 ....................................................................................................... 4

N.J. Stat. Ann. 32:36-2 .................................................................................................... 4

## Regulations

2 C.F.R. § 1201.1 .......................................................................................................... 15

2 C.F.R. § 200.339 ................................................................................................... passim

2 C.F.R § 200.342 ..................................................................................................... 16, 18

49 C.F.R. § 26.103 ......................................................................................................... 18

90 FR 47969-02 ......................................................................................................... 5, 20

## Other Authorities

*WATCH: People 'we want paid' in shutdown will be, Trump says* at 01:09–01:31, PBS NewsHour

(Oct. 15, 2025), https://tinyurl.com/r3axbsh ............................................................ 6

# INTRODUCTION

Superstorm Sandy revealed that a critical infrastructure lifeline between New York and New Jersey—the North River Tunnel—was in significant disrepair. Roughly 200,000 rail passengers use it every day. Because the failure or closure of that tunnel would wreak havoc on the regional economy, to the tune of $100 million *per day*, federal and state officials called for a "Gateway" Program over a decade ago to construct a new tunnel for the region. In 2019, the Gateway Program came to life with the Hudson Tunnel Project ("Project") at its core. The Project—the subject of this lawsuit—will build a new tunnel and reconstruct the original tunnel. The Federal Government awarded enormous sums for the Project to the Gateway Development Commission ("GDC"), a bi-state agency created by New York and New Jersey statutes.

Over the following five years, federal agencies obligated roughly $15 billion in funding under federal laws designed to ensure the safety, reliability, and resiliency of core infrastructure—a sure sign of the Project's critical importance to the economy, the States, workers, and the region. But everything changed on the eve of a government shutdown when the U.S. Department of Transportation ("DOT") announced its decision on September 30, 2025, to indefinitely suspend payment of all Project funds pending a newly-announced compliance review ("September 30 Suspension"). DOT's decision came without warning, and the agency's explanations for its decision have shifted repeatedly. But despite DOT's shifting or opaque reasons, one thing has remained true for months: DOT has consistently implemented and refused to reconsider its decision that "no further disbursements" to the Project could be made. The reason is clear: whatever DOT's shifting official reasons, statements by the President and other officials tell the true story—DOT suspended Project funding to punish New York officials for opposing unrelated Presidential demands.

The September 30 Suspension was flagrantly unlawful under the Administrative Procedure Act. First, Defendants acted contrary to federal regulations that establish precisely whether, when,

and how agencies can suspend disbursements of obligated grants. Especially given the severe impact a funding freeze would have on a core infrastructure project that is already underway, federal rules ensure that agencies can implement funding suspensions only if they find a recipient in violation of the law and find that no corrective conditions could remedy the issue—findings that DOT did not make, and could not have made here. And second, DOT's decision to suspend all Project funding was arbitrary and capricious, because an agency cannot decide to upend a massive project, and harm the States, economies, businesses, and livelihoods that depend on it, without giving any reasons, then giving shifting and invalid reasons, and then giving pretextual reasons—all to mask a decision made for unrelated political purposes to punish political rivals.

New York and New Jersey urgently require relief. One week ago, GDC issued notices to contractors stating that all Project work must cease February 6—three days away—when funding for active construction runs dry. The work stoppage will inflict immediate and severe harms on GDC, the States, and nearly 1,000 workers employed on the project who will lose their jobs. But while GDC has brought a breach of contract suit seeking monetary damages in the Court of Federal Claims for GDC's harms resulting from the breach of DOT's funding agreements, that action will not remedy the distinct injuries that the States suffer as a result of DOT's decision to violate federal regulations and the APA by imposing an indefinite funding suspension. The Suspension will defer, until some unknown time, a critical economic lifeline for the region. It will upend the massive financial investments the States themselves have put into the Project. And it will require the States themselves to expend millions more simply to abate the serious public safety threats that pausing construction sites midstream presents to residents within their sovereign territory.

This Court should grant preliminary relief enjoining implementation of DOT's September 30 decision to indefinitely halt all Project funding. And to forestall the chaos that will otherwise

ensue on February 6, it should grant a fourteen-day TRO to permit this Court a reasonable time to adjudicate the preliminary injunction motion.

## **BACKGROUND**

### A.    **Hudson Tunnel Project.**

The Hudson River rail crossing between northern New Jersey and New York City is a vital economic lifeline for the entire Northeast region. Ex. 3 at 1-5.[1] It serves Amtrak intercity passenger trains traversing through the heavily-populated northeast corridor between Washington, D.C. and Boston, and NJ Transit commuter trains, shuttling 200,000 passengers between New Jersey and New York each day. *Id.* at 1-5, 1-6. Currently, all Hudson River rail traffic is confined to the North River Tunnel ("NRT"), a single tunnel that began service in 1910. *Id.* at 1-9. Its age and "antiquated standards" have long led to "suboptimal" rail service, *id.*, prompting Amtrak to propose the "Gateway" program in 2011 to improve rail service and create a new rail tunnel. Ex. 4.

The need to improve Hudson River rail reliability took on renewed urgency following Superstorm Sandy in 2012. The storm flooded the NRT with millions of gallons of saltwater, accelerating deterioration of the tunnel's concrete, electrical systems, and mechanical components, and creating an urgent need for "a comprehensive reconstruction of the tunnel." Ex. 3 at 1-5. Residual chlorides from seawater degraded the track and tunnel walls, resulting in "short circuits [of] the track," and "frequent delays due to component failures within the tunnel." *Id.* at 1-10. The "poor condition" of the tunnel and ongoing "emergency maintenance" needs have already "disrupt[ed] service for hundreds of thousands of rail passengers throughout the region." *Id.* at 1-5. And a failure or extended NRT closure would be economically catastrophic, potentially costing the regional economy $100 million per day and affecting commuters, businesses, and travelers throughout the

---

[1] Citations to "Ex. _" refer to the exhibits to the Declaration of Stephen C. Thompson.

northeast corridor. Ex. 5. Without a new tunnel, experts have warned that Amtrak and NJ Transit would be forced to reduce service through the existing tunnel to a single track for extended periods during rehabilitation work, creating severe bottlenecks and potentially cutting rail capacity by 75 percent during peak commuting hours. *See* Ex. 6; Ex. 5. The Gateway Project is thus frequently cited as "the nation's most urgent infrastructure project." Ex 6.

