# EXHIBIT 8

EXECUTED VERSION

---

**PROJECT DEVELOPMENT AGREEMENT**
**for**
**HUDSON TUNNEL PROJECT**

among

GATEWAY DEVELOPMENT COMMISSION

THE STATE OF NEW JERSEY

THE STATE OF NEW YORK

and

NATIONAL RAILROAD PASSENGER CORPORATION

Dated as of February 3, 2023

---

TABLE OF CONTENTS

SECTION                                                                                                            PAGE

## ARTICLE I

### DEFINITIONS AND RULES OF INTERPRETATION

1.01   Definitions....................................................................................................................2
1.02   Rules of Interpretation ...............................................................................................2

## ARTICLE II

### PURPOSE AND SCOPE

2.01   Project Description......................................................................................................3
2.02   HTP Work....................................................................................................................3
2.03   Performance Requirements .........................................................................................4

## ARTICLE III

### DECISION MAKING AND GOVERNANCE

3.01   GDC Board. .................................................................................................................4
3.02   Senior Project Coordination Committee.....................................................................5
3.03   Technical Standards Committee. .................................................................................6
3.04   Advisory Working Groups...........................................................................................7

## ARTICLE IV

### ROLES AND RESPONSIBILITIES

4.01   GDC .............................................................................................................................7
4.02   State of New Jersey......................................................................................................8
4.03   State of New York........................................................................................................9
4.04   Amtrak .........................................................................................................................9
4.05   Representatives. ...........................................................................................................9

## ARTICLE V

### PROJECT DELIVERY

5.01   Executive Project Schedule.......................................................................................10
5.02   Project Plans..............................................................................................................11
5.03   HTP Delivery Strategy..............................................................................................11

## ARTICLE VI

### PROCUREMENT

6.01   Solicitation Procedure...............................................................................................11

6.02    Evaluation ...........................................................................................................13

## ARTICLE VII

## THIRD PARTY AGREEMENTS; RIGHT-OF-WAY

7.01    Third Party Agreements. ....................................................................................13
7.02    Right-of-Way and Real Property Interest Acquisition.......................................13
7.03    Right-of-Way and Real Property Interest Access ..............................................15

## ARTICLE VIII

## ENVIRONMENTAL COMPLIANCE; PERMITTING

8.01    NEPA Compliance...............................................................................................16
8.02    Permits ................................................................................................................16

## ARTICLE IX

## PROJECT BUDGETING

9.01    Responsibility for Developing and Maintaining Project Budget ......................17
9.02    Credit for Costs ..................................................................................................18

## ARTICLE X

## PROJECT REPORTING AND CONTROLS

10.01    Responsibility for Preparation and Maintenance of Records ...........................18
10.02    Public Records. ...................................................................................................19
10.03    Data Protection....................................................................................................20
10.04    Audit Procedures.................................................................................................20

## ARTICLE XI

## FUNDING AND FINANCING OBLIGATIONS

11.01    GDC Operating Funds .........................................................................................20
11.02    Financing..............................................................................................................20
11.03    Sources of Funding ..............................................................................................21
11.04    Funding Responsibilities......................................................................................21

## ARTICLE XII

## DESIGN AND CONSTRUCTION

12.01    Overall HTP Project Management.......................................................................26
12.02    Standards and Specifications...............................................................................26
12.03    Delegation of Code Compliance .........................................................................29
12.04    Roles and Responsibilities During Construction. ..............................................29

## ARTICLE XIII

### INSURANCE

13.01   Requirements and Scope ................................................................................................30

## ARTICLE XIV

### OPERATIONS AND MAINTENANCE

14.01   Post-Construction Ownership and Responsibilities ..........................................................31
14.02   Process and Sequence for Handover ................................................................................33

## ARTICLE XV

### DISPUTE RESOLUTION PROCEDURES

15.01   Dispute Resolution Procedures .......................................................................................35
15.02   Executive Level Consideration .......................................................................................36
15.03   Arbitration .......................................................................................................................36
15.04   General Requirements .....................................................................................................37

## ARTICLE XVI

### DEFAULTS AND REMEDIES

16.01   Events of Default ............................................................................................................37
16.02   Process. ...........................................................................................................................37
16.03   Payment Default Remedies .............................................................................................38

## ARTICLE XVII

### TERM AND TERMINATION

17.01   Term .................................................................................................................................38
17.02   Termination for Failure to Perform .................................................................................38
17.03   Termination ......................................................................................................................38

## ARTICLE XVIII

### REPRESENTATIONS AND WARRANTIES

18.01   Representations and Warranties ......................................................................................39

## ARTICLE XIX

### MISCELLANEOUS

19.01   Compliance with Laws ....................................................................................................39
19.02   Notices .............................................................................................................................39
19.03   Severability ......................................................................................................................41

19.04   Entire Agreement .................................................................................................41
19.05   Benefits of Agreement; Assignments ....................................................................41
19.06   Cumulative Remedies; No Waiver .........................................................................41
19.07   Amendments; Waivers ..........................................................................................41
19.08   No Partnership ......................................................................................................42
19.09   Counterparts and Electronic Signatures ...............................................................42
19.10   Personal Liability ..................................................................................................42
19.11   Several Liability ....................................................................................................42
19.12   Time is of the Essence ..........................................................................................42
19.13   Survival .................................................................................................................43

APPENDICES

  A        Definitions

## PROJECT DEVELOPMENT AGREEMENT

This Project Development Agreement (this "**Agreement**"), dated as of [●], 2022 (the "**Effective Date**"), is made among:

**GATEWAY DEVELOPMENT COMMISSION**, a public authority and a government sponsored authority by the State of New Jersey and the State of New York ("**GDC**");

**THE STATE OF NEW JERSEY** ("**New Jersey**");

**THE STATE OF NEW YORK** ("**New York**"); and

**NATIONAL RAILROAD PASSENGER CORPORATION**, a corporation established by the United States and organized under the laws of the District of Columbia ("**Amtrak**").

GDC, New Jersey, New York, and Amtrak are collectively referred to herein as "**Parties**" or in the singular each as "**Party**" as the context requires.

WHEREAS:

A.      To help ensure the functionality of intercity and commuter rail infrastructure between New Jersey and New York and throughout the Northeast Corridor (the "**NEC**"), New Jersey and New York created GDC through the enactment of parallel legislation by each state codified as the Gateway Development Commission Act (2019 N.Y. Sess. Laws ch. 108 (McKinney) and N.J.S.A. 32:36-1, et seq.) (collectively, the "**GDC Act**");

B.      Amtrak owns various segments of the NEC rail line that extends between Washington, D.C. and Boston, MA, maintains the segment of the NEC between Washington, D.C. and New York City, and operates intercity passenger rail service over the NEC;

C.      New Jersey Transit Corporation ("**NJ TRANSIT**") is an instrumentality of New Jersey and is authorized to operate commuter passenger rail service in New Jersey and between points in New Jersey and points in other states pursuant to the New Jersey Public Transportation Act of 1979, as amended;

D.      New Jersey may engage state agencies or instrumentalities, including NJ TRANSIT, to support New Jersey's roles and responsibilities hereunder;

E.      The Parties share a common concern to preserve the functionality and strengthen the resiliency of the intercity and commuter passenger rail infrastructure between New Jersey and New York, including passenger rail infrastructure owned, controlled, or utilized by Amtrak;

F.      Intercity and commuter passenger rail service and infrastructure is vital to the economies of New Jersey and New York;

G.      Due to the passage of time and damage caused by natural disasters, existing intercity passenger rail and commuter rail infrastructure, including the existing North River Tunnels, is at risk of system failures that could result in prolonged service disruptions that would severely damage the economies of New Jersey, New York, and many other participants in the national economy;

H.      The Parties recognize the urgent need to undertake projects necessary to rehabilitate intercity and commuter passenger rail infrastructure under the Hudson River, maintain current levels of intercity and commuter rail service between New York and New Jersey, and provide additional reliability, safety, and security as well as create redundant passenger rail capacity under the Hudson River;

I.      The Parties wish to enter into this Agreement in order to establish their respective roles and responsibilities with respect to the funding, financing, right-of-way acquisition, procurement, delivery, operation, and maintenance of the Hudson Tunnel Project (as further described in Section 2.02, the "**HTP**"); and

J.      As further described herein, the delivery of certain work packages of the HTP may be implemented pursuant to agreements with Supporting or Executing Partners (as defined in Section 3.02(a)), and such Supporting or Executing Partners may include Amtrak, the Port Authority of New York and New Jersey ("**PANYNJ**"), and NJ TRANSIT.

NOW, THEREFORE, in consideration of the covenants and conditions herein contained, the Parties hereby agree with each other as follows:

ARTICLE I

DEFINITIONS AND RULES OF INTERPRETATION

1.01    *Definitions*. Defined terms in this Agreement and in the Appendix hereto, which may be identified by the capitalization of the first letter of each principal word thereof, have the meanings assigned to them in Appendix A.

1.02    *Rules of Interpretation*.

(a)      In this Agreement and in the Appendix hereto, except to the extent that the context otherwise requires:

(i)      words and phrases not otherwise defined in this Agreement or in the Appendix hereto (A) that have well-known technical, insurance, or construction industry meanings shall be construed pursuant to such recognized meanings, and (B) of an accounting or financial nature shall be construed pursuant to generally accepted accounting principles in the United States, in each case considering the context in which such words and phrases are used;

(ii)      references to any document or agreement, including this Agreement and the Appendix hereto, shall be deemed to include references to such document or agreement as

amended, supplemented or replaced from time to time in accordance with its terms and (where applicable) subject to compliance with the requirements set forth herein and therein;

(iii)    references to an entity shall include its successors and permitted assigns;

(iv)    references to time and dates shall be deemed to refer to Eastern Time;

(v)    reference to any applicable law shall be deemed to include reference to such law as amended or supplemented from time to time;

(vi)    unless the context shall otherwise require, the words "hereto," "herein," "hereof," and other words of similar import refer to this Agreement as a whole;

(vii)    the use herein of the words "include" or "including," when following any general statement, term or matter, shall not be construed to limit such statement, term, or matter to the specific items or matters set forth immediately following such word or to similar items or matters, whether or not non-limiting language (such as "without limitation" or "but not limited to" or words of similar import) is used with reference thereto, but rather shall be deemed to refer to all other items or matters that fall within the broadest possible scope of such general statement, term or matter;

(viii)    the term "promptly" shall mean as soon as reasonably practicable under the facts and circumstances at the time; and

(ix)    headings are for convenience only and shall not affect the interpretation of this Agreement.

(b)    The relevant terms of this Agreement shall not be construed against the Party that prepared them, and the Parties waive any law with contrary effect that would otherwise be applicable in connection with the construction and interpretation of this Agreement.

ARTICLE II

PURPOSE AND SCOPE

2.01    *Project Description*. The HTP includes the development, design, and construction of a new two-tube tunnel connecting New York and New Jersey (the "**Hudson River Tunnel**") and certain ancillary facilities, the construction of the final segment of the concrete casing under western Hudson Yards in Manhattan, New York, the rehabilitation of the existing North River Tunnels, and certain projects necessary to connect such projects to the contiguous Amtrak NEC facilities. The HTP has been bundled in work packages as described in Section 2.02 (each an "**HTP Package**", and collectively, the "**HTP Packages**") to provide more efficient execution and delivery of the HTP.

2.02    *HTP Work*. The HTP includes the following HTP Packages:

(a)    the design and construction of the final segment of the concrete casing travelling diagonally beneath property owned by a private developer and the Long Island Rail

Road West Rail Yard and below the existing NYC Parks Department High Line Structure and terminating south of the High Line, within the West Rail Yard, along the north side of West 30th Street;

(b)    the design and construction of the tunneling and heavy civil work for the new Hudson River Tunnel;

(c)    the fit-out work for the new Hudson River Tunnel, including (i) the internal concrete for the ventilation shafts; (ii) the concrete for the track bed, benches, and ventilation duct walls in the tunnels; (iii) fan plant building structures and fit-outs; (iv) traction power, communications, and signal systems; and (v) track work along the entire alignment;

(d)    the design and construction of the New Jersey surface alignment work, including retaining walls, embankments, and viaducts to support the track bed in New Jersey;

(e)    the design and construction of a new highway tunnel bridge at Tonnelle Avenue; and

(f)    the work necessary to rehabilitate the existing North River Tunnels, and to address the causes of chronic unreliability and bring the North River Tunnels to a state of good repair, including: (i) bench wall and duct bank removal and reconstruction; (ii) replacement of the antiquated ballast track system to ballast-less track system; (iii) installation of new signal, communication, and power cables and associated components; and (iv) replacement of in-tunnel fire/life safety systems while maintaining all required systems and tunnel ventilation to protect construction workers during tunnel construction.

2.03    *Performance Requirements*. The Parties acknowledge and agree that it is the intent of the Parties that the HTP: (a) supports the existing level of service as of the Effective Date of 24 trains per hour (TPH) during the North River Tunnel rehabilitation, (b) supports a doubling of peak hour capacity to 48 TPH or more following completion of other infrastructure improvements such as those contemplated in the Gateway Program (as defined in the GDC Act), and (c) supports the provision of direct NJ TRANSIT service from all NJ TRANSIT rail lines, except for the Atlantic City Rail Line, including compatibility with existing NJ TRANSIT rail equipment and known future capital investments in rolling stock (e.g., multi-level multiple unit rolling stock), and fixed infrastructure (e.g., Gateway loop tracks and associated rail configurations), to the extent that such requirements are not inconsistent with the Record of Decision (as defined in Section 8.01(a)).

ARTICLE III

DECISION MAKING AND GOVERNANCE

3.01    *GDC Board.*

(a)    The Parties acknowledge that the composition and powers of the GDC Board of Commissioners (the "**GDC Board**") are as set forth in the GDC Act, as further specified in the Bylaws of the Gateway Development Commission, adopted by the GDC Board on or about March 5, 2021 as amended July 12, 2021, and as may be subsequently amended (the "**Bylaws**").

In accordance with the GDC Act, GDC shall have the power to facilitate the HTP. As further described herein, GDC shall be responsible for the development, design, and construction of the HTP. Actions referenced in this Agreement to be undertaken by the GDC Board shall be exercised in accordance with the GDC Act, the Bylaws, and all applicable GDC policies adopted by the GDC Board.

(b)     In accordance with Section 3.06 of the Bylaws, certain powers, authority, discretion, or obligations of the GDC Board may be delegated to an officer of GDC, to the extent that the GDC Board may deem appropriate. In accordance therewith, certain powers, authority, discretion, and obligations of the GDC Board hereunder have been delegated to the GDC CEO (or the GDC CEO's designee), as further set forth herein and in the applicable resolution(s) of the GDC Board delegating such authority. Decision making authority delegated to the GDC CEO under this Agreement shall be subject to the GDC CEO's fiduciary responsibilities to all of the Parties.

(c)     The committees established by the Parties pursuant to Sections 3.02 and 3.03 shall not be considered GDC committees as contemplated by Section 6.01 of the Bylaws, and, for the avoidance of doubt, shall not have the power to make decisions related to the HTP that are binding on the GDC Board. The GDC Board retains all powers and duties granted to the GDC Board pursuant the GDC Act (*see* 2019 N.Y. Laws, ch. 108, sections 2(6) and (7) and N.J.S.A. 32:36-7, 8) that are not explicitly delegated as described in Section 3.01(b), and the GDC Board will exercise all such powers and duties related to the HTP in accordance with the GDC Act, the Bylaws, and all applicable GDC policies adopted by the GDC Board.

3.02    *Senior Project Coordination Committee.*

(a)     *Establishment of the Senior Project Coordination Committee.* In order to facilitate adequate coordination among the Parties during development and delivery of the HTP, the Parties shall establish the Senior Project Coordination Committee ("**SPCC**") prior to the advertisement of the HTP's first construction package. The SPCC shall be initially comprised of one executive-level representative from each of GDC and Amtrak, and shall include one executive-level representative from any HTP user, operator, or other governmental entity partnering with GDC (e.g. Amtrak, PANYNJ, and/or NJ TRANSIT) (each a "**Supporting or Executing Partner**" or "**SEP**") that has been engaged to support delivery of an HTP Package pursuant to an agreement between GDC and such SEP (an "**SEP Agreement**") to the extent such SEP is not otherwise represented on the SPCC. Each of New Jersey and New York may elect to have an executive-level designee serve on the SPCC and attend any or all meetings and coordination activities of the SPCC. Each of New Jersey and New York may engage additional resources (including through state agencies or instrumentalities) to support participation in the SPCC as such state deems appropriate. As of the Effective Date, New Jersey anticipates designating an executive-level representative from NJ TRANSIT as the initial representative of New Jersey in the SPCC. Further identified representatives, agencies, and instrumentalities of each of New York and New Jersey may attend meetings of the SPCC and support the work of each state's designated representative as needed. The GDC CEO or the GDC CEO's designee shall act as chairperson of the SPCC. Upon establishment of the SPCC, each applicable Party shall promptly identify its representative, and an alternative representative in the event the representative is unavailable.

