**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STATE OF NEW JERSEY and STATE OF NEW YORK, <br><br>       Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF TRANSPORTATION, *et al.*, <br><br>       Defendants. | Case No. 26-cv-00939 |

**DECLARATION OF MATTHEW HAWKINS**

I, Matthew Hawkins, do hereby declare and state as follows:

1. I am the Director of the Departmental Office of Grants and Financial Assistance ("GFA") within the United States Department of Transportation ("DOT"). GFA provides Department-wide leadership and guidance on the interpretation, implementation, and administration of financial assistance policies governed by the Office of Management and Budget's regulations (2 CFR Part 200). GFA serves as a key resource to ensure effective and consistent award management practices for critical financial assistance programs in support of DOT's mission, in alignment with applicable grant regulations.

2. On September 30, 2025, DOT paused reimbursements to GDC under the following agreements:

    a. Full Funding Grant Agreement No. NY-2024-015-00 with the Federal Transit Administration ("FTA") under the Capital Investment Grants Program in the amount of $6.88 billion (the "FTA CIG Grant"). A true and correct copy of this grant agreement is attached hereto as Exhibit A.

    b. Grant Agreement No. NY-2024-014-00 with FTA under the Rebuilding American Infrastructure with Sustainability and Equity ("RAISE") Program in the amount of $25 million (the "FTA RAISE Grant"). A true and correct copy

of this grant agreement is attached hereto as Exhibit B.  The FTA RAISE Program incorporates by reference the "General Terms and Conditions Under the Fiscal Year 2023 RAISE Program: FTA Projects, dated June 23, 2023.  A true and correct copy of that document is attached hereto as Exhibit C.

c.  Grant Agreement No. 69A36524420700FSPNY with the Federal Railroad Administration ("FRA") under the Federal-State Partnership for Intercity Passenger Rail Program in the amount of $3.79 billion (the "FRA FSP Grant").  A true and correct copy of this grant agreement is attached hereto as Exhibit D.

d.  Three separate loan agreements with DOT under the Railroad Rehabilitation and Improvement Financing Program ("RRIF") in the amount of approximately $4.06 billion (the "RRIF Loans"). True and correct copies of these loan agreements are attached hereto as Exhibits E-G.

3.      Each of the HTP Grant and Loan Agreements is executed between DOT, or a component thereof, and GDC and each contains its own terms and conditions.  *See* Exs. A-B, D-G.

4.      Notably, the terms of each of the HTP Grant and Loan Agreements govern: (1) what constitutes a breach or event of default; (2) the circumstances in which DOT may withhold funding from GDC or suspend GDC's drawdown of funds; and (3) the procedural requirements attendant to the Government's withholding or suspension of funding.  *See id*. The following is a non-exhaustive list of the agreement terms that govern breach and default.

a.  The FTA CIG Grant (Ex. A)

Section 19 of the FTA CIG Grant provides:

> (a) . . . In the event that the Government determines that the Grantee is in breach of this Agreement, the Government may withhold its approvals of further funding and suspend drawdown of funds, under the provisions of Section 11 of the Master Agreement, "Right of the Federal Government to Terminate," until any necessary corrective action, which may be required by the Government, is accomplished….
>
> (b) In the event of a breach of this Agreement by the Grantee and before the Government takes action contemplated by this Section, the Government will provide the Grantee with ninety (90) days'

written notice that the Government considers that such a breach has occurred and will provide the Grantee a reasonable period of time to respond and to take necessary corrective action.  Ex. B at 18.

b.  The FTA RAISE Grant (Ex. C)

Section 16.1, titled Noncompliance Determinations, provides:

(a) If the USDOT determines that the Recipient may have failed to comply with the United States Constitution, Federal law, or the terms and conditions of this agreement, the USDOT may notify the Recipient of a proposed determination of noncompliance. For that notice to be effective, USDOT must include an explanation of the nature of the noncompliance, describe a remedy, state whether that remedy is proposed or effective at an already determined date, and describe the process through and form in which the Recipient may respond to the notice.

(b) If the USDOT notifies the Recipient of a proposed determination of noncompliance under section 16.1(a), the Recipient may, not later than 7 calendar days after the notice, respond to that notice in the form and through the process described in that notice. In its response, the Recipient may:

(1) accept the remedy;

(2) acknowledge the noncompliance, but propose an alternative remedy; or

(3) dispute the noncompliance.

To dispute the noncompliance, the Recipient must include in its response documentation or other information supporting the Recipient's compliance.

