# Exhibit A

**UNITED STATES OF AMERICA
DEPARTMENT OF TRANSPORTATION
FEDERAL TRANSIT ADMINISTRATION
WASHINGTON, D.C.**

**FULL FUNDING GRANT AGREEMENT**

**GATEWAY DEVELOPMENT COMMISSION (GDC)**

**HUDSON TUNNEL PROJECT**

**NY-2024-015-00**

# TABLE OF CONTENTS

## FULL FUNDING GRANT AGREEMENT TERMS AND CONDITIONS

SECTION 1. DEFINITIONS ............................................................................................................ 2
SECTION 2. PURPOSES OF AGREEMENT ................................................................................ 4
SECTION 3. PREVIOUS FEDERAL DOCUMENTS AND GRANTS ....................................... 5
SECTION 4. OBLIGATION TO COMPLETE THE PROJECT .................................................. 5
SECTION 5. REVENUE SERVICE DATE AND LEVELS OF SERVICE ................................. 6
SECTION 6. NET PROJECT COST ............................................................................................... 7
SECTION 7. ESTIMATED NET PROJECT COST ...................................................................... 7
SECTION 8. LIMITATIONS OF THE FEDERAL FUNDING COMMITMENT ...................... 8
SECTION 9. FEDERAL FUNDING-OTHER SOURCES ........................................................... 8
SECTION 10. LOCAL FINANCIAL COMMITMENT–CAPITAL COSTS ............................... 8
SECTION 11. AUTHORIZATION TO ADVANCE PROJECT WITHOUT PREJUDICE ......... 9
SECTION 12. LOCAL FINANCIAL COMMITMENT–OPERATING AND MAINTENANCE COSTS .............. 9
SECTION 13. BASELINE COST ESTIMATE .............................................................................. 10
SECTION 14. BASELINE SCHEDULE ........................................................................................ 10
SECTION 15. PROJECT MANAGEMENT OVERSIGHT .......................................................... 11
SECTION 16. ENVIRONMENTAL PROTECTION ..................................................................... 11
SECTION 17. LABOR PROTECTION .......................................................................................... 11
SECTION 18. GOVERNMENT ACTIONS ................................................................................... 12
SECTION 19. REMEDIES .............................................................................................................. 12
SECTION 20. CONTENTS OF AGREEMENT ............................................................................ 13
SECTION 21. SIMULTANEOUS CREATION OF AGREEMENT IN ELECTRONIC FORMAT ......... 13
SECTION 22. AMENDMENTS TO AGREEMENT .................................................................... 13
SECTION 23. ATTACHMENTS-INCORPORATION ................................................................. 14
SECTION 24. NOTICES ......,........................................................................................................ 14
SECTION 25. APPLICABLE LAW ............................................................................................... 14
SECTION 26. AWARD AND EXECUTION OF AGREEMENT ....................................... 14, 15
EXECUTION BY GRANTEE ......................................................................................................... 15
AFFIRMATIONS OF GRANTEE'S ATTORNEY ........................................................................ 16

## ATTACHMENTS

ATTACHMENT 1        SCOPE OF PROJECT
ATTACHMENT IA       PROJECT MAP
ATTACHMENT 1B       PROJECT VICINITY MAP
ATTACHMENT 2        PROJECT DESCRIPTION
ATTACHMENT 3        BASELINE COST ESTIMATE
ATTACHMENT 3A       PROJECT BUDGET
ATTACHMENT4         BASELINE SCHEDULE
ATTACHMENT 5        PRIOR GRANTS AND RELATED DOCUMENTS
ATTACHMENT 6        SCHEDULE OF FEDERAL FUNDS
ATTACHMENT 7        MEASURES TO MITIGATE ENVIRONMENTAL IMPACTS
ATTACHMENT 8        INFORMATION COLLECTION AND ANALYSIS PLAN

**UNITED STATES OF AMERICA**
**DEPARTMENT OF TRANSPORTATION**
**FEDERAL TRANSIT ADMINISTRATION**

**FULL FUNDING GRANT AGREEMENT**

On the date the authorized U.S. Department of Transportation, Federal Transit Administration (FTA) official signs this Full Funding Grant Agreement, the Government (FTA) has awarded Federal assistance in support of the Project described below. Upon execution of this Full Funding Grant Agreement by the Grantee named below, the Grantee affirms this Award by the Government (FTA Award), and enters into this Full Funding Grant Agreement with FTA. The following documents are incorporated by reference and made part of this Full Funding Grant Agreement:

(1) "Federal Transit Administration Master Agreement," FTA MA (31), May 2, 2024;
(2) The Certifications and Assurances applicable to the Project that the Grantee has selected and provided to FTA, and
(3) Any Award notification containing special conditions or requirements, if issued.

**FTA AWARD**

The Government (FTA) hereby awards a Full Funding Grant as follows:

Project Number(s): NY-2024-015-00

Grantee: Gateway Development Commission (GDC), New York, NY

Citation of Statutes Authorizing the Project: 49 U.S.C. §§ 5309(b), 5309(d)

Estimated Net Project Cost:  $ 14,576,170,721

Maximum FTA Amount Awarded: $6,905,000,000

Amount of This FTA Award: $800,000,000

Maximum Federal Section 5309 Capital Investment Grant Program Financial Contribution: $6,880,000,000

Maximum Percentage of FTA Participation:  47.4 percent

Maximum Percentage of Section 5309 Capital Investment Grant Program Participation: 47.2 percent.

Special Conditions:  Grantee shall provide evidence to FTA, in a timely manner, of the recording of the deed referenced in Section 7.02(e) and Section 14.0l(c)(ii) of the Project Development Agreement (PDA) for the Hudson Tunnel Project among the Gateway Development Commission, the State of New Jersey, the State of New York, and the National Railroad Passenger Corporation, executed on February 3, 2023 as amended by First Amendment dated May 24, 2023 and Second Amendment dated March 5, 2024.  To the extent that any transfer of real property, retention of easements, or transfer of Project Improvements referenced in Section 7.02(e) and Section 14.0l(c) of the PDA will occur in a manner that is inconsistent with such provisions of the PDA, Grantee shall obtain approval from FTA prior to such transfer.

.

Dates of U.S. Department of Labor Certifications of Transit Employee Protective Arrangements:

Original Project or
<u>Amendment Numbers:</u>                         <u>Certification Dates:</u>
NY-2024-015-00                                   June 10, 2024

Revenue Service Date:  November 9, 2040

Project Description:

The CIG Project consists of three elements:   1) the construction of a new Hudson River Tunnel between New York and New Jersey; 2) the rehabilitation of the existing North River Tunnel under the Hudson River; and 3) Long Island Rail Road (LIRR) Emergency Services Building (ESB) Utility Relocation Early Work associated with the separately funded Hudson Yards Concrete Casing Section 3 project.

For a more detailed description, see Attachments 1 and 2.

## <u>UNITED STATES OF AMERICA DEPARTMENT OF TRANSPORTATION FEDERAL TRANSIT ADMINISTRATION</u>

### FULL FUNDING GRANT AGREEMENT TERMS AND CONDITIONS

**THIS FEDERAL TRANSIT ADMINISTRATION FULL FUNDING GRANT AGREEMENT** (Agreement) is entered into by the Gateway Development Commission, New York, NY (Grantee), and the United States of America, acting through the United States Department of Transportation, Federal Transit Administration (FTA or Government).

**WHEREAS,** the Grantee and cognizant jurisdictions have determined through the local planning process that construction of the Hudson Tunnel Project (Project) will effectively and efficiently serve the transportation needs of the Northeast Corridor located between Secaucus, New Jersey and New York, New York.

**WHEREAS,** the Grantee has developed a Financial Plan, as herein defined, using a combination of local, state, and Federal funds to finance the costs of the Project and, in accordance with its plan, has requested a Grant, as herein defined, of Federal financial assistance in the Project.

**WHEREAS,** the Project is the public transportation share of a new fixed guideway capital project that will provide both public transportation and intercity passenger rail service, and the Government has determined that the net capital costs of the new fixed guideway capital project attributable to public transportation are equal to 90 percent of the overall new fixed guideway capital project based on the peak hour usage of the existing North River (Hudson) Tunnel.

**WHEREAS,** the Government has determined to enter into this Agreement and to support the net capital costs of the Project up to a Maximum Federal Section 5309 Capital Investment Grants Program Financial Contribution of $6,880,000,000, subject to all the terms and conditions set forth in this Agreement.

**WHEREAS,** the Grantee has submitted its request for Federal assistance (the Application) and the Government has received and is relying upon the Grantee's assurances, certifications, and all other documents required as conditions precedent to a grant of assistance by the Government for the Project; and, in its submissions, the Grantee has demonstrated justification for the Project, has demonstrated its financial, organizational, legal, and technical capacity as is necessary to complete the Project within the maximum amount of Federal assistance set forth in this Agreement, and has demonstrated the capability to secure non-Federal funds as may be necessary for such completion.

**WHEREAS,** the Government has determined that the Project is justified based on a comprehensive review of its mobility improvements, environmental benefits, cost effectiveness, land use, economic development effects, and congestion relief; and the Project is supported by an acceptable degree of local financial commitment, including evidence of stable and dependable financing sources to construct, maintain, and operate the Project.

6

**WHEREAS,** a Project Development Agreement among the Grantee, the State of New Jersey, the State of New York, and the National Railroad Passenger Corporation (Amtrak), dated February 3, 2023 as amended by First Amendment dated May 24, 2023 and Second Amendment dated March 5, 2024, establishes the conditions upon which the Project will be completed, and post-construction responsibilities of GDC and the other parties to the agreement, including operation and maintenance of the Project.

**WHEREAS,** the Government and the Grantee have agreed that their respective duties and responsibilities as related to the completion of the Project shall be determined by and under the terms and conditions of this Agreement and have agreed that this Agreement shall be recognized as the sole understanding between the Government and the Grantee in consideration of the mutual promises as set forth in this Agreement.

