Exhibit D

**U.S Department of Transportation**

**Federal Railroad Administration**

# Grant Agreement

| | |
|---|---|
| 1. RECIPIENT NAME AND ADDRESS<br>GATEWAY DEVELOPMENT COMMISSION<br><br>120 Broadway FL 10<br>New York, NY 10271-1103 | 2. AGREEMENT NUMBER:     3. AMENDMENT NO.<br>4. PROJECT PERFORMANCE PERIOD: FROM   TO<br>5. FEDERAL FUNDING PERIOD: FROM   TO |

| 1A. IRS/VENDOR NO. | 6. PRE-AWARD AUTHORITY? Yes   6A. PRE-AWARD DATE (MM/DD/YYYY) 11/15/2022 |
|---|---|
| 1B. UEI. L3A1UJSRCT44    1C. DUNS. | 7. ACTION   New |

| 8. CFDA#: | TITLE | FEDERAL | NON-FEDERAL | TOTAL |
|---|---|---|---|---|
| 9. PROJECT TITLE<br>Hudson Tunnel Project | 10. PREVIOUS AGREEMENTS | 0.00 | 0.00 | 0.00 |
| | 11. THIS AGREEMENT | 1,899,999,917.00 | 949,999,955.00 | 2,849,999,872.00 |
| | 12. TOTAL AGREEMENT | 1,899,999,917.00 | 949,999,955.00 | 2,849,999,872.00 |

| 12A. OTHER FEDERAL FUNDING | 7,176,169,165.00 |
|---|---|

**13. INCORPORATED ATTACHMENTS**

THIS AGREEMENT INCLUDES THE FOLLOWING ATTACHMENTS, INCORPORATED HEREIN AND MADE A PART HEREOF:

General Terms and Conditions, Attachment 1; Project Specific Terms and Conditions, Attachment 2; Exhibits, Attachment 3

**14. STATUTORY AUTHORITY FOR GRANT/ COOPERATIVE AGREEMENT**

Infrastructure Investment and Jobs Act (IIJA), Sec. 22101 and Tit. VIII of Div. J (Pub. L. 117-58) (Nov. 15, 2021)

**15. REMARKS**

| GRANTEE ACCEPTANCE | AGENCY APPROVAL |
|---|---|
| 16. NAME AND TITLE OF AUTHORIZED GRANTEE OFFICIAL<br>Ms. Madeleine McDonnell<br>Deputy Chief Program Officer | 18. NAME AND TITLE OF AUTHORIZED FRA OFFICIAL<br>Rebecca Reyes Alicea<br>Director, Office of Amtrak & NEC Program Delivery |
| 17. SIGNATURE OF AUTHORIZED GRANTEE OFFICIAL<br><br>Electronically Signed | 17A. DATE<br><br>09/17/2024 | 19. SIGNATURE OF AUTHORIZED FRA OFFICIAL<br><br>Electronically Signed | 19A. DATE<br><br>09/17/2024 |

| AGENCY USE ONLY | |
|---|---|
| 20. OBJECT CLASS CODE: 41010 | 21. ORGANIZATION CODE: 9022000000 |

**22. ACCOUNTING CLASSIFICATION CODES**

| DOCUMENT NUMBER | FUND | BY | BPAC | AMOUNT |
|---|---|---|---|---|
| 69A36524420700FSPNY | | | | |
| 69A36524420700FSPNY | | | | |
| 69A36524420700FSPNY | | | | |

# AWARD ATTACHMENTS

GATEWAY DEVELOPMENT COMMISSION                    69A36524420700FSPNY

1. General Terms and Conditions, Attachment 1
2. Project Specific Terms and Conditions, Attachment 2
3. Exhibits, Attachment 3
4. Exhibit D-Declaration of Covenants



U.S. Department of Transportation
**Federal Railroad Administration**

## Attachment 1

# GENERAL TERMS AND CONDITIONS

Revision Date: February 15, 2024

U.S. Department of Transportation
**Federal Railroad Administration**

# General Terms and Conditions
# Table of Contents

ATTACHMENT 1 ......................................................................................................................... 7

ARTICLE 1:  TERMS AND CONDITIONS ....................................................................................... 7

   1.1    General Terms and Conditions ......................................................................................... 7

   1.2    Project-Specific Terms and Conditions ........................................................................... 7

   1.3    Program-Specific Clauses ................................................................................................. 7

   1.4    Exhibits ............................................................................................................................ 8

ARTICLE 2:  FRA ROLE AND RESPONSIBILITIES ......................................................................... 8

   2.1    FRA Role .......................................................................................................................... 8

   2.2    FRA Professional Staff ..................................................................................................... 8

ARTICLE 3:  RECIPIENT ROLE ................................................................................................... 9

   3.1    Representations and Acknowledgments on the Project .................................................. 9

   3.2    Representations on Authority and Capacity ................................................................... 9

   3.3    FRA Reliance ................................................................................................................. 10

   3.4    Project Delivery ............................................................................................................ 10

   3.5    Rights and Powers Affecting the Project ....................................................................... 10

   3.6    Notification of Changes to Key Personnel .................................................................... 11

ARTICLE 4:  AWARD AMOUNT, OBLIGATION, AND TIME PERIODS ........................................... 11

   4.1    Federal Award Amount ................................................................................................. 11

   4.2    Federal Obligations ....................................................................................................... 11

   4.3    Maximum Funding Amount ........................................................................................... 11

   4.4    Budget Period ................................................................................................................ 11

   4.5    Period of Performance .................................................................................................. 11

ARTICLE 5:  STATEMENT OF WORK, SCHEDULE, AND BUDGET CHANGES ................................. 11

   5.1    Notification Requirement ............................................................................................. 11

   5.2    Scope and Statement of Work Changes ....................................................................... 12

   5.3    Schedule Changes ......................................................................................................... 12

   5.4    Budget Changes ............................................................................................................ 12

   5.5    Project Cost Savings ...................................................................................................... 13

   5.6    FRA Acceptance of Changes ......................................................................................... 13

ARTICLE 6:  GENERAL REPORTING TERMS ............................................................................... 14

**U.S. Department of Transportation**
**Federal Railroad Administration**

6.1    Alternative Reporting Methods ................................................................................ 14

6.2    Paperwork Reduction Act Notice ........................................................................... 14

ARTICLE 7:  PROGRESS AND FINANCIAL REPORTING ..................................................... 14

7.1    Quarterly Project Progress Reports and Recertifications ........................................ 14

7.2    Final Progress Reports and Financial Information .................................................. 15

7.3    Real Property Reporting........................................................................................ 15

ARTICLE 8:  PERFORMANCE MEASUREMENT AND REPORTING ..................................... 15

8.1    Baseline Performance Measurement ..................................................................... 15

8.2    Post-Project Performance Measurement ............................................................... 15

8.3    Project Outcomes Report...................................................................................... 16

8.4    General Performance Measurement Requirements ................................................ 16

8.5    Outcome Measurement and Reporting Survival .................................................... 16

ARTICLE 9:  NONCOMPLIANCE AND REMEDIES ............................................................. 16

9.1    Noncompliance Determinations ............................................................................ 16

9.2    Remedies.............................................................................................................. 17

9.3    Other Oversight Entities....................................................................................... 18

ARTICLE 10:  AGREEMENT SUSPENSION AND TERMINATION ........................................ 18

10.1   Suspension of Award Activities ............................................................................ 18

10.2   FRA Termination .................................................................................................. 19

10.3   Closeout Termination........................................................................................... 19

10.4   Post-Termination Adjustments ............................................................................. 19

10.5   Non-Terminating Events ....................................................................................... 19

ARTICLE 11:  MONITORING, FINANCIAL MANAGEMENT, CONTROLS, AND RECORDS .............................. 20

11.1   Recipient Monitoring and Record Retention ......................................................... 20

11.2   Financial Records and Audits ............................................................................... 20

11.3   Internal Controls .................................................................................................. 21

11.4   FRA Record Access .............................................................................................. 21

11.5   Site Visits ............................................................................................................ 21

ARTICLE 12:  CONTRACTING AND SUBAWARDING ........................................................ 21

12.1   Buy America ........................................................................................................ 21

12.2   Small and Disadvantaged Business Requirements ................................................ 22

12.3   Engineering and Design Services [Reserved] ........................................................ 22

12.4   Prohibition on Certain Telecommunications and Video Surveillance Services or Equipment ... 22

**U.S. Department of Transportation**
**Federal Railroad Administration**

12.5    Pass-Through Entity Responsibilities ................................................................. 22

12.6    Local Hiring Preference for Construction Jobs ................................................. 22

12.7    Procurement ....................................................................................................... 23

ARTICLE 13:  COSTS, PAYMENTS, AND UNEXPENDED FUNDS ................................. 23

13.1    Limitation of Federal Award Amount ............................................................... 23

13.2    Project Costs ....................................................................................................... 23

13.3    Timing of Project Costs ...................................................................................... 23

13.4    Recipient Recovery of Federal Funds ............................................................... 23

13.5    Unexpended Agreement Federal Funds ........................................................... 24

13.6    Interest Earned ................................................................................................... 24

13.7    Timing of Payments to the Recipient ............................................................... 24

13.8    Payment Method ................................................................................................ 24

13.9    Information Supporting Expenditures ............................................................... 24

13.10   Reimbursement Request Timing Frequency ................................................... 24

13.11   Program Income ................................................................................................. 25

ARTICLE 14:  PROPERTY AND EQUIPMENT ................................................................ 25

14.1    General Requirements ....................................................................................... 25

14.2    Relocation and Real Property Acquisition ....................................................... 25

14.3    Use for Originally Authorized Purpose ............................................................. 25

14.4    Maintenance ....................................................................................................... 25

14.5    Real Property Disposition .................................................................................. 26

14.6    Equipment Disposition ...................................................................................... 26

14.7    Recordkeeping .................................................................................................... 26

14.8    Encumbrance ...................................................................................................... 26

ARTICLE 15:  AMENDMENTS ....................................................................................... 26

15.1    Bilateral Amendments ....................................................................................... 26

15.2    FRA Unilateral Amendments ............................................................................. 26

15.3    Other Amendments ........................................................................................... 27

ARTICLE 16:  CLIMATE CHANGE AND ENVIRONMENTAL JUSTICE ............................ 27

16.1    Climate Change and Environmental Justice ..................................................... 27

ARTICLE 17:  RACIAL EQUITY AND BARRIERS TO OPPORTUNITY .............................. 27

17.1    Racial Equity and Barriers to Opportunity ....................................................... 27

ARTICLE 18:  LABOR AND WORK .................................................................................. 27

**U.S. Department of Transportation**
**Federal Railroad Administration**

18.1    Labor and Work.................................................................................................... 27

18.2    OFCCP Mega Construction Project Program................................................... 28

ARTICLE 19:  CRITICAL INFRASTRUCTURE SECURITY AND RESILIENCE ..................... 28

19.1    Critical Infrastructure Security and Resilience ............................................... 28

ARTICLE 20:  FEDERAL FINANCIAL ASSISTANCE, ADMINISTRATIVE,  AND NATIONAL POLICY
REQUIREMENTS .................................................................................................................. 28

20.1    Uniform Administrative Requirements for Federal Awards ........................... 28

20.2    Federal Law and Public Policy Requirements ................................................. 29

20.3    Federal Freedom of Information Act ............................................................... 29

20.4    History of Performance .................................................................................... 29

20.5    Whistleblower Protection ................................................................................ 29

20.6    External Award Terms and Obligations........................................................... 29

20.7    Incorporated Certifications .............................................................................. 30

ARTICLE 21:  ASSIGNMENT.............................................................................................. 30

21.1    Assignment Prohibited ..................................................................................... 30

ARTICLE 22:  WAIVER ....................................................................................................... 30

22.1    Waivers .............................................................................................................. 30

ARTICLE 23:  ADDITIONAL TERMS AND CONDITIONS .................................................... 31

23.1    Disclaimer of Federal Liability ......................................................................... 31

23.2    Environmental Review ...................................................................................... 31

23.3    Project Maintenance Requirement.................................................................. 32

23.4    Appropriations Act Requirements ................................................................... 32

23.5    Standards of Conduct........................................................................................ 32

23.6    Changed Conditions of Performance .............................................................. 33

23.7    Litigation ............................................................................................................ 33

23.8    Bipartisan Infrastructure Law Signage Guidelines ........................................ 33

23.9    Equipment and Supplies ................................................................................... 33

23.10   Safety and Technology Data ............................................................................ 34

23.11   Intellectual Property ......................................................................................... 34

23.12   Liquidation of Recipient Obligations ............................................................... 34

ARTICLE 24:  CONSTRUCTION AND DEFINITIONS ........................................................... 34

24.1    Agreement ......................................................................................................... 34

24.2    Construction....................................................................................................... 34

U.S. Department of Transportation
**Federal Railroad Administration**

24.3   Integration ................................................................................................................ 35

24.4   Definitions ................................................................................................................. 35

24.5   Calendar Dates .......................................................................................................... 36

24.6   Communication in Writing ........................................................................................ 36

ARTICLE 25:  AGREEMENT EXECUTION AND EFFECTIVE DATE .................................................... 36

25.1   Counterparts ............................................................................................................. 36

25.2   Effective Date ............................................................................................................ 36

ARTICLE 26:  PROGRAM-SPECIFIC CLAUSES ............................................................................... 36

26.1   Interstate Rail Compacts Grant Program .................................................................. 36

26.2   Railroad Crossing Elimination Program Clauses ........................................................ 38

26.3   Consolidated Rail Infrastructure and Safety Improvements Grants Clauses.............. 41

26.4   Restoration and Enhancement Grants Clauses........................................................... 43

26.5   Federal-State Partnership for Intercity Passenger Rail and Federal-State Partnership for State of Good Repair Clauses ................................................................................................. 45



## ATTACHMENT 1

This Grant Agreement (Agreement) is between the Federal Railroad Administration (FRA) and the Recipient identified in Attachment 2: Project-Specific Terms and Conditions. This Agreement, including the Agreement cover sheet, this Attachment 1, Attachment 2, and Exhibits A–C, constitutes the entire Agreement between FRA and the Recipient regarding the Project as defined in Attachment 2. All prior discussions and understandings concerning the scope and subject matter of this agreement are superseded by this Agreement.

This Agreement is governed by and subject to 2 C.F.R. part 200, Uniform Administrative Requirements, Cost Principles and Audit Requirements for Federal Awards, and the U.S. Department of Transportation (USDOT) implementing regulations at 2 C.F.R. part 1201.

## ARTICLE 1:  TERMS AND CONDITIONS

**1.1 General Terms and Conditions**

This Attachment 1: General Terms and Conditions, is part of the Agreement between FRA and the Recipient. This Attachment 1 contains the standard terms and conditions governing the administration of this Agreement and the execution of the Project. The General Terms and Conditions incorporate by reference the information contained in Attachment 2 and the Exhibits to this Agreement.

**1.2 Project-Specific Terms and Conditions**

Attachment 2: Project-Specific Terms and Conditions, is part of the Agreement between FRA and the Recipient. Attachment 2 contains Project-Specific Terms and Conditions, which may include special terms and conditions.

**1.3 Program-Specific Clauses**

Article 26 of this Attachment 1 contains the applicable program-specific clauses. The Recipient will comply with the program-specific clauses below that are associated with the grant program identified in Attachment 2 of this Agreement. In the event that the Recipient's grant is not authorized under a program listed below, Article 26 does not apply.

(a)  For Projects funded under the Interstate Rail Compacts program (49 U.S.C. § 22910), the Recipient will comply with the program-specific clauses in Article 26.1.

(b)  For Projects funded under the Railroad Crossing Elimination program (49 U.S.C. § 22909), the Recipient will comply with the program-specific clauses in Article 26.2.

(c)  For Projects funded under the Consolidated Rail Infrastructure and Safety Improvements program (49 U.S.C. § 22907), the Recipient will comply with the program-specific clauses in Article 26.3.

(d)  For Projects funded under the Restoration and Enhancement program (49 U.S.C. § 22908), the Recipient will comply with the program-specific clauses in Article 26.4.

**U.S. Department of Transportation**
**Federal Railroad Administration**

(e)  For Projects funded under the Federal-State Partnership for Intercity Passenger Rail program (49 U.S.C. § 24911) and Federal-State Partnership for State of Good Repair (as authorized in Sections 11103 and 11302 of the Passenger Rail Reform and Investment Act of 2015 (Title XI of the Fixing America's Surface Transportation (FAST) Act, Pub. L. No. 114-94 (2015))), the Recipient will comply with the program-specific clauses in Article 26.5.

**1.4    Exhibits**

Exhibits A–C are part of the Agreement between FRA and the Recipient. The Recipient will comply with Exhibits A–C.

## ARTICLE 2:  FRA ROLE AND RESPONSIBILITIES

**2.1    FRA Role**

(a)  FRA is responsible for funding disbursements to the Recipient under this Agreement. FRA will also conduct oversight and monitoring activities to assess Recipient progress against established performance goals and to assess compliance with terms and conditions, including the Statement of Work and other requirements of this Agreement.

(b)  If this award is made as a Cooperative Agreement, FRA will have substantial programmatic involvement. Substantial involvement means that, after award, technical, administrative, or programmatic staff will assist, guide, coordinate, or otherwise participate with the Recipient in Project activities.

(c)  If this award is made as a Grant, FRA will not have substantial programmatic involvement.

**2.2    FRA Professional Staff**

FRA may provide professional staff to review work in progress, completed products, and to provide or facilitate access to technical assistance when it is available, feasible, and appropriate. FRA professional staff may include the following:

(a)  Financial Analyst. The Financial Analyst will serve as the Recipient's point of contact for systems (e.g., GrantSolutions and the Delphi eInvoicing System) access and troubleshooting as well as for financial monitoring.

(b)  Grant Manager. The Grant Manager will serve as the Recipient's point of contact for grant administration and will oversee compliance with the terms and conditions in this Agreement. The Grant Manager reviews financial reports, performance reports, and works with the Project Manager to facilitate effective Project delivery.

(c)  Project Manager. The Project Manager will serve as the Recipient's point of contact for the technical aspects of Project delivery. The Project Manager coordinates Project deliverable review, provides technical assistance to the Recipient, and generally assesses Project progress and performance.

U.S. Department of Transportation
**Federal Railroad Administration**

## ARTICLE 3: RECIPIENT ROLE

**3.1    Representations and Acknowledgments on the Project**

(a)  The Recipient represents that:

(1)  all material statements of fact in the Application were accurate when the Application was submitted and now; and

(2)  the Recipient read and understands the terms and conditions in Attachment 1 and Attachment 2 of this Agreement, the applicable program-specific clauses in Article 26 of this Attachment 1, and the information and conditions in the Exhibits.

(b)  The Recipient acknowledges that:

(1)  the terms and conditions impose obligations on the Recipient and that the Recipient's non-compliance with the terms and conditions may result in remedial action, including terminating the Agreement, disallowing costs incurred for the Project, requiring the Recipient to refund Federal contributions to FRA, and reporting the non-compliance in the Federal-government-wide integrity and performance system. Recipient acknowledges that the terms and conditions impose such obligations on the Recipient whether the award is made as a Cooperative Agreement, Grant Agreement, or Phased Funding Agreement.

(2)  The Recipient acknowledges that the requirements of this Agreement apply to the entire Project, including Project costs satisfied from sources other than Agreement Federal Funds.

(c)  By entering into this Agreement with FRA, the Recipient agrees to comply with the terms and conditions in Attachment 1 and Attachment 2, including applicable program-specific clauses in Article 26 of this Attachment 1, Exhibits A–C, and all applicable Federal laws and regulations, including those identified in this Agreement. The Recipient will ensure compliance with all terms of this Agreement and all of its parts for all tiers of subawards and contracts under this Agreement, as appropriate. The Recipient understands that the terms and conditions of this Agreement apply regardless of whether the award is made as a Cooperative Agreement, Grant Agreement, or Phased Funding Agreement.

**3.2    Representations on Authority and Capacity**

The Recipient represents that:

(a)  it has the legal authority to receive Federal financial assistance under this Agreement;

(b)  it has the legal authority to complete the Project;

(c)  all representations and warranties made in the Federal System for Awards Management (SAM.gov) and in the Application are true and correct;

9

**U.S. Department of Transportation**
**Federal Railroad Administration**

(d)  it has the capacity, including legal, technical, institutional, managerial, and financial capacity, to comply with its obligations under this Agreement and complete the Project;

(e)  the Non-Federal Funds listed in Article 6 of Attachment 2 of this Agreement are committed to fund the Project;

(f)  it has sufficient funds available to ensure that equipment and infrastructure funded under this Agreement will be operated and maintained in compliance with this Agreement and applicable Federal law;

(g)  it has sufficient funds available to ensure that operations funded under this agreement are conducted in compliance with this Agreement and applicable Federal law; and

(h)  the individual executing this agreement on behalf of the Recipient has the legal authority to enter this Agreement and make the statements and certifications in this Agreement on behalf of the Recipient.

**3.3     FRA Reliance**

The Recipient acknowledges that:

(a)  FRA relied on statements of fact in the Application and SAM.gov to select the Project to receive this award;

(b)  FRA relied on statements of fact in the Application, SAM.gov, and this Agreement to determine that the Recipient and the Project are eligible to receive financial assistance under this Agreement;

(c)  FRA relied on statements of fact in the Application, SAM.gov, and this Agreement to determine that the Recipient has the legal authority to implement the Project; and

(d)  FRA relied on statements of fact in both the Application and this Agreement to establish the terms of this Agreement; and

(e)  FRA's selection of the Project to receive this award may have prevented awards to other eligible applicants.

**3.4     Project Delivery**

(a)  The Recipient will implement and complete the Project to FRA's satisfaction under the terms of this Agreement.

(b)  The Recipient will ensure that the Project is financed, constructed, operated, and maintained in accordance with all applicable Federal laws, regulations, and policies.

**3.5     Rights and Powers Affecting the Project**

(a)  The Recipient will not take or permit any action that deprives it of any rights or powers necessary to the Recipient's performance under this Agreement without written approval of FRA.

U.S. Department of Transportation
**Federal Railroad Administration**

(b) The Recipient will act promptly, in a manner acceptable to FRA, to acquire, extinguish, or modify any outstanding rights or claims of right of others that would interfere with the Recipient's performance under this Agreement.

**3.6    Notification of Changes to Key Personnel**

The Recipient will notify the FRA Grant Manager in writing within 30 days of any change in key personnel who are identified in the Application, which may require an amendment to this Agreement.

## ARTICLE 4:  AWARD AMOUNT, OBLIGATION, AND TIME PERIODS

**4.1    Federal Award Amount**

Under this Agreement, FRA awards a Grant to the Recipient in the amount that is the Agreement Federal Funds in Article 6.1 of Attachment 2 of this Agreement.

**4.2    Federal Obligations**

This Agreement obligates for the budget period the amount that is the Agreement Federal Funds in Article 6.1 of Attachment 2 of this Agreement.

**4.3    Maximum Funding Amount**

This Agreement funds the Project at the lesser amount of the Agreement Federal Funds in Article 6.1 of Attachment 2 of this Agreement, or the FRA maximum contribution percentage of the total Project cost identified in Article 6.5 of Attachment 2 of this Agreement.

**4.4    Budget Period**

The budget period for this award begins on the date of this Agreement and ends on the end date that is listed in Section 5 on the Agreement cover sheet. In this Agreement, "budget period" is used as defined at 2 C.F.R. § 200.1.

**4.5    Period of Performance**

The Period of Performance for this award is listed in Section 4 on the Agreement cover sheet. In this Agreement, "Period of Performance" is used as defined at 2 C.F.R. § 200.1.

## ARTICLE 5:  STATEMENT OF WORK, SCHEDULE, AND BUDGET CHANGES

**5.1    Notification Requirement**

The Recipient will notify the FRA Grant Manager and Project Manager by electronic correspondence within 30 days of any change in circumstances or commitments that adversely affect the Recipient's plan to complete the Project, including change in authority. In that notification, the Recipient will describe the change and what actions the Recipient has taken or plans to take to ensure completion of the Project. This notification requirement under this Section 5.1 is separate from any requirements under this Article 5 that the Recipient request an amendment to this Agreement.

U.S. Department of Transportation
**Federal Railroad Administration**

**5.2    Scope and Statement of Work Changes**

If the Project's activities differ from the activities described in Article 4 of Attachment 2 of this Agreement, then the Recipient will notify FRA in writing of the change, which may require an amendment to this Agreement.

**5.3    Schedule Changes**

If one or more of the following conditions are satisfied, then the Recipient will request an amendment to this Agreement to update the Estimated Project Schedule in Section 5.2 of Attachment 2 of this Agreement:

(a)  a completion date for the Project or a component of the Project is listed in the Estimated Project Schedule in Section 5.2 of Attachment 2 of this Agreement and the Recipient's estimate for that milestone changes to a date that is more than six months after the date listed;

(b)  a schedule change would require the budget period to continue after the end of the budget period defined in Section 4.4; or

(c)  a schedule change would require the Period of Performance to continue after the end of the Period of Performance defined in Section 4.5. The Recipient must submit requests to extend the Period of Performance not later than 90 days before the end of the Period of Performance.

For other schedule changes, the Recipient will notify the Grant Manager in writing.

**5.4    Budget Changes**

(a)  The Recipient acknowledges that if the cost of completing the Project increases:

(1)  that increase does not affect the Recipient's obligation under this Agreement to complete the Project;

(2)  any additional funds the Recipient contributes to complete the Project are subject to the requirements of this Agreement in the same manner as the Non-Federal Funds identified in Article 6.5 of Attachment 2 of this Agreement; and

(3)  FRA will not increase the amount of this award to address any funding shortfall.

(b)  The Recipient will notify FRA in writing if the total Project cost, as described in Table 6-A of Attachment 2 of this Agreement, amount increases, which may result in an amendment to this Agreement.

(c)  The Recipient will notify FRA in writing if the Non-Federal Funds amount decreases, which may result in an amendment to this Agreement.

(d)  For all other budget changes, the Recipient will follow the applicable procedures and document the changes in writing.

U.S. Department of Transportation
**Federal Railroad Administration**

**5.5**    **Project Cost Savings**

(a)  If there are Project Cost Savings, then the Recipient may notify FRA in writing of its intent to include in the Project and complete with the Project Cost Savings the additional activities within the scope of this award that are specified in the Additional Task(s) in Article 4 of Attachment 2 of this Agreement. The Recipient will complete the Additional Task(s) after FRA provides a written approval. An amendment to this Agreement is not required to proceed with the Additional Task(s).

(b)  If there are Project Cost Savings, and there are not Additional Task(s) identified in Article 4 of Attachment 2 of this Agreement, then the Recipient may propose a new task that is within the scope of this award and request an amendment to add the new task to this Agreement and complete it with Project Cost Savings.

(c)  In this Agreement, **"Project Cost Savings"** means the difference between the actual costs to complete the Project and the estimated total Project cost listed in Section 6.5 of Attachment 2 of this Agreement, if after the Recipient completes the tasks identified in Article 4 of Attachment 2 of this Agreement to FRA's satisfaction, the actual Project costs are less than the estimated total Project costs. There are no Project Cost Savings prior to completion of the Project or if the actual costs to complete the Project are equal to or greater than the total Project cost listed in Section 6.5 of Attachment 2 of this Agreement.

(d)  If there are Project Cost Savings and either the Recipient does not make a proposal or FRA does not accept the Recipient's proposal under (a) of this Section 5.5, then:

(1)  The Recipient will provide written notice to FRA and reduce the Federal Share by the Project Cost Savings, which may result in an amendment to this Agreement; and

(2)  If the reduced Federal Share reduces this award and the Recipient received reimbursed costs exceeding the appropriate amount under the reduced award, the Recipient will refund the difference between the reimbursed costs and the reduced award.

(e)  In this Agreement, "Federal Share" means the sum of the Agreement Federal Funds and Other Federal Funds amounts that are identified in the Approved Project Budget in Section 6.5 of Attachment 2 of this Agreement.

(f)  The Recipient acknowledges that amounts that are required to be refunded under this Section constitute a debt to the Federal Government that FRA may collect under 2 C.F.R. § 200.346 and the Federal Claims Collection Standards (31 C.F.R. parts 900–999).

**5.6**    **FRA Acceptance of Changes**

FRA may accept or reject changes requested under this Article 5, and in doing so may elect to consider only the interests of the grant program and FRA. The Recipient acknowledges that any request under this Article 5 does not amend, modify, or supplement this Agreement unless FRA


U.S. Department of Transportation
**Federal Railroad Administration**

accepts the request and the parties amend this Agreement under Section 15.1 of this
Attachment 1.

## ARTICLE 6:  GENERAL REPORTING TERMS

**6.1      Alternative Reporting Methods**

FRA may establish processes for the Recipient to submit reports required by this Agreement,
including electronic submission processes. If the Recipient is notified of those processes in
writing, the Recipient will use the processes required by FRA.

**6.2      Paperwork Reduction Act Notice**

Under 5 C.F.R. § 1320.6, the Recipient is not required to respond to a collection of information
that does not display a currently valid control number issued by the Office of Management and
Budget (OMB). Notwithstanding any other term of this Agreement, the due date for any
information collections required under this Agreement, including the reporting requirements in
Articles 7 and 8, is the later of (1) the due date stated with the requirement and (2) the 30th day
after OMB approves that information collection.

## ARTICLE 7:  PROGRESS AND FINANCIAL REPORTING

**7.1      Quarterly Project Progress Reports and Recertifications**

(a)  On or before the 30th day of the first month of each quarter and until the end of the
Period of Performance, the Recipient will submit to FRA through GrantSolutions a
complete FRA Form 34[1] Quarterly Project Progress Report and Recertification that
contains, for the previous quarter:

(1)  a certification that the Recipient is in compliance with 2 C.F.R. § 200.303
(Internal Controls) and 2 C.F.R. part 200, Subpart F (Audit Requirements);

(2)  the certification required under 2 C.F.R. § 200.415(a); and

(3)  a certification that the Recipient is complying with any environmental
mitigation commitments and Section 106 compliance obligations.

If the date of this Agreement is in the final month of a quarter, then the Recipient will
submit the first Quarterly Project Progress Report and Recertification in the quarter that
begins after the date of this Agreement.

(b)  On or before the 30th day of the first month of each quarter and until the end of the
Period of Performance, the Recipient will submit to FRA through GrantSolutions a Federal
Financial Report (SF-425) covering the previous quarter.

---

[1] FRA Form 34 is available at https://railroads.dot.gov/grant-administration/reporting-requirements/fra-reports

**U.S. Department of Transportation**
**Federal Railroad Administration**

7.2     **Final Progress Reports and Financial Information**

No later than 120 days after the end of the Period of Performance, the Recipient will submit:

(a)  a final Quarterly Project Progress Report and Recertification in the format and with the content described in Section 7.1(a) of this Attachment 1 for each Quarterly Project Progress Report and Recertification;

(b)  a final SF-425 through GrantSolutions;

(c)  a Final Performance Report FRA Form 33 as provided by FRA[2] ; and

(d)  any other information required under FRA's award closeout procedures.

7.3     **Real Property Reporting**

The Recipient will comply with the reporting obligations in 2 C.F.R. § 200.330, as directed by FRA.

## ARTICLE 8:  PERFORMANCE MEASUREMENT AND REPORTING

8.1     **Baseline Performance Measurement**

Within one year before the start of work on the Project, the Recipient will collect baseline data for each performance measure that is identified in Article 7 of Attachment 2 of this Agreement. Within six months of the start of the Period of Performance, the Recipient will submit to FRA a Baseline Performance Measurement Report that describes the data collected, the dates when the data were collected, the data sources, assumptions, variability, and estimated levels of precision for each performance measure. The Recipient will also provide FRA access to the data collected in machine-readable format.