### B.    Project Financing.

In 2019, New Jersey and New York entered into a bi-state compact to facilitate the "Gateway Program" to strengthen Hudson River rail service. *See* N.J. Stat. Ann. 32:36; 2019 N.Y. Laws ch. 108; 49 U.S.C. § 24101 (note). Seeking to "preserve the functionality and strengthen the resiliency of long-distance and commuter rail infrastructure" connecting them, the States established GDC to design, execute, and obtain funding for the Program. N.J. Stat. Ann. 32:36-2(a); 2019 N.Y. Laws ch. 108, § 2. A central feature of the Program was the creation of a new Hudson River tunnel and rehabilitation of the existing NRT (the "Hudson Tunnel Project," or "Project").

In 2021, the Federal Transit Administration ("FTA") and Federal Railroad Administration ("FRA") completed a favorable review of the Project, and in early 2022, the FTA qualified it for federal funding. Ex. 7. By early 2023, New Jersey, New York, GDC, and Amtrak had entered into a Project Development Agreement for the Project, including construction of the new tunnel, the rehabilitation of the NRT, and certain ancillary projects. Ex. 8. While GDC was tasked with Project development, design, and construction, each State committed to providing funding and services. *Id.* at 4.02, 4.03. New Jersey also committed to acquiring certain land needed for the new tunnel and engaging in certain remediation activities. *Id.* at 4.02, 7.02. In 2023, DOT awarded over $300 million in grants for two early stage projects, one in New Jersey and one in New York, that were both designed to facilitate the new tunnel. Exs. 9 and 10. Work began in late 2023.

Between July and September 2024, DOT component agencies granted or loaned to GDC about $15 billion in Project funding: (i) a $3.79 billion FRA grant, pursuant to Federal-State Partnership Program for the Northeast Corridor, (ii) a $6.88 billion FTA grant, (iii) a $25 million FTA grant, and (iv) more than $4 billion in Railroad Rehabilitation and Improvement Financing program loans from the Build America Bureau. Ex. 1 at ¶15; Ex. 2 at ¶10.

With billions of dollars in necessary Project funding from the Federal Government in hand, GDC proceeded to design and execute a series of interdependent projects to complete the Hudson Tunnel Project, including surface alignment and bridge and utility relocation in New Jersey, tunnel construction in New Jersey and Manhattan, Hudson River ground stabilization, tunnel construction under the River, rail construction in Manhattan, and NRT rehabilitation. Ex. 1 at ¶12; Ex. 2 at ¶12. A number of these projects are now under active site construction. *Id.* Those projects rely not only on federal funds, but on major state investments, including directly funding parts of GDC's operating budget, procuring parcels of land exclusively for Project use, and covering portions of the interest on private loans GDC procures. *See, e.g.*, Ex. 1 at ¶¶15, 17; Ex. 2 at ¶¶10,15.

### C.    DOT's September 30 Suspension Decision And GDC's Suspension Order.

On September 30, 2025, on the eve of a Federal Government shutdown, DOT informed GDC that "in conjunction with the issuance" of a new interim final rule ("IFR") that removed certain race- and sex-based presumptions from its Disadvantaged Business Enterprise ("DBE") program, DOT was "reviewing the projects it funds to ensure nondiscrimination." Ex. 11. The letter stated that "the review will commence immediately" and "[p]ending completion of the review, no further disbursements for the Project will be made." *Id*. DOT cited no authority for the decision to suspend all funding pending the compliance review. DOT published the IFR in the Federal Register days later. *See* 90 FR 47969-02 (Oct. 3, 2025).

On October 1, the Federal Government shut down as Congress failed to reach agreement on appropriations bills for FY2026. That had no effect on Project funding, which relies on funds already appropriated by Congress and obligated to GDC. But just hours after the shutdown commenced on October 1, OMB Director Russell Vought announced that the Administration was withholding "roughly $18 billion" for infrastructure projects, including the Hudson Tunnel Project, of importance to New York City—the home of Senate Minority Leader Schumer and House Minority Leader Jeffries. Ex. 12. A DOT press release confirmed that disbursements for the Hudson Tunnel Project "cannot be processed" and declared: "Thanks to the Chuck Schumer and Hakeem Jefferies shutdown, however, USDOT's review … will take more time. Without a budget, the Department has been forced to furlough the civil rights staff responsible for conducting this review." Ex. 13.

Throughout October, as the federal shutdown continued, President Trump made clear that he had decided to "terminat[e]" the Project for reasons unrelated to any compliance review:

> Russell Vought is really terminating tremendous numbers of Democrat projects. This is not only jobs, I mean the project in Manhattan, the project in New York. It's billions and billions of dollars that Schumer has worked 20 years to get—it's terminated.[2]

Two days later, he reiterated: "[W]e're cutting Democrat programs that we didn't want. ... We're cutting them permanently ... [w]e're cutting a $20 billion project that Schumer fought for 15 years to get, and I'm cutting the project. The project is gonna be dead. It's just pretty much dead right now." Ex. 14. Days later, the President declared the Project "terminated because the Democrats are so foolish," adding "there is no funding—because it's up to me." Ex. 15.

Funding has remained frozen, notwithstanding that GDC has speedily responded to all requests it has received from DOT. On October 2, just two days after DOT announced its review and

---

[2] *WATCH: People 'we want paid' in shutdown will be, Trump says* at 01:09–01:31, PBS NewsHour (Oct. 15, 2025), https://tinyurl.com/r3axbsh.

decision to suspend funding, GDC wrote to DOT acknowledging receipt and stating that it "looks forward to working with [DOT] on this review." Ex. 16. Despite DOT's claim that it could not conduct its review during the shutdown, it followed up on October 7 requesting more information from GDC. Ex. 17. GDC provided that information on October 21 and reaffirmed its commitment to "remain compliant with all applicable laws, regulations, and executive orders." Ex. 18.

On December 1, DOT announced that it had "completed its initial civil rights administrative review" of the Project. Ex. 19. Shifting course, DOT abandoned any reference to the IFR and for the first time suggested GDC violated *previous* DBE regulations by failing to ensure contractors met certain DBE requirements. *Id*. DOT asked GDC to commit to two remedial actions, adding that it "intends to resume funding disbursements for the Project if GDC certifies in writing within 30 days of receipt of this letter that it accepts and will abide by the conditions identified in this letter, and affirms that it has terminated or will terminate within the time frame identified above any contracts or subcontracts that were awarded to DBE firms" contrary to law. *Id*. at 2.