(b)    *SPCC Meetings.* The SPCC shall meet on a regular basis as the SPCC deems appropriate, but in no event less frequently than monthly, in order to facilitate its review and consideration of the HTP progress, HTP project budget ("**Project Budget**") updates, schedule updates, review of major project plans (including but not limited to the HTP Project Management Plan (the "**PMP**"), as described in Section 5.02), disputes as described in Article XV, and other HTP delivery issues. The SPCC shall coordinate information sharing as described in this Agreement in order to facilitate each Party's provision of the inputs required to fulfill reporting requirements as set forth in the PMP.

(c)    *SPCC Role.* The SPCC shall provide support and consultation in resolving issues prior to those issues becoming disputes as set forth in Article XV, but shall have no decision-making authority on behalf of the GDC Board.

(d)    *GDC CEO Reports.* The GDC CEO shall report to the GDC Board on issues considered by the SPCC, including any issue that results in time or cost impacts to the HTP on a monthly basis or an alternative frequency as determined by the GDC Board.

3.03    *Technical Standards Committee.*

(a)    *Establishment of the Technical Standards Committee.* In order to facilitate (i) resolution of technical issues related to the HTP as described in this Section 3.03 and Article XII, (ii) the establishment of and application of Design Standards and Specifications applicable to the HTP, and (iii) the consideration and approval or disapproval of any requested deviations from the Design Standards and Specifications applicable to the HTP (including, for the avoidance of doubt, with respect to such deviations necessary for any alternative technical concepts proposed by HTP bidders) as described in Section 12.02, the Parties shall establish the Technical Standards Committee ("**TSC**") prior to the advertisement of the HTP's first construction package. The TSC shall be comprised of one representative from each of the Parties and the PANYNJ, to the extent the PANYNJ is engaged as an SEP (each such representative, a "**TSC Representative**"). Each of the Parties may engage additional resources to support participation in the TSC as such Party deems appropriate. Further identified representatives, agencies, and instrumentalities of each of New York and New Jersey may attend meetings of the TSC and support the work of each state's designated representative as needed. In addition, each entity participating in the TSC shall designate one non-voting alternate representative who shall have the full powers of the TSC Representative in the event the TSC Representative is unavailable. The GDC CEO or the GDC CEO's designee shall act as chairperson of the TSC, and the TSC shall report to the GDC CEO or the GDC CEO's designee.

(b)    *TSC Meetings.* The GDC CEO or the GDC CEO's designee shall be responsible for calling meetings of the TSC. The TSC shall meet upon a minimum of five business days' written notice to the TSC Representatives or in another manner that the TSC may determine in writing. All decisions of the TSC shall be made by unanimous agreement at a meeting of the TSC, subject to Section 12.02. The failure of a Party to identify its TSC Representative or otherwise participate in a scheduled meeting of the TSC shall not be deemed a barrier to a unanimous agreement pursuant to Section 12.02.

(c)    *TSC Role*. The TSC shall perform the roles and responsibilities as described in this Section 3.03 and Section 12.02, but shall have no decision-making authority on behalf of GDC. Any disputes with respect to those items considered by the TSC shall be subject to the dispute resolution processes as described in Article XV.

3.04    *Advisory Working Groups*. The GDC CEO may from time to time create other advisory working groups, to include representatives from the Parties and, as applicable, the SEPs, to support the HTP's development and execution by advising the GDC CEO in the performance of their duties.

ARTICLE IV

ROLES AND RESPONSIBILITIES

4.01    *GDC*.

(a)    *Project Delivery Partner/Project Management Organization.* As soon as reasonably practicable following the Effective Date, GDC shall procure, either directly or through another Party, a Project Delivery Partner ("**PDP**") or a Project Management Organization ("**PMO**"), to provide additional services to GDC for the delivery of the HTP to augment the resources provided by the Parties responsible for delivery of each applicable HTP Package.

(b)    *Project Labor Relations*. The Parties acknowledge and agree that (i) the facilitation of any portion of the HTP that is located within New York shall be designated public work and shall be subject to the provisions of New York state labor law that are applicable as a result of such designation, and (ii) the facilitation of any portion of the HTP that is located within New Jersey shall be designated public work and shall be subject to the provisions of New Jersey state labor law that are applicable as a result of such designation. In furtherance of the satisfaction of such requirements, GDC shall, with support from New Jersey, New York, and Amtrak, engage with labor constituencies and lead the development and negotiation of applicable project labor agreement(s). Amtrak remains responsible for its own Labor Relations, pursuant to the Railway Labor Act; in the event of any potential labor disruption under the Railway Labor Act that could result in an impact to the Project, the Amtrak CEO will notify GDC for determination of appropriate action.

(c)    *GDC Role for HTP Packages*.

(i)    GDC shall be responsible for the development, design, and construction of each HTP Package. In accordance with Article VI, GDC shall procure all third-party services related to delivery of the HTP or that are otherwise necessary to facilitate the HTP, including those of construction contractors, design-build contractors, engineers, and consultants, as applicable (each an "**HTP Contractor**" and collectively, the "**HTP Contractors**") for each HTP Package, consistent with federal funding and financing requirements and flowdowns. Upon selection of the applicable HTP Contractor(s) for an HTP Package, GDC shall execute all applicable contract documents (collectively, the "**HTP Contract Documents**"), and shall oversee performance by such HTP Contractor(s)

of the applicable HTP Contract Documents. GDC will not operate or directly engage in transportation services as provided in the GDC Act.

(ii)     GDC shall partner with an SEP to provide services to support delivery of certain HTP Packages six months prior to publication of the Procurement Documents (as defined in Section 6.01(a)(ii)) or as soon as practicable. The SEP shall be responsible for completing the work of the applicable HTP Package in accordance with the terms and conditions set forth in the SEP Agreement (including with respect to budget and schedule requirements), and the SEP shall have the rights and powers as may be delegated by GDC as set forth in the SEP Agreements. Each SEP Agreement shall provide that the applicable SEP shall be responsible for all Cost Impacts (as defined in in Section 11.04(b)) attributable to the applicable HTP Package from the date of execution of the applicable SEP Agreement, except to the extent described in Section 11.04(b). In the event of a conflict between the terms of any SEP Agreement and this Agreement, the terms of this Agreement shall govern.

(iii)     The Parties acknowledge and agree that, prior to the Effective Date, Amtrak has engaged designers to develop certain designs and related documents in connection with the HTP ("**Existing HTP Designs**"). Amtrak shall transfer ownership of and any rights to use the Existing HTP Designs to GDC and, to the extent practicable, shall assign any relevant design contracts to GDC. Beginning on the Effective Date and until such time as a relevant design contract is assigned to GDC, any modifications to the design or design approach subject to Amtrak approval under such design contracts shall be subject to the approval of GDC.

4.02     *State of New Jersey*.

(a)     *Funding*. New Jersey shall provide funding for GDC operations and the delivery of the HTP (including with respect to the estimated cost described in Section 11.04(a) and any Cost Impacts), subject to state appropriations laws and requirements, and the provisions of the Funding Agreements (as defined in Section 11.02(c)) and GDC Operations Funding Agreements (as defined in Section 11.01), each as contemplated in Article XI.

(b)     *New Jersey Role for HTP Packages*. New Jersey shall support the delivery of the HTP in accordance with the terms and conditions set forth herein. To the extent required, GDC and New Jersey will enter into a supplemental agreement to detail the provision of force account and technical services as described herein. New Jersey may elect to perform its obligations under the Agreement through an agency or instrumentality of New Jersey, including NJ TRANSIT. New Jersey shall provide prior written notice to the Parties of such election. If an agency or instrumentality of New Jersey is engaged as an SEP for an HTP Package, such agency or instrumentality shall perform is obligations as SEP in accordance with the terms and conditions set forth in the applicable SEP Agreement.

(c)     *Right-of-Way Acquisition*. New Jersey shall acquire all NJ HTP ROW (as defined in Section 7.02(a)), as further described in Article VII.

4.03    *State of New York*.

(a)    *Funding*. New York shall provide funding for GDC operations, and the delivery of the HTP (including with respect to the estimated cost described in Section 11.04(a) and any Cost Impacts), subject to state appropriations laws and requirements, and the provisions of the Funding Agreements and GDC Operations Funding Agreements, each as contemplated in Article XI.

(b)    *New York Role for HTP Packages*. New York shall support the delivery of the HTP in accordance with the terms and conditions set forth herein including cooperation with the Parties, as requested by GDC or its SEP. New York may elect to perform its obligations under the Agreement through an agency or instrumentality of New York. New York shall provide prior written notice to the Parties of such election.

4.04    *Amtrak*.

(a)    *Funding*. Amtrak shall provide funding for GDC operations, and the delivery of the HTP (including with respect to the estimated cost described in Section 11.04(a) and any Cost Impacts), subject to federal appropriations and requirements, and the provisions of the Funding Agreements and GDC Operations Funding Agreements, each as contemplated in Article XI.

(b)    *Amtrak Role for HTP Packages*. Amtrak shall support the delivery of the HTP in accordance with the terms and conditions set forth herein. To the extent required, GDC and Amtrak will enter into a supplemental agreement to detail the provision of force account and technical services. If Amtrak is engaged as an SEP for an HTP Package, Amtrak shall perform its obligations as SEP in accordance with the terms and conditions set forth in the applicable SEP Agreement.

(c)    *Right-of-Way Acquisition*. Amtrak shall acquire all NY HTP ROW (as defined in Section 7.02(a)), as further described in Article VII.

4.05    *Representatives*.

(a)    *Governors' Representatives*. The governors of New Jersey and New York shall each designate a representative of the respective state that shall serve as a point of contact and may act on behalf of the applicable state Party in all matters under this Agreement (each, a "**Governor's Representative**").

(b)    *Owner's Representative*. Each Party may designate an authorized representative to serve as its representative in performing the Party's obligations under this Agreement (each, an "**Owner's Representative**"). An Owner's Representative may perform any tasks designated for such Party unless another individual is specifically assigned to serve as a representative for a particular task, including serving on committees, reviewing plans, and submitting comments to Submittals (as defined herein).

ARTICLE V

PROJECT DELIVERY

5.01    *Executive Project Schedule.*

(a)    *Development of Executive Project Schedule.* GDC shall develop and maintain a schedule setting forth the anticipated timetable for the implementation of the HTP, including those key dates described in Section 5.01(b) (the "**Executive Project Schedule**"). GDC shall update the Executive Project Schedule in a manner consistent with United States Department of Transportation ("**USDOT**") requirements, any applicable federal grant agreement requirements, and the PMP. The initial Executive Project Schedule developed by GDC shall be subject to approval by the Parties, which shall not be unreasonably withheld. Thereafter, GDC shall consult with the SPCC regarding updates to the Executive Project Schedule, but such updates shall not be subject to the approval or concurrence of any Party other than GDC. On a quarterly basis, or more frequently as required, GDC shall deliver (or otherwise make available) an Executive Project Schedule report to the Parties. Such quarterly report shall comply with USDOT reporting requirements. Each Party, to the extent applicable to such Party's HTP Package delivery and oversight responsibilities and as further described in the PMP, shall provide the information requested of such Party by GDC for the development of the Executive Project Schedule.

(b)    *Timing Requirements.* The Executive Project Schedule shall record the progress, and projected progress, of the HTP, and shall identify key timing requirements and milestones for the HTP, including: (i) key procurement dates, (ii) key dates for the HTP ROW (as defined in Section 7.02(a)) acquisition process, (iii) commencement and completion dates for key design, construction, and commissioning phases and activities, (iv) financing and funding, (v) utility agreements, third-party agreements, and permits, (vi) dates otherwise required in accordance with this Agreement, and (vii) those dates and milestones necessary to satisfy USDOT reporting requirements.

(c)    *Maintenance of Executive Project Schedule.* Each Party, to the extent applicable to such Party's HTP Package delivery and oversight responsibilities, shall cooperate with GDC in order to provide the information necessary for GDC to maintain and update the Executive Project Schedule. Each Party shall require its contractors (including all HTP Contractors to the extent required by the applicable HTP Contract Documents and the PMP), consultants and employees, to the extent applicable, to: (i) provide inputs for the Executive Project Schedule in a common electronic format as agreed by GDC, (ii) provide regular schedule updates at a time and in a manner determined by GDC, and (iii) cooperate with GDC and coordinate the respective HTP Package schedules in an effort not to delay the HTP.

(d)    *Change Orders.* With respect to the HTP Contract Documents, the GDC may, in the SEP Agreements, delegate certain authority to SEPs with regard to change orders, and if so, will specify the procedures for the handling and approval of proposed modifications, supplements and other changes. Such procedures will be in accordance with the PDA, the GDC Procurement Guidelines or applicable federally-compliant procurement guidelines of an SEP to the extent it is procuring a contract, and applicable federal requirements with respect to procurements and acquisitions.

5.02    *Project Plans*

(a)    *Project Management Plan*. GDC shall develop the PMP in consultation with the other Parties as coordinated through the SPCC. The PMP shall set forth reporting, scheduling, and production obligations applicable to the Parties, including with respect to HTP budgeting as described in Article IX, and the maintenance of records and development of reports as described in Article X.

(b)    *Force Account Resources Plan*. The Parties acknowledge and agree that the SEP Agreements and HTP Contract Documents shall include reasonable fulfillment rate provisions for force account resources. For each federal fiscal year, GDC shall develop an annual force account resources plan prior to the start of federal fiscal year in coordination with the applicable parties that are providing force account or requesting force account work (the "**Force Account Resources Plan**") in accordance with the applicable HTP Contract Documents. Such Force Account Resources Plan shall be approved by the railroad providing the resources, such approval not to be unreasonably withheld.

(c)    *Federally Required Project Plans*. GDC shall draft and submit all plans required to be submitted to FTA, FRA, or any other applicable federal agency providing funding or financing for the HTP. GDC shall consult with the SPCC as deemed appropriate by GDC prior to submitting such plans.

5.03    *HTP Delivery Strategy.*

(a)    GDC shall determine the manner of procurement and delivery of all HTP Packages. GDC shall consider, where appropriate and subject to value for money considerations, design-build, design-bid-build, progressive design-build, and other contracting strategies. GDC shall consult with the applicable SEP for an HTP Package prior to making a final determination with respect to selection of the contracting strategy.

(b)    Notwithstanding anything to the contrary herein, the Parties may determine by mutual agreement to alter the scope and sequencing of any HTP Package prior to procurement of such HTP Package by GDC, and no later than the execution of the Full Funding Grant Agreement ("**FFGA**") for the HTP.

ARTICLE VI

PROCUREMENT

6.01    *Solicitation Procedure.*

(a)    *Procurement by GDC.*

(i)    The Parties acknowledge that the GDC Board has adopted the Gateway Development Commission Procurement Guidelines (the "**GDC Procurement Guidelines**"). The GDC Procurement Guidelines expressly provide that, where federal or state law, rules, or regulations applicable to any funds received by GDC prescribe procurement requirements that are different from the GDC Procurement Guidelines, such

procurement requirements shall apply. GDC shall adopt an FTA-compliant procurement manual with respect to its procurement obligations hereunder. GDC shall comply with the GDC Procurement Guidelines (as such GDC Procurement Guidelines may be modified pursuant to the FTA-compliant procurement manual, or as such GDC Procurement Guidelines shall be modified in order to satisfy applicable funding or financing requirements including, without limitation, compliance with 2 CFR Part 200) for all GDC-initiated procurements. GDC shall procure services from third parties as it determines are necessary to facilitate delivery of the HTP.