(c) The USDOT may make a final determination of noncompliance only:

(1) after considering the Recipient's response under section 16.1(b); or

(2) if the Recipient fails to respond under section 16.1(b), after the time for that response has passed.

(d) To make a final determination of noncompliance, the USDOT must provide to the Recipient a notice that states the bases for that determination.  Ex. C at 19.

Section 16.2, titled Remedies, provides:

>    (a) If the USDOT makes a final determination of noncompliance under section 16.1, the USDOT may impose a remedy, including:
>
>    >    (1) additional conditions on the award;
>    >
>    >    (2) any remedy permitted under 2 C.F.R. 200.339–200.340, including withholding of payments; disallowance of previously reimbursed costs, requiring refunds from the Recipient to the USDOT; suspension or termination of the award; or suspension and disbarment under 2 C.F.R. part 180; or
>    >
>    >    (3) any other remedy legally available.
>
>    (b) To impose a remedy, the USDOT must provide to the Recipient a notice that describes the remedy, but the USDOT may make the remedy effective before the Recipient receives that notice.
>
>    (c) If the USDOT determines that it is in the public interest, the USDOT may impose a remedy, including all remedies described in section 16.2(a), before making a final determination of noncompliance under section 16.1. If it does so, then the notice provided under section 16.1(d) must also state whether the remedy imposed will continue, be rescinded, or modified.
>
>    (d) In imposing a remedy under this section 16.2 or making a public interest determination under section 16.2(c), the USDOT may elect to consider the interests of only the USDOT.
>
>    (e) The Recipient acknowledges that amounts that the USDOT requires the Recipient to refund to the USDOT due to a remedy under this section 16.2 constitute a debt to the Federal Government that the USDOT may collect under 2 C.F.R. 200.346 and the Federal Claims Collection Standards (31 C.F.R. parts 900– 999). Ex. C at 19-20.

>    c.   The FRA FSP Grant (Ex. D)

Article 9.1, titled Noncompliance Determinations, provides:

>    (a) Notice of Proposed Determination. If FRA determines that the Recipient may have failed to comply with the United States Constitution, Federal law, or the terms and conditions of this Agreement, FRA will notify the Recipient of a proposed determination of noncompliance through a written notice that:

(1) explains the noncompliance;

(2) describes a proposed remedy that is consistent with Section 9.2 of this Attachment 1;

(3) describes the process and form in which the Recipient may respond to the notice that is consistent with Section 9.1(b) of this Attachment 1; and

(4) if applicable, provides the Recipient an opportunity to cure the noncompliance or take corrective action.

(b) Response to Notice of Proposed Determination. The Recipient may, not later than 7 days after receiving the notice of proposed determination of noncompliance respond to that notice in the form and through the process described in that notice.  In its response, the Recipient may:

(1) accept the proposed remedy;

(2) acknowledge the noncompliance, but propose an alternative remedy;

(3) acknowledge the noncompliance and agree to cure or take corrective action; or

(4) dispute the noncompliance.

To dispute the noncompliance, the Recipient must include in its response sufficient documentation or other information supporting the Recipient's compliance.

(c) Notice of Final Determination. After considering the Recipient's response or failure to timely respond under Section 9.1(b) of this Attachment 1, FRA will make a final determination. To make a final determination, FRA must provide a written notice to the Recipient that:

(1) states what the final determination is (e.g., noncompliance or compliance);

(2) states the basis for the final determination; and

(3) describes the remedy that FRA is imposing, if applicable, or if FRA is not imposing a remedy, describes the resolution to the proposed determination of noncompliance, including whether the Recipient has cured or corrected the noncompliance.

(d) If FRA determines the noncompliance is one that cannot be addressed while work on the Project is ongoing, in the notice of proposed determination or in the notice of final determination, FRA will direct the Recipient to stop work. The Recipient will stop work and will direct any Subrecipients or contractors to stop work immediately upon receipt of a notice to stop work from FRA.

(e) FRA may consider the public interest in making a determination of noncompliance and imposing a remedy.  Ex. D at 17.

Article 9.2, titled Remedies, provides:

(a) If FRA makes a final determination of noncompliance under Section 9.1(c) of this Attachment 1, FRA may impose a remedy, including:

(1) additional conditions on the award;

(2) requiring the Recipient to prepare and implement a corrective action plan;

(3) directing the Recipient to stop work;

(4) any remedy permitted under 2 C.F.R. §§ 200.339–200.340, including withholding of payments; disallowance of previously reimbursed costs, requiring refunds from the Recipient to FRA; suspension or termination of the award; or suspension and disbarment under 2 C.F.R. part 180; or

(5) any other remedy legally available.