**THEREFORE,** in consideration of the above and the parties' mutual promises as set forth in this Federal Transit Administration Full Funding Grant Agreement, the Grantee and the Government agree to the specific terms, conditions and provisions set forth in this entire Agreement including, in particular, the specific terms of the following Sections and Attachments:

## SECTION 1.  DEFINITIONS

**"Agreement"** means this Federal Transit Administration Full Funding Grant Agreement (FFGA) and consists of all parts and documents listed in Section 20 of this Agreement, "Contents of Agreement," and will include all future addenda, substitutions, modifications, and amendments as and when legally executed and effective. (This definition supersedes the definition of "Grant Agreement" set forth in Section 2(a) of the Federal Transit Administration Master Agreement (Master Agreement), incorporated by reference and made part of this Agreement).

**"Application"** means those documents and written submissions filed by or on behalf of the Grantee pursuant to its request for Federal financial assistance for support of the Project and relied upon by the Government as satisfaction of the legal and policy requirements of the Grant award. The Application includes all explanatory, supporting, or supplementary documents related to the Project that the Government relied upon in its determination to obligate and award Federal funds for the Project. (This definition is intended to supplement the definition "Application" set forth in Section 2(a) of the Master Agreement, incorporated by reference and made part of this Agreement.)

**"Baseline Cost Estimate"** means the Application document described in Section 13 of this Agreement and set forth in the Tables that comprise Attachment 3. The requirements of the Baseline Cost Estimate are set forth in FTA Circular 5200.1A, "Full Funding Grant Agreements Guidance," as may be revised from time to time. The Baseline Cost Estimate reflects the total anticipated cost of the Project as of the Date of this Agreement.

**"Complete the Project"** means to accomplish all of the scope and activities of the Project as described in Attachment 1, "Scope of the Project," and Attachment 2, "Project Description."

**"Date of this Agreement"** means the date the Government awards this Full Funding Grant Agreement.

**"Estimated Net Project Cost"** means the amount that is calculated by subtracting the cost that can reasonably be financed from the Grantee's revenue from the total anticipated cost of the Project as reflected in the "Baseline Cost Estimate," Attachment 3. The Estimated Net Project Cost is set forth in Section 7 of this Agreement.

**"Financial Plan"** means the plan accepted by the Government as part of the Application process describing the Grantee's financial condition and capability to complete the Project and NJ Transit's financial condition and capability to maintain and operate commuter rail public transportation on the Project together with its existing system. It includes all explanatory, supporting and supplementary documents, commitments, and agreements accepted or approved by the Government.

**"Government"** means the United States of America, acting through the Federal Transit Administration of the United States Department of Transportation.

**"Grantee"** means the Gateway Development Commission, New York, NY (GDC).

8

**"Grant(s)"** means, in singular and plural forms, the obligation and award of Federal financial assistance by the Government pursuant to the laws codified at 49 U.S.C. Chapter 53.

**"Levels of Service"** means the hours of service and the service headways set forth in Attachment 1, "Scope of the Project."

**"Local Share"** means that portion of the Grantee's local financial commitment that is the Grantee's legally required share of the Net Project Cost.

**"Master Agreement"** means the standard terms and conditions applicable to recipients of Federal financial assistance from the Government.  It is updated and published annually.  It is incorporated by reference and made part of this Agreement and identified in Federal Fiscal Year 2024 by FTA Form MA (31) (May 2, 2024).

**"Maximum Federal Section 5309 Capital Investment Grants Program Financial Contribution"** means the limit of Federal Section 5309 Capital Investment Grants Program financial participation in the Project. (The amount of the "Maximum Federal Section 5309 Capital Investment Grants Program Financial Contribution" is set forth in Section 8 of this Agreement, "Limitations of the Federal Funding Commitment," and is only a portion of the total Federal financial contribution for the Project.)

**"Maximum FTA Amount Awarded"** means the total amount of Federal funds from all sources administered by FTA and awarded for the Project, regardless of source, and available to the Grantee.  (This amount is set forth in the first page of this Agreement.)

**"Net Project Cost"** means the cost of the Project that cannot reasonably be financed from the Grantee's revenues.

**"Project"** means the public transportation improvements the Grantee has promised to implement as a condition of its Full Funding Grant. A description of the Project is set forth in Attachment 1, "Scope of the Project." Activities to carry out the project scope are set forth in Attachment 2, "Project Description."

**"Project Cost"** means all costs eligible for Federal financial participation under the terms of this Agreement and consistent with the cost principles set forth in Section 7 of the Master Agreement, "Payments to the Recipient."

**"Project Development Agreement"** means the agreement for the Hudson Tunnel Project among the Gateway Development Commission, the State of New Jersey, the State of New York, and the National Railroad Passenger Corporation (Amtrak), executed on February 3, 2023 as amended by First Amendment dated May 24, 2023 and Second Amendment dated March 5, 2024 and as subsequently amended from time to time.  The Project Development Agreement is incorporated by reference and made part of this Agreement.

**"Recovery Plan"** means a plan developed by the Grantee, and accepted by the Government, whereby the Grantee will take every reasonable measure to minimize any delay in achieving the baseline schedule set forth in Attachment 4 to this Agreement (the Baseline Schedule) and

9

eliminate or otherwise mitigate (recover) any increase in the total Project costs as currently estimated, as compared to the total Project cost identified in Attachment 3 to this Agreement (the Baseline Cost Estimate).

**"Revenue Service Date"** means the date certain upon which NJ Transit or any successor transit agency, commencesrevenue operations of the full Project as defined in Section 5 of this Agreement.

## SECTION 2. PURPOSES OF AGREEMENT

Pursuant to 49 U.S.C. § 5309, the purposes of this Agreement are to:

(a) provide Federal financial assistance to the Grantee in the form of this Full Funding Grant and possible future awards of financial assistance as contemplated under this Agreement, not to exceed the Maximum Federal Section 5309 Capital Investment Grants Program Financial Contribution for the Project, as is and may be awarded under this Agreement and the laws codified at 49 U.S.C. Chapter 53 for purposes that are consistent with those statutes, implementing regulations, and other applicable laws and regulations;

(b) describe the Project and set forth the mutual understandings, terms, conditions, rights, and obligations of the parties related to implementing the Project, the future management and operation of the Project, and the manner in which Project real property and equipment will be used;

(c) establish the Maximum Federal Section 5309 Capital Investment Grants Program Financial Contribution for the Project, and the manner in which all future Federal funds for the Project, if any, will be awarded and released to the Grantee;

(d) establish the Grantee's financial commitment to the Project, including its obligation to fund the Local Share, its obligation to Complete the Project with a specified amount of Federal assistance, its obligation to ensure the Project achieves revenue operation by NJ Transit, or a successor transit agency, by a specified date, its obligation to pay all costs necessary to Complete the Project that are in excess of the Estimated Net Project Cost, its obligation to ensure the funding of future maintenance and operational costs of the Project, consistent with the terms of the Project Development Agreement; and

(e) facilitate timely and efficient management of the Project.

## SECTION 3. PREVIOUS FEDERAL DOCUMENTS AND GRANTS

(a) Federal law, procedure, and policy require the completion of a project development process and environmental review prior to the Award and Execution of this Agreement. Prior Grants of Federal assistance awarded by the Government for this project development process are described in Attachment 5 to this Agreement. These Grants (and any other previous documents identified in Attachment 5, including Letters of No Prejudice) are incorporated by reference and made part of this Agreement, except for the terms and conditions thereof specifically superseded by this Agreement. Further, in executing this Agreement, the Grantee assures the Government that the

Certifications and Assurances (made by the Grantee, or on behalf of the Grantee by a third party), upon which the Government relied in these prior actions were made in good faith and to the best of the Grantee's knowledge and belief, and that the Grantee has no present knowledge of facts or circumstances substantially affecting the continued validity of these Certifications and Assurances that the Grantee has not formally conveyed to the Government prior to the Government's Award of funding set forth in this Agreement.

(b)  This Agreement does not discharge or rescind any of the terms, conditions, or obligations established under the documents set forth in Attachment 5 unless specifically stated otherwise herein. Furthermore, the terms, conditions, and obligations of this Agreement take precedence over the provisions of all prior agreements between the Grantee and the Government related to the Project and will be controlling for all actions related to the Project taken after the Date of this Agreement unless specifically stated otherwise herein.

(c)  No amendments will be sought or approved to increase the amount of funds in the prior Grants listed in Attachment 5 beyond the amounts described in this Agreement as available to the Project.

## SECTION 4.  OBLIGATION TO COMPLETE THE PROJECT

(a)  The Government has no obligation to provide any financial assistance for the Project beyond the Maximum Federal Section 5309 Capital Investment Grants Program Financial Contribution. If the total Federal funding provided under Section 8 of this Agreement, "Limitations of the Federal Funding Commitment," is insufficient to undertake the activities necessary to Complete the Project and for NJ Transit, or a successor transit agency, to begin revenue operations, the Grantee agrees to Complete the Project and accepts sole responsibility for the payment of any additional costs (overruns).

(b)  If at any time during its efforts to Complete the Project the Grantee determines that the total Project Cost will exceed the Baseline Cost Estimate, the Grantee must immediately notify the Government of the amount of the difference and the reasons for the difference. Further, the Grantee must provide the Government with a Recovery Plan that demonstrates the Grantee is taking and will take every reasonable measure to eliminate [recover] the difference between the total project cost and the Baseline Cost Estimate. Insofar as any difference between the total project cost and the Baseline Cost Estimate cannot be eliminated [recovered], the Grantee must secure and provide such additional resources as are necessary to meet the additional costs and expeditiously Complete the Project without further financial assistance from the Federal Section 5309 Capital Investment Grants Program. Further, in its Recovery Plan, the Grantee must identify the sources of funds it will draw upon to meet the additional costs and cover the difference between the total Project Cost and the Baseline Cost Estimate.