8.2     **Post-Project Performance Measurement**

For each performance measure that is listed in Article 7 of Attachment 2 of this Agreement, the Recipient will collect data and submit to FRA a Post-Project Performance Measurement Report that describes the data collected, the dates when the data were collected, the data sources, assumptions, variability, and estimated levels of precision for each performance measure, at the frequency and for the duration identified in Article 7 of Attachment 2 of this Agreement. The Recipient will also provide FRA access to the data collected in machine-readable format. If an external factor affects a performance measure, the Recipient will identify that external factor in the Post-Project Performance Measurement Report and discuss the external factor's influence on the performance measure. In the Post-Project Performance Report, the Recipient will compare the actual project performance against the pre-project (baseline) performance and expected post-project performance as described in Table 7-A of Attachment 2 of this Agreement.

---

[2]FRA Form 33 is available at https://railroads.dot.gov/grant-administration/reporting-requirements/fra-reports

U.S. Department of Transportation
**Federal Railroad Administration**

**8.3** **Project Outcomes Report**

Where indicated in Article 7 of Attachment 2 of this Agreement, the Recipient will submit to FRA, not later than January 31st of the year that follows the final year during which data were collected, a Project Outcomes Report that contains:

(a)  an analysis of the impacts of the Project, including a comparison of the baseline performance measurement data collected under Section 8.1 of this Attachment 1 with the post-project performance measurement data that the Recipient reported in the final Post-Project Performance Measurement Report required under Section 8.2 of this Attachment 1;

(b)  for each performance measure that is identified in Article 7 of Attachment 2 of this Agreement, an analysis of the accuracy of the projected outcome; and

(c)  all data collected under Sections 8.1 and 8.2 of this Attachment 1;

(d)  additional information as directed.

**8.4** **General Performance Measurement Requirements**

The Recipient will ensure that all data collection for each performance measure identified in Article 7 of Attachment 2 of this Agreement is completed in a manner consistent with the description, location, and other attributes associated with that performance measure.

**8.5** **Outcome Measurement and Reporting Survival**

The data collection and reporting requirements in Article 8 of this Attachment 1 survive the termination of this Agreement. FRA may consider the Recipient's compliance with this requirement after closeout of the grant in its evaluation of future applications for Federal financial assistance.

## ARTICLE 9:  NONCOMPLIANCE AND REMEDIES

**9.1** **Noncompliance Determinations**

(a)  Notice of Proposed Determination. If FRA determines that the Recipient may have failed to comply with the United States Constitution, Federal law, or the terms and conditions of this Agreement, FRA will notify the Recipient of a proposed determination of noncompliance through a written notice that:

(1)  explains the noncompliance;

(2)  describes a proposed remedy that is consistent with Section 9.2 of this Attachment 1;

(3)  describes the process and form in which the Recipient may respond to the notice that is consistent with Section 9.1(b) of this Attachment 1; and

**U.S. Department of Transportation**
**Federal Railroad Administration**

(4)  if applicable, provides the Recipient an opportunity to cure the noncompliance or take corrective action.

(b)  Response to Notice of Proposed Determination. The Recipient may, not later than 7 days after receiving the notice of proposed determination of noncompliance, respond to that notice in the form and through the process described in that notice. In its response, the Recipient may:

(1)  accept the proposed remedy;

(2)  acknowledge the noncompliance, but propose an alternative remedy;

(3)  acknowledge the noncompliance and agree to cure or take corrective action; or

(4)  dispute the noncompliance.

To dispute the noncompliance, the Recipient must include in its response sufficient documentation or other information supporting the Recipient's compliance.

(c)  Notice of Final Determination. After considering the Recipient's response or failure to timely respond under Section 9.1(b) of this Attachment 1, FRA will make a final determination. To make a final determination, FRA must provide a written notice to the Recipient that:

(1) states what the final determination is (e.g., noncompliance or compliance);

(2) states the basis for the final determination; and

(3) describes the remedy that FRA is imposing, if applicable, or if FRA is not imposing a remedy, describes the resolution to the proposed determination of noncompliance, including whether the Recipient has cured or corrected the noncompliance.

(d) If FRA determines the noncompliance is one that cannot be addressed while work on the Project is ongoing, in the notice of proposed determination or in the notice of final determination, FRA will direct the Recipient to stop work. The Recipient will stop work and will direct any Subrecipients or contractors to stop work immediately upon receipt of a notice to stop work from FRA.

(e)  FRA may consider the public interest in making a determination of noncompliance and imposing a remedy.

**9.2    Remedies**

(a)  If FRA makes a final determination of noncompliance under Section 9.1(c) of this Attachment 1, FRA may impose a remedy, including:

(1)  additional conditions on the award;

(2)  requiring the Recipient to prepare and implement a corrective action plan;

17

U.S. Department of Transportation
**Federal Railroad Administration**

(3)  directing the Recipient to stop work;

(4)  any remedy permitted under 2 C.F.R. §§ 200.339–200.340, including withholding of payments; disallowance of previously reimbursed costs, requiring refunds from the Recipient to FRA; suspension or termination of the award; or suspension and disbarment under 2 C.F.R. part 180; or

(5)  any other remedy legally available.

(b)  The Recipient acknowledges that any amounts FRA requires the Recipient to refund to FRA under this Section 9.2 constitute a debt to the Federal Government that FRA may collect under 2 C.F.R. § 200.346 and the Federal Claims Collection Standards (31 C.F.R. parts 900–999).

(c)  Other Remedies. The termination authority under Article 10 of this Attachment 1 supplements and does not limit FRA's remedial authority under this Article 9 or 2 C.F.R. part 200, including 2 C.F.R. §§ 200.339-200.240.  FRA reserves the right to seek any appropriate remedy or otherwise enforce the terms and conditions of this Agreement as authorized by law.

**9.3    Other Oversight Entities**

Nothing in Article 9 of this Attachment 1 limits any party's authority to report activity under this agreement to the United States Department of Transportation Inspector General or other appropriate oversight entities.

## ARTICLE 10:  AGREEMENT SUSPENSION AND TERMINATION

**10.1    Suspension of Award Activities**

(a)  If FRA determines that the remedy for noncompliance imposed under Article 9 of this Agreement does not achieve the desired result or is unlikely to improve compliance or performance, FRA may suspend activities under this Agreement pending corrective action by the Recipient or termination.

(b)  If FRA suspends activities under this Agreement, FRA will notify the Recipient in writing of the following, which may be included in the determinations of non-compliance under Section 9.1 of this Attachment 1:

(1)  what project activities, if any, will take place during the period of suspension;

(2)  what costs FRA will reimburse if the suspension is lifted and the award resumed;

(3)  what corrective actions must occur during the suspension; and

(4)  FRA's intent to terminate the award under this Article 10 if the Recipient does not meet the conditions of the remedial action.

**U.S. Department of Transportation**
**Federal Railroad Administration**

(c)  The duration of the temporary suspension of activities under the Agreement should be commensurate with the corrective action needed, but should not exceed 120 days at the outset. If the Recipient is not making sufficient progress in correcting the noncompliance, FRA must consider both financial and programmatic requirements in determining the appropriate extension to avoid the need for termination.

**10.2    FRA Termination**

(a)  FRA may terminate this Agreement and all its obligations under this Agreement if any of the following occurs:

(1)  the Recipient fails to obtain or contribute the required Non-Federal Funds, or alternatives approved by FRA, as provided in this agreement and consistent with Article 6 of Attachment 2 of this Agreement;

(2)  the Recipient fails to meet a milestone by six months after the completion date listed in Article 5 of Attachment 2 of this Agreement and the Recipient fails to request an amendment to this Agreement pursuant to Section 5.3 of this Attachment 1;

(3)  the Recipient fails to comply with the terms and conditions of this Agreement;

(4)  there are changes to the Project that FRA determines are inconsistent with FRA's basis for selecting the Project to receive the award; or

(5)  FRA determines that termination of this Agreement is in the public interest.

(b)  The Recipient may request that FRA terminate the Agreement, which may result in FRA determining noncompliance and imposing remedies pursuant to Article 9 of this Attachment 1.

**10.3    Closeout Termination**

(a)  This Agreement terminates on Project Closeout.

(b)  In this Agreement, "Project Closeout" means the date that FRA notifies the Recipient that the award is closed out. Under 2 C.F.R. § 200.344, Project Closeout should occur no later than one year after the end of the Period of Performance.

**10.4    Post-Termination Adjustments**

The Recipient acknowledges that under 2 C.F.R. §§ 200.345–200.346, termination of this Agreement does not extinguish FRA's authority to disallow costs, including costs that FRA reimbursed before termination, and recover funds from the Recipient.

**10.5    Non-Terminating Events**

(a)  The end of the budget period described under Section 4.4 of this Attachment 1 does not terminate this Agreement or the Recipient's obligations under this Agreement.

**U.S. Department of Transportation**
**Federal Railroad Administration**

(b)  The end of the Period of Performance described under Section 4.5 of this Attachment 1 does not terminate this Agreement or the Recipient's obligations under this Agreement.

## ARTICLE 11:  MONITORING, FINANCIAL MANAGEMENT, CONTROLS, AND RECORDS

**11.1    Recipient Monitoring and Record Retention**

(a)  The Recipient will monitor activities under this award, including activities under subawards and contracts, to ensure:

(1)  that those activities comply with this agreement; and

(2)  that funds provided under this award are not expended on costs that are not allowable under this award or not allocable to this award.

(b) If the Recipient makes a subaward under this award, the Recipient will monitor the activities of the Subrecipient in compliance with 2 C.F.R. §200.332(d).

(c)  The Recipient will retain and provide access to records relevant to the award during the course of the Project and for three years after closeout or longer, as required under 2 C.F.R. § 200.334

(d)  The Recipient will adhere to the recording and recordkeeping requirements set forth in 2 C.F.R. §§ 200.334–200.338.  Project Closeout does not alter these requirements.

**11.2    Financial Records and Audits**

(a)  The Recipient will keep all Project accounts and records that fully disclose the amount and disposition by the Recipient of the award funds, the total cost of the Project, and the amount or nature of that portion of the cost of the Project supplied by other sources, and any other financial records related to the Project.

(b)  The Recipient will keep accounts and records described under Section 11.2(a) of this Attachment 1 in accordance with a financial management system that meets the requirements of 2 C.F.R. §§ 200.301–200.303 and 2 C.F.R. part 200, subpart F and will facilitate an effective audit in accordance with 31 U.S.C. §§ 7501–7506.

(c)  The Recipient will separately identify expenditures under the award in financial records required for audits under 31 U.S.C. §§ 7501–7506. Specifically, the Recipient will:

(1)  list expenditures separately on the schedule of expenditures of Federal awards required under 2 C.F.R. part 200, subpart F, including the fiscal year in the format "FY 202X" in the program name; and

(2)  list expenditures on a separate row under Part II, Item 1 (Federal Awards Expended During Fiscal Period) of Form SF-SAC, including "FY 202X" in Column C (Additional Award Identification).

U.S. Department of Transportation
**Federal Railroad Administration**

(d) If the Recipient expends $750,000 or more in Federal awards during the Recipient's fiscal year, a single or program audit will be conducted for that year, consistent with 2 C.F.R. §§ 200.501(a) and 200.512(c).

**11.3    Internal Controls**

The Recipient will establish and maintain internal controls as required under 2 C.F.R. § 200.303.

**11.4    FRA Record Access**

FRA may access Recipient records related to this award under 2 C.F.R. § 200.337.

**11.5    Site Visits**

FRA may conduct site visits to review Project activities, accomplishments, and management control systems and to provide technical assistance to the Recipient. The Recipient will provide or ensure reasonable, safe, and convenient access to FRA for any such site visit. FRA will conduct all site visits in such a manner as will not unduly delay work conducted by the Recipient, Subrecipient, or contractor.

## ARTICLE 12:  CONTRACTING AND SUBAWARDING

**12.1    Buy America**

(a)  For infrastructure projects, steel, iron, manufactured goods, and construction materials used in the Project are subject to the domestic preference requirement at § 70914 of the Build America, Buy America Act (Buy American Act), Pub. L. No. 117-58, div. G, tit. IX, subtit. A, 135 Stat. 429, 1298 (2021) and 2 C.F.R. part 184, as implemented by OMB, USDOT, and FRA. The Recipient acknowledges that this Agreement is neither a waiver of § 70914(a) nor a finding under § 70914(b).

(b)  For all other projects, the Recipient's acquisition of steel, iron, and manufactured goods with funding provided through this Agreement is subject to the requirements set forth in the Buy American Act, 41 U.S.C. §§ 8301-8305. The Recipient also represents that it has never been convicted of violating the Buy American Act nor will it make funding received under this Agreement available to any person or entity who has been convicted of violating the Buy American Act.

(c)  Under this Section, "infrastructure project" has the definition provided in 2 C.F.R. § 184.3.

(d)  Under 2 C.F.R. § 200.322, as appropriate and to the extent consistent with law, the Recipient should, to the greatest extent practicable under this award, provide a preference for the purchase, acquisition, or use of goods, products, or materials produced in the United States. The Recipient shall include the requirements of 2 C.F.R. § 200.322 in all subawards including all contracts and purchase orders for work or products under this award.

U.S. Department of Transportation
**Federal Railroad Administration**

**12.2    Small and Disadvantaged Business Requirements**

The Recipient will expend all funds under this award in compliance with the requirements at 2 C.F.R. § 200.321 (Contracting with small and minority businesses, women's business enterprises, and labor surplus area firms), and to the extent applicable, 49 C.F.R. part 26 (Participation by disadvantaged business enterprises in Department of Transportation financial assistance programs).

**12.3    Engineering and Design Services [Reserved]**

**12.4    Prohibition on Certain Telecommunications and Video Surveillance Services or Equipment**

The Recipient acknowledges that Section 889 of Pub. L. No. 115-232 and 2 C.F.R. § 200.216 prohibit the Recipient and all Subrecipients from procuring or obtaining certain telecommunications and video surveillance services or equipment under this award.

**12.5    Pass-Through Entity Responsibilities**

(a)  If the Recipient makes a subaward under this award, the Recipient will comply with the requirements for pass-through entities under 2 C.F.R. parts 200 and 1201, including 2 C.F.R. §§ 200.331–200.333, regardless of whether the Recipient is also a Pass-Through Entity as defined in 2 C.F.R. § 200.1.

(b)  The Recipient will report any subaward obligation of $25,000 or more in Federal funds in USASpending.gov consistent with the Federal Funding Accountability and Transparency Act, Pub. L. 109-282.

(c)  The Recipient is accountable for performance under this award, the appropriate expenditure of funds, and other requirements under this Agreement. The Recipient is responsible for any non-compliance under the award and for compliance with any remedies imposed.

**12.6    Local Hiring Preference for Construction Jobs**

Under Section 25019 of the Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, div. B, tit. V (2021), a Recipient or Subrecipient may implement a local or other geographical or economic hiring preference relating to the use of labor for construction of a project funded by this grant if funded under title 49 or 23 United States Code, including prehire agreements, subject to any applicable State and local laws, policies, and procedures. The use of such a local or other geographical or economic hiring preference in any bid for a contract for the construction of a project funded by this grant shall not be considered to unduly limit competition. Project labor agreements should be consistent with the definition and standards outlined in Executive Order 13502. The Recipient will document its consideration of Local Hiring Preference for Construction Jobs related to the Project in Article 11 of Attachment 2 of this Agreement. For additional information, see https://www.transportation.gov/sites/dot.gov/files/2023-05/Creating-Local-Construction-Workforce.pdf.

U.S. Department of Transportation
**Federal Railroad Administration**

**12.7    Procurement**

The Recipient may acquire property, goods, or services in connection with the Project. If the Recipient is a State, then it will use its own procurement procedures that reflect applicable State laws and regulations in compliance with 2 C.F.R. § 200.317. A Subrecipient of a State will follow the policies and procedures allowed by that State when procuring property and services under this award consistent with 2 C.F.R. § 1201.317, notwithstanding 2 C.F.R. § 200.317. An entity that is not a State or Subrecipient of a State will comply with 2 C.F.R. §§ 200.318–200.327, and applicable supplementary USDOT or FRA directives and regulations. The Recipient will provide technical specifications and requirements to FRA for review upon request.

## ARTICLE 13:  COSTS, PAYMENTS, AND UNEXPENDED FUNDS

**13.1    Limitation of Federal Award Amount**

Under this award, FRA will not provide funding in an amount greater than the Agreement Federal Funds. The Recipient acknowledges that FRA is not liable for payments exceeding that amount, and the Recipient will not request reimbursement of costs exceeding that amount.

**13.2    Project Costs**

This award is subject to the cost principles at 2 C.F.R. part 200, subpart E, including provisions on determining allocable costs and determining allowable costs.

**13.3    Timing of Project Costs**

(a)  The Recipient will not charge to this award costs that are incurred after the budget period.

(b)  The Recipient will not charge to this award costs that were incurred before the date of this Agreement unless those costs are identified as approved pre-award costs in Section 6.6 of Attachment 2 of this Agreement and would have been allowable if incurred during the budget period. This limitation applies to pre-award costs under 2 C.F.R. § 200.458. This agreement hereby terminates and supersedes any previous FRA approval for the Recipient to incur costs under this award for the Project. Section 6.6 of Attachment 2 of this Agreement is the exclusive FRA approval of costs incurred before the date of this Agreement.

(c)  The Recipient may request approval of pre-award costs in a written request that demonstrates the purpose and amount of the costs, compliance with 2 C.F.R. § 200.458, and whether such costs would otherwise serve as Non-Federal Funds.

**13.4    Recipient Recovery of Federal Funds**

The Recipient will make all reasonable efforts, including initiating litigation, if necessary, to recover Federal funds if FRA determines, after consultation with the Recipient, that those funds have been spent fraudulently, wastefully, or in violation of Federal laws, or misused in any manner. The Recipient will not enter a settlement or other final position, in court or otherwise, involving the recovery of funds under the award unless approved in advance in writing by FRA.

U.S. Department of Transportation
**Federal Railroad Administration**

**13.5    Unexpended Agreement Federal Funds**

Any Agreement Federal Funds that are obligated but not expended on allocable, allowable costs remain the property of the United States.

**13.6    Interest Earned**

Interest earned on advances of Agreement Federal Funds is not program income.

**13.7    Timing of Payments to the Recipient**

(a)  Reimbursement is the payment method, unless otherwise approved by FRA.

(b)  The Recipient will not request reimbursement of a cost before the Recipient has entered into an obligation for that cost.

**13.8    Payment Method**

(a)  The Recipient will use the DELPHI e-Invoicing System (https://www.dot.gov/cfo/delphi-einvoicing-system.html) to request reimbursement under this award. FRA will provide access to that system upon request by the Recipient.

(b)  FRA may deny a payment request that is not submitted using the method identified in this Section.

**13.9    Information Supporting Expenditures**

(a)  When requesting reimbursement of costs incurred or credit for cost share incurred, the Recipient will electronically submit the SF 270 (Request for Advance or Reimbursement) and will submit supporting cost detail to document clearly all costs incurred. As supporting cost detail, the Recipient will include a detailed breakout of all costs incurred and classify all costs by task and by Agreement Federal Funds and Agreement Non-Federal Funds.

(b)  Unless FRA and the Recipient agree otherwise in writing, the Recipient will ensure that the proportion of expenditure of Agreement Federal Funds to Agreement Non-Federal Funds is not more than the maximum percent of total Project cost FRA will contribute identified in Section 6.5 of Attachment 2 of this Agreement. The Recipient will ensure the proportional expenditure of funds is reflected in the detailed breakout of costs supporting the SF 270.

(c)  If the Recipient submits a request for reimbursement that FRA determines does not include or is not supported by sufficient detail, FRA may deny the request or withhold processing the request until the Recipient provides sufficient detail.

**13.10    Reimbursement Request Timing Frequency**

The Recipient will request reimbursement as needed to maintain cash flow sufficient to timely complete the Project. The Recipient will not submit any single payment request exceeding $99,999,999.99. The Recipient will not submit a payment request exceeding $50,000,000.00 unless the Recipient notifies FRA six days before submitting the request.

**U.S. Department of Transportation**
**Federal Railroad Administration**

**13.11**    **Program Income**

The Recipient is encouraged to earn income to defray Project costs, where appropriate, and will work with FRA to determine how income may be applied to the grant, in accordance with 2 C.F.R. § 200.307 and 2 C.F.R. § 1201.80. Program income not deducted from total allowable costs may be used only for the purposes and under the terms and conditions established in this Agreement. The Recipient will maintain records of all program income.

## ARTICLE 14:  PROPERTY AND EQUIPMENT

**14.1**    **General Requirements**

The Recipient will comply with the property standards of 2 C.F.R. §§ 200.310–200.316 and will ensure compliance with these standards for all tiers of subawards and contracts under this award.

**14.2**    **Relocation and Real Property Acquisition**

The Recipient will comply with the land acquisition policies and relocation requirements in 42 U.S.C. § 4601 et seq. and 49 C.F.R. part 24, subparts A–F, as applicable. At a minimum, under this section, the Recipient will:

(a)  comply with the land acquisition policies in 49 C.F.R. part 24, subpart B and will pay or reimburse property owners for necessary expenses as specified in that subpart;

(b)  provide a relocation assistance program offering the services described in 49 C.F.R. part 24, subpart C and provide reasonable relocation payments and assistance to displaced persons as required in 49 C.F.R. part 24, subparts D–E; and

(c)  make available to displaced persons comparable replacement dwellings in accordance with 49 C.F.R. part 24, subpart E.

(d)  provide to FRA a real estate acquisition and management plan prior to beginning real property acquisition if the Project is designated a Major Project in Article 1 of Attachment 2 of this Agreement, or if the total Project cost in Section 6.5 of Attachment 2 of this Agreement is greater than $300 million and the Project is also receiving financial assistance from the Federal Transit Administration (FTA).

**14.3**    **Use for Originally Authorized Purpose**

The Recipient will ensure that property and equipment funded under this Agreement is used for the originally authorized purpose. If necessary to satisfy this obligation, the Recipient will enter into appropriate arrangements with the entity or entities using, or with the owner of right-of-way used by, the property and/or equipment funded under this Agreement.

**14.4**    **Maintenance**

The Recipient will ensure that any property, improvements to property, and any equipment funded under this Agreement are maintained in good working order and in accordance with FRA regulations, guidelines, and directives.

**U.S. Department of Transportation**
**Federal Railroad Administration**

**14.5    Real Property Disposition**

In accordance with 2 C.F.R. § 200.311, when real property acquired or improved under this award is no longer used for its originally intended purpose, the Recipient will request disposition instructions from FRA.

**14.6    Equipment Disposition**

(a)  In accordance with 2 C.F.R. §§ 200.313 and 1201.313, when equipment acquired under this award is no longer needed for the Project:

(1)  if the entity that acquired the equipment is a State or a Subrecipient of a State, that entity will dispose of that equipment in accordance with State laws and procedures; and

(2)  if the entity that acquired the equipment is neither a State nor a Subrecipient of a State, that entity will request disposition instructions from FRA.

(b)  In accordance with 2 C.F.R. §200.443(d), the distribution of the proceeds from the disposition of equipment must be made in accordance with 2 C.F.R. §§ 200.313–200.316 and 2 C.F.R. § 1201.313.

**14.7    Recordkeeping**

The Recipient will keep records regarding the operation and maintenance of property, improvements to property, equipment, and supplies funded under this Agreement and will provide them to FRA upon request.

**14.8    Encumbrance**

The Recipient will not create an obligation, such as a transfer of title, lease, lien, mortgage, or encumbrance, that would dispose of or encumber the Recipient's title or other interest in property, improvements to property, equipment or supplies funded under this Agreement without prior written approval from FRA.

The Recipient will not take any action that would adversely affect FRA's interest or impair the Recipient's continuing control over the use of the property, improvements to property, equipment, or supplies funded under the Agreement without prior written approval from FRA.

## ARTICLE 15:  AMENDMENTS

**15.1    Bilateral Amendments**

The parties may amend, modify, or supplement this Agreement by mutual agreement in writing signed by FRA and the Recipient. Either party may request to amend, modify, or supplement this Agreement by written notice to the other party.

**15.2    FRA Unilateral Amendments**

(a)  FRA may unilaterally amend this Agreement for the following reasons:

**U.S. Department of Transportation**
**Federal Railroad Administration**

(1)  to comply with Federal law;

(2)  at closeout or in anticipation of closeout; and

(3)  other non-substantive changes, such as to correct typographical errors, as deemed appropriate by FRA.

(b)  To unilaterally amend this Agreement under Section 15.3 of this Attachment 1, FRA will provide a written notice to the Recipient that includes the amendment and the date that the amendment is effective.

(c)  Except at closeout or in anticipation of closeout, FRA may not unilaterally amend the Statement of Work, this Agreement's monetary amount, the delivery schedule, the Period of Performance, or other terms or conditions of this Agreement.

**15.3    Other Amendments**

The parties will not amend, modify, or supplement this Agreement except as permitted under Sections 15.1, 15.2, or 15.3 of this Attachment 1. If an amendment, modification, or supplement is not permitted under Section 15.1, 15.2, or 15.3 of this Attachment 1, it is void.

## ARTICLE 16:  CLIMATE CHANGE AND ENVIRONMENTAL JUSTICE

**16.1    Climate Change and Environmental Justice**

Consistent with Executive Order 14008, "Tackling the Climate Crisis at Home and Abroad" (Jan. 27, 2021), the Recipient will document its consideration of climate change and environmental justice impacts of the Project in Article 9 of Attachment 2 of this Agreement.

## ARTICLE 17:  RACIAL EQUITY AND BARRIERS TO OPPORTUNITY

**17.1    Racial Equity and Barriers to Opportunity**

Consistent with Executive Order 13985, "Advancing Racial Equity and Support for Underserved Communities Through the Federal Government" (Jan. 20, 2021), the Recipient will document its activities related to the Project to improve racial equity and reduce barriers to opportunity in Article 10 of Attachment 2 of this Agreement.

## ARTICLE 18:  LABOR AND WORK

**18.1    Labor and Work**

Consistent with Executive Order 14025, "Worker Organizing and Empowerment" (Apr. 26, 2021), and Executive Order 14052, "Implementation of the Infrastructure Investment and Jobs Act" (Nov. 15, 2021) (IIJA), the Recipient will document its consideration of job quality and labor rights, standards, and protections related to the Project in Article 11 of Attachment 2 of this Agreement.

U.S. Department of Transportation
**Federal Railroad Administration**

**18.2    OFCCP Mega Construction Project Program**

If the total eligible Project costs listed in Attachment 2 of this Agreement are greater than $35,000,000 and the Department of Labor's Office of Federal Contract Compliance Programs (OFCCP) selects this award for participation in the Mega Construction Project Program, then the Recipient shall partner with OFCCP, as requested by OFCCP.

## ARTICLE 19:  CRITICAL INFRASTRUCTURE SECURITY AND RESILIENCE

**19.1    Critical Infrastructure Security and Resilience**

(a)  Consistent with Presidential Policy Directive 21, "Critical Infrastructure Security and Resilience" (Feb. 12, 2013), and the National Security Presidential Memorandum on Improving Cybersecurity for Critical Infrastructure Control Systems (July 28, 2021), the Recipient will consider physical and cyber security and resilience in planning, design, and oversight of the Project.

(b)  If the Security Risk Designation in Section 1.3 of Attachment 2 of this Agreement is "Elevated," then not later that than two years after the date of this Agreement the Recipient will submit to FRA a report that:

(1)  identifies a cybersecurity point of contact for the transportation infrastructure being improved in the Project;

(2)  summarizes or contains a cybersecurity incident reporting plan for the transportation infrastructure being improved in the Project;

(3)  summarizes or contains a cybersecurity incident response plan for the transportation infrastructure being improved in the Project;

(4)  documents the results of a self-assessment of the Recipient's cybersecurity posture and capabilities; and

(5)  describes any additional actions that the Recipient has taken to consider or address cybersecurity risk of the transportation infrastructure being improved in the Project.

## ARTICLE 20:  FEDERAL FINANCIAL ASSISTANCE, ADMINISTRATIVE, AND NATIONAL POLICY REQUIREMENTS

**20.1    Uniform Administrative Requirements for Federal Awards**

The Recipient will comply, and will ensure that other entities receiving funding under this agreement will comply, with the obligations on non-Federal entities under 2 C.F.R. parts 200 and 1201, regardless of whether the Recipient or other entity receiving funding under this agreement is a Non-Federal entity as defined in 2 C.F.R. § 200.1, except that subpart F of part 200 does not apply if the Recipient or Subrecipient is a for-profit entity.



U.S. Department of Transportation
**Federal Railroad Administration**

**20.2    Federal Law and Public Policy Requirements**

(a)  The Recipient will ensure that Federal funding is expended in full accordance with the United States Constitution, Federal law, and statutory and public policy requirements: including but not limited to, those protecting free speech, religious liberty, public welfare, the environment, and prohibiting discrimination.

(b)  The failure of this Agreement to expressly identify Federal law applicable to the Recipient or activities under this Agreement does not make that law inapplicable.

**20.3    Federal Freedom of Information Act**

(a)  FRA is subject to the Freedom of Information Act (FOIA), 5 U.S.C. § 552.

(b)  The Recipient acknowledges that the Application and materials submitted to FRA by the Recipient related to this Agreement will become FRA records that may be subject to public release under 5 U.S.C. § 552. If the Recipient submits any materials to FRA related to this Agreement that the Recipient considers to include trade secret or confidential commercial or financial information, the Recipient should note that the submission contains confidential business information, mark each affected page, and highlight or otherwise denote the portions of the submission that contain confidential business information.

**20.4    History of Performance**

Under 2 C.F.R. § 200.206, any Federal awarding agency may consider the Recipient's performance under this Agreement, when evaluating the risks of making a future Federal financial assistance award to the Recipient.

**20.5    Whistleblower Protection**

(a)  The Recipient acknowledges that it is a "Recipient" within the scope of 41 U.S.C. § 4712, which prohibits the Recipient from taking certain actions against an employee for certain disclosures of information that the employee reasonably believes are evidence of gross mismanagement of this award, gross waste of Federal funds, or a violation of Federal law related this this award.

(b)  The Recipient will inform its employees in writing of the rights and remedies provided under 41 U.S.C. § 4712, in the predominant native language of the workforce.

**20.6    External Award Terms and Obligations**

(a)  In addition to this document and the contents described in Article 25 of this Attachment 1, this Agreement includes the following additional terms as integral parts:

(1)  Appendix A to 2 C.F.R. part 25: System for Award Management and Universal Identifier Requirements;

(2)  Appendix A to 2 C.F.R. part 170: Reporting Subawards and Executive Compensation;

U.S. Department of Transportation
**Federal Railroad Administration**

(3)  2 C.F.R. § 175.15(b): Trafficking in Persons; and

(4)  Appendix XII to 2 C.F.R. part 200: Award Term and Condition for Recipient Integrity and Performance Matters.

(b)  The Recipient will comply with:

(1)  49 C.F.R. part 20: New Restrictions on Lobbying;

(2)  49 C.F.R. part 21: Nondiscrimination in Federally Assisted Programs of the Department of Transportation—Effectuation of Title VI of the Civil Rights Act of 1964;

(3)  49 C.F.R. part 27: Nondiscrimination on the Basis of Disability in Programs or Activities Receiving Federal Financial Assistance; and

(4)  Subpart B of 49 C.F.R. part 32: Governmentwide Requirements for Drug-free Workplace (Financial Assistance).