GDC promptly provided those certifications one week later, agreeing to "fully comply with 49 CFR Part 26 and all applicable federal guidance," including taking the remedial actions DOT requested. Ex. 20. GDC explained it is not a "DBE certifying agency," and that it relies on certifications others issue. *Id.* at 1–2. DOT neither responded to GDC's letter nor resumed funding disbursements. GDC followed up January 8, confirming "no prime contractors were awarded contracts as a DBE" and that its DBE subcontractors were properly certified. Ex. 21. DOT still has not responded, and it has continued to implement its September 30 Suspension.

To enable continued work on the Project, GDC drew down its existing line of credit with Bank of America, for which the States and Amtrak pay monthly interest. Ex. 1 at ¶¶21–22; Ex. 2 at ¶¶17–18. But that credit line has been severely depleted. Ex. 1 at ¶¶21,46. As a result, on January

27, GDC announced that it had notified contractors that they would need to suspend active con-
struction work on February 6. Ex. 1 at ¶49. Although GDC separately sued DOT in the Court of
Federal Claims for breaching the grant and loan agreements GDC and DOT signed, the States did
not sign those agreements and yet suffer distinct and significant harms from DOT's September 30
Suspension of all Project funds. And in any event, that Court has no procedures for awarding
injunctive or emergency relief that the States require.

## ARGUMENT

## I.    THE STATES HAVE STANDING.

Plaintiffs have standing to challenge DOT's decision to indefinitely suspend Project fund-
ing because they have suffered an independent "injury in fact caused by the defendant and redress-
able by a court order," *United States v. Texas*, 599 U.S. 670, 676 (2023), separate from the harms
GDC has suffered. "At the preliminary injunction stage" the plaintiff must merely show it "likely"
has standing. *Murthy v. Missouri*, 603 U.S. 43, 58 (2024).

The States face numerous independent Article III injuries from DOT's decision to suspend
all Project disbursements. *First*, the suspension triggers an imminent need for the States to commit
additional, unplanned resources—a classic pocketbook injury that gives rise to Article III standing.
*See Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464 (2017); *Air All. Houston v. EPA*, 906
F.3d 1049, 1059–60 (D.C. Cir. 2018) (finding "expenditures to mitigate and recover from harms"
from agency action show standing). GDC must stop active work on February 6 but cannot abandon
the Project's construction sites. Ex. 1 at ¶¶50, 58–59. To ensure compliance with applicable laws,
avoid serious public safety and health risks, protect against environmental hazards, and ensure that
equipment does not fall into disrepair, GDC will have to fund measures to secure and supervise
the sites, like site security, maintenance of tunnel boring machines and other equipment, rental of
field offices, and utilities. Ex. 1 at ¶¶58–59; Ex. 2 at ¶30. Even this limited work costs *millions* per

week given the scale of the Project, and once GDC's funds have been exhausted, the States will be forced to cover the costs of maintaining the inactive sites. Ex. 1 at ¶¶50–52, 63; Ex. 2 at ¶33. These costs on the States are the direct result of the September 30 Suspension. Nor could these costs be avoided by permanently shutting down the construction sites: that would require the States to supply even greater funds to ensure legal compliance and mitigate public safety and environmental risks. Ex. 1 at ¶¶67–69; Ex. 2 at ¶30–33. Equipment would have to be removed and returned; sites cleaned and restored; and fencing and permanent security measures installed. *Id.* This process would take nearly a year and cost tens of millions of dollars. Ex. 1 at ¶68; Ex. 2 at ¶33.

One way or another, the States will need to foot the bill for securing these active construction sites. They will either need to pay the costs or backstop the repayment of a private loan. Ex. 1 at ¶¶50–52, 63; Ex. 2 at ¶33. So because DOT's action "would cause [the plaintiffs] *some* financial injury," the States have independent Article III injuries. *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 433 (2019). Nor are these economic injuries the kind of "self-inflicted" harms that defeat standing. *Backer ex rel. Freedman v. Shah*, 788 F.3d 341, 344 (2d Cir. 2015). The States have no alternative: construction sites cannot be abandoned without posing overwhelming public safety and environmental hazards, and GDC will run out of money in the near future, so the States must pay to secure the sites, or incur the costs of a takedown, at sites within their sovereign territories.

Although those costs suffice to show standing, there is more. As the funding suspension drags on, the States face a "substantial risk," *McMorris v. Carlos Lopez & Assocs.*, 995 F.3d 295, 300 (2d Cir. 2021), that GDC's lenders could invoke provisions in GDC's financing agreements that increase interest payments—requiring the States to pay millions more each month. Ex. 1 at ¶¶54,57. And apart from these immediate costs, delay in Project completion will force the States

to incur greater operating costs prospectively. Ex. 1 at ¶¶53–57; Ex. 2 at ¶¶16, 30–32. The States are responsible for the majority of GDC's operating costs, including salaries, office space, and administrative expenses, some of which is ineligible for federal reimbursement. Ex. 1 at ¶57; Ex. 2 at ¶¶16–17. Those costs continue until the Project is completed or terminated, meaning delays in completion from the continued implementation of the September 30 Suspension will result in greater unreimbursable operating costs over the long-term—costs the States can never recover. *Id.*

*Second*, there is a substantial risk that the September 30 Suspension will deprive the States of the value of their investments. A loss of "up-front economic expenditures on a detailed developmental proposal for a specific piece [or pieces] of property" imposes injury. *Anderson Grp. v. Saratoga Springs*, 805 F.3d 34, 46 (2d Cir. 2015). Here, the States expended "[millions] of dollars on the plans for [a public works project]." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 262 (1977); *see* Ex. 1 at ¶17; Ex. 2 at ¶¶15–18 (detailing state investments). If the September 30 Suspension persists and the Project cannot continue, the States will lose the benefits of their investments. And even if the Project restarts, delay imposes outsized economic consequences that the States never expected when they made their investments. Ex. 1 at ¶73; Ex. 2 at ¶33. A "massive" infrastructure project that "costs millions of dollars, lasts years, and involves hundreds of workers and many unions" is particularly susceptible to "highly detrimental" impacts of "work stoppages and interruptions." *Int'l Bd. of Elec. Workers Loc. Union 351 v. Int'l Union of Operating Eng'rs*, No. 13-3712, 2013 WL 5719507 (D.N.J. Oct. 21, 2013); *see also Guar. Co. of N. Am. v. Ikhana*, 941 F.3d 1140, 1149 (Fed. Cir. 2019) (Wallach, J., concurring) (delays in public works projects could "be problematic, expensive, and even dangerous"). This harm to settled expectations is an "economic injury" stemming from DOT's "refusal" to follow the law governing these Project funds. *Arlington Heights*, 429 U.S. at 262.