(ii)    With respect to the procurement of HTP Contractors for an HTP Package, GDC shall coordinate the development of any primary procurement documents, including any requests for qualifications, requests for proposals, invitations for bids, evaluation criteria, and terms and conditions of the applicable contracts to be awarded (collectively, "**Procurement Documents**") with the applicable SEP (if any) for the HTP Package such that the applicable SEP (if any) is appropriately integrated into the process for development of such Procurement Documents prior to advertisement for the applicable procurement. The TSC shall review any Procurement Documents to confirm adherence to the Design Standards and Specifications and the performance requirements set forth in Article II. GDC shall also coordinate the development of any Procurement Documents with any entity whose force account will be necessary to provide the appropriate commitments for the contract and Amtrak and NJ TRANSIT as to any commissioning requirements in accordance with the Rail Activation Plan (as defined in Section 14.02(a)).

(iii)    GDC shall distribute drafts of its Procurement Documents to Amtrak, any HTP operator or user (e.g., NJ TRANSIT), and the applicable SEP (if any) (each in such role, a "**Reviewing Entity**") for review and comment in advance of publication of such Procurement Documents. Each Reviewing Entity shall provide comments, if any, no later than 10 business days from the date of delivery of such draft Procurement Documents. A Reviewing Entity's failure to provide comments to GDC within 10 business days shall be deemed such Reviewing Entity's approval of the draft Procurement Documents.

(iv)    GDC shall respond to and address any comments to its draft Procurement Documents provided by a Reviewing Entity; *provided*, that the terms and conditions of GDC's Procurement Documents, including, for the avoidance of doubt, any forms of agreement incorporated therein, shall be ultimately determined by GDC.

(b)    *Procurement by Parties other than GDC.* The Parties intend that GDC shall centrally procure all third-party services required hereunder; *provided, however*, subject to the GDC Board's delegation of authority, the GDC CEO or the GDC CEO's designee may request that another Party, SEP, HTP operator or user (e.g., NJ TRANSIT), or governmental entity partnering with GDC procure such third-party services. An SEP's authority to procure third-party services, and develop and release Procurement Documents, shall be governed by the terms of the applicable SEP Agreement. After the Effective Date, if a non-SEP Party other than GDC (in such role, a "**Procuring Party**") seeks to incur third-party costs attributable to the HTP for which such Procuring Party will seek credit toward its required financial contributions to the HTP hereunder, then the Procuring Party shall obtain prior approval of the GDC CEO or the GDC CEO's designee in advance of such procurement. The GDC CEO or the GDC CEO's designee shall approve such

third-party procurements if (i) the third-party services are within the Procuring Party's GDC-approved scope of work, (ii) the cost of such third-party services are within the Procuring Party's budget, and (iii) the third-party services and the Procurement Documents are in compliance with applicable federal requirements. GDC may alternatively procure such third-party services directly.

6.02    *Evaluation.*

(a)    *Evaluation Panels.* The evaluation of respondents to GDC-initiated or SEP-initiated procurements of HTP Packages shall include as a voting member (i) one representative having requisite expertise related to the procurement from each of GDC, the HTP operator or user (e.g., NJ TRANSIT) and Amtrak on any evaluation panel for HTP Contract Documents specific to the design and/or construction of the HTP, and (ii) one representative having requisite expertise related to the procurement from the applicable SEP on any evaluation panel for HTP Contract Documents for an HTP Package being delivered by an SEP pursuant to an SEP Agreement (in the event such SEP is not already represented on the panel pursuant to clause (i)). The Parties acknowledge and agree that personnel participating on an evaluation panel shall be required to comply with any required or customary rules and procedures governing the confidentiality and the integrity of the bid process with respect to procurement of HTP Contract Documents, and such personnel may be required, as a condition of participation, to execute non-disclosure agreements, and other documents as GDC may reasonably require, reflecting the same.

(b)    *Distribution of Procurement Materials.* Procurement materials relevant to the proposal evaluation shall be timely shared by GDC with applicable evaluators through a platform determined by GDC. The Parties acknowledge and agree that, as a condition to accessing such information, GDC may require evaluators to execute non-disclosure agreements and other documents as GDC may reasonably require.

(c)    In the event a procurement is made by an SEP, it shall be made under applicable federally-compliant rules and procedures of that SEP.

ARTICLE VII

THIRD PARTY AGREEMENTS; RIGHT-OF-WAY

7.01    *Third Party Agreements.*

(a)    The Parties acknowledge and agree that GDC may enter into third party agreements with respect to delivery of the HTP as GDC determines appropriate, including, for example, agreements with utilities. GDC may delegate responsibility for negotiation and execution of such agreements to an SEP pursuant to an SEP Agreement.

(b)    GDC will comply with all federal grant disposition requirements.

7.02    *Right-of-Way and Real Property Interest Acquisition.*

(a)    New Jersey, either directly or through its designee, shall acquire all necessary surface and subsurface property required for the operations, construction, and maintenance of the HTP that is located in New Jersey, as set forth in the Real Estate Acquisition

- 13 -

Management Plan (the "**RAMP**") developed by GDC in consultation with the Parties as coordinated through the SPCC. Amtrak shall acquire all surface and subsurface property required for the operations, construction, and maintenance of the HTP that is located in New York, as set forth in the RAMP. The necessary surface and subsurface property required for the operations, construction, and maintenance of the HTP in New Jersey shall be referred to as "**NJ HTP ROW**", and the necessary surface and subsurface property required for the operations, construction, and maintenance of the HTP in New York shall be referred to as "**NY HTP ROW**", and, collectively with NJ HTP ROW, as the "**HTP ROW**." Notwithstanding the above, Amtrak and New Jersey may enter into a bilateral agreement pursuant to which Amtrak assumes acquisition responsibility for any NJ HTP ROW parcel as set forth therein. For the purposes of this Section 7.02, New Jersey (or its designee) and Amtrak shall be referred to individually as the "**Acquiring Party**" and collectively as the "**Acquiring Parties**". Each Acquiring Party has already begun acquisition of necessary property prior to the Effective Date. Each Acquiring Party shall comply with all applicable federal, state, and local laws, and all applicable USDOT rules and guidance documents in the acquisition of the HTP ROW, including the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 (Public Law 91-646), and 49 CFR Part 24 (the "**Uniform Relocation Act**").

(b)     Each Acquiring Party shall acquire those HTP ROW parcels allocated to such Acquiring Party that are deemed "critical" by the FTA on or before the date of the submission of the application for the FFGA. As of the Effective Date, the submission of the application for the FFGA is anticipated to occur in September 2023. Each Acquiring Party shall acquire all non-critical HTP ROW parcels allocated to such Acquiring Party in accordance with the schedule set forth in the RAMP.

(c)     Each Acquiring Party shall be responsible for any HTP Contractor delay claims under the applicable HTP Contract Documents arising out of such Acquiring Party's failure to acquire any applicable HTP ROW parcel according to the schedule set forth in the RAMP, unless the applicable Acquiring Party is able to demonstrate both (i) that a reasonable standard of care was exercised by the applicable Acquiring Party and (ii) the applicable Acquiring Party endeavored to exercise available authority by the state government to assist in the timely completion of the acquisition.

(d)     Each Acquiring Party shall be permitted to make reasonable and customary business decisions that impact the cost of the acquisition of the HTP ROW that meet the Uniform Relocation Act. An Acquiring Party's acquisition costs related to HTP ROW shall be credited toward such Acquiring Party's required contributions for the applicable HTP Package pursuant to the agreements developed under Section 9.02. Notwithstanding anything to the contrary herein, any acquisition decisions that deviate from the requirements set forth in the RAMP, or otherwise involve restrictions that impact the use of an HTP ROW parcel, including the availability of such parcel, the timing of required relocation of existing property owners, or limitations on the use of such parcel, shall be made by the Acquiring Party in consultation and coordination with GDC.

(e)     Ownership of the HTP ROW and HTP improvements shall be structured to satisfy federal funding and financing requirements while any such funding and/or financing remains current. Upon the earlier of: (i) the dissolution of GDC pursuant to the terms of the GDC Act, or (ii) the Operations Readiness Date (as defined in Section 14.02(f)), ownership of the HTP

ROW and HTP improvements shall be transferred to Amtrak; *provided that* following such transfer, Amtrak shall provide NJ TRANSIT (or any other entity as may be required by USDOT) with a recorded easement for operation of commuter rail passenger transportation on the HTP ROW and the HTP improvements, and in no case shall NJ TRANSIT (or any other entity as may be required by USDOT) be required to pay any consideration to Amtrak for retention of the easements. No Party's funding obligations under this Agreement shall be conditioned upon such Party's ownership of or title to any HTP ROW. Amtrak agrees, in a manner consistent with Section 14.01(c), to enter into a deed, to be recorded, granting NJ TRANSIT an easement for operation of commuter rail passenger transportation on the NY HTP ROW and HTP improvements, in a form conforming to the Portal North Bridge (PNB) Deed of Easement, as applicable, which Deed of Easement was attached to the PNB PDA, and is agreed to by the Parties and agreed to by USDOT. New Jersey, through an agency or instrumentality of New Jersey, agrees, in a manner consistent with Section 14.01(c), to enter into a deed, to be recorded, granting Amtrak a fee interest in NJ HTP ROW and reserving unto itself an easement for operation of commuter rail passenger transportation on the HTP ROW and HTP improvements, in a form conforming to the PNB Deed of Easement, as applicable, and is agreed to by the Parties and agreed to by USDOT.

(f)    Prior to commencement of construction relating to an HTP Package by the applicable HTP Contractor, to the extent the applicable Acquiring Party is aware of any necessary pre-existing or historic contamination or condition requiring reporting or further investigation, testing, monitoring or remediation, as mandated by the U.S. Environmental Protection Agency or any applicable state or local agency (collectively, "**Remediation Activities**"), such Acquiring Party shall begin to conduct such Remediation Activities as soon as reasonably practicable, subject to GDC approval and identification of funding, following acquisition of the HTP ROW parcel requiring the performance of Remediation Activities. Subject to the requirements set forth in Article XI, the approved costs incurred by New Jersey (or its designee) in connection with performing such Remediation Activities shall be credited toward New Jersey's required contributions to the applicable HTP Package, and the approved costs incurred by Amtrak in connection with performing such Remediation Activities shall be credited toward Amtrak's required contribution to the applicable HTP Package.

7.03    *Right-of-Way and Real Property Interest Access.*

(a)    *Contractor Access.* Any HTP Contractor that desires to enter upon Amtrak right-of-way or other Amtrak property in connection with delivery of an HTP Package shall be required to comply with Amtrak's requirements for a "Temporary Permit to Enter Upon Property" ("**PTE**"). The terms and conditions of the PTE shall not change once an HTP Contractor begins work on the applicable HTP Package, provided that such HTP Contractor's scope of work does not materially change. The requirements of the PTE shall be included to the extent applicable in all HTP Contract Documents.

(b)    *Storage of Equipment and Materials.* Subject to availability and the requirement that an HTP Contractor execute Amtrak's then-current PTE or other applicable form of agreement, Amtrak shall allow such HTP Contractor to store equipment and materials for the HTP on certain Amtrak-approved property without rental charge to such HTP Contractor; *provided that* Amtrak shall have no liability with respect to such equipment or materials, including for any theft or damage thereto.

(c)    *Staff Access.* The Parties agree that staff and representatives of the Parties, FTA and FRA, including authorized FTA and FRA contactors, shall, upon reasonable notice, be granted access to HTP ROW, subject to adherence at all times by the Party granted access to the directions, procedures, and safety guidelines established by the owning Party, and available protection resources, as required. Such access shall not require execution of a PTE.

## ARTICLE VIII

## ENVIRONMENTAL COMPLIANCE; PERMITTING

8.01    *NEPA Compliance.*

(a)    GDC shall assume the role of NEPA sponsor and shall be responsible for ensuring conformance of the HTP, including all required mitigations, with NEPA Approvals, and shall seek technical or other amendments to the NEPA Approvals, in each case as required to support delivery of the HTP. For the purposes of this Agreement, "**NEPA Approvals**" shall mean the final approval(s) issued under the National Environmental Policy Act pertaining to the HTP, including the Final Environmental Impact Statement and Record of Decision (the "**ROD**") from FRA and FTA, and all approved supplements and reevaluations pertaining to the HTP, and all NEPA documents, including technical memoranda required to be submitted to FRA and FTA under NEPA.

(b)    GDC shall require the applicable HTP Contractors, and any other contractors performing work on its behalf, to comply with all NEPA requirements and mitigations set forth in the HTP Contract Documents, including all applicable federal, state, and local laws, regulations, and requirements, including NEPA, the Coastal Zone Management Act, 49 USC Section 303, and the National Historic Preservation Act, as may be further described in the ROD. In the event that an HTP Package is inconsistent with the ROD, GDC shall coordinate with the FRA, and FTA to require that all federal approvals are met and whether any additional NEPA review is required. GDC shall be responsible for all legal and regulatory compliance matters in connection with the work it or its contractors perform. GDC may delegate any such responsibilities to the applicable SEP. Each Party shall cooperate in all respects (including with applicable SEP(s), as necessary) in a manner designed to ensure that each Party meets its respective obligations under this Section 8.01.

8.02    *Permits.*

(a)    GDC (on behalf of and subject to approval by the Acquiring Parties as property owners, if required) shall prepare, file, renew, secure (including by the provision of all supporting documents necessary), expedite (as GDC deems appropriate) and pay for (including all applicable filing fees) all permits, licenses, and approvals (collectively, "**Permits**") that are required in connection with each HTP Package. GDC shall track the progress of all Permit applications through a Permit tracking and management tool developed by GDC that GDC shall make available to the Parties. The status of pending Permit applications shall be reviewed with the SPCC as the Parties deem appropriate.

(b)      GDC may delegate to an SEP pursuant to an SEP Agreement the rights and obligations to obtain and maintain Permits described in subsection (a) for any HTP Package. GDC may elect to require that an HTP Contractor, pursuant to applicable HTP Contract Documents, identify and secure certain Permits.

(c)      Each Party shall support the pursuit of all necessary Permits, including through the provision of technical assistance and other support in a manner designed to ensure that each Party meets its respective obligations under this Section 8.02.

(d)      All HTP Contract Documents shall require, to the extent applicable to such HTP Contractor's scope of work, that such HTP Contractor comply with all applicable Permits. GDC (or the applicable SEP to the extent authority therefor is delegated to an SEP pursuant to an SEP Agreement) shall use reasonable efforts to enforce and maintain such compliance pursuant to the terms of the applicable HTP Contract Documents.

ARTICLE IX

PROJECT BUDGETING

9.01    *Responsibility for Developing and Maintaining Project Budget*.

(a)      GDC shall develop the initial Project Budget. The initial Project Budget developed by GDC shall be subject to approval by the Parties, which shall not be unreasonably withheld. The Project Budget shall be developed in a format that satisfies the requirements set forth in the PMP and all applicable federal funding and financing requirements. Each Party shall provide to GDC the budget forecasts, spending plans, and other documents required of such Party in the format and at the time described in the PMP in order to facilitate GDC's maintenance of the Project Budget in a common and consistent format across all HTP Packages. The PMP shall set forth additional reporting requirements applicable to the development and maintenance of the Project Budget, and the Parties shall comply with such requirements. GDC shall ensure that the budgets applicable to each HTP Package are maintained in a common and consistent format across all HTP Packages.

(b)      Each Party shall maintain such Party's HTP budget information (to the extent such Party is responsible for such budget information as set forth in the PMP) within the FTA's Standard Cost Categories ("**SCC**"). Any modifications to SCC line items shall be subject to GDC's prior approval unless authority to modify SCC line items is delegated to an SEP for an HTP Package pursuant to an SEP Agreement. Except to the extent GDC has delegated authority to authorize the use of supplemental line items in HTP Contract Documents to an SEP pursuant to an SEP Agreement, GDC must approve the use of any supplemental line items in such HTP Contract Documents. Except to the extent GDC has delegated authority to utilize unallocated contingency funds to an SEP pursuant to an SEP Agreement, GDC must approve the use of any unallocated contingency funds.

(c)      GDC shall update the Project Budget as described in the PMP on a quarterly basis consistent with federal requirements (each such update, a "**Quarterly Budget Update**"). Each Quarterly Budget Update shall include a report by category on any changes to the Project

Budget from the previous quarter, describe new commitments, summarize expenditures on an executive level, and provide any additional budgetary information required as described in the PMP. GDC shall deliver (or otherwise make available) the Quarterly Budget Updates to the Parties and the GDC Board.