(b) The Recipient acknowledges that any amounts FRA requires the Recipient to refund to FRA under this Section 9.2 constitute a debt to the Federal Government that FRA may collect under 2 C.F.R. § 200.346 and the Federal Claims Collection Standards (31 C.F.R. parts 900–999).

(c) Other Remedies. The termination authority under Article 10 of this Attachment 1 supplements and does not limit FRA's remedial authority under this Article 9 or 2 C.F.R. part 200, including 2 C.F.R. §§ 200.339-200.240. FRA reserves the right to seek any appropriate remedy or otherwise enforce the terms and conditions of this Agreement as authorized by law.  Ex. D at 17-18.

Article 10.1, titled Suspension of Award Activities, provides:

(a) If FRA determines that the remedy for noncompliance imposed under Article 9 of this Agreement does not achieve the desired result

or is unlikely to improve compliance or performance, FRA may suspend activities under this Agreement pending corrective action by the Recipient or termination.

(b) If FRA suspends activities under this Agreement, FRA will notify the Recipient in writing of the following, which may be included in the determinations of noncompliance under Section 9.1 of this Attachment 1:

(1) what project activities, if any, will take place during the period of suspension;

(2) what costs FRA will reimburse if the suspension is lifted and the award resumed;

(3) what corrective actions must occur during the suspension; and

(4) FRA's intent to terminate the award under this Article 10 if the Recipient does not meet the conditions of the remedial action.

(c) The duration of the temporary suspension of activities under the Agreement should be commensurate with the corrective action needed, but should not exceed 120 days at the outset. If the Recipient is not making sufficient progress in correcting the noncompliance, FRA must consider both financial and programmatic requirements in determining the appropriate extension to avoid the need for termination.  Ex. E at 18-19.

d.   The RRIF Loans (Exs. E-G)

The RRIF Loan Agreements contain the same standard terms and conditions, which provide:

Section 4. Withholding. The RRIF Lender shall be entitled to withhold approval (in whole or in part) of any pending or subsequent requests for the disbursement of RRIF Loan proceeds if:

(a) an Event of Default or event that, with the giving of notice or the passage of time or both, would constitute an Event of Default under the RRIF Loan Agreement shall have occurred and be continuing; or

(b) the Borrower:

(i) knowingly takes any action, or omits to take any action, amounting to fraud or violation of any applicable federal or local criminal law, in connection with the transactions contemplated hereby; or

(ii) fails to construct the Project in a manner consistent with the Governmental Approvals with respect to the Project, or in accordance with the highest standards of the Borrower's industry, where such failure prevents or materially impairs the Project from fulfilling its intended purpose, or prevents or materially impairs the ability of the RRIF Lender to monitor compliance by the Borrower with applicable federal or local law pertaining to the Project or with the terms and conditions of the RRIF Loan Agreement; or

(iii) fails to observe or comply with any applicable federal or local law, or any term or condition of the RRIF Loan Agreement; or

(iv) fails to satisfy any condition set forth in Section 4 (Disbursement Conditions), Section 12(b) (Conditions Precedent to All Disbursements) or, if applicable, Section 13(b) (Officers' Authorization) of the RRIF Loan Agreement; or

(v) fails to deliver documentation satisfactory to the RRIF Lender evidencing Eligible Project Costs claimed for disbursement at the times and in the manner specified by the RRIF Loan Agreement; provided, that in such case the RRIF Lender may, in its sole discretion, partially approve a disbursement request in respect of any amounts for which adequate documentation evidencing Eligible Project Costs has been provided and may, in its sole discretion, disburse in respect of such properly documented amounts.  *See* Ex. E at Ex. D-2, Requisition Procedures.

Section 19(c) provides:

Upon the occurrence of any other Event of Default, [DOT] may (i) suspend or terminate all of its obligations hereunder with respect to the disbursement of any undisbursed amounts of the RRIF Loan and (ii) demand that the Borrower immediately repay any unexpended

RRIF Loan proceeds disbursed to the Borrower under this Agreement, in which event the Borrower shall immediately repay any such unexpended RRIF Loan proceeds to [DOT].  Ex. E at 52.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed on this 6th day of February 2026.

_____

Matthew Hawkins  
Director  
Departmental Office of Grants and Financial Assistance  
U.S. Department of Transportation