## SECTION 5.  REVENUE SERVICE DATE AND LEVELS OF SERVICE

(a)  The Grantee agrees and promises to ensure the Project achieves revenue operations on or before November 9, 2040, (the Revenue Service Date), in accordance with the terms and conditions of this Agreement.

11

(b)  The Revenue Service Date is a significant term of this Agreement. The Grantee's failure to ensure the Project meets the Revenue Service Date will constitute a breach of this Agreement. Upon the Grantee's request, the Government may determine, at its sole discretion, to waive a breach or an anticipatory breach of this Agreement and to extend the Revenue Service Date if there is an unavoidable delay in achieving the operational goals of the Project resulting from an event or circumstance beyond the control of the Grantee, or if the Government determines that allowing the delay is in the best interest of the Government and the success of the Project. Requests by the Grantee for waiver of a breach or anticipatory breach of this Agreement and extension of the Revenue Service Date for the reasons set forth herein shall be submitted promptly (with appropriate documentation) to the Government. In the exercise of its discretion to waive the breach and extend the Revenue Service Date, the Government will take into consideration the actions and measures taken by the Grantee to ensure adherence to its promise to achieve the operational goals of the Project on or before the scheduled Revenue Service Date.

(c)  Delays in appropriations of funds from Congress shall not constitute a basis for extension of the Revenue Service Date.

(d)  The Government's consent to extend the Revenue Service Date pursuant to Paragraph (b) of this Section 5 does not constitute a basis for additional Federal financial assistance beyond the Maximum Federal Section 5309 Capital Investment Grants Program Financial Contribution.

(e)  Set forth in Attachment 1 to this Agreement, "Scope of Project," are the hours of service and headways the Grantee will ensure NJ Transit maintains (or a successor transit agency) once the Project is opened to revenue service and for no less than five years thereafter. These specified Levels of Service are a significant term of this Agreement. The Grantee's failure to ensure NJ Transit, or a successor transit agency, achieves and maintains these Levels of Service at the Revenue Service Date and for five years thereafter will constitute a breach of this Agreement. Upon the Grantee's request, the Government may determine in its sole discretion to waive a breach of the Grantee's obligation to maintain these specified Levels of Service for events or circumstances beyond the control of the Grantee, or if the Government determines that a waiver is in the interests of the United States.  In the exercise of its discretion whether to waive a breach of the specified Levels of Service, the Government will take into consideration the actions and measures taken by the Grantee to ensure NJ Transit, or a successor transit agency, achieved and maintained the operational goals of the Project and NJ Transit's entire public transportation system for at least five years beyond the opening of the Project to revenue service.

## SECTION 6. NET PROJECT COST

(a)  This Grant is to assist in the payment of actual eligible costs within the scope of the Project under this Agreement, minus any amount that can reasonably be financed from revenues of the Grantee. If the funds awarded under this Grant exceed the amount necessary to finance the Federal share, those excess funds are not available to the Grantee for payment of costs beyond the scope of the Project supported by this Grant.

(b)  In accordance with FTA Master Agreement, a refund or reduction of the Grantee's Local Share of the Net Project Cost requires a refund to the Government of a proportional amount of the Federal financial assistance provided under this Agreement.

12

(c)  The portion of the Net Project Cost that may be financed by the Government with Federal Section 5309 Capital Investment Grants Program funds may not exceed the amount of the Maximum Federal Section 5309 Capital Investment Grants Program Financial Contribution for this Project as stated in Section 8 of this Agreement, "Limitations of the Federal Funding Commitment."

(d)  The Grantee acknowledges that Federal funds may be used only to reimburse eligible expenses for the Project. Should FTA determine that Federal funds have been used to reimburse any expenses that were ineligible for Federal reimbursement, FTA will direct the Grantee either to reimburse FTA with local funds not already committed to the Project or to reduce the total Project costs by the amounts found to have been ineligible.

## SECTION 7. ESTIMATED NET PROJECT COST

(a)  The Government's determination to provide financial assistance for the Project is based, in significant part, upon the Grantee's estimated Project costs as set forth in the "Baseline Cost Estimate," Attachment 3 to this Agreement. The Estimated Net Project Cost reported in Attachment 3 is $14,576,170,721.

(b)  The Estimated Net Project Cost financed with the Execution of this Agreement is limited by the amount of the Maximum FTA Amount Awarded. The amount of the Estimated Net Project Cost and the amount of the Maximum FTA Amount Awarded are stated in the first page of this Agreement.  The amount reimbursable by the Government is limited to the lesser of either the amount of the Maximum FTA Amount Awarded or the maximum percentage of FTA participation permitted by Federal law and regulations.  Additional funds will not be provided until a Grant amendment awarding additional funds and amending this Full Funding Grant Agreement is executed.

## SECTION 8.  LIMITATIONS OF THE FEDERAL FUNDING COMMITMENT

(a)  With its Award set forth in this Agreement, the Government obligates $800,000,000 in Section 5309 Capital Investment Grants Program financial assistance for the Project. FTA has not previously awarded Section 5309 Capital Investment Grants Program funds for the Project. The sources of this Federal financial assistance are set forth in the "Project Budget," Attachment 3A. These funds are in addition to all previous Federal financial commitments in the development of the Project as set forth in the schedule of "Prior Grants and Related Documents," Attachment 5 of this Agreement.

(b)(1)  With its Award set forth in this Agreement, the Government also acknowledges its intent to provide Federal Section 5309 Capital Investment Grants Program financial assistance for the Project in addition to the amount appropriated and set forth in Paragraph (a) of this Section 8. The amount of additional Section 5309 Capital Investment Grants Program funds the Government may provide will not exceed $6,080,000,000. The anticipated sources of Federal financial assistance in this amount are listed in Attachment 6 to this Agreement, "Schedule of Federal Funds".  Additional funds obligated pursuant to this Paragraph will be subject to all the terms,

13

conditions and obligations established by this Agreement. Accordingly, it is expected that the award of funds will be processed through amendments to this Agreement.

(b)(2)  The award by the Government of additional Federal Section 5309 Capital Investment Grants Program financial assistance to the Project under Paragraph (b)( 1) of this Section 8 is subject to the following limitations:

(i) the availability of appropriated funds, and

(ii) the Grantee's continued performance under the terms and conditions of this Agreement.

(c)  The Maximum Federal Section 5309 Capital Investment Grants Program Financial Contribution for the Project is limited to $6,880,000,000.

## SECTION 9.  FEDERAL FUNDING-OTHER SOURCES

The Maximum Federal Section 5309 Capital Investment Grants Program Financial Contribution specified in Section 8(c) of this Agreement does not include funds other than from the Capital Investment Grants program under 49 U.S.C. Chapter 53. Should such other Federal funds be provided for the Project in addition to the Section 5309 Capital Investment Grants Program funds set forth in Attachment 6 of this Agreement, the limitation on the Federal funding commitment set forth in Section 8 of this Agreement shall not apply to those funds.

Accordingly, such additional funds shall be excluded from the calculation of the Maximum Federal Section 5309 Capital Investment Grants Program Financial Contribution. Funds awarded pursuant to this Section will be subject to all other terms, conditions and obligations set forth in the Agreement.

## SECTION 10.  LOCAL FINANCIAL COMMITMENT-CAPITAL COSTS

(a) As a condition of the Government's Award of this Full Funding Grant, the Grantee has developed and adopted a Financial Plan for financing all Project Costs necessary to Complete the Project.  In addition to the amount of Federal funds requested, the Financial Plan includes a statement identifying the State, local and private sources of funding and the amount of funds available for and committed to the Project from each such source. This Financial Plan, as accepted by the Government, with the supporting documentation (including formal funding agreements and commitments) is hereby incorporated by reference and made part of this Agreement.

(b) The Grantee hereby commits and certifies that it will provide funds in an amount sufficient, together with the Federal contribution (acknowledging the limitations as set forth in this Agreement), to assure timely and full payment of the Project Costs as necessary to Complete the Project.

(c) The Grantee hereby commits and certifies that the Local Share portion of its financial commitment will be provided from funding sources other than Federal funds (except as may otherwise be authorized by Federal statute), receipts from the use of Project facilities or

14

equipment (except as may otherwise be authorized by Federal statute), or revenues of the public transportation system in which such facilities or equipment are used.

(d) Given the Estimated Net Project Cost, as set forth in Section 7 of this Agreement, the Grantee's financial commitment to the Net Project Cost is estimated to total $3,940,334,889. This amount constitutes the Local Share needed to match the Maximum Section 5309 Capital Investment Grants Program Financial Contribution for the Project and Other Federal Sources.  In the event that the actual Federal financial contribution for the Project is reduced or is increased or the funding percentage as set forth in this Agreement is changed, the portion of the Grantee's financial contribution for the Project that is identified as Local Share shall be adjusted accordingly.

(e) The Grantee agrees to notify the Government of any change in circumstances or commitments that adversely affect the Grantee's plan to fund the Project Costs necessary to Complete the Project as set forth in the Financial Plan. In its notification, the Grantee shall advise the Government of what actions it has taken or plans to take to ensure adequate funding resources and shall reaffirm its commitment to the Government as set forth in Paragraph (b) of this Section 10.

## SECTION 11.  AUTHORIZATION TO ADVANCE PROJECT WITHOUT PREJUDICE

The Grantee may incur costs or expend local funds for all phases of the Project as is reasonably necessary to advance the Project prior to an award of Federal funding assistance without prejudice to possible future Federal participation in or reimbursement of the Project Costs to the extent that such costs are incurred in accordance with all applicable Federal requirements and this Agreement. It is understood that the authority conferred on the Grantee to advance the Project without prejudice does not constitute a legal commitment by the Government to obligate and award Federal funds.

## SECTION 12.  LOCAL FINANCIAL COMMITMENT-OPERATING AND MAINTENANCE COSTS

(a) The Government recognizes that the Grantee has entered into a Project Development Agreement, which establishes the following: the conditions upon which the Grantee will ensure the Project will be completed, that NJ Transit, or a successor agency will provide commuter rail service, and how the Project will be maintained.