**20.7    Incorporated Certifications**

The Recipient makes the representations in the following certifications, which are incorporated by reference:

(a)  Appendix A to 49 C.F.R. part 20 (Certification Regarding Lobbying).

## ARTICLE 21:  ASSIGNMENT

**21.1    Assignment Prohibited**

The Recipient will not transfer to any other entity any discretion granted under this Agreement, any right to satisfy a condition under this Agreement, any remedy under this Agreement, or any obligation imposed under this Agreement.

## ARTICLE 22:  WAIVER

**22.1    Waivers**

(a)  A waiver of a term of this Agreement authorized by law and granted by FRA will not be effective unless it is in writing and signed by an authorized representative of FRA.

(b)  A waiver of a term of this Agreement granted by FRA on one occasion will not operate as a waiver on other occasions.

(c)  If FRA fails to require strict performance of a term of this Agreement, fails to exercise a remedy for a breach of this Agreement, or fails to reject a payment during a breach of this Agreement, that failure does not constitute a waiver of that term or breach.


U.S. Department of Transportation
**Federal Railroad Administration**

## ARTICLE 23:  ADDITIONAL TERMS AND CONDITIONS

**23.1  Disclaimer of Federal Liability**

FRA will not be responsible or liable for any damage to property or any injury to persons that may arise from, or be incident to, performance or compliance with this Agreement.

**23.2  Environmental Review**

(a)  Except as authorized by law or under 23 C.F.R. § 771.113(d)(4), the Recipient will not begin final design activities; acquire real property, construction materials, or equipment, including rolling stock; begin construction; or take other actions that would have an adverse environmental impact or limit the choice of reasonable alternatives for the Project unless and until FRA complies with the National Environmental Policy Act, 42 U.S.C. § 4321 et seq. (NEPA), and any other applicable environmental laws and regulations. In addition, the Recipient will not begin project development that involves ground disturbing activity prior to FRA compliance with NEPA and any other applicable environmental laws and regulations.

(b)  The Recipient acknowledges that:

(1)  FRA's actions under Section 23.2(a) of this Attachment 1 may depend on the Recipient conducting necessary environmental analyses and submitting necessary documents to FRA; and

(2)  applicable environmental statutes and regulations may require the Recipient to prepare and submit documents to other Federal, State, and local agencies.

(c)  Consistent with 23 C.F.R. § 771.105(a), to the maximum extent practicable and consistent with Federal law, the Recipient will coordinate all environmental investigations, reviews, and consultations as a single process.

(f)  The activities described in Article 4 of Attachment 2 of this Agreement and other information described in this Agreement may inform environmental decision-making processes, but the parties do not intend this Agreement to document the alternatives under consideration under those processes. If a build alternative is selected that does not align with Article 4 of Attachment 2 of this Agreement or other information in this Agreement, then FRA will either:

(1)  amend this Agreement under Section 15.1 of this Attachment 1 for consistency with the selected build alternative; or

(2)  if FRA determines that the condition at Section 10.1(a)(5) of this Attachment 1 is satisfied, terminate this Agreement under Section 10.1(a)(5) of this Attachment 1; or

(3) take other action as deemed appropriate by FRA.



U.S. Department of Transportation
**Federal Railroad Administration**

(g)  The Recipient will complete any mitigation activities described in the environmental document or documents for the Project, including the terms and conditions contained in the required permits and authorizations for the Project. Article 4 of Attachment 2 of this Agreement identifies documents describing mitigation activities, but the absence of a document from that section does not relieve the Recipient of any compliance obligations.

**23.3    Project Maintenance Requirement**

The Recipient will ensure that any property and equipment funded within this Agreement is operated and maintained in good operating order and in accordance with 2 C.F.R. §§ 200.310–200.316, 1201.313 and any guidelines, directives, or regulations that FRA may issue.

**23.4    Appropriations Act Requirements**

The Recipient will comply with applicable requirements of the appropriations act identified in Section 6.3 of Attachment 2 of this Agreement.

**23.5    Standards of Conduct**

The Recipient will comply with the following standards of conduct:

(a)  Standards of Conduct. The Recipient will maintain a written code or standards of conduct governing the performance of its officers, employees, board members, or agents engaged in the award and administration of contracts or agreements supported by the Federal contribution provided through this Agreement. The code or standards will provide that the Recipient's officers, employees, board members, or agents may neither solicit nor accept gratuities, favors, or anything of monetary value from present or potential Subrecipients or contractors. The Recipient may set minimum rules where the financial interest is not substantial, or the gift is an unsolicited item of nominal intrinsic value. As permitted by state or local law or regulations, such code or standards will provide for penalties, sanctions, or other disciplinary actions for violations by the Recipient's officers, employees, board members, or agents, or by Subrecipients or their agents.

(b)  Personal Conflict of Interest. The Recipient's code or standards must provide that no employee, officer, board member, or agent of the Recipient may participate in the selection, award, or administration of a contract supported by the Federal contribution if a real or apparent conflict of interest would be involved. Such a conflict of interest would arise when the employee, officer, or agent, any member of his or her immediate family, his or her partner, or an organization which employs or is about to employ any of the parties indicated herein, has a financial or other interest in or a tangible personal benefit from a firm considered for a contract.

(c)  Organizational Conflicts of Interest. The Recipient's code or standards of conduct must include procedures for identifying and preventing real and apparent organizational conflicts of interests. An organizational conflict of interest exists when the nature of the work to be performed under a proposed contract, may, without some restrictions on future activities, result in an unfair competitive advantage to the contractor or impair the contractor's objectivity in performing the contract work.

U.S. Department of Transportation
**Federal Railroad Administration**

(d)  Existing Codes or Standards. This Section does not require the Recipient to implement a new code or standards of conduct where a state statute, or written code or standards of conduct, already effectively covers all of the required elements.

(e)  Disclosure of Conflicts. The Recipient will disclose in writing any potential conflict of interest to FRA or pass-through entity.

**23.6    Changed Conditions of Performance**

The Recipient will notify FRA of any event that may affect its ability to perform the Project in accordance with the terms of this Agreement.

**23.7    Litigation**

The Recipient will notify FRA in writing of any decision pertaining to the Recipient's conduct of litigation that may affect FRA's interests in the Project or FRA's administration or enforcement of applicable Federal laws or regulations. The Recipient will inform FRA in writing before naming FRA as a party to any type of litigation for any reason in any forum.

**23.8    Bipartisan Infrastructure Law Signage Guidelines**

For projects funded by the Bipartisan Infrastructure Law, also known as the Infrastructure Investment and Jobs Act, Pub. L. No. 117-58 (2021), the Recipient will ensure:

(a)  signage is designed consistent with the guidelines and design specifications available at https://www.whitehouse.gov/wp-content/uploads/2023/02/Investing-in-America-Brand-Guide.pdf. Signs should include the official Investing in America logo and identify the project as "funded by President Biden's Bipartisan Infrastructure Law."

(b)  signage displays the FRA logo and the Recipient logo, if any, along with the official Investing in America logo. The FRA logo should not be displayed in a manner that implies FRA itself is conducting the project.

(c)  where applicable, the signage includes the project name (e.g., [Name of] Project funded by President Biden's Bipartisan Infrastructure Law.)

(d)  the sign is placed at construction sites where it is clearly visible near the location of work and that the sign is maintained in good condition throughout the construction period.

(e)  signs on equipment are placed in an easily visible location and maintained in good condition

**23.9    Equipment and Supplies**

The Recipient will maintain written policies and procedures that address acquisition, classification, and management of all equipment and supplies acquired or used under this award.

U.S. Department of Transportation
**Federal Railroad Administration**

**23.10    Safety and Technology Data**

The Recipient will ensure that FRA has access to safety and technology relevant data generated by the Recipient under the award, in a machine-readable format, where specified in Article 4 of Attachment 2 of this Agreement.

**23.11    Intellectual Property**

The Recipient agrees to the standard patent rights clauses issued by the Department of Commerce at 37 C.F.R. Part 401, as applicable.

**23.12    Liquidation of Recipient Obligations**

(a)  The Recipient will liquidate all obligations of award funds under this Agreement not later than 120 days after the end of the Period of Performance.

(b)  Liquidation of obligations and adjustment of costs under this Agreement follow the requirements of 2 C.F.R. §§ 200.344–200.346.

## ARTICLE 24:  CONSTRUCTION AND DEFINITIONS

**24.1    Agreement**

This Agreement consists of the following:

(a)  Agreement Cover Sheet

(b)  Attachment 1: General Terms and Conditions

(c)  Attachment 2: Project-Specific Terms and Conditions

(d)  Exhibit A: Applicable Federal Laws and Regulations

(e)  Exhibit B: Additional Standard Terms

(f)  Exhibit C: Quarterly Project Progress Reports and Recertifications

**24.2    Construction**

(a)  In these General Terms and Conditions, there are no references to articles or sections in project-specific portions of this Agreement that are not contained in Attachments or Exhibits listed in Section 24.1.

(b)  If a provision in these General Terms and Conditions or the Exhibits conflicts with a provision in the Project-Specific Terms and Conditions in Attachment 2 of this Agreement, then the relevant portion in Attachment 2 prevails. If a provision in the Exhibits conflicts with a provision in these General Terms and Conditions, then the provision in these General Terms and Conditions prevails.

U.S. Department of Transportation
**Federal Railroad Administration**

**24.3    Integration**

This Agreement constitutes the entire agreement of the parties relating to the Project and supersedes any previous agreements, oral or written, relating to the Project.

**24.4    Definitions**

This Section defines terms used in this Agreement. Additional definitions found in 2 C.F.R. § 200.1 are incorporated by referenced into this Agreement.

"Agreement Federal Funds" means the total amount of Federal funds obligated under this Agreement. This is the amount shown in Section 6.1 of Attachment 2 of this Agreement.

"Application" means the application identified in Article 3 of Attachment 2 of this Agreement, including Standard Form 424 and all information and attachments submitted with that form through Grants.gov.

"Construction Substantial Completion" means the stage of the Project when all construction tasks are complete such that the Recipient can use the Project for its intended use and only closeout activities remain. Activity to address or complete closeout activities will not prevent or disrupt use of the Project.

"Contingent Commitment" means the unobligated amounts of future available budget authority specified in law that FRA commits to obligate under the terms of this Agreement.

"Federal Share" means the sum of Agreement Federal Funds and Other Federal Funds. If there are no Other Federal Funds, the Federal Share is the same as the Agreement Federal Funds.

"General Terms and Conditions" means this Attachment 1.

"Other Federal Funds" means Federal funds that are part of the Approved Project Budget in Section 6.5 of Attachment 2 of this Agreement for the Project but are not obligated under this Agreement.

"Project" means the project proposed in the Application, as modified by the negotiated provisions of this Agreement, including Attachment 2 of this Agreement.

"Project Closeout" means the date that FRA notifies the Recipient that the award is closed out. Under 2 C.F.R. § 200.344, Project Closeout should occur no later than one year after the end of the Period of Performance.

"Project Cost Savings" means the difference between the actual costs to complete the Project and the estimated total Project cost listed in Section 6.5 of Attachment 2 of this Agreement, if after the Recipient completes the tasks identified in Article 4 of Attachment 2 of this Agreement to FRA's satisfaction, the actual Project costs are less than the estimated total Project costs.

"Rural Area" means any area that is not within an area designated as an urbanized area by the Bureau of the Census.

U.S. Department of Transportation
**Federal Railroad Administration**

**24.5    Calendar Dates**

Unless otherwise specified, all dates and durations are in calendar days, calendar quarters, or calendar years, as appropriate.

**24.6    Communication in Writing**

Unless otherwise specified, all written communication may be provided by electronic mail.

## ARTICLE 25:  AGREEMENT EXECUTION AND EFFECTIVE DATE

**25.1    Counterparts**

This agreement may be executed in counterparts, which constitute one document. The parties intend each countersigned original to have identical legal effect.

**25.2    Effective Date**

The agreement will become effective when all parties have signed it. The date of this Agreement will be the date this Agreement is signed by the last party to sign it.

## ARTICLE 26:  PROGRAM-SPECIFIC CLAUSES

**26.1    Interstate Rail Compacts Grant Program**

The Recipient agrees to comply with the clauses in Section 26.1 of this Attachment 1.

Consistent with 49 U.S.C. § 22905(e), clauses (b) through (g) of Section 26.1 of this Attachment 1 do not apply to: 1) commuter rail passenger transportation (as defined in 49 U.S.C. § 24102(3)) operations of a State or local government authority (as those terms are defined in 49 U.S.C. § 5302) or its contractor performing services in connection with commuter rail passenger operations; 2) the Alaska Railroad or its contractors; or 3) Amtrak's access rights to railroad right of way and facilities under current law.

(a)  Non-Federal Match. The Recipient will provide a Non-Federal match of not less than 50 percent of the eligible expenses under the grant.

(b)  Buy America. In lieu of Section 12.1 of this Attachment 1, the Recipient will comply with the following clauses, as applicable:

(1)  for infrastructure projects, steel, iron, and manufactured products used in the Project are subject to 49 U.S.C. § 22905(a), as implemented by FRA. The Recipient acknowledges that this agreement is neither a waiver of 49 U.S.C. § 22905(a)(1) nor a finding under 49 U.S.C. § 22905(a)(2). For infrastructure projects, construction materials used in the Project are subject to the domestic preference requirement at § 70914 of the Build America, Buy America Act, Pub. L. No. 117-58, div. G, tit. IX, subtit. A, 135 Stat. 429, 1298 (2021) and 2 C.F.R. part 184, as implemented by OMB, USDOT and FRA. The Recipient acknowledges that this agreement is neither a waiver of § 70914(a) nor a finding under § 70914(b).

U.S. Department of Transportation
**Federal Railroad Administration**

(2)  for non-infrastructure projects, steel, iron, and manufactured products used in the Project are subject to 49 U.S.C. § 22905(a), as implemented by FRA. The Recipient acknowledges that this agreement is neither a waiver of 49 U.S.C. § 22905(a)(1) nor a finding under 49 U.S.C. § 22905(a)(2).

(3)  under Section 26.1 of this Attachment 1, "infrastructure project" has the definition provided in 2 C.F.R. § 184.3.

(4)  for all projects, as appropriate and to the extent consistent with law, the Recipient should under 2 C.F.R. § 200.322, to the greatest extent practicable under this award, provide a preference for the purchase, acquisition, or use of goods, products, or materials produced in the United States. The Recipient shall include the requirements of 2 C.F.R. § 200.322 in all subawards including all contracts and purchase orders for work or products under this award.

(c)  Operators Deemed Rail Carriers. The Recipient recognizes and agrees that 49 U.S.C. § 22905(b) provides that persons conducting rail operations over rail infrastructure constructed or improved in whole or in part with funds provided under chapter 229 of Title 49, United States Code, will be considered a "rail carrier" as defined by 49 U.S.C. § 10102(5), for purposes of Title 49, United States Code, and any other statute that adopts that definition or in which that definition applies, including: the Railroad Retirement Act of 1974 (45 U.S.C. § 231 et seq.); the Railway Labor Act (45 U.S.C. § 151 et seq.); and the Railroad Unemployment Insurance Act (45 U.S.C. § 351 et seq.). The Recipient agrees to reflect this provision in its agreements (if any) with any entity operating rail services over such rail infrastructure.

(d)  Railroad Agreements. In accordance with 49 U.S.C. § 22905(c)(1), if the Project funded by this Agreement uses rights-of-way owned by a railroad, then Recipient represents that it has entered into a written agreement with that railroad owner, which includes: compensation for such use; assurances regarding the adequacy of infrastructure capacity to accommodate both existing and future freight and passenger operations; an assurance by the railroad that collective bargaining agreements with railroad's employees (including terms regulating the contracting of work) will remain in full force and effect according to their terms for work performed by the railroad on the railroad transportation corridor; and an assurance that Recipient complies with liability requirements consistent with 49 U.S.C. § 28103.

By signing this Agreement, Recipient certifies that the written agreement referenced in this Section 26.1(d) has been executed or is not required.

Additional guidance on compliance with the Railroad Agreements provisions is available on FRA's website at:  https://railroads.dot.gov/elibrary/frequently-asked-questions-about-rail-improvement-grant-conditions-under-49-usc-ss-22905c1.

(e)  Labor Protective Arrangements. In accordance with 49 U.S.C. § 22905(c)(2)(B), if the Project funded by this Agreement uses rights-of-way owned by a railroad, then the Recipient will ensure compliance with the protective arrangements that are equivalent to

37

U.S. Department of Transportation
**Federal Railroad Administration**

those established under Section 504 of the Railroad Revitalization and Regulatory Reform Act of 1976, 49 U.S.C. § 22404. Such protective arrangements are included herein as Exhibit B.5.

(f)  Davis-Bacon and Related Acts Provisions. In accordance with 49 U.S.C. § 22905(c)(2)(A), if the Project funded by this Agreement uses rights-of-way owned by a railroad, the Recipient will ensure compliance with the standards of 49 U.S.C. § 24312 with respect to the Project in the same manner that Amtrak is required to comply with those standards for construction work financed under an agreement made under 49 U.S.C.§ 24308(a). For these purposes, wages in collective bargaining agreements negotiated under the Railway Labor Act are deemed to comply with Davis-Bacon Act requirements.

(g)  Replacement of Existing Intercity Passenger Rail Service. If an intercity passenger rail transportation provider replaces Amtrak intercity passenger rail service through a Project funded by this Agreement, then such provider must comply with the provisions of 49 U.S.C. § 22905(d).

(h)  Operator Limitation. Recipient's eligible expenses must be related to intercity passenger rail service to be operated by Amtrak.

(i)  Reporting. As requested by FRA, the Recipient will report on:

> (1)  the status of the planning efforts and coordination funded by the grant award;

> (2)  plans for continued implementation of the interstate rail compact;

> (3)  the status of, and data regarding, any new, restored, or enhanced rail services initiated under the interstate rail compact; and

> (4)  other data and information as requested by FRA.

**26.2    Railroad Crossing Elimination Program Clauses**

The Recipient agrees to comply with the clauses in Section 26.2 of this Attachment 1.

Consistent with 49 U.S.C. §§ 22905(e) & 22909(j), clauses (b), (c), (d), and (g) of Section 26.2 of this Agreement 1 do not apply to: 1) commuter rail passenger transportation (as defined in 49 U.S.C. § 24102(3)) operations of a State or local government authority (as those terms are defined in 49 U.S.C. § 5302) or its contractor performing services in connection with commuter rail passenger operations; 2) the Alaska Railroad or its contractors; or 3) Amtrak's access rights to railroad right of way and facilities under current law. In addition, clause (f) does not apply to: 1) the Alaska Railroad or its contractors; or 2) Amtrak's access rights to railroad right of way and facilities under current law.

(a)  Federal Share. The Federal Share of total Project costs shall not exceed 80 percent.

(b)  Buy America. In lieu of Section 12.1 of this Agreement 1:



U.S. Department of Transportation
**Federal Railroad Administration**

(1)  for infrastructure projects, steel, iron, and manufactured products used in the Project are subject to 49 U.S.C. § 22905(a), as implemented by FRA. The Recipient acknowledges that this Agreement is neither a waiver of 49 U.S.C. § 22905(a)(1) nor a finding under 49 U.S.C. § 22905(a)(2). For infrastructure projects, construction materials used in the Project are subject to the domestic preference requirement at § 70914 of the Build America, Buy America Act, Pub. L. No. 117-58, div. G, tit. IX, subtit. A, 135 Stat. 429, 1298 (2021) and 2 C.F.R. part 184, as implemented by OMB, USDOT and FRA. The Recipient acknowledges that this Agreement is neither a waiver of § 70914(a) nor a finding under § 70914(b).

(2)  for non-infrastructure projects, steel, iron, and manufactured products used in the Project are subject to 49 U.S.C. § 22905(a), as implemented by FRA. The Recipient acknowledges that this Agreement is neither a waiver of 49 U.S.C. § 22905(a)(1) nor a finding under 49 U.S.C. § 22905(a)(2).

(3)  under this Section, "infrastructure project" has the definition provided in 2 C.F.R. § 184.3.

(4)  for all projects, as appropriate and to the extent consistent with law, the Recipient should under 2 C.F.R. § 200.322, to the greatest extent practicable under this award, provide a preference for the purchase, acquisition, or use of goods, products, or materials produced in the United States. The Recipient shall include the requirements of 2 C.F.R. § 200.322 in all subawards including all contracts and purchase orders for work or products under this award.

(c)  Operators Deemed Rail Carriers. The Recipient recognizes and agrees that 49 U.S.C. § 22905(b) provides that persons conducting rail operations over rail infrastructure constructed or improved in whole or in part with funds provided under chapter 229 of Title 49, United States Code, will be considered a "rail carrier" as defined by 49 U.S.C. § 10102(5), for purposes of Title 49, United States Code, and any other statute that adopts that definition or in which that definition applies, including: the Railroad Retirement Act of 1974 (45 U.S.C. § 231 et seq.); the Railway Labor Act (45 U.S.C. § 151 et seq.); and the Railroad Unemployment Insurance Act (45 U.S.C. § 351 et seq.). The Recipient agrees to reflect this provision in its agreements (if any) with any entity operating rail services over such rail infrastructure.

(d)  Railroad Agreements. In accordance with 49 U.S.C. § 22905(c)(1), if the Project funded by this Agreement uses rights-of-way owned by a railroad, then Recipient represents that it has entered into a written agreement with that railroad owner, which includes: compensation for such use; assurances regarding the adequacy of infrastructure capacity to accommodate both existing and future freight and passenger operations; an assurance by the railroad that collective bargaining agreements with railroad's employees (including terms regulating the contracting of work) will remain in full force and effect according to their terms for work performed by the railroad on the railroad transportation corridor; and an assurance that Recipient complies with liability requirements consistent with 49 U.S.C. § 28103.

**U.S. Department of Transportation**
**Federal Railroad Administration**

By signing this Agreement, Recipient certifies that the written agreement referenced in this Section 26.2(d) has been executed or is not required.

Additional guidance on compliance with the Railroad Agreements provisions is available on FRA's website at: https://railroads.dot.gov/elibrary/frequently-asked-questions-about-rail-improvement-grant-conditions-under-49-usc-ss-22905c1.

(e)  Impacted Rail Carrier or Real Property Owner Approvals. In accordance with 49 U.S.C. § 22909(e)(2)(A), prior to proceeding with the construction of the Project funded by this Agreement, if applicable, Recipient will obtain necessary approvals to commence construction from any impacted rail carriers or real property owners. If the Project is a planning project, as described in 49 U.S.C. § 22909(d)(6), the Recipient agrees to work collaboratively with rail carriers and right-of-way owners.

(f)  Labor Protective Arrangements

> (1)  Notwithstanding 49 U.S.C. § 22905(e)(1), and in accordance with 49 U.S.C. § 22909(j)(3), any employee covered by the Railway Labor Act (45 U.S.C. § 151 et seq.) and the Railroad Retirement Act of 1974 (45 U.S.C. § 231 et seq.) who is adversely affected by actions taken in connection with the project financed in whole or in part by such grant shall be covered by employee protective arrangements required to be established under  49 U.S.C. § 22905(c)(2)(B). In accordance with 49 U.S.C. § 22905(c)(2)(B), the Recipient will ensure compliance with the protective arrangements that are equivalent to those established under Section 504 of the Railroad Revitalization and Regulatory Reform Act of 1976, 49 U.S.C. § 22404, as such protective arrangements are described in the final FRA guidance titled Equivalent Protections for Railroad Employees and effective December 28, 2022, included herein in Exhibit B.

> (2)  In accordance with 49 U.S.C. § 22909(j)(3), Recipient, and any successors, assigns, and contractors of Recipient:

> > i.   shall be bound by the employee protective arrangements required under subparagraph (1); and

> > ii.  shall be responsible for the implementation of such arrangements and for the obligations under such arrangements, but may arrange for another entity to take initial responsibility for compliance with the conditions of such arrangement.

> (3)  Labor protections required pursuant to Subsection (f) of Section 26.2 of this Attachment 1 shall be documented consistent with Article 18 of this Attachment 1.

(g)  Davis-Bacon and Related Acts Provisions. In accordance with 49 U.S.C. § 22905(c)(2)(A), if the Project funded by this Agreement uses rights-of-way owned by a railroad, the Recipient will ensure compliance with the standards of 49 U.S.C. § 24312 with respect to the Project in the same manner that Amtrak is required to comply with



U.S. Department of Transportation
**Federal Railroad Administration**

those standards for construction work financed under an agreement made under 49 U.S.C.§ 24308(a). For these purposes, wages in collective bargaining agreements negotiated under the Railway Labor Act are deemed to comply with Davis-Bacon Act requirements.

(h)  Replacement of Existing Intercity Passenger Rail Service. If an intercity passenger rail transportation provider replaces Amtrak intercity passenger rail service through a Project funded by this Agreement, then such provider must comply with the provisions of 49 U.S.C. § 22905(d).

**26.3    Consolidated Rail Infrastructure and Safety Improvements Grants Clauses**

The Recipient agrees to comply with the clauses in Section 26.3 of this Attachment 1.

Consistent with 49 U.S.C. § 22905(e), clauses (b) and (c) through (g) of Section 26.3 of this Attachment 1 do not apply to: 1) commuter rail passenger transportation (as defined in 49 U.S.C. § 24102(3)) operations of a State or local government authority (as those terms are defined in 49 U.S.C. § 5302) or its contractor performing services in connection with commuter rail passenger operations; 2) the Alaska Railroad or its contractors; or 3) Amtrak's access rights to railroad right of way and facilities under current law.

(a)  Federal Share. The Federal Share of total Project costs shall not exceed 80 percent.

(b)  Buy America. In lieu of Section 12.1 of this Attachment 1:

(1)  for infrastructure projects, steel, iron, and manufactured products used in the Project are subject to 49 U.S.C. §22905(a), as implemented by FRA. The Recipient acknowledges that this Agreement is neither a waiver of 49 U.S.C. § 22905(a)(1) nor a finding under 49 U.S.C. § 22905(a)(2). For infrastructure projects, construction materials used in the Project are subject to the domestic preference requirement at § 70914 of the Build America, Buy America Act, Pub. L. No. 117-58, div. G, tit. IX, subtit. A, 135 Stat. 429, 1298 (2021) and 2 C.F.R. part 184, as implemented by OMB, USDOT and FRA. The Recipient acknowledges that this Agreement is neither a waiver of § 70914(a) nor a finding under § 70914(b).

(2)  for non-infrastructure projects, steel, iron, and manufactured products used in the Project are subject to 49 U.S.C. § 22905(a), as implemented by FRA. The Recipient acknowledges that this Agreement is neither a waiver of 49 U.S.C. § 22905(a)(1) nor a finding under 49 U.S.C. § 22905(a)(2).

(3)  under this Section, "infrastructure project" has the definition provided in 2 C.F.R. § 184.3.

(4)  for all projects, as appropriate and to the extent consistent with law, the Recipient should under 2 C.F.R. § 200.322, to the greatest extent practicable under this award, provide a preference for the purchase, acquisition, or use of goods, products, or materials produced in the United States. The Recipient shall



U.S. Department of Transportation
**Federal Railroad Administration**

include the requirements of 2 C.F.R. § 200.322 in all subawards including all contracts and purchase orders for work or products under this award.

(c)  Operators Deemed Rail Carriers. The Recipient recognizes and agrees that 49 U.S.C. § 22905(b) provides that persons conducting rail operations over rail infrastructure constructed or improved in whole or in part with funds provided under chapter 229 of Title 49, United States Code, will be considered a "rail carrier" as defined by 49 U.S.C. § 10102(5), for purposes of Title 49, United States Code, and any other statute that adopts that definition or in which that definition applies, including: the Railroad Retirement Act of 1974 (45 U.S.C. § 231 et seq.); the Railway Labor Act (45 U.S.C. § 151 et seq.); and the Railroad Unemployment Insurance Act (45 U.S.C. § 351 et seq.). The Recipient agrees to reflect this provision in its agreements (if any) with any entity operating rail services over such rail infrastructure.

(d)  Railroad Agreements. In accordance with 49 U.S.C. § 22905(c)(1), if the Project funded by this Agreement uses rights-of-way owned by a railroad, then Recipient represents that it has entered into a written agreement with that railroad owner, which includes: compensation for such use; assurances regarding the adequacy of infrastructure capacity to accommodate both existing and future freight and passenger operations; an assurance by the railroad that collective bargaining agreements with railroad's employees (including terms regulating the contracting of work) will remain in full force and effect according to their terms for work performed by the railroad on the railroad transportation corridor; and an assurance that Recipient complies with liability requirements consistent with 49 U.S.C. § 28103.

By signing this Agreement, Recipient certifies that the written agreement referenced in this Section 26.3(d) has been executed or is not required.

Additional guidance on compliance with the Railroad Agreements provisions is available on FRA's website at:  https://railroads.dot.gov/elibrary/frequently-asked-questions-about-rail-improvement-grant-conditions-under-49-usc-ss-22905c1.

(e)  Labor Protective Arrangements. In accordance with 49 U.S.C. § 22905(c)(2)(B), if the Project funded by this Agreement uses rights-of-way owned by a railroad, then the Recipient will ensure compliance with the protective arrangements that are equivalent to those established under Section 504 of the Railroad Revitalization and Regulatory Reform Act of 1976, 49 U.S.C. § 22404. Such protective arrangements are included herein as Exhibit B.5.

(f)  Davis-Bacon and Related Acts Provisions. In accordance with 49 U.S.C. § 22905(c)(2)(A), if the Project funded by this Agreement uses rights-of-way owned by a railroad, the Recipient will ensure compliance with the standards of 49 U.S.C. § 24312 with respect to the Project in the same manner that Amtrak is required to comply with those standards for construction work financed under an agreement made under 49 U.S.C.§ 24308(a). For these purposes, wages in collective bargaining agreements

U.S. Department of Transportation
**Federal Railroad Administration**

negotiated under the Railway Labor Act are deemed to comply with Davis-Bacon Act requirements.

(g)  Replacement of Existing Intercity Passenger Rail Service. If an intercity passenger rail transportation provider replaces Amtrak intercity passenger rail service through a Project funded by this Agreement, then such provider must comply with the provisions of 49 U.S.C. § 22905(d).

**26.4    Restoration and Enhancement Grants Clauses**

The Recipient agrees to comply with the clauses in Section 26.4 of this Attachment 1.

Consistent with 49 U.S.C. § 22905(e), clauses (b) and (c) through (g) of Section 26.4 do not apply to: 1) commuter rail passenger transportation (as defined in 49 U.S.C. § 24102(3)) operations of a State or local government authority (as those terms are defined in 49 U.S.C. § 5302) or its contractor performing services in connection with commuter rail passenger operations; 2) the Alaska Railroad or its contractors; or 3) Amtrak's access rights to railroad right-of -way and facilities under current law.

(a)  Maximum Funding Limitation. A grant authorized by 49 U.S.C. § 22908 may not exceed:

(1) 90 percent of the projected net operating costs for the first year of service;

(2) 80 percent of the projected net operating costs for the second year of service;

(3) 70 percent of the projected net operating costs for the third year of service;

(4) 60 percent of the projected net operating costs for the fourth year of service;

(5) 50 percent of the projected net operating costs for the fifth year of service; and

(6) 30 percent of the projected net operating costs for the sixth year of service.