*Third*, interruption of the Project—either delay or cancellation—will injure the States' proprietary interests. Because NJ Transit is a public "corporation" that was "constituted as an instrumentality of the State," N.J. Stat. Ann. 27:25-4, impairment of its interests inflicts "injury-in-fact" on the State. *Biden v. Nebraska*, 600 U.S. 477, 489–494 (2023) (injuries to "instrumentality" constituted as a "public corporation" conferred Article III standing on State). Here, NJ Transit has an obvious interest in the prompt and successful completion of the Project; its very purpose is to increase the reliability of passenger rail service across the Hudson Tunnel. *See supra* at 3. Expanded train service will permit NJ Transit to better fulfill its charge of providing frequent and regular transit for residents. Ex. 22 at 13. Cancellation or delay would cause "disruption" of its "long-term business strategies." *Mulhern Gas Co. v. Mosley*, 798 F. Supp. 3d 304, 322–23 (N.D.N.Y. 2025); *Nemer Jeep-Eagle v. Jeep-Eagle Sales Corp.*, 992 F.2d 430, 435 (2d Cir. 1993) ("Major disruption of a business … can constitute irreparable injury"); *Washington v. DOT*, 792 F. Supp. 3d 1147, 1168 (W.D. Wash. 2025) ("disrupted business expectancies" constitute injury, especially where "freeze of expected funding has pulled the rug out from under" the entity, "leaving [it] with partially completed, partially funded infrastructure projects").

Plus, a "shovels down" order would deprive NJ Transit of the "economic use of [its] property" acquired for the Project. *WBY v. Chamblee*, 155 F.4th 1242, 1259 (11th Cir. 2025). NJ Transit agreed to procure certain real estate necessary for the Project's construction efforts, and as of September 2025, owns at least 115 parcels and easements. Ex. 1 at ¶41. Many of the parcels that NJ Transit acquired had and have no value to it aside from their role in the Project. Ex. 1 at ¶¶42–43. Project suspension and potential cancellation thus stops NJ Transit from "us[ing its] property for its intended purpose," *Novin v. Fong*, No. 14-1218, 2014 WL 6956923, at *4 (N.D. Cal. Dec. 8, 2014), and causes "a demonstrable reduction in [the] market value" of that land, Ex. 1 at ¶43, all

recognized harms. *See Kathrein v. Evanston*, 636 F.3d 906, 914–15 (7th Cir. 2011); *Soc'y Hill Towers Owners' Ass'n v. Rendell*, 210 F.3d 169, 176–77 (3d Cir. 2000).[3]

## II.    THIS COURT SHOULD GRANT EMERGENCY RELIEF.

The States need emergency relief urgently. To obtain a TRO or PI, movants must establish sufficient likelihood of success and satisfy the non-merits factors—irreparable harm, balance of the equities, and public interest. *Hartford Courant Co. v. Carroll*, 986 F.3d 211, 223 (2d Cir. 2021). If the balance of equities tips decidedly toward the movant, "sufficiently serious questions going to the merits to make them a fair ground for litigation" suffice for relief. *Mendez v. Banks,* 65 F.4th 56, 63 (2d Cir. 2023). The APA also allows courts to stay "agency action" to "prevent irreparable injury." 5 U.S.C. § 705. The merits and equities both compel relief.

### A.    The States Are Likely To Succeed.

New York and New Jersey will prevail because DOT's decision to indefinitely suspend payments for the Project through the conclusion of a compliance review violated the APA in multiple, independent ways. DOT's decision to indefinitely suspend Project funding was a final agency action. Its decision was contrary to law. And it was arbitrary and capricious to boot.

---

[3] The Tucker Act, which gives the Court of Federal Claims "exclusive jurisdiction" over certain contractual claims by a contracting party against the Federal Government, is no bar to this Court's jurisdiction because the States are not signatories to the funding agreements between DOT and GDC. *See Pac. Gas & Elec. Co. v. United States*, 838 F.3d 1341, 1346 (Fed. Cir. 2016). That distinguishes this case from the Supreme Court's recent emergency docket rulings in which it held challenges to grant terminations by direct grant recipients had to be brought in the Claims Court. *Dep't of Ed. v. California*, 604 U.S. 650, 651 (2025); *NIH v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2660 (2025). And regardless, the States' lawsuit is not barred by the Tucker Act because it is not "founded ... upon" a contract. *APHA*, 145 S. Ct. at 2661 (Barrett, J., concurring). The States do not contend that DOT violated the terms of a particular agreement or seek "prototypical contract remed[ies]" of monetary damages or specific performance. *Crowley Gov't Servs., Inc. v. GAO*, 38 F.4th 1099, 1110 (D.C. Cir. 2022). They only ask that, if the federal agencies believe a suspension of Project funding is merited, they adhere to 2 C.F.R. § 200.339 and make any such decision (other the one announced on September 30) based on reasoned decisionmaking. *See infra* at 12–23.

1.    **DOT's September 30 Suspension Is Final Agency Action.**

DOT's decision to indefinitely suspend Project funding pending completion of its regulatory review was a final agency decision with immediate and lasting consequences, as funding has been suspended for four months and counting. Courts have held that decisions to halt federal disbursements are final agency action subject to judicial review. *See, e.g.*, *New York v. Trump*, 133 F.4th 51, 66–68 (1st Cir. 2025) (holding agency actions to implement "categorical funding freezes without regard and contrary to legal authority" pursuant to rescinded OMB guidance were final); *Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, 778 F. Supp. 3d 440, 467 (D.R.I. 2025) (determining plaintiffs had "a strong likelihood of proving that the funding freezes constitute final agency action" and emphasizing "[a] breadth of caselaw supports this conclusion," including "an emerging consensus of district courts recently hearing cases about different aspects of federal funding freezes"); *Louisiana v. Biden*, 622 F. Supp. 3d 267, 291–92 (W.D. La. 2022) (identifying myriad cases where temporary suspensions were final agency action).