(d)    Based on the information provided by the Parties as described in the PMP, GDC shall track HTP spending against the Project Budget in a manner consistent with federal requirements. The PMP shall describe each Party's obligations with respect to the provision of (i) estimates to complete HTP Packages, (ii) required notifications to GDC related to spending against the Project Budget, including advance notification by Parties regarding when budgets are approaching limits, and (iii) routine forecasts of estimates at identified times to facilitate necessary Project Budget updates. Each Party shall comply with such PMP requirements to the extent applicable to such Party. If material spending and commitment deviations from the Project Budget for an HTP Package are identified, GDC shall work cooperatively with the applicable Party or SEP to determine the nature and cause for such deviation and, to the extent required, develop a plan that documents the deviation and the Parties' and any applicable SEPs' agreed mitigation strategies related thereto. The applicable SEP shall support GDC in all respects in developing the deviation analysis and the planned mitigation action in accordance with the applicable federal funding and financing requirements.

9.02    *Credit for Costs*. The Parties shall execute separate Funding Agreements describing the manner in which past and future contributions and expenditures incurred by each Party shall be credited toward such Party's required contribution to HTP costs hereunder or otherwise repaid to such Party.

ARTICLE X

PROJECT REPORTING AND CONTROLS

10.01 *Responsibility for Preparation and Maintenance of Records*.

(a)    *Preparation of Reports to USDOT*. GDC shall be responsible for the preparation of reports necessary to satisfy federal funding and financing requirements applicable to the HTP, including reports addressing (i) the HTP's adherence to scope, schedule, and budget, (ii) the use of contingency, and (iii) other material or critical HTP issues, all as described in the PMP. GDC shall ensure that such reports satisfy applicable USDOT requirements. GDC shall develop and maintain those additional reports requested by the GDC Board or GDC's CEO or as may be required in the PMP. GDC shall inform all Parties and applicable SEPs of the information required for reports and scheduling thereof, and each Party (and SEPs pursuant to the terms of the applicable SEP Agreements) shall provide the inputs for such SEP's HTP Package that are necessary for GDC's development of the reports described in this Section 10.01(a).

(b)    *Document Access and Control*.

(i)    GDC shall promptly deliver (or otherwise make available) to the other Parties copies of all HTP reports delivered by GDC to USDOT.

- 18 -

(ii)    GDC shall specify to each SEP the methodology, consistent with federal requirements, for the management and control of HTP documentation in order to provide a consistent approach to management and control of documentation for all HTP Packages. Each SEP's approach to document management shall comply with applicable GDC procedures and conventions and all applicable federal requirements. Each SEP shall be required, pursuant to applicable SEP Agreement, to timely deliver to GDC (and make available to the other Parties, subject to the requirements set forth herein) any HTP document required to be provided by the SEPs pursuant to GDC's document control policy.

(iii)    Except to the extent any HTP matters are subject to executive session of the GDC Board or are otherwise subject to confidentiality or other specific requirements, HTP documentation, including Submittals (as defined in Section 12.02(c)(i)), shall be accessible by designated staff of the Parties; *provided that* such designated staff shall be required to comply with GDC document control procedures and conventions.

(c)    *Record Retention*. GDC shall develop a record retention policy that is consistent with the FTA record retention policy, any other applicable state or federal requirements, and the audit requirements set forth in Section 10.04 (the "**GDC Record Retention Policy**"). The GDC Record Retention Policy shall require that each Party maintain the HTP records for at least the minimum period of time required to satisfy applicable law and the audit requirements set forth in Section 10.04. Each Party shall comply with the GDC Record Retention Policy with respect to the retention of HTP records.

(d)    *Risk Register Management*. GDC shall, as part of its risk and contingency management plan, establish a framework for the development and maintenance of HTP risk registers. GDC may delegate to an SEP the management of a risk register of a specific HTP Package, as determined by GDC; *provided, however*, that all risk registers and updates to risk registers shall be subject to GDC review. Each SEP that is delegated responsibility for the development and maintenance of an applicable risk register shall, pursuant to the terms of the applicable SEP Agreement, be required to ensure that such risk register complies with GDC's risk and contingency management plan and otherwise conforms with applicable GDC standards for risk registers.

10.02    *Public Records.*

(a)    Each Party acknowledges and agrees that each of the Parties is subject to specific public records laws and policies, including, as applicable, the Freedom of Information Act, 5. U.S.C. § 552; the New York Freedom of Information Law, Article 6 (§§ 84-90) of the New York State Public Officers Law; the New Jersey Open Public Records Act, P.L. 2001, c. 404; the GDC Act; and the Gateway Development Commission Public Records Access Policy, adopted on July 12, 2021, and each Party shall cooperate in all respects in a manner designed to ensure that each Party meets its respective obligations under such public records laws and policies.

(b)    Subject to the foregoing provision of this Section 10.02, the Parties acknowledge that from time to time infrastructure security, proprietary commercial data, certain procurement documentation, and other related project documents may necessitate confidentiality agreements for the Parties and their personnel in order to access such materials.

- 19 -

10.03 *Data Protection*. Each Party acknowledges and agrees that each of the Parties is subject to specific data protection laws and policies, including, as applicable, the New York Personal Privacy Protection Law, Article 6-A (§§ 91-99) of the New York State Public Officers Law; the GDC Act; and the Gateway Development Commission Access to Personal Information policy, published on August 13, 2021, and each Party shall cooperate in all respects in a manner designed to ensure that each Party meets its respective obligations under such data protection laws and policies.

10.04 *Audit Procedures*.

(a)     Each Party shall permit the authorized representatives of each other Party and those of USDOT, FRA, FTA, and the inspector generals of GDC and Amtrak, and any other state or federal governmental entity or agency with oversight authority applicable hereto, in each case upon request, to inspect and audit such Party's data, books, records, and documents (and, subject to any applicable confidentiality obligations and public records requirements, those of its contractors, consultants, and assignees, if any) relating to its obligations under this Agreement or the HTP.

(b)     Each Party agrees to notify its contractors, consultants and assignees that each other Party, USDOT, FRA, FTA, and the inspector generals of GDC and Amtrak, and any of their duly authorized representatives, shall have access to and the right to inspect and audit any data, books, records, and documents relating to such contractors', consultants', and assignees' performance of work in connection with this Agreement or the HTP, taking into account any applicable confidentiality obligations and public records requirements.

(c)     Nothing in this Agreement shall be construed to limit the rights, obligations, authority, or responsibilities of Amtrak's Office of the Inspector General pursuant to the Inspector General Act of 1978, as amended, including the right to seek information by subpoena.

ARTICLE XI

FUNDING AND FINANCING OBLIGATIONS

11.01 *GDC Operating Funds*. Upon presentation to the Parties prior to the beginning of each year and subject to each Party's applicable governance requirements, each of New Jersey, New York, and Amtrak shall fund one-third of the annual operating budget for the HTP approved by the GDC Board (the "**GDC Operating Budget**") pursuant to the terms of the applicable funding agreement(s) between GDC and such Party(ies) (the "**GDC Operations Funding Agreement(s)**"). The Parties intend that the GDC Operations Funding Agreement(s) shall ensure that GDC's operations are continuously funded in accordance with the GDC Operating Budget.

11.02 *Financing*.

(a)     A Party that is required to fund Cost Impacts due to a Non-Shared Cost Impact Event (as defined in Section 11.04(b)) (such Party, the "**Funding Party**") shall not be required to contribute to GDC the funding related to such Cost Impact Event (as defined in Section 11.04(c)(i)) until such funding is actually required to meet GDC's commitments and warranties

related to maintaining sufficient contingency to complete the HTP under any applicable funding and financing agreement.

(b)    All HTP funding shall be provided to, and all payments shall be made from, GDC, except where otherwise provided in this or subsequent agreements. The Parties acknowledge and agree that the accounts for each funding source shall be separate, and such funds will not be commingled.

(c)    Each of New Jersey, New York, and Amtrak shall provide cash contributions pursuant to agreed fixed schedules for payments as set forth in separate funding agreements (the "**Funding Agreements**") between GDC and such Parties. Such Funding Agreements shall be prepared by counsel to GDC and shall be consistent with applicable federal agreements, and state appropriations laws and requirements. The Funding Agreements shall include back-to-back payment obligations of each local funding Party to GDC in order for GDC to service applicable federal loans supported by such Party.

(d)    GDC shall prepare the HTP financial plans required for federal funding and financing agreements. GDC shall act as the project sponsor for the HTP and shall have primary responsibility under the FTA Capital Investment Grants Program FFGA.

(e)    GDC's obligations under applicable federal funding and financing agreements shall be performed directly by GDC or, to the extent responsibility for such obligations is delegated to an SEP, such obligations shall be included in the applicable SEP Agreement.

11.03    *Sources of Funding*. The Parties acknowledge and agree that the costs for delivery of the HTP described in Section 11.04(a) shall be funded in accordance with the HTP financial plan and separate Funding Agreement(s) among the Parties to be executed after the Effective Date. In the event that the forecast or actual Total Project Cost, or allocated share thereof per Section 11.04(b), would violate restrictions that flow from the funding sources being used (e.g., FFGA, FRA annual grants, state appropriations), the Parties agree to work in good faith together to identify and advocate for additional sources of funds to address such shortfall.  Such cooperation does not relieve any individual Party of its responsibility to bear the costs for which it is responsible pursuant to Section 11.04(b) (Shared and Non-Shared Cost Impacts).

11.04    *Funding Responsibilities*.

(a)    *Basis of Cost.* The cost of an HTP Package shall be the amount set forth in the Market Case Estimate for the delivery of such HTP Package (including any contingency amounts set forth therein), as such estimate may be amended from time to time by GDC as contemplated by this Agreement. The "**Market Case Estimate**" means, with respect to any HTP Package, the project estimate based on bid pricing following completion of procurement of the applicable HTP Package, which shall include all final negotiated costs and contingencies related to delivery of the applicable HTP Package. GDC shall provide an updated project estimate, in the form of a Market Case Estimate, within 30 days of contract award of the applicable HTP Package. The Market Case Estimate, and any amendments to the Market Case Estimate, shall be approved by the GDC Board.

(b)    *Allocation of Cost Impacts*. "**Cost Impacts**" shall mean and refer to the amount by which the delivery of an HTP Package exceeds the cost as set forth in Section 11.04(a) applicable for such HTP Package. Except to the extent set forth in this Section 11.04(b), the SEP for an HTP Package shall be responsible for all Cost Impacts attributable to the delivery of such HTP Package. In no event shall the allocation of Cost Impacts pursuant to this Section 11.04(b) result in the federal funding for the HTP exceeding applicable statutory limitations.

(i)    *Shared Cost Impacts.* With respect to Cost Impacts that are directly incurred as a result of an event described in this Section 11.04(b)(i) (each a "**Shared Cost Impact Event**"), subject to satisfaction of the requirements set forth in Section 11.04(c), such Cost Impacts shall be funded one-third by Amtrak, one-third by New Jersey, and one-third by New York. The Shared Cost Impact Events are:

(A)    the occurrence of any of these events affecting the project site after the Effective Date: war, civil war, invasion, violent act of foreign enemy, act of terrorism or armed conflict, acts of God, riots, civil unrest, natural catastrophes, an explosion, and force majeure events as further defined in the applicable HTP Contract Documents (collectively, "**Force Majeure Events**"); provided, however, that with respect to Force Majeure Events as defined in the applicable HTP Contract Documents that are claimed by the applicable HTP Contractor, such Force Majeure Events claim must be approved by GDC to the extent that the applicable HTP Contractor is not able to mitigate the impacts of such event using such measures as are reasonable under the circumstances;

(B)    any modification or change that an SEP is required to make to the plans or to the project due to government mandated revisions (i.e., change in laws), and undisclosed or unforeseeable site, safety, or security conditions, subject to review and approval by the TSC;

(C)    a failure by a utility to perform work or provide services in accordance with the relevant third-party agreement or a failure of permitting or other third-party entity to issue timely approvals, in each case despite a reasonable standard of care being exercised by the applicable SEP and a demonstrated good faith effort by the relevant state Party to exercise all available resources to ensure timely completion, each as determined by GDC;

(D)    any event that satisfies all of the following: (a) for which, pursuant to the terms of the applicable HTP Contract Documents, an HTP Contractor is entitled to either (1) an increase in the applicable contract price, or (2) an extension of the schedule for the HTP Contractor's delivery of the HTP Package, (b) that is claimed by an HTP Contractor and approved by GDC pursuant to the terms of the applicable HTP Contract Documents, and (c) that is determined by GDC not to be attributable to a Party's material acts, errors or

omissions, or failure to comply with such Party's contractual obligations with a reasonable standard of care;

(E)    an HTP Contractor's failure to perform in accordance with the applicable HTP Contract Documents, including, for example, HTP Contractor default and HTP Contractor-caused productivity or other delays, in each case that are determined in a written determination issued by the GDC CEO (or the GDC CEO's designee) not to be attributable to the SEP's material acts, errors or omissions, or failure to comply with such SEP's contractual obligations with a reasonable standard of care;

(F)    any event resulting in a Cost Impact with respect to an HTP Package delivered by the PANYNJ as an SEP pursuant to an SEP Agreement, except to the extent set forth in Section 11.04(b)(ii);

(G)    a deviation from the approved Force Account Resources Plan, as defined in Section 5.02(b), that is due to an incident or condition occurring in the states of New York, New Jersey, or Connecticut that creates an imminent threat to life and safety that requires that resources be redirected from HTP associated work (an "**Operational Emergency**"), and a reasonable time associated with the restoration of service, if applicable;

(H)    the GDC's failure to comply with its obligations with a reasonable standard of care, or GDC's determination to override a Party's proposed strategy for addressing and mitigating the impacts of the Cost Impact Event;

(I)    costs resulting from litigation related to the HTP by a non-Party except to the extent such litigation is due to a Party's or a non-Party SEP's material acts, errors or omissions, or failure to comply with such Party's or non-Party SEP's contractual obligations with a reasonable standard of care;

(J)    any other event that the GDC Board approves via vote after consultation with the appropriate SEP regarding the event and the impact of the event; and

(K)    if GDC delivers the HTP Package described in Section 2.02(e) (the design and construction of a new highway tunnel bridge at Tonnelle Avenue), all Cost Impacts related to such HTP Package shall be deemed Shared Cost Impacts.

(ii)    *Non-Shared Cost Impacts.* With respect to Cost Impacts that are incurred as a result of an event described in this Section 11.04(b)(ii) (each a "**Non-Shared Cost Impact Event**"), subject to satisfaction of the requirements set forth in Section 11.04(c)

(to the extent applicable), such Cost Impacts shall be funded as described in this Section 11.04(b)(ii).

    (A)    Except as set forth in Section 11.04(b)(i)(G), if there is a deviation from an approved Force Account Resources Plan, as defined in Section 5.02(b), the Party providing the force account will be responsible for resulting Cost Impacts;

    (B)    Cost Impacts applicable to an HTP Package resulting from (1) any deviation from the Design Standard and Specifications that is not approved by the TSC, or (2) any other deviation from the approved design (that does not deviate from the Design Standard and Specification) that is not approved by the GDC CEO or the GDC CEO's designee, shall be funded solely by the SEP for such HTP Package;

    (C)    Cost Impacts resulting from a change in law, regulation, procedure, or standards by New Jersey (or its municipalities or instrumentalities), that is not of general application, the terms of which change apply to the HTP, the SEP, or any key HTP Contractor shall be funded solely by New Jersey;

    (D)    Cost Impacts resulting from a change in law, regulation, procedure, or standards by New York (or its municipalities or instrumentalities), that is not of general application, the terms of which change apply to the HTP, the SEP, or any key HTP Contractor shall be funded solely by New York;

    (E)    Except as set forth in Section 11.04(b)(i)(B), Cost Impacts from a requested change to the Design Standards and Specifications subsequent to the date the contract documents are advertised in accordance with Section 6.01(a)(ii), shall be funded solely by the requesting Party; and

    (F)    In the event that GDC enters into an SEP Agreement with the PANYNJ, the SEP Agreement shall provide that Cost Impacts caused by the acts or omissions arising from the PANYNJ's intentional wrongdoing shall be funded solely by the PANYNJ. The Parties acknowledge and agree that, except to the extent set forth in this Section 11.04(b)(ii)(F), the PANYNJ shall not be responsible for any Cost Impacts.