(b) As a condition of the Government's Award of funding set forth in this Agreement, and in cooperation with NJ Transit, the Grantee has developed and adopted a Financial Plan whereby NJ Transit will finance future operation and maintenance of the Project concomitant to NJ Transit's continuing financial responsibilities to operate, maintain, and reinvest in its transit existing system in a manner as described in the Financial Plan. This Financial Plan, as accepted by the Government, and the supporting documentation (including specific funding commitments) evidencing stable and dependable funding sources is an essential part of the Grantee's Application and is made part of this Agreement by incorporation of the Application.

(c) With the Execution of this Agreement, the Grantee assures that there are stable and dependable funding sources available to NJ Transit, sufficient in amount and in degree of commitment, to operate and maintain NJ Transit's entire mass transportation system at an adequate and efficient level of service, including future transit operations and maintenance of the Project, without additional Federal assistance beyond the amounts set forth in the Financial Plan.

(d) The Grantee will notify the Government of any change in circumstances or commitments that adversely affect the plan to fund the maintenance and operating costs of the Project as set forth in the Financial Plan. In its notification, the Grantee will advise the Government of actions it has taken or plans to take to ensure adequate funding resources and will reaffirm to the Government its assurance as set forth in Paragraph (b) of this Section.

## SECTION 13.  BASELINE COST ESTIMATE

(a) In its Application, the Grantee submitted to the Government a Baseline Cost Estimate for the activities constituting the Project. The Baseline Cost Estimate is accepted by the Government and is Attachment 3 of this Agreement. The Baseline Cost Estimate is derived from cost estimates of the individual third-party contracts and force account work that, in sum, constitute the Project; it reflects appropriate escalation and Project schedule dates.

(b) The Government intends to use the Baseline Cost Estimate to monitor the Grantee's compliance with certain terms and conditions of this Agreement. The Baseline Cost Estimate established in Attachment 3 serves as the measure of cost estimates as of the Date of this Agreement, and should not be amended or modified during the implementation of the Project.

(c) The Grantee will submit cost reports on the implementation of the Project as required by this Agreement and in a format consistent with the units set forth in the Baseline Cost Estimate so that the Government can, with reasonable diligence, reconcile the Grantee's reports with the Baseline Cost Estimate.

## SECTION 14.  BASELINE SCHEDULE

(a)  In its Application, as approved, the Grantee submitted a Baseline Schedule for the Project that demonstrates how the Grantee intends to implement the Project and meet the Revenue Service Date.  This Baseline Schedule has been accepted by the Government and is Attachment 4 of this Agreement.

(b)  The schedule for the Project may be modified from time to time at the discretion of the Grantee. However, the Baseline Schedule is not to be modified because it is to be used as a basis for comparing planned to actual Project implementation. The Grantee will notify the Government when a Project schedule modification has the potential to change the Revenue Service Date and describe the actions planned to recover the schedule. The Government's acquiescence in such notice will not be deemed approval by the Government of an extension of a Revenue Service Date unless the Government expressly grants an extension in writing.

16

**SECTION 15.  PROJECT MANAGEMENT OVERSIGHT**

The Project is a "Major Capital Project" as defined in FTA's Project Management Oversight regulations at 49 CFR § 633.5. Accordingly, the Grantee agrees that all requirements and conditions set forth in the rule at 49 CFR Part 633 apply to the Project activities. Noncompliance with any regulatory requirements shall constitute a breach of this Agreement, unless the Government formally waives the regulatory requirement.

**SECTION 16.  ENVIRONMENTAL PROTECTION**

(a)  As a condition precedent to this Agreement, the environmental impacts of the Project have been assessed as required by law. The results of that assessment and the adopted mitigation measures are described in the environmental documents identified in Attachment 7 of this Agreement. These documents together with related agreements and supporting documentation are incorporated by reference and made part of this Agreement. To assist the Government in monitoring the implementation of the adopted mitigation measures, these measures are specifically referenced in Attachment 7 of this Agreement. It is understood and agreed that the description in Attachment 7 shall not supersede or in any way result in a circumvention of the requirements set forth in the Government's environmental record for the Project.

(b)  Certain terms and conditions of this Agreement as related to the Grantee's responsibility to ensure protection of the environment are set forth in Section 26 of the Master Agreement, "Environmental Protections." Under Subsection 26(i), "Mitigation of Adverse Environmental Effects," the Grantee is required, among other actions, to undertake all environmental mitigation measures that are identified in environmental documents prepared for the Project. Accordingly, the Grantee understands that it shall not withdraw or substantially change any of the adopted mitigation measures as described in the Government's environmental record for theProject without the express written approval of the Government.

(c)  This Section is intended only to supplement the provisions set forth in Section 26 of the Master Agreement, "Environmental Protections."

**SECTION 17.  LABOR PROTECTION**

The Grantee will carry out the Project in conformance with the terms and conditions determined by the Secretary of Labor to be fair and equitable to protect the interests of employees affected by the Project and meet the requirements of 49 U.S.C. § 5333(b) and U.S. Department of Labor (USDOL) Guidelines at 29 CFR Part 215.  These terms and conditions are identified in the letters of certification from USDOL on the dates set forth on the first page of this Agreement. The Grantee will carry out the Project in compliance with the conditions stated in the USDOL certification letters. Those letters and any documents cited therein are incorporated by reference and made part of this Agreement.

**SECTION 18.  GOVERNMENT ACTIONS**

(a) In all cases where the Government's review, approval, or concurrence is required under the terms and conditions of this Agreement, the Government will provide its response within sixty

17

(60) calendar days of receipt from the Grantee of all materials reasonably necessary for the formulation of the Government's response.

(b) If the Government determines that its position cannot be finalized within that sixty (60) day period, the Government will notify the Grantee, in writing, within thirty (30) days following receipt of the Grantee's submission that the Government's response will be delayed and advise the Grantee of the Government's anticipated time period for response.

(c) Whenever the Government's approval or concurrence is needed on any matter pertaining to or concerning this Agreement, the Government's approval or concurrence will not be umeasonably withheld.

## SECTION 19.  REMEDIES

(a)  Substantial failure of the Grantee to Complete the Project in accordance with the Application and this Agreement will be a default of this Agreement.  In the event of default, the Government will have all remedies at law and equity, including the right to specific performance without further Federal financial assistance, and the rights to termination or suspension as provided by Section 11 of the Master Agreement, "Right of the Federal Government to Terminate." The Grantee recognizes that in the event of default, the Government may demand all Federal funds provided to the Grantee for the Project be returned bthe Government. Furthermore, a default of this Agreement will be a factor considered before a decision is made with respect to the approval of future Grants requested by the Grantee.

Under the provisions of Section 15 of this Agreement, "Project Management Oversight," and under the terms and conditions of the Master Agreement, the Government will review performance by the Grantee to determine whether satisfactory progress is being made to Complete the Project.  In the event that the Government determines that the Grantee is in breach of this Agreement, the Government may withhold its approvals of further funding and suspend drawdown of funds, under the provisions of Section 11 of the Master Agreement, "Right of the Federal Government to Terminate," until any necessary corrective action, which may be required by the Government, is accomplished.  Any breach of this Agreement that is not corrected within a reasonable period of time will be a default of this Agreement. The Government in its discretion may permit the cost of such corrective action to be deemed a Project Cost, provided that such cost is an allowable cost under the requirements of Section 7(b) of the Master Agreement, "Eligible Costs," and so long as it remains within the limits of the Maximum Federal Section 5309 Capital Investment Grants Program Financial Contribution set forth in Section 8 of this Agreement, "Limitations of the Federal Funding Commitment."

(b)  In the event of a breach of this Agreement by the Grantee and before the Government takes action contemplated by this Section, the Government will provide the Grantee with ninety (90) days' written notice that the Government considers that such a breach has occurred and will provide the Grantee a reasonable period of time to respond and to take necessary corrective action.

**SECTION 20.  CONTENTS OF AGREEMENT**

This Full Funding Grant Agreement consists of the text of this Agreement, which includes the first pages setting forth significant characteristics of the Agreement (such as the maximum Federal funds obligated and awarded for expenditure on the Project and the funding ratio of Federal and local funds to be expended for the Project, and such other data), followed by the Terms and Conditions and the Attachments to the Agreement.  The Agreement also includes the following documents incorporated by reference and made part of this Agreement: the "Federal Transit Administration Master Agreement," FTA Form MA(31) (May 2, 2024) as may be revised from time to time, the Application, the Government's environmental record for the Project, related agreements, and prior Grant Agreements for the Project referenced in Attachment 5 of this Agreement. Should the Federal assistance award letter include special conditions for the Project, that letter is incorporated by reference and made part of this Agreement. Any inconsistency between the Application and the terms and conditions of this Full Funding Grant Agreement will be resolved according to the clear meaning of the provisions of this Agreement and Attachments hereto.

**SECTION 21. SIMULTANEOUS CREATION OF AGREEMENT IN ELECTRONIC FORMAT**

Simultaneous to the Award and Execution of this Agreement set forth in typewritten hard copy, the Agreement is being awarded and executed by electronic means through FTA's electronic award and management system. To the extent any discrepancy may arise between the typewritten version and the electronic version of this Agreement, the typewritten version will prevail.  Should any special conditions or requirements for the Project be added separately in the electronic version, those conditions or requirements are incorporated by reference and made part of this Agreement.

**SECTION 22.  AMENDMENTS TO AGREEMENT**

Amendments to any of the documents referenced in Section 20, "Contents of Agreement," will be made in accordance with the requirements and procedures set forth in FTA Circular 5010.lE, "FTA Project Management Guidelines" (July 16, 2018), as may be amended from time to time, and FTA Circular 5200.1A (December 5, 2002), "Full Funding Grant Agreements Guidance," as may be amended from time to time.