(b)  Buy America. In lieu of Section 12.1 of this Agreement 1:

(1)  for infrastructure projects, steel, iron, and manufactured products used in the Project are subject to 49 U.S.C. § 22905(a), as implemented by FRA. The Recipient acknowledges that this Agreement is neither a waiver of 49 U.S.C. § 22905(a)(1) nor a finding under 49 U.S.C. § 22905(a)(2). For infrastructure projects, construction materials used in the Project are subject to the domestic preference requirement at § 70914 of the Build America, Buy America Act, Pub. L. No. 117-58, div. G, tit. IX, subtit. A, 135 Stat. 429, 1298 (2021) and 2 C.F.R. part 184, as implemented by OMB, USDOT, and FRA. The Recipient acknowledges that this Agreement is neither a waiver of § 70914(a) nor a finding under § 70914(b).

 (2)  for non-infrastructure projects, steel, iron, and manufactured products used in the Project are subject to 49 U.S.C. § 22905(a), as implemented by FRA. The


U.S. Department of Transportation
**Federal Railroad Administration**

Recipient acknowledges that this Agreement is neither a waiver of 49 U.S.C. § 22905(a)(1) nor a finding under 49 U.S.C. § 22905(a)(2).

(3)  under Section 26.4 of this Attachment 1, "infrastructure project" has the definition provided in 2 C.F.R. § 184.3.

(4)  for all projects, as appropriate and to the extent consistent with law, the Recipient should under 2 C.F.R. § 200.322, to the greatest extent practicable under this award, provide a preference for the purchase, acquisition, or use of goods, products, or materials produced in the United States. The Recipient shall include the requirements of 2 C.F.R. § 200.322 in all subawards including all contracts and purchase orders for work or products under this award.

(c)  Operators Deemed Rail Carriers. The Recipient recognizes and agrees that 49 U.S.C. § 22905(b) provides that persons conducting rail operations over rail infrastructure constructed or improved in whole or in part with funds provided under chapter 229 of Title 49, United States Code, will be considered a "rail carrier" as defined by 49 U.S.C. § 10102(5), for purposes of Title 49, United States Code, and any other statute that adopts that definition or in which that definition applies, including: the Railroad Retirement Act of 1974 (45 U.S.C. § 231 et seq.); the Railway Labor Act (45 U.S.C. § 151 et seq.); and the Railroad Unemployment Insurance Act (45 U.S.C. § 351 et seq.). The Recipient agrees to reflect this provision in its agreements (if any) with any entity operating rail services over such rail infrastructure.

(d)  Railroad Agreements. In accordance with 49 U.S.C. § 22905(c)(1), if the Project funded by this Agreement uses rights-of-way owned by a railroad, then Recipient represents that it has entered into a written agreement with that railroad owner, which includes: compensation for such use; assurances regarding the adequacy of infrastructure capacity to accommodate both existing and future freight and passenger operations; an assurance by the railroad that collective bargaining agreements with railroad's employees (including terms regulating the contracting of work) will remain in full force and effect according to their terms for work performed by the railroad on the railroad transportation corridor; and an assurance that Recipient complies with liability requirements consistent with 49 U.S.C. § 28103.

By signing this Agreement, Recipient certifies that the written agreement referenced in this Section 26.4(d) has been executed or is not required.

Additional guidance on compliance with the Railroad Agreements provisions is available on FRA's website at:  https://railroads.dot.gov/elibrary/frequently-asked-questions-about-rail-improvement-grant-conditions-under-49-usc-ss-22905c1.

(e)  Labor Protective Arrangements. In accordance with 49 U.S.C. § 22905(c)(2)(B), if the Project funded by this Agreement uses rights-of-way owned by a railroad, then the Recipient will ensure compliance with the protective arrangements that are equivalent to those established under Section 504 of the Railroad Revitalization and Regulatory Reform

**U.S. Department of Transportation**
**Federal Railroad Administration**

Act of 1976, 49 U.S.C. § 22404. Such protective arrangements are included herein as Exhibit B.5.

(f)  Davis-Bacon and Related Acts Provisions. In accordance with 49 U.S.C. § 22905(c)(2)(A), if the Project funded by this Agreement uses rights-of-way owned by a railroad, the Recipient will ensure compliance with the standards of 49 U.S.C. § 24312 with respect to the Project in the same manner that Amtrak is required to comply with those standards for construction work financed under an agreement made under 49 U.S.C.§ 24308(a). For these purposes, wages in collective bargaining agreements negotiated under the Railway Labor Act are deemed to comply with Davis-Bacon Act requirements.

(g)  Replacement of Existing Intercity Passenger Rail Service. If an intercity passenger rail transportation provider replaces Amtrak intercity passenger rail service through a Project funded by this Agreement, then such provider must comply with the provisions of 49 U.S.C. § 22905(d).

(h)  Route Reporting. The Recipient will provide similar information regarding the route performance, financial, and ridership projections, and capital and business plans that Amtrak is required to provide, and such other data and information as is required by Article 4 of Attachment 2 of this Agreement.

(i)  Termination. In addition to the terms of this Attachment 1, FRA may terminate this Agreement upon the cessation of service, or the violation of any other term of this Agreement.

## 26.5    Federal-State Partnership for Intercity Passenger Rail and Federal-State Partnership for State of Good Repair Clauses

The Recipient agrees to comply with the clauses in Section 26.5 of this Attachment 1.

Consistent with 49 U.S.C. § 22905(e), clauses (b) through (g) of Section 26.5 of this Attachment 1 do not apply to: 1) commuter rail passenger transportation (as defined in 49 U.S.C. § 24102(3)) operations of a State or local government authority (as those terms are defined in 49 U.S.C. § 5302) or its contractor performing services in connection with commuter rail passenger operations; 2) the Alaska Railroad or its contractors; or 3) Amtrak's access rights to railroad right of way and facilities under current law.

(a)  Federal Share. The Federal Share of total Project costs shall not exceed 80 percent.

(b)  Buy America. In lieu of Section 12.1 of this Attachment 1:

(1)  for infrastructure projects, steel, iron, and manufactured products used in the Project are subject to 49 U.S.C. § 22905(a), as implemented by FRA. The Recipient acknowledges that this Agreement is neither a waiver of 49 U.S.C. § 22905(a)(1) nor a finding under 49 U.S.C. § 22905(a)(2). For infrastructure projects, construction materials used in the Project are subject to the domestic preference requirement at § 70914 of the Build America, Buy America Act, Pub. L. No. 117-58,



U.S. Department of Transportation
**Federal Railroad Administration**

div. G, tit. IX, subtit. A, 135 Stat. 429, 1298 (2021) and 2 C.F.R. part 184, as implemented by OMB, USDOT and FRA. The Recipient acknowledges that this Agreement is neither a waiver of § 70914(a) nor a finding under § 70914(b).

(2)  for non-infrastructure projects, steel, iron, and manufactured products used in the Project are subject to 49 U.S.C. § 22905(a), as implemented by FRA. The Recipient acknowledges that this Agreement is neither a waiver of 49 U.S.C. § 22905(a)(1) nor a finding under 49 U.S.C. § 22905(a)(2).

(3)  under this Section, "infrastructure project" has the definition provided in 2 C.F.R. § 184.3.

(4) for all projects, as appropriate and to the extent consistent with law, the Recipient should under 2 C.F.R. § 200.322, to the greatest extent practicable under this award, provide a preference for the purchase, acquisition, or use of goods, products, or materials produced in the United States. The Recipient shall include the requirements of 2 C.F.R. § 200.322 in all subawards including all contracts and purchase orders for work or products under this award.

(c)  Operators Deemed Rail Carriers. The Recipient recognizes and agrees that 49 U.S.C. § 22905(b) provides that persons conducting rail operations over rail infrastructure constructed or improved in whole or in part with funds provided under chapter 229 of Title 49, United States Code, will be considered a "rail carrier" as defined by 49 U.S.C. § 10102(5), for purposes of Title 49, United States Code, and any other statute that adopts that definition or in which that definition applies, including: the Railroad Retirement Act of 1974 (45 U.S.C. § 231 et seq.); the Railway Labor Act (45 U.S.C. § 151 et seq.); and the Railroad Unemployment Insurance Act (45 U.S.C. § 351 et seq.). The Recipient agrees to reflect this provision in its agreements (if any) with any entity operating rail services over such rail infrastructure.

(d)  Railroad Agreements. In accordance with 49 U.S.C. § 22905(c)(1), if the Project funded by this Agreement uses rights-of-way owned by a railroad, then Recipient represents that it has entered into a written agreement with that railroad owner, which includes: compensation for such use; assurances regarding the adequacy of infrastructure capacity to accommodate both existing and future freight and passenger operations; an assurance by the railroad that collective bargaining agreements with railroad's employees (including terms regulating the contracting of work) will remain in full force and effect according to their terms for work performed by the railroad on the railroad transportation corridor; and an assurance that Recipient complies with liability requirements consistent with 49 U.S.C. § 28103.

By signing this Agreement, Recipient certifies that the written agreement referenced in this Section 26.5(d) has been executed or is not required.

Additional guidance on compliance with the Railroad Agreements provisions is available on FRA's website at:  https://railroads.dot.gov/elibrary/frequently-asked-questions-about-rail-improvement-grant-conditions-under-49-usc-ss-22905c1.



U.S. Department of Transportation
**Federal Railroad Administration**

(e)  Labor Protective Arrangements. In accordance with 49 U.S.C. § 22905(c)(2)(B), if the Project funded by this Agreement uses rights-of-way owned by a railroad, then the Recipient will ensure compliance with the protective arrangements that are equivalent to those established under Section 504 of the Railroad Revitalization and Regulatory Reform Act of 1976, 49 U.S.C. § 22404. Such protective arrangements are included herein as Exhibit B.5.

(f)  Davis-Bacon and Related Acts Provisions. In accordance with 49 U.S.C. § 22905(c)(2)(A), if the Project funded by this Agreement uses rights-of-way owned by a railroad, the Recipient will ensure compliance with the standards of 49 U.S.C. § 24312 with respect to the Project in the same manner that Amtrak is required to comply with those standards for construction work financed under an agreement made under 49 U.S.C.§ 24308(a). For these purposes, wages in collective bargaining agreements negotiated under the Railway Labor Act are deemed to comply with Davis-Bacon Act requirements.

(g)  Replacement of Existing Intercity Passenger Rail Service. If an intercity passenger rail transportation provider replaces Amtrak intercity passenger rail service through a Project funded by this Agreement, then such provider must comply with the provisions of 49 U.S.C. § 22905(d).

(h)  Northeast Corridor Cost Allocation. For projects located on the Northeast Corridor, as that term is defined in 49 U.S.C. § 24911(a)(4), Amtrak and the public authorities providing commuter rail passenger transportation at the Project location on the Northeast Corridor must remain in compliance with 49 U.S.C. § 24905(c)(2).

(i)  Interest and Financing Costs. Pursuant to 49 U.S.C. § 24911(g)(2), interest and other financing costs of efficiently carrying out a part of the Project within a reasonable time are a cost of carrying out the Project under a Phased Funding Agreement, except that eligible costs may not be more than the cost of the most favorable financing terms reasonably available for the Project at the time of borrowing. The Recipient will certify to FRA's satisfaction that the Recipient has shown reasonable diligence in seeking the most favorable financing terms.

###

47



U.S. Department of Transportation
**Federal Railroad Administration**

---

## Attachment 2

---

# PROJECT-SPECIFIC
# TERMS AND CONDITIONS



U.S. Department of Transportation
**Federal Railroad Administration**

# Project-Specific Terms and Conditions
# Table of Contents

ARTICLE 1: PROJECT-SPECIFIC DESIGNATIONS...........................................................4

1.1     Recipient ......................................................................................................4

1.2     Project and Purpose......................................................................................4

1.3     Program Designations...................................................................................4

ARTICLE 2: SPECIAL TERMS AND CONDITIONS ..........................................................4

ARTICLE 3: ADMINISTRATIVE INFORMATION ............................................................8

3.1     Application ....................................................................................................8

3.2     FRA Awarding Official....................................................................................8

3.3     Federal Award Date ......................................................................................8

3.4     Program Name and Assistance Listings Number ...........................................8

3.5     Recipient's Unique Entity Identifier ..............................................................8

3.6     Federal Award Identification Number ...........................................................8

ARTICLE 4: STATEMENT OF WORK ............................................................................8

4.1     General Project Description ..........................................................................8

4.2     Project Location ............................................................................................8

4.3     Project Scope ..............................................................................................10

4.4     Implement Required Environmental Commitments......................................17

ARTICLE 5: AWARD DATES AND ESTIMATED PROJECT SCHEDULE ............................17

5.1     Award Dates................................................................................................17

5.2     Estimated Project Schedule ........................................................................17

ARTICLE 6: AWARD AND PROJECT FINANCIAL INFORMATION .................................18

6.1     Award Amount.............................................................................................18

6.2     Federal Obligation Information ...................................................................18

6.3     Federal Authorization and Funding Source. ................................................18

6.4     Funding Availability.....................................................................................18

6.5     Approved Project Budget.............................................................................18

6.6     Pre-Award Costs..........................................................................................22

6.7     Phased Funding Agreement.........................................................................22

ARTICLE 7: PERFORMANCE MEASUREMENT INFORMATION ...................................24

U.S. Department of Transportation
**Federal Railroad Administration**

ARTICLE 8: ENVIRONMENTAL COMPLIANCE ........................................................................................... 25

ARTICLE 9: CLIMATE CHANGE AND ENVIRONMENTAL JUSTICE IMPACTS ............................................ 25

9.1     Consideration of Climate Change and Environmental Justice Impacts ..................................... 25

9.2     Supporting Narrative ................................................................................................................. 27

ARTICLE 10: RACIAL EQUITY AND BARRIERS TO OPPORTUNITY ....................................................... 27

10.1    Efforts to Improve Racial Equity and Reduce Barriers to Opportunity ................................... 27

10.2    Supporting Narrative ................................................................................................................. 28

ARTICLE 11: LABOR AND WORK ........................................................................................................... 28

11.1    Efforts to Support Good-Paying Jobs and Strong Labor Standards .......................................... 28

11.2    Supporting Narrative ................................................................................................................. 30

U.S. Department of Transportation
**Federal Railroad Administration**

# ARTICLE 1: PROJECT-SPECIFIC DESIGNATIONS

**1.1     Recipient**

This Agreement (Agreement) is between the Federal Railroad Administration ("FRA") and the Gateway Development Commission ("the Recipient").

**1.2     Project and Purpose**

The purpose of this award is to fund a Federal-State partnership for intercity passenger rail (FSP) Program grant for the Hudson Tunnel Project ("the Project" or "HTP"), as described in Article 4 of this Attachment 2, to help achieve the goals identified in the Notice of Funding Opportunity for Projects Located on the Northeast Corridor for the Federal-State Partnership for Intercity Passenger Rail Grants Program, 87 Fed. Reg. 79421, December 27, 2022, that solicited applications for Federal financial assistance. FRA and the Recipient will accomplish that purpose by completing the Project and ensuring that this award does not substitute for non-Federal investment in the Project, except as proposed in the Application.

**1.3     Program Designations**

(a)  Research and Development. This award is not for research and development.

(b)  Project Size. This award is for a Major Project as that term is defined in FRA Guidance on Development and Implementation of Railroad Capital Projects, January 11, 2023 (Railroad Capital Projects Guidance).

(c)  Phased Funding. This award is a phased funding agreement as further discussed in Section 6.7 of this Attachment 2.

(d)  Grant or Cooperative Agreement. This award is made as a Grant Agreement.

(e)  Security Risk. This award is for a Project that has a low security risk.

# ARTICLE 2: SPECIAL TERMS AND CONDITIONS

**2.0     Definitions**

"Declaration of Covenants" means the **Declaration of Covenants, Conditions and Restrictions for the Hudson Tunnel Project** in the form attached hereto as Exhibit D.

"Project Development Agreement" ("PDA") means that certain Project Development Agreement for Hudson Tunnel Project among Gateway Development Commission, the State of New Jersey, the State of New York and National Railroad Passenger Corporation ("Amtrak"), dated as of February 3, 2023, as amended by First Amendment dated May 24, 2023, and Second Amendment dated March 5, 2024.

"Project Property" means all real and personal property acquired or improved under this Agreement (including permanent easements necessary for ensuring access, maintenance, operation, and use of the Project as long as they are necessary for intercity passenger rail

4

U.S. Department of Transportation
**Federal Railroad Administration**

service), whether funded by Federal or Non-Federal contributions, including as specified in the Project Development Agreement.

"SEP" or "Supporting or Executing Partner" for purposes of this Agreement means any HTP user, operator, or other governmental entity partnering with the Recipient (e.g., Amtrak, Port Authority of New York and New Jersey ("PANYNJ"), and/or New Jersey Transit ("NJ TRANSIT") that has been engaged to support delivery of the Project.)

**2.1    Federal Grant Interest**
The Recipient agrees that FRA retains a Federal interest in all Project Property. Upon the Operations Readiness Date, the Recipient will ensure recordation of the Notice of FRA's Federal interest in Project Property in the form set forth in Exhibit E in the land records of New York County, New York and Hudson County, New Jersey and as otherwise appropriate to record such notice in a manner consistent with the recordation laws and regulations of the applicable jurisdiction. The Recipient will promptly deliver evidence of such recording to Amtrak and to FRA.

**2.2    Declaration of Covenants**
The Recipient will ensure that the Project Property is maintained and available for use for intercity passenger railroad transportation.  Upon Operations Readiness Date, the Recipient will obtain signatures on the Declaration of Covenants and ensure recordation of the Declaration of Covenants in the land records of New York County, New York and Hudson County, New Jersey and as otherwise appropriate to record such notice in a manner consistent with the recordation laws and regulations of the applicable jurisdiction. The Recipient will promptly deliver evidence of such recording to Amtrak and to FRA.

**2.3    Federal Mortgage Interest**
The Recipient acknowledges that property acquired or improved for use in connection with this Agreement is or may be owned by Amtrak and therefore subject to that certain mortgage by and between the United States of America and Amtrak dated December 9, 1976, amended June 20, 2001, and as may be further amended (the "Mortgage").  For such property, upon the Operations Readiness Date the Recipient will ensure recordation of the Declaration of Covenants in the land records of New York County, New York and Hudson County, New Jersey and as otherwise appropriate to record such notice in a manner consistent with the recordation laws and regulations of the applicable jurisdiction.  The Recipient will promptly deliver evidence of such recording to Amtrak and to FRA.

**2.4    Northeast Corridor**
The Recipient agrees that the Project Property is subject to the applicable agreement under 49 U.S.C. § 24905(c)(2).  The Recipient agrees the Project Property is within the "NEC" as that term is defined in Section 1.1 of that certain Amended and Restated Northeast Corridor Services Agreement, effective October 1, 2015, as amended, collectively referred to as the (NECSA).

The Recipient will ensure that the Project Property is integrated into the existing Northeast Corridor ("NEC") systems and infrastructure and upon completion the Recipient will ensure the Project Property is maintained and available at all times necessary for intercity passenger railroad transportation operations.

**U.S. Department of Transportation**
**Federal Railroad Administration**

The Recipient agrees to ensure that Amtrak and the NJ TRANSIT providing commuter rail passenger transportation at the project location will, upon the Operations Readiness Date, be in compliance with 49 U.S.C. § 24905(c)(2).

**2.5    Use and Control**

To satisfy the obligations in this Agreement the Recipient will obtain and maintain sufficient control of Project Property, ensure access, maintenance, operation, and use as long as it is necessary for intercity passenger rail service, and prohibit sale, transfer, encumbrance or other disposition, and by causing Amtrak to obtain deeds of fee or easement, as applicable, to all Project Property.

To the extent that any transfer of real property, retention of easement, or transfer of Project Property is inconsistent with the PDA or this Agreement, the Recipient will request and obtain FRA approval prior to any such transfer.

The Recipient will ensure that no request is made to FTA for approval to use Project Property for any use unless such use is consistent with the terms of this Agreement.

**2.6    Consistency in Contracting**

a.      The Recipient itself will not:

   i.      Take any action or enter into any agreement, amendment, consent, waiver, modification, assignment, termination of the PDA, agreements with the Supporting or Executing Partners or any other agreement if the same is inconsistent with the terms of this Agreement, or the Declaration of Covenants, or if such action would have an adverse effect on the Project Property.

   ii.     Take any action or enter into any agreement, amendment, consent, waiver, modification, assignment that would cause adverse effects to: a) the safety of Amtrak's property, facilities, personnel or operations; b) the Project Property; c) Amtrak's interest in the Project Property, including as future transferee of ownership interest as set forth in the PDA; d) the provision of intercity passenger rail service on the Project Property or the NEC; or e) the Declaration of Covenants.

b.      The Recipient will not permit Supporting or Executing Partners and others to:

   i.      Enter into any new agreements or any amendment, consent, waiver, modification, assignment, termination or replacement of any agreement if the same is inconsistent with the terms of this Agreement, or the Declaration of Covenants, or if such action would have an adverse effect on the Project Property.

6



U.S. Department of Transportation
**Federal Railroad Administration**

ii.      Take any action or enter into any agreement, amendment, consent, waiver, modification, assignment that would cause adverse effects to: a) the safety of Amtrak's property, facilities, personnel or operations; b) the Project Property; c) Amtrak's interest in the Project Property, including as future transferee of ownership interest as set forth in the PDA; d) the provision of intercity passenger rail service on the Project Property or the NEC; or e) the Declaration of Covenants.

**2.7    Survival**

The Recipient acknowledges that certain obligations of this Agreement survive the Operations Readiness Date of the Project and termination and closeout of this Agreement.

**2.8    Maintain Legal Structure**

The Recipient will at all times do or cause to be done all things necessary to obtain, document, preserve, renew, extend, maintain and keep in full force and effect the approvals and other rights, and authorizations material to the conduct of its operations and existence as a public authority.

**2.9    Assignment**

Notwithstanding Section 21.1 of Attachment 1, after Construction Substantial Completion and in the event of  imminent cessation of Recipient's existence, the Recipient may request FRA's consent to assign its rights and responsibilities with respect to the Project Property and this Agreement to Amtrak pursuant to the PDA, provided that such assignment: a) is not reasonably expected to have a material adverse effect on the Project Property, the provision of intercity passenger railroad service on the Project Property, the NEC, the Federal interest in the Project Property, or compliance with this Agreement and b) is subject to Amtrak's assumption of the obligations of this Agreement and all legal requirements applicable to the use of Federal funds and the Project Property whether or not expressly set forth in this Agreement.

**2.10   Operations Costs Ineligible**

For the avoidance of doubt, operations costs including those of the Recipient or other entities are ineligible for reimbursement under this Agreement.

**2.11   Bonding Requirements**

For all construction or facility improvement contracts or subcontracts exceeding the Simplified Acquisition Threshold, the Recipient will comply with the bonding requirements of 2 CFR 200.326(a)-(c), unless otherwise approved by FRA consistent with 2 CFR 200.326.

**2.12   Contracts and Costs**

U.S. Department of Transportation
**Federal Railroad Administration**

Notwithstanding any term or condition of this Agreement to the contrary, except for with respect to financing costs, the Recipient may permit Amtrak to comply with the cost principles in 48 C.F.R. Subpart 31.2 in lieu of 2 C.F.R. Subpart E, § 200.400 – 200.476.

## ARTICLE 3: ADMINISTRATIVE INFORMATION

**3.1      Application**

Application Title: Hudson Tunnel Project

Application Date: 03/27/2023

**3.2      FRA Awarding Official**

FRA Office of Railroad Development
Federal Railroad Administration
1200 New Jersey Ave, SE
Washington, DC 20590
FRA-Grants@dot.gov

**3.3      Federal Award Date**

The "Federal Award Date" is the effective date of this Agreement, as defined under Section 25.2 of Attachment 1 of this Agreement.

**3.4      Program Name and Assistance Listings Number**

For the Federal-State Partnership for Intercity Passenger Rail program the Assistance Listings Number is 20.326 and the Assistance Listings Title is Federal-State Partnership for Intercity Passenger Rail.

**3.5      Recipient's Unique Entity Identifier**

The Recipient's Unique Entity Identifier, as defined at 2 C.F.R. § 25.415, is listed in Section 1B on the Agreement cover sheet.

**3.6      Federal Award Identification Number**

The Federal Award Identification Number is listed in Section 2 on the Agreement cover sheet as the "Agreement Number."

## ARTICLE 4: STATEMENT OF WORK

**4.1      General Project Description**

The Project goals are: 1) to strengthen the NEC's resiliency to support reliable service by providing redundant capability through a new and separate tunnel under the Hudson River for Amtrak and NJ TRANSIT trains between New Jersey and the existing Penn Station New York ("PSNY"), and 2) to preserve

U.S. Department of Transportation
**Federal Railroad Administration**

the current functionality of Amtrak's NEC intercity passenger rail service and NJ TRANSIT's commuter rail service between New Jersey and PSNY by repairing the deteriorating North River Tunnel ("NRT").

The Project funded under this Agreement consists of the following two elements:

**Element 1:  Construction of a new Hudson River Tunnel between New York and New Jersey**

The new Hudson River Tunnel will include:

   a.  In-river work to strengthen the weak soils of the river sediments and provide a reliable path for the tunnel boring machines in advance of the construction of the new tunnel beneath the Hudson River.
   b.  Construction of a new two-tube tunnel that will extend beneath the rock formation of the Palisades and continue below the surface beneath Hoboken, New Jersey. The new tunnel will continue through the foundation of the Manhattan Bulkhead below the river bottom and continue below the surface beneath Hudson River Park and Twelfth Avenue (New York State Route 9A) in New York; beneath the block between West 29th and West 30th Streets on the west side of Twelfth Avenue (Manhattan Block 675); and beneath West 30th Street. The alignment will meet the separately-funded underground Hudson Yards Concrete Casing Project. From the eastern end of the Hudson Yards Concrete Casing, the Hudson River Tunnel will continue beneath Tenth Avenue to a tunnel portal east of Tenth Avenue, within the complex of tracks located beneath the existing building that spans the tracks on the east side of Tenth Avenue and connect to the existing PSNY approach tracks in an area referred to as "A-Yard."
   c.  Installation of ventilation shafts and fan plants, internal tunnel concrete, railroad systems and track work.
   d.  Construction of two new surface tracks that will branch off from and run alongside and to the south of the existing NEC in New Jersey. The new tracks will begin at a realigned Allied Interlocking in Secaucus, New Jersey just east of NJ TRANSIT's Secaucus Junction Station.

**Element 2:  Rehabilitation of the existing NRT under the Hudson River**

The NRT rehabilitation will make improvements to the existing NRT that opened in 1910.  The work necessary to rehabilitate the existing North River Tunnels, and to address the causes of chronic unreliability and bring the North River Tunnels to a state of good repair, may include:

   a.  Bench wall and duct bank removal and reconstruction;
   b.  Replacement of the antiquated ballast track system to ballast-less track system;
   c.  Installation of new signal, communication, and power cables and associated components; and
   d.  Replacement of in-tunnel fire/life safety systems while maintaining all required systems and tunnel ventilation to protect construction workers during tunnel construction.

The Project as defined in this Agreement excludes costs incurred prior to November 15, 2022, as well as the separately funded Tonnelle Avenue Bridge Replacement Project, Hudson Yards Concrete Casing Section Three Project ("HYCC – Section 3"), and the Long Island Rail Road ("LIRR") Emergency Services Building ("ESB") Utility Relocation Early Work associated with HYCC - Section 3.



U.S. Department of Transportation
**Federal Railroad Administration**

## 4.2    Project Location

The Project extends along the NEC from Secaucus, New Jersey, beneath the Palisades (North Bergen and Union City, New Jersey) and the Hoboken waterfront area, and beneath the Hudson River to connect to the tracks in A-Yard west of PSNY. The geographic coordinates of the new Hudson River Tunnel at the New York/New Jersey State boundary line in the Hudson River are -74°0'53.1146" 40°45'16.3965".   The western terminus of the new tunnel and related tracks and infrastructure would be east of County Road in Secaucus, New Jersey, and the eastern terminus would be at approximately Ninth Avenue in Manhattan, New York. New ventilation shafts and associated fan plants would be located above the tunnel in New Jersey and New York for regular and emergency ventilation and emergency access. The new tunnel would make use of the HYCC – Section 3 that is being constructed along the southern edge of the West Side Yard and extends from the north side of West 30th Street to the west side of Tenth Avenue.



## 4.3    Project Scope

The Recipient will notify FRA in writing of any requested changes in Project Scope as defined in Section 4.3 and will not proceed with the changed scope unless approved by FRA in writing. If approved, changes to Project Scope may require additional environmental review or an amendment to this Agreement.

**Task 1: Project Administration and Management**

Subtask 1.1:  Project Administration

The Recipient will perform all tasks required for the Project through a coordinated process, which will involve affected railroad owners, operators, and funding partners, including:



U.S. Department of Transportation
**Federal Railroad Administration**

- AMTRAK-Host Railroad, Intercity Passenger Railroad Operator (Supporting or Executing Partner)
- State of New York (Funding Partner)
- State of New Jersey (Funding Partner)
- PANYNJ (Funding Partner and Supporting or Executing Partner)
- NJ TRANSIT (Commuter Railroad Operator and Supporting or Executing Partner)
- Federal Transit Administration (FTA)
- FRA

The Recipient will facilitate the coordination of all activities necessary for implementation of the Project. The Recipient will:

- complete necessary steps to hire a qualified consultant/contractor to perform required Project work, as necessary;
- hold regularly scheduled Project meetings with FRA;
- inspect and approve work as it is completed; and
- participate in other coordination, as needed.

Subtask 1.1a: Project Management Plan

The Recipient will prepare a Project Management Plan (PMP), that describes how the Project will be implemented and monitored to ensure effective, efficient, and safe delivery of the Project on time and within budget. The PMP will describe, in detail, the activities and steps necessary to complete the tasks outlined in this Statement of Work.

The PMP will include a Project Schedule and Project Budget for the work to be performed under this Agreement. The Project Schedule will be consistent with the Estimated Project Schedule in Section 5.2 of this Attachment 2, but provide a greater level of detail. Similarly, the Project Budget should be consistent with the Approved Project Budget in Section 6.5 of this Attachment 2, but provide a greater level of detail.

The Recipient will submit the PMP to FRA for review and approval. The Recipient will implement the Project as described in the approved PMP. The Recipient will not begin work on subsequent tasks until FRA has provided written approval of the PMP, unless FRA has provided pre-award authority for such work under Section 6.6 of this Attachment 2. FRA will not reimburse the Recipient for costs incurred in contravention of this requirement.

FRA may require the Recipient to update the PMP. The Recipient will submit any such updates to FRA for review and approval, and FRA will determine if updates to the PMP require an amendment to this Agreement.  The Project Budget and Project Schedule may be revised consistent with Article 5 of Attachment 1 of this Agreement without amending this Agreement.

The Recipient will identify agreements governing the construction, operation, and maintenance of the Project in the PMP. If requested by FRA, the Recipient will provide FRA the final, executed copies of any agreements within ten business days of the request.



The PMP will be consistent with the FRA Guidance on Development and Implementation of Railroad Capital Projects (Railroad Capital Projects Guidance) and 49 U.S.C. § 22903, as applicable.