Indeed, DOT's decision to indefinitely suspend Project funds falls well within the APA's "generous review provisions" for final agency actions. *Bennett v. Spear*, 520 U.S. 154, 163 (1997). The APA's "pragmatic" finality test, *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599 (2016), demands only two conditions be met: the action should (1) "mark the consummation of the agency's decisionmaking process," and (2) it should determine "rights or obligations" or be an action "from which legal consequences will flow," *Bennett*, 520 U.S. at 177–78; *NLRB v. Nexstar Media*, 133 F.4th 201, 204 (2d Cir. 2025). As to the former, there is no doubt that DOT has "arrived at a definitive position on the issue." *Nexstar*, 133 F.4th at 204. DOT made a final call to suspend funds: its September 30 letter stated in express terms that "[p]ending completion of the review, no further disbursements for the Project will be made." Ex. 11; Ex. 13 (October 1 release reiterating "project reimbursements cannot be processed"); *Woonasquatucket*, 778 F. Supp. 3d at 468 (finding

finality because "there [were] no further steps the agencies need[ed] to take to determine whether they [would] freeze th[e] funding"). While DOT's regulatory review itself remains ongoing and DOT has not expressed a final conclusion as to GDC's compliance, none of that is challenged here. The challenge here is only to the September 30 Suspension—a decision DOT expressed with no tentativeness and implemented immediately, and with no opportunity for GDC to seek further review. *See Louisiana*, 622 F. Supp. 3d at 292 ("'[F]inal agency action' does not have to be defined as permanent to be considered final."). That decision was definitive.

That final action also "directly affect[s] the parties." *Nexstar*, 133 F.4th at 204. The decision to merely engage in a DBE compliance review (not challenged here) may not have imposed any consequences on the ground, but the *independent decision* (challenged here) to suspend funding pending this indefinite review certainly did: "project reimbursements [could] not be processed" as of that time. Ex. 13 at 1. Put bluntly, "legal consequences surely flow, given that grant recipients cannot access previously awarded funds." *Woonasquatucket*, 778 F. Supp. 3d at 468. Especially here: as GDC explained on January 8, "[t]he pause in disbursements" had already "resulted in increased costs for the Project and any continuation will lead to GDC incurring additional costs and risks suspension of the Project"—a risk that has now fully materialized. Ex. 21. Because GDC has had to self-finance by drawing down its reserves and its credit line, DOT's decision to indefinitely withhold payments has already increased GDC's operating budget (which the States pay) from $56.382 million in FY2025 to $77.5 million in FY2026. Ex. 1 at ¶24. Where an agency's explicit decision to suspend funds pending completion of its indefinite "review" has already caused such catastrophic harm, its action is final and subject to review.

### 2.    DOT's September 30 Suspension Is Contrary to Law.

DOT's final decision to indefinitely suspend payments under three Project grants pending a regulatory review is contrary to law, 5 U.S.C. § 706(2)(A), and "without observance of procedure

required by law," *id.* § 706(2)(D). As a general matter, an agency acts contrary to law when it acts "contrary to existing valid regulations." *Accardi v. Shaughnessy*, 347 U.S. 260, 267–68 (1954); *Fed. Defs. of N.Y. v. Fed. Bureau of Prisons*, 954 F.3d 118, 130 (2d Cir. 2020) (holding party can sue under APA to "bring an agency's conduct into [regulatory] conformity"); *African Cmtys. Together v. Lyons*, 799 F. Supp. 3d 362, 386 (S.D.N.Y. 2025). That is fatal, because DOT's action indefinitely suspending funds contravenes 2 C.F.R. § 200.339. *See, e.g.*, *Porwancher v. Nat'l Endowment for the Humanities*, 792 F. Supp. 3d 107, 114–15 (D.D.C. 2025) (granting relief because agency likely "failed to comply with the process expressly required by the applicable regulations," including 2 C.F.R. § 200.339); *Launch Alaska v. Dep't of Navy*, No. 25-141, 2025 WL 2223744, at *8 (D. Alaska Aug. 5, 2025) (similar); *Washington v. U.S. Dep't of Com.*, No. 25-1507, 2025 WL 2978822, at *6–7, *12 (W.D. Wa. Oct. 22, 2025) (enjoining agency from terminating grants "except in accordance with the requirements set forth in the 2 C.F.R. Part 200").

Federal regulations limit whether and when a federal agency may freeze grant payments. OMB's uniform guidelines for federal awards, which DOT has adopted by regulation, 2 C.F.R. § 1201.1, provide that where a recipient "fails to comply with the U.S. Constitution, Federal statutes, regulations, or [award] terms and conditions," the agency may "implement specific conditions" to address such failures. 2 C.F.R. § 200.339. They then lay out a series of more drastic measures the agency may take, only "[w]hen" the agency "determines that noncompliance cannot be remedied by imposing specific conditions." *Id.* At that point, the agency "may take one or more" other remedial actions, including "temporarily withhold[ing] payments until the recipient or subrecipient takes corrective action." *Id.* The rules thus set up a multi-step process where interrupting federal funding streams is only ever the last resort: the agency must first determine that an act of

noncompliance occurred; then assess whether it can remedy noncompliance through added conditions; and only temporarily withhold funds if it determines imposing new conditions would not suffice—and even then, only until a recipient takes corrective action. Moreover, "[u]pon initiating a remedy for noncompliance … the Federal agency must provide the recipient with an opportunity to object and provide information challenging the action." *Id.* § 200.342.

DOT breached these requirements at every stage. First, DOT commenced the suspension without making any finding of a violation—the most basic and fundamental of Section 200.339's requirements. DOT imposed the suspension simultaneously with announcing a *review* of whether GDC was compliant with applicable rules.[4] See Ex. 11 (announcing on September 30 that DOT is "commenc[ing]" a compliance "review," including of "the Hudson Tunnel Project," and "[p]ending completion of the review, no further disbursements for the Project will be made"). Federal law prohibits this "shoot first ask questions later" approach: Section 200.339 is explicit that an agency may take remedial actions only where it first determines that a recipient "fail[ed] to comply" with applicable laws, not when it merely initiates a compliance inquiry.

DOT's December 1 follow-up letter to GDC only worsened the legal violations. That letter expressed DOT's concerns, based on an "initial civil rights administrative review," that there were deficiencies with GDC's process for selecting contractors. Ex. 19 at 1–2. Even assuming this letter could constitute a noncompliance finding sufficient under Section 200.339, DOT's post hoc assertion cannot justify the policy choice that it already made—by then in effect over two months—to suspend all Project funding. *See, e.g.*, *DHS v. Regents of Univ. of Cal.*, 591 U.S. 1, 20–24 (2020)

---

[4] As already detailed above, for purposes of this case, New York and New Jersey are not challenging the underlying DBE rules; the decision to initiate a regulatory review to assess GDC's compliance; or DOT's statements regarding GDC's potential noncompliance with DBE regulations. The States challenge only the independent policy decision to freeze funding indefinitely while the review proceeds.