    (iii)    *Concurrent Delays.* Notwithstanding the above, if there are multiple, concurrent delays, the Parties agree to work together to mitigate the total impact to the HTP, without regard to fault. The residual cost impacts following mitigation will be shared in proportion to the responsibility for the events contributing to the cost impacts.

(c)     *Establishment of Cost Impacts.*

(i)     Upon the occurrence of any of the events described in Section 11.04(b)(i) or Section 11.04(b)(ii) (each event, a "**Cost Impact Event**"), the Party requesting the application of Section 11.04(b) with respect to a given Cost Impact Event (such Party, the "**Requesting Party**") shall promptly, and in any event no later than 30 calendar days following the Requesting Party's knowledge of the occurrence of the Cost Impact Event, notify the Parties in writing thereof (such notice, a "**Cost Impact Event Notice**"). Such Cost Impact Event Notice shall describe the Cost Impact Event and (to the extent such information is available at the time), the efforts of the Requesting Party and the applicable HTP Contractors, if any, that have been (or are going to be) undertaken by such party to overcome or mitigate the potential adverse effect on the cost for performance of the work from such Cost Impact Event. After the issuance of a Cost Impact Event Notice, the Requesting Party shall provide updates in writing to GDC every 30 calendar days or as reasonably necessary to keep the other Parties informed of the impacts of the Cost Impact Event, including in such updates, to the extent such information is available, estimates of the Cost Impacts that will result from the applicable Cost Impact Event.

(ii)     When the Requesting Party is reasonably aware of the cost impact of any Cost Impact Event, the Requesting Party shall provide GDC in writing a summary of the known or estimated Cost Impacts that resulted from the Cost Impact Event (the "**Cost Impact Notice**"). In the Cost Impact Notice, the Requesting Party shall be responsible for (A) describing the Cost Impact Event and the known or estimated impacts of such event in detail, (B) providing a full accounting setting forth all known or estimated Cost Impacts resulting from the Cost Impact Event, including supporting materials, such as schedule impacts, and (C) describing the efforts of the Requesting Party and the applicable HTP Contractors, if any, that were undertaken by such party to overcome or mitigate the adverse effect on the cost for performance of the work from such Cost Impact Event.

(iii)     After a Requesting Party provides a Cost Impact Notice, the GDC CEO or designee shall make its determination regarding whether the Cost Impact Event is a Shared Cost Impact Event, a Non-Shared Cost Impact Event, or whether more information is required, as set forth in the funding agreements and subject to Article XV.

(iv)     Compliance with this subsection (c) is a condition precedent to the application of the cost sharing described in Section 11.04(b)(i) or Section 11.04(b)(ii). Upon satisfaction by the Requesting Party of the terms and conditions in this subsection (c), the Parties shall use good faith efforts to agree on the Cost Impacts attributable to the Cost Impact Event. If a Party disagrees with GDC's determination with respect to the occurrence of a Cost Impact Event or the amount of Cost Impacts attributable to such event, the Parties shall resolve the dispute as described in Article XV.

(d)     *Loss of Funding Due to an Action of a Party*. If a Party causes the loss or repayment of federal funds to the HTP, attributable to a Party's material acts, errors or omissions, or failure to comply with such Party's contractual obligations with a reasonable standard of care, as determined in a written determination issued by the GDC CEO (or the GDC CEO's designee),

such Party shall be solely responsible for the loss of funding due to such Party's actions, unless such Party is able to restore such funding to support timely project completion.

ARTICLE XII

DESIGN AND CONSTRUCTION

12.01    *Overall HTP Project Management*. As set forth in Article IV hereof, GDC shall be responsible for project management of the HTP, including all project engineering and construction for each HTP Package, with support from SEPs if and to the extent set forth in SEP Agreements. Each SEP Agreement shall delineate the project management and other services required of the applicable SEP, and may delegate specific rights and powers of GDC to the applicable SEP. In delivering the HTP program, GDC shall consider future operational needs while controlling overall cost and endeavoring to deliver the HTP in an efficient manner satisfying the performance and other requirements herein and in conformance with the Executive Project Schedule. GDC shall consult, as appropriate, with the SPCC, with respect to anticipated operational needs of the HTP.

12.02    *Standards and Specifications*.

(a)    *Approval of Applicable Design Standards and Specifications*. GDC will develop the Design Standards and Specifications as necessary to meet the performance requirements identified in Article II. Such Design Standards and Specifications shall (i) be developed in conformance with Amtrak's engineering standards for design and construction, (ii) leverage best available information including industry standards such as AREMA standards and FRA standards, (iii) to the extent practicable, meet or exceed local building and fire codes, and (iv) be submitted to the TSC for approval. The Parties acknowledge and agree that, pursuant to the GDC Act, GDC shall, to the extent practicable, conform the Design Standards and Specifications to the enactments, ordinances, resolutions, and regulations of the respective states and local governments where the HTP is located in regard to construction and maintenance of the HTP, and in regard to health and fire protection that would be applicable if GDC were a private corporation. If the TSC is not able to reach unanimous agreement regarding approval of any portion of the applicable Design Standards and Specifications to the HTP, the GDC CEO's designee and Amtrak's designee shall be authorized to jointly make determinations with respect to any areas of disagreement among the TSC Representatives after soliciting input from the TSC, and, subject to satisfaction of the terms and conditions set forth herein (including, for the avoidance of doubt, compliance with applicable laws and regulations), shall be permitted to finalize and approve the Design Standards and Specifications applicable to the HTP. If the GDC CEO's designee and Amtrak's designee are unable to reach an agreement, the GDC CEO and Amtrak CEO (or the Amtrak CEO's designee) shall be authorized to jointly make a determination. If the GDC CEO and Amtrak CEO (or the Amtrak CEO's designee) are unable to reach an agreement, the GDC CEO shall issue a written determination on the Design Standards and Specifications to the HTP. All applicable HTP Contract Documents shall require that the engineer of record design the applicable portion of the HTP in compliance with the Design Standards and Specifications.

(b)    *Deviations from Design Standards and Specifications*. The GDC CEO, the GDC CEO's designee, or an SEP may submit a written request to the TSC to make a determination

- 26 -

with respect to a proposed deviation from the Design Standards and Specifications applicable to such an HTP Package. If the TSC Representatives reach a unanimous decision with respect to the requested deviation, the TSC shall respond to a written request within 10 business days of the TSC's receipt thereof, unless otherwise extended by the party submitting the written request. If the TSC Representatives fail to reach a unanimous decision with respect to the requested deviation, the GDC CEO's designee and Amtrak's designee shall be authorized to jointly approve or disapprove of the requested deviation after soliciting input from the TSC. If the GDC CEO's designee and Amtrak's designee are unable to reach an agreement, the GDC CEO and Amtrak CEO (or the Amtrak CEO's designee) shall be authorized to jointly make a determination on the proposed deviation. If the GDC CEO and Amtrak CEO (or the Amtrak CEO's designee) are unable to reach an agreement, within two business days, the GDC CEO shall issue a written determination with regard to approval or disapproval of the deviation and the financial responsibility therefor. If Amtrak disagrees with the written determination of the GDC CEO, Amtrak may, at its own risk, override the determination of the GDC CEO and approve or disapprove the proposed deviation and may then dispute the GDC CEO's determination of financial responsibility through the dispute resolution processes as described in Article XV.

(c)     *Comments to Submittals*.

(i)     The GDC shall be responsible for (A) processing and cataloging designs or other submittals from the HTP Contractors requiring review or approval (collectively, "**Submittals**") through a central document control or sharing system for distribution to the Parties hereunder, (B) clearly managing and coordinating submission of Submittal comments by the applicable Parties and SEPs (including by establishing applicable deadlines for submission of such Submittal comments within the timeframes delineated in the applicable HTP Contract Documents), tracking responses and comments from the Parties, and confirming lack of Submittals comments from the applicable Parties and SEPs, as applicable, (C) timely consolidating and preparing Submittal comments, (D) considering all comments to Submittals received from the applicable Parties and SEPs in good faith (subject to the process described in subsections (d) and (e) below), (E) coordinating design reviews with FRA and FTA, as required, and (vi) determining whether a Submittal comment will have an impact to cost or schedule or deviates from the Design Standards and Specifications; provided, however, that GDC may delegate the responsibilities set forth in (A) through (E) to an SEP pursuant to an SEP Agreement. All Parties shall have contemporaneous access to all Submittals through the central document control or sharing system managed by GDC; provided, however, that each Party's rights to comment upon Submittals shall be as set forth in Section 12.02(c)(ii).

(ii)     The Parties may review Submittals for each HTP Package as follows:

(A)     During pre-procurement of any HTP Package until issuance of any notice to proceed (in the case of design-bid-build contracts), or the issuance of issued-for-construction packages (in the case of alternative delivery contracts), Amtrak, any HTP operator or user, and the applicable SEP may review and comment on all Submittals.

(B)    After issuance of a notice to proceed (in the case of design-bid-build contracts), or the issuance of issued-for-construction packages (in the case of alternative delivery contracts) for an applicable HTP Package, GDC, or an SEP in the event GDC delegates responsibility for Submittals to such SEP pursuant to the applicable SEP Agreement, may review and comment on all Submittals, provided, however, that other Parties may review and comment on Submittals to the extent such Party clearly identified at the time of the notice to proceed or the issuance of issued-for-construction-packages (as applicable) a need to review and comment on a future Submittal due to a contingent approval of a prior Submittal. The need to review and comment on such a Submittal must be reasonable and limited in nature. The Party needs to set forth in writing its rationale for the need to review and comment on the future Submittal.

(iii)    Each Party shall provide adequate numbers of appropriate, dedicated, competent staff to support design reviews as outlined in this Agreement. If a Party fails to provide comments to a Submittal by applicable deadlines, such Party shall be deemed, as among the Parties, to have reviewed the Submittal without comment. Any Submittal comments made by a Party after the applicable deadline (including the introduction of additional or different comments during a second round of review of the same Submittal) shall be considered at the discretion of the GDC CEO or the GDC CEO's designee (or the applicable SEP if so delegated pursuant to an SEP Agreement). The Parties acknowledge and agree that any Submittal reviewer contemplated hereunder may recommend that a Submittal be revised and resubmitted by the applicable HTP Contractor; provided, however, that GDC (or the applicable SEP to the extent authority therefor is delegated pursuant to an SEP Agreement) shall make the determination regarding whether to respond to a Submittal with an approval as noted or with a directive to the applicable HTP Contractor to revise and resubmit.

(d)    *Comments that Do Not Involve a Conflict.* If a comment has an impact to cost or schedule, and the Submittal comments do not require a deviation from the Design Standards and Specifications, GDC shall, in consultation with the SEP, Amtrak, and other operators or users of the HTP (e.g., NJ TRANSIT), determine whether the comment should be accepted. If a comment has no impact to cost or schedule, and the Submittal comments do not require a deviation from the Design Standards and Specifications, Amtrak shall determine whether the comment should be accepted, in consultation with the GDC and the commenting party. If a comment would cause the HTP to deviate from the Design Standards and Specifications, the TSC shall determine whether the comment should be accepted in accordance with Section 12.02(b).

(e)    *Comments that Involve a Conflict.* In the event of conflicting comments, GDC shall work with the TSC to resolve the conflicting comments and assess whether the resolution of the conflicting comments will cause any impact to cost or schedule. Where GDC determines that the resolution of the conflicting comments will have an impact to cost or schedule and the Submittal comments do not require a deviation from the Design Standards and Specifications, GDC shall, in consultation with the SEP, Amtrak, and other operators or users of the HTP (e.g., NJ TRANSIT), make a determination regarding resolution of such Submittal

comments. Where the resolution of the conflicting comments will have no impact to cost or schedule and the conflicting comments do not require a deviation from the Design Standards and Specifications, Amtrak will resolve the conflicting comment and make the final determination in good faith and in consultation with the Parties that submitted the comments. If a comment would cause the HTP to deviate from the Design Standards and Specifications, the TSC shall determine whether the comment should be accepted in accordance with Section 12.02(b).

12.03  *Delegation of Code Compliance*. GDC may delegate to an applicable SEP pursuant to an SEP Agreement code compliance functions as will be further specified in such an SEP Agreement (which agreement will provide for performance of construction management services). GDC (or the applicable SEP to the extent authority therefor is delegated to an SEP pursuant to an SEP Agreement) shall enforce and maintain code compliance, as required by the Design Standards and Specifications, pursuant to the terms of the applicable HTP Contract Documents. The GDC CEO's designee, or as delegated to an SEP, will review design drawings and plans for consistency with the Design Standards and Specifications, inspect the construction work to confirm consistency with the drawings and plans, audit the engineer of record's certification of the completed construction work and issue a permit to occupy. The determination of the GDC CEO's designee, or as delegated to an SEP, will be dispositive. For the avoidance of doubt, requests to deviate from the Design Standards and Specifications will be subject to the review of the TSC, pursuant to Section 12.02(b), which review process may be subject to further clarification and modification and other procedural covenants to preserve schedule efficiency and predictability, including the TSC specifying a class of deviations which are immaterial, addressable in the field, and therefore not subject to its approval, all as further addressed in an SEP Agreement.

12.04  *Roles and Responsibilities During Construction.*

(a)    *Delivery.*

(i)    *GDC*. GDC shall procure (on its own behalf or that of an SEP, if applicable), necessary support to deliver the individual HTP Packages, including, for example, third-party construction management and construction inspection services to the extent required pursuant to an SEP Agreement. GDC (or an applicable SEP, to the extent so delegated pursuant to an SEP Agreement) shall be the managing and contractual authority and shall use reasonable efforts to enforce the obligations and performance of the HTP Contractors pursuant to the terms of the applicable HTP Contract Documents. GDC shall be responsible for managing interface risks and the integration between HTP Packages.

(ii)    *SEP*. Any delegation to an SEP of GDC's roles, responsibilities, or authority with respect to the delivery of an HTP Package shall be set forth in the applicable SEP Agreement.

(iii)    *Amtrak*. Amtrak shall act as a technical advisor to GDC and the applicable SEPs (to the extent Amtrak is not the applicable SEP), with respect to commissioning and handover, operations and maintenance and shall in this role promptly provide GDC and the applicable SEPs with feedback during construction regarding any potential issues that may impact Amtrak's ability to accept HTP into its rail system. Amtrak shall be responsible for

supporting GDC's (or the applicable SEP's) determination of final acceptance of the HTP Contractors' work and shall have certain approval rights as set forth hereunder and in the applicable HTP Contract Documents. Amtrak shall have the power to ultimately determine whether the HTP is accepted into its rail system as further described in Article XIV (such acceptance not to be unreasonably withheld).

(b)    *Invoices.* GDC shall have the authority and responsibility to develop and set consistent guidelines or policies for the authorization of payment to HTP Contractors and other third-party service providers. GDC may delegate to an SEP certain invoice review and approval authorities pursuant to an SEP Agreement. An SEP's own costs will be set forth and invoiced as set forth in the applicable SEP Agreements.

## ARTICLE XIII

## INSURANCE

13.01    *Requirements and Scope.*

(a)    *HTP Insurance Program.* GDC shall retain an insurance advisor (the "**HTP Insurance Advisor**") to advise the GDC Board regarding insurance coverage strategies and options for the HTP insurance program (the "**HTP Insurance Program**"). The cost of such HTP Insurance Advisor shall be considered a GDC operating cost subject to the funding requirements set forth in Section 11.01. The GDC Board shall determine and establish the HTP Insurance Program in consultation with the HTP Insurance Advisor and the Parties. Each Party procuring an HTP Contractor shall ensure that the requirements set forth in the HTP Insurance Program are included in the applicable HTP Contract Documents.

(b)    *Employee Coverage.* Subject to commercial availability, and as determined by the GDC Board, the HTP Insurance Program may contemplate that GDC shall procure, as part of its insurance policies related to the HTP, insurance coverage for employees of New Jersey, New York, Amtrak, and NJ TRANSIT who are assigned primarily to the delivery of the HTP; provided, however, that the coverage of NJ TRANSIT employees shall be subject to a separate agreement between GDC and NJ TRANSIT. If the HTP Insurance Program does not contemplate GDC procuring such insurance coverage, New Jersey, New York, Amtrak, and NJ TRANSIT shall be responsible for obtaining and maintaining such insurance for their respective employees, and the cost of such coverage, to the extent such employees are assigned primarily to delivery of an HTP Package, shall be credited as a required contribution by such Party (or, in the case of NJ TRANSIT, as a contribution by New Jersey) to the costs of the applicable HTP Package.