**SECTION 23.  ATTACHMENTS-INCORPORATION**

Each and every Attachment to this Agreement is incorporated by reference and made part of this Agreement.

**SECTION 24.  NOTICES**

Notices required by this Agreement will be addressed as follows:

As to the Government:

    Mr. Michael Culotta
    Regional Administrator
    Federal Transit Administration, Region II
    One Bowling Green, Suite 429
    New York, NY 10004

As to the Grantee:

    Chief Executive Officer
    Gateway Development Commission
    120 Broadway, 10th Floor
    New York, NY  10271

With a copy to:
    General Counsel
    Gateway Development Commission
    120 Broadway, 10th Floor
    New York, NY  10271

**SECTION 25.  APPLICABLE LAW**

If neither Federal statute nor Federal common law governs the interpretation of the provisions of this Agreement, New York law will apply. This provision is intended only to supplement Section 3(g) of the Master Agreement, "Application of Federal, State, and Local Laws, Regulations, Requirements, and Guidance."

**SECTION 26.  AWARD AND EXECUTION OF AGREEMENT**

There are several identical counterparts of this Agreement in typewritten hard copy; each counterpart is to be fully signed in writing by the parties and each counterpart is deemed to be an original having identical legal effect. When signed and dated by the authorized official of the Government, this instrument will constitute an Award that should be executed by the Grantee within ninety (90) days of the date of the Government's Award (FTA Award). The Government may withdraw its Award of financial assistance and obligation of funds if this Agreement is not executed within the ninety (90) day period. Upon full Execution of this Agreement by the Grantee, the effective date will be the date the Government awarded funding under this Agreement as set forth below.

**THE GOVERNMENT HEREBY AWARDS THIS FULL FUNDING GRANT AGREEMENT THIS**

_____ 8 ___ DAY OF _____ July _____, 2024

Signature: _____

Veronica Vanterpool
Acting Administrator
FEDERAL TRANSIT ADMINISTRATION

**EXECUTION BY GRANTEE**

The Grantee, by executing this Agreement, affirms this FTA Award; adopts and ratifies all statements, representations, warranties, covenants, and materials it has submitted to FTA; consents to this Award; and agrees to all terms and conditions set forth in this Agreement.

**THE GRANTEE HEREBY EXECUTES THIS FULL FUNDING GRANT AGREEMENT THISJ**

_____ DAY OF ___,_" \ J_____ , 2024

Signature: _____

Kris Kolluri
Chief Executive Officer
Gateway Development Commission

**ATTESTED BY:**

Signature: _____

Maria Anderson
Deputy General Counsel
Gateway Development Commission

## AFFIRMATION OF GRANTEE'S ATTORNEY

As the undersigned Attorney for the Grantee, I affirm to the Grantee that I have examined this Agreement and the proceedings taken by the Grantee relating to it.  As a result of this examination I hereby affirm to the Grantee the Execution of the Agreement by the Grantee is duly authorized under state and local law. In addition, I find that in all respects the Execution of this Agreement is due and proper and in accordance with applicable State and local law. Further, in my opinion, this Agreement constitutes a legal and binding obligation of the Grantee in accordance with the terms of the Agreement. Finally, I affirm to the Grantee that, to the best of my knowledge, there is no legislation or litigation pending or imminent that might adversely affect the full implementation of the Project in accordance with the terms thereof.

DATED ___8th___ DAY OF _____, 2024

**AFFIRMED BY:**

Signature: _____

Edmund J. Caulfield
Acting General Counsel, Chief Ethics & Compliance Officer and Secretary
Gateway Development Commission

**Attachment 1**

**Gateway Development Commission**
**Hudson Tunnel Project**
**Located Between Secaucus, New Jersey and New York, New York**

**Scope of the Project**

The following scope described is for a new fixed guideway capital project that will provide both public transportation and intercity passenger rail service. The Government has determined that the net capital costs attributable to public transportation are equal to 90 percent of the overall new fixed guideway capital project based on the peak hour usage of the existing North River Hudson Tunnel. Therefore, 90 percent of the total net capital costs of the following described scope are eligible for funding under this grant and are considered "the Project" under this agreement, although percentages of elements or sub-elements allocated to the public transportation project may vary.

The Hudson Tunnel project (Project) consists of three elements:  1) the construction of a new Hudson River Tunnel between New York and New Jersey; 2) the rehabilitation of the existing North River Tunnel under the Hudson River; and 3) Long Island Rail Road (LIRR) Emergency Services Building (ESB) Utility Relocation Early Work associated with the separately funded Hudson Yards Concrete Casing Section 3 project.

The new Hudson River Tunnel includes two new surface tracks parallel to the south side of the Northeast Corridor (NEC) beginning at a realigned Allied Interlocking in Secaucus, New Jersey just east of NJ Transit's Secaucus Junction Station.  The new two-track Hudson River Tunnel runs parallel to the North River Tunnel, beneath the Palisades (North Bergen and Union City) and the Hoboken waterfront area, and beneath the Hudson River to connect to the tracks in the A Yard west of Penn Station New York (PSNY).

The rehabilitation of the North River Tunnel makes improvements to the existing North River Tunnel that opened in 1910.

The Hudson Yards Concrete Casing - Section 3 Long Island Rail Road Emergency Services Building (ESB) Utility Relocation move utilities out of the future path of the HYCC - Section 3, the third and final concrete casing section for rail right-of-way preservation beneath the extensive overbuild project that is planned to be constructed on a platform above the rail complex in Manhattan (immediately west of PSNY) known as "Hudson Yards."

The Revenue Service Date is November 9, 2040.

NJ Transit service on the Project is planned to operate 24 hours a day, seven days a week, with trains every three minutes during peak periods (7:00 - 9:30 am and 3:30 - 6:00 pm), every nine minutes during off-peak periods, and every 10 minutes during evenings and weekends.

The forecasted public transportation ridership on the Project, using current year inputs of population and employment, is 189,000 daily linked trips. This number is expected to grow to 210,400 daily linked trips by the 10-year horizon used in the CIG evaluation process.

## Attachment 1B

### Gateway Development Commission
### Hudson Tunnel Project
### Located Between Secaucus, New Jersey and New York, New York

### Project Location Map



**Attachment 2**

**Gateway Development Commission
Hudson Tunnel Project
Located Between Secaucus, New Jersey and New York, New York**


**Project Description**

**Narrative Description:**
The Project consists of three elements:   1) the construction of a new Hudson River Tunnel between New York and New Jersey; 2) the rehabilitation of the existing North River Tunnel under the Hudson River; and 3) Hudson Yards Concrete Casing - Section 3 (HYCC-3) Long Island Rail Road (LIRR) Emergency Services Building (ESB) Utility Relocation Early Work associated with the separately funded Hudson Yards Concrete Casing Section 3 project.

**Project Description by Standard Cost Category:**
The following descriptions follow the Federal Transit Administration's (FTA) Standard Cost Categories (SCC) for construction. These SCCs are the basis for the Baseline Cost Estimate and Baseline Schedule contained in Attachments 3 and 4, respectively.

**SCC 10 - GUIDEWAY & TRACK ELEMENTS**
This SCC includes the civil, geotechnical, and structural elements of the project. SCC 10 includes the following subcategories.

SCC 10.04 Guideway: Aerial Structure: This subcategory includes all structural steel, concrete, pre-cast concrete, cast in place concrete, drilled shafts, concrete-filled steel pipe pilings, safety railings, access systems, fiberglass walkway systems, aerial drainage systems, waterproofing and miscellaneous systems support structures. These structures include Meadowland Viaduct, Tonnelle Avenue Bridge, and bridges over Secaucus Road and Conrail, New York, Susquehanna & Western Railway (NYSW).

SCC 10.05 Guideway: Built-Up Fill: This subcategory includes cast in place concrete retaining wall along the alignment between County Road and Secaucus Road with pile foundation, safety railing.

SCC 10.06 Guideway Underground Cut & Cover: This subcategory includes excavation, support of excavation, construction of cast in place cut and cover box, back fill and surface restoration at the Palisades Tunnel Portal, and 10th Avenue in Manhattan.

SCC 10.07 Guideway: Underground Tunnel: This subcategory includes excavation, support of excavation, construction of cast in place cut and cover box, back fill and surface restoration at the Palisades Tunnel Portal, and 10th Avenue in Manhattan.


SCC 10.08 Guideway: Retained cut or fill: This subcategory includes earth work in addition to construction of the U-Shaped cast in place concrete structure at the Palisades Tunnel Portal.

SCC 10.09 Track: Direct Fixation: This subcategory includes installation of direct fixation track through both new Hudson River Tunnels and the existing North River Tunnels.

SCC 10.11 Ballasted: This subcategory includes all costs associated with the construction of new ballasted track and the relocation(s) of existing track, including cutover, lining, and surfacing, bonded insulated joints, ballast and guard rail system along Amtrak NEC A-yard as well as new ballasted tracks on the aerial structures.

SCC 10.12 Track: Special (switches, turnout): This subcategory includes costs for the construction/installation of special track work along Amtrak NEC Allied interlocking.

## sec 30-FACILITIES: YARD, SHOPS, ADMINISTRATION BUILDINGS

SCC 30.05 Yard and Yard Track: This subcategory includes costs of track work in A yard including civil work and underpinning of Lerner building.

## sec 40 - SITEWORK AND SPECIAL CONDITIONS

This SCC includes all necessary site work and special work associated with demolition, clearing, earthwork, and utilities needed for the construction of the Project. SCC 40 includes the following subcategories.

SCC 40.01 Demolition, Clearing, Earthwork: This subcategory includes call costs relating to the demolition in NJ along the surface alignment.

SCC 40.02 Site Utilities, Utility Relocation: This subcategory includes all costs associated with relocations of utility conduits and appurtenances owned and/or managed by PSE&G, Verizon, Hudson County ITS, etc. Additionally, this category contains costs for relocation of existing drainage and water mains and appurtenances.