Subtask 1.1b: Financial Plan

The Recipient will prepare an Initial Financial Plan to document the availability of sufficient financial resources to implement the Project as planned, as described in FRA's Guidance on Development and Implementation of Railroad Capital Projects.  The Financial Plan will include a project description, schedule, project cost, funding, financing, and cash flow. The Recipient will submit the Financial Plan to FRA for review and acceptance.

The Recipient will update the Financial Plan, as described in FRA's Guidance on Development and Implementation of Railroad Capital Projects. The updated Financial Plan will describe the changes from the prior Financial Plan and discussing the primary reason(s) for the change(s) and the actions the Recipient has taken to monitor and control cost growth. The Recipient will update a Financial Plan annually to FRA for review and acceptance.

Subtask 1.1c: Capital Cost Estimate

The Recipient will prepare a Capital Cost Estimate that included all costs and the value of any resources needed or incurred for the Project development, final design, and construction stages of a capital project, as described in FRA's Guidance on Development and Implementation of Railroad Capital Projects. The estimate will include documentation explaining the logic, methodologies, assumptions, calculations and sources used. These should account for varying risks related to materials, labor, and project activities necessary. Any financing costs to implement the Project that are not included in the Capital Cost Estimate and should be estimated separately.

The Recipient will submit the Capital Cost Estimate to FRA for review and acceptance. FRA may require the Recipient to update the Capital Cost Estimate to occur not more than once per year. The Recipient will submit any such updates to FRA for review and acceptance.

Subtask 1.1d:  Project Closeout

The Recipient will submit a Final Performance Report as required by Section 7.2 of Attachment 1 of this Agreement, which should describe the cumulative activities of the Project, including a complete description of the Recipient's achievements with respect to the Project objectives and milestones.

Subtask 1.2:  Professional Services

The Recipient will conduct activities related to the procurement of final design, project management, construction management and administration, agency coordination, testing, inspection and startup services for Project Elements 1 and 2.

Subtask 1.3: Financing



U.S. Department of Transportation
**Federal Railroad Administration**

The Recipient will only charge eligible financing costs to this Project.  Such costs must be consistent with the Financial Plan, 2 CFR part 200, the terms of this Agreement including Section 26.5(i) of Attachment 1 to this Agreement. The Recipient will include a certification as required in Section 26.5(i) of Attachment 1 for each borrowing with each reimbursement request as directed by FRA.

**Task 1 Deliverables:**

| Deliverable ID | Subtask | Deliverable Name |
|:---:|:---:|:---:|
| 1.1 | 1.1a | Project Management Plan |
| 1.2 | 1.1b | Financial Plan |
| 1.3 | 1.1c | Capital Cost Estimate |
| 1.4 | 1.1d | Final Performance Report |
| 1.5 | 1.3 | Certifications of Financing Terms Required under 26.5(i) of Attachment 1 |

**Task 2: Final Design**

The Recipient will ensure that applicable Final Design (FD) and/or design bridging documents are prepared for the construction components of the Project. The Recipient will prepare FD in individual documents or a consolidated document.

Subtasks 2.1: Final Design Set(s)

The Recipient has prepared or cause to be prepared in coordination with the Engineer-of-Record Preliminary Engineering (PE) set(s) that will consist of the title sheet, scale maps, design plan drawings showing proposed track changes or proposed new construction, signal route and aspect charts, construction cost estimate with itemized quantities and costs, Amtrak Force Account Work costs, and construction implementation schedule. The FD set(s) may vary in scope and timing of the submittal dependent on the contractual mechanism used to procure design and construction services (e.g., Design-Build or Design-Bid-Build approach). The Recipient will prepare or cause to be prepared in coordination with the Engineer-of-Record or Design-Builder and submit the following FD Set(s) documents:

U.S. Department of Transportation
**Federal Railroad Administration**

- Matrix summarizing any significant changes to design since PE plans that were reviewed by FRA.

- Updated cost estimate, as applicable to Design-Bid-Build package.

- Comment-resolution log(s) tracking all comments/responses/acceptance the Recipient may have collected by reviewing agencies or organization (e.g., other railroad users of the infrastructure).

- For a Design-Bid-Build package, the Recipient shall submit the FD set documents for FRA review and acceptance prior to proceeding with the construction. For a Design-Build package, the Recipient shall be permitted to proceed with the design or construction without prior acceptance from FRA.

**Task 2 Deliverables:**

| Deliverable ID | Subtask | Deliverable Name |
|:---:|:---:|:---:|
| 2.1 | 2.1 | Final Design Set |

**Task 3: Property Acquisition**

The Recipient will ensure the acquisition of privately and publicly held properties, including railroad-owned or controlled properties and permits that are necessary to construct and operate the Project. The Recipient will ensure that the real property necessary for the Project are acquired consistent with the PDA. The Recipient will ensure among other things:

- Acquisition through negotiations.
- Relocation assistance for non-residential (e.g., commercial) and residential occupants.
- Property management covering the time period between acquiring the property and the time the Project is granted control and use of the property.
- Recording the instruments that transfer title.

The Recipient will submit to FRA for review and acceptance, and update as appropriate, a Real Estate Acquisition and Management Plan ("RAMP"), as described in FRA's Guidance on Development and Implementation of Railroad Capital Projects, which is a planning document that includes real estate goals and methodology from the perspective of timing, staffing, statutory, and policy issues and details how the needed real estate will be acquired. FRA may require the Recipient to update the RAMP. The Recipient will submit any such updates to FRA for review and acceptance.

**Task 3 Deliverables:**

| Deliverable ID | Subtask | Deliverable Name |
|:---:|:---:|:---:|



U.S. Department of Transportation
**Federal Railroad Administration**

| 3.1 | 3.1 | Real Estate Acquisition Management Plan |
|---|---|---|

**Task 4: Construction**

The Recipient divided the Project into discrete construction contracts and other elements necessary to implement the Project. The Recipient will ensure completion of all aspects of construction.

| Construction Activities | Detail |
|---|---|
| **Subtask 4.1 Guideway and Track Elements** | Guideway and Track Elements activities in connection with:<br>○ Construct earth retaining structure along the alignment between County Road and Secaucus Road. This includes multiple foundations with varying heights. Install safety railings in areas where controlled access is needed.<br>○ Construct cut & cover box section which includes support of excavation, removal of material, construction of structure, backfill and surface restoration at the Palisades Tunnel Portal, and 10th. Ave. in Manhattan.<br>○ Conduct boring and disposal of muck for two tunnels from the Palisades Portal to 12th. Ave. Tunnel boring includes installing pre-cast concrete liners; constructing cross passages; conducting second pour concrete. invert slab and drainage; and installing fan plants at Hoboken in New Jersey and A-Yard and 12th. Ave in Manhattan.<br>○ Install tunnel ventilation fans; tunnel lighting; fire standpipe system; duct bank; walkway and safety railing, it also includes the rehabilitation of existing North River Tunnels.<br>○ Complete earth work in addition to construction of the U-Shaped structure at the Palisades Tunnel Portal.<br>○ Install direct fixation track through both new Hudson River Tunnels and the existing North River Tunnels.<br>○ Construct new ballasted track and relocate existing track, including cutover, lining and surfacing, bonded insulated joints, ballast and guard rail system along Amtrak NEC, A-Yard. This includes new ballasted tracks on the aerial structures.<br>○ Construct/install special track work along Allied Interlocking.<br>○ Structural steel, concrete, pre-cast concrete, cast in place concrete, drilled shafts, concrete-filled steel pipe pilings, safety railings, access systems, fiberglass walkway systems, aerial drainage systems, waterproofing and miscellaneous systems support structures.<br>○ Purchase or procure supplies, materials and equipment needed to construct all guideway and track elements. |



U.S. Department of Transportation
**Federal Railroad Administration**

| Construction Activities | Detail |
|---|---|
| | o   Mobilization (e.g., stored materials) in connection with Guideway and Track Elements. |
| **Subtask 4.2 Support Facilities: Yards, Shops, Admin. Buildings** | Support Facilities: Yards, Shops, Admin. Buildings in connection with:<br><br>o   Complete track work in A-Yard. This includes civil work and underpinning of the Lerner building (Manhattan, NYC).<br>o   Purchase or procure supplies, materials and equipment needed to construct all support facilities.<br>o   Mobilization (e.g., stored materials) in connection with Support Facilities: Yards, Shops and Admin. Buildings. |
| **Subtask 4.3 Sitework & Special Conditions** | Sitework & Special Conditions activities in connection with:<br><br>o   Complete site demolition work NJ along the surface alignment in NJ.<br>o   Relocate utility conduits and appurtenances. This utility work also includes the relocation of existing drainage and water mains and appurtenances.<br>o   Management of regulated materials and the disposal of hazardous and contaminated soils at all locations.<br>o   Mitigate permanent wetland impacts and riparian impacts during construction.<br>o   This includes Amtrak forces providing flagging support for construction activities on the active railroad systems.<br>o   Purchase or procure supplies, materials and equipment needed to construct all sitework.<br>o   Mobilization (e.g., stored materials) in connection with Sitework and Special Conditions. |
| **Subtask 4.4 Systems** | Systems activities in connection with:<br><br>o   Construct/install signal and train control equipment along the NEC, the new Hudson Tunnel alignment, NRT, and A-Yard.<br>o   Modify existing substation No. 42 and the existing substation No. 43 at 31st Street by adding 1500A circuit breakers and disconnecting switches and wiring including all supporting structures along with site modification.<br>o   Install new catenary structures and supports, feeders and wire, bonding and grounding, and new Overhead Contact system both along the surface alignments and tunnels.<br>o   It also includes the cost of new catenary systems in the existing rehabilitated North River Tunnel. In addition, it includes New third rail installation both in Hudson River Tunnels and North River Tunnels.<br>o   Furnishing and install CCTV, Radio, Telephone, Access Control systems and other communication/safety/control systems.<br>o   Install, test, and commission the central control panel.<br>o   Purchase or procure supplies, materials and equipment needed to construct all systems for the HTP.<br><br>Mobilization (e.g., stored materials) in connection with Systems. |

U.S. Department of Transportation
**Federal Railroad Administration**

**Task 4 Deliverables:**

FRA may request procurement documentation and inspect the progress of construction to ensure compliance with the terms and conditions of the Agreement.

**4.4    Implement Required Environmental Commitments**

The Recipient will implement the Project consistent with the documents and environmental commitments identified below.

**Table 4-A: Environmental Commitments**

| Document Type | Commitment Reference | Document Date |
|---|---|---|
| Record of Decision | Attachment A of Record of Decision | May 28, 2021 |
| Programmatic Agreement (PA) and First Amendment to the PA for the HTP | All Stipulations | PA - May 10, 21; First Amendment to PA July 10,2023 |

## ARTICLE 5: AWARD DATES AND ESTIMATED PROJECT SCHEDULE

**5.1    Award Dates**

Budget Period End Date: April 30, 2041

Period of Performance End Date: April 30, 2041

**5.2    Estimated Project Schedule**

Milestones associated with this Agreement are identified in Table 5-A: Estimated Project Schedule. The Recipient will complete these milestones to FRA's satisfaction by the Schedule Date, subject to Article 5 of Attachment 1 of this Agreement. The Recipient will notify FRA in writing when it believes it has achieved the milestone.

**Table 5-A: Estimated Project Schedule**

| Milestone | Schedule Date |
|---|---|
| Preliminary Engineering Completion | 01/13/2022 |
| National Environmental Policy Act ("NEPA") Completion | 05/28/2021 |

U.S. Department of Transportation
**Federal Railroad Administration**

| Final Design Completion | 07/30/2034 |
|---|---|
| Construction Substantial Completion[1] | 11/9/2040 |

## ARTICLE 6: AWARD AND PROJECT FINANCIAL INFORMATION

**6.1      Award Amount**

Agreement Federal Funds:  $1,899,999,917

Contingent Commitment: $1,899,999,903

**6.2      Federal Obligation Information**

Federal Obligation Type: Phased

**6.3      Federal Authorization and Funding Source.**

Authorization: Sections 22106 and 22307 of the Infrastructure Investment and Jobs Act, Public Law 117-58 (November 15, 2021); 49 U.S.C. § 24911

Appropriation: Advance appropriations provided in the Infrastructure Investment and Jobs Act, Division J, Title VIII (Public Law 117–58 (2021))

**6.4      Funding Availability**

Program funding that is obligated under this Agreement remains available until expended.

**6.5      Approved Project Budget**

The estimated total Project cost under this Agreement is $15,468,433,207.

FRA will contribute a maximum of 24.57 percent of the total Project cost, not to exceed the Agreement Federal Funds in Section 6.1 of this Attachment 2. FRA will fund the Project at the lesser amount of the Agreement Federal Funds or the FRA maximum contribution percentage of total Project costs.

The Recipient will contribute $949,999,955 in Agreement Non-Federal Funds. Recipient's Agreement Non-Federal Funds are comprised of RRIF loans.

The Recipient will complete the Project to FRA's satisfaction within the Approved Project Budget, subject to Article 5 of Attachment 1 of this Agreement.

Consistent with Section 13.9 in Attachment 1 FRA agrees to reimburse the Recipient even where such reimbursement may temporarily exceed FRA's contributory percentage. By the end of the period of

---

[1] Represents Revenue Service date for the Project.



U.S. Department of Transportation
**Federal Railroad Administration**

performance, the Recipient is still required to provide a non-Federal match of at least 20 percent of the total Project cost.

The Recipient will not reallocate Agreement Unallocated Contingency without prior written approval by FRA. The Recipient may re-allocate or drawdown Unallocated Contingency of Other Federal Funds identified in Table 6-A without prior written approval by FRA approval.

U.S. Department of Transportation
**Federal Railroad Administration**

## Table 6-A: Approved Project Budget by Task

| Task # | Task Title | Agreement Federal Funds | Agreement Non-Federal Funds | Total Agreement Funds | Other Federal Funds | Other Non-Federal Funds | Total |
|---|---|---|---|---|---|---|---|
| 1 | **Project Administration and Management** | **$1,251,528,796** | **$264,327,977** | **$1,515,856,773** | **$690,852,311** | **$1,273,128,420** | **$3,479,837,504** |
| 1.1 | Project Administration | $491,841,074 | $147,456,952 | $639,298,026 | $249,524,447 | $37,015,787 | $925,838,260 |
| 1.2 | Professional Services | $682,939,757 | $116,871,025 | $799,810,782 | $278,500,908 | $54,399,595 | $1,132,711,285 |
| 1.3 | Financing | $76,747,965 | $0.00 | $76,747,965 | $162,826,956 | $1,181,713,038 | $1,421,287,959 |
| 2 | **Final Design** | **$408,318,470** | **$90,188,217** | **$498,506,687** | **$97,819,243** | **$36,318,071** | **$632,644,001** |
| 3 | **Property Acquisitions** | **$0** | **$0** | **$0** | **$577,460,690** | **$97,802,723** | **$675,263,413** |
| 4 | **Construction** | **$1,420,231,370** | **$595,483,761** | **$2,015,715,131** | **$4,151,883,292** | **$2,135,015,053** | **$8,302,613,476** |
| 4.1 | Guideway and Track Elements | $1,013,639,648 | $506,747,989 | $1,520,387,637 | $3,227,711,189 | $1,862,345,392 | $6,610,444,218 |
| 4.2 | Support Facilities: Yard, Shops, Admin. Buildings | $33,217,153 | $0 | $33,217,153 | $14,970,947 | $17,981,527 | $66,169,627 |
| 4.3 | Sitework and Special Conditions | $20,063,280 | $26,582,790 | $46,646,070 | $187,340,993 | $228,994,846 | $462,981,909 |
| 4.4 | Systems | $353,311,289 | $62,152,982 | $415,464,271 | $721,860,163 | $25,693,288 | $1,163,017,722 |


U.S. Department of Transportation
**Federal Railroad Administration**

| Task # | Task Title | Agreement Federal Funds | Agreement Non-Federal Funds | Total Agreement Funds | Other Federal Funds | Other Non-Federal Funds | Total |
|---|---|---|---|---|---|---|---|
| 5 | Unallocated Contingency | $719,921,184 | $0 | $719,921,184 | $1,658,153,629 | $0 | $2,378,074,813 |
| | Total | $3,799,999,820 | $949,999,955 | Total Agreement Cost: $4,749,999,775 | $7,176,169,165 | $3,542,264,267 | Total Project Cost: $15,468,433,207 |

Amounts reflected in Table 6-A may vary plus or minus one-dollar ($1) due to rounding.

### Table 6-B: Approved Project Budget by Source[2]

| Funding Source | Total Amount | Percentage of Total Project Cost |
|---|---|---|
| **Federal Share** | **$10,976,168,985** | **70.96%** |
| **Agreement Federal Funds** | **$1,899,999,917** | |
| FSP-NEC FY22 | $474,999,983 | |
| FSP-NEC FY23 | $474,999,982 | |
| FSP-NEC FY24 | $949,999,952 | **24.57%** |
| **Contingent Commitment Funds** | **$1,899,999,903** | |
| FSP-NEC FY25 | $949,999,952 | |
| FSP-NEC FY26 | $949,999,951 | |
| **Other Federal Funds** | **$7,176,169,165** | **46.39%** |
| FTA (CIG) Funds (80/20) | $6,880,000,000 | 44.48% |
| Amtrak Annual Grant Funds (100%) | $296,169,165 | 1.91% |
| **Non-Federal Share** | **$4,492,264,222** | **29.04%** |
| **Agreement Non-Federal Funds** | **$949,999,955** | **6.14%** |
| GDC RRIF repaid by PANYNJ | $576,950,041 | 3.73% |
| GDC RRIF repaid by NJ | $66,211,320 | 0.43% |
| GDC RRIF repaid by NYS | $306,838,594 | 1.98% |
| **Other Non-Federal Funds** | **$3,542,264,267** | **22.90%** |
| GDC RRIF repaid by PANYNJ | $2,021,765,494 | 13.07% |
| GDC RRIF repaid by NJ | $221,047,945 | 1.43% |
| GDC RRIF repaid by NYS | $1,026,079,843 | 6.63% |
| Amtrak (non-Federal) | $273,370,985 | 1.77% |

---

[2]Table 6-B excludes LIRR Utility Relocation and FY 2023 RAISE Tonnelle Avenue Bridge Project, as well as costs incurred prior to November 15, 2022. This also includes Agreement Federal Funds and Agreement Non-Federal Funds, Other Federal Funds and Other Non-Federal Funds and further breaks down Amtrak sources of funds between annual grants (Federal) and program income (non-Federal)



| TOTAL PROJECT BUDGET | $15,468,433,207 | 100.00% |
|---|---|---|

**6.6    Pre-Award Costs**

On June 27, 2024, FRA provided pre-award authority, effective November 15, 2022, for cost incurrence for the following costs for the Project in response to Recipient's request:

| Estimated Advance Costs Budget | | | | |
|---|---|---|---|---|
| Task # | Task Activity | Federal Contribution | Non-Federal Contribution | Total Cost |
| 1 | Project Administration & Management | $234,956,000 | $58,739,000 | $293,695,000 |
| 1.1 | *Program Administration & Management* | *$98,368,000* | *$24,592,000* | *$122,960,000* |
| 1.2 | *Professional Services* | *$136,588,000* | *$34,147,000* | *$170,735,000* |
| 2 | Final Design | $102,418,000 | $25,604,000 | $128,022,000 |
| 4 | Construction | $462,626,000 | $115,657,000 | $578,283,000 |
| 4.1 | *Guideway and Track Elements* | *$416,363,400* | *$104,091,300* | *$520,454,700* |
| 4.3 | *Sitework and Special Conditions* | *$46,262,600* | *$11,565,700* | *$57,828,300* |
| | **TOTAL ESTIMATED COST** | **$800,000,000** | **$200,000,000** | **$1,000,000,000** |

The above pre-award costs were necessary for efficient and timely performance of the scope of work and were incurred directly pursuant to the negotiation and in anticipation of this Agreement.

**6.7    Phased Funding Agreement**

This Agreement is a phased funding agreement under 49 U.S.C. § 24911(g)(2). The maximum amount of Federal financial assistance ((49 U.S.C. § 24911(g)(2)(B)(ii)) for the Project will not exceed the maximum Federal share (80 percent) of the total costs of the Project (49 U.S.C. § 24911(f)(2)).

The total amount of funds that may be obligated under this Agreement is $3,799,999,820, which is the sum of the Agreement Federal Funds and the Contingent Commitment identified in Section 6.1 of this Attachment 2.

This Agreement obligates the Agreement Federal Funds, which is the same as the total amount of funds described in Table 6-C: Obligation by Fiscal Year. Through this Agreement, FRA agrees to obligate the Contingent Commitment pursuant to the terms in Section 6.7.  FRA scheduled and allocated the Contingent Commitment as described in Table 6-D: Contingent Commitment by Fiscal Year.

U.S. Department of Transportation
**Federal Railroad Administration**

This Agreement does not obligate Federal funds, other than the Agreement Federal Funds identified in Section 6.1 of this Attachment 2. The Contingent Commitment is not an obligation of the Government.

Under this phased funding agreement, the Recipient may incur costs for eligible activities as is reasonably necessary to advance the Project prior to obligation of the Contingent Commitment, without prejudice to future reimbursement of the costs, to the extent that such costs are incurred in accordance with all applicable Federal requirements and this Agreement.

To request that FRA obligate the scheduled portion of the Contingent Commitment as described in Table 6-D, the Recipient will request an amendment to this Agreement as provided in Article 15 of Attachment 1 of this Agreement. The Recipient will not request such an amendment more than once every 12 months. Such amounts are subject to the terms and conditions of this Agreement upon obligation.

Unless otherwise determined by the Administrator, FRA's obligation of all or portions of the Contingent Commitment is subject to the availability of Federal funds, program authority, and FRA's determination of satisfactory performance by the Recipient under this Agreement. In assessing performance, FRA will consider whether:

(a)  the Recipient is in compliance with the terms and conditions of this Agreement;

(b)  the Recipient confirms that all statements and representations made in the Federal System for Awards Management, in the Application, and in this Agreement are true and correct as of the request to obligate contingently committed funds; and

(c)  FRA has not terminated this Agreement under Article 10 of Attachment 1 of this Agreement nor provided notice of intent to terminate under Article 9 of Attachment 1 of this Agreement.

**Table 6-C: Obligation by Fiscal Year**

| Fiscal Year of Funding Source | Amount |
|---|---|
| 2022 | $474,999,983 |
| 2023 | $474,999,982 |
| 2024 | $949,999,952 |
| **Total** | **$1,899,999,917** |

**Table 6-D: Contingent Commitment by Fiscal Year**

| Fiscal Year of Appropriation | Amount |
|---|---|
| 2025 | $949,999,952 |
| 2026 | $949,999,951 |


U.S. Department of Transportation
**Federal Railroad Administration**

| Total | $1,899,999,903 |
|---|---|

Pursuant to 49 U.S.C. § 24911(g)(2)(C), if the Recipient does not carry out the Project for reasons within control of the Recipient, the Recipient will repay all Federal grant funds awarded for the Project from all Federal funding sources, for all Project activities, facilities, and equipment, plus reasonable interest and penalty charges allowable by law or established in this Agreement. For the avoidance of doubt, this clause does not restrict or otherwise limit FRA's ability to act under Article 9 or 10 of Attachment 1 of this Agreement.

## ARTICLE 7: PERFORMANCE MEASUREMENT INFORMATION

Table 7-A: Performance Measurement Table identifies the performance measures that this Project is expected to achieve. These performance measures will enable FRA to assess the Recipient's progress in achieving grant program goals and objectives. The Recipient will report on these performance measures in accordance with the frequency and duration specified in Table 7-A.

Upon Project completion, the Recipient will submit reports comparing the actual Project performance of the new and or improved asset(s) against the pre-Project (baseline) performance and expected post-Project performance as described in Table 7-A. The Recipient will submit the performance measures report to the Project Manager in accordance with Table 7-A.

**Table 7-A: Performance Measurement Table**

| Goal | Objective | Performance Measure | Description of Measure | Measurement | Reporting |
|---|---|---|---|---|---|
| *Strengthen resiliency to support reliable service* | Trans-Hudson Ridership | Ridership | Collect, document, analyze data from NJ TRANSIT and Amtrak on ridership. Report differences in predicted district-to-district trips at initiation of revenue service for HTP compared to the previous milestone (if any). | **Pre-Project Baseline as of 2019.** Collect, analyze, review, baseline existing NJT and Amtrak Ridership. Report on total annualized, monthly and daily system-wide linked trips (the actual number of complete trips from origin to destination, including transfers) by operator (NJ Transit / Amtrak). | **Frequency:** Frequency: Once |
| | | | | **Expected Post-Project Performance:** Comparison "delta" of NJT and Amtrak **ridership** between | **Duration:** Within thirty-six (36) months of project |



U.S. Department of Transportation
**Federal Railroad Administration**

| Goal | Objective | Performance Measure | Description of Measure | Measurement | Reporting |
|------|-----------|---------------------|------------------------|-------------|-----------|
| | | | | baseline and new conditions. | opening, the Recipient will prepare the final report. |
| **Reduce the State of Good Repair Backlog** | Operating and Maintenance Costs | Total Costs per Year | Collate, document, and analyze Operating and Maintenance Costs for the North River Tunnel. | **Pre-Project (Baseline) Performance as of FY 2023:** Report total baseline Operating and Maintenance costs incurred by Amtrak for the North River Tunnel. | **Frequency:** Once |
| | | | | **Expected Post-Project Performance:** Comparison of baseline Operating and Maintenance costs at FY2023 with actual costs by post-rehabilitation of the North River Tunnel. | **Duration:** Within thirty-six (36) months of project opening, the Recipient will prepare the final report. |

The Recipient will prepare a Project Outcomes Report pursuant to Section 8.3 of Attachment 1 of this Agreement.

## ARTICLE 8: ENVIRONMENTAL COMPLIANCE

The FRA and FTA signed a Final Environmental Impact Statement and Final Section 4(f) Evaluation, and issued a Record of Decision for this Project on May 28, 2021, in compliance with the National Environmental Policy Act. A Programmatic Agreement ("PA"), in compliance with the National Historic Preservation Act, was executed on May 10, 2021.  A First Amendment to the PA was executed on July 10, 2023. The Recipient is responsible for complying with environmental commitments, such as mitigation measures and/or design features, described in the Record of Decision and the PA, as identified in Section 4.4 of this Attachment 2.

## ARTICLE 9: CLIMATE CHANGE AND ENVIRONMENTAL JUSTICE IMPACTS

**9.1    Consideration of Climate Change and Environmental Justice Impacts**

This Section identifies how the Project addresses climate change and environmental justice priorities. The Recipient certifies that rows marked with "X" in the following table are accurate:



U.S. Department of Transportation
**Federal Railroad Administration**

| | |
|---|---|
| | The Project directly supports a Local/Regional/State Climate Action Plan that results in lower greenhouse gas emissions. *(Identify the plan in the supporting narrative below.)* |
| | The Project directly supports a Local/Regional/State Equitable Development Plan that results in lower greenhouse gas emissions. *(Identify the plan in the supporting narrative below.)* |
| | The Project directly supports a Local/Regional/State Energy Baseline Study that results in lower greenhouse gas emissions. *(Identify the plan in the supporting narrative below.)* |
| | The Recipient or a Project partner used environmental justice tools, such as the EJSCREEN, to minimize adverse impacts of the Project on environmental justice communities. *(Identify the tool(s) in the supporting narrative below.)* |
| | The Project supports a modal shift in freight or passenger movement to reduce emissions or reduce induced travel demand. *(Describe that shift in the supporting narrative below.)* |
| | The Project utilizes demand management strategies to reduce congestion, induced travel demand, and greenhouse gas emissions. *(Describe those strategies in the supporting narrative below.)* |
| | The Project incorporates electrification infrastructure, zero-emission vehicle infrastructure, or both. *(Describe the incorporated infrastructure in the supporting narrative below.)* |
| | The Project supports the installation of electric vehicle charging stations. *(Describe that support in the supporting narrative below.)* |
| | The Project promotes energy efficiency. *(Describe how in the supporting narrative below.)* |
| | The Project serves the renewable energy supply chain. *(Describe how in the supporting narrative below.)* |
| X | The Project improves disaster preparedness and resiliency. *(Describe how in the supporting narrative below.)* |
| | The Project avoids adverse environmental impacts to air or water quality, wetlands, and endangered species, such as through reduction in Clean Air Act criteria pollutants and greenhouse gases, improved stormwater management, or improved habitat connectivity. *(Describe how in the supporting narrative below.)* |
| | The Project repairs existing dilapidated or idle infrastructure that is currently causing environmental harm. *(Describe that infrastructure in the supporting narrative below.)* |
| | The Project supports or incorporates the construction of energy- and location-efficient buildings. *(Describe how in the supporting narrative below.)* |



U.S. Department of Transportation
**Federal Railroad Administration**

| | |
|---|---|
| | The Project includes recycling of materials, use of materials known to reduce or reverse carbon emissions, or both. *(Describe the materials in the supporting narrative below.)* |
| | The Project includes other actions or attributes that address climate change and environmental justice. *(Describe those actions in the supporting narrative below.)* |
| | The Project does not include actions or attributes that address climate change and environmental justice but, before beginning construction of the Project, the Recipient will take relevant actions described below to address climate change and environmental justice impacts of the Project. *(Identify the relevant actions in the supporting narrative below.)* |

**9.2    Supporting Narrative**

The Project will improve the resiliency of the transportation infrastructure in the Project area and will preserve the current functionality of Amtrak's NEC service and NJ TRANSIT's commuter passenger rail service between New Jersey and PSNY.  Project features will be designed using a Design Flood Elevation ("DFE") that is five (5) feet higher than FEMA's Base Flood Elevation ("BFE"). Project elements would either be higher than the DFE or designed to be watertight and/or resistant to flooding. The new Hudson River Tunnel would include floodgates on each side of the river tunnel, to protect both the tunnel and landside areas from future flooding such as occurred during Superstorm Sandy.

## ARTICLE 10: RACIAL EQUITY AND BARRIERS TO OPPORTUNITY

**10.1    Efforts to Improve Racial Equity and Reduce Barriers to Opportunity**

This Section identifies how the Project addresses efforts to improve racial equity and reduce barriers to opportunity. The Recipient certifies that rows marked with "X" in the following table are accurate:

| | |
|---|---|
| | A racial equity impact analysis has been completed for the Project. *(Identify a report on that analysis or, if no report was produced, describe the analysis and its results in the supporting narrative below.)* |
| | The Recipient or a Project partner has adopted an equity and inclusion program/plan or has otherwise instituted equity-focused policies related to project procurement, material sourcing, construction, inspection, hiring, or other activities designed to ensure racial equity in the overall delivery and implementation of the Project. *(Identify the relevant programs, plans, or policies in the supporting narrative below.)* |
| | The Project includes physical-barrier-mitigating land bridges, caps, lids, linear parks, and multimodal mobility investments that either redress past barriers to opportunity or that proactively create new connections and opportunities for underserved communities that are underserved by transportation. *(Identify the relevant investments in the supporting narrative below.)* |



**U.S. Department of Transportation**
**Federal Railroad Administration**

| | |
|---|---|
| | The Project includes new or improved walking, biking, and rolling access for individuals with disabilities, especially access that reverses the disproportional impacts of crashes on people of color and mitigates neighborhood bifurcation. *(Identify the new or improved access in the supporting narrative below.)* |
| | The Project includes new or improved freight access to underserved communities to increase access to goods and job opportunities for those underserved communities. *(Identify the new or improved access in the supporting narrative below.)* |
| X | The Recipient has taken other actions related to the Project to improve racial equity and reduce barriers to opportunity. *(Describe those actions in the supporting narrative below.)* |
| | The Recipient has not yet taken actions related to the Project to improve racial equity and reduce barriers to opportunity but, before beginning construction of the Project, the Recipient will take relevant actions described below to improve racial equity and reduce barriers to opportunity. *(Identify the relevant actions in the supporting narrative below.)* |

## 10.2    Supporting Narrative

The Recipient has taken other actions related to the Project to improve racial equity and reduce barriers to opportunity.  In accordance with the Recipient's adopted Title VI/ Nondiscrimination Program Plan, the Recipient will ensure that its plans, programs, procedures, policies, and activities do not have disproportionate adverse effects based on race, color, religion, sex, sexual orientation, gender identity, disability, age, or national origin. In addition, as part of the Project, the Recipient will provide meaningful access to its information for persons with limited English proficiency as described in the Title VI/Nondiscrimination Program Plan. When necessary, the Recipient will meet the needs of the communities that may be affected by construction activities, as defined in the Recipient's adopted Title VI/Nondiscrimination Program Plan, by providing project meeting materials translation Spanish which is the predominant language other than English that residents of the study area speak at home. Spanish translators may be provided at public meetings, open houses, and other events when determined to be necessary.