(citing "foundational principle of administrative law that judicial review of agency action is limited to the grounds that the agency invoked when it took the action" and holding "the basic rule here is clear: An agency must defend its actions based on the reasons it gave when it acted."); *End Citizens United PAC v. FEC*, 69 F.4th 916, 921–23 (D.C. Cir. 2023) (same). Because DOT adopted a final policy of freezing Project funding based on initiation of a regulatory review, it cannot pretend it was based on a later finding of noncompliance.

That said, even assuming—contra *Regents*—that the December 1 letter offers the operative decisionmaking for a September 30 action, it still contravenes the regulations. DOT did not "determine[] that noncompliance cannot be remedied by imposing specific conditions" as required to halt disbursements. 2 C.F.R. § 200.339; *see Am. Ass'n of Univ. Professors v. Trump*, No. 25-7864, 2025 WL 3187762, at *28 (N.D. Cal. Nov. 14, 2025) (stating that Section 200.339 could not be a basis for grant termination where agency had "not shown any unremedied failure to comply with federal law"); *Porwancher*, 792 F. Supp. 3d at 114 (finding likely success in APA suit because "notice was supposed to indicate 'that noncompliance cannot be remedied by imposing additional conditions' on the award … [i]t didn't"). Nor could DOT have concluded that any "noncompliance cannot be remedied" by conditions, since its letter instead asked GDC to "commit to taking" specified steps, and represented that DOT would "resume funding disbursements for the Project if GDC certifies in writing within 30 days … that it accepts and will abide by th[os]e conditions." Ex. 19 at 2. And GDC did precisely that: one week later, it committed to taking the exact actions that DOT demanded. Ex. 20 at 1; Ex. 21. So DOT promised its concerns could be fixed with certain actions, and GDC took those steps—the opposite of finding noncompliance that "cannot be remedied."

17

Further, even if DOT's December 1 letter somehow justified a funding termination, at the very least DOT's authority to withhold funds terminated upon GDC's taking the sole "corrective action" the letter sought on December 8. *See* 2 C.F.R. § 200.339(a) (allowing an agency to "temporarily withhold payments until the recipient … takes corrective action"); Ex. 19 at 2 (December 1 letter confirming DOT intended to "resume funding disbursements" if GDC provided certifications). So even were it otherwise legally compliant, the December 1 letter could justify the freeze for no more than a week. *See* Ex. 20 at 1 (GDC's December 8 response agreeing to "actions enumerated" in DOT's letter). Yet DOT is still implementing its original September 30 Suspension of Project funds. Last, DOT unlawfully failed to provide any opportunity to appeal. *See* 2 C.F.R. § 200.342 ("agency must provide the recipient with an opportunity to object and provide information challenging the action"); *Porwancher*, 792 F. Supp. 3d at 114 (APA claim likely to succeed because agency "was supposed to provide [grantee] with a right to appeal").[5]

DOT's September 30 decision flagrantly violated the regulations governing when and how federal agencies can suspend disbursements of grant funds. The agency has withheld tens of millions in funding for four months even though DOT first failed to find that GDC had violated federal law, DOT made no determination that conditions could not remedy noncompliance, and GDC did exactly what DOT demanded as a condition of lifting the suspension.

---

[5] Nothing in the DBE regulations cited in the December 1 letter, 49 C.F.R. part 26, excuses compliance with 2 C.F.R. § 200.339. As a threshold matter, DOT did not even reference 49 C.F.R. part 26 until two months after it froze funds, precluding it from constituting the actual basis for its action. *See Regents*, 591 U.S. at 23. Moreover, 49 C.F.R. part 26, just like Section 200.339, requires DOT to have taken procedural steps that it did not take, and did not purport to take, before engaging in an enforcement action. Specifically, the regulations governing DBE enforcement actions under FTA programs permit DOT to "begin" enforcement only after (1) a "finding" of noncompliance; (2) an offer to begin "conciliation," and (3) the conclusion of the conciliation process. 49 C.F.R. § 26.103. DOT took no such steps before suspending Project funding.

### 3.    DOT's September 30 Suspension Was Arbitrary and Capricious.

The September 30 decision to indefinitely suspend all Project funding violates the APA in other ways too. DOT's final decision provided no cogent explanation for why it was suspending all Project funding pending a compliance review. Officials' repeated acknowledgement of the real purpose of the freeze instead reveals that the stated rationale was unlawfully pretextual.

"An agency action qualifies as arbitrary or capricious if it is not reasonable and reasonably explained." *Ohio v. EPA*, 603 U.S. 279, 292 (2024). "In reviewing an agency's action under that standard, a court … must ensure, among other things, that the agency has offered a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Id.* Action violates the APA if the agency "has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Guertin v. United States*, 743 F.3d 382, 386 (2d Cir. 2014). The APA extends as well to actions based on a "pretextual rationale," where there is a "significant mismatch" between stated reasons and actual decisionmaking. *Dep't of Com. v. New York*, 588 U.S. 752, 766, 783 785 (2019) (agencies must "offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public. Accepting contrived reasons would defeat the purpose of the enterprise.").

DOT's decisionmaking here was arbitrary and capricious for multiple independent reasons. Strikingly, DOT's initial September 30 Suspension failed to cite any "reasoned explanation" at all. DOT's letter announcing that decision to indefinitely suspend funding stated that the agency would be reviewing GDC's compliance with regulations, and declared that "no further disbursements for the Project would be made," but DOT gave *no* reason why funding had to be halted while assessing compliance. Ex. 11. DOT was not compelled to take this step: if regulations do not allow agencies

to suspend payments without a finding of noncompliance, *a fortiori* they do not require agencies to suspend payments at the start of an inquiry. *See supra* at 14–18. Nor is it clear why an agency would need to impose this penalty absent an actual determination of legal noncompliance. Continuing to fund the Project while an inquiry is underway does not impair DOT's ability to get information from GDC about compliance with DBE rules, nor did DOT suggest otherwise. And there is no evidence that DOT gave the slightest thought to the "serious reliance interests" imperiled by its abrupt about-face on funding, much less whether an alternative "within the ambit of existing policy" could accomplish the agency's goals without imperiling those interests—namely, to investigate and act at the end of its review. *Id.* Yet thanks to DOT's unreasoned suspension, millions of taxpayer dollars invested, land acquired, and contracts secured have been upended.