(c)    *Insurance During Operations and Maintenance Period.* Amtrak shall procure and keep in effect insurance covering the HTP during the operations and maintenance period, and the costs of any such insurance will be allocated to other users pursuant to the Passenger Rail Investment and Improvement Act of 2008 ("**PRIIA**"), as referenced in Section 14.01. Amtrak shall ensure that such insurance satisfies applicable federal funding and financing requirements. Amtrak shall ensure that such insurance is consistent with the approved HTP Insurance Program.

ARTICLE XIV

OPERATIONS AND MAINTENANCE

14.01  *Post-Construction Ownership and Responsibilities*.

(a)  *Ownership*. Ownership of the HTP and HTP ROW shall be structured as described in Section 7.02(e).

(b)  *Maintenance*.

(i)  Amtrak shall incorporate the HTP into Amtrak's asset management plans in accordance with Section 14.02. Amtrak shall manage the maintenance of the HTP in accordance with federal requirements and best practices. For non-NEC assets, GDC may enter into maintenance agreements with other third parties, if required.

(ii)  The Parties acknowledge that the federal funding and financing agreements will include specific requirements related to HTP asset management. The Parties shall, to the extent applicable to each Party's obligations hereunder, comply with such federal asset management requirements.

(iii)  GDC may assign its obligation as FFGA recipient to NJ TRANSIT to include the HTP in NJ TRANSIT's FTA-compliant Transit Asset Management Plan.

(iv)  Prior to commissioning of any HTP asset, Amtrak shall develop a lifecycle maintenance schedule for such HTP asset ("**Lifecycle Maintenance Schedule**"). Amtrak shall develop Lifecycle Maintenance Schedules that facilitate the new Hudson River Tunnel meeting its useful life assumption. Each Lifecycle Maintenance Schedule shall be subject to review and approval by GDC. Subject to Section 14.01(b)(v), Amtrak shall be responsible for the performance and cost of the lifecycle maintenance of the HTP in accordance with the Lifecycle Maintenance Schedules.

(v)  Operations and maintenance costs of the HTP shall be borne by Amtrak and any user of the HTP in accordance with each entity's respective obligations under PRIIA, other applicable laws, and all applicable existing and future agreements between Amtrak and any user of the HTP. HTP operations and maintenance costs shall not be credited to Amtrak or other users of the HTP as required contributions to the HTP described in Article XI.

(vi)  From the time that the ownership of any HTP asset is transferred to Amtrak, Amtrak shall be responsible for funding any capital replacement costs thereof in a manner consistent with applicable Northeast Corridor Commission policies and agreements between Amtrak and any user of the HTP, as described in Section 14.01(b)(v).

(vii)  From the time that the responsibility for maintenance of any HTP asset is transferred to Amtrak, Amtrak shall maintain such HTP asset at all times to a state of good repair and in accordance with applicable federal requirements. In the event of destruction or substantial damage to any HTP asset due to a disaster following the time that the

responsibility for maintenance of such HTP asset is transferred to Amtrak, Amtrak shall perform or cause to be performed necessary repairs to the damaged HTP infrastructure. Amtrak shall be responsible for obtaining funding consistent with PRIIA to perform any necessary repairs to any HTP asset from the time that the responsibility for maintenance of such HTP asset is transferred to Amtrak, including by reporting and processing all applicable insurance claims under the insurance policies procured and maintained by Amtrak as required by Section 13.01(c).

(c)     *Operations*.

(i)     During the ownership of the HTP ROW and/or HTP improvements by an entity other than Amtrak, the Party owning the HTP ROW and/or HTP improvements shall cause to be granted to Amtrak an irrevocable intercity passenger easement in the HTP ROW and HTP improvements to physically serve and provide intercity passenger rail service to Amtrak's rail systems or to other connecting railroads. GDC shall not enter into any agreement which disturbs Amtrak's intercity rail service.

(ii)     During the ownership of the HTP ROW and/or HTP improvements by an entity other than NJ TRANSIT, the Party owning the HTP ROW and/or HTP improvements shall cause to be granted to NJ TRANSIT an irrevocable commuter passenger easement in the HTP ROW and HTP improvements to physically serve and provide commuter passenger rail service to Amtrak's rail systems, NJ TRANSIT's rail systems or to other connecting railroads. GDC shall not enter into any agreement which disturbs NJ TRANSIT's commuter rail service.

(iii)     Upon transfer of the HTP improvements and during the operations and maintenance period, Amtrak and the users of the HTP shall make the HTP available for use in a manner consistent with the federal funding and financing requirements, including for intercity and commuter rail operations use. The operation and use of the HTP improvements, including the number of slots that Amtrak and any other users of the HTP receive shall be set forth in a separate documented process or agreement between Amtrak and such other users and shall be consistent with Northeast Corridor Commission policies.

(iv)     The Parties shall execute any additional or subsequent agreements to facilitate the transfer of HTP ROW and HTP improvements on or before the Operations Readiness Date (as defined in Section 14.02(f)).

(d)     *Incidental Use*.

(i)     Prior to dissolution of GDC, all requests for incidental use of the HTP (e.g., fiber optic line, power line, or other third-party resource not directly needed for rail or tunnel operations that will not limit rail capacity) ("**Incidental Use**") shall be subject to review and approval by GDC. If an Incidental Use is approved by GDC, GDC shall submit such Incidental Use request to the FTA as may be required by FTA. If the FTA approves the Incidental Use, Amtrak shall install or otherwise proceed with such Incidental Use, and any profits derived therefrom, after accounting for the reimbursement of costs to secure

- 32 -

and support such Incidental Use, shall be shared equally among New York, New Jersey, and Amtrak.

(ii)    After dissolution of GDC, Amtrak shall submit any requests for approval of an Incidental Use to the FTA as may be required by FTA. Amtrak shall not install or proceed with any Incidental Use unless such Incidental Use has been approved by the FTA as may be required by FTA. Proceeds attributable to any such Incidental Use shall be applied to offset Amtrak's operations and maintenance costs in accordance with its obligations under the PRIIA, other applicable laws, and all applicable agreements between Amtrak and any user of the HTP.

14.02    *Process and Sequence for Handover*. GDC and Amtrak shall enter into a subsequent agreement to govern the process and sequence for handover of the HTP. That agreement shall delineate the specific procedures for the handover, the parcels and improvements to be transferred, the timing (and costs, if applicable) for such transfers, the agreement or other document(s) in which such transfers will be documented and the timing for entry into such agreements and document(s). Such agreement will also include, at a minimum, the following provisions which may be modified as determined by GDC and Amtrak. The following provisions delineate the critical items to be completed, and the roles and responsibilities of GDC and Amtrak related to, the handover of the rail facilities to Amtrak and the integration of such rail facilities into Amtrak's rail network. Such requirements shall be further described and defined in the Rail Activation Plan (as defined in Section 14.02(a)) and the applicable HTP Contract Documents.

(a)    *Development of a Rail Activation Plan/Systems Integration Plan.* Amtrak shall develop, in coordination with GDC and any users and operators of the HTP (e.g., NJ TRANSIT), a meaningful draft of the rail activation and systems integration plan, including without limitation a training plan for personnel, (the "**Rail Activation Plan**") and any other plans necessary to commence rail service within two years of Effective Date, including a dynamic testing plan that shall account for the fleets of users and operators of the HTP (e.g., NJ TRANSIT). Such Rail Activation Plan shall inform the development of each HTP Package as needed. The Rail Activation Plan shall be finalized no later than 12 months prior to the operation of the new Hudson River Tunnel.

(b)    *Compliance with Design Criteria and Approved Design.* Any proposed or actual deviations to the Design Standards and Specifications shall have been approved by the TSC (or Amtrak) in accordance with Section 12.02(b) or remedied by the applicable HTP Contractor or SEP (if any) if not approved by the TSC (or Amtrak) in accordance with Section 12.02(b).

(c)    *Testing Generally.* GDC (or the SEP if authority is so delegated pursuant to an SEP Agreement) shall coordinate, and the Parties shall be permitted to witness, any testing with the applicable HTP Contractor(s),  the results of which shall be subject to the approval of Amtrak and, to the extent applicable, NJ TRANSIT. Disagreements among the Parties with respect to the acceptance of any required testing shall be subject to the dispute resolution procedures set forth in Article XV.

(d)    *Final Testing.* Amtrak shall perform any final testing, in coordination with GDC, the applicable SEP (if any), and any known users and operators of the HTP (e.g., NJ

TRANSIT) according to (i) the schedule specified by GDC and the applicable SEP (if any) and (ii) the Force Account Resources Plan for the applicable year.

(e)     *Safety and Security Certification.* Amtrak shall set safety and security certification requirements in writing. GDC (or the SEP if authority is so delegated pursuant to an SEP Agreement) shall have approval rights over such requirements. In determining such approval, GDC (or the SEP, if applicable) shall consider whether certification requirements are within scope of the HTP Contract Documents. Amtrak shall not place additional scope, cost, and schedule requirements through the safety and security certification process. If FRA imposes additional requirements to the safety and security certification process, such requirements would be considered non-discretionary change as described in Section 11.04(b)(i)(B).

(f)     *Setting Operation Readiness Date.* Amtrak shall determine when the work is sufficiently complete to commence simulated rail service (the "**Operations Readiness Date**"). Amtrak shall set the Operations Readiness Date in consultation with the GDC and the applicable SEP(s) (if any).

(g)     *Acceptance of Contractor Work.* GDC (or the SEP if authority is so delegated pursuant to an SEP Agreement) shall determine when to issue a certificate of final acceptance under the applicable HTP Contract Documents. GDC (or the SEP if authority is so delegated pursuant to an SEP Agreement) shall consult with Amtrak prior to issuance of a certificate of final acceptance under the applicable HTP Contract Documents.

(h)     *All Required Property Transfers Completed.* GDC shall be responsible for facilitating the provision of access rights or title transfer, as applicable, to Amtrak as necessary to facilitate Amtrak operations. The HTP ROW and all improvements shall be transferred to Amtrak for nominal value unless otherwise required by the applicable federal funding or financing requirements, and shall be free and clear of encumbrances except as agreed by the applicable Parties and applicable federal entities. The transfer of access right and/or title shall be completed in a sequence and manner as determined to achieve beneficial use of the HTP's project components during the completion of the HTP, consistent with Article VII, and shall occur on or before the Operations Readiness Date.

(i)     *Spare Parts, Training, and O&M Manuals Provided to Amtrak.* GDC (or the SEP if authority is so delegated pursuant to an SEP Agreement) shall enforce the requirements set forth in the applicable HTP Contract Documents with respect to the HTP Contractor's satisfaction of the provision of required spare parts, training, and delivery of final as-built plans and any required operations and maintenance manuals to Amtrak, subject to review by Amtrak in accordance with the timing and sequences as may be set forth in the Rail Activation Plan and in accordance with the applicable HTP Contract Documents.

(j)     *Required Record Deliverables Provided to Amtrak.* GDC (or the SEP if authority is so delegated pursuant to an SEP Agreement) shall enforce the requirements set forth in the applicable HTP Contract Documents with respect to the HTP Contractor's satisfaction of the provision of record deliverables to Amtrak in the form necessary to support Amtrak's operations in accordance with the HTP Contract Documents, subject to review by Amtrak.

(k)     *Warranties Assigned to Amtrak.* The HTP Contract Documents shall require that all warranties remaining at completion of the applicable HTP Package be assigned to Amtrak. GDC (or the SEP if authority is so delegated pursuant to an SEP Agreement) shall enforce the requirements related to the HTP Contractor's assignment of such warranties to Amtrak as set forth in the applicable HTP Contract Documents.

## ARTICLE XV

## DISPUTE RESOLUTION PROCEDURES

15.01   *Dispute Resolution Procedures.*

(a)     If any dispute arises between or among any of the Parties as to the interpretation of this Agreement, or other matters set forth herein (each, a "**Dispute**"), a Party to the Dispute shall promptly, and in any event, no later than 90 days from the date upon which such Party knew or reasonably should have known, of the Dispute, provide written notice of the Dispute to the GDC CEO or the GDC CEO's designee, and all other Parties to the Dispute. For the avoidance of doubt, for disputes under Article XII, the process described in this Section 15.01 shall not commence until the completion of any applicable design review process contemplated in Article XII. Such written notice shall describe the Dispute in reasonable detail. A Party's failure to submit such notice of Dispute within 90 days from the date upon which such Party knew or reasonably should have known of the Dispute shall be deemed a waiver by such Party of any claims related to such Dispute.

(b)     The GDC CEO or the GDC CEO's designee shall coordinate through the SPCC or other informal means to attempt to resolve any Dispute. The Parties agree to work in good faith to promptly resolve any Disputes in order to avoid delay to the HTP.

(c)     If the applicable Parties are unable to resolve the Dispute within five business days, unless extended by mutual agreement, then any Party to the Dispute may request that the Dispute be escalated. The GDC CEO or the GDC CEO's designee may request at any time that the disputing Parties continue to negotiate in good faith to resolve the Dispute prior to escalation thereof.

(d)     If the Parties fail to resolve a Dispute pursuant to informal resolution as described above, and a Party has requested that such Dispute be escalated, the GDC CEO or the GDC CEO's designee shall make a formal determination in writing resolving such Dispute no later than 10 business days following the Party's request for escalation pursuant to subsection (c) above.

(e)     If a Party to the Dispute disagrees with determination rendered by the GDC CEO or the GDC CEO's designee pursuant to subsection (d) above, such Party may request that the Dispute be considered by the full GDC Board. If a Party wishes to submit a Dispute to the GDC Board, then such Party shall deliver written notice of such request no later than 10 business days following the issuance of the written determination by the GDC CEO or the GDC CEO's designee pursuant to subsection (d). The GDC Board may consider the Dispute within 60 days, and if the GDC Board fails to act within this period, then the Dispute will be subject to procedures referenced in Section 15.02.

(f)     Pending consideration by the GDC Board of such Dispute, and any further actions contemplated in Sections 15.02 and 15.03, the Parties shall perform their respective obligations in accordance with the determination made by the GDC CEO or the GDC CEO's designee. Except to the extent that the GDC Board determines to overturn a decision rendered by the GDC CEO or the GDC CEO's designee pursuant to subsection (e), such decision shall be final, subject to Section 15.03.

15.02     *Executive Level Consideration*. In the event the GDC Board declares an impasse or fails to act in the time specified as set forth in 15.01(e), the Parties shall elevate the Dispute to the State Governors and Amtrak Chairperson (or their respective designees) who shall have 30 days unless extended by mutual agreement to resolve the Dispute prior to a Party pursuing the Dispute resolution process in Section 15.03.

15.03     *Arbitration*. If, following GDC Board review as contemplated in Section 15.01(e), the Board is at an impasse or a Party disagrees with such final determination, the Parties agree to engage in nonbinding mediation to be initiated immediately following Executive Level Consideration in Section 15.02 and completed within 60 days of initiation. If unresolved, the Parties agree to engage in binding arbitration for final resolution of such Dispute ("**Arbitration**"). The Arbitration will be conducted under a substantial evidence standard by three independent arbitrators (the "**Arbitration Tribunal**"). The following shall be included in the Arbitration procedures.

(a)     Each Party to the PDA, except GDC, shall designate in writing sent to the other Parties an appointed arbitrator before the award of the first construction agreement or within 180 days of the Effective Date of the PDA, whichever is earlier. The other Parties to the PDA may object to a Party-appointed arbitrator for bias, evident partiality, or having a prior relationship with a Party that could impede the arbitrator's partiality. Objections to a Party-appointed arbitrator shall be determined by the GDC Board. Any Party may replace its Party-appointed arbitrator by providing written notice to the GDC Board, the GDC CEO or the GDC CEO's designee, and all Parties to the PDA without stating its reason for doing so. No arbitrator may be replaced after an Arbitration is commenced unless the arbitrator is unable to serve for valid reasons.

(b)     Any Party may initiate Arbitration by submitting a Request for Arbitration ("**RFA**") to the GDC Board, the GDC CEO or the GDC CEO's designee, and all of the Parties to the PDA. The Arbitration shall be administered by the American Arbitration Association (the "**AAA**") pursuant to its Construction Industry Arbitration Rules, who must agree to the arbitrator appointment process and other Arbitration procedures established by this PDA. In no event may the arbitrators be permitted to award attorneys' fees or costs for any reason. The Parties to a Dispute agree to share equally all arbitrator fees and costs and arbitration expenses, including AAA fees.