SCC 40.03 Hazardous Materials Contaminated soil removal and mitigation, ground water treatments: This subcategory includes costs for the management of regulated materials and the disposal of hazardous and contaminated soils at all locations.

SCC 40.04 Environmental mitigation, e.g., wetlands, historic/archeological, parks: This subcategory contains costs for permanent wetland impacts and riparian impacts.

SCC 40.05 Site structures including retaining walls, sound walls: This subcategory includes costs associated with reconstruction of the Emergency Service Building.

SCC 40.08 Temporary Facilities and other indirect costs during construction: This subcategory includes costs associated with Amtrak forces providing flagging to support construction activities on the active railroad systems.

## sec 50 - SYSTEMS
This SCC includes the installation of train control and signals, traction power distribution, and communications systems. SCC 50 includes the following subcategories.

SCC 50.1 Train Control and Signals: This subcategory includes costs for the construction of signaling and train control equipment along the NEC, the new Hudson Tunnel alignment, North River Tunnel, and A yard.

SCC 50.03 Traction power supply: substations: This subcategory contains costs for the modification of existing substation No. 42 and the existing substation at 31st Street (No. 43) by adding 1500A circuit breakers and disconnect switches and wiring including all supporting structures along with site modification.

SCC 50.04 Traction power distribution - catenary and third rail: This subcategory contains costs for the installation of new catenary structures and supports, feeders and wire, bonding and grounding, and new overhead contact system both along the surface alignments as well as through the new tunnels. It also includes the cost of new catenary systems in the existing rehabilitated North River Tunnel. In addition, it includes cost of new third rail installation both in the Hudson River Tunnels and the North River Tunnels.

SCC 50.05 Communication: This subcategory covers costs for the furnishing and installation of Closed-Circuit Television (CCTV), Radio, Telephone, Access Control systems.

SCC 50.07 Central Control: This category includes costs for a central control panel.

## sec 60-RIGHT-OF-WAY. LAND, EXISTING IMPROVEMENTS

This SCC includes all private takings, temporary and utility easements, and standard relocation costs required for the Project. It includes appraisal and consultant costs. Project staffing is included in SCC 80. SCC 60 includes the following subcategories.

60.01 Purchase or lease of real estate: This subcategory includes contains costs for the purchase of land to establish the proposed right-of-way (ROW) including all legal fees.

## sec 80 - PROFESSIONAL SERVICES

This includes costs for the General Engineering Consultant, Program Management Consultant (PMC), Environmental Services Consultant, anticipated force account totals, lease payments, and Project Office costs. These costs are delineated by project development; engineering; project management for design and construction; construction administration and management; legal costs; surveys, testing, and inspection; as well as project start-up costs.

SCC 80.01 Project Development: This category includes all Grantee-incurred program management and engineering costs associated with the project at the conceptual design and preliminary design/construction level.

SCC 80.02 Engineering: This cost is for the engineering required before and during the construction stage(s) of the project.

SCC 80.03 Project Management for Design and Construction: This category covers the cost of project management by the D/B Contractor as well as a third-party Management firm.

SCC 80.04 Construction Administration & Management:  This category aggregates costs for Grantee/Agency's project management and supervision personnel incurred during all phases of the project.

SCC 80.05 Professional Liability and other Non-Construction Insurance: This category includes cost of Workers Compensation, General Liability and Property Damage insurance as a form of Owners Control Insurance Program (OCIP) for all the work contained in Categories 10's thru 50's.

SCC 80.06 Legal; Permits; Review Fees by other agencies, cities, etc.:  This category aggregates costs for fees paid to outside public entities for the issuance of required permits, reviews, etc.

SCC 80.07 Surveys, Testing, Investigation, Inspection:  This category aggregates costs for preliminary and pre-construction surveys, site investigations, soil testing, etc. However, it is included with category 80.03.

SCC 80.08 Start up:  This category includes costs sustained by the Grantee/Agency(ies) in facilitating the initiation of the project for both New Hudson River Tunnels and the existing North River Tunnels Rehabilitation.

## sec 90 - UNALLOCATED CONTINGENCY
This sec includes unallocated contingency and project reserves. It provides for unknown additional costs and uncertainty due to risk factors such as third-party approvals, market fluctuation, differing site conditions, change orders and contract modifications.

## sec 100 - FINANCE CHARGES
This sec includes finance charges expected to be incurred by the Gateway Development Commission prior to either the completion of the Project or the fulfillment of the Capital Investment Grants funding commitment, whichever occurs later.

**Attachment 3**

**Gateway Development Commission**
**Hudson Tunnel Project**
**Located Between Secaucus, New Jersey and New York, New York**

**Baseline Cost Estimate**

| *Applicable Line Items Only* | (Public Transportation Only) YOE Dollars Total (X000) |
|---|---|
| **10 GUIDEWAY & TRACK ELEMENTS (route miles)** | **6,182,268,025** |
| 10.01   Guideway: At-grade exclusive right-of-way | 0 |
| 10.02   Guideway: At-grade semi-exclusive (allows cross-traffic) | 0 |
| 10.03   Guideway: At-grade in mixed traffic | 0 |
| 10.04   Guideway: Aerial structure | 311,813,293 |
| 10.05   Guideway: Built-up fill | 987,626 |
| 10.06   Guideway: Underground cut & cover | 86,099,580 |
| 10.07   Guideway: Underground tunnel | 5,355,003,461 |
| 10.08   Guideway: Retained cut or fill | 235,945,990 |
| 10.09   Track:  Direct fixation | 79,940,359 |
| 10.10   Track:  Embedded | 94,891,006 |
| 10.11   Track:  Ballasted | 14,025,454 |
| 10.12   Track:  Special (switches, turnouts) | 3,564,209 |
| 10.13   Track:  Vibration and noise dampening | 0 |
| **20 STATIONS, STOPS, TERMINALS, INTERMODAL (number)** | 0 |
| 20.01   At-grade station, stop, shelter, mall, terminal, platform | 0 |
| 20.02   Aerial station, stop, shelter, mall, terminal, platform | 0 |
| 20.03   Underground station, stop, shelter, mall, terminal, platform | 0 |
| 20.04   Other stations, landings, terminals:  Intermodal, ferry, trolley, etc. | 0 |
| 20.05   Joint development | 0 |
| 20.06   Automobile parking multi-story structure | 0 |
| 20.07   Elevators, escalators | 0 |
| **30 SUPPORT FACILITIES: YARDS, SHOPS, ADMIN. BLDGS** | **0** |
| 30.01   Administration Building:  Office, sales, storage, revenue counting | 0 |
| 30.02   Light Maintenance Facility | 0 |
| 30.03   Heavy Maintenance Facility | 0 |
| 30.04   Storage or Maintenance of Way Building | 0 |
| 30.05   Yard and Yard Track | 0 |
| **40 SITEWORK & SPECIAL CONDITIONS** | **349,486,405** |
| 40.01   Demolition, Clearing, Earthwork | 74,403,594 |
| 40.02   Site Utilities, Utility Relocation | 90,440,138 |
| 40.03   Haz. mat'l, contam'd soil removal/mitigation, ground water treatments | 97,697,948 |

| | | |
|---|---|---:|
| 40.04 | Environmental mitigation, e.g. wetlands, historic/archeologic, parks | 11,613,825 |
| 40.05 | Site structures including retaining walls, sound walls | 14,759,179 |
| 40.06 | Pedestrian/ bike access and accommodation, landscaping | 0 |
| 40.07 | Automobile, bus, van accessways including roads, parking lots | 0 |
| 40.08 | Temporary Facilities and other indirect costs during construction | 60,574,992 |
| **50** | **SYSTEMS** | **814,887,458** |
| 50.01 | Train control and signals | 196,586,437 |
| 50.02 | Traffic signals and crossing protection | 0 |
| 50.03 | Traction power supply:  substations | 0 |
| 50.04 | Traction power distribution:  catenary and third rail | 332,716,123 |
| 50.05 | Communications | 258,082,635 |
| 50.06 | Fare collection system and equipment | 0 |
| 50.07 | Central Control | 27,502,263 |
| **Construction Subtotal (10 - 50)** | | **7,346,641,888** |
| **60 ROW, LAND, EXISTING IMPROVEMENTS** | | **1,032,534,079** |
| 60.01 | Purchase or lease of real estate | 1,001,197,144 |
| 60.02 | Relocation of existing households and businesses | 31,336,935 |
| **70 VEHICLES (number)** | | **0** |
| 70.01 | Light Rail | 0 |
| 70.02 | Heavy Rail | 0 |
| 70.03 | Commuter Rail | 0 |
| 70.04 | Bus | 0 |
| 70.05 | Other | 0 |
| 70.06 | Non-revenue vehicles | 0 |
| 70.07 | Spare parts | 0 |
| **80 PROFESSIONAL SERVICES (applies to Cats. 10-50)** | | **2,387,732,253** |
| 80.01 | Project Development | 106,647,227 |
| 80.02 | Engineering | 468,871,343 |
| 80.03 | Project Management for Design and Construction | 873,940,786 |
| 80.04 | Construction Administration & Management | 200,393,002 |
| 80.05 | Professional Liability and other Non-Construction Insurance | 476,766,842 |
| 80.06 | Legal; Permits; Review Fees by other agencies, cities, etc. | 231,140,875 |
| 80.07 | Surveys, Testing, Investigation, Inspection | 13,557,663 |
| 80.08 | Start up | 16,414,516 |
| **Subtotal (10 - 80)** | | **10,766,908,221** |
| **90 UNALLOCATED CONTINGENCY** | | **2,387,974,542** |
| **Subtotal (1 O- 90)** | | **13,154,882,763** |
| **100  FINANCE CHARGES** | | **1,421,287,958** |
| **Total Project Cost (10 - 100)** | | **14,576,170,721** |

**Attachment 3**

**Gateway Development Commission**
**Hudson Tunnel Project**
**Located Between Secaucus, New Jersey and New York, New York**
**Baseline Cost Estimate**