# ARTICLE 11: LABOR AND WORK

## 11.1    Efforts to Support Good-Paying Jobs and Strong Labor Standards

This Section identifies the Recipient's efforts to support good-paying jobs and strong labor standards related to the Project. The Recipient certifies that rows marked with "X" in the following table are accurate:

| | |
|---|---|
| X | The Recipient or a Project partner has adopted the use of project labor agreements in the overall delivery and implementation of the Project. *(Identify the relevant agreements and describe the scope of activities they cover in the supporting narrative below.)* |


U.S. Department of Transportation
**Federal Railroad Administration**

| |
|---|
| The Recipient or a Project partner has adopted the use of local and economic hiring preferences in the overall delivery and implementation of the Project, subject to all applicable State and local laws, policies, and procedures. *(Describe the relevant provisions in the supporting narrative below.)* |
| The Recipient or a Project partner has adopted the use of registered apprenticeships in the overall delivery and implementation of the Project. *(Describe the use of registered apprenticeships in the supporting narrative below.)* |
| The Recipient or a Project partner will provide training and placement programs for underrepresented workers in the overall delivery and implementation of the Project. *(Describe the training programs in the supporting narrative below.)* |
| The Recipient or a Project partner will support free and fair choice to join a union in the overall delivery and implementation of the Project by investing in workforce development services offered by labor-management training partnerships or setting expectations for contractors to develop labor-management training programs. *(Describe the workforce development services offered by labor-management training partnerships in the supporting narrative below.)* |
| The Recipient or a Project partner will provide supportive services and cash assistance to address systemic barriers to employment to be able to participate and thrive in training and employment, including childcare, emergency cash assistance for items such as tools, work clothing, application fees and other costs of apprenticeship or required pre-employment training, transportation and travel to training and work sites, and services aimed at helping to retain underrepresented groups like mentoring, support groups, and peer networking. *(Describe the supportive services and/or cash assistance provided to trainees and employees in the supporting narrative below.)* |
| The Recipient or a Project partner has documented agreements or ordinances in place to hire from certain workforce programs that serve underrepresented groups. *(Identify the relevant agreements and describe the scope of activities they cover in the supporting narrative below.)* |

U.S. Department of Transportation
**Federal Railroad Administration**

| | |
|---|---|
| | The Recipient or a Project partner participates in a State/Regional/Local comprehensive plan to promote equal opportunity, including removing barriers to hiring and preventing harassment on work sites, and that plan demonstrates action to create an inclusive environment with a commitment to equal opportunity, including:<br><br>  a. affirmative efforts to remove barriers to equal employment opportunity above and beyond complying with Federal law;<br>  b. proactive partnerships with the U.S. Department of Labor's Office of Federal Contract Compliance Programs to promote compliance with EO 11246 Equal Employment Opportunity requirements;<br>  c. no discriminatory use of criminal background screens and affirmative steps to recruit and include those with former justice involvement, in accordance with the Fair Chance Act and equal opportunity requirements;<br>  d. efforts to prevent harassment based on race, color, religion, sex, sexual orientation, gender identity, and national origin;<br>  e. training on anti-harassment and third-party reporting procedures covering employees and contractors; and<br>  f. maintaining robust anti-retaliation measures covering employees and contractors.<br><br>*(Describe the equal opportunity plan in the supporting narrative below.)* |
| | The Recipient has taken other actions related to the Project to create good-paying jobs with the free and fair choice to join a union and incorporate strong labor standards. *(Describe those actions in the supporting narrative below.)* |
| | The Recipient has not yet taken actions related to the Project to create good-paying jobs with the free and fair choice to join a union and incorporate strong labor standards but, before beginning construction of the Project, will take the relevant actions described below. *(Identify the relevant actions in the supporting narrative below.)* |

## 11.2    Supporting Narrative

The Recipient has adopted the use of project labor agreements ("PLA") for the delivery and implementation of the Project. The Recipient has already executed PLAs that will govern The Hudson River Ground Stabilization package and the Palisades Tunnel package in New York and New Jersey, respectively. Based on the findings of a draft labor feasibility study, the Recipient is currently in the process of negotiating a PLA for the next phase of the Project, the Manhattan Tunnel package. The Recipient will continue to conduct labor feasibility studies and work with the applicable trades to negotiate PLAs for the remainder of the construction packages of the Project in accordance with the findings of the applicable labor feasibility studies.

Those PLAs to date have included the following initiatives:

- Varying goals for the participation of disadvantaged business enterprises for each phase of construction.



- Requires the contractor, subcontractors, and unions to provide equal employment opportunities.
- Requires the contractor and any subcontractors to pay all workmen, laborers, and mechanics at least the prevailing rate of wage as established by the Secretary of Labor of the United States under the Davis-Bacon Act and/or state prevailing wage laws, whichever is applicable.
- Non-discrimination provisions prohibiting discrimination against applicants because of their union membership or lack thereof.


U.S. Department of Transportation
**Federal Railroad Administration**

# Exhibits

Revision Date: December 11, 2023



U.S. Department of Transportation
**Federal Railroad Administration**

## Exhibits
## Table of Contents

EXHIBIT A: APPLICABLE FEDERAL LAWS AND REGULATIONS ......................................................... 3

    GENERAL FEDERAL LEGISLATION ...................................................................................... 3

    EXECUTIVE ORDERS ........................................................................................................ 4

    GENERAL FEDERAL REGULATIONS .................................................................................. 4

EXHIBIT B: ADDITIONAL STANDARD TERMS ............................................................................ 6

    EXHIBIT B.1: TITLE VI ASSURANCES ................................................................................ 7

    EXHIBIT B.2: CERTIFICATION REGARDING DEBARMENT, SUSPENSION, AND OTHER RESPONSIBILITY MATTERS -- PRIMARY COVERED TRANSACTIONS ..................................... 16

    EXHIBIT B.3: REQUIREMENTS REGARDING DELINQUENT TAX LIABILITY OR A FELONY CONVICTION UNDER ANY FEDERAL LAW ........................................................................ 20

    EXHIBIT B.4: RECIPIENT POLICY TO BAN TEXT MESSAGING WHILE DRIVING ..................... 22

    EXHIBIT B.5: EQUIVALENT LABOR PROTECTIONS UNDER 49 U.S.C. 22905(c)(2)(B) ............ 24

EXHIBIT C: QUARTERLY PROJECT PROGRESS REPORTS AND RECERTIFICATIONS ......................... 33

**U.S. Department of Transportation**
**Federal Railroad Administration**

## EXHIBIT A: APPLICABLE FEDERAL LAWS AND REGULATIONS

By entering into this Agreement, the Recipient assures and certifies, with respect to this award, that it will comply with all applicable Federal laws, regulations, executive orders, policies, guidelines, and requirements as they relate to the application, acceptance, and use of Federal funds for this Project. Performance under this Agreement shall be governed by and in compliance with the following requirements, as applicable, to the type of organization of the Recipient and any applicable sub-recipients. The applicable provisions to this Agreement include, but are not limited to, the following:

**GENERAL FEDERAL LEGISLATION**
a. Davis-Bacon Act - 40 U.S.C. § 3141 et seq.
b. Federal Fair Labor Standards Act - 29 U.S.C. § 201 et seq.
c. Hatch Act - 5 U.S.C. § 1501 et seq.
d. Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 - 42 U.S.C. § 4601 et seq.
e. National Historic Preservation Act of 1966 – Section 106 - 54 U.S.C. § 306108
f. Archeological and Historic Preservation Act of 1974 - 54 U.S.C. §§ 312501–312508
g. Native American Graves Protection and Repatriation Act - 25 U.S.C. § 3001 et seq.
h. Clean Air Act, P.L. 90-148, as amended – 42 U.S.C. § 7401 et seq.
i. Section 404 of the Clean Water Act, as amended - 33 U.S.C. § 1344
j. Section 7 of the Endangered Species Act, P.L. 93-205, as amended – 16 U.S.C. § 1536
k. Coastal Zone Management Act, P.L. 92-583, as amended – 16 U.S.C. § 1451 et seq.
l. Flood Disaster Protection Act of 1973, Section 102(a) – 42 U.S.C. § 4012a
m. Age Discrimination Act of 1975 - 42 U.S.C. § 6101 et seq.
n. American Indian Religious Freedom Act, P.L. 95-341, as amended
o. Sections 523 and 527 of the Public Health Service Act of 1912, as amended, 42 U.S.C. §§ 290dd through 290dd-2
p. Architectural Barriers Act of 1968 - 42 U.S.C. § 4151 et seq.
q. Power Plant and Industrial Fuel Use Act of 1978, P.L. 100-42 - Section 403 - 42 U.S.C. § 8373
r. Contract Work Hours and Safety Standards Act - 40 U.S.C. § 3701 et seq.
s. Copeland Anti-kickback Act, as amended - 18 U.S.C. § 874 and 40 U.S.C. § 3145
t. National Environmental Policy Act of 1969 - 42 U.S.C. § 4321 et seq.
u. Wild and Scenic Rivers Act, P.L. 90-542, as amended – 16 U.S.C. § 1271 et seq.
v. Federal Water Pollution Control Act, as amended - 33 U.S.C. §§1251–1376
w. Single Audit Act of 1984 - 31 U.S.C. § 7501 et seq.
x. Americans with Disabilities Act of 1990 - 42 U.S.C. § 12101 et seq.
y. Title IX of the Education Amendments of 1972, as amended - 20 U.S.C. §§ 1681–1683 and §§ 1685–1687
z. Section 504 of the Rehabilitation Act of 1973, as amended - 29 U.S.C. § 794
aa. Title VI of the Civil Rights Act of 1964 - 42 U.S.C. § 2000d et seq.
bb. Limitation on Use of Appropriated Funds to Influence Certain Federal Contracting and Financial Transactions – 31 U.S.C. § 1352
cc. Freedom of Information Act - 5 U.S.C. § 552, as amended
dd. Magnuson-Stevens Fishery Conservation and Management Act – 16 U.S.C. § 1801 et seq.
ee. Farmland Protection Policy Act of 1981 – 7 U.S.C. § 4201 et seq.
ff. Noise Control Act of 1972 – 42 U.S.C. § 4901 et seq.
gg. Fish and Wildlife Coordination Act of 1956 – 16 U.S.C. § 661 et seq.

3

U.S. Department of Transportation
**Federal Railroad Administration**

hh. Section 9 of the Rivers and Harbors Act and the General Bridge Act of 1946 - 33 U.S.C. §§ 401 and 525

ii. Section 4(f) of the Department of Transportation Act of 1966, 49 U.S.C. 303

jj. Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), as amended – 42 U.S.C. §§ 9601–9657

kk. Safe Drinking Water Act – 42 U.S.C. §§ 300f to 300j-26

ll. The Wilderness Act – 16 U.S.C. §§ 1131–1136

mm. Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976 – 42 U.S.C. § 6901 et seq.

nn. Migratory Bird Treaty Act 16 U.S.C. § 703 et seq.

oo. The Federal Funding Transparency and Accountability Act of 2006, as amended (Pub. L. 109–282, as amended by section 6202 of Public Law 110–252)

pp. Cargo Preference Act of 1954 – 46 U.S.C. § 55305

qq. Section 889 of the John D. McCain National Defense Authorization Act for Fiscal Year 2019, Pub. L. 115-232

rr. Efficient Environmental Reviews - 23 U.S.C. § 139

ss. Grant Conditions – 49 U.S.C. § 22905

tt. Build America, Buy America Act – Pub. L. No. 117-58, div. G, tit. IX, subtit. A, 135 Stat. 429, 1298

**EXECUTIVE ORDERS**

a. Executive Order 11246 – Equal Employment Opportunity

b. Executive Order 11990 – Protection of Wetlands

c. Executive Order 11988 – Floodplain Management

d. Executive Order 12372 – Intergovernmental Review of Federal Programs

e. Executive Order 12549 – Debarment and Suspension

f. Executive Order 12898 – Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations

g. Executive Order 13166 – Improving Access to Services for Persons With Limited English Proficiency

h. Executive Order 13985 – Advancing Racial Equity and Support for Underserved Communities Through the Federal Government

i. Executive Order 14005 – Ensuring the Future is Made in All of America by All of America's Workers

j. Executive Order 14008 – Tackling the Climate Crisis at Home and Abroad

**GENERAL FEDERAL REGULATIONS**

a. Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards – 2 C.F.R. Parts 200, 1201

b. Non-procurement Suspension and Debarment – 2 C.F.R. Parts 180, 1200

c. Investigative and Enforcement Procedures – 14 C.F.R. Part 13

d. Procedures for predetermination of wage rates – 29 C.F.R. Part 1

e. Contractors and subcontractors on public building or public work financed in whole or part by loans or grants from the United States – 29 C.F.R. Part 3

f. Labor standards provisions applicable to contracts governing federally financed and assisted construction (also labor standards provisions applicable to non-construction contracts subject to the Contract Work Hours and Safety Standards Act) – 29 C.F.R. Part 5

g. Office of Federal Contract Compliance Programs, Equal Employment Opportunity, Department

U.S. Department of Transportation
**Federal Railroad Administration**

of Labor (Federal and federally assisted contracting requirements) – 41 C.F.R. Parts 60 et seq.
h. New Restrictions on Lobbying – 49 C.F.R. Part 20
i. Nondiscrimination in Federally Assisted Programs of the Department of Transportation – Effectuation of Title VI of the Civil Rights Act of 1964 – 49 C.F.R. Part 21
j. Uniform relocation assistance and real property acquisition for Federal and Federally assisted programs – 49 C.F.R. Part 24
k. Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance – 49 C.F.R. Part 25
l. Nondiscrimination on the Basis of Handicap in Programs and Activities Receiving or Benefiting from Federal Financial Assistance – 49 C.F.R. Part 27
m. DOT's implementation of DOJ's ADA Title II regulations compliance procedures for all programs, services, and regulatory activities relating to transportation under 28 C.F.R. Part 35
n. Enforcement of Nondiscrimination on the Basis of Handicap in Programs or Activities Conducted by the Department of Transportation – 49 C.F.R. Part 28
o. Denial of public works contracts to suppliers of goods and services of countries that deny procurement market access to U.S. contractors – 49 C.F.R. Part 30
p. Governmentwide Requirements for Drug-Free Workplace (Financial Assistance) – 49 C.F.R. Part 32
q. DOT's implementing ADA regulations for transit services and transit vehicles, including the DOT's standards for accessible transportation facilities in Part 37, Appendix A – 49 C.F.R. Parts 37 and 38
r. Environmental Impact and Related Procedures – 23 C.F.R. Part 771
s. Procedures Implementing Section 4(f) of the Department of Transportation Act – 23 C.F.R. Part 774

Specific assurances required to be included in the Agreement by any of the above laws, regulations, or circulars are hereby incorporated by reference into this Agreement.



U.S. Department of Transportation
**Federal Railroad Administration**

EXHIBIT B: ADDITIONAL STANDARD TERMS



**EXHIBIT B.1: TITLE VI ASSURANCES**

**TITLE VI ASSURANCE**
**Implementing Title VI of the Civil Rights Act of 1964, as amended**

**ASSURANCE CONCERNING NONDISCRIMINATION IN FEDERALLY-ASSISTED PROGRAMS AND ACTIVITIES RECEIVING OR BENEFITING FROM FEDERAL FINANCIAL ASSISTANCE**

(Implementing the Rehabilitation Act of 1973, as amended, and the Americans With Disabilities Act, as amended)

49 C.F.R. Parts 21, 25, 27, 37 and 38

**The United States Department of Transportation (USDOT)**

**Standard Title VI/Non-Discrimination Assurances**

**DOT Order No. 1050.2A**

By signing and submitting the Application and by entering into this Agreement, the Recipient **HEREBY AGREES THAT**, as a condition to receiving Federal financial assistance from the Federal Railroad Administration (FRA), it is subject to and will comply with the following:

**Statutory/Regulatory Authorities**

- Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d *et seq*., 78 stat. 252), (prohibits discrimination on the basis of race, color, national origin);
- 49 C.F.R. Part 21 (entitled *Non-discrimination In Federally-Assisted Programs Of The Department Of Transportation—Effectuation Of Title VI Of The Civil Rights Act Of 1964*);
- 28 C.F.R. section 50.3 (U.S. Department of Justice Guidelines for Enforcement of Title VI of the Civil Rights Act of 1964);

The preceding statutory and regulatory cites hereinafter are referred to as the "Acts" and "Regulations," respectively.

**General Assurances**

In accordance with the Acts, the Regulations, and other pertinent directives, circulars, policy, memoranda, and/or guidance, the Recipient hereby gives assurance that it will promptly take any measures necessary to ensure that:

> *"No person in the United States shall, on the grounds of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination under any program or activity,"* for which the Recipient receives Federal financial assistance from DOT, including FRA.



U.S. Department of Transportation
**Federal Railroad Administration**

The Civil Rights Restoration Act of 1987 clarified the original intent of Congress, with respect to Title VI and other Non-discrimination requirements (The Age Discrimination Act of 1975, and Section 504 of the Rehabilitation Act of 1973), by restoring the broad, institutional-wide scope and coverage of these non-discrimination statutes and requirements to include all programs and activities of the Recipient, so long as any portion of the program is Federally assisted.

**Specific Assurances**

More specifically, and without limiting the above general Assurance, the Recipient agrees with and gives the following Assurances with respect to its Federally assisted program:

1. The Recipient agrees that each "activity," "facility," or "program," as defined in §§ 21.23 (b) and 21.23 (e) of 49 C.F.R. § 21 will be (with regard to an "activity") facilitated, or will be (with regard to a "facility") operated, or will be (with regard to a "program") conducted in compliance with all requirements imposed by, or pursuant to the Acts and the Regulations.

2. The Recipient will insert the following notification in all solicitations for bids, Requests For Proposals for work, or material subject to the Acts and the Regulations made in connection with the Grant and, in adapted form, in all proposals for negotiated agreements regardless of funding source:

   "*The Recipient, in accordance with the provisions of Title VI of the Civil Rights Act of 1964 (78 Stat. 252, 42 U.S.C. §§ 2000d to 2000d-4) and the Regulations, hereby notifies all bidders that it will affirmatively ensure that for any contract entered into pursuant to this advertisement, disadvantaged business enterprises will be afforded full and fair opportunity to submit bids in response to this invitation and will not be discriminated against on the grounds of race, color, or national origin in consideration for an award.*"

3. The Recipient will insert the clauses of Appendix A and E of this Assurance in every contract or agreement subject to the Acts and the Regulations.

4. The Recipient will insert the clauses of Appendix B of this Assurance, as a covenant running with the land, in any deed from the United States effecting or recording a transfer of real property, structures, use, or improvements thereon or interest therein to a Recipient.

5. That where the Recipient receives Federal financial assistance to construct a facility, or part of a facility, the Assurance will extend to the entire facility and facilities operated in connection therewith.

6. That where the Recipient receives Federal financial assistance in the form, or for the acquisition of real property or an interest in real property, the Assurance will extend to rights to space on, over, or under such property.

7. That the Recipient will include the clauses set forth in Appendix C and Appendix D of this Assurance, as a covenant running with the land, in any future deeds, leases, licenses, permits, or similar instruments entered into by the Recipient with other parties:

**U.S. Department of Transportation**
**Federal Railroad Administration**

    a. for the subsequent transfer of real property acquired or improved under the applicable activity, project, or program; and

    b. for the construction or use of, or access to, space on, over, or under real property acquired or improved under the applicable activity, project, or program.

8. That this Assurance obligates the Recipient for the period during which Federal financial assistance is extended to the program, except where the Federal financial assistance is to provide, or is in the form of, personal property, or real property, or interest therein, or structures or improvements thereon, in which case the Assurance obligates the Recipient, or any transferee for the longer of the following periods:

    a. the period during which the property is used for a purpose for which the Federal financial assistance is extended, or for another purpose involving the provision of similar services or benefits; or

    b. the period during which the Recipient retains ownership or possession of the property.

9. The Recipient will provide for such methods of administration for the program as are found by the Secretary of Transportation or the official to whom he/she delegates specific authority to give reasonable guarantee that it, other recipients, sub-recipients, contractors, subcontractors, consultants, transferees, successors in interest, and other participants of Federal financial assistance under such program will comply with all requirements imposed or pursuant to the Acts, the Regulations, and this Assurance.

10. The Recipient agrees that the United States has a right to seek judicial enforcement with regard to any matter arising under the Acts, the Regulations, and this Assurance.

By signing this ASSURANCE, the Recipient also agrees to comply (and require any sub-recipients, contractors, successors, transferees, and/or assignees to comply) with all applicable provisions governing FRA's access to records, accounts, documents, information, facilities, and staff. You also recognize that you must comply with any program or compliance reviews, and/or complaint investigations conducted by FRA. You must keep records, reports, and submit the material for review upon request to FRA, or its designee in a timely, complete, and accurate way. Additionally, you must comply with all other reporting, data collection, and evaluation requirements, as prescribed by law or detailed in program guidance.

The Recipient gives this ASSURANCE in consideration of and for obtaining any Federal grants, loans, contracts, agreements, property, and/or discounts, or other Federal-aid and Federal financial assistance extended after the date hereof to the recipients by the FRA under this Agreement. This ASSURANCE is binding on the Recipient, other recipients, sub-recipients, contractors, subcontractors and their subcontractors', transferees, successors in interest, and any other participants in the program or project funded under this Agreement.



U.S. Department of Transportation
**Federal Railroad Administration**

**APPENDIX A**

During the performance of this contract, the contractor, for itself, its assignees, and successors in interest (hereinafter referred to as the "contractor") agrees as follows:

1.  **Compliance with Regulations:** The contractor (hereinafter includes consultants) will comply with the Acts and the Regulations relative to Non-discrimination in Federally assisted programs of the U.S. Department of Transportation, Federal Railroad Administration (FRA), as they may be amended from time to time, which are herein incorporated by reference and made a part of this contract.

2.  **Non-discrimination:** The contractor, with regard to the work performed by it during the contract, will not discriminate on the grounds of race, color, or national origin in the selection and retention of subcontractors, including procurements of materials and leases of equipment. The contractor will not participate directly or indirectly in the discrimination prohibited by the Acts and the Regulations, including employment practices when the contract covers any activity, project, or program set forth in Appendix B of 49 C.F.R. Part 21.

3.  **Solicitations for Subcontracts, Including Procurements of Materials and Equipment:** In all solicitations, either by competitive bidding, or negotiation made by the contractor for work to be performed under a subcontract, including procurements of materials, or leases of equipment, each potential subcontractor or supplier will be notified by the contractor of the contractor's obligations under this contract and the Acts and the Regulations relative to Non-discrimination on the grounds of race, color, or national origin.

4.  **Information and Reports:** The contractor will provide all information and reports required by the Acts, the Regulations, and directives issued pursuant thereto and will permit access to its books, records, accounts, other sources of information, and its facilities as may be determined by the Recipient or FRA to be pertinent to ascertain compliance with such Acts, Regulations, and instructions. Where any information required of a contractor is in the exclusive possession of another who fails or refuses to furnish the information, the contractor will so certify to the Recipient or FRA, as appropriate, and will set forth what efforts it has made to obtain the information.

5.  **Sanctions for Noncompliance:** In the event of a contractor's noncompliance with the Non-discrimination provisions of this contract, the Recipient will impose such contract sanctions as it or FRA may determine to be appropriate, including, but not limited to:

    a.  withholding payments to the contractor under the contract until the contractor complies; and/or
    b.  cancelling, terminating, or suspending a contract, in whole or in part.

6.  **Incorporation of Provisions:** The contractor will include the provisions of paragraphs one through six in every subcontract, including procurements of materials and leases of equipment, unless exempt by the Acts, the Regulations and directives issued pursuant thereto. The contractor will take action with respect to any subcontract or procurement as the Recipient or FRA may direct as a means of enforcing such provisions including sanctions for noncompliance. Provided, that if the



contractor becomes involved in, or is threatened with litigation by a subcontractor, or supplier because of such direction, the contractor may request the Recipient to enter into any litigation to protect the interests of the Recipient. In addition, the contractor may request the United States to enter into the litigation to protect the interests of the United States.

**U.S. Department of Transportation**
**Federal Railroad Administration**

APPENDIX B

**CLAUSES FOR DEEDS TRANSFERRING UNITED STATES PROPERTY**

The following clauses will be included in deeds effecting or recording the transfer of real property, structures, or improvements thereon, or granting interest therein from the United States pursuant to the provisions of Specific Assurance 4:

**NOW, THEREFORE,** the U.S. Department of Transportation as authorized by law and upon the condition that the Recipient will accept title to the lands and maintain the project constructed thereon in accordance with the Infrastructure Investment and Jobs Act, Pub. L. No. 117-58 (Nov. 15, 2021), 23 U.S.C. § 117 and the policies and procedures prescribed by the Federal Railroad Administration (FRA) of the U.S. Department of Transportation in accordance and in compliance with all requirements imposed by Title 49, Code of Federal Regulations, U.S. Department of Transportation, Subtitle A, Office of the Secretary, Part 21, Non-discrimination in Federally-assisted programs of the U.S. Department of Transportation pertaining to and effectuating the provisions of Title VI of the Civil Rights Act of 1964 (78 Stat. 252; 42 U.S.C. § 2000d to 2000d-4), does hereby remise, release, quitclaim and convey unto the Recipient all the right, title and interest of the U.S. Department of Transportation in and to said lands described in Exhibit A attached hereto and made a part hereof.

**(HABENDUM CLAUSE)**

**TO HAVE AND TO HOLD** said lands and interests therein unto Recipient and its successors forever, subject, however, to the covenants, conditions, restrictions and reservations herein contained as follows, which will remain in effect for the period during which the real property or structures are used for a purpose for which Federal financial assistance is extended or for another purpose involving the provision of similar services or benefits and will be binding on the Recipient, its successors and assigns.

The Recipient, in consideration of the conveyance of said lands and interests in lands, does hereby covenant and agree as a covenant running with the land for itself, its successors and assigns, that (1) no person will on the grounds of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination with regard to any facility located wholly or in part on, over, or under such lands hereby conveyed [,] [and]* (2) that the Recipient will use the lands and interests in lands and interests in lands so conveyed, in compliance with all requirements imposed by or pursuant to Title 49, Code of Federal Regulations, U.S. Department of Transportation, Subtitle A, Office of the Secretary, Part 21, Non-discrimination in Federally-assisted programs of the U.S. Department of Transportation, Effectuation of Title VI of the Civil Rights Act of 1964, and as said Regulations and Acts may be amended[, and (3) that in the event of breach of any of the above-mentioned non-discrimination conditions, the Department will have a right to enter or re-enter said lands and facilities on said land, and that above described land and facilities will thereon revert to and vest in and become the absolute property of the U.S. Department of Transportation and its assigns as such interest existed prior to this instruction].*

(*Reverter clause and related language to be used only when it is determined that such a clause is necessary in order to make clear the purpose of Title VI.)



**U.S. Department of Transportation**
**Federal Railroad Administration**

**APPENDIX C**

**CLAUSES FOR TRANSFER OF REAL PROPERTY ACQUIRED OR IMPROVED UNDER THE ACTIVITY, FACILITY, OR PROGRAM**

The following clauses will be included in deeds, licenses, leases, permits, or similar instruments entered into by the Recipient pursuant to the provisions of Specific Assurance 7(a):

A.    The (Recipient, lessee, permittee, etc. as appropriate) for himself/herself, his/her heirs, personal representatives, successors in interest, and assigns, as a part of the consideration hereof, does hereby covenant and agree [in the case of deeds and leases add "as a covenant running with the land"] that:

1.    In the event facilities are constructed, maintained, or otherwise operated on the property described in this (deed, license, lease, permit, etc.) for a purpose for which a U.S. Department of Transportation activity, facility, or program is extended or for another purpose involving the provision of similar services or benefits, the (Recipient, licensee, lessee, permittee, etc.) will maintain and operate such facilities and services in compliance with all requirements imposed by the Acts and Regulations (as may be amended) such that no person on the grounds of race, color, or national origin, will be excluded from participation in, denied the benefits of, or be otherwise subjected to discrimination in the use of said facilities.

B.    With respect to licenses, leases, permits, etc., in the event of breach of any of the above Non-discrimination covenants, Recipient will have the right to terminate the (lease, license, permit, etc.) and to enter, re-enter, and repossess said lands and facilities thereon, and hold the same as if the (lease, license, permit, etc.) had never been made or issued.*

C.    With respect to a deed, in the event of breach of any of the above Non-discrimination covenants, the Recipient will have the right to enter or re-enter the lands and facilities thereon, and the above described lands and facilities will there upon revert to and vest in and become the absolute property of the Recipient and its assigns.*

(*Reverter clause and related language to be used only when it is determined that such a clause is necessary to make clear the purpose of Title VI.)



U.S. Department of Transportation
**Federal Railroad Administration**

**APPENDIX D**

**CLAUSES FOR CONSTRUCTION/USE/ACCESS TO REAL PROPERTY ACQUIRED UNDER THE ACTIVITY, FACILITY OR PROGRAM**

The following clauses will be included in deeds, licenses, permits, or similar instruments/agreements entered into by Recipient pursuant to the provisions of Specific Assurance 7(b):

A.  The (Recipient, licensee, permittee, etc., as appropriate) for himself/herself, his/her heirs, personal representatives, successors in interest, and assigns, as a part of the consideration hereof, does hereby covenant and agree (in the case of deeds and leases add, "as a covenant running with the land") that (1) no person on the ground of race, color, or national origin, will be excluded from participation in, denied the benefits of, or be otherwise subjected to discrimination in the use of said facilities, (2) that in the construction of any improvements on, over, or under such land, and the furnishing of services thereon, no person on the ground of race, color, or national origin, will be excluded from participation in, denied the benefits of, or otherwise be subjected to discrimination, (3) that the (Recipient, licensee, lessee, permittee, etc.) will use the premises in compliance with all other requirements imposed by or pursuant to the Acts and Regulations, as amended, set forth in this Assurance.

B.  With respect to (licenses, leases, permits, etc.), in the event of breach of any of the above Non-discrimination covenants, Recipient will have the right to terminate the (license, permit, etc., as appropriate) and to enter or re-enter and repossess said land and the facilities thereon, and hold the same as if said (license, permit, etc., as appropriate) had never been made or issued.*

C.  With respect to deeds, in the event of breach of any of the above Non-discrimination covenants, Recipient will there upon revert to and vest in and become the absolute property of Recipient and its assigns.*

(*Reverter clause and related language to be used only when it is determined that such a clause is necessary to make clear the purpose of Title VI.)