Although the September 30 letter claims DOT's review is being undertaken "[i]n conjunction" with a newly-issued IFR, Ex. 11, nothing in the IFR authorizes suspension of funding, nor does either the IFR or DOT's letter explain why a suspension would be necessary pending a simple review. Indeed, the IFR was not even published—and did not become legally effective—until three days later, yet the decision to suspend Project funding took effect immediately. 90 FR at 47969-02. In short, far from offering a "rational connection between the facts found and the choice made," *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), DOT offered no explanation, leaving States "compelled to guess at the theory underlying the agency's action," *SEC v. Chenery Corp*, 332 U.S. 194, 196–97 (1947). This is arbitrary and capricious. *See State Farm*, 463 U.S. at 58 (Rehnquist, J., concurring) (action was unreasoned because "agency gave no explanation at all."); *La. Delta Serv. Corps v. Corp. for Nat'l & Community Serv.*, No. 25-378, 2025 WL 1787429, at *28 (M.D. La. June 27, 2025) (same).

DOT's December 1 letter did not fix—and instead compounded—the arbitrary-and-capricious decision. The December 1 letter announced DOT's concerns regarding GDC's DBE program and asserted the agency's "inten[t] to resume funding disbursements … if GDC certifies in writing within 30 days … that it accepts and will abide by the conditions in this letter." Ex. 19 at 2. Initially, DOT's December 1 letter cannot supply the missing reasoning for a decision to freeze funding that DOT made September 30 and had been implementing for months. *See supra* at 5–8; *Regents*, 591 U.S. at 20–24. Nor does DOT's December 1 letter offer reasoned decisionmaking of its own: the letter merely linked the preexisting funding freeze to a request for certain commitments relating to DBE-related conditions, Ex. 19 at 2, which GDC provided one week later, Ex. 20 at 1. DOT did not resume payments as it said it would, nor respond with a deficiency in GDC's response; instead, DOT went radio silent. So the reasoning DOT's December 1 letter purported to offer cannot justify this freeze—an "[u]nexplained inconsistency" that renders its action arbitrary and capricious. *Encino Motorcars v. Navarro*, 579 U.S. 211, 222 (2016).

And taken together, the arbitrariness reflected in the September 30 and December 1 letters is even more apparent. An agency's "inability to settle on a single rationale" for why it has taken its final agency action is a strong indication that it "fail[ed] to engage in reasoned decisionmaking." *FPL Energy Marcus Hook v. FERC*, 430 F.3d 441, 448 (D.C. Cir. 2005). DOT's shifting explanations provide a stark example. DOT's first explanation claimed it was freezing this funding pending its review of the projects it funds "[i]n conjunction" with a new IFR. *See* Ex. 11. Months later, DOT suddenly offered a different reason: concerns based its "initial … review" regarding GDC's compliance with preexisting DBE regulations at 49 C.F.R. part 26, in effect well before the IFR was promulgated. Ex. 19 at 1–2. The shifting rationales underscore the lack of any clear "reasoned decisionmaking." *See FPL Energy*, 430 F.3d at 448; *see also*, *e.g.*, *Chicago v. DHS*, No. 25-5463,

2025 WL 3043528, at *24 (N.D. Ill. Oct. 31, 2025) (agency "provided no reasoned explanation" where it "changed the explanation used to support its decisions ... at least three times").

All of this requires invalidating DOT's indefinite funding suspension as arbitrary and capricious, but there is more: DOT cannot provide reasoned, consistent explanations because its alleged grounds are "pretext." *Dep't of Com.*, 588 U.S. at 780–83. The above discussion reveals a "significant mismatch" between DOT's "rationale" (the need for a regulatory compliance review) and DOT's action (indefinite funding suspension on all Project funds since September 30), a strong indication that its "explanation" is "incongruent" with its real reasoning. *Id.* at 783, 785; *Am. Acad. of Pediatrics v. HHS*, No. 25-4505, 2026 WL 80796, at *20 (D.D.C. Jan. 11, 2026) (agreeing that "implausible" explanations "only confirm suspicions" that actions are "retaliatory"). In such situations, this Court need not ignore the evidence that "speak[s] to Defendants' retaliatory motive in [suspending] funding," especially if "government officials spoke publicly and contemporaneously on these issues, including about their motivations, and those statements are flatly inconsistent with" the agency's public reasons. *Harvard Coll. v. HHS*, 798 F. Supp. 3d 77, 121–22 (D. Mass. 2025); *Dep't of Com.*, 588 U.S. at 781–82 (recognizing such analysis is warranted in narrow cases involving improper agency behavior). For good reason: courts are "not required to exhibit a naiveté from which ordinary citizens are free," *Dep't of Com.*, 588 U.S. at 785, and must ensure that the agency did not rely on factors Congress intended to be off the table.

The evidence is overwhelming that DOT's reason for suspending Project funding was to punish the Senate minority leader and House minority leader—who represent New York—as leverage for unrelated policy disputes and in retaliation for their refusal to accede to the President's budget. On the morning of October 1, the day the Federal Government shutdown began, the OMB Director boasted that "[r]oughly $18 billion in New York City infrastructure projects have been

put on hold." Ex. 12 at 2. DOT emphasized that it "issued letters to New York to inform them that their two mega projects—the 2nd Avenue Subway and Hudson Tunnel—are under administrative review," disrupting projects benefiting New York. Ex. 13 at 1. DOT even threatened its review would "take more time"—thus dragging out the newly announced decision to indefinitely suspend payments—because of "the Chuck Schumer and Hakeem Jeffries shutdown." *Id*. The President confirmed the true motivation was to terminate the Project—an acknowledgment consistent with DOT's continued implementation of its indefinite suspension, notwithstanding GDC swiftly taking each step DOT requested. On October 15, he praised Director Vought for "terminating tremendous numbers of Democrat projects," including "the project in Manhattan, the project in New York," which "Schumer has worked for 20 years to get." *Supra* note 2. He announced of the Project: "it's terminated." *Id*. Days later, discussing the shutdown, he confirmed: "We're cutting a $20 billion project that Schumer fought for 15 years to get, and I'm cutting the project. The project is gonna be dead. It's just pretty much dead right now." Ex. 14 at 2. He later declared Gateway was "terminated because the Democrats are so foolish—what they've done to the country." Ex. 15 at 6. As recently as January 27, the President's spokesperson stated that "Schumer and Democrats … are standing in the way of a deal for the Gateway Tunnel Project by refusing to negotiate with the Trump administration," and could "get[] this project back on track" if they "prioritiz[ed] the interests of Americans over illegal aliens," Ex. 23 at 3—language that makes no sense if the basis for the suspension is a pending DOT review regarding GDC's compliance with DBE rules. So for this reason too, the September 30 Suspension was arbitrary and capricious.