(c)     The Party-appointed arbitrators shall choose a Chair of the Arbitration Tribunal (the "**Chair**") from among them by majority vote.

(d)     After the Chair is appointed, the arbitration panel shall develop arbitration procedures in consultation with the Parties to the Dispute.

15.04   *General Requirements.*

(a)     Pending final resolution of a Dispute, the Parties shall proceed diligently with the performance of their respective undisputed obligations under this Agreement in order to avoid delay to the HTP.

(b)     The Parties shall, and shall require their respective representatives and the arbitrators to, maintain the confidential nature of the arbitration proceeding and the award, including the hearing, except as may be required by law or as may be necessary to prepare for or conduct the arbitration hearing on the merits, or as may be necessary in connection with a court application for a preliminary remedy, a judicial challenge to an award or its enforcement.

ARTICLE XVI

DEFAULTS AND REMEDIES

16.01   *Events of Default.* Each of the following events or circumstances constitutes an event of default by a Party under this Agreement (a "**Default**"):

(a)     *Payment Default.* A Party fails to make a payment when due under this Agreement, subject to state appropriations laws and requirements.

(b)     *Cross Default.* A Party is in default under (i) an SEP Agreement, (ii) a GDC Operations Funding Agreement, or (iii) a Funding Agreement.

(c)     *Other Material Breach.* A Party fails to timely observe or perform, or cause to be observed or performed, or breaches or causes to be breached, any material obligation, term, or condition required to be observed or performed by such Party under this Agreement.

16.02   *Process.*

(a)     *GDC CEO's Determination.* Any Party may notify GDC in writing of an alleged Default of another Party, and the GDC CEO shall make an initial determination as to whether there is an apparent Default of such Party. If the GDC CEO determines that there is an apparent Default, the GDC CEO shall provide the applicable Party with notice of such determination, and the Party shall respond to such notice within 10 business days. The GDC CEO shall review such response and make a final determination regarding the alleged Default. The GDC CEO shall deliver his or her final decision regarding the alleged Default to the Parties in writing.

(b)     *GDC Board's Determination.* If a Party disagrees with the determination rendered by the GDC CEO, such Party may request consideration by the full GDC Board by delivering written notice of such request to the GDC Board no later than 10 business days following the issuance of the final written determination by the GDC CEO pursuant to subsection (a). Except to the extent that the GDC Board determines to overturn the decision rendered by the GDC CEO, such decision shall be final, subject to a Party's right to submit a dispute to binding arbitration as contemplated by Section 15.03.

(c)    *Opportunity to Cure.* Following the issuance of a final determination by the GDC CEO that a Party is in Default hereunder, such Party shall have the opportunity to cure such Default within 30 calendar days, unless such cure period is extended by the GDC CEO.

16.03    *Payment Default Remedies*. Following a Default determined in accordance with the process established by Section 16.02 due to a Party's failure to make payments required hereunder, any non-defaulting Party may, or the non-defaulting Parties collectively may by agreement amongst such non-defaulting Parties, pay the sum in question on behalf of and for the account of the defaulting Party. The non-defaulting Parties may seek any legal or contractual remedies against the defaulting Party pursuant to the dispute resolution provisions set forth in Article XV.

ARTICLE XVII

TERM AND TERMINATION

17.01    *Term*. Unless terminated early in accordance with Section 17.02 or 17.03 and subject to the survival of certain provisions pursuant to Section 19.13, this Agreement shall expire upon the satisfaction of all of the following: (i) final acceptance of the construction of the improvements of the HTP under all HTP Packages, (ii) the satisfaction in full of the property transfer and handover obligations pursuant to Articles VII and XIV, and (iii) completion of the applicable HTP funding and financing requirements.

17.02    *Termination for Failure to Perform*. If (a) GDC fails to execute a FFGA within three (3) years after the Effective Date, and (b) such failure is not due to a Party's (except the GDC's) failure to perform its obligations hereunder or under any applicable SEP Agreement, then, subject to prior consent by the federal funding or financing providers party to any financing agreement in respect of HTP entered into in accordance with this Agreement to the extent required by the terms of any such financing agreement, the Parties shall develop a plan to terminate this Agreement and address such failure to perform, including a process for transferring GDC's roles and obligations hereunder to other Parties, and the proper disposition of the assets of the GDC related to the HTP to any of the Parties that would succeed GDC in advancing the HTP.

17.03    *Termination*. Other than as set forth in Section 17.02, this Agreement shall not be terminated prior to expiration in accordance with Section 17.01 for any reason unless it is terminated in a writing signed by all Parties to this Agreement and consented to by the federal funding or financing providers party to any financing agreement in respect of the HTP entered into in accordance with this Agreement to the extent required by the terms of any such financing agreement.

ARTICLE XVIII

REPRESENTATIONS AND WARRANTIES

18.01  *Representations and Warranties*.

(a)  Each Party hereby represents and warrants to the other Parties that, as of the date hereof:

(i)  it has full power and authority to enter into, deliver, and perform this Agreement upon the terms and conditions as set forth herein;

(ii)  this Agreement has been duly authorized by such Party and does not require any additional action to be effective; and

(iii)  each person signing on such Party's behalf is authorized to do so.

(b)  Each Party acknowledges and agrees that each other Party enters into this Agreement in reliance on the foregoing representations and warranties.

ARTICLE XIX

MISCELLANEOUS

19.01  *Compliance with Laws*.

(a)  In performing its obligations under this Agreement, each Party shall, and shall require any contractors performing work on its behalf to, comply with all federal, state and local laws, regulations and requirements applicable to it when performing such obligation, and the Parties shall cooperate in all respects in a manner designed to ensure that each Party meets its respective obligations under this Section 19.01(a).

(b)  Each Party shall be responsible for administration and management activities of its respective federal grant and financing agreements and as otherwise required by federal law (including, for the avoidance of doubt, all applicable federal standards and requirements). All of the Parties shall cooperate fully and promptly with each other to ensure that each Party is able to comply with all of its respective administration and management responsibilities in respect of such federal grant and financing agreements and under federal law, including providing each other with all reports and data necessary to comply with such responsibilities and incorporating corresponding compliance obligations in agreements it may have with contractors, consultants, and assignees.

19.02  *Notices*. Except as otherwise required by applicable law, including with respect to service of process, any request, demand, authorization, direction, notice, consent, waiver, or other document provided or permitted by this Agreement to be made, given, furnished to, or filed with one Party by any other Party shall be in writing and shall be delivered by hand or by certified mail, return receipt requested, or by overnight delivery service, to such Party, with a copy to each other Party, in an envelope addressed as follows:

- 39 -

(a)  If to GDC:

        Gateway Development Commission
        2 Penn Plaza East, 11th Floor
        Newark, New Jersey 07105
        Attn: Chief Executive Officer

(b)  If to New Jersey:

        Office of the Governor
        P.O. Box 001
        Trenton, New Jersey 08625
        Attn: Chief Counsel to the Governor

with a copy to NJ TRANSIT:

        NJ TRANSIT
        1 Penn Plaza West
        Newark, New Jersey 07105
        Attn: Board Secretary

and a copy to:

        New Jersey Turnpike Authority
        P.O. Box 5042
        Woodbridge, New Jersey 07095
        Attn: Director of Law

(c)  If to New York:

        Governor of New York State
        NYS State Capitol Building
        Albany, New York 12224
        Attn: Counsel to the Governor

(d)  If to Amtrak:

        National Railroad Passenger Corporation
        1 Massachusetts Avenue, N.W.
        Washington, DC 20001
        Attn: Executive Vice President, Capital Delivery

with a copy to:

        National Railroad Passenger Corporation
        1 Massachusetts Avenue, N.W.
        Washington, DC 20001
        Attn: General Counsel and Corporate Secretary

19.03   *Severability*. If any term or provision of this Agreement is invalid, illegal, or unenforceable, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such other term or provision. Upon a determination that any term or provision is invalid, illegal, or unenforceable, the Parties hereto shall negotiate in good faith to modify this Agreement to effect the original intent of the Parties as closely as possible in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

19.04   *Entire Agreement*. This Agreement, as well as its attachments and exhibits, and any valid amendments constitute the entire agreement among the Parties regarding its subject matter, and no other oral or written understandings, representations, inducements, consideration, promises, or interpretations are part of this Agreement.

19.05   *Benefits of Agreement; Assignments*.

(a)     This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns.

(b)     No Party shall assign any of its rights or delegate any of its obligations hereunder without the prior written consent of the other Parties, provided that no such consent shall be required for (i) the assignment by GDC of its interest in this Agreement to its lenders under the security instrument granted by GDC to such lender and in connection with the exercise by such lender of its rights under such security instrument or (ii) the assignment by Amtrak of its interest in this Agreement to FRA under the mortgage granted by Amtrak to FRA and in connection with the exercise by FRA of its rights thereunder.

19.06   *Cumulative Remedies; No Waiver*.

(a)     The remedies of the Parties provided herein are cumulative and not exclusive of any remedies provided for by law.

(b)     No Party has agreed to waive any defense, right, immunity, or other protection under applicable law, including any statutory provision, by entering into this Agreement, except to the extent provided for in statutes promulgated by the States of New York and New Jersey.

19.07   *Amendments; Waivers*.

(a)     Subject to subsection (c), no modifications, amendments or waivers of, or consents to departures from, this Agreement will be valid unless in a writing signed by all Parties to this Agreement and consented to by the financing providers party to any financing agreement in respect of the HTP entered into in accordance with this Agreement to the extent required by the terms of any such financing agreement.

(b)     Except to the extent set forth in subsection (c), any waiver or consent granted by a Party shall only apply to the instance and for the specific purpose for which it has been given. No waiver by any Party of any requirement or condition, in whole or part, shall operate as a waiver of any other requirement or condition, and no consent shall prevent a Party from

subsequently exercising its rights pursuant to this Agreement without being bound by the manner in which it previously exercised (or refrained from exercising) such rights. Furthermore, failure to enforce a provision shall not be construed to constitute waiver of the enforceability or applicability of the provision or any other provision of this Agreement.

(c)    Notwithstanding subsections (a) and (b), the Parties agree that, from time to time, the GDC Board may vote to amend this Agreement. The GDC CEO shall consult with the SPCC prior to the GDC Board's consideration of any amendment to this Agreement, and the GDC CEO shall report to the GDC Board regarding the SPCC's position on any proposed amendment. Any final vote of the GDC Board to amend any provision of this Agreement shall supersede such provision and bind the Parties, and any such final vote shall constitute a modification, amendment or waiver of, or consent to a departure from, this Agreement, as applicable, to the extent of such conflict without any further action on the part of any Party.

19.08    *No Partnership*.

(a)    The Parties shall each independently comply with and perform their respective obligations under this Agreement, and nothing contained in this Agreement shall be deemed to create any association, agency, partnership, joint venture, other form of joint enterprise or fiduciary relationship among the Parties, or to provide any Party with the right, power, or authority, whether express or implied, to act or create any obligation on behalf of any other Party.

(b)    In furtherance of the foregoing it is understood and agreed that no Party has the power to contract on behalf of, or to authorize the expenditure of any monies by, any other Party.

19.09    *Counterparts and Electronic Signatures*. This Agreement may be executed in any number of counterparts, each of which shall constitute an original agreement, and all of which taken together shall be deemed one and the same agreement. The counterparts of this Agreement may be executed and delivered by PDF, facsimile, or other electronic signature by email transmission by the Parties. The receiving Party may rely on the receipt of such document so executed and delivered electronically or by facsimile as if the original has been received. No Party shall contest the admissibility or enforceability of the electronically signed copy of the Agreement in any proceeding arising out of the terms and conditions of this Agreement.

19.10    *Personal Liability*. No director, commissioner, officer, member, agent, or employee of any Party shall be charged personally by any Party with any liability or held liable to it under this Agreement for acts or omissions within the scope of his, her or their duties.

19.11    *Several Liability*. Except to the extent expressly stated otherwise, the obligations of the Parties in this Agreement shall be several and not joint and several.

19.12    *Time is of the Essence*. Each Party recognizes that time is of the essence with respect to the performance of each Party's obligations under this Agreement. Each Party shall use its reasonable best efforts to perform such Party's obligations set forth in this Agreement in accordance with the Executive Project Schedule.

19.13  *Survival*. The following provisions of this Agreement shall survive the expiration or earlier termination of this Agreement:

(a)       Section 1.01 (Definitions) and <u>Appendix A</u> (Definitions);

(b)       Section 1.02 (Rules of Interpretation);

(c)       Article XV (Dispute Resolution Procedures);

(d)       Section 18.01 (Representations and Warranties);

(e)       Article XIX (Miscellaneous);

(f)       any provision of this Agreement that expressly or by its content is intended to operate after termination or expiration of this Agreement and/or completion of construction of the HTP; and

(g)       any provision of this Agreement and applicable definitions that are necessary for interpretation or application of the foregoing.

[*Signature Pages Follow*]

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed.

GATEWAY DEVELOPMENT COMMISSION

By: _____
     Name:  Kris Kolluri
     Title:   Chief Executive Officer

THE STATE OF NEW JERSEY

By: _____
Diane Gutierrez-Scaccetti
Commissioner
New Jersey Department of Transportation

**THE STATE OF NEW YORK**

By: _Kathryn Garcia_

Name: Kathryn Garcia

Title: NYS Director of Operations

**NATIONAL RAILROAD PASSENGER
CORPORATION**

By: _____
    Name: Laura Mason
    Title:  Executive Vice President, Capital Delivery

## APPENDIX A - DEFINITIONS

"**AAA**" shall have the meaning set forth in Section 15.03(b).

"**Acquiring Party**" and "**Acquiring Parties**" shall have the meanings set forth in Section 7.02(a).

"**Agreement**" shall mean this Project Development Agreement, dated as of the Effective Date, by and among GDC, New Jersey, New York, and Amtrak.

"**Amtrak**" shall have the meaning set forth in the preamble to the Agreement.

"**Amtrak CEO**" shall mean the Chief Executive Officer of Amtrak.

"**Arbitration**" shall have the meaning set forth in Section 15.03.

"**Arbitration Tribunal**" shall have the meaning set forth in Section 15.03 of the Agreement.

"**AREMA**" shall mean the American Railway Engineering and Maintenance-of-Way Association.

"**Bylaws**" shall have the meaning set forth in Section 3.01(a).

"**Chair**" shall have the meaning set forth in Section 15.03(c).

"**Cost Impact Event**" shall have the meaning set forth in Section 11.04(c)(i).

"**Cost Impact Event Notice**" shall have the meaning set forth in Section 11.04(c)(i) of the Agreement.

"**Cost Impact Notice**" shall have the meaning set forth in Section 11.04(c)(ii) of the Agreement.

"**Cost Impacts**" shall have the meaning set forth in Section 11.04(b) of the Agreement.

"**Default**" shall have the meaning set forth in Section 16.01 of the Agreement.

"**Design Standards and Specifications**" means the design standards and specifications approved for the HTP as contemplated in Article XII, which design standards and specifications shall be (i) developed in conformance with Amtrak's engineering standards for design and construction, (ii) leverage best available information including industry standards such as AREMA standards and FRA standards, (iii) to the extent practicable, meet or exceed local building and fire codes, and (iv) be submitted to the TSC for approval. No other standards shall be considered.

"**Dispute**" shall have the meaning set forth in Section 15.01(a) of the Agreement.

"**Effective Date**" shall have the meaning set forth in the preamble to the Agreement.

"**Executive Project Schedule**" shall have the meaning set forth in Section 5.01(a) of the Agreement.

"**Existing HTP Designs**" shall have the meaning set forth in Section 4.01(c)(iii) of the Agreement.

"**FFGA**" shall have the meaning set forth in Section 5.03(b) of the Agreement.

"**Force Account Resources Plan**" shall have the meaning set forth in Section 5.02(b) of the Agreement.

"**Force Majeure Events**" shall have the meaning set forth in Section 11.04(b)(i)(A) of the Agreement.

"**FRA**" shall mean the Federal Railroad Administration.

"**FTA**" shall mean the Federal Transit Administration.

"**Funding Agreements**" shall have the meaning set forth in Section 11.02(c).