Inflated Cost to
Year of
Ex_Qenditure

| | Base Year Dollars w/o Contingency (X000) | Base Year Dollars Allocated Contingency (X000) | Base Year Dollars TOTAL (X000) | Inflation Factor | YOE Dollars TOTAL (Public Transportation Only) (X000) |
|---|---|---|---|---|---|
| 10  GUIDEWAY & TRACK ELEMENTS (route miles) | 3,425,486,005 | 1,383,960,585 | 4,809,446,590 | 1.2854 | 6,182,268,025 |
| 20  STATION$, STOPS, TERMINALS, INTERMODAL (number) | 0 | 0 | 0 | #DIV/0! | 0 |
| 30  SUPPORT FACILITIES: YARDS, SHOPS, ADMIN. BLDGS | 0 | 0 | 0 | #DIV/0! | 0 |
| 40  SITEWORK & SPECIAL CONDITIONS | 187,513,934 | 73,910,739 | 261,424,674 | 1.3369 | 349,486,405 |
| 50  SYSTEMS | 343,442,404 | 171,292,448 | 514,734,852 | 1.5831 | 814,887,458 |
| 60  ROW, LAND, EXISTING IMPROVEMENTS | 702,412,536 | 264,068,404 | 966,480,940 | 1.0683 | 1,032,534,079 |
| 70  VEHICLES (number) | 0 | 0 | 0 | #DIV/0! | 0 |
| 80  PROFESSIONAL SERVICES (applies to Cats. 10-50) | 1,340,278,722 | 553,659,355 | 1,893,938,077 | 1.2607 | 2,387,732,253 |
| 90  UNALLOCATED CONTINGENCY | | | 1,749,151,162 | 1.3652 | 2,387,974,542 |
| 100  FINANCE CHARGES | | | 1,041,476,363 | 1.3647 | 1,421,287,958 |
| **Total  Project Cost (10 - 100)** | | | **11,236,652,657** | 1.2972 | **14,576,170,721** |

**Attachment 3**

**Gateway Development Commission**
**Hudson Tunnel Project**
**Located Between Secaucus, New Jersey and New York, New York**

**Baseline Cost Estimate**

BCE by Source of Funding

| | Total Project Cost in YOE Dollars (Public Tansportation Only) (X000) | Double Check Total (X000) | Federal 5309 New Starts | Federal Other | Local |
|---|---|---|---|---|---|
| 10 GUIDEWAY & TRACK ELEMENTS (route miles) | 6,182,268 | 6,182,268 | 3,197,827 | 896,250 | 2,088,191 |
| 20 STATIONS, STOPS, TERMINALS, INTERMODAL (number) | 0 | 0 | 0 | 0 | 0 |
| 30 SUPPORT FACILITIES: YARDS, SHOPS, ADMIN. BLDGS | 0 | 0 | 0 | 0 | 0 |
| 40 SITEWORK & SPECIAL CONDITIONS | 349,486 | 349,486 | 156,632 | 0 | 192,855 |
| 50 SYSTEMS | 814,887 | 814,887 | 707,487 | 78,815 | 28,585 |
| 60 ROW, LAND, EXISTING IMPROVEMENTS | 1,032,534 | 1,032,534 | 393,103 | 604,466 | 34,965 |
| 70 VEHICLES (number) | 0 | 0 | 0 | 0 | 0 |
| 80 PROFESSIONAL SERVICES (applies to Cats. 10-50) | 2,387,732 | 2,387,732 | 603,283 | 1,376,877 | 407,572 |
| 90 UNALLOCATED CONTINGENCY | 2,387,975 | 2,387,975 | 1,658,840 | 722,680 | 6,454 |
| 100 FINANCE CHARGES | 1,421,288 | 1,421,288 | 162,827 | 76,748 | 1,181,713 |
| **Total Project Cost (10 - 100)** | **14,576,171** | **14,576,171** | **6,880,000** | **3,755,836** | **3,940,335** |

Sources of Federal Funding and Matching Share Ratios

| | Costs Attributed to Source of Funds (X000} | Federal/ Local Matching Ratio within Source | All Federal Funds (X000} | Local Funds (X000) |
|---|---|---|---|---|
| Federal 5309 New Starts | 10,215,387 | 67/33 | 6,880,000 | 3,335,387 |
| Amtrak Contribution | 667,106 | 100/0 | 667,106 | 0 |
| Federal-State Partnership | 3,646,378 | 84/16 | 3,063,730 | 582,648 |
| RAISE | 47,300 | 53/47 | 25,000 | 22,300 |
| Total | 14,576,171 | | **10,635,836** | **3,940,335** |
| **Overall Federal Share of Project** | | | 72.97% | |
| **New Starts Share of Project** | | | 47.20% | |

## Attachment 3A

## Gateway Development Commission
## Hudson Tunnel Project
## Located Between Secaucus, New Jersey and New York, New York

## Project Budget

| Scope and Activity Description | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Scope Code | ALI Code | Scope and Activity Line Item Descriptions | Qty | | Federal 5309 New Starts | | | Federal Other | | | Project Totals | | | Check Total Project Cost in YOE Dollars (Public Tansportation Only) (XO00) |
| | | | | Total Federal % | Federal | Local | Total | Federal | Local | Total | Federal | Local | Total | |
| 14010 | 140110 | GUIDEWAY & TRACK ELEMENTS | 6.47 | 66.22% | 3,197,827 | 1,861,373 | 5,059,200 | 896,250 | 226,818 | 1,123,068 | 4,094,077 | 2,088,191 | 6,182,268 | 6,182,268 |
| 14020 | 140220 | STATIONS, STOPS, TERMINALS, INTERMODAL | 0 | 0.00% | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 14030 | 140330 | SUPPORT FACILITIES, YARDS, SHOPS, ADMIN. BLDGS. | | 0.00% | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 14040 | 140440 | SITEWORK & SPECIAL CONDITIONS | | 44.82% | 156,632 | 192,341 | 348,972 | 0 | 514 | 514 | 156,632 | 192,855 | 349,486 | 349,486 |
| 14050 | 140550 | SYSTEMS | | 96.49% | 707,487 | 8,764 | 716,251 | 78,815 | 19,821 | 98,636 | 786,302 | 28,585 | 814,887 | 814,887 |
| 14060 | 140660 | ROW, LAND, EXISTING IMPROVEMENTS | | 96.61% | 393,103 | 34,965 | 428,068 | 604,466 | 0 | 604,466 | 997,569 | 34,965 | 1,032,534 | 1,032,534 |
| 14070 | | VEHICLES | 0 | 0.00% | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 14080 | 140880 | PROFESSIONAL SERVICES | | 82.93% | 603,283 | 56,230 | 659,514 | 1,376,877 | 351,341 | 1,728,218 | 1,980,160 | 407,572 | 2,387,732 | 2,387,732 |
| 14090 | 140990 | UNALLOCATED CONTINGENCY | | 99.73% | 1,658,840 | 0 | 1,658,840 | 722,680 | 6,454 | 729,134 | 2,381,521 | 6,454 | 2,387,975 | 2,387,975 |
| 14100 | 141010 | FINANCE CHARGES | | 16.86% | 162,827 | 1,181,713 | 1,344,540 | 76,748 | 0 | 76,748 | 239,575 | 1,181,713 | 1,421,288 | 1,421,288 |
| Total Project Cost (10 - 100) | | | | 72.97% | 6,880,000 | 3,335,387 | 10,215,387 | 3,755,836 | 604,948 | 4,360,784 | 10,635,836 | 3,940,335 | 14,576,171 | 14,576,171 |

**Attachment 4**

**Gateway Development Commission
Hudson Tunnel Project
Located Between Secaucus, New Jersey and New York, New York**

**Baseline Schedule**



| SCHEDULE | Start Date | End Date | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 | 2034 | 2035 | 2036 | 2037 | 2038 | 2039 | 2040 | 2041 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10 GUIDEWAY & TRACK ELEMENTS (route miles) | 04/01/23 | 06/25138 | | | | | | | | | | | | | | | | | | | | | | | | | |
| 20 STATIONS, STOPS, TERMINALS, INTERMODAL (number) | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 30 SUPPORT FACILITIES: YARDS, SHOPS, ADMIN. BLDGS | 10/01127 | 01/31/34 | | | | | | | | | | | | | | | | | | | | | | | | | |
| 40 SITEWORK & SPECIAL CONDITIONS | 01/01/17 | 06/25/38 | | | | | | | | | | | | | | | | | | | | | | | | | |
| 50 SYSTEMS | 01/01/27 | 06/25/38 | | | | | | | | | | | | | | | | | | | | | | | | | |
| 60 ROW, LAND, EXISTING IMPROVEMENTS | 01/01/17 | 01/31127 | | | | | | | | | | | | | | | | | | | | | | | | | |
| 70 VEHICLES (number) | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 80 PROFESSIONAL SERVICES (appfies to Cats. 10.50) | 01/01/17 | 06/25/38 | | | | | | | | | | | | | | | | | | | | | | | | | |
| 90 UNALLOCATED CONTINGENCY | 04/01/23 | 11/09/40 | | | | | | | | | | | | | | | | | | | | | | | | | |
| 100 FINANCE CHARGES (CC On ) | 01/01/24 | 06/25/38 | | | | | | | | | | | | | | | | | | | | | | | | | |
| REVENUE OPERATIONS | 06/25/38 | 11/09/40 | | | | | | | | | | | | | | | | | | | | | | | | | |
| SCHEDULE CONTINGENCY | 06/26/38 | 11/09/40 | | | | | | | | | | | | | | | | | | | | | | | | | |

**Attachment 5**

**Gateway Development Commission**
**Hudson Tunnel Project**
**Located Between Secaucus, New Jersey and New York, New York**

**Related Documents and Grants**

**I.  Prior Grants (Not included in the FFGA)**

| Project Number | Federal Amount | Funding Source | Purpose |
|---|---|---|---|
| Not Applicable | | | |