U.S. Department of Transportation
**Federal Railroad Administration**

**APPENDIX E**

During the performance of this contract, the contractor, for itself, its assignees, and successors in interest (hereinafter referred to as the "contractor") agrees to comply with the following non-discrimination statutes and authorities; including but not limited to:

**Pertinent Non-Discrimination Authorities:**

- Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d *et seq*., 78 stat. 252), (prohibits discrimination on the basis of race, color, national origin); and 49 C.F.R. Part 21.
- The Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, (42 U.S.C. § 4601), (prohibits unfair treatment of persons displaced or whose property has been acquired because of Federal or Federal-aid programs and projects);
- Federal-Aid Highway Act of 1973, (23 U.S.C. § 324 *et seq*.), (prohibits discrimination on the basis of sex);
- Section 504 of the Rehabilitation Act of 1973, (29 U.S.C. § 794 *et seq*.), as amended, (prohibits discrimination on the basis of disability); and 49 C.F.R. Part 27;
- The Age Discrimination Act of 1975, as amended, (42 U.S.C. § 6101 *et seq*.), (prohibits discrimination on the basis of age);
- Airport and Airway Improvement Act of 1982, (49 U.S.C. § 471, Section 47123), as amended, (prohibits discrimination based on race, creed, color, national origin, or sex);
- The Civil Rights Restoration Act of 1987, (PL 100-209), (Broadened the scope, coverage and applicability of Title VI of the Civil Rights Act of 1964, The Age Discrimination Act of 1975 and Section 504 of the Rehabilitation Act of 1973, by expanding the definition of the terms "programs or activities" to include all of the programs or activities of the Federal-aid recipients, sub-recipients and contractors, whether such programs or activities are Federally funded or not);
- Titles II and III of the Americans with Disabilities Act, which prohibit discrimination on the basis of disability in the operation of public entities, public and private transportation systems, places of public accommodation, and certain testing entities (42 U.S.C. §§ 12131 – 12189) as implemented by Department of Transportation regulations at 49 C.F.R. Parts 37 and 38;
- The Federal Aviation Administration's Non-discrimination statute (49 U.S.C. § 47123) (prohibits discrimination on the basis of race, color, national origin, and sex);
- Executive Order 12898, Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations, which ensures nondiscrimination against minority populations by discouraging programs, policies, and activities with disproportionately high and adverse human health or environmental effects on minority and low-income populations;
- Executive Order 13166, Improving Access to Services for Persons with Limited English Proficiency, and resulting agency guidance, national origin discrimination includes discrimination because of limited English proficiency (LEP). To ensure compliance with Title VI, you must take reasonable steps to ensure that LEP persons have meaningful access to your programs (70 Fed. Reg. at 74087 to 74100);
- Title IX of the Education Amendments of 1972, as amended, which prohibits you from discriminating because of sex in education programs or activities (20 U.S.C. § 1681 et seq).

**U.S. Department of Transportation**
**Federal Railroad Administration**

**EXHIBIT B.2: CERTIFICATION REGARDING DEBARMENT, SUSPENSION, AND OTHER RESPONSIBILITY MATTERS -- PRIMARY COVERED TRANSACTIONS**

**2 C.F.R. Parts 180 and 1200**

These assurances and certifications are applicable to all Federal-aid construction contracts, design-build contracts, subcontracts, lower-tier subcontracts, purchase orders, lease agreements, consultant contracts or any other covered transaction requiring FRA approval or that is estimated to cost $25,000 or more—as defined in 2 C.F.R. Parts 180 and 1200.

By signing and submitting the Application and by entering into this Agreement, the Recipient is providing the assurances and certifications for First Tier Participants and Lower Tier Participants, as set out below.

**1. Instructions for Certification – First Tier Participants:**

a. The prospective first tier participant is providing the certification set out below.

b. The inability of a person to provide the certification set out below will not necessarily result in denial of participation in this covered transaction. The prospective first tier participant shall submit an explanation of why it cannot provide the certification set out below. The certification or explanation will be considered in connection with the department or agency's determination whether to enter into this transaction. However, failure of the prospective first tier participant to furnish a certification or an explanation shall disqualify such a person from participation in this transaction.

c. The certification in this clause is a material representation of fact upon which reliance was placed when the contracting agency determined to enter into this transaction. If it is later determined that the prospective participant knowingly rendered an erroneous certification, in addition to other remedies available to the Federal Government, the contracting agency may terminate this transaction for cause of default.

d. The prospective first tier participant shall provide immediate written notice to the contracting agency to whom this proposal is submitted if any time the prospective first tier participant learns that its certification was erroneous when submitted or has become erroneous by reason of changed circumstances.

e. The terms "covered transaction," "civil judgment," "debarred," "suspended," "ineligible," "participant," "person," "principal," and "voluntarily excluded," as used in this clause, are defined in 2 C.F.R. Parts 180 and 1200. "First Tier Covered Transactions" refers to any covered transaction between a Recipient or subrecipient of Federal funds and a participant (such as the prime or general contract). "Lower Tier Covered Transactions" refers to any covered transaction under a First Tier Covered Transaction (such as subcontracts). "First Tier Participant" refers to the participant who has entered into a covered transaction with a Recipient or subrecipient of Federal funds (such as the prime or general contractor). "Lower Tier Participant" refers to any participant who has entered into a covered transaction with a First Tier Participant or other Lower Tier Participants (such as subcontractors and suppliers).

16

**U.S. Department of Transportation**
**Federal Railroad Administration**

f. The prospective first tier participant agrees by submitting this proposal that, should the proposed covered transaction be entered into, it shall not knowingly enter into any lower tier covered transaction with a person who is debarred, suspended, declared ineligible, or voluntarily excluded from participation in this covered transaction, unless authorized by the department or agency entering into this transaction.

g. The prospective first tier participant further agrees by submitting this proposal that it will include the clause titled "Certification Regarding Debarment, Suspension, Ineligibility and Voluntary Exclusion-Lower Tier Covered Transactions," provided by the department or contracting agency, entering into this covered transaction, without modification, in all lower tier covered transactions and in all solicitations for lower tier covered transactions exceeding the $25,000 threshold.

h. A participant in a covered transaction may rely upon a certification of a prospective participant in a lower tier covered transaction that is not debarred, suspended, ineligible, or voluntarily excluded from the covered transaction, unless it knows that the certification is erroneous. A participant is responsible for ensuring that its principals are not suspended, debarred, or otherwise ineligible to participate in covered transactions. To verify the eligibility of its principals, as well as the eligibility of any lower tier prospective participants, each participant may, but is not required to, check the System for Award Management website (https://www.sam.gov/), which is compiled by the General Services Administration.

i. Nothing contained in the foregoing shall be construed to require the establishment of a system of records in order to render in good faith the certification required by this clause. The knowledge and information of the prospective participant is not required to exceed that which is normally possessed by a prudent person in the ordinary course of business dealings.

j. Except for transactions authorized under paragraph (f) of these instructions, if a participant in a covered transaction knowingly enters into a lower tier covered transaction with a person who is suspended, debarred, ineligible, or voluntarily excluded from participation in this transaction, in addition to other remedies available to the Federal Government, the department or agency may terminate this transaction for cause or default.

**Certification Regarding Debarment, Suspension, Ineligibility and Voluntary Exclusion – First Tier Participants:**

a. The prospective first tier participant certifies to the best of its knowledge and belief, that it and its principals:

(1) Are not presently debarred, suspended, proposed for debarment, declared ineligible, or voluntarily excluded from participating in covered transactions by any Federal department or agency;

(2) Have not within a three-year period preceding this proposal been convicted of or had a civil judgment, including a civil settlement, rendered against them for commission of fraud or a criminal offense in connection with obtaining, attempting to obtain, or performing a public (Federal, State or local) transaction or contract under a public transaction; violation of Federal or State antitrust

**U.S. Department of Transportation**
**Federal Railroad Administration**

statutes or commission of embezzlement, theft, forgery, bribery, falsification or destruction of records, making false statements, or receiving stolen property;

(3) Are not presently indicted for or otherwise criminally or civilly charged by a governmental entity (Federal, State or local) with commission of any of the offenses enumerated in paragraph (a)(2) of this certification; and

(4) Have not within a three-year period preceding this application/proposal had one or more public transactions (Federal, State or local) terminated for cause or default.

b. Where the prospective participant is unable to certify to any of the statements in this certification, such prospective participant shall attach an explanation to this proposal.

**2. Instructions for Certification - Lower Tier Participants:**

(Applicable to all subcontracts, purchase orders and other lower tier transactions requiring prior FRA approval or estimated to cost $25,000 or more - 2 C.F.R. Parts 180 and 1200)

a. The prospective lower tier participant is providing the certification set out below.

b. The certification in this clause is a material representation of fact upon which reliance was placed when this transaction was entered into. If it is later determined that the prospective lower tier participant knowingly rendered an erroneous certification, in addition to other remedies available to the Federal Government, the department, or agency with which this transaction originated may pursue available remedies, including suspension and/or debarment.

c. The prospective lower tier participant shall provide immediate written notice to the person to which this proposal is submitted if at any time the prospective lower tier participant learns that its certification was erroneous by reason of changed circumstances.

d. The terms "covered transaction," "civil settlement," "debarred," "suspended," "ineligible," "participant," "person," "principal," and "voluntarily excluded," as used in this clause, are defined in 2 C.F.R. Parts 180 and 1200. You may contact the person to which this proposal is submitted for assistance in obtaining a copy of those regulations. "First Tier Covered Transactions" refers to any covered transaction between a Recipient or subrecipient of Federal funds and a participant (such as the prime or general contract). "Lower Tier Covered Transactions" refers to any covered transaction under a First Tier Covered Transaction (such as subcontracts). "First Tier Participant" refers to the participant who has entered into a covered transaction with a Recipient or subrecipient of Federal funds (such as the prime or general contractor). "Lower Tier Participant" refers any participant who has entered into a covered transaction with a First Tier Participant or other Lower Tier Participants (such as subcontractors and suppliers).

e. The prospective lower tier participant agrees by submitting this proposal that, should the proposed covered transaction be entered into, it shall not knowingly enter into any lower tier covered transaction with a person who is debarred, suspended, declared ineligible, or voluntarily excluded from participation in this covered transaction, unless authorized by the department or agency with which this transaction originated.



U.S. Department of Transportation
**Federal Railroad Administration**

    f. The prospective lower tier participant further agrees by submitting this proposal that it will include this clause titled "Certification Regarding Debarment, Suspension, Ineligibility and Voluntary Exclusion-Lower Tier Covered Transaction," without modification, in all lower tier covered transactions and in all solicitations for lower tier covered transactions exceeding the $25,000 threshold.

    g. A participant in a covered transaction may rely upon a certification of a prospective participant in a lower tier covered transaction that is not debarred, suspended, ineligible, or voluntarily excluded from the covered transaction, unless it knows that the certification is erroneous. A participant is responsible for ensuring that its principals are not suspended, debarred, or otherwise ineligible to participate in covered transactions. To verify the eligibility of its principals, as well as the eligibility of any lower tier prospective participants, each participant may, but is not required to, check the System for Award Management website (https://www.sam.gov/), which is compiled by the General Services Administration.

    h. Nothing contained in the foregoing shall be construed to require establishment of a system of records in order to render in good faith the certification required by this clause. The knowledge and information of participant is not required to exceed that which is normally possessed by a prudent person in the ordinary course of business dealings.

    i. Except for transactions authorized under paragraph e of these instructions, if a participant in a covered transaction knowingly enters into a lower tier covered transaction with a person who is suspended, debarred, ineligible, or voluntarily excluded from participation in this transaction, in addition to other remedies available to the Federal Government, the department or agency with which this transaction originated may pursue available remedies, including suspension and/or debarment.

**Certification Regarding Debarment, Suspension, Ineligibility and Voluntary Exclusion -- Lower Tier Participants:**

    1. The prospective lower tier participant certifies, by submission of this proposal, that neither it nor its principals is presently debarred, suspended, proposed for debarment, declared ineligible, or voluntarily excluded from participating in covered transactions by any Federal department or agency.

    2. Where the prospective lower tier participant is unable to certify to any of the statements in this certification, such prospective participant shall attach an explanation to this proposal.

**U.S. Department of Transportation**
**Federal Railroad Administration**

**EXHIBIT B.3: REQUIREMENTS REGARDING DELINQUENT TAX LIABILITY OR A FELONY CONVICTION UNDER ANY FEDERAL LAW**

As required by sections 744 and 745 of Title VII, Division E of the Consolidated Appropriations Act, 2022, Pub. L. No. 117-103 (Mar. 15, 2022), and implemented through USDOT Order 4200.6, the funds provided under this award shall not be used to enter into a contract, memorandum of understanding, or cooperative agreement with, make a grant to, or provide a loan or loan guarantee to, any corporation that:

(1) Has any unpaid Federal tax liability that has been assessed, for which all judicial and administrative remedies have been exhausted or have lapsed, and that is not being paid in a timely manner pursuant to an agreement with the authority responsible for collecting the tax liability, where the awarding agency is aware of the unpaid tax liability, unless a Federal agency has considered suspension or debarment of the corporation and made a determination that suspension or debarment is not necessary to protect the interests of the Government; or

(2) Was convicted of a felony criminal violation under any Federal law within the preceding 24 months, where the awarding agency is aware of the conviction, unless a Federal agency has considered suspension or debarment of the corporation and made a determination that suspension or debarment is not necessary to protect the interests of the Government.

The Recipient therefore agrees:

1. **Definitions.** For the purposes of this exhibit, the following definitions apply:

   "**Covered Transaction**" means a transaction that uses any funds under this award and that is a contract, memorandum of understanding, cooperative agreement, grant, loan, or loan guarantee.

   "**Felony Conviction**" means a conviction within the preceding 24 months of a felony criminal violation under any Federal law and includes conviction of an offense defined in a section of the United States Code that specifically classifies the offense as a felony and conviction of an offense that is classified as a felony under 18 U.S.C. 3559.

   "**Participant**" means the Recipient, an entity who submits a proposal for a Covered Transaction, or an entity who enters into a Covered Transaction.

   "**Tax Delinquency**" means an unpaid Federal tax liability that has been assessed, for which all judicial and administrative remedies have been exhausted, or have lapsed, and that is not being paid in a timely manner pursuant to an agreement with the authority responsible for collecting the tax liability.

2. **Mandatory Check in the System for Award Management.** Before entering a Covered Transaction with another entity, a Participant shall check the System for Award Management (the "**SAM**") at http://www.sam.gov/ for an entry describing that entity.

3. **Mandatory Certifications.** Before entering a Covered Transaction with another entity, a Participant shall require that entity to:

20

U.S. Department of Transportation
**Federal Railroad Administration**

    (1)  Certify whether the entity has a Tax Delinquency; and

    (2)  Certify whether the entity has a Felony Conviction.

4   **Prohibition.** If

    (1)  the SAM entry for an entity indicates that the entity has a Tax Delinquency or a Federal Conviction;

    (2)  an entity provides an affirmative response to either certification in section 3; or

    (3)  an entity's certification under section 3 was inaccurate when made or became inaccurate after being made

then a Participant shall not enter or continue a Covered Transaction with that entity unless the USDOT has determined in writing that suspension or debarment of that entity are not necessary to protect the interests of the Government.

5.  **Mandatory Notice to the USDOT.**

    (a)  If the SAM entry for a Participant indicates that the Participant has a Tax Delinquency or a Felony Conviction, the Recipient shall notify the USDOT in writing of that entry.

    (b)  If a Participant provides an affirmative response to either certification in section 1, the Recipient shall notify the USDOT in writing of that affirmative response.

    (c)  If the Recipient knows that a Participant's certification under section 1 was inaccurate when made or became inaccurate after being made, the Recipient shall notify the USDOT in writing of that inaccuracy.

6.  **Flow Down.** For all Covered Transactions, including all tiers of subcontracts and subawards, the Recipient shall:

    (1)  require the SAM check in section 2;

    (2)  require the certifications in section 3;

    (3)  include the prohibition in section 4; and

    (4)  require all Participants to notify the Recipient in writing of any information that would require the Recipient to notify the USDOT under section 5.

U.S. Department of Transportation
**Federal Railroad Administration**

**EXHIBIT B.4: RECIPIENT POLICY TO BAN TEXT MESSAGING WHILE DRIVING**

(a) *Definitions.* The following definitions are intended to be consistent with the definitions in DOT Order 3902.10, Text Messaging While Driving (Dec. 30, 2009) and Executive Order 13513, Federal Leadership on Reducing Text Messaging While Driving (Oct. 1, 2009). For clarification purposes, they may expand upon the definitions in the executive order.

For the purpose of this Term B.4, "**Motor Vehicles**" means any vehicle, self-propelled or drawn by mechanical power, designed and operated principally for use on a local, State or Federal roadway, but does not include a military design motor vehicle or any other vehicle excluded under Federal Management Regulation 102-34-15.

For the purpose of this Term B.4, "**Driving**" means operating a motor vehicle on a roadway, including while temporarily stationary because of traffic congestion, a traffic signal, a stop sign, another traffic control device, or otherwise. It does not include being in your vehicle (with or without the motor running) in a location off the roadway where it is safe and legal to remain stationary.

For the purpose of this Term B.4, "**Text messaging**" means reading from or entering data into any handheld or other electronic device (including, but not limited to, cell phones, navigational tools, laptop computers, or other electronic devices), including for the purpose of Short Message Service (SMS) texting, e-mailing, instant messaging, obtaining navigational information, or engaging in any other form of electronic data retrieval or electronic data communication. The term does not include the use of a cell phone or other electronic device for the limited purpose of entering a telephone number to make an outgoing call or answer an incoming call, unless this practice is prohibited by State or local law. The term also does not include glancing at or listening to a navigational device that is secured in a commercially designed holder affixed to the vehicle, provided that the destination and route are programmed into the device either before driving or while stopped in a location off the roadway where it is safe and legal to remain stationary.

For the purpose of this Term B.4, the "**Government**" includes the United States Government and State, local, and tribal governments at all levels.

(b) *Workplace Safety.* In accordance with Executive Order 13513, Federal Leadership on Reducing Text Messaging While Driving (Oct. 1, 2009) and DOT Order 3902.10, Text Messaging While Driving (Dec. 30, 2009), the Recipient, subrecipients, contractors, and subcontractors are encouraged to:
　　(1) adopt and enforce workplace safety policies to decrease crashes caused by distracted drivers including policies to ban text messaging while driving—
　　　　(i) Company-owned or -rented vehicles or Government-owned, leased or rented vehicles; or
　　　　(ii) Privately-owned vehicles when on official Government business or when performing any work for or on behalf of the Government.
　　(2) Conduct workplace safety initiatives in a manner commensurate with the size of the business, such as—
　　　　(i) Establishment of new rules and programs or re-evaluation of existing programs to prohibit text messaging while driving; and
　　　　(ii) Education, awareness, and other outreach to employees about the safety risks associated with texting while driving.

22


U.S. Department of Transportation
**Federal Railroad Administration**

(c) *Subawards and Contracts.* To the extent permitted by law, the Recipient shall insert the substance of this exhibit, including this paragraph (c), in all subawards, contracts, and subcontracts under this award that exceed the micro-purchase threshold, other than contracts and subcontracts for the acquisition of commercially available off-the-shelf items.

**U.S. Department of Transportation**
**Federal Railroad Administration**

**EXHIBIT B.5: EQUIVALENT LABOR PROTECTIONS UNDER 49 U.S.C. 22905(c)(2)(B)**

This Exhibit provides guidance on the protective arrangements equivalent to the protective arrangements established under Section 504 of the Railroad Revitalization Reform Act of 1976, with respect to employees affected by actions taken in connection with a Project financed in whole or in part with financial assistance subject to 49 U.S.C. § 22905(c)(2)(B). Fluctuations and changes in volume or character of employment brought about solely by other causes are not within the scope of this Exhibit.

1.      **Definitions.** Whenever used in this Exhibit, capitalized terms shall have the meanings below:

(a)      "Average Monthly Compensation" means the total compensation received by a Displaced Employee or a Dismissed Employee during the last twelve (12) months in which they were employed immediately preceding the date of their displacement or dismissal, divided by twelve (12). The Average Monthly Compensation shall be adjusted to reflect subsequent general wage increases.

(b)      "Average Monthly Time" means the total number of hours worked by a Displaced Employee during the last twelve (12) months in which they were employed immediately preceding the date of their displacement, divided by twelve (12).

(c)      "Day" means one 24-hour calendar day (including holidays and weekends) for purposes of calculating deadlines and other timeframes in this Exhibit.

(d)      "Displaced Employee" means a Protected Employee who remains employed by a Railroad but, as a result of a Project, is placed in a worse position with respect to compensation and rules governing working conditions. A Protected Employee's status as a Displaced Employee begins on the date said employee is harmed.

(e)      "Dismissed Employee" means a Protected Employee who: (1) as a result of a Project, is deprived of employment with the Railroad because (i) the Railroad eliminates the Protected Employee's position, or (ii) the Railroad eliminates another employee's position (and that employee's exercise of seniority rights results in the Protected Employee's inability to secure another position by the exercise of the Protected Employee's seniority rights); and (2) is unable to secure another position by exercise of their seniority rights A Protected Employee's status as a Dismissed Employee begins on the date said employee is deprived of employment.

(f)      "Project" means any action financed in whole or in part with financial assistance subject to 49 U.S.C. § 22905(c)(2)(B).

(g)      "Protected Employee" means an employee of a Railroad who is affected by actions taken pursuant to a Project, whether the Project is initiated by a Railroad or a Recipient. If a Railroad rearranges or adjusts its forces in anticipation of a Project with the purpose or effect of depriving an employee of benefits to which they otherwise would have become entitled under this Exhibit, then that employee is a Protected Employee under this Exhibit. An employee's status as a Protected Employee shall continue for the duration of the applicable Protective Period. An employee who solely benefitted as a result of a Project shall not be a Protected Employee under this Exhibit.

(h)      "Protective Period" means that period during which a Displaced Employee or a Dismissed Employee is provided the protections described in this Exhibit. The Protective Period begins

**U.S. Department of Transportation**
**Federal Railroad Administration**

on the date an employee of a Railroad is displaced or dismissed and ends after six (6) years. However, the Protective Period for any particular employee shall not continue longer than the period of time the Railroad employed the employee prior to the date of their displacement or dismissal. For purposes of this Exhibit, an employee's length of service shall be determined in accordance with the provisions of Section 7(b) of the Washington Job Protection Agreement of May 1936, as amended.

(i)      "Recipient" means any person or entity receiving financial assistance subject to the requirements of 49 U.S.C. § 22905(c), including grantees, subrecipients, contractors, and subcontractors.

(j)      "Railroad" means (1) a railroad carrier as defined in 49 U.S.C. § 20102(3), or (2) any person deemed a rail carrier pursuant to 49 U.S.C. § 22905(b).

**2.      Flow Down.**

(a)      In accepting financial assistance for a Project, the Recipient is responsible for ensuring the compliance with the protections provided in this Exhibit. The Recipient shall make the acceptance of this Exhibit a condition of any new contract (or incorporate its terms into any existing contract by amendment) that uses funds subject to the requirements of 49 U.S.C. § 22905(c). These conditions shall apply to a Recipient, any Railroad and any contractor of any tier with which the Recipient contracts using funds subject to the requirements of 49 U.S.C. § 22905(c).

(b)      The Recipient shall require in an agreement (either in a new agreement or as an amendment to an existing agreement) with a Railroad owning the right-of-way to be improved by a Project that the Railroad notify its employees (or their representatives) of the Project being funded with financial assistance subject to 49 U.S.C. § 22905(c) and the applicability of these protections.

(c)      Any Railroad employee (or their representatives) may notify a Recipient of a dispute or controversy relating to the requirements of this Exhibit to ensure compliance with 49 U.S.C. § 22905(c)(2)(B).

**3.      Collective Bargaining Agreements.**

(a)      **Existing Agreements**. The rates of pay, rules, working conditions, and all collective bargaining and other rights, privileges, and benefits (including continuation of pension rights and benefits) of a Railroad's employees under applicable laws, regulations, and/or existing collective bargaining agreements shall be preserved and remain applicable unless changed by future collective bargaining agreements or applicable statutes or regulations. As applied to the regulation of subcontracting by the Railroads of a Project, the provisions of this section shall mean that a determination of whether or not such work validly may be subcontracted by a Railroad shall not be affected by the fact that the work is being financed by funds subject to the requirements of 49 U.S.C. § 22905(c)(2)(B). Nothing in this Exhibit shall be construed as depriving any Railroad employee of any rights or benefits or eliminating any obligations that such employee may have under any existing contractual or statutory arrangement, including job security agreements, protective conditions, or arrangements.

(b)      **Election by Protected Employee**. Where a Protected Employee is eligible for protections under both this Exhibit and another contractual or statutory arrangement, the Protected Employee shall elect between the protection under this Exhibit and protection under such other arrangement. After

**U.S. Department of Transportation**
**Federal Railroad Administration**

such an election, the Protected Employee shall be protected only by the arrangement that they elect. The Protected Employee shall not be entitled to any protection or benefit (regardless of whether such benefit is duplicative) under the arrangement that they do not elect. However, if the elected protection expires pursuant to the terms of the arrangement that governs the elected protection, the Protected Employee is entitled to protection under the arrangement not originally elected for the remainder, if any, of the Protective Period.

####    4.    Change in Operations, Services, Facilities, or Equipment.

(a)    **Notice**. When a Railroad contemplates a change or changes in its operations, services, facilities, or equipment as a result of a Project, which may cause the dismissal or displacement of Protected Employees or rearrangement of forces involving such employees, it shall give at least sixty (60) days' written notice of such intended changes to both Protected Employees and their duly authorized representatives (if applicable). Such notice shall contain a full and adequate description of the proposed changes, including an estimate of the number of Protected Employees of each class affected by the intended changes.

(b)    **Negotiations**.

(i)    Initiation of Negotiation. Within sixty (60) days after the Railroad issues a notice under Section 4(a) of this Exhibit, the Railroad or the Protected Employees (or their representatives) may, by written notice to the other party, request a meeting and opportunity to negotiate an agreement with respect to the application of the terms and conditions of this Exhibit. These negotiations shall commence within fourteen (14) days from the receipt of such request.

(ii)    Subject of Negotiations. Each change to rail operations, services, facilities, infrastructure, or equipment (including rights-of-way, track, and signal and crossing systems) that may result in dismissal or displacement of Protected Employees or rearrangement of forces involving such employees shall be subject to review and negotiation by the parties, but only to the extent necessary to ensure compliance with this Exhibit. For any contemplated rearrangement of rail forces, the Railroad and the representative(s) of the Protected Employees shall agree on the method of selection of employees to be moved, and the assignment of those employees to new roles.

(c)    **Arbitration**. If the Railroad and the representative(s) of the Protected Employees fail to agree within forty-five (45) days from the initial meeting and opportunity to negotiate, either party may submit the dispute for arbitration in accordance with the following procedures:

(i)    Notice & Selection of Arbitrator. Within ten (10) days after either party has notified the other in writing of their desire to submit the dispute for arbitration, the parties shall select a neutral arbitrator. If the parties cannot agree upon the selection of said arbitrator, then the parties shall submit a request to the National Mediation Board to appoint an arbitrator. In either case, a hearing shall be scheduled no later than thirty (30) days after an arbitrator has been appointed.

**U.S. Department of Transportation**
**Federal Railroad Administration**

(ii)     <u>Binding Decision</u>. The decision of the arbitrator shall be final, binding, and conclusive and shall be rendered within thirty (30) days from the date of the commencement of the hearing of the dispute.

(iii)     <u>Expenses</u>. The salary and expenses of the arbitrator shall be borne equally by the parties to the proceeding; all other expenses shall be paid by the party incurring them.

(d)     **Implementation**. If a notice is issued under Section 4(a), the Railroad shall not implement such a change or changes until: (i) sixty (60) days after the notice in accordance with Section 4(a), if no party requests a meeting and opportunity to negotiate; (ii) the parties reach agreement pursuant to Section 4(b), if a party requests a meeting and opportunity to negotiate; or (iii) a referee has rendered a decision pursuant to Section 4(c).

**5.     Protections for Displaced Employees**

(a)     **Displacement Allowances**.

(i)     <u>In General</u>. If a Displaced Employee is unable, in the normal exercise of such employee's seniority rights under existing agreements, rules and practices, to obtain a position that is compensated equal to or exceeding the compensation the Displaced Employee received in the position from which such employee was displaced, then the Displaced Employee shall, during the Protective Period, be paid a monthly displacement allowance equal to the difference between the monthly compensation received by the Displaced Employee in the position in which such employee is retained and the Average Monthly Compensation received by the Displaced Employee in the position from which such employee was displaced (the "Displacement Allowance").

(ii)     <u>Application of Displacement Allowance</u>. If a Displaced Employee's compensation in that employee's retained position is less in any month in which such employee performs work than the Average Monthly Compensation, then the Displaced Employee shall be paid the difference between the current compensation and the Average Monthly Compensation. However, the Displacement Allowance shall be reduced by the Displaced Employee's time lost as a result of voluntary absences, to the extent that the Displaced Employee is not available for service equivalent to the Displaced Employee's Average Monthly Time. If, on the other hand, the Displaced Employee, in such employee's retained position, works in excess of the Average Monthly Time in any given month, then the Displaced Employee shall be additionally compensated for such excess time at the rate of pay of the employee's retained position. If a Displaced Employee fails to exercise their seniority rights to secure another position available to the employee which does not require a change in such employee's place of residence, to which the employee is entitled under the working agreement, and which carries a rate of pay and compensation exceeding those of the position that the employee elects to retain, then the Displaced Employee shall thereafter be treated for the purposes of this section as occupying the position such employee elects to decline.

(iii)     <u>Early Expiration</u>. The Displacement Allowance shall cease prior to the expiration of the Protective Period in the event of the Displaced Employee's resignation, death, retirement, or dismissal for justifiable cause.



U.S. Department of Transportation
**Federal Railroad Administration**

(b)    **Moving Expenses**. Any Protected Employee retained in the service of a Railroad, or who is later restored to service after being entitled to receive a Dismissal Allowance, and is required to change the point of such employee's employment as a result of the Project, and within the employee's Protective Period is required to move the employee's place of residence, shall be reimbursed for all expenses of moving the employee's household and other personal effects, including travel expenses, temporary living expenses, and any actual wage loss during the time necessary to make the move, and for a reasonable time thereafter, not to exceed five (5) days.

(i)    Prior Agreement. The exact extent of the responsibility of a Railroad under this Section and the ways and means of transportation shall be agreed upon in advance by the Railroad and the Protected Employee or their representatives.

(ii)    Exception. Changes in residence that are not a result of a Project, which are made after the initial change and that grow out of the normal exercise of seniority rights, are not within the purview of this Section.

(iii)    Furloughed Employees. The Railroad shall, to the same extent provided above, assume the moving expenses outlined in Section 5(b) for an employee furloughed within three (3) years after changing such employee's point of employment as a result of a Project, who elects to move their place of residence back to their original point of employment.

(iv)    Reimbursement. A claim for reimbursement shall be paid under the provisions of this Section within sixty (60) days after it is submitted, unless disputed by the Railroad, but no claim shall be paid if presented to the Railroad more than ninety (90) days after the date on which the expenses were incurred.