### B.    The Equities Compel Preliminary Relief.

Absent an order preventing DOT from continuing to enforce the September 30 Suspension, the States would suffer extraordinary and independent irreparable harm for many of the same reasons that they have standing. To begin, the financial injuries the States will incur are irreparable

because they cannot pursue any damages claims against the Federal Government. *See, e.g.*, *United States v. New York*, 708 F.2d 92, 93 (2d Cir. 1983) (affirming "pecuniary" loss was irreparable when action "to recover the damages" would be "barred by [sovereign immunity]"); *Regeneron Pharm. v. HHS*, 510 F. Supp. 3d 29, 39 (S.D.N.Y. 2020) (holding that if "a plaintiff cannot recover damages due to sovereign immunity, monetary loss may amount to irreparable harm"—and holding that this applies to APA challenges); *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018); *Iowa Utils. Bd. v. FCC*, 109 F.3d 418, 426 (8th Cir. 1996). The financial injuries are overwhelming, *see supra* at 8–12—and they begin accruing as soon as active construction work is suspended on February 6. Even if the Project is resumed, delay lengthens the timeline for completion, increasing operating costs the States must pay. Ex. 1 at ¶¶53–57; Ex. 2 at ¶¶30,32. A delay of even days would likely result in "costly repercussions" and "spill-over effects," adding millions to the States' obligations to GDC, which would need to operate for longer to complete the Project. *Jones v. Niagara Frontier Transp. Auth.*, 524 F. Supp. 233, 241 (W.D.N.Y. 1981); *see also MTA v. Duffy*, 784 F. Supp. 3d 624, 692 (S.D.N.Y. 2025) (irreparable harm exists if infrastructure projects "would be imperiled or at least delayed" by withholding of federal funding); Ex. 1 at ¶¶65–66; Ex. 2 at ¶30. Even worse, continued implementation of the September 30 Suspension creates a serious risk that GDC's lenders will increase the interest payments that the States are responsible for paying. Ex. 1 at ¶56. The States, independent of GDC itself, thus urgently need relief.

And the States' irreparable injuries will further pile up soon after the stop work order takes effect—exacerbating the need for swift relief. Once GDC imminently runs out of available funds, the States will have no choice but to cover the cost of site maintenance, lest they risk severe public safety and public health risks from the abandonment of active construction sites—costing millions of dollars. *See supra* at 8–9; Ex. 1 at ¶63; Ex. 2 at ¶33. And that is on top of the millions the States

already provided for critical aspects of the Project, all on the understanding that DOT would continue providing the necessary money it obligated. *Supra* at 9–12; Ex. 1 at ¶¶18–44, Ex. 2 at ¶¶16,18. In short, "irreparable harm exists where, in reliance on the Federal Government's approval of a program, a state makes substantial resource investments in planning for the implementation of that program, only to have that approval rescinded and the expectation interest that the state would be able to capitalize on those investments stymied." *Duffy*, 784 F. Supp. 3d at 692. So too here.

Finally, an injunction in this case undoubtedly vindicates the public interest. *See SAM Party of N.Y. v. Kosinski*, 987 F.3d 267, 278 (2d Cir. 2021) ("In a suit against the government, balancing of the equities merges into our consideration of the public interest."). Absent immediate relief, the impact on the region's economic interests will be severe, as contractors otherwise must wind down operations and begin laying off workers this Friday. Ex. 1 at ¶58, Ex. 2 at ¶¶30–31. Substantial delays could lead to the loss of up to 95,000 jobs—as well as $7.3 billion in annual GDP associated with completion of the Project. *See* Ex. 1 at ¶11; Ex. 24 at 6. And delay or cancellation of the Project will undermine the States' and region's short-term and long-term economic interests, as well as the safety of rail transportation under the Hudson River—as DOT has recognized. *See supra* at 3–5; *Duffy*, 784 F. Supp. 3d at 695–98 (finding, in a case concerning federal interference with transportation policy, injunction in the public interest). Each harm alone is sufficient to show that an injunction is in the public interest; together, the conclusion is inescapable.

## <u>CONCLUSION</u>

This Court should enter a TRO and/or preliminary injunction, and a stay under 5 U.S.C. § 705, barring DOT's continued implementation of the September 30 Suspension.

Date: February 3, 2026

Respectfully Submitted,

**JENNIFER DAVENPORT**
ACTING ATTORNEY GENERAL OF NEW JERSEY

By */s/ Jeremy M. Feigenbaum*
Jeremy M. Feigenbaum*
  *Solicitor General*
Shankar Duraiswamy*
  *Deputy Solicitor General*
Janine S. Balekdjian*
Naima Drecker-Waxman*
Jake Mazeitis*
Amanda McElfresh*
Amanda I. Morejón*
Lauren E. Van Driesen
  *Deputy Attorneys General*
Office of the Attorney General
25 Market Street
Trenton, NJ 08625
(862) 350-5800
Shankar.Duraiswamy@njoag.gov
*Counsel for the State of New Jersey*

*Pro hac vice application forthcoming

**LETITIA JAMES**
ATTORNEY GENERAL OF NEW YORK

By */s/ Rabia Muqaddam*
Rabia Muqaddam
  *Chief Counsel for Federal Initiatives*
Jessica Ranucci
  *Special Counsel*
Stephen Thompson
  *Special Counsel*

New York Office of the Attorney General
28 Liberty St.
New York, NY 10005
rabia.muqaddam@ag.ny.gov
(212) 617-8883

*Counsel for the State of New York*

26

## LOCAL RULE 7.1(C) CERTIFICATE

Pursuant to Local Civil Rule 7.1(c), the above-named counsel certifies that this memorandum complies with the word-count limitation of this Court's Local Civil Rules. As measured by the word processing system used to prepare it, this memorandum contains 8,690 words.