"**Funding Party**" shall have the meaning set forth in Section 11.02(a).

"**GDC**" shall have the meaning set forth in the preamble to the Agreement.

"**GDC Act**" shall have the meaning set forth in Recital A to the Agreement.

"**GDC Board**" shall have the meaning set forth in Section 3.01(a).

"**GDC CEO**" shall mean the Chief Executive Officer of Gateway Development Commission.

"**GDC Operating Budget**" shall have the meaning set forth in Section 11.01 of the Agreement.

"**GDC Operations Funding Agreement**" and "**GDC Operations Funding Agreements**" shall have the meanings set forth in Section 11.01 of the Agreement.

"**GDC Procurement Guidelines**" shall have the meaning set forth in Section 6.01(a)(i) of the Agreement.

"**GDC Record Retention Policy**" shall have the meaning set forth in Section 10.01(c) of the Agreement.

"**GDC Vice Chair**" shall mean the Vice Chair of Gateway Development Commission.

"**Governor's Representative**" shall have the meaning set forth in Section 4.05(a) of the Agreement.

"**HTP**" shall have the meaning set forth in Recital I to the Agreement.

"**HTP Contract Documents**" shall have the meaning set forth in Section 4.01(c)(i).

"**HTP Contractor**" and "**HTP Contractors**" shall have the meaning set forth in Section 4.01(c)(i) .

"**HTP Insurance Advisor**" shall have the meaning set forth in Section 13.01(a) of the Agreement.

"**HTP Insurance Program**" shall have the meaning set forth in Section 13.01(a) of the Agreement.

"**HTP Package**" and "**HTP Packages**" shall have the meanings set forth in Section 2.01 of the Agreement.

"**HTP ROW**" shall have the meaning set forth in Section 7.02(a).

"**Hudson River Tunnel**" shall have the meaning set forth in Section 2.01 of the Agreement.

"**Incidental Use**" shall have the meaning set forth in Section 14.01(d)(i) of the Agreement.

"**Lifecycle Maintenance Schedule**" shall have the meaning set forth in Section 14.01(b)(iv) of the Agreement.

"**Market Case Estimate**" shall have the meaning set forth in Section 11.04(a).

"**NEC**" shall have the meaning set forth in Recital A to the Agreement.

"**NEPA**" shall mean the National Environmental Policy Act of 1969.

"**NEPA Approvals**" shall have the meaning set forth in Section 8.01(a) of the Agreement.

"**New Jersey**" shall have the meaning set forth in the preamble to the Agreement.

"**New York**" shall have the meaning set forth in the preamble to the Agreement.

"**NJ HTP ROW**" shall have the meaning set forth in Section 7.02(a).

"**NJ TRANSIT**" shall have the meaning set forth in Recital C to the Agreement.

"**NY HTP ROW**" shall have the meaning set forth in Section 7.02(a).

"**Non-Shared Cost Impact Event**" shall have the meaning set forth in Section 11.04(b)(ii).

"**Operational Emergency**" shall have the meaning set forth in Section 11.04(b)(i)(G) of the Agreement.

"**Operations Readiness Date**" shall have the meaning set forth in Section 14.02(f) of the Agreement.

"**Owner's Representative**" shall have the meaning set forth in Section 4.05(b) of the Agreement.

"**PANYNJ**" shall mean the Port Authority of New York and New Jersey, a municipal corporate instrumentality and political subdivision of the States of New York and New Jersey, created and existing by virtue of the Compact of April 30, 1921, made by and between the two states, and thereafter consented to by the Congress of the United States.

"**Party**" and "**Parties**" shall have the meanings set forth in the preamble to the Agreement.

"**PDP**" shall have the meaning set forth in Section 4.01(a).

"**Permits**" shall have the meaning set forth in Section 8.02(a) of the Agreement.

"**PMO**" shall have the meaning set forth in Section 4.01(a).

"**PMP**" shall have the meaning set forth in Section 3.02(b) of the Agreement.

"**PNB PDA**" shall mean the Portal North Bridge Project Development Agreement, dated as of November 27, 2020, by and between NJ TRANSIT and Amtrak.

"**PRIIA**" shall have the meaning set forth in Section 13.01(c) of the Agreement.

"**Procurement Documents**" shall have the meaning set forth in Section 6.01(a)(ii) of the Agreement.

"**Procuring Party**" shall have the meaning set forth in Section 6.01(b).

"**Project Budget**" shall have the meaning set forth in Section 3.02(b) of the Agreement.

"**PTE**" shall have the meaning set forth in Section 7.03(a) of the Agreement.

"**Quarterly Budget Update**" shall have the meaning set forth in Section 9.01(c) of the Agreement.

"**Rail Activation Plan**" shall have the meaning set forth in Section 14.02(a).

"**RAMP**" shall have the meaning set forth in Section 7.02(a) of the Agreement.

"**Remediation Activities**" shall have the meaning set forth in Section 7.02(f) of the Agreement.

"**Requesting Party**" shall have the meaning set forth in Section 11.04(c)(i).

"**Reviewing Entity**" shall have the meaning set forth in Section 6.01(a)(iii).

"**RFA**" shall have the meaning set forth in Section 15.03(b).

"**ROD**" shall have the meaning set forth in Section 8.01(a) of the Agreement.

"**SCC**" shall have the meaning set forth in Section 9.01(b) of the Agreement.

"**SEP**" or "**Supporting or Executing Partner**" shall have the meaning set forth in Section 3.02(a).

"**SEP Agreement**" shall have the meaning set forth in Section 3.02(a).

"**Shared Cost Impact Event**" shall have the meaning set forth in Section 11.04(b)(i).

"**SPCC**" shall have the meaning set forth in Section 3.02(a) of the Agreement.

"**Submittals**" shall have the meaning set forth in Section 12.02(c)(i).

"**TSC**" shall have the meaning set forth in Section 3.03(a) of the Agreement.

"**TSC Representative**" shall have the meaning set forth in Section 3.03(a) of the Agreement.

"**Uniform Relocation Act**" shall have the meaning set forth in Section 7.02(a) of the Agreement.

"**USDOT**" shall have the meaning set forth in Section 5.01(a) of the Agreement.

**AMENDMENT NO. 1 TO PROJECT DEVELOPMENT AGREEMENT FOR HUDSON TUNNEL PROJECT**

This Amendment No. 1 to the Project Development Agreement for Hudson Tunnel Project ("**PDA**"), dated as of May 24, 2023 (the "**Amendment**"), is made among Gateway Development Commission ("**GDC**"), the State of New Jersey ("**New Jersey**"), the State of New York ("**New York**"), and National Railroad Passenger Corporation ("**Amtrak**"). GDC, New Jersey, New York, and Amtrak are collectively referred to herein as "**Parties**" or in the singular each as "**Party**" as the context requires.

WHEREAS, the Parties entered into the PDA, which was effective as of February 3, 2023; and

WHEREAS, the Parties hereto desire to amend the PDA on the terms and subject to the conditions set forth herein; and

WHEREAS, pursuant to Section 19.07(c) of the PDA, the GDC Board of Commissioners has voted to amend the PDA and this Amendment shall bind the Parties.

NOW, THEREFORE, in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.      *Definitions*. Capitalized terms used and not defined in this Amendment have the respective meanings assigned to them in the PDA.

2.      *Amendments to the PDA*. As of the Effective Date (defined below), the PDA is hereby amended or modified as follows:

(a)      Section 6.02(a) of the PDA is hereby amended by inserting immediately following the words "(i) one representative having requisite expertise related to the procurement from each of GDC, the HTP operator or user (e.g., NJ TRANSIT)" the words "New York,".

(b)      Section 12.02(b) of the PDA is hereby amended by inserting at the end of such Section the following new Section 12.02(b)(i):

*Material Deviations*.  Any Party or HTP Contractor may propose a "**Material Deviation**" under the terms of relevant HTP contract documents. The TSC shall conduct an analysis of and make a recommendation regarding the Material Deviation within ten (10) business days of the TSC's receipt thereof, unless otherwise extended by the GDC CEO. The TSC shall provide a briefing on any proposed Material Deviations and present its analysis and recommendations to the GDC Board. For the avoidance of all doubt, in the event that the TSC cannot present a unanimous recommendation it shall present arguments for and against any Material Deviation when it briefs the GDC Board. All Material Deviations shall be either approved or disapproved by the GDC Board. A Material Deviation shall mean a deviation from

Design Standards and Specifications that if implemented: (A) has an aggregate cost impact (increase or decrease) that exceeds $100 million, (B) would require further environmental evaluation or reevaluation of the Project, or (C) has a schedule impact of 60 calendar days or more (computed as the total of all schedule increases and savings created by a deviation).

     (c)    Article 12 of the PDA is hereby amended by inserting a new Section 12.05 as follows:

12.05          *Alternative Technical Concepts.*

(a)   Any HTP Contractor may propose an alternative technical concept ("**ATC**") under the terms of a relevant HTP procurement. The TSC shall conduct an analysis and make a recommendation regarding the ATC within ten (10) business days of the TSC's receipt thereof, unless otherwise extended by the GDC CEO. The TSC shall provide a briefing on all proposed ATCs and present its analysis and recommendations during an executive session of the GDC Board. For the avoidance of all doubt, in the event that the TSC cannot present a unanimous recommendation it shall present arguments for and against any ATC when it briefs the GDC Board. Following the briefing, a determination on the ATC will be rendered by the TSC based on input and guidance provided by the GDC Board. All ATCs recommended for award at the conclusion of the procurement process shall be subject to the approval of the GDC Board at such time.

(b)   All persons briefed with respect to an ATC during an ongoing procurement shall maintain the confidentiality of such information and shall execute a procurement confidentiality agreement as may be required.

     (d)    Appendix A- Definitions of the PDA is hereby amended by inserting the following new definitions in the appropriate alphabetical order:

"**ATC**" shall have the meaning set forth in Section 12.05(a) of the Agreement.

"**Material Deviation**" shall have the meaning set forth in Section 12.02(b)(i) of the Agreement.

     *3.*    *Date of Effectiveness; Limited Effect.* This Amendment will become effective as of the date first written above (the "**Effective Date**"). Except as expressly provided in this Amendment, all of the terms and provisions of the PDA are and will remain in full force and effect and are hereby ratified and confirmed by the Parties. Without limiting the generality of the foregoing, the amendments contained herein will not be construed as an amendment to or waiver of any other provision of the PDA or as a waiver of or consent to any further or future action on the part of any Party that would require the waiver or consent of the other Party. On and after the Effective Date, each reference in the PDA to "this Agreement," "the Agreement," "hereunder," "hereof," "herein," or words of like import, will mean and be a reference to the PDA as amended by this Amendment.

# AMENDMENT NO. 2 TO PROJECT DEVELOPMENT AGREEMENT FOR HUDSON TUNNEL PROJECT

This Amendment No. 2 to the Project Development Agreement for Hudson Tunnel Project ("**PDA**"), dated as of March 5, 2024 (the "Amendment"), is made among Gateway Development Commission ("**GDC**"), the State of New Jersey ("**New Jersey**"), the State of New York ("**New York**"), and National Railroad Passenger Corporation ("**Amtrak**"). GDC, New Jersey, New York, and Amtrak are collectively referred to herein as "**Parties**" or in the singular each as "**Party**" as the context requires.

WHEREAS, the Parties entered into the PDA, which was effective as of February 3, 2023; and

WHEREAS, the Parties entered into Amendment No. 1 to the PDA ("**PDA Amendment No. 1**"), which was effective as of May 24, 2023; and

WHEREAS, the Parties hereto desire to amend the PDA on the terms and subject to the conditions set forth herein; and

WHEREAS, pursuant to Section 19.07(c) of the PDA, the GDC Board of Commissioners has voted to amend the PDA and this Amendment shall bind the Parties.

NOW, THEREFORE, in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.  *Definitions*. Capitalized terms used and not defined in this Amendment have the respective meanings assigned to them in the PDA.

2.  *Amendment to the PDA*. As of the Effective Date (defined below), Section 14.01(d) of the PDA is hereby amended by deleting Section 14.01(d)(ii) and replacing it with the following new Section 14.01(d)(ii) and inserting a new Section 14.01(d)(iii):

"(ii) After dissolution of GDC, Amtrak shall submit any requests for approval of an Incidental Use to the FTA and/or FRA as may be required by FTA and/or FRA. If the FTA and/or FRA, as applicable, approve the Incidental Use, then, subject to any applicable FTA and/or FRA requirements and conditions regarding the use of proceeds from HTP assets, Amtrak shall install or otherwise proceed with such Incidental Use, and any profits derived therefrom, after accounting for the reimbursement of costs to secure and support such Incidental Use, shall be restricted to use for operation and maintenance and capital renewal of the North River Tunnel, Hudson River Tunnel, East River Tunnels and Penn Station New York, and such use of profits shall be applied to reduce in equal amounts the aggregate Monthly Operating Charges assessed to each of the Metropolitan Transportation Authority, NJ TRANSIT, and Amtrak with respect to such assets in accordance with the then-effective Northeast Corridor Commuter and Intercity Rail Cost Allocation Policy (the "**NECC Policy**") or successor policy; provided that if

such profits exceed the aggregate Monthly Operating Charges assessed to any such operator with respect to such assets, then the balance shall be applied to reduce in equal amounts the aggregate Baseline Capital Charges assessed to each such operator with respect to such assets. For the purpose of this subsection (ii), the terms "Monthly Operating Charges" and "Baseline Capital Charges" shall have the meanings assigned thereto in the NECC Policy.

(iii) Except for any purpose directly related to the construction, operation or maintenance of the HTP ("**Excluded Uses**"), if at any time Amtrak seeks to develop, pursue a joint development, sell or dispose of any portion of, sell or transfer any development rights or air rights, lease, license or permit another grant of use, mortgage, lien or otherwise encumber, use for any income-producing purpose, or use for any purpose not directly related to construction, operation, or maintenance of the HTP, or effect any similar transaction with any third party, in each case with respect to Manhattan Block 675, Lot 1 (each, a "**675 Transaction**"), Amtrak must first obtain the approval of GDC. If GDC has been dissolved at the time Amtrak is pursuing such 675 Transaction, then Amtrak must first obtain the approval of New York and New Jersey. If such 675 Transaction is approved by GDC, or New York and New Jersey in the event of GDC's dissolution, Amtrak shall, if required pursuant to relevant law, submit a request for approval of the 675 Transaction to the FTA and/or FRA. If the FTA and/or FRA approve such 675 Transaction, then, subject to FTA and/or FRA requirements and conditions regarding the use of proceeds from property acquired in connection with a federally-supported project, Amtrak shall enter into such 675 Transaction, and any proceeds derived therefrom, after accounting for the reimbursement of costs reasonably approved in writing by GDC, or New York and New Jersey in the event of dissolution of GDC, to secure and support such 675 Transaction, shall be distributed in equal amounts to New York, New Jersey, and Amtrak for any use permitted by relevant law, or otherwise applied as may be agreed by New York, New Jersey and Amtrak. At the request of New York, New Jersey or Amtrak, the Parties shall cooperate to record a memorandum of PDA or other instrument providing record notice of the existence of the rights set forth in this Section 14.01(d)(iii).  For avoidance of doubt, Amtrak's granting a required mortgage to FRA pursuant to Section 19.05(b), any commuter easement required by Section 7.02(e), and any Incidental Uses under Section 14.01(d)(i), shall each be deemed Excluded Uses and not 675 Transactions."

3.      *Amendment to the PDA*. As of the Effective Date, Section 19.13 of the PDA is hereby amended by inserting at the end of such Section the following new Section 19.13(h):

"Section 14.01 (Post-Construction Ownership and Responsibilities)."

4.      *Date of Effectiveness; Limited Effect*. This Amendment will become effective as of the date first written above (the "**Effective Date**"). Except as expressly provided in

this Amendment, all of the terms and provisions of the PDA are and will remain in full force and effect and are hereby ratified and confirmed by the Parties. Without limiting the generality of the foregoing, the amendments contained herein will not be construed as an amendment to or waiver of any other provision of the PDA or as a waiver of or consent to any further or future action on the part of any Party that would require the waiver or consent of the other Party. On and after the Effective Date, each reference in the PDA to "this Agreement," "the Agreement," "hereunder," "hereof," "herein," or words of like import, will mean and be a reference to the PDA as amended by this Amendment.