**II.  Related Documents**

| Milestone | Date |
|---|---|
| Notice of Intent to prepare an Environmental Impact Statement (EIS) with NJ TRANSIT as prnject sponsor | May 2, 2016 |
| Entry into Project Development Phase of CIG Program | July 14, 2016 |
| Selection of Locally Preferred Alternative (LPA) | October 2016 |
| LPA adopted into New Jersey fiscally constrained long range transportation plan | November 13, 2017 |
| LPA adopted into New York fiscally constrained long range transportation plan | August 9, 2018 |
| Draft EIS | July 7, 2017 |
| FTA is notified PANYNJ will become joint lead agency with NJ TRANSIT for NEPA | Summer 2018 |
| FTA issued a Categorical Exclusion for the Hudson Yards Concrete Casing Phase 3 work | November 20, 2019 |
| Joint FRA/FTA Final EIS/ROD issued | May 28, 2021 |
| GDC notifies FTA it is the project sponsor | October 21, 2022 |
| Project selected for RAISE award | June 30, 2023 |
| FTA approval of Entry into Engineering | July 06, 2023 |
| Section 106 Programmatic Agreement updated to reflect GDC as prnject sponsor | July 10, 2023 |
| FTA approves RAISE pre-award authority | August 15, 2023 |
| FTA CIG LONP approved for Tonnelle Avenue | August 23, 2023 |
| FTA CIG LONP approved for Hudson River Ground Stabilization | October 6, 2023 |
| Environmental Re-evaluation completed | October 26, 2023 |
| Project selected for FRA FSP award | November 6, 2023 |
| FTA CIG LOI approved for the Project | December 26, 2023 |
| Environmental Re-evaluation completed | April 22, 2024 |
| Environmental Re-evaluation completed | April 24, 2024 |

**III. FFGA Grant History (Grants Under the FFGA)**

| Project Number | Federal Amount | Funding Source | Purpose |
|---|---|---|---|
| NY-2024-014-00 | $25,000,000 | FY 2023 Rebuilding American Infrastructure with Sustainability and Equity (RAISE) funding | To convert a portion of Tonnelle Avenue in North Bergen, New Jersey, into a new roadway bridge to provide a railroad right-of-way for the new Hudson River Tunnel |

**Attachment 6**

**Gateway Development Commission**
**Hudson Tunnel Project**
**Located Between Secaucus, New Jersey and New York, New York**

**Schedule of Federal Funds**

Section 30005 of the Infrastructure Investment and Jobs Act (IIJA) (Pub. L. 117-58; November 15, 2021) authorizes FTA to award Federal Capital Investment Grants program funds for design and construction of the Hudson Tunnel Project (the Project). In accordance with the Federal transit law at 49 U.S.C. Chapter 53 and FTA Circular 5200.1A, Full Funding Grant Agreements Guidance (December 5, 2002), by the execution of this Agreement the Government is limiting its commitment to provide CIG funding for the Project to those funds that have been or may be appropriated during the term of IIJA and subsequent authorizations. The Government and the Grantee recognize, however, that the period of time necessary to complete the Project may extend beyond the IIJA, as evidenced below and by Attachment 4 of this Agreement (Baseline Schedule). Currently, the Government and the Grantee anticipate that the CIG funds will be provided for the Project as follows:

**Proposed Schedule of Federal Funds**
**(Based on Federal Fiscal Year of Appropriation)**

| Fiscal Year | Section 5309 New Starts Funds | Other Federal Funding | State/Local Funding | Total |
|---|---|---|---|---|
| FY 2024 and prior | $800,000,000 | 1,458,038,661 | $836,551,888 | $3,094,590,550 |
| FY 2025 | $700,000,000 | 765,932,390 | $543,094,556 | $2,009,026,946 |
| FY 2026 | $700,000,000 | 765,932,390 | $543,094,556 | $2,009,026,946 |
| FY 2027 | $668,571,428 | 765,932,390 | $531,450,987 | $1,965,954,805 |
| FY 2028 | $668,571,428 | . | $247,690,485 | $916,261,913 |
| FY2029 | $668,571,428 | | $247,690,484 | $916,261,912 |
| FY2030 | $668,571,428 | | $247,690,484 | $916,261,912 |
| FY 2031 | $668,571,428 | | $247,690,484 | $916,261,912 |
| FY2032 | $668,571,428 | | $247,690,484 | $916,261,912 |
| FY2033 | $668,571,432 | | $247,690,481 | $916,261,913 |
| Total | $6,880,000,000 | $3,755,835,831 | $3,940,334,889 | $14,576,170,721 |

* GDC is obtaining three USDOT Railroad Rehabilitation & Improvement Financing (RRIF) loans for the project, which will be repaid by funds received by GDC from the states of NY and NJ and the PANYNJ. These loans comprise the state/local match.

**Attachment 7**

**Gateway Development Commission**
**Hudson Tunnel Project**
**Located Between Secaucus, New Jersey and New York, New York**

**Measures to Mitigate Environmental Impacts**

The measures to mitigate the environmental impacts of the Hudson Tunnel Project (Project) are included in the environmental record and include the following documents which are incorporated herein:

1. Draft Environmental Impact Statement (EIS) published - July 7, 2017
2. Final EIS/Record of Decision published --- May 28, 2021
3. Section 106 Programmatic Agreement executed- May 27, 2021 and updated July 10, 2023
4. Categorical exclusion for Hudson Yards Concrete Casing Phase 3 (including LIRR building utility)- November 20, 2019
5. Environmental Re-evaluation completed- October 26, 2023
6. Environmental Re-evaluation completed - April 22, 2024
7. Environmental Re-evaluation completed-April 24, 2024

The mitigation measures and other Project features that reduce adverse environmental and community impacts, to which FTA and the Gateway Development Commission (GDC) committed in the environmental record, may not be eliminated from the Project except by FTA's written consent in accordance with applicable laws and regulations. These mitigation measures include, but are not limited to, commitments in the environmental record to perform further consultation with an agency or community on environmental and related matters.

The GDC will transmit a Mitigation Monitoring Program Report listing the mitigation measures committed to in the documents listed above. This report includes a table which identifies the party responsible for implementing each mitigation measure and indicates the status of the implementation of each measure. The table's purpose is to facilitate monitoring the implementation of the mitigation measures during the Construction Phase of the Project. That table will be periodically revised to add measures from required consultations, permit approvals, and PTA-approved changes, and to update the implementation status of the measures. The table and its quarterly updates are incorporated herein by reference and will be included in quarterly reports to the FTA and its project management oversight contractor (PMOC).

The GDC may propose, and FTA may approve, an alternative method for monitoring the implementation of mitigation commitments.

**Attachment 8**

**Gateway Development Commission**
**Hudson Tunnel Project**
**Located Between Secaucus, New Jersey and New York, New York**

**Information Collection and Analysis Plan**

The Gateway Development Commission (GDC) will assemble information and conduct analyses to identify the impacts of the Hudson Tunnel Project (Project) on public transportation services and public transportation ridership and evaluate the accuracy of the forecasts prepared during the planning and development of the Project. The GDC will produce a plan that addresses the following requirements and assemble the information and conduct the analyses pursuant to the plan.

**I. Information**

The GDC will assemble information on five key characteristics of the Project and its associated transit services in addition to information on the current public transportation system regarding transit services levels and ridership patterns:

1. <u>Project scope:</u> The physical components of the Project, including environmental mitigation and other related elements;

2. <u>Capital cost:</u> The total Project capital costs in constant dollars, formatted in FTA's Standard Cost Categories, and annual expenditures in year-of-expenditure dollars;

3. <u>Transit service levels:</u> The current service levels of the public transportation system in the Project corridor, and the service characteristics of the fixed guideway, feeder bus services, and other bus services in the corridor;

4. <u>Operation and maintenance (O&M) costs:</u> O&M costs for the Project and the change in O&M costs for other transit services in the corridor;

5. <u>Ridership:</u> Trips on the Project and the change in transit trips in the corridor plus associated impacts on fare box revenues; and

**II. Milestones**

The GDC will assemble predictions of Project outcomes at three milestones during development of the Project and will collect data at two milestones during its implementation. At each milestone, the GDC will archive the assembled information, data, and documentation and provide to FTA a copy of the archive.

1. <u>Entry into Project Development:</u> Assembly, documentation, and archiving of the predicted outcomes on all five characteristics of the Project at the point when the GDC requested

FTA approval for entry into Project Development;

2.    Entry into Engineering: Assembly, documentation, and archiving of the predicted outcomes on all five characteristics of the Project at the point when the GDC requested FTA approval for Entry into Engineering, plus an analysis of any significant differences in the predicted outcomes compared to the predictions at entry into Project Development;

3.    Full Funding Grant Agreement: Assembly, documentation, and archiving of the predicted outcomes on all five characteristics of the Project at the signing of the FFGA and an analysis of any significant differences in the predicted outcomes compared to the predictions at Entry into Engineering;

4.    Actual Conditions before Project Opening: Collection, documentation, and archiving of data on existing transit services, O&M costs, and transit ridership/revenues immediately prior to any significant changes in transit service levels caused by either the construction or the opening of the Project; and

5.    Actual Conditions after Project Opening: Collection, documentation, and archiving of data on the actual outcomes of the Project on all five characteristics for two years after the start of service.

## Ill. Final Report

Within 36 months after Project opening, the GDC will complete a final report that (1) documents the actual outcomes of the Project on all five characteristics and (2) analyzes the accuracy of predictions of those outcomes that were prepared during the Project's development. The body of the final report will highlight findings, conclusions, and lessons learned. To support the findings and conclusions, the GDC will include appendices to document the detailed analysis of each Project outcome.

## IV. Coordination with FTA

The GDC will maintain communication with FTA on progress in implementing the plan and provide opportunities for early review and for commenting on draft products. The GDC must obtain approval in advance of any changes in the scope or schedule for the plan approved by FTA.