(c)    **Losses from Home Sale or Contract Termination**. Any Displaced Employee who is retained in the service of a Railroad (or who is later restored to service after being entitled to receive a dismissal allowance), and who is required to change the point of such employee's employment during the Protective Period as a result of a Project, is entitled to the following:

(i)    Home Sale for Less Than Fair Market Value. If the Displaced Employee owns their place of residence in the locality from which such employee is required to move, then at the Displaced Employee's option, the Railroad shall reimburse the Displaced Employee for the difference between the actual sale price and the fair market value of the employee's place of residence. The Railroad shall pay such difference within sixty (60) days after the Displaced Employee has filed a claim for such loss in accordance with Section 5(c)(vi), unless a controversy arises as to which Section 5(c)(vii) applies. In each case, the fair market value of the home in question shall be determined without consideration of the Project. The Railroad shall in each instance be afforded an opportunity to purchase the home at such fair market value before it is sold by the Displaced Employee to any other person.

(ii)    Election to Receive Closing Costs. The Displaced Employee may elect to waive the provisions of Section 5(c)(i) and to receive, in lieu thereof, an amount equal to the closing costs that are customarily paid for and assumed by a seller of real estate in the jurisdiction in which the employee's residence is located. Such costs shall include customary fees paid to a licensed realtor (not to exceed six percent (6%) of the final sale price) and any prepayment penalty required by any mortgagor or beneficiary of a deed of trust. Such costs shall not include

28

**U.S. Department of Transportation**
**Federal Railroad Administration**

the payment of any mortgage discount points or similar interest discount fees by the Displaced Employee.

    (iii)    <u>Pending Contract to Purchase</u>. If a Displaced Employee has entered into a contract to purchase a place of residence, but due to a Project must cancel that contract, the Railroad shall indemnify the Displaced Employee against any losses due to such cancellation, and shall relieve the Displaced Employee from any further obligation under the contract.

    (iv)    <u>Unexpired Lease</u>. If the Displaced Employee holds an unexpired lease of a dwelling as the employee's primary place of residence, and the Displaced Employee must cancel the lease due to a Project, the Railroad shall indemnify the Displaced Employee from all costs and liability arising from said cancellation.

    (v)    <u>Exclusions</u>. Any change in residence that is not due to or caused by a Project, or that resulted from the normal exercise of a Protected Employee's seniority rights, shall not be within the purview of this Section.

    (vi)    <u>Notification of Claims</u>. A Displaced Employee shall notify, in writing, the Railroad of such employee's claim arising from this Section 5(c) within one (1) year of the date the Displaced Employee's claim accrues.

    (vii)    <u>Home Value Disagreements</u>. In the event of disagreement between a Railroad and a Displaced Employee as to the value of a Displaced Employee's claim, either party (or their representatives) may request, in writing, a joint conference to resolve the disagreement.

    A.  <u>Real Estate Appraisers</u>. If the parties are unable to resolve the disagreement, either party may refer the disagreement to two licensed real estate appraisers, one of whom shall be selected by the Displaced Employee (or such employee's representatives), and one of whom shall be selected by the Railroad. If the two selected real estate appraisers are unable to agree on a valuation within thirty (30) days, the selected real estate appraisers shall designate (or agree to a method by which to select) a third licensed real estate appraiser within ten (10) days. If unable to agree on a selection, either party may request the National Mediation Board to designate within twenty (20) days a third licensed real estate appraiser. A decision by two of the three licensed real estate appraisers shall be required to determine the value in dispute. Said decision shall be final and conclusive.

    B.  <u>Payment of Expenses</u>. The salary and expenses of the third or neutral appraiser shall be borne equally by the parties to the proceedings. All other expenses shall be paid by the party incurring them, including the compensation of the appraiser selected by such party.

    (d)    **Failure to Exercise Seniority Rights**. If a Displaced Employee is able but does not exercise such employee's seniority rights to secure another position that does not require a change in the employee's primary place of residence, the Displaced Employee shall not be entitled to moving expenses or protections due to the sale of a home outlined in Sections 5(b)&(c).



U.S. Department of Transportation
**Federal Railroad Administration**

**6.         Protections for Dismissed Employees.**

(a)         **Dismissal Allowance**. A Dismissed Employee shall be paid a monthly dismissal allowance from the date they are deprived of employment through the Protective Period.

(i)         Monthly Dismissal Allowance Calculation. The monthly dismissal allowance shall be equivalent to the Average Monthly Compensation received by the Dismissed Employee in the last twelve (12) months of employment prior to the employee's dismissal.

(ii)         Submission of Claim. A claim for the initial month of a dismissal allowance shall be paid within ninety (90) days and a claim for a subsequent month shall be paid within sixty (60) days after the claim is filed by the Dismissed Employee, unless the claim is disputed by the Railroad pursuant to Section 8 of this Exhibit.

(iii)         Reduction or Suspension of Dismissal Allowance. If a Dismissed Employee accepts new employment (or reemployment by the dismissing Railroad) during the Protective Period, the dismissal allowance shall be reduced such that the accepted monthly compensation at the then-current position (including any unemployment insurance compensation received) plus the dismissal allowance is equivalent to the Dismissed Employee's Average Monthly Compensation. If the compensation of the Dismissed Employee's then-current employment is greater than the dismissal allowance, the dismissal allowance shall be suspended. Such reduction or suspension shall continue for the duration of the Protective Period, unless and until the Dismissed Employee's then-current compensation is reduced or eliminated. Prior to dismissal, such Dismissed Employee (or their representative) and the dismissing Railroad shall agree upon a procedure by which such Railroad shall be informed of the earnings and benefits of such Dismissed Employee in their new position of employment.

(iv)         Early Termination. The dismissal allowance shall cease prior to the expiration of the Protective Period in the event of the Dismissed Employee's resignation, death, retirement, dismissal for justifiable cause under existing agreements, failure without good cause to return to service after being notified in accordance with an applicable working agreement, or failure without good cause to accept a comparable position that does not require a change of residence, for which the Dismissed Employee is qualified and eligible with the Railroad from which such employee was dismissed after being notified, if the employee's return does not infringe upon employment rights of other employees under a working agreement.

(b)         **Separation Allowance**. A Dismissed Employee may, at such employee's option, within seven (7) days of dismissal or an arbitration award establishing the employee's status as a Dismissed Employee, resign and (in lieu of all other benefits and protections provided in this Exhibit) accept a lump sum payment computed in accordance with Section 9 of the Washington Job Protection Agreement of May 1936, as amended.

(c)         **Priority of Employment or Re-Employment**. Any Protected Employee whose employment is terminated or who is furloughed as a result of a Project shall, if they so request, be granted priority of employment or re-employment to fill a position comparable to that which they held on the Railroad (even if in a different craft or class), so long as they are qualified, or by training or retraining can become physically and mentally qualified, for the position. However, such priority of

**U.S. Department of Transportation**
**Federal Railroad Administration**

employment or re-employment must not be in contravention of any relevant collective bargaining agreements.

(i)    **Training or Re-Training**. In the event such training or retraining is requested by a Protected Employee pursuant to Section 6(c), the Railroad shall provide such training or retraining at no cost to the Protected Employee.

(ii)    **Waiver of Protections**. If a Protected Employee who has made a request under Section 6(c) fails without good cause within ten (10) days to accept an offer of a comparable position for which such employee has satisfactorily completed such training, the Protected Employee shall, upon the expiration of such ten (10) day period, forfeit all rights and benefits under this Exhibit.

**7.    Fringe Benefits.** No Protected Employee shall be deprived during the Protective Period of any (non-salary) rights, privileges, or benefits attached to such employee's previous employment under the terms and conditions of an existing employment agreement (including, but not limited to, free transportation, hospitalization, pensions, insurance, or vacation benefits), so long as such rights, privileges, or benefits continue to be accorded to other employees of the Railroad, in active service or on furlough as the case may be, to the extent that such rights, privileges, or benefits can be so maintained under present authority of law, corporate action, or through future authorization.

**8.    Arbitration of Disputes.**

(a)    **Scope**. Any dispute under these conditions not settled by the relevant parties will be resolved in arbitration as provided herein. In the event a Railroad and the Protected Employee(s) (or their representatives) cannot settle a dispute or controversy with respect to the interpretation, application, or enforcement of any provision of this Exhibit (other than those Sections of this Exhibit that provide for another means of dispute resolution) within thirty (30) days after the dispute arises, either party may refer the dispute to an arbitration committee. The affected Protected Employee(s) (or their representatives) may notify a Recipient of a dispute or controversy under this Section 8 to ensure compliance with 49 U.S.C. § 22905(c)(2)(B).

(b)    **Notice**. The party referring the dispute to an arbitration committee shall notify the other party in writing of its intent to refer a dispute or controversy to an arbitration committee.

(c)    **Selection of Members**. Within ten (10) days of receipt of the written notice, each party to the arbitration shall select one (1) member of the committee, and the members thus chosen shall select an additional, neutral member to serve as chairman. If any party fails to select its member of the arbitration committee within the prescribed time limit, the general chairman of the involved labor organization or a senior officer designated by the Railroad or the Recipient, as the case may be, shall be deemed the selected member. Should the members be unable to agree upon the appointment of the neutral member within ten (10) days, the parties shall then within an additional ten (10) days agree to a method by which a neutral member shall be appointed; failing such agreement, either party may request the National Mediation Board to designate within twenty (20) days the neutral member whose designation will be binding upon the parties.

(d)    **Multiple Representatives**. In the event a dispute involves more than one labor organization, each will be entitled to a representative on the arbitration committee, in which event the Railroad or Recipient may appoint additional representatives equivalent to the number of labor

31

U.S. Department of Transportation
**Federal Railroad Administration**

organization representatives; provided, however, that the decision in such case shall be made by the neutral member.

(e)    **Decisions Binding**. The decision, by majority vote except as provided otherwise in paragraph (d) of this Section, of the arbitration committee shall be final, binding, conclusive, and rendered within forty-five (45) days after the hearing of the dispute or controversy has been concluded and the record closed.

(f)    **Expenses**. The salaries and expenses of the neutral member shall be borne equally by the parties to the proceeding, and all other expenses shall be paid by the party incurring them.

**9.    Classification of a Protected Employee.** In the event an employee (or their representatives) cannot settle a dispute or controversy with the Railroad or the Recipient as to whether or not a particular employee would be affected by a Project, either party may refer the dispute to an arbitration committee within thirty (30) days after the dispute arises pursuant to the arbitration procedures in Section 8. For any such dispute, the employee of a Railroad shall have the burden to identify, with reasonable specificity, the Project that allegedly affected them, and to specify the pertinent facts of that Project, including the change or changes resulting from the Project that allegedly affected them. The burden shall then shift to the Railroad or Recipient to show that factors other than a change resulting from the Project affected the employee. The employee shall prevail on this issue if it is established that the Project had an effect upon the employee, even if other factors also may have affected the employee.

**10.    Resolution of Disputes for Non-Bargaining Unit Protected Employees.** Any Protected Employee who is not represented by a labor organization shall be afforded substantially the same levels of protection as are afforded to members of labor organizations under this Exhibit. In the event any dispute arises between a Railroad and an employee not represented by a labor organization with respect to the interpretation, application, or enforcement of any provision of this Exhibit that cannot be settled by the parties within thirty (30) days after the dispute arises, either party may, as an alternative to the dispute resolution procedures outlined in this Exhibit, refer the dispute within ninety (90) days after the dispute arises to the Secretary of Labor for determination. The determination of the Secretary of Labor, or their designated representative, shall be final and binding on the parties.

**11.    Severability.** In the event any provision of this Exhibit is held to be invalid or otherwise unenforceable under applicable law, the remaining provisions of this Exhibit shall not be affected.



U.S. Department of Transportation
**Federal Railroad Administration**

EXHIBIT C: QUARTERLY PROJECT PROGRESS REPORTS AND RECERTIFICATIONS

Expires 01/31/2025

OMB Control No. 2130-0615

Paperwork Reduction Act Burden Statement A federal agency may not conduct or sponsor, and a person is not required to respond to, nor shall a person be subject to a penalty for failure to comply with a collection of information unless it displays a currently valid OMB Control Number. The OMB Control Number for this information collection is 2130-0615. Public reporting for this collection of information is estimated to be approximately 4 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, completing and reviewing the collection of information. All responses to this collection of information are mandatory. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden to: Information Collection Clearance Officer (RAD-20), Federal Railroad Administration, 1200 New Jersey Avenue, Washington, DC. 20590.

## FRA GRANT/COOPERATIVE AGREEMENT
## Quarterly Progress Report

### A. Submission Information

| 1. Report Submission Date (mm/dd/yy): | | 2. Report Quarter: | - | 3. FFY: | - |
|---|---|---|---|---|---|

| 4. Agreement Number | 5. Project Title | | 6. Project Type |
|---|---|---|---|
| | | | |

| 7. Completed By (Name) | 8. Title | 9. Email | 10. Phone |
|---|---|---|---|
| | | | |

11. *Certification*: By checking this box, I certify that I have reviewed this report and that, to the best of my knowledge, the report is complete, accurate, and meets the terms and conditions of the award.

### B. Overall Project Status

| | a. Status | b. Explanation |
|---|---|---|
| 12. Scope | Off-Track | |
| 13. Schedule | Off-Track | |
| 14. Budget | Off-Track | |

| 15. Significant Activities this Quarter | 16. Significant Activities Planned for Next Quarter |
|---|---|
| | |

| 17. Amendment Request? | 17 a. Status | 17 b. Explanation |
|---|---|---|
| Yes | N/A | |

## C. Financial Status

### Budget Status

| 18. Budget Changes? | 18 a. Status | 18 b. Explanation |
|---|---|---|
| Yes | N/A | |

### Expenditures and Reimbursement Status

| Funding Source | Actual Expenditures this Quarter |
|---|---|
| 19. FRA Grant: | |
| 20. Grantee Match: | |
| 21. Other Federal Funds: | |
| 22. Total: | $ 0.00 |

| 23. Accomplishments Related to Expenditures in this Quarter | 24. Accomplishments Related to Expenditures in other Quarters (if applicable) |
|---|---|
| | |

### Reimbursement Forecast

| 25. Planned Reimbursement Requests to FRA | | 26. Unliquidated Obligations | |
|---|---|---|---|
| 25 a. Next Quarter | 25 b. Next Four Quarters (Cumulative) | 26 a. Any reported on this quarter's SF-425? | 26 b. Explanation |
| | | No | |

FRA F 34 (4/2021)

2

## D. Major Milestones

*If your project contains one or more of the following components, please report on all that apply:*

| 27. Milestone Name | 28. Status | Completion Date mm/dd/yy | | 31. Change to Status? | 32. Status Notes |
|---|---|---|---|---|---|
| | | 29. Planned | 30. Actual | | |
| **All Projects** | | | | | |
| 27 a. Award of Sub-Contract(s) | Off-Track | | | N/A | |
| 27 b. Project Work Begun | Off-Track | | | N/A | |
| 27 c. Project Substantially Complete | Off-Track | | | N/A | |
| **Projects with a Construction Component** | | | | | |
| 27 d. Construction Notice to Proceed Issued | Off-Track | | | N/A | |
| 27 e. ROW Acquisition Complete | Off-Track | | | N/A | |
| 27 f. Construction Ground-Breaking | Off-Track | | | N/A | |
| 27 g. Construction Substantially Complete | Off-Track | | | N/A | |
| 27 h. Environmental Mitigation Substantially Complete | Off-Track | | | N/A | |
| 27 i. Ribbon-Cutting Ceremony | Off-Track | | | N/A | |
| 27 j. Commencement of Service | Off-Track | | | N/A | |
| **Projects with a Rolling Stock Component** | | | | | |
| 27 k. Test Vehicle Complete | Off-Track | | | N/A | |
| 27 l. First Rolling Stock Delivery | Off-Track | | | N/A | |

3

FRA F 34 (4/2021)

# E. Statement of Work Task Status

| 33. Task # | 34. Task Name | 35. Status | 36. Task Started? | Completion Date (mm/dd/yy) | | 39. Percent Complete (%) | 40. Change to Status? |
|---|---|---|---|---|---|---|---|
| | | | | 37. Planned | 38. Actual | | |
| 1 | Pre-populated | Off-Track | N/A | | | | N/A |
| | | Off-Track | N/A | | | | N/A |
| | | Off-Track | N/A | | | | N/A |
| | | Off-Track | N/A | | | | N/A |
| | | Off-Track | N/A | | | | N/A |
| | | Off-Track | N/A | | | | N/A |
| | | Off-Track | N/A | | | | N/A |
| | | Off-Track | N/A | | | | N/A |
| | | Off-Track | N/A | | | | N/A |
| | | Off-Track | N/A | | | | N/A |
| | | Off-Track | N/A | | | | N/A |
| | | Off-Track | N/A | | | | N/A |
| | | Off-Track | N/A | | | | N/A |
| | | Off-Track | N/A | | | | N/A |
| | | Off-Track | N/A | | | | N/A |
| | | Off-Track | N/A | | | | N/A |
| | | Off-Track | N/A | | | | N/A |
| | Contingency (optional) | | | | | | |

# E. Statement of Work Task Status (Continued)

| 41. Status Notes |
| --- |
| |

U.S. Department of Transportation
**Federal Railroad Administration**

**EXHIBIT D**

**Declaration of Covenants**

**Prepared by, Record and Return to:**

[Insert Preparer Information]

DECLARATION OF COVENANTS, CONDITIONS AND RESTRICTIONS
FOR HUDSON TUNNEL PROJECT

THIS DECLARATION OF COVENANTS, CONDITIONS AND RESTRICTIONS FOR HUDSON TUNNEL PROJECT
(THIS "DECLARATION") IS MADE BY AND AMONG

GATEWAY DEVELOPMENT COMMISSION

("GDC"), a public authority and a government sponsored authority by the State of New Jersey and the
State of New York, having an address at Two Penn Plaza East, 11th Floor Newark, NJ 07105

NATIONAL RAILROAD PASSENGER CORPORATION

("Amtrak"), a corporation organized under the Rail Passenger Service Act and the laws of the District of
Columbia, having an address at 1 Massachusetts Avenue NW, Washington, D.C. 20001

AND

NEW JERSEY TRANSITCORPORATION,

acting for itself and through its subsidiary, New Jersey Transit Rail Operations, Inc. ("NJ TRANSIT")[1] and
together with GDC and Amtrak, each, a "Covenantor" and collectively, "Covenantors") having its
principal place of business at One Penn Plaza East, Newark, NJ 07105

IN FAVOR OF

UNITED STATES OF AMERICA

represented by the Secretary of Transportation acting through the Administrator of
the Federal Railroad Administration (the "Covenantee"), having an address at 1200 New Jersey Avenue,
SE, Washington, D.C. 20590

---

[1] Note to draft: update addresses as appropriate.



U.S. Department of Transportation
**Federal Railroad Administration**

WHEREAS, the Covenantors desire to preserve the current functionality of Amtrak's Northeast Corridor ("NEC") intercity passenger railroad service and NJ TRANSIT's commuter railroad service between New Jersey and Penn State New York ("PSNY") by and to strengthen the NEC's resiliency to support reliable service by providing redundant capability under the Hudson River for Amtrak and NJ TRANSIT trains between New Jersey and the existing PSNY by construction of the Hudson Tunnel Project as further described below;

WHEREAS, for purposes of the Declaration of Covenants, the Project is that project which is funded by the Federal Railroad Administration's Federal-State Partnership for Intercity Passenger Rail (FSP) Program grant funding (FSP Grant);

WHEREAS, the Project is also funded by the Federal Transit Administration's Capital Investment Grants Program, and the U.S. Department of Transportation's Railroad Rehabilitation and Improvement Financing (RRIF) program and directed funding provided in cooperative agreements between Amtrak and FRA;

WHEREAS, the Project (funded by the FSP Grant and further defined therein) consists of the construction of a new and separate Hudson River Tunnel under the Hudson River between New York and New Jersey and the rehabilitation of the existing North River Tunnel under the Hudson River (the "Project");

WHEREAS, GDC, the State of New York, State of New Jersey and Amtrak have agreed on their respective obligations regarding the funding, construction, completion and operation in connection with the Hudson Tunnel Project in accordance with that certain Project Development Agreement, between GDC, the State of New Jersey, the State of New York and Amtrak; dated as of February 3, 2023 as amended by First Amendment dated May 24, 2023, Second Amendment dated March 5, 2024, (the "Project Development Agreement");

WHEREAS, the NJ TRANSIT is or will be the owner of certain Project Property, as such term is defined in the FSP Grant, and will transfer certain property interests as further described on Exhibit A to Amtrak on or before the Operations Readiness Date in accordance with the terms of the Project Development Agreement;

WHEREAS, after the Operations Readiness Date, Amtrak will own the Project Property, such real and personal property interests being further described on Exhibit B attached hereto [and in the General Property Parcel Map prepared by [_____] and dated [____] [(____)] sheets (collectively referred herein together with improvements thereon, the "PROJECT PROPERTY");

WHEREAS, after NJ TRANSIT transfers to Amtrak certain Project Property, Amtrak will provide NJ TRANSIT a recorded easement for operations of commuter rail passenger transportation on the Project Property in accordance with the Project Development Agreement; and

WHEREAS, Covenantee has a direct interest in the continued maintenance and availability of the Northeast Corridor, including the new Hudson Tunnel and the North River Tunnel, for intercity passenger rail service, and Covenantors have a direct interest in the implementation by Covenantors of the goals of the Project Development Agreement.



U.S. Department of Transportation
**Federal Railroad Administration**

NOW, THEREFORE, GDC, Amtrak and NJ TRANSIT, in each case for itself, its successors, assigns and legal representatives, hereby covenants and agrees with Covenantee that:

Section 1. Subject to the limitations on the availability of funds caused by the expenditure of funds to carry out Covenantors' Federal statutory obligations, the Project shall, on a continuing basis, be available at all times and maintained for purposes of intercity passenger rail and commuter rail service at the level of utility determined in accordance with the terms of the Project Development Agreement and Northeast Corridor Services Agreement as amended.  The Project necessary for intercity passenger rail shall remain available for such use subject to any liens, easements or other encumbrances (including, but not limited to, NJ TRANSIT's permanent easement for commuter passenger rail service) as authorized by the Project Development Agreement.

Section 2.  Amtrak agrees that the COVENANTS, CONDITIONS AND RESTRICTIONS set forth herein shall be covenants running with the title to all or any part of the Project owned by Amtrak and shall be binding on all parties having or acquiring any right, title, or interest in or to said part or parcel (including Covenantors) and shall inure to the benefit of Covenantee and shall be and remain a charge thereon until such time as the Project is no longer necessary for the intercity passenger rail service and FRA has provided disposition instructions.

Section 3.  NJ TRANSIT agrees that the COVENANTS, CONDITIONS AND RESTRICTIONS set forth herein shall be covenants running with the title to all or any part of the Project owned by Amtrak and shall be binding on all parties having or acquiring any right, title, or interest in or to said part or parcel (including Covenantors) and shall inure to the benefit of Covenantee and shall be and remain a charge thereon until such time as the Project is no longer necessary for the intercity passenger rail service and FRA has provided disposition instructions.

Section 4.  Covenantee may enforce this Declaration by an action at law or suit in equity against Covenantors or any other holder of the property interests subject to the COVENANTS, CONDITIONS AND RESTRICTIONS contained herein.  Covenantors hereby agree that money damages are inadequate as a sole remedy for any breach hereof.

Section 5.  This Declaration shall be for the sole benefit of Covenantee.

Section 6.  As it may affect the rights, remedies, duties, and obligations of Covenantee, this Declaration shall be governed by and construed in accordance with Federal law.  To the extent that Federal law does not specify the appropriate rule of decision for a particular matter at issue, it is the intention and agreement of the parties hereto that the substantive law of the State of New York, where the Project is located, shall inform the governing Federal rule of decision as appropriate.

Section 7. GDC shall cause this Declaration to be recorded and filed in all appropriate jurisdictions on or before the Operations Readiness Date.

Section 8.  As between Amtrak and Covenantee, Amtrak agrees the COVENANTS, CONDITIONS AND RESTRICTIONS created hereby (a) shall be junior to the lien of that certain Mortgage, between Covenantee and Amtrak, dated December 9, 1976, as amended by that certain Agreement Amending the FRA Note and Mortgage, dated as of June 20, 2001 (as may be further amended, renewed, increased, modified, supplemented, replaced, substituted, extended, consolidated or spread from time to time, the "Mortgage") and (b) shall not amend, supplement, replace, supersede, novate or otherwise modify the



existing Declaration of Covenants, Conditions, Charges and Restrictions for Northeast Corridor Maintenance by and between the National Railroad Passenger Corporation and the United States of America, dated August 29, 1976, which remains in full force and effect and the terms of which are hereby ratified by Amtrak. NJ TRANSIT is not a party to the Mortgage and is not encumbering its property with any covenants, conditions, or restrictions stated herein.

[Signature Pages Follow]



IN WITNESS WHEREOF, the undersigned duly authorized officers or members of the parties hereto have executed this Declaration.

NATIONAL RAILROAD PASSENGER CORPORATION

By:_____
Name:
Title:

STATE OF

COUNTY OF

On this _____ day of _____, 20_____, in the County and State aforesaid, before me, the subscriber, a Notary Public authorized to take acknowledgements and proofs in said County and State, personally appeared _____, the _____ of NATIONAL RAILROAD PASSENGER CORPORATION, who, I am satisfied, is the person who, as such officer, signed the within instrument on behalf of such corporation, and said person did acknowledge that he or she is authorized to sign and deliver the within instrument on behalf of such corporation and that he or she signed and delivered the same as the act and deed of such corporation for the uses and purposes expressed therein.

_____
Name:

Notary Public

My Commission Expires: _____

(NOTARIAL SEAL)

[Signatures Pages Continue to Follow]



U.S. Department of Transportation
**Federal Railroad Administration**

**NEW JERSEY TRANSIT CORPORATION,** acting for itself and through its subsidiary New Jersey Transit Rail Operations, Inc.

By:_____

Name:

Title:

STATE OF

COUNTY OF

On this _____ day of _____, 20____, in the County and State aforesaid, before me, the subscriber, a Notary Public authorized to take acknowledgements and proofs in said County and State, personally appeared _____ the _____ of **NEW JERSEY TRANSIT CORPORATION**, who, I am satisfied, is the person who, as such officer, signed the within instrument on behalf of such corporation, and said person did acknowledge that he or she is authorized to sign and deliver the within instrument on behalf of such corporation and that he or she signed and delivered the same as the act and deed of such corporation for the uses and purposes expressed therein.

_____

Name:

Notary Public

My Commission Expires: _____

(NOTARIAL SEAL)

.

[Signatures Pages Continue to Follow]



U.S. Department of Transportation
**Federal Railroad Administration**

UNITED STATES OF AMERICA,
REPRESENTED BY THE SECRETARY OF
TRANSPORTATION, ACTING THROUGH THE
ADMINISTRATOR OF THE FEDERAL RAILROAD
ADMINISTRATION

By:_____

      Name:
      Title:  Administrator

DISTRICT OF COLUMBIA  ss

      On this _____ day of _____, 20____, in the County and State aforesaid, before me, the subscriber, a Notary Public authorized to take acknowledgements and proofs in said County and State, personally appeared _____, the Administrator of the FEDERAL RAILROAD ADMINISTRATION, who, I am satisfied, is the person who, as such officer, signed the within instrument on behalf of the FEDERAL RAILROAD ADMINISTRATION, and said person did acknowledge that he or she is authorized to sign and deliver the within instrument on behalf of the FEDERAL RAILROAD ADMINISTRATION and that he or she signed and delivered the same as the act and deed of the FEDERAL RAILROAD ADMINISTRATION for the uses and purposes expressed therein.

_____

Name:
Notary Public:

My Commission Expires: _____

(NOTARIAL SEAL)

[Signature Pages End]

U.S. Department of Transportation
**Federal Railroad Administration**

**Declaration of Covenants - Exhibit A**

**Legal Descriptions of Properties as per Sixth Whereas of the Declaration of Covenants**

Version Date: December 11, 2023


U.S. Department of Transportation
**Federal Railroad Administration**

**Declaration of Covenants - Exhibit B**

**Legal Descriptions of Properties as per Seventh Whereas of the Declaration of Covenants**

U.S. Department of Transportation
**Federal Railroad Administration**

**EXHIBIT E**

*The following is an example of a Notice of Federal Interest that may be included in the deed after the legal description sections and before the closing and signature sections of the deed and recorded, or recorded separately in the land records in each county in which the Project Property is located.  Refer to 2 CFR part 200 and seek professional legal advice before using.*

**Prepared by:**

**[Insert preparer's name and address]**

**Notice of Federal Interest**

This is to notify all potential sellers, purchasers, transferors, transferees, mortgagees, creditors and any other persons or entities who have or may seek to obtain an interest of any kind in the real property described herein ("Project Property"), of the Federal government's interest in said Project Property pursuant to 2 CFR part 200 and the associated restrictions on use and disposition ("Federal Interest").

The Federal Interest arises because the Project Property has been acquired or improved with Federal funds provided to Recipient under one or more grant agreements ("Grant Agreements") from the Federal Railroad Administration ("FRA").  Consistent with the Grant Agreements, the Project Property will be developed in coordination with and owned by the Authorized Title Holder.

Accordingly, Recipient, and the Authorized Title Holder of the Project Property each acknowledge and agree that:

1.   The Project Property was acquired or improved with Federal funds pursuant to 2 CFR part 200.
2.   The legal description for the Project Property is set forth in Exhibit A.[2]
3.   The names and addresses of the Recipient and the Authorized Title Holder are:
     a.   Recipient:
          Gateway Development Commission
          ADDRESS
          ADDRESS
     b.   Authorized Title Holder:
          National Railroad Passenger Corporation
          1 Massachusetts Avenue NW
          Washington, DC  20001
4.   The agreement numbers for the Grant Agreements funding the Project Property are:
5.   The Federal participation in the total cost of the Project Property is __%.
6.   Project Property will not be conveyed or encumbered, in whole or in part, to or by a party other than Recipient or Authorized Title Holder, without written permission and instructions from FRA.

---

[2] Note to draft:  Please provide property descriptions associated with the Project Property upon Construction Substantial Completion. Lengthy legal descriptions may need to be included as attachments.

10

**U.S. Department of Transportation**
**Federal Railroad Administration**

Further information regarding the Federal Interest in the property described in this Notice can be obtained from the Federal Railroad Administration, 1200 New Jersey Avenue, SE Washington, DC 20590.

[Signature Pages Follow]

11



**IN WITNESS WHEREOF**, **NATIONAL RAILROAD PASSENGER CORPORATION** has caused this **NOTICE OF FEDERAL INTEREST** to be recorded on its behalf by its duly authorized representative:


AUTHORIZED TITLE HOLDER:    National Railroad Passenger Corporation

By:    _____

[NAME AND TITLE]


(INSERT NOTARY INFORMATION)




_____

Notary Public_

Notary Registration No. _____

[Signature Pages Follow]

**IN WITNESS WHEREOF, GATEWAY DEVELOPMENT COMMISSION,** has caused this **NOTICE OF FEDERAL INTEREST** to be recorded on its behalf by its duly authorized representative:


RECIPIENT: Gateway Development Commission

By:    _____

[NAME AND TITLE]


(INSERT NOTARY INFORMATION)




_____

Notary Public_

Notary Registration No. _____



U.S. Department of Transportation
**Federal Railroad Administration**

[Signature Pages End]