# Exhibit E

*Execution Version*

# UNITED STATES
# DEPARTMENT OF TRANSPORTATION


# RRIF LOAN AGREEMENT


## For Up to $1,870,000,000

## With

## GATEWAY DEVELOPMENT COMMISSION

## For the


## HUDSON TUNNEL PROJECT

## (Port Authority Funding Agreement)
## (RRIF – 2024-0051)


## Dated as of July 8, 2024

1714408.05-WASSR01A - MSW

**TABLE OF CONTENTS**

Page

Section 1.    Definitions ..................................................................................................2
Section 2.    Interpretation ...........................................................................................16
Section 3.    RRIF Loan Amount ..................................................................................16
Section 4.    Disbursement Conditions ........................................................................16
Section 5.    Term .........................................................................................................17
Section 6.    Interest Rate ............................................................................................17
Section 7.    Outstanding RRIF Loan Balance; Revisions to Exhibit B and Loan
                    Amortization Schedule .............................................................................18
Section 8.    Security and Priority. ..............................................................................18
Section 9.    Payment of Principal and Interest ...........................................................19
Section 10.   Prepayment .............................................................................................21
Section 11.   Compliance with Laws ...........................................................................22
Section 12.   Conditions Precedent ..............................................................................22
Section 13.   Representations and Warranties of Borrower .........................................27
Section 14.   Representations and Warranties of RRIF Lender ...................................34
Section 15.   Affirmative Covenants ...........................................................................34
Section 16.   Negative Covenants ................................................................................43
Section 17.   Indemnification .......................................................................................48
Section 18.   Sale of RRIF Loan ..................................................................................49
Section 19.   Events of Default and Remedies .............................................................49
Section 20.   Accounting and Audit Procedures; Inspections; Reports and Records. ...............52
Section 21.   Financial Plan; Financial Statements .....................................................53
Section 22.   Oversight and Monitoring .......................................................................56
Section 23.   No Personal Recourse .............................................................................58
Section 24.   No Third Party Rights .............................................................................58
Section 25.   Borrower's Authorized Representative ....................................................58
Section 26.   RRIF Lender's Authorized Representative ..............................................58
Section 27.   Servicer ...................................................................................................58
Section 28.   Fees and Expenses ..................................................................................59
Section 29.   Amendments and Waivers ......................................................................60
Section 30.   Governing Law ........................................................................................60
Section 31.   Severability .............................................................................................60
Section 32.   Successors and Assigns ...........................................................................60
Section 33.   Remedies Not Exclusive .........................................................................60
Section 34.   Delay or Omission Not Waiver ...............................................................60
Section 35.   Counterparts; Electronic Signatures .......................................................61
Section 36.   Notices ....................................................................................................61
Section 37.   Effectiveness ...........................................................................................62
Section 38.   Termination .............................................................................................62
Section 39.   Integration ...............................................................................................62

1714408.05-WASSR01A - MSW

**SCHEDULE I** – Project Budget

**SCHEDULE II** – Construction Schedule


**EXHIBIT A** – Anticipated RRIF Loan Disbursement Schedule

**EXHIBIT B** – RRIF Debt Service

**EXHIBIT C** – RRIF Loan Reamortization Methodology

**EXHIBIT D** – Requisition Procedures

**EXHIBIT E** – Form of RRIF Promissory Note

**EXHIBIT F** – Compliance With Laws

**EXHIBIT G** – Opinions Required from Counsel to Borrower

**EXHIBIT H** – Non-Debarment Certification

**EXHIBIT I** – Form of Borrower's Officer's Certificate

**EXHIBIT J** – Form of Certificate of Collateral Agent

**EXHIBIT K** – Certification Regarding Lobbying

**EXHIBIT L** – Form of Certificate of Substantial Completion

**EXHIBIT M** – Reporting Subawards and Executive Compensation

**EXHIBIT N** – Employee Protection Arrangements

1714408.05-WASSR01A - MSW

**RRIF LOAN AGREEMENT**

**THIS RRIF LOAN AGREEMENT** (this "**Agreement**"), dated as of July 8, 2024, is by and between **GATEWAY DEVELOPMENT COMMISSION**, a body politic and corporate, a public authority and a government sponsored authority established by the State of New Jersey and the State of New York, with an address of 120 Broadway – 10th Floor, New York, New York 10271 (the "**Borrower**"), and the **UNITED STATES DEPARTMENT OF TRANSPORTATION**, an agency of the United States of America, acting by and through the Executive Director of the Build America Bureau (the "**Executive Director**"), with an address of 1200 New Jersey Avenue, S.E., Washington, D.C. 20590 (the "**RRIF Lender**").

**RECITALS:**

WHEREAS, the Congress of the United States of America (the "**Congress**") has found that a well-developed system of transportation infrastructure is critical to the economic well-being, health and welfare of the people of the United States of America and, in furtherance thereof, has created the Railroad Rehabilitation and Improvement Financing program ("**RRIF**") codified at 49 U.S.C. §§ 22401-22406 (as amended from time to time, the "**Act**"); and

WHEREAS, Section 22402 of the Act authorizes the RRIF Lender to provide direct loans and loan guarantees to eligible project sponsors; and

WHEREAS, the Borrower has requested that the RRIF Lender make the RRIF Loan (as defined herein), to pay a portion of the Eligible Project Costs (as defined herein) related to the Project (as defined herein) pursuant to the application for RRIF credit assistance dated May 1, 2024 (the "**Application**"); and

WHEREAS, on June 6, 2024 the Secretary (as defined herein) approved RRIF credit assistance for the Project in the form of the RRIF Loan (as defined herein); and

WHEREAS, the RRIF Lender is prepared to extend credit upon the terms and conditions hereof; and

WHEREAS, the Borrower agrees to repay any amount due pursuant to this Agreement and the RRIF Note (as defined herein) in accordance with the terms and provisions hereof and thereof; and

WHEREAS, the RRIF Lender has entered into this Agreement in reliance upon, among other things, the GDC Act, the Fundamental Contracts, and the Direct Agreement (each as defined herein).

NOW, THEREFORE, the premises being as stated above, and for good and valuable consideration, the receipt and sufficiency of which are acknowledged to be adequate, and intending to be legally bound hereby, it is hereby mutually agreed by and between the Borrower and the RRIF Lender as follows:

Section 1.    Definitions.  Unless the context otherwise requires, capitalized terms used in this Agreement shall have the meanings set forth below in this Section 1 (*Definitions*) or as otherwise defined in this Agreement.  Any term used in this Agreement that is defined by reference to any other agreement shall continue to have the meaning specified in such agreement, whether or not such agreement remains in effect.

"**Acceptable Credit Rating**" means, with respect to any Person, the rating of its unsecured, senior long-term indebtedness (or, if such Person has no such rating, then its issuer rating or corporate credit rating) is no lower than 'A+', 'A1' or the equivalent rating from at least one (1) Rating Agency that provides a rating on such Person's unsecured, senior long-term indebtedness or that provides an issuer rating or corporate credit rating for such Person, as applicable.

"**Account**" has the meaning ascribed to the term "PANYNJ RRIF Account" in the CASA.

"**Act**" means the Act as defined in the recitals hereto.

"**Agreement**" has the meaning provided in the preamble hereto.

"**Amtrak**" means the National Railroad Passenger Corporation (d/b/a Amtrak).

"**Anti-Corruption Laws**" means all U.S. and other applicable laws, rules and regulations, as amended from time to time, concerning or related to bribery or corruption.

"**Anti-Money Laundering Laws**" means all U.S. and other applicable laws, rules and regulations, as amended from time to time, concerning or related to anti-money laundering, including but not limited to those contained in the Bank Secrecy Act and the Patriot Act.

"**Anticipated RRIF Loan Disbursement Schedule**" means the schedule set forth in **Exhibit A**, reflecting the anticipated disbursement of proceeds of the RRIF Loan, as such schedule may be amended from time to time pursuant to Section 4(c) (*Disbursement Conditions*) of this Agreement.

"**Application**" has the meaning provided in the recitals hereto.

"**Bank Secrecy Act**" means the Bank Secrecy Act of 1970 (Titles I and II of Pub. L. No. 91-508, codified at 12 U.S.C. §§ 1829b and 1951-1960 and 31 U.S.C. §§ 312, 5311-5313, and 5316-5322), as amended from time to time, and any successor statute of similar import, and the regulations promulgated thereunder.

"**Bankruptcy Related Event**" means, with respect to any Person,

(a)    an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, reorganization or other relief in respect of such Person or any of its debts, or of a substantial part of the assets thereof, under any Insolvency Laws, or (ii) the appointment of a receiver, trustee, liquidator, custodian, sequestrator, conservator or similar official for such Person or for a substantial part of the assets thereof and, in any case referred to in the foregoing subclauses (i) and (ii), such proceeding or petition shall

2

continue undismissed for sixty (60) days or an order or decree approving or ordering any of the foregoing shall be entered; or

(b)    such Person shall (i) apply for or consent to the appointment of a receiver, trustee, liquidator, custodian, sequestrator, conservator or similar official therefor or for a substantial part of the assets thereof, (ii) generally not be paying its debts as they become due unless such debts are the subject of a bona fide dispute, or become unable to pay its debts generally as they become due, (iii) solely with respect to the Borrower, fail to make two (2) consecutive payments of RRIF Debt Service in accordance with the provisions of Section 9 (*Payment of Principal and Interest*), (iv) make a general assignment for the benefit of creditors, (v) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition with respect to it described in clause (a) of this definition, (vi) commence a voluntary proceeding under any Insolvency Law, or file a voluntary petition seeking liquidation, reorganization, an arrangement with creditors or an order for relief under any Insolvency Law, (vii) file an answer admitting the material allegations of a petition filed against it in any proceeding referred to in the foregoing subclauses (i) through (vi), inclusive, of this clause (b), or (viii) take any action for the purpose of effecting any of the foregoing, including seeking approval or legislative enactment by any Governmental Authority to authorize commencement of a voluntary proceeding under any Insolvency Law.

"**Base Case Financial Model**" means a financial model prepared by the Borrower that includes (a) for each six (6) month period (commencing on January 1 and July 1, respectively) through the later of (i) the Final Maturity Date and (ii) the latest final maturity date under any Other RRIF Loan Agreement, a forecast of all Contract Payments, all Contract Payments under (and as defined in) each Other Funding Agreement, and all expenditures and funding obligations of the Borrower or related to the Project, (b) for each six (6) month period (commencing on January 1 and July 1, respectively) through the later of (i) the Final Maturity Date and (ii) the latest final maturity date under any Other RRIF Loan Agreement, a forecast of all RRIF Debt Service, all debt service in respect of the Other RRIF Loans, and all debt service in respect of all other Obligations, and (c) the Project Budget, which model, in each case in clauses (a), (b), and (c) above, shall be based upon assumptions and a methodology provided by the Borrower and acceptable to the RRIF Lender as of the Effective Date, and which model shall be provided to the RRIF Lender as a fully functional Microsoft Excel-based financial model or shall use such other format requested by the RRIF Lender.

"**Borrower**" has the meaning provided in the preamble hereto.

"**Borrower Default Rate Incremental Amount**" means the amount of any interest, included in any amount of RRIF Debt Service due on a Semi-Annual Payment Date or capitalized pursuant to Section 9(b) (*Capitalized Interest Period*), that (a) has accrued and is in excess of the interest that accrued at the RRIF Interest Rate as a result of the application of the Default Rate and (b) is not payable by the Funding Partner in accordance with the Funding Agreement.

"**Borrower Fiscal Year**" means (a) as of the Effective Date, a fiscal year of the Borrower commencing on January 1 of any calendar year and ending on December 31 of such calendar year or (b) such other fiscal year as the Borrower may hereafter adopt after giving thirty (30) days' prior

3

written notice to the RRIF Lender, as provided in Section 16(d) (*Organizational Documents; Fiscal Year*).

"**Borrower's Authorized Representative**" means any Person who shall be designated as such pursuant to Section 25 (*Borrower's Authorized Representative*).

"**Business Day**" means any day other than a Saturday, a Sunday or a day on which offices of the Federal Government or the State of New York are authorized to be closed or on which commercial banks are authorized or required by law, regulation or executive order to be closed in New York, New York.

"**Capital Expenditures**" means expenditures made or liabilities incurred for the acquisition of any assets, improvements or replacements thereof that have a useful life of more than one (1) year and that are capitalized in accordance with GAAP.

"**Capitalized Interest Period**" means the period from (and including) the Effective Date to (but excluding) the first day of the initial Payment Period.

"**CASA**" means that certain Collateral Accounts and Security Agreement, dated as of the Effective Date, by and among the Borrower, the RRIF Lender, the Collateral Agent, and the Securities Intermediary (as defined therein).

"**CIG**" means that certain Capital Investment Grant awarded by the FTA to the Borrower pursuant to the FFGA.

"**Collateral**" means all of the right, title and interest of the Borrower, whether now owned or hereafter acquired or arising, in and to (a) the Funding Agreement, including all right, title, and interest of the Borrower in the Contract Payments payable thereunder, (b) the Account, and (c) all Proceeds (as defined in the CASA) and products in whatever form of all or any part of the foregoing items (a) and (b), including all security entitlements carried therein, and all cash, cash equivalents, instruments, Permitted Investments and other funds or amounts on deposit in the Account.

"**Collateral Agent**" means The Bank of New York Mellon, a bank organized under the laws of the state of New York.

"**Congress**" has the meaning provided in the recitals hereto.

"**Construction Period**" means the period from the Effective Date through the Substantial Completion Date.

"**Construction-Related Contract Party**" means any Person (other than the Borrower) party to a Construction-Related Contract.

"**Construction-Related Contracts**" means

    (a)    Master Services Agreement, Contract No. GDC-24-005-HTP, dated as of March 18, 2024, between the Borrower and MPA Delivery Partners;

4

(b)    Design-Build Agreement, dated as of March 11, 2024, between the Borrower and Weeks Marine, Inc.;

(c)    Tonnelle Avenue Overhead Bridge and Utility Relocations, Contract GDC23-002, dated as of October 12, 2023, between the Borrower and Conti Civil, LLC;

(d)    GDC Agreement GDC-23-001, dated as of September 29, 2023, between the Borrower and Naik Consulting Group, P.C.; and

(e)    each other construction-related contract entered into by the Borrower in connection with the New Tunnel from time to time.

"**Construction Schedule**" means (a) the initial schedule or schedules on which the construction timetables for the Project are set forth, attached as **Schedule I**, and (b) any updates thereto included in the Financial Plan most recently submitted to the RRIF Lender pursuant to Section 21(a)(iv)(B) (*Financial Plan*).

"**Contract Payments**" has the meaning set forth in the Funding Agreement.

"**Control**" means, when used with respect to any particular Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or partnership or other ownership interests, by contract or otherwise, and the terms "Controlling" and "Controlled by" have meanings correlative to the foregoing.

"**CPI**" means the Consumer Price Index for All Urban Consumers (CPI-U) for the U.S. City Average for All Items, 1982-84=100 (not seasonally adjusted), or its successor, published by the Bureau of Labor Statistics, with, unless otherwise specified herein, January 2024 as the base period.

"**Credit Risk Premium**" means a nonrefundable fee in the amount of zero dollars ($0.00) for each disbursement of the RRIF Loan.

"**Debt Service Payment Commencement Date**" means October 15, 2034.

"**Default**" means any event or condition that, with the giving of notice, the passage of time, or both, would constitute an Event of Default.

"**Default Rate**" means an interest rate equal to the sum of (a) the RRIF Interest Rate plus (b) two percent (2.00%).

"**Development Default**" means (a) the Borrower fails to diligently prosecute the work related to the Project and, if a Recovery Plan has been provided in accordance with Section 22(d) (*Recovery Plan*), in accordance with such Recovery Plan, or (b) the Borrower fails to complete the Project by the Projected Substantial Completion Date or, if a Recovery Plan has been provided in accordance with Section 22(d) (*Recovery Plan*), in accordance with the updated Projected Substantial Completion Date established pursuant to such Recovery Plan.

1710417.19-WASSR01A - MSW

"**Direct Agreement**" means that certain Direct Agreement (PANYNJ), dated as of the date hereof, among the RRIF Lender, the Borrower and the Funding Partner, and acknowledged and agreed to by the Collateral Agent.

"**Effective Date**" means the date of this Agreement.

"**Electronic Signature**" means any electronic symbol or process attached to or logically associated with a contract or other record and executed or adopted by a person with the intent to sign such contract or record pursuant to the Electronic Signatures in Global and National Commerce Act (15 U.S.C. § 7001 *et seq.*), as amended from time to time.

"**Eligible Project Costs**" means amounts in the Project Budget, substantially all of which are paid by or for the account of the Borrower in connection with the Project, all of which shall arise from the following:

(a)     development phase activities, including planning, feasibility analysis, revenue forecasting, environmental review, permitting, preliminary engineering and design work and other preconstruction activities;

(b)     construction, reconstruction, rehabilitation, replacement and acquisition of real property (including land related to the Project and improvements to land), environmental mitigation, construction contingencies and acquisition of equipment; or

(c)     capitalized interest necessary to meet market requirements, reasonably required reserve funds, capital issuance expenses and other carrying costs during construction;

provided, however, that Eligible Project Costs must be consistent with the Act and all other applicable federal law.

"**Environmental Laws**" has the meaning provided in Section 13(r) (*Environmental Matters*).

"**ERISA**" means the Employee Retirement Income Security Act of 1974, Pub. L. 93-406 (29 U.S.C. § 1001 *et seq.*), as amended from time to time, and any successor statute of similar import, and the regulations thereunder.

"**ERISA Affiliate**" means any trade or business (whether or not incorporated) that, together with the Borrower, is treated as a single employer under Section 414(b) or (c) of the Tax Code or, solely for purposes of Section 302 of ERISA and Section 412 of the Tax Code, is treated as a single employer under Section 414 of the Tax Code.

"**Event of Default**" has the meaning provided in Section 19(a) (*Events of Default and Remedies*).

"**Event of Loss**" means any event or series of events that causes any portion of the Project to be damaged, destroyed or rendered unfit for normal use for any reason whatsoever, including through a failure of title, or any loss of such property, or a condemnation.

1710417.19-WASSR01A - MSW

"**Executive Director**" has the meaning provided in the preamble hereto.

"**Federal Fiscal Year**" or "**FFY**" means the fiscal year of the Federal Government, which is the twelve (12) month period that ends on September 30 of the specified calendar year and begins on October 1 of the preceding calendar year.

"**Federal Government**" means the Federal Government of the United States of America and its departments and agencies.

"**Federal Grant Agreements**" means the FFGA, the FSP Grant Agreement, and the RAISE Grant Agreement.

"**Federal Grants**" means the CIG, the FSP Grant, and the RAISE Grant.

"**FFGA**" means that certain Full Funding Grant Agreement (Hudson Tunnel Project, Project No. NY-2024-015-00), dated as of July 8, 2024, by and between the United States of America, acting through the FTA and the Borrower.

"**Final Maturity Date**" means April 15, 2069.

"**Financial Plan**" means the financial plan for each Borrower Fiscal Year to be delivered pursuant to Section 21(a) (*Financial Plan*).

"**Financial Statements**" has the meaning provided in Section 13(w) (*Financial Statements*).

"**Fixed Level Payment**" has the meaning provided in Section 9(c) (*Payment of RRIF Debt Service*).

"**FRA**" means the Federal Railroad Administration, a modal agency of the USDOT.

"**FRA Regional Office**" means the United States Department of Transportation, Federal Railroad Administration, Region II Office.

"**FSP Grant**" means that certain Federal-State Partnership for Intercity Passenger Rail Grant awarded to the Borrower in connection with the Project pursuant to the FSP Grant Agreement.

"**FSP Grant Agreement**" means the agreement, to be entered into between the Borrower and FRA, governing the FSP Grant.

"**FTA**" means the Federal Transit Administration, a modal agency of the USDOT.

"**FTA Project Management Oversight Requirements**" means the requirements and conditions for FTA project management oversight, as set forth in 49 U.S.C. § 5327 and in 49 C.F.R. Part 633.

"**FTA Regional Office**" means the United States Department of Transportation, Federal Transit Administration, Region 2 Office.

7

1710417.19-WASSR01A - MSW

"**Fundamental Contract Party**" means any Person (other than the Borrower) party to a Fundamental Contract.

"**Fundamental Contracts**" means the Funding Agreement and the Project Development Agreement.

"**Funding Agreement**" means that certain Hudson Tunnel Project RRIF Loan Funding Agreement, dated as of April 8, 2024, by and between the Funding Partner and the Borrower.

"**Funding Partner**" means the Port Authority of New York and New Jersey, a body corporate and politic, created by compact between the State of New York and the State of New Jersey with the consent of Congress.

"**Funding Partner Default Rate Incremental Amount**" means the amount of any interest, included in any amount of RRIF Debt Service to be capitalized pursuant to Section 9(b) (*Capitalized Interest Period*), that (a) has accrued and is in excess of the interest that accrued at the RRIF Interest Rate as a result of the application of the Default Rate and (b) is payable by the Funding Partner in accordance with the Funding Agreement.

"**GAAP**" means generally accepted accounting principles as defined by the Governmental Accounting Standards Board, or such other nationally recognized professional body, in effect from time to time in the United States of America.

"**GANs**" means any grant anticipation notes issued by the Borrower after the Effective Date.

"**GDC Act**" means the parallel legislation by the State of New York and the State of New Jersey, codified as the Gateway Development Commission Act (2019 N.Y. Laws, Ch. 108 and N.J.S.A. 32:36-1, *et seq.*).

"**GDC Operations Funding Agreement**" means any agreement entered into between or among the Borrower, the State of New York, the State of New Jersey, and/or Amtrak pursuant to Section 11.01 of the Project Development Agreement to provide funding for the Borrower's annual operating budget.

"**Government Obligations**" means (a) direct obligations of, or obligations on which the timely payment of principal and interest are fully and unconditionally guaranteed by, the Federal Government, (b) bonds, debentures or notes issued by any of the following federal agencies: Banks for Cooperatives, Federal Intermediate Credit Banks, Federal Home Loan Banks, Export-Import Bank of the United States, Government National Mortgage Association or Federal Land Banks, (c) obligations issued or guaranteed by a Person Controlled or supervised by and acting as an instrumentality of the Federal Government pursuant to authority granted by the Congress, and (d) evidences of ownership of proportionate interests in future interest or principal payments on obligations specified in clauses (a), (b) and (c) of this definition held by a bank or trust company as custodian and which underlying obligations are not available to satisfy any claim of the custodian or any Person claiming through the custodian or to whom the custodian may be obligated, in each case.

8

"**Governmental Approvals**" means all authorizations, consents, approvals, waivers, exceptions, variances, filings, permits, orders, licenses, exemptions and declarations of or with any Governmental Authority.

"**Governmental Authority**" means any federal, state, provincial, county, city, town, village, municipal or other government or governmental department, commission, council, court, board, bureau, agency, authority or instrumentality (whether executive, legislative, judicial, administrative or regulatory), of or within the United States of America or its territories or possessions, including the states and their respective counties and municipalities, and their respective courts, agencies, instrumentalities and regulatory bodies, or any entity that acts "on behalf of" any of the foregoing, whether as an agency or authority of such body.

"**Indemnitee**" has the meaning provided in Section 17 (*Indemnification*).

"**Insolvency Laws**" means the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq*., as from time to time amended and in effect, and any state bankruptcy, insolvency, receivership, conservatorship or similar law now or hereafter in effect.

"**Level Payment Commencement Date**" means October 15, 2039.

"**Level Payment Period**" means the period commencing on the Level Payment Commencement Date and ending on the Final Maturity Date (or on such earlier date as all amounts due or to become due to the RRIF Lender hereunder have been irrevocably paid in full in cash).

"**Lien**" means any mortgage, pledge, hypothecation, assignment, mandatory deposit arrangement, encumbrance, attachment, lien (statutory or other), charge or other security interest, or preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever, including any sale-leaseback arrangement, any conditional sale or other title retention agreement, any financing lease having substantially the same effect as any of the foregoing, and the filing of any financing statement or similar instrument under the UCC or any other applicable law.

"**Loan Amortization Schedule**" means the Loan Amortization Schedule set forth in **Exhibit B**, as amended from time to time in accordance with Section 7 (*Outstanding RRIF Loan Balance; Revisions to Exhibit B and Loan Amortization Schedule*).

"**Material Adverse Effect**" means a material adverse effect on (a) the Project (until the Substantial Completion Date) or the Contract Payments, (b) the business, operations, properties, condition (financial or otherwise) or prospects of the Borrower, (c) the legality, validity or enforceability of any material provision of any RRIF Loan Document or Fundamental Contract, (d) the ability of (1) the Borrower to enter into, perform or comply with any of its material obligations under any RRIF Loan Document or (2) the Funding Partner to enter into, perform, or comply with any of its material obligations under the Funding Agreement, (e) the validity, enforceability or priority of the Liens granted under the CASA on the Collateral in favor of the Collateral Agent (on behalf of the RRIF Lender) or (f) the RRIF Lender's rights or remedies available under any RRIF Loan Document.

"**Modal Grant Offices**" means the FRA Regional Office and the FTA Regional Office.

9

"**NEPA**" means the National Environmental Policy Act of 1969, Pub. L. 91-190 (42 U.S.C. § 4321 *et seq.*), and any successor statute of similar import, and regulations thereunder, in each case as in effect from time to time.

"**NEPA Determination**" means the Record of Decision for the Project issued by the FTA Regional Office and the FRA on May 28, 2021, in accordance with NEPA.

"**New Tunnel**" means the portions of the Project, as defined herein, described in clause (a) of the definition thereof.

"**New York Funding Agreement**" means that certain Service Contract, dated as of March 31, 2024, by and between the State of New York, acting by and through the Director of the Budget of the State of New York, and the Borrower.

"**NJT**" means the New Jersey Transit Corporation, a body corporate and politic and an instrumentality of the State, organized and existing by virtue of the New Jersey Public Transportation Act of 1979, constituting Chapter 150 of the Laws of New Jersey of 1979, as amended and supplemented (N.J.S.A. 27:25-1 *et seq.*).

"**NJT Funding Agreement**" means that certain Hudson Tunnel Project Funding Agreement (RRIF Loan), dated as of March 31, 2024, by and between the Borrower and NJT.

"**Obligations**" means the RRIF Loan, each Other RRIF Loan, the Working Capital Facility, the GANs, and any other indebtedness for borrowed money of the Borrower.

"**OFAC**" means the Office of Foreign Assets Control of the United States Department of the Treasury.

"**Organizational Documents**" means: (a) with respect to any Person that is a Governmental Authority, (i) the constitutional and statutory provisions that are the basis for the existence and authority of such Governmental Authority, including any enabling statutes, ordinances or public charters and any other organic laws establishing such Governmental Authority and (ii) the bylaws, code of regulations, operating procedures or other organizational documents of or adopted by such Governmental Authority by which such Governmental Authority, its powers, operations or procedures or its securities, bonds, notes or other obligations are governed or from which such powers are derived; and (b) with respect to a Person that is not a Governmental Authority, (i) to the extent such Person is a corporation, the certificate or articles of incorporation and the by-laws of such Person, (ii) to the extent such Person is a limited liability company, the certificate of formation or articles of formation or organization and operating or limited liability company agreement of such Person and (iii) to the extent such Person is a partnership, joint venture, trust or other form of business, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization or formation of such Person.

"**Other Borrower Financing Documents**" means the indenture, credit agreement or other definitive documents pursuant to which any Obligations (other than the RRIF Loan and the Other

10

RRIF Loans) are issued or incurred, including any other agreement, instrument and document executed and/or delivered pursuant to or in connection with any of the foregoing.

"**Other Funding Agreements**" means, collectively:

(a)    the NJT Funding Agreement; and

(b)    the New York Funding Agreement.

"**Other Funding Partner**" means (i) with respect to the New York Funding Agreement, the State of New York, acting by and through the Director of the Budget of the State of New York, and (ii) with respect to the NJT Funding Agreement, NJT.

"**Other RRIF Loan**" means each secured loan made by the RRIF Lender to the Borrower on the terms and conditions set forth in the Other RRIF Loan Agreements.

"**Other RRIF Loan Agreements**" means, collectively:

(a)    the RRIF Loan Agreement (NJT Funding Agreement); and

(b)    the RRIF Loan Agreement (New York Funding Agreement).

"**Outstanding RRIF Loan Balance**" means the aggregate principal amount drawn by the Borrower and then outstanding (including capitalized interest) with respect to the RRIF Loan, as determined in accordance with Section 7 (*Outstanding RRIF Loan Balance, Revisions to Exhibit B and Loan Amortization Schedule)*.

"**Patriot Act**" means the USA PATRIOT Act, also known as the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Pub. L. 107-56, as amended from time to time, and any successor statute of similar import, and the regulations promulgated thereunder.

"**Payment Default**" has the meaning provided in Section 19(a) (*Events of Default and Remedies*).

"**Payment Period**" means any period of six (6) months from (and including) a Semi-Annual Payment Date to (but excluding) the immediately succeeding Semi-Annual Payment Date, commencing with the six (6) month period ending on the date immediately prior to the Debt Service Payment Commencement Date.

"**Permitted Investments**" means (with respect to the investment of the proceeds of the RRIF Loan or any construction or reserve account established and maintained pursuant to the CASA):

(a)    Government Obligations;

(b)    certificates of deposit where the certificates are collaterally secured by securities of the type described in clause (a) of this definition and held by a third party as

11

1710417.19-WASSR01A - MSW

escrow agent or custodian, of a market value not less than the amount of the certificates of deposit so secured, including interest, but this collateral is not required to the extent the certificates of deposit are insured by the Federal Government;

(c)     repurchase agreements with counterparties that have an Acceptable Credit Rating, when collateralized by securities of the type described in clause (a) of this definition and held by a third party as escrow agent or custodian, of a market value not less than the amount of the repurchase agreement so collateralized, including interest;

(d)     investment agreements or guaranteed investment contracts rated, or with any financial institution whose senior long-term debt obligations are rated, or guaranteed by a financial institution whose senior long-term debt obligations are rated in one of the two (2) highest rating categories (without regard to any refinement or gradation of such rating by a numerical modifier or otherwise) for comparable types of obligations by any Rating Agency; and

(e)     money market funds that invest solely in obligations of the United States of America, its agencies and instrumentalities, and having a rating by a Rating Agency equal to the then applicable rating of the United States of America by such Rating Agency.

"**Person**" means and includes an individual, a general or limited partnership, a joint venture, a corporation, a limited liability company, a trust, an unincorporated organization and any Governmental Authority.

"**Project**" means (a) the construction of a new Hudson River Tunnel between New York and New Jersey; (b) the rehabilitation of the existing North River Tunnel under the Hudson River; and (c) Hudson Yards Concrete Casing – Section 3 Long Island Rail Road Emergency Services Building Utility Relocation Early Work associated with the separately funded Hudson Yards Concrete Casing Section 3 project, in each case of clauses (a) through (c) as more fully described in the Federal Grant Agreements.

"**Project Budget**" means the budget for the Project in the aggregate amount of $15,783,729,598 attached to this Agreement as **Schedule I** showing a summary of Total Project Costs with a breakdown of all Eligible Project Costs for the Project and the estimated sources and uses of funds for the Project, as amended from time to time subject to the reporting requirements in Section 22(b) (*Monthly Construction Progress Report*).

"**Project Development Agreement**" means that certain Project Development Agreement for Hudson Tunnel Project, dated as of February 3, 2023, by and among Borrower, the State of New York, the State of New Jersey, and Amtrak, as amended by those certain amendments, dated as of May 2, 2023, and as of March 5, 2024.

"**Projected Substantial Completion Date**" means November 9, 2040.

"**RAISE Grant**" means that certain Rebuilding America's Infrastructure with Sustainability and Equity (RAISE) program grant, awarded to the Borrower in connection with the Project pursuant to the RAISE Grant Agreement.

1710417.19-WASSR01A - MSW

"**RAISE Grant Agreement**" means that certain Grant Agreement under the Fiscal Year 2023 RAISE Program, dated as of June 4, 2024, by and between FTA and the Borrower.

"**Rating Agency**" means a rating agency registered with the Securities and Exchange Commission as a nationally recognized statistical rating organization (as defined in 15 U.S.C. § 78c(a)(62)).

"**Recovery Plan**" means a recovery plan with respect to the implementation of the Project that has been prepared by the Borrower in accordance with the FFGA and the FSP Agreement, as applicable, and delivered to the RRIF Lender and the FTA Regional Office on behalf of both Modal Grant Offices.

"**Related Documents**" means the RRIF Loan Documents, the Federal Grant Agreements, and the Fundamental Contracts.

"**Requisition**" has the meaning provided in Section 4(a) (*Disbursement Conditions*).

"**Revised Financial Model**" means an updated version of the Base Case Financial Model, in form and substance satisfactory to the RRIF Lender, taking into account changes in projected revenues, expenditures or other modeling assumptions since the delivery of the Base Case Financial Model (or, as applicable, the most recently submitted Revised Financial Model) and including a change log describing such changes.

"**RRIF**" has the meaning provided in the recitals hereto.

"**RRIF Debt Service**" means, with respect to any Semi-Annual Payment Date occurring on or after the Debt Service Payment Commencement Date, the principal portion of the Outstanding RRIF Loan Balance and any interest payable thereon (including interest accruing after the date of any filing by the Borrower of any petition in bankruptcy or the commencement of any bankruptcy, insolvency, or similar proceeding with respect to the Borrower) at the RRIF Interest Rate or, as applicable, the Default Rate, in each case, then due and payable on such Semi-Annual Payment Date in accordance with Section 9(c) (*Payment of RRIF Debt Service*).

"**RRIF Interest Rate**" has the meaning provided in Section 6 (*Interest Rate*).

"**RRIF Lender**" has the meaning provided in the preamble hereto.

"**RRIF Lender's Authorized Representative**" means the Executive Director and any other Person who shall be designated as such pursuant to Section 26 (*RRIF Lender's Authorized Representative*).

"**RRIF Loan**" means the direct loan made by the RRIF Lender to the Borrower on the terms and conditions set forth herein, in a principal amount not to exceed $1,870,000,000 (excluding capitalized interest), pursuant to the Act to be used in respect of Eligible Project Costs paid or incurred by or on behalf of the Borrower.

"**RRIF Loan Agreement (New York Funding Agreement)**" means that certain RRIF Loan Agreement (New York Funding Agreement), dated as of the date hereof, between the RRIF

13

1710417.19-WASSR01A - MSW

Lender and the Borrower, to be supported by certain payments to be provided by the State of New York pursuant to the New York Funding Agreement.

"**RRIF Loan Agreement (NJT Funding Agreement)**" means that certain RRIF Loan Agreement (NJT Funding Agreement), dated as of the date hereof, between the RRIF Lender and the Borrower, to be supported by certain payments to be provided by NJT pursuant to the NJT Funding Agreement.

"**RRIF Loan Documents**" means this Agreement, the RRIF Note, the Direct Agreement, the CASA, the Waiver, and all filings, recordings or registrations required by the RRIF Loan Documents to be filed or made in respect of the CASA.

"**RRIF Note**" means the promissory note delivered by the Borrower substantially in the form of **Exhibit E**.

"**Sanctioned Country**" means, at any time, a country or territory which is itself the subject or target of any Sanctions.

"**Sanctioned Person**" means, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by OFAC or the U.S. Department of State, (b) any Person operating, organized or resident in a Sanctioned Country, or (c) any Person owned or Controlled by any such Person or Persons.

"**Sanctions**" means economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by the Federal Government, including those administered by OFAC or the U.S. Department of State.

"**Secretary**" means the United States Secretary of Transportation.

"**Semi-Annual Payment Date**" means each April 15 and October 15.

"**SEP Agreement**" means any agreement entered into by the Borrower and any user or operator of any element of the Project, or other governmental entity partnering with the Borrower to support the delivery of any work package associated with the Project.

"**SEP Agreement Party**" means any Person (other than the Borrower) party to a SEP Agreement.

"**Servicer**" means such entity or entities as the RRIF Lender shall designate from time to time to perform, or assist the RRIF Lender in performing, certain duties hereunder.

"**Substantial Completion**" means the later to occur of Amtrak or NJT commencing, or having commenced, revenue operations on both of the elements described in clauses (a) and (b) of the definition of "Project."

"**Substantial Completion Date**" means the date on which Substantial Completion occurs.

14

"**Tax Code**" means the Internal Revenue Code of 1986, as amended from time to time, and any successor statute of similar import, and the regulations promulgated thereunder.

"**Total Project Costs**" means (a) the costs paid or incurred or to be paid or incurred, either by the Borrower or a SEP Agreement Party, in connection with or incidental to the acquisition, design, construction and equipping of the Project, including (solely in respect of the Borrower) legal, administrative, engineering, planning, design, and insurance costs, and costs of issuance; (b) amounts, if any, required by the Other Borrower Financing Documents to be paid into any fund or account upon the incurrence of any Obligations; (c) without duplication of amounts described in clause (a), payments when due (whether at the maturity of principal, the due date of interest, or upon optional or mandatory prepayment) during the Construction Period in respect of any Obligations (other than the RRIF Loan and each Other RRIF Loan); and (d) furniture, fixtures and equipment, and general administrative expenses and overhead of the Borrower.

"**Uncontrollable Force**" means any cause beyond the control of the Borrower, including: (a) a hurricane, tornado, flood or similar occurrence, landslide, earthquake, fire or other casualty, strike or labor disturbance, freight embargo, act of a public enemy, explosion, war, blockade, terrorist act, insurrection, riot, general arrest or restraint of government and people, civil disturbance or similar occurrence, sabotage, or act of God (provided that the Borrower shall not be required to settle any strike or labor disturbance in which it may be involved) or (b) the order or judgment of any federal, state or local court, administrative agency or governmental officer or body, if it is not also the result of willful or negligent action or a lack of reasonable diligence of the Borrower and the Borrower does not control the administrative agency or governmental officer or body; provided that the diligent contest in good faith of any such order or judgment shall not constitute or be construed as a willful or negligent action or a lack of reasonable diligence of the Borrower.

"**Uniform Commercial Code**" or "**UCC**" means the Uniform Commercial Code, as in effect from time to time in the State of New York.

"**USDOT**" means the United States Department of Transportation.

"**Waiver**" means that certain Waiver and Disclaimer, dated as of the date hereof, among the RRIF Lender, the Collateral Agent, the Borrower, Bank of America, N.A., and the other Persons from time to time party thereto.

"**Working Capital Facility**" means the revolving line of credit facility made available by the Working Capital Facility Lender under the Working Capital Facility Documents, the proceeds of which will be applied to the payment of Total Project Costs, and which shall be secured by the proceeds of certain Federal Grants.

"**Working Capital Facility Documents**" means (a) that certain Revolving Credit Agreement, dated as of July 8, 2024, by and between the Borrower and the Working Capital Facility Lender, (b) that certain Pledge and Security Agreement, dated as of July 8, 2024, by and between the Borrower and the Working Capital Facility Lender, and (c) each other agreement entered into by the Borrower and the Working Capital Facility Lender from time to time pursuant to or in connection with the Working Capital Facility.

15

1710417.19-WASSR01A - MSW

"**Working Capital Facility Lender**" means Bank of America, N.A., together with its successors and permitted assigns.

Section 2.    Interpretation.    Unless the context shall otherwise require, the words "hereto," "herein," "hereof," and other words of similar import refer to this Agreement as a whole. Words of the masculine gender shall be deemed and construed to include correlative words of the feminine and neuter genders and vice versa. Words importing the singular number shall include the plural number and vice versa unless the context shall otherwise require. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." Whenever the Borrower's knowledge is implicated in this Agreement or the phrase "to the Borrower's knowledge" or a similar phrase is used in this Agreement, the Borrower's knowledge or such phrase(s) shall be interpreted to mean to the best of the Borrower's knowledge after reasonable and diligent inquiry and investigation. Unless the context shall otherwise require, references to any Person shall be deemed to include such Person's successors and permitted assigns. Unless the context shall otherwise require, references to preambles, recitals, sections, subsections, clauses, schedules, exhibits, appendices and provisions are to the applicable preambles, recitals, sections, subsections, clauses, schedules, exhibits, appendices and provisions of this Agreement. The schedules and exhibits to this Agreement, and the appendices and schedules to such exhibits, are hereby incorporated by reference and made an integral part of this Agreement. The headings or titles of this Agreement and its sections, schedules or exhibits, as well as any table of contents, are for convenience of reference only and shall not define or limit its provisions. Unless the context shall otherwise require, all references to any resolution, contract, agreement, lease or other document shall be deemed to include any amendments or supplements to, or modifications or restatements or replacements of, such documents that are approved from time to time in accordance with the terms thereof and hereof. Every request, order, demand, application, appointment, notice, statement, certificate, consent or similar communication or action hereunder by any party shall, unless otherwise specifically provided, be delivered in writing in accordance with Section 36 (*Notices*) and signed by a duly authorized representative of such party.

Section 3.    RRIF Loan Amount. The principal amount of the RRIF Loan (excluding interest that is capitalized in accordance with the terms hereof) shall not exceed $1,870,000,000. RRIF Loan proceeds shall be disbursed from time to time in accordance with Section 4 (*Disbursement Conditions*) and Section 12(b) (*Conditions Precedent to All Disbursements*).

Section 4.    Disbursement Conditions

(a)    RRIF Loan proceeds shall be disbursed solely in respect of Eligible Project Costs paid or incurred by or on behalf of the Borrower in connection with the Project. The Borrower acknowledges and agrees that any costs incurred in connection with the Project prior to receipt of all necessary authorizations from the USDOT in respect of such costs (which may include approvals of prior-incurred costs) are incurred solely at the Borrower's risk and expense, will not constitute Eligible Project Costs, and no RRIF Loan proceeds will be disbursed in respect thereof, unless and until such authorizations have been received. If the Borrower intends to utilize any RRIF Loan proceeds to make progress payments for the Project construction work, the Borrower shall demonstrate to the satisfaction of the RRIF Lender that such progress payments are commensurate with the value of the work that has been completed. Each disbursement of the

16

RRIF Loan shall be made pursuant to a requisition and certification (a "**Requisition**") in the form set forth in **Appendix One** to **Exhibit D**, along with all documentation and other information required thereby, submitted by the Borrower to, and approved by, the RRIF Lender, all in accordance with the procedures of **Exhibit D** and subject to the requirements of this Section 4 (*Disbursement Conditions*), and the conditions set forth in Section 12(b) (*Conditions Precedent to All Disbursements*); provided, however, that no disbursements of RRIF Loan proceeds shall be made on or after the date that is five (5) years after the Substantial Completion Date. The amount of each disbursement of the RRIF Loan, together with all prior disbursements of the RRIF Loan, shall not exceed the amount of the RRIF Loan and shall not exceed the "Maximum Cumulative Drawn Amount" set forth in **Exhibit A** (*Anticipated RRIF Loan Disbursement Schedule*) and corresponding to the date of such disbursement.

(b)     The Borrower shall deliver copies of each Requisition to the RRIF Lender, the Servicer (if any) and the FTA Regional Office on behalf of both Modal Grant Offices on or before the first (1st) Business Day of each month prior to the month for which a disbursement is requested.  Subject to Section 4(d) (*Disbursement Conditions*), if the RRIF Lender does not expressly deny a Requisition, disbursements of funds shall be made on the first (1st) day of the month for which a disbursement has been requested, or on the next succeeding Business Day if such first (1st) day is not a Business Day.  Express denial of a Requisition by the RRIF Lender shall be provided substantially in the form attached as **Appendix Two** to **Exhibit D** (*Requisition Procedures*). In no event shall disbursements under this Agreement be made more than once each month.

(c)     The Borrower shall not amend the Anticipated RRIF Loan Disbursement Schedule in any manner that would result in a disbursement of RRIF Loan amounts in any month that exceeds the amount reflected in the "Maximum Cumulative Drawn Amount" column for such month in the Anticipated RRIF Loan Disbursement Schedule. The Borrower may amend the Anticipated RRIF Loan Disbursement Schedule to delay any disbursement of the RRIF Loan to a later date than reflected in the then current version of the Anticipated RRIF Loan Disbursement Schedule.

(d)     Notwithstanding anything to the contrary set forth in this Agreement (including this Section 4 (*Disbursement Conditions*), Section 12 (*Conditions Precedent*) or **Exhibit D** *(Requisition Procedures)*), in no event shall the RRIF Lender have any obligation to make any disbursement of proceeds of the RRIF Loan to the Borrower if the RRIF Lender's ability to make such disbursement is impaired as a result of a partial or total shutdown of the operations of any federal department or agency (including the USDOT or any of its agencies), or any contractor of any such department or agency, due to a lapse in appropriations by Congress.

Section 5.     Term.  The term of the RRIF Loan shall extend from the Effective Date to the Final Maturity Date or to such earlier date as all amounts due or to become due to the RRIF Lender hereunder have been irrevocably paid in full in cash.

Section 6.     Interest Rate.  The interest rate (the "**RRIF Interest Rate**") with respect to the outstanding principal balance of the RRIF Loan shall be four and forty-eight hundredths percent (4.48%) per annum. Interest will be computed on the outstanding principal balance (as well as on any past due interest) from time to time on the basis of a 365-day or 366-day year, as

1710417.19-WASSR01A - MSW

appropriate, for the actual number of days elapsed; provided, however, in the event of a Payment Default, the Borrower shall pay interest on the outstanding principal balance and on any interest accrued thereon but unpaid as of the applicable Semi-Annual Payment Date (including interest accruing after the date of any filing by the Borrower of any petition in bankruptcy or the commencement of any bankruptcy, insolvency or similar proceeding with respect to the Borrower) at the Default Rate from (and including) its due date to (but excluding) the date of actual payment. Upon the occurrence of any other Event of Default, the Borrower shall pay interest on the outstanding principal balance of the RRIF Loan and on any interest accrued thereon but unpaid as of the applicable Semi-Annual Payment Date (including interest accruing after the date of any filing by the Borrower of any petition in bankruptcy or the commencement of any bankruptcy, insolvency or similar proceeding with respect to the Borrower) at the Default Rate from (and including) the date such Event of Default first occurred to (but excluding) the earlier to occur of (a) the date such Event of Default has been waived in writing by the RRIF Lender and (b) the date the outstanding principal balance of the RRIF Loan and any interest accrued thereon (at the Default Rate) but unpaid has been irrevocably paid in full in cash.

Section 7.     Outstanding RRIF Loan Balance; Revisions to Exhibit B and Loan Amortization Schedule.

(a)     The Outstanding RRIF Loan Balance will be (i) increased on each occasion on which the RRIF Lender disburses loan proceeds hereunder, by the amount of such disbursement of loan proceeds; (ii) increased on each occasion on which interest on the RRIF Loan is capitalized pursuant to the provisions of Section 9(b) (*Capitalized Interest Period*), by the amount of interest so capitalized; and (iii) decreased upon each payment or prepayment of the Outstanding RRIF Loan Balance, by the amount of principal so paid.  The RRIF Lender may in its discretion at any time and from time to time, or when so requested by the Borrower, advise the Borrower by written notice of the amount of the Outstanding RRIF Loan Balance as of the date of such notice, and its determination of such amount in any such notice shall be deemed conclusive absent manifest error.

(b)     The RRIF Lender is hereby authorized to modify the Loan Amortization Schedule included in **Exhibit B** from time to time, in accordance with the principles set forth in Section 10(b) (*General Prepayment Instructions*) and in **Exhibit C**, to reflect (i) any change to the Outstanding RRIF Loan Balance, (ii) any change to the date and amount of any principal or interest due and payable or to become due and payable by the Borrower under this Agreement, and (iii) such other information as the RRIF Lender may determine is necessary for administering the RRIF Loan and this Agreement.  Any calculations described above shall be rounded up or down to the nearest whole cent.  Absent manifest error, the RRIF Lender's determination of such matters as set forth on **Exhibit B** shall be conclusive evidence thereof; provided, however, that neither the failure to make any such recordation nor any error in such recordation shall affect in any manner the Borrower's obligations hereunder or under any other RRIF Loan Document.  The RRIF Lender shall provide the Borrower with a copy of **Exhibit B,** as revised, but no failure to provide or delay in providing the Borrower with such copy shall affect any of the obligations of the Borrower under this Agreement or the other RRIF Loan Documents.

Section 8.     Security and Priority.

18

(a)     As security for the RRIF Loan, the Borrower shall pledge, assign and grant to the Collateral Agent for the benefit of the RRIF Lender, a Lien on the Collateral in accordance with the provisions of the CASA.

(b)     The Borrower is the legal and beneficial owner of the Collateral.  The filing of the financing statements attached to the CASA as Exhibit C in the filing offices set forth in Schedule I of the CASA and the taking of possession or control by the Collateral Agent of such of the Collateral with respect to which a security interest may be perfected only by possession or control will create a valid, perfected and first priority security interest in the Borrower's rights in the Collateral in favor of the Collateral Agent, subject to no other Liens (other than Permitted Liens, as defined in the CASA) and entitled to all the rights, remedies and priorities and benefits afforded by the Uniform Commercial Code and all other applicable law as enacted in any relevant jurisdiction. The Borrower shall promptly take any and all steps that may be necessary, or that the Collateral Agent may reasonably request (acting on the written instructions of the RRIF Lender) to maintain the validity, perfection and first priority position of the Liens on the Collateral (subject only to Permitted Liens, as defined in the CASA) to enable the Collateral Agent or any designee to exercise and enforce its rights, remedies, powers and privileges under this Agreement with respect to such Liens.

(c)     The Borrower shall not use Contract Payments to make any payments or satisfy any obligations other than the payment of RRIF Debt Service and fees, expenses and other amounts due and payable under the RRIF Loan Documents. The Borrower shall not apply any portion of the Contract Payments in contravention of the RRIF Loan Documents. The RRIF Loan will be payable from Contract Payments and will be the sole obligation of the Borrower secured by or payable from the Contract Payments.

Section 9.     Payment of Principal and Interest.

(a)     Semi-Annual Payment Dates.  The Borrower agrees to pay the principal of and interest on the RRIF Loan by making payments in accordance with the provisions of this Agreement and the CASA on each Semi-Annual Payment Date, beginning on the Debt Service Payment Commencement Date, and on each other date on which payment thereof is required to be made hereunder (including the Final Maturity Date); provided that if any such date is not a Business Day, payment shall be made on the next Business Day following such date.

(b)     Capitalized Interest Period.

(i)     Except as expressly provided in Section 9(b)(ii) and Section 9(b)(iii), no payment of the principal of or interest on the RRIF Loan is required to be made during the Capitalized Interest Period.  On each April 15 and October 15 occurring during the Capitalized Interest Period (and on the Semi-Annual Payment Date immediately following the end of the Capitalized Interest Period), interest accrued on the RRIF Loan (including interest accrued at the Default Rate) in the six (6) month period ending immediately prior to such date shall be capitalized and added to the outstanding principal amount of the RRIF Loan.  Within thirty (30) days after the end of the Capitalized Interest Period, the RRIF Lender shall give written notice to the Borrower stating the Outstanding RRIF Loan Balance as of the close of business on the Semi-Annual Payment Date

19

immediately following the last day of the Capitalized Interest Period, which statement thereof shall be deemed conclusive absent manifest error; provided, however, that no failure to give or delay in giving such notice shall affect any of the obligations of the Borrower hereunder or under any of the other RRIF Loan Documents.

(ii)    The Borrower may elect to pay all or a portion of the Funding Partner Default Rate Incremental Amount that would otherwise be capitalized pursuant to Section 9(b)(i) above, which payment shall be made on the Semi-Annual Payment Date as of which such Funding Partner Default Rate Incremental Amount would otherwise be capitalized. The Borrower shall provide written notice to the RRIF Lender at least fifteen (15) days prior to the date on which it makes any such payment (or, if the date on which the Funding Partner becomes liable for the Funding Partner Default Rate Incremental Amount is fewer than fifteen (15) days prior to the next Semi-Annual Payment Date, the date on which the Borrower becomes so liable), which written notice shall specify the amount of the Funding Partner Default Rate Incremental Amount to be paid on such Semi-Annual Payment Date. At any time between delivery of such written notice and the applicable Semi-Annual Payment Date, the Borrower may, without penalty or premium, rescind its announced optional payment by further written notice to the RRIF Lender. Anything in this Section 9(b) to the contrary notwithstanding, the failure by the Borrower to make any optional payment shall not constitute a breach or default under this Agreement.

(iii)    Notwithstanding Section 9(b)(i), the Borrower shall pay the amount of any Borrower Default Rate Incremental Amount that would otherwise be capitalized pursuant to Section 9(b)(i) above, which payment shall be made on the Semi-Annual Date as of which such Borrower Default Rate Incremental Amount would otherwise be capitalized pursuant to Section 9(b)(i) above. The Borrower shall provide written notice to the RRIF Lender at least fifteen (15) days prior to the date on which it makes any such payment (or, if the date on which the Borrower becomes liable for the Borrower Default Rate Incremental Amount is fewer than fifteen (15) days prior to the next Semi-Annual Payment Date, the date on which the Borrower becomes so liable), which written notice shall specify the amount of the Borrower Default Rate Incremental Amount to be paid on such Semi-Annual Payment Date; provided, that the Borrower's failure to deliver such notice shall not diminish, impair or otherwise affect the Borrower's obligation to make any such payment as and when the circumstances requiring such payment have occurred. Each payment pursuant to this Section 9(b)(iii) shall be accompanied by a certificate signed by the Borrower's Authorized Representative containing a calculation in reasonable detail of the amount of such payment.

(c)    Payment of RRIF Debt Service.

(i)    On each Semi-Annual Payment Date occurring on or after the Debt Service Payment Commencement Date and prior to the Level Payment Commencement Date, the Borrower shall pay RRIF Debt Service in the amounts set forth in respect of such Semi-Annual Payment Date on **Exhibit B**, as the same may be revised as provided in Section 7 (*Outstanding RRIF Loan Balance; Revisions to Exhibit B and Loan Amortization*

20

*Schedule*), which payments shall be made in accordance with Section 9(d) (*Manner of Payment*).

(ii)    On each Semi-Annual Payment Date occurring on or after the Level Payment Commencement Date, the Borrower shall pay RRIF Debt Service in the amounts (each a "**Fixed Level Payment**"), as set forth in respect of such Semi-Annual Payment Date on **Exhibit B**, as the same may be revised as provided in Section 7 (*Outstanding RRIF Loan Balance; Revisions to Exhibit B and Loan Amortization Schedule*), which payments shall be made in accordance with Section 9(d) (*Manner of Payment*).

(d)    Manner of Payment.  Payments under this Agreement and the RRIF Note shall be made by wire transfer on or before each Semi-Annual Payment Date in immediately available funds in accordance with payment instructions provided by the RRIF Lender pursuant to Section 36 (*Notices*), as modified in writing from time to time by the RRIF Lender.  The Borrower may make any such payment or portion thereof (or direct the Collateral Agent to make such payment) with funds then on deposit in the Account.

(e)    Final Maturity Date.  Notwithstanding anything herein to the contrary, the outstanding principal amount of the RRIF Loan and any accrued interest thereon shall be due and payable in full on the Final Maturity Date.

(f)    RRIF Note.  As evidence of the Borrower's obligation to repay the RRIF Loan, the Borrower shall issue and deliver to the RRIF Lender, on or prior to the Effective Date, the RRIF Note, substantially in the form of **Exhibit E**, having a maximum principal amount (excluding capitalized interest) of $1,870,000,000 and bearing interest at the rate set forth in Section 6 (*Interest Rate*).

Section 10.    Prepayment.

(a)    Optional Prepayments.  The Borrower may prepay the RRIF Loan at any time without penalty or premium, in whole or in part; provided, that each partial prepayment shall be in a minimum principal amount of $1,000,000.  Each prepayment shall be made on such date and in such principal amount as shall be specified by the Borrower in a written notice delivered to the RRIF Lender, which notice shall also specify the amount of unpaid interest accrued to the date of such prepayment on the amount of principal to be prepaid that the Borrower intends to pay concurrently with such prepayment.  Such written notice shall be delivered to the RRIF Lender not less than ten (10) days or more than thirty (30) days prior to the date set for prepayment, unless otherwise agreed by the RRIF Lender.  At any time between delivery of such written notice and the applicable optional prepayment, the Borrower may, without penalty or premium, rescind its announced optional prepayment by further written notice to the RRIF Lender.  Anything in this Section 10(a) (*Optional Prepayment*) to the contrary notwithstanding, the failure by the Borrower to make any optional prepayment shall not constitute a breach or default under this Agreement.

(b)    General Prepayment Instructions.  Upon the RRIF Lender's receipt of confirmation that payment in full of the entire Outstanding RRIF Loan Balance and any unpaid interest and fees with respect thereto has occurred as a result of an optional prepayment, the RRIF Lender shall surrender the RRIF Note to the Borrower or its representative at the principal office

21

of the RRIF Lender or certify to the Borrower that the RRIF Note has been destroyed in accordance with the RRIF Lender's procedures. If the Borrower prepays only part of the unpaid balance of principal of the RRIF Loan, such partial prepayments shall be applied to reduce future payments due with respect to the RRIF Loan ratably (based on the remaining number of Semi-Annual Payment Dates through and including the Final Maturity Date). Absent manifest error, the RRIF Lender's determination of such matters as set forth on **Exhibit B** shall be conclusive evidence thereof; provided, however, that neither the failure to make any such recordation nor any error in such recordation shall affect in any manner the Borrower's obligations hereunder or under any other RRIF Loan Document. Any principal amount of the RRIF Loan that is subject to a voluntary prepayment notice (as described in Section 10(a) (*Optional Prepayment*)) but that is not so paid on the applicable prepayment date shall continue to bear interest until payment thereof at the rate provided for in Section 6 (*Interest Rate*).

Section 11.    Compliance with Laws. The Borrower shall, and shall require its contractors and subcontractors at all tiers for the Project and all SEP Agreement Parties, to comply in all material respects with all applicable laws, rules, regulations, executive and administrative decrees and orders, and orders and judgments of any court or arbitral panel, including all applicable federal and state laws, rules, regulations and executive orders. The list of federal laws attached as **Exhibit F** is illustrative of the type of requirements generally applicable to transportation projects and is not intended to be exhaustive. The Modal Grant Offices have oversight responsibility for the Project, including ensuring compliance in all material respects with all applicable provisions of federal law and with the Federal Grant Agreements.

Section 12.    Conditions Precedent

(a)    Conditions Precedent to Effectiveness. Notwithstanding anything in this Agreement to the contrary, this Agreement shall not become effective until each of the following conditions precedent shall have been satisfied or waived in writing by the RRIF Lender:

(i)    The Borrower shall have duly executed and delivered to the RRIF Lender this Agreement and each other RRIF Loan Document, each in form and substance satisfactory to the RRIF Lender.

(ii)    The Borrower shall have delivered to the RRIF Lender certified, complete, and fully executed copies of each Federal Grant Agreement and each Other Borrower Financing Document, together with any amendments, waivers or modifications thereto, in each case that has been entered into on or prior to the Effective Date, and each such agreement shall be in full force and effect and in form and substance satisfactory to the RRIF Lender, and all conditions contained in such documents to the closing of the transactions contemplated thereby shall have been fulfilled or effectively waived.

(iii)    The RRIF Lender shall have received customary legal opinions, each in form and substance satisfactory to the RRIF Lender in its sole discretion, from internal and external counsel to the Borrower (including those opinions set forth on Exhibit G). The RRIF Lender shall also have received customary legal opinions, each in form and substance satisfactory to the RRIF Lender in its sole discretion, from counsel to the Funding Partner (including those opinions set forth in Exhibit A to the Direct Agreement).

22

1710417.19-WASSR01A - MSW

(iv)        The Borrower shall have provided a certificate from the Borrower's Authorized Representative as to the absence of debarment, suspension or voluntary exclusion from participation in Federal Government contracts, procurement and non-procurement matters substantially in the form attached hereto as **Exhibit H** with respect to the Borrower and its principals (as defined in 2 CFR § 180.995).

(v)        The Borrower shall have provided evidence to the RRIF Lender's satisfaction, no more than forty five (45), but no less than fourteen (14), days prior to the Effective Date, of the assignment by a Rating Agency of a public rating to the RRIF Loan, which rating shall not have been reduced, withdrawn or suspended as of the Effective Date.

(vi)        The Borrower shall have delivered to the RRIF Lender a certificate from the Borrower's Authorized Representative in the form attached hereto as **Exhibit I** (A) as to the satisfaction of certain conditions precedent set forth in this Section 12(a) (*Conditions Precedent to Effectiveness*) as required by the RRIF Lender, (B) designating the Borrower's Authorized Representative, and (C) confirming such person's position and incumbency.

(vii)        The Borrower and the Funding Partner shall have each demonstrated satisfaction of their respective conditions precedent to the effectiveness of the Direct Agreement, including the execution and delivery of all documents required in connection with satisfying such conditions precedent.

(viii)        The Borrower shall have demonstrated to the RRIF Lender's satisfaction that the sum of (A) the aggregate principal amount of the RRIF Loan and the Other RRIF Loans, (B) the aggregate amount of the Federal Grants, and (C) the maximum amount committed to the Project by Amtrak, all as reflected in the Base Case Financial Model for the Project and in the Project Budget, are sufficient to pay all Total Project Costs necessary to achieve Substantial Completion, estimated as of the Effective Date.

(ix)        The Borrower shall have provided to the RRIF Lender certified, complete, and fully executed copies of each Fundamental Contract (each in form and substance satisfactory to the RRIF Lender), each Construction-Related Contract in effect as of the Effective Date, and each SEP Agreement in effect as of the Effective Date, in each case under this clause (ix) together with any amendments, waivers or modifications thereto that have been entered into on or prior to the Effective Date and each such agreement shall be in full force and effect.

(x)        The Borrower shall have demonstrated to the RRIF Lender's satisfaction that (A) it has obtained all Governmental Approvals necessary to execute and deliver, and perform its obligations under the RRIF Loan Documents to which it is a party, (B) it held all Governmental Approvals needed for work related to the Project that was completed prior to the Effective Date, and (C) that all such Governmental Approvals are final, non-appealable, and in full force and effect (and are not subject to any notice of violation, breach, or revocation).

23

(xi)    The Borrower shall have delivered to the RRIF Lender a certified Base Case Financial Model on or prior to the Effective Date, which Base Case Financial Model shall (A) demonstrate that projected Contract Payments are sufficient to meet the Loan Amortization Schedule, and (B) otherwise be in form and substance acceptable to the RRIF Lender.

(xii)    The Borrower shall have (A) provided evidence satisfactory to the RRIF Lender that the Borrower is authorized, pursuant to the GDC Act, to pledge, assign, and grant the Liens on the Collateral purported to be pledged, assigned, and granted pursuant to the CASA, without the need for notice to any Person, physical delivery, recordation, filing or further act other than as set forth in clause (B), (B) recorded or filed, or caused to be recorded or filed, for record in such manner and in such places as are required all documents and instruments, and taken or caused to be taken all other actions, as are necessary or desirable to establish and enforce the Collateral Agent's Lien on the Collateral (for the benefit of the RRIF Lender) to the extent contemplated by the RRIF Loan Documents or the GDC Act, including delivery of a time-stamped UCC-1 financing statement, in form and substance satisfactory to the RRIF Lender and the Collateral Agent, that has been filed with the New York State Department of State, Division of Corporations, State Records and Uniform Commercial Code, (C) recorded or filed, or caused to be recorded or filed, with the New Jersey Department of the Treasury, Division of Revenue and Enterprise Services, a time-stamped UCC-1 financing statement, in form and substance satisfactory to the RRIF Lender and the Collateral Agent, and (D) paid, or caused to be paid, all taxes and filing fees that are due and payable in connection with the execution, delivery or recordation of any RRIF Loan Documents or any instruments, certificates or financing statements in connection with the foregoing.

(xiii)    The Borrower shall have paid in full all invoices delivered by the RRIF Lender (or by advisors to the RRIF Lender that have direct billing arrangements with the Borrower) to the Borrower as of the Effective Date for the reasonable fees and expenses of the RRIF Lender's counsel and advisors and any auditors or other consultants employed by the RRIF Lender for the purposes hereof (such reasonableness to be determined in accordance with Part 31 of the Federal Acquisition Regulation).

(xiv)    The Borrower shall have (A) provided evidence satisfactory to the RRIF Lender of compliance with NEPA, and (B) complied with all applicable requirements of the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 (42 U.S.C. § 4601 *et seq.)* and Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d *et seq.*) and shall have provided evidence satisfactory to the RRIF Lender of such compliance upon request by the RRIF Lender.

(xv)    The RRIF Lender shall have delivered its initial RRIF Lender's Authorized Representative certificate.

(xvi)    The Borrower shall have (A) obtained a Federal Employer Identification Number, (B) obtained a Unique Entity Identifier number, and (C) registered with, and obtained confirmation as of the Effective Date of active registration status with

24

no active exclusions listed in such registration from, the federal System for Award Management (www.SAM.gov).

(xvii) The Borrower shall have delivered to the RRIF Lender (A) certificates of insurance evidencing (1) that the Borrower, the Construction-Related Contract Parties party to any Construction-Related Contracts in effect as of the Effective Date, and any counterparty to a SEP Agreement to which the obligation to obtain and maintain insurance has been delegated, have in effect as of the Effective Date insurance with respect to the Project that meets the requirements of Section 15(f) (*Insurance; Events of Loss*) and (2) that each liability policy (other than professional liability and workers' compensation insurance) reflects the RRIF Lender as an additional insured and (B) at the RRIF Lender's request, copies of such insurance policies.

(xviii) The Borrower shall have provided to the RRIF Lender evidence that the Borrower is duly organized and validly existing under the laws of its jurisdictions of formation, with full power, authority and legal right to own its properties and carry on its business and governmental functions as now conducted and as contemplated in the Related Documents and the Other Borrower Financing Documents, including the following documents, each certified by the Borrower's Authorized Representative: (A) a copy of its Organizational Documents, as in effect on the Effective Date, which Organizational Documents shall each be in full force and effect and shall not have been amended since the date of the last amendment thereto shown on the certificate, (B) a copy of all resolutions authorizing the Borrower to execute and deliver, and to perform its respective obligations under, the RRIF Loan Documents, and such resolutions have not been subsequently modified, rescinded or amended, are in full force and effect in the form adopted, and are the only resolutions adopted by the Borrower relating to the matters described therein, and (C) a copy of such further instruments and documents as are necessary, appropriate or advisable to effectuate the foregoing resolutions and to consummate and implement the transactions contemplated by such resolutions and any RRIF Loan Documents.

(xix) The representations and warranties of the Borrower set forth in this Agreement (including Section 13 (*Representations and Warranties of Borrower*)) and the representations and warranties of each of the Borrower and the Funding Partner set forth in each other Related Document and Other Borrower Financing Document to which it is a party shall be true and correct, as of the Effective Date, except to the extent such representations and warranties expressly relate to an earlier date (in which case, such representations and warranties shall be true and correct as of such earlier date).

(xx) The Borrower shall have delivered to the RRIF Lender a duly executed certificate from the Collateral Agent in the form attached hereto as **Exhibit J**.

(xxi) The Borrower shall have provided a certificate from the Borrower's Authorized Representative as to the prohibition on the use of appropriated funds for lobbying substantially in the form attached hereto as **Exhibit K** in accordance with 49 CFR §20.100(b).

25

(xxii)     The Borrower shall have provided to the RRIF Lender and the FTA Regional Office on behalf of both Modal Grant Offices records of the Eligible Project Costs incurred prior to the Effective Date, in form and substance satisfactory to the RRIF Lender and in sufficient time prior to the Effective Date to permit the RRIF Lender and to the Modal Grant Offices to review such costs.

(xxiii)    The Borrower shall have delivered such other agreements, documents, instruments, opinions and other items required by the RRIF Lender, all in form and substance satisfactory to the RRIF Lender, including evidence that all other Project funding requirements have been met (including evidence of other funding sources or funding commitments).

(xxiv)     The RRIF Lender shall have received evidence of compliance with 49 U.S.C. § 5333(b) and the regulations promulgated thereunder with respect to the Project (such evidence being a certification letter from the Department of Labor acceptable to the FTA Regional Office).

(b)     <u>Conditions Precedent to All Disbursements</u>.  Notwithstanding anything in this Agreement to the contrary, the RRIF Lender shall have no obligation to make any disbursement of loan proceeds to the Borrower (including the initial disbursement of RRIF Loan proceeds made under this Agreement) until each of the following conditions precedent has been satisfied or waived in writing by the RRIF Lender:

(i)     With respect to any disbursement of the RRIF Loan on or after April 1, 2025, the Borrower shall have provided the Financial Plan, or the most recent update thereto, in each case in accordance with Section 21(a) *(Financial Plan)*.

(ii)     To the extent not previously delivered to the RRIF Lender, the Borrower shall have delivered to the RRIF Lender certified, complete and fully executed copies of any Federal Grant Agreement or Other Borrower Financing Document, including any amendment, modification or supplement thereto, entered into after the Effective Date.

(iii)     To the extent not previously delivered to the RRIF Lender, the Borrower shall have provided certified copies of (i) all Construction-Related Contracts and SEP Agreements, in each case, including any amendment, modification or supplement thereto and related performance security instrument, entered into after the Effective Date, (ii) any amendment, modification or supplement to any Fundamental Contract, and (iii) any other Related Document.

(iv)     The Borrower shall have demonstrated to the RRIF Lender's satisfaction that all Governmental Approvals necessary as of the time of the applicable disbursement for the development and construction of the Project have been issued and are in full force and effect.

(v)     Each of the insurance policies obtained by the Borrower, the Construction-Related Contract Parties or the SEP Agreement Parties in satisfaction of the conditions in Section 12(a)(xvii) *(Conditions Precedent to Effectiveness)* is in full force

26

and effect, and no notice of termination thereof has been issued by the applicable insurance provider.

(vi)     At the time of, and immediately after giving effect to, any disbursement of RRIF Loan proceeds then currently requested, (A) no Default or Event of Default hereunder, and no event of default (howsoever described or designated) under any other Related Document shall have occurred and be continuing, and (B) no event or condition that, with the giving of notice, the passage of time, or both, would constitute an event of default (howsoever described or designated) of the Borrower under any other Related Document, in each case, shall have occurred and be continuing.

(vii)    The representations and warranties of the Borrower set forth in this Agreement (including Section 13 (*Representations and Warranties of Borrower*)) and the representations and warranties of each of the Borrower and the Funding Partner set forth in each other Related Document shall be true, correct, and complete as of each date on which any disbursement of the RRIF Loan is made, except to the extent such representations and warranties expressly relate to an earlier date (in which case, such representations and warranties shall be true and correct as of such earlier date).

(viii)   No Material Adverse Effect, or any event or condition that could reasonably be expected to result in a Material Adverse Effect, shall have occurred and be continuing since the date the Borrower submitted the Application to the RRIF Lender.

(ix)     The Borrower shall have delivered to the RRIF Lender a Requisition that complies with the provisions of Section 4 (*Disbursement Conditions*), and such Requisition has not been expressly denied by the RRIF Lender.

(x)      The Borrower shall have paid in full all invoices received from the RRIF Lender (or from advisors to the RRIF Lender that have direct billing arrangements with the Borrower) as of the date of disbursement of the RRIF Loan, for the reasonable fees and expenses of the RRIF Lender's counsel and advisors and any auditors or other consultants employed by the RRIF Lender for the purposes hereof (such reasonableness to be determined in accordance with Part 31 of the Federal Acquisition Regulation).

(xi)     The Borrower shall have paid in full, at least three (3) Business Days prior to the date of disbursement of the RRIF Loan, the Credit Risk Premium in respect of the RRIF Loan proceeds to be disbursed therewith.

Section 13.    Representations and Warranties of Borrower.    The Borrower hereby represents and warrants that, as of the Effective Date and, as to each of the representations and warranties below other than those contained in Section 13(b) (*Officers' Authorization*) and Section 13(k) (*Credit Ratings*), as of each date on which any disbursement of the RRIF Loan is requested or made:

(a)      Organization; Power and Authority.    The Borrower is a body politic and corporate, a public authority and a government sponsored authority established by the State of New Jersey and the State of New York under the GDC Act and is validly existing under the laws of the State of New York and the State of New Jersey, has full legal right, power and authority to

27

1710417.19-WASSR01A - MSW

enter into the Related Documents then in existence, to execute and deliver the RRIF Note, and to carry out and consummate all transactions contemplated hereby and thereby and has duly authorized the execution, delivery and performance of the Related Documents.

(b)  Officers' Authorization.  As of the Effective Date, the officers of the Borrower executing (or that previously executed) the Related Documents, and any certifications or instruments related thereto, to which the Borrower is a party are (or were at the time of such execution) duly and properly in office and fully authorized to execute the same.

(c)  Due Execution; Enforceability.  Each of the Related Documents in effect as of any date on which this representation and warranty is made, and to which the Borrower is a party, has been duly authorized, executed and delivered by the Borrower and constitutes the legal, valid and binding agreement of the Borrower enforceable in accordance with its terms, except as such enforceability (i) may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the rights of creditors generally, and (ii) is subject to general principles of equity (regardless of whether enforceability is considered in equity or at law).

(d)  Non-Contravention.  The execution and delivery of the Related Documents to which the Borrower is a party, the consummation of the transactions contemplated in the Related Documents by the Borrower and the fulfillment of or compliance with the terms and conditions of the Related Documents by the Borrower will not (i) conflict with the Borrower's Organizational Documents (including the GDC Act), (ii) conflict in any material respect with, or constitute a violation, breach or default (whether immediately or after notice or the passage of time or both) by the Borrower of or under, any applicable law, administrative rule or regulation, any applicable court or administrative decree or order, or any indenture, mortgage, deed of trust, loan agreement, lease, contract or other agreement or instrument to which the Borrower is a party or by which it or its properties or assets are otherwise subject or bound, or (iii) result in the creation or imposition of any Lien, charge or encumbrance of any nature whatsoever upon any of the property or assets of the Borrower other than the Liens on the Collateral provided for in the CASA.

(e)  Consents and Approvals.  No consent or approval of any trustee, holder of any indebtedness of the Borrower or any other Person, and no consent, permission, authorization, order or license of, or filing or registration with, any Governmental Authority is necessary in connection with (i) the execution and delivery by the Borrower of the Related Documents in effect as of any date on which this representation and warranty is made, except as have been obtained or made and as are in full force and effect, or (ii) (A) the consummation of any transaction contemplated by such Related Documents or (B) the fulfillment of or compliance by the Borrower with the terms and conditions of such Related Documents, except as have been obtained or made and as are in full force and effect or as are ministerial in nature and can reasonably be expected to be obtained or made in the ordinary course on commercially reasonable terms and conditions when needed.

(f)  Litigation.  As of the Effective Date, there is no action, suit, proceeding or, to the knowledge of the Borrower, any inquiry or investigation, in any case before or by any court or other Governmental Authority pending or, to the knowledge of the Borrower, threatened against or affecting any element of the Project or the ability of the Borrower to execute, deliver and perform its obligations under the Related Documents or the Other Borrower Financing Documents.

28

As of the Effective Date and as of each other date on which the representations and warranties herein are made or confirmed, there is no action, suit, proceeding or, to the knowledge of the Borrower, any inquiry or investigation before or by any court or other Governmental Authority pending, or to the knowledge of the Borrower, threatened against or affecting any element of the Project, the Borrower or the assets, properties or operations of the Borrower, that in any case could reasonably be expected to result in a Material Adverse Effect. To the Borrower's knowledge, there are no actions of the type described above pending, threatened against, or affecting any other party to a Fundamental Contract except for matters arising after the Effective Date that could not reasonably be expected to (i) result in a Material Adverse Effect or (ii) adversely affect the Borrower's ability to receive Contract Payments in amounts sufficient to meet the Borrower's payment obligations hereunder. The Borrower is not in default (and no event has occurred and is continuing that, with the giving of notice or the passage of time or both, could constitute a default) with respect to any Governmental Approval, which default could reasonably be expected to result in a Material Adverse Effect.

(g)    Security Interests. The CASA establishes in favor of the Collateral Agent (on behalf of the RRIF Lender) the valid and binding Liens on the Collateral that it purports to create, and no physical delivery, recordation, filing, notice or further act is required to establish such Liens other than the filing of a UCC-1 financing statement with the New York State Department of State, Division of Corporations, State Records and Uniform Commercial Code and the taking of possession or control by the Collateral Agent of such of the Collateral with respect to which a security interest may be perfected only by possession or control. Such Liens are in full force and effect and there are no other Liens on or in respect of the Collateral. The Borrower has duly and lawfully taken all actions required under this Agreement, the other RRIF Loan Documents, and applicable laws for the pledge of, and the grant of a security interest in, the Collateral pursuant to the CASA. The Borrower is not in breach of any covenants set forth in Section 15(a) (*Securing Liens*) or in the RRIF Loan Documents with respect to the matters described in such section or documents. As of the Effective Date and as of each other date this representation and warranty is made, (i) all documents and instruments (including the above-referenced UCC-1 financing statement) have been recorded or filed for record in such manner and in such places as are required and all other action as is necessary or desirable has been taken to establish a legal, valid, binding, and enforceable Lien on the Collateral in favor of the Collateral Agent (on behalf of the RRIF Lender) to the extent contemplated by the RRIF Loan Documents, and (ii) all taxes and filing fees that are due and payable in connection with the execution, delivery or recordation of any RRIF Loan Documents or any instruments, certificates or financing statements in connection with the foregoing, have been paid.

(h)    No Debarment. The Borrower has fully complied with its verification obligations under 2 CFR § 180.320 and confirms that, to its knowledge, neither the Borrower nor any of its principals (as defined in 2 CFR § 180.995) is debarred, suspended or voluntarily excluded from participation in Federal Government contracts, procurement or non-procurement matters or delinquent on a Federal Government debt as more fully set forth in the certificate delivered pursuant to Section 12(a)(iv) (*Conditions Precedent to Effectiveness*). Further, the Borrower has fully complied with 2 CFR Part 180, including Subpart C, in particular §§ 180.300 and 180.330, and with 2 CFR § 1200.332. The Borrower is not aware of any non-compliance by any SEP Agreement Party or any of its or their contractors or subcontractors on any element of the Project with the applicable requirements of 2 CFR Part 180.

(i)    Accuracy of Representations and Warranties.    The representations, warranties and certifications of the Borrower set forth in this Agreement and the other Related Documents are true, correct, and complete, except to the extent such representations and warranties expressly relate to an earlier date (in which case, such representations and warranties shall be true, correct, and complete as of such earlier date).

(j)    Compliance with Federal Requirements.  The Borrower has complied, with respect to the Project, with all applicable requirements of NEPA, the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 (42 U.S.C. § 4601 *et seq*.), and Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d *et seq*.).

(k)    Credit Ratings.  The RRIF Loan has received a public rating from at least one (1) Rating Agency, and written evidence of such rating has been provided to the RRIF Lender prior to the Effective Date, and such rating has not been reduced, withdrawn or suspended as of the Effective Date.

(l)    No Defaults.  No Default or Event of Default, and no event of default (howsoever described or designated) of the Borrower under any Related Document has occurred and is continuing.

(m)    Governmental Approvals.  All Governmental Approvals necessary as of any date on which this representation and warranty is made for the then-current stage of development and construction of the Project have been obtained or effected and are in full force and effect and there is no basis for, nor proceeding that is pending or threatened that could reasonably be expected to result in, the revocation of any such Governmental Approval.

(n)    Fundamental Contracts; SEP Agreements; Construction-Related Contracts. Each Fundamental Contract, SEP Agreement and Construction-Related Contract in effect as of any date on which this representation and warranty is made is in full force and effect and all conditions precedent to the obligations of the respective parties under each such Fundamental Contract, SEP Agreement, and Construction-Related Contract (other than any notice to proceed under a Construction-Related Contract that, as of the applicable date, is not intended to have been issued by the Borrower in accordance with the terms of such Construction-Related Contract) have been satisfied.  The Borrower has delivered to the RRIF Lender a fully executed, complete, and correct copy of each such Fundamental Contract, SEP Agreement and Construction-Related Contract (including, in each case, all exhibits, schedules, and other attachments) that is in effect, including any amendments or modifications thereto.  No event has occurred that gives the Borrower or, to the Borrower's knowledge, any Fundamental Contract Party, SEP Agreement Party or Construction-Related Contract Party, the right to terminate such Fundamental Contract, SEP Agreement or Construction-Related Contract, as applicable.  The Borrower is not in breach of, or in default under, any Fundamental Contract, and is not in breach of, or in default under, any material term in any SEP Agreement or Construction-Related Contract. To the knowledge of the Borrower, no Fundamental Contract Party is in breach of, or in default under, any Fundamental Contract. To the knowledge of the Borrower, no other SEP Agreement Party or Construction-Related Contract Party is in breach of, or in default under, any material term in any SEP Agreement or Construction-Related Contract, as applicable.

30

(o)    Information.  The information furnished by the Borrower to the RRIF Lender, when taken as a whole, does not contain any untrue statement of a material fact or omit to state any material fact necessary to make the statements contained therein not misleading as of the date made or furnished; provided that no representation or warranty is made with regard to projections or other forward-looking statements provided by or on behalf of the Borrower (including the Base Case Financial Model, any Revised Financial Model, and the assumptions therein) except that the assumptions in the Base Case Financial Model and any Revised Financial Model were reasonable in all material respects when made.

(p)    OFAC; Anti-Corruption Laws.

(i)    None of the Borrower nor, to the knowledge of the Borrower, any Construction-Related Contract Party or SEP Agreement Party is a Sanctioned Person.

(ii)    None of the Borrower nor, to the knowledge of the Borrower, any Construction-Related Contract Party or SEP Agreement Party is in violation of or, since the date that is five (5) years prior to the Effective Date, has violated: (A) any applicable Anti-Money Laundering Laws; (B) any applicable Sanctions; (C) any applicable Anti-Corruption Laws; or (D) any applicable anti-drug trafficking or anti-terrorism laws, civil or criminal.

(iii)    There are no pending or, to the knowledge of the Borrower, threatened claims or investigations by any Governmental Authority against, or any internal investigations conducted by, the Borrower, Construction-Related Contract Party or SEP Agreement Party, with respect to any possible or alleged violations of any applicable Sanctions, Anti-Money Laundering Laws, Anti-Corruption Laws, or any applicable anti-drug trafficking or anti-terrorism laws.

(iv)    No use of proceeds of the RRIF Loan or other transaction contemplated by this Agreement or any other Related Document will violate any applicable Sanctions, Anti-Money Laundering Laws, or Anti-Corruption Laws, or any applicable anti-drug trafficking or anti-terrorism laws.

(q)    Compliance with Law.  The Borrower is in compliance in all material respects with, and has conducted (or caused to be conducted) its business and government functions and the business and operations of the Project in compliance in all material respects with, all applicable laws (other than Environmental Laws, which are addressed in Section 13(r) (*Environmental Matters*)), including those set forth on **Exhibit F**, to the extent applicable.  To the Borrower's knowledge, each Construction-Related Contract Party and SEP Agreement Party is, and has caused its respective contractors and subcontractors to be, in compliance in all material respects with all applicable laws, including those set forth on **Exhibit F**, to the extent applicable. No notices of violation of any applicable law have been issued, entered or received by (i) the Borrower or (ii) to the Borrower's knowledge, any Construction-Related Contract Party or SEP Agreement Party other than, in each case, notices of violations that are immaterial.

(r)    Environmental Matters.  Each of the Borrower and, to the Borrower's knowledge, each Construction-Related Contract Party and SEP Agreement Party is in compliance

31

with all laws applicable to the Project relating to (i) air emissions, (ii) discharges to surface water or ground water, (iii) noise emissions, (iv) solid or liquid waste disposal, (v) the use, generation, storage, transportation or disposal of toxic or hazardous substances or wastes, (vi) biological resources (such as threatened and endangered species), and (vii) other environmental, health or safety matters, including all laws applicable to the Project referenced in the notice "Federal Environmental Statutes, Regulations, and Executive Orders Applicable to the Development and Review of Transportation Infrastructure Projects," 79 Fed. Reg. 22756 (April 23, 2014) (or any successor Federal Register notice of similar import), which document is available at http://www.transportation.gov/policy/transportation-policy/environment/laws  ("**Environmental Laws**").  All Governmental Approvals for the Project relating to Environmental Laws have been, or, when required, will be, obtained and are (or, as applicable, will be) in full force and effect.  The Borrower has not received any written communication or notice, whether from a Governmental Authority, employee, citizens group, or any other Person, that alleges that the Borrower is not in full compliance with all Environmental Laws and Governmental Approvals relating thereto in connection with the Project and, to the Borrower's knowledge, there are no circumstances that may prevent or interfere with full compliance in the future by the Borrower with any such Environmental Law or Governmental Approval.  The Borrower has provided to the RRIF Lender all material assessments, reports, results of investigations or audits, and other material information in the possession of or reasonably available to the Borrower regarding the Borrower's or the Project's compliance with (A) Environmental Laws, and (B) Governmental Approvals relating to Environmental Laws that are required for the Project.

(s)     <u>Insurance</u>.  The Borrower is in compliance with all of its insurance obligations required under each Related Document and each Construction-Related Contract to which it is a party as of any date on which this representation and warranty is made. To the Borrower's knowledge, each SEP Agreement Party and each Construction-Related Contract Party is in compliance with all insurance obligations required under such SEP Agreement or such Construction-Related Contract, as applicable, as of any date on which this representation and warranty is made.

(t)     <u>No Liens</u>.  Except for the Liens granted pursuant to the CASA, the Borrower has not created, and is not under any obligation to create, and has not entered into any transaction or agreement that would result in the imposition of, any Lien on the Collateral.

(u)     <u>Intellectual Property</u>.  The Borrower owns, or has adequate licenses or other valid rights to use, all patents, trademarks, service marks, trade names, copyrights, franchises, formulas, licenses and other rights with respect thereto and has obtained assignment of all licenses and other rights of whatsoever nature, in each case necessary for the Project and the operation of its business.  To the Borrower's knowledge, there exists no conflict with the rights or title of any third party with respect to the intellectual property described in the preceding sentence.  Excluding the use of commercially available "off-the-shelf" software, to the Borrower's knowledge, no product, process, method, substance, part or other material produced or employed or presently contemplated to be produced by or employed by the Project infringes or will infringe any patent, trademark, service mark, trade name, copyright, franchise, formula, license or other intellectual property right of any third party.

32

(v)  Investment Company Act.  The Borrower is not, and after applying the proceeds of the RRIF Loan will not be, required to register as an "investment company" within the meaning of the Investment Company Act of 1940, as amended, and is not "controlled" by a company required to register as an "investment company" under the Investment Company Act of 1940, as amended.

(w)  Financial Statements.  Each income statement, balance sheet, and statement of operations and cash flows (collectively, "**Financial Statements**") delivered to the RRIF Lender pursuant to Section 21(b) (*Financial Statements*) has been prepared in accordance with GAAP and presents fairly, in all material respects, the financial condition of the Borrower as of the respective dates of the balance sheets included therein and the results of operations of the Borrower for the respective periods covered by the statements of income included therein.  Except as reflected in such Financial Statements, there are no liabilities or obligations of the Borrower of any nature whatsoever for the period to which such Financial Statements relate that are required to be disclosed in accordance with GAAP.

(x)  Taxes.  The Borrower is not required to file tax returns with any Governmental Authority.

(y)  ERISA.  Neither the Borrower nor any ERISA Affiliate maintains, sponsors, contributes to (or is required to contribute to) or otherwise has any liability in respect of any plan or other arrangement that is (i) subject to Title IV or Section 302 ERISA, or Section 412 of the Tax Code or (ii) a "multiemployer plan" (within the meaning of Section 3(37) of ERISA).

(z)  Sufficient Funds.  The aggregate of (i) the undrawn portion of the RRIF Loan, (ii) the undrawn portion of the Other RRIF Loans, (iii) all funds that are undrawn but fully and completely committed under the Other Borrower Financing Documents, and (iv) without duplication of the amounts described in clause (iii), funds committed and/or awarded in respect of each Federal Grant by the applicable Modal Grant Office, will be sufficient to pay all Total Project Costs necessary to achieve Substantial Completion.

(aa)  Sovereign Immunity.  (i) Pursuant to (A) Section 6 of the State of New York's version of the Gateway Development Commission Act (2019 vol. 1 874, 899 (2019), ch. 108, Section 6), the Borrower can sue and be sued in respect of its contractual obligations, and judgments against the Borrower can be legally enforced, subject to the applicable limitations set forth in such Section 6, and (B) Section 6 of the State of New York's version of the Gateway Development Commission Act (2019 vol. 1 874, 899 (2019), ch. 108, Section 6), sovereign immunity shall not bar an action to enforce a claim based on a breach of this Agreement or any other Related Document in effect from time to time presented in accordance with the applicable provisions set forth in such Section 6 and other applicable laws of the State of New York, including without limitation Section 8 of the New York Court of Claims Act, and (ii) pursuant to (A) Section 23 of the State of New Jersey's version of the Gateway Development Commission Act (N.J.S.A. 32:36-23), the Borrower can sue and be sued in respect of its contractual obligations, and judgments against the Borrower can be legally enforced, subject to the limitations set forth in such Section 23, and (B) Section 29 of the State of New Jersey's version of the Gateway Development Commission Act (N.J.S.A. 32:37-2), sovereign immunity shall not bar an action to enforce a claim

33

based on a breach of this Agreement or any other Related Document in effect from time to time presented in accordance with such Section 29.

(bb)    Patriot Act.  The Borrower is not required to establish an anti-money laundering compliance program pursuant to the Patriot Act.

Section 14.    Representations and Warranties of RRIF Lender.  The RRIF Lender represents and warrants that:

(a)    Power and Authority.  The RRIF Lender has all requisite power and authority to make the RRIF Loan and to perform all transactions contemplated by the Related Documents to which it is a party.

(b)    Due Execution; Enforceability.  The Related Documents to which it is a party have been duly authorized, executed and delivered by the RRIF Lender, and are legally valid and binding agreements of the RRIF Lender, enforceable in accordance with their terms.

(c)    Officers' Authorization.  The officers of the RRIF Lender executing each of the Related Documents to which the RRIF Lender is a party are duly and properly in office and fully authorized to execute the same on behalf of the RRIF Lender.

Section 15.    Affirmative Covenants.  The Borrower covenants and agrees as follows until the date the RRIF Note and the obligations of the Borrower under this Agreement (other than contingent indemnity obligations) are irrevocably paid in full in cash and the RRIF Lender no longer has any commitment to make disbursements to the Borrower, unless the RRIF Lender waives compliance in writing:

(a)    Securing Liens.  The Borrower agrees that from time to time, at its expense, it will promptly execute and deliver all further instruments, powers, assignments, amendments, and documents, and take all further action as the Collateral Agent or the RRIF Lender shall, in their reasonable discretion, deem necessary or appropriate to ensure creation of Liens and to perfect and maintain perfected the Liens created and/or perfected under the CASA and under the other Security Documents (as defined in the CASA), to enable the Collateral Agent and RRIF Lender to enforce their rights and remedies thereunder, and to carry into effect the purposes thereof or better assure and confirm the validity, enforceability and priority of the Liens on the Collateral. Without limiting the generality of the foregoing, the Borrower shall file or refile and/or deliver to the Collateral Agent from time to time, when necessary or requested, financing statements (including UCC-3 financing statements), powers of attorney, certificates, and other assurances or instruments as the Collateral Agent or the RRIF Lender shall reasonably request.  All of the foregoing shall be at the sole cost and expense of the Borrower.

(b)    Copies of Documents.

(i)    At least ninety (90) days prior to the incurrence or issuance of any Obligations that satisfy the requirements of Section 16(a) (*Indebtedness*), and therefore do not require RRIF Lender consent, the Borrower shall notify the RRIF Lender unless such issuance consists solely of a refinancing on the same terms and conditions (other than interest rate) as the indebtedness being refinanced, in which case the above-referenced

34

1710417.19-WASSR01A - MSW

notice may be provided forty-five (45) days prior to the incurrence or issuance of such Obligations. At least thirty (30) days prior to the incurrence or issuance of any such Obligations, the Borrower shall provide to the RRIF Lender (A) a copy of the Other Borrower Financing Documents (or other comparable transaction or offering documents) applicable to such Obligations and (B) a Revised Financial Model that takes into account the proposed Obligations, which Revised Financial Model shall reflect and be based on the actual amortization schedules for such proposed Obligations and all Obligations then outstanding in accordance with their respective terms and shall otherwise be in form and substance satisfactory to the RRIF Lender. The Borrower shall provide to the RRIF Lender a fully executed or final version of each such Other Borrower Financing Document (or other comparable transaction documentation) within ten (10) days following execution or completion thereof.

(ii)    The Borrower shall provide to the RRIF Lender, promptly after the sending or receipt thereof, copies of (A) final ratings presentations sent to, and any notices, reports or other written materials (other than those that are ministerial in nature) received from, any Rating Agency that has provided, or is being requested to provide, a rating with respect to the Project, the RRIF Loan or any other Obligations issued or incurred by the Borrower, (B) all notices and other written communications received by the Borrower from the Collateral Agent, (C) all reports, notices and other written materials required to be sent to the lenders or holders (or any agent or trustee appointed on their behalf) pursuant to the Other Borrower Financing Documents, and (D) all notices delivered by or to the Borrower relating to any of the Fundamental Contracts; unless, in each case, the RRIF Lender notifies the Borrower in writing that any such reports, notices and/or other written materials no longer need to be provided.

(iii)    Except as otherwise agreed by the RRIF Lender in writing, and without limiting the Borrower's obligations or the RRIF Lender's rights under Section 16(b) (*No Lien Extinguishment; Adverse Amendments*), the Borrower will provide to the RRIF Lender (A) copies of any new Related Document or any proposed amendments, modifications, replacements of, or supplements to any Related Document or any Other Borrower Financing Document (other than proposed amendments, modifications, replacements or supplements that are ministerial in nature and do not change any substantive provision of such Related Document or such Other Borrower Financing Document) at least (1) ninety (90) days in the case of any amendment to the Funding Agreement and (2) thirty (30) days in the case of any other Related Document or amendment thereto (provided that the Borrower shall not be required to deliver copies of draft amendments to any Federal Grant Agreement) or any amendment to an Other Borrower Financing Document, in each case prior to the proposed effective date thereof, and (B) complete, correct and fully executed copies of any such new Related Document or amendment, modification or supplement to, or replacement of, any Related Document or any Other Borrower Financing Document within five (5) Business Days after execution thereof.

(iv)    If the Borrower enters into a Construction-Related Contract or SEP Agreement after the Effective Date, the Borrower shall promptly provide to the RRIF

35

Lender an executed version of such Construction-Related Contract or SEP Agreement, as applicable, together with any related contracts, side letters or other understandings.

(v)    Without in any way limiting the requirements of Section 16(d) (*Organizational Documents*), the Borrower shall provide to the RRIF Lender (A) copies of any proposed amendments, modifications, replacements of, or supplements to (1) the GDC Act, where Borrower has knowledge of such proposed amendment, modification, replacement or supplement, and (2) the bylaws of the Borrower, each at least thirty (30) days prior to the proposed effective date thereof or with respect to (1), such shorter period of time necessary based on when the Borrower became aware thereof, and (B) complete, correct and fully executed copies of any amendment, modification or supplement to, or replacement of, the same within five (5) Business Days after execution thereof.

(vi)    The Borrower shall provide to the RRIF Lender copies of (A) its operating budget, as adopted by its board of commissioners, (B) any amendments, modifications, replacements of, or supplements to, such operating budget, and (C) each funding agreement related to its operating budget, in each case of clauses (A) – (C), within five (5) Business Days after execution or adoption thereof, as applicable.

(c)    Use of Proceeds.  The Borrower shall use the proceeds of the RRIF Loan for purposes permitted by applicable law and as otherwise permitted under this Agreement and the other Related Documents. The Borrower shall use proceeds of the RRIF Loan solely to fund costs of the New Tunnel.

(d)    Prosecution of Work; Verification Requirements.

(i)    The Borrower shall diligently prosecute the work relating to the Project and complete the Project in accordance with the Construction Schedule, in compliance with the Project Development Agreement, and in accordance with the highest standards of the design, engineering, and construction industries for projects of similar size and importance as the Project.

(ii)    The Borrower shall comply with, and cause each SEP Agreement Party to comply with, 2 CFR Part 180, including Subpart C, in particular §§ 180.300 and 180.320, and with 2 CFR § 1200.332.

(e)    Operations and Maintenance.

(i)    The Borrower shall enforce its rights under the Project Development Agreement (and any other agreement to which the Borrower is a party from time to time with Amtrak that is relevant to the operation or maintenance of the Project) to cause Amtrak to (A) operate and maintain the Project (1) economically and efficiently and in a reasonable and prudent manner and (2) substantially in accordance with all applicable laws, regulations, standards and guidelines, and (B) maintain the Project in good repair, working order and condition and in accordance with the requirements of all applicable laws, regulations, standards and guidelines, including those of FRA.

36

(ii)    The Borrower shall comply, and shall cause Amtrak and NJT to comply, with the requirements of 49 U.S.C. § 22402(h)(1)(A) and (B).

(f)    <u>Insurance; Events of Loss</u>.

(i)    The Borrower shall at all times maintain insurance with responsible insurers, in amounts and with coverages as are customarily maintained in the United States of America by entities similar to the Borrower, or as is required under any Related Document, Construction-Related Contract or applicable law. During the construction of the Project, the Borrower shall maintain or cause to be maintained appropriate casualty and liability insurance covering the Borrower and the Project, including a builders all-risk policy and pollution and other environmental liability and remediation related coverage. The Borrower shall cause each Construction-Related Contract Party to obtain and maintain casualty and liability insurance in accordance with the requirements of the applicable Construction-Related Contract.

(ii)    The Borrower shall cause all liability insurance policies that it maintains and that each Construction-Related Contract Party maintains, other than professional liability and workers' compensation insurance, to reflect the RRIF Lender as an additional insured.

(iii)    If an Event of Loss shall occur with respect to the Project or any part thereof prior to the transfer of the Project to Amtrak as contemplated in the Project Development Agreement, the Borrower shall (A) diligently pursue all of its rights to compensation against all relevant insurers, reinsurers, Construction-Related Contract Parties, SEP Agreement Parties, and Governmental Authorities, as applicable, in respect of such event and (B) pay or apply all loss proceeds stemming from such event to rebuild, repair or replace the Project in accordance with all applicable laws and within a reasonable time period; <u>provided</u>, <u>however</u>, that loss proceeds must in any event be applied in accordance with all applicable federal disposition rules, including those set forth in the Federal Grant Agreements and 2 CFR Part 200.

(iv)    Following the transfer of ownership of the Project to Amtrak, if an Event of Loss shall occur with respect to the Project or any part thereof, the Borrower shall diligently pursue all of its contractual and other rights to cause Amtrak to perform or cause to be performed all necessary repairs to any damaged portions of the Project, to obtain funding to perform such repairs, and to pursue all applicable insurance claims under the insurance policies procured and maintained by Amtrak.

(g)    <u>Notices</u>.

(i)    The Borrower shall, within five (5) Business Days after the Borrower learns of the occurrence, give the RRIF Lender notice of any of the following events or receipt of any of the following notices, as applicable, setting forth details of such event:

(A)    Substantial Completion: the occurrence of Substantial Completion, such notice to be provided in the form set forth in **Exhibit L**;

37

(B)    Ratings Changes:  any change in the rating assigned to the RRIF Loan or any other Obligations (disregarding Other RRIF Loans) by any Rating Agency that has provided a rating on such indebtedness, the Borrower, or the Contract Payments, <u>provided</u>, that with respect to other Obligations, a single notice shall be provided for purposes of this Agreement and each Other RRIF Loan Agreement (and no notice is required hereunder in respect of any Other RRIF Loan);

(C)    Defaults; Events of Default: the occurrence of any Default or Event of Default;

(D)    Other Defaults:  any default or event of default on the part of the Borrower or any other party under any Related Document, Construction-Related Contract, SEP Agreement or Other Borrower Financing Document;

(E)    Litigation:  (1) the filing of any litigation, suit or action, or the commencement of any proceeding, against the Borrower before any arbitrator, Governmental Authority, alternative dispute resolution body, or other neutral third-party, or the receipt by the Borrower in writing of any threat of litigation, suit, action, or proceeding, or of any written claim against the Borrower that, in each case, could reasonably be expected to have a Material Adverse Effect and any material changes in the status of such litigation, suit, action or claim and (2) any judgments against the Borrower that are not otherwise fully covered by insurance (for which the insurer has acknowledged and not disputed coverage) or by funds immediately available to the Borrower and set aside for such purpose within the Borrower's operating budget, either individually or in the aggregate;

(F)    Delayed Governmental Approvals:  any failure to receive or delay in receiving any Governmental Approval or making any required filing, notice, recordation or other demonstration to or with a Governmental Authority, in each case to the extent such failure or delay will or could reasonably be expected to result in a delay to any major milestone date (including the Projected Substantial Completion Date) set forth in the Construction Schedule, together with a written explanation of the reasons for such failure or delay and the Borrower's plans to remedy or mitigate the effects of such failure or delay;

(G)    Environmental Notices: any notice of material violation under any Environmental Law related to the Project or any material changes to the NEPA Determination;

(H)    Uncontrollable Force:  the occurrence of any Uncontrollable Force that could reasonably be expected to result in a Material Adverse Effect;

(I)    Contract Payments:  if the Funding Partner has not made any transfer of a Contract Payment to the Collateral Agent that is required under the Funding Agreement by the time required under the Funding Agreement;

38

1710417.19-WASSR01A - MSW

(J)    Project Changes:  any (1) change to the Total Project Costs forecasts in excess of five percent (5%) of forecasted Eligible Project Costs or (2) any change to the schedule for the Project in excess of five percent (5%) of the total number of days reflected in the Construction Schedule;

(K)    2 CFR Notices:  (1) that any of the information set forth in the certificate provided pursuant to Section 12(a)(iv) (*Conditions Precedent to Effectiveness*) was incorrect at the time the certificate was delivered or there has been a change in status of the Borrower or any of its principals with respect to the criteria set forth in 2 CFR § 180.335; (2) any other notification required pursuant to 2 CFR § 180.350; and (3) any violation of Federal criminal law involving fraud, bribery, or gratuity violations potentially affecting the RRIF Loan as described in 2 CFR § 200.113, and the Borrower shall require its subcontractors to provide it notice of any such violation;

(L)    Other Loan Reporting Requirements:  copies of notices delivered to any provider of additional Obligations (other than a RRIF Loan) pursuant to the applicable Other Borrower Financing Documents; and

(M)    Other Adverse Events:  the occurrence of any other event or condition, including any notice of breach from a contract counterparty, that could reasonably be expected to result in a Material Adverse Effect.

(ii)    The Borrower shall provide the RRIF Lender with any further information reasonably requested by the RRIF Lender from time to time concerning the matters described in Section 15(g)(i) (*Notices*).

(h)    Remedial Action.  Within thirty (30) calendar days after the Borrower learns of the occurrence of an event specified in Section 15(g)(i) (*Notices*) (other than in Section 15(g)(i)(A) (*Substantial Completion*) or Section 15(g)(i)(B) (*Ratings Changes*) (in the case of a ratings upgrade)), the Borrower's Authorized Representative shall provide a statement to the RRIF Lender setting forth the actions the Borrower proposes to take with respect thereto.

(i)    Maintain Legal Structure.  The Borrower shall maintain its existence as a body politic and corporate, a public authority and a government sponsored authority established by the State of New Jersey and the State of New York under the GDC Act. The Borrower shall at all times do or cause to be done all things necessary to obtain, preserve, renew, extend and keep in full force and effect the Governmental Approvals and any other rights, licenses, franchises, and authorizations material to the conduct of its business.

(j)    Annual Rating.  The Borrower shall, commencing in 2025, no later than the last Business Day of June of each year during the term of the RRIF Note, at no cost to the RRIF Lender, provide to the RRIF Lender a public rating on the RRIF Note, together with the rating report or letter delivered by such Rating Agency in connection with each such rating, in each case prepared no earlier than June 1 of such year.

(k)    Accounts; Permitted Investments.

39

(i)        The Borrower shall maintain the Account and any other accounts established pursuant to the CASA or any Other Borrower Financing Document for so long as the Obligations to which any such account relates remains outstanding.

(ii)        If any Other Borrower Financing Documents establish reserve accounts and reserve requirements, the Borrower shall cause such reserve accounts to be funded in such amounts and under such conditions as are required by the applicable Other Borrower Financing Documents.

(iii)        Amounts on deposit in the Account and in any other accounts described above shall be held uninvested or invested in Permitted Investments. Permitted Investments must mature or be redeemable at the election of the holder as follows: (A) with respect to Permitted Investments maintained in the Account with respect to RRIF Debt Service, not later than the next Semi-Annual Payment Date, (B) with respect to Permitted Investments maintained in the Account in respect of other amounts payable hereunder, not later than the date such other amounts are due and payable hereunder, (C) with respect to Permitted Investments maintained in an account established under an Other Borrower Financing Document for the repayment of principal or interest with respect to other Obligations, the next date on which principal and/or interest is due and payable with respect to any such Obligations, and (D) with respect to any reserve account or the construction account, on or prior to the date on which the funds invested in such Permitted Investments are reasonably expected to be needed for any payment from such account. The Borrower shall, promptly but in any event within five (5) days, liquidate any investment that was, but no longer is, a Permitted Investment and shall invest the proceeds of such investment solely into one or more Permitted Investments.

(l)        Fundamental Contracts. The Borrower shall diligently exercise its rights and enforce its remedies under each Fundamental Contract. The Borrower shall actively monitor the Funding Partner's compliance with the Funding Agreement and shall promptly notify the RRIF Lender of any events and circumstances that could reasonably be expected to result in the Funding Partner's failure to perform its material obligations under the Funding Agreement. In connection with any potential funding shortfall under the Funding Agreement, the Borrower shall exercise any and all rights under the Funding Agreement to cause the Funding Partner to act to cure or avoid any such funding shortfall. The Borrower shall cooperate with the RRIF Lender in connection with the RRIF Lender's exercise of its rights and remedies under the Direct Agreement.

(m)        Compliance with Law. The Borrower shall comply (i) in all material respects with all applicable federal, State of New York and State of New Jersey laws, including all items set forth in **Exhibit F**, to the extent applicable, and (ii) with the terms and conditions of the Federal Grant Agreements.

(n)        Material Obligations; Liens. The Borrower shall pay its material obligations promptly and in accordance with their terms and pay and discharge promptly all taxes, assessments, and governmental charges or levies imposed upon it or upon its property, before the same shall become delinquent or in default, as well as all lawful and material claims for labor, materials and supplies or other claims which, if unpaid, might give rise to a Lien upon such properties or any part thereof or on the Collateral or any portion thereof, including the Contract

40

1710417.19-WASSR01A - MSW

Payments; <u>provided</u>, <u>however</u>, that such payment and discharge shall not be required with respect to any such tax, assessment, charge, levy, claim or Lien so long as the validity or amount thereof shall be contested by the Borrower in good faith by appropriate proceedings and so long as the Borrower shall have set aside adequate reserves with respect thereto in accordance with and to the extent required by GAAP, applied on a consistent basis.

(o)    <u>SAM Registration</u>.  The Borrower shall (i) maintain its active registration status with the federal System for Award Management (www.SAM.gov) (or any successor system or registry) and (ii) within sixty (60) days prior to each anniversary of the Effective Date, provide to the RRIF Lender evidence of such active registration status with no active exclusions listed in such registration (a single notification being sufficient for purposes of complying with this Agreement and each Other RRIF Loan Agreement), in each case until the Final Maturity Date or to such earlier date as all amounts due or to become due to the RRIF Lender hereunder have been irrevocably paid in full in cash.

(p)    <u>Immunity</u>.  Consistent with Section 6 of the State of New York's version of the Gateway Development Commission Act (2019 vol. 1 874, 899 (2019), ch. 108, Section 6), the Borrower agrees that it is immune from liability under the law of the State of New York as though it were the State of New York, except to the extent that such immunity is waived by the State of New York under Section 8 of the New York Court of Claims Act, and the Borrower irrevocably agrees that it will not assert immunity from claims made by the RRIF Lender against the Borrower to enforce this Agreement or any other Related Document under New York State law to the extent immunity for such claim is waived pursuant to the Gateway Development Commission Act and Section 8 of the New York Court of Claims Act as though the Borrower were the State of New York and the RRIF Lender has complied with the applicable New York State law. Further, consistent with Section 29 of the State of New Jersey's version of the Gateway Development Commission Act (N.J.S.A. 32:37-2), the Borrower agrees that it is immune from liability in the State of New Jersey in the same manner and to the same extent as is the State of New Jersey under the provisions of the "New Jersey Tort Claims Act", N.J.S. 59:1-1 et seq. and the "New Jersey Contractual Liability Act," N.J.S.59:13-1 et seq., and the Borrower irrevocably agrees that it will not assert immunity from claims made by the RRIF Lender against the Borrower to enforce this Agreement or any other Related Document under New Jersey State law to the extent immunity for such claims is waived in accordance with the State of New Jersey's version of the Gateway Development Commission Act and the New Jersey Contractual Liability Act as though the Borrower were the State of New Jersey and the RRIF Lender has complied with the applicable New Jersey State law.

(q)    <u>Patriot Act</u>.  If the anti-money laundering compliance program provisions of the Patriot Act become applicable to the Borrower, then the Borrower will provide written notice to the RRIF Lender of the same and will promptly establish an anti-money laundering compliance program that complies with all requirements of the Patriot Act.

(r)    <u>Cargo Preference Act</u>.  Pursuant to 46 CFR Part 381, the Borrower hereby agrees as follows, and shall insert the following clauses in contracts entered into by the Borrower pursuant to which equipment, materials or commodities may be transported by ocean vessel in carrying out the Project:

41

(i)        At least fifty percent (50%) of any equipment, materials or commodities procured, contracted for or otherwise obtained with RRIF Loan proceeds, and which may be transported by ocean vessel, shall be transported on privately owned United States-flag commercial vessels, if available.

(ii)        Within twenty (20) days following the date of loading for shipments originating within the United States of America or within thirty (30) Business Days following the date of loading for shipments originating outside the United States of America, a legible copy of a rated, 'on-board' commercial ocean bill-of-lading in English for each shipment of cargo described in paragraph (i) above shall be furnished to both the RRIF Lender and to the Division of National Cargo, Office of Market Development, Maritime Administration, Washington, DC 20590.

(s)        <u>Lobbying</u>.  The Borrower shall comply with all applicable certification, declaration and/or disclosure requirements under 49 CFR Part 20.

(t)        <u>Reporting Subawards and Executive Compensation</u>.  To the extent applicable, the Borrower shall comply, and shall require each subrecipient to comply, with the reporting requirements set forth in **Exhibit M** hereto.

(u)        <u>Buy America</u>

(i)        The Borrower agrees that steel, iron, and manufactured products used in the Project are subject to both 49 U.S.C. § 5323(j), as implemented by FTA, and 49 U.S.C. § 22905, as implemented by FRA. The Borrower acknowledges that this Agreement is neither a waiver of 49 U.S.C. § 5323(j)(1) or 49 U.S.C. § 22905(a)(1) nor a finding under either 49 U.S.C. § 5323(j)(2) or 49 U.S.C. § 22905(a)(2).

(ii)        The Borrower agrees that construction materials used in the Project are subject to the domestic preference requirement at § 70914 of the Build America, Buy America Act, Pub. L. No. 117-58, div. G, tit. IX, subtit. A, 135 Stat. 429, 1298 (2021), as implemented by the Office of Management and Budget, USDOT, FTA, and FRA. The Borrower acknowledges that this Agreement is neither a waiver of § 70914(a) nor a finding under § 70914(b).

(v)        <u>Employee Protection.</u>

(i)        In accordance with 49 U.S.C. § 22402(h)(3)(A), the Borrower shall comply with the standards of 49 U.S.C. § 24312 as in effect on September 1, 2002, with respect to the Project in the same manner that Amtrak is required to comply with such standards for construction work financed under an agreement made under 49 U.S.C. § 24308(a).

(ii)        In accordance with 49 U.S.C. § 22402(h)(3)(B), the Borrower shall make fair and equitable arrangements, in accordance with 49 U.S.C. § 22404, to protect the interests of any employees who may be adversely affected by actions pursuant to, or as a consequence of, this Agreement, including the arrangements prescribed by the United States Secretary of Labor on July 6, 1976, and set forth on **Exhibit N** hereto.

42

(w)    Direct Agreement.  Where in the Direct Agreement a covenant or agreement of the Funding Partner is contingent upon a notice or request from the Borrower, the Borrower shall make such notice or request, as applicable, promptly, and in any event within two (2) Business Days, after receipt of notice from the RRIF Lender requesting that the Borrower make such notice or request.

(x)    Borrower's Operating Budgets.

(i)    The Borrower shall include a financing cost line item in each proposed annual operating budget that it submits pursuant to Section 11.01 of the Project Development Agreement, which line item shall be in an amount sufficient to make all payments in respect of indebtedness (including any amounts under the RRIF Loan Documents) that the Borrower reasonably anticipates will or may be paid from amounts made available pursuant to its operating budget.

(ii)    Upon the occurrence of any Event of Default that results in, or that is reasonably expected to result in, a Borrower Default Rate Incremental Amount, the Borrower shall (A) if necessary, take all steps necessary or desirable to cause its then current operating budget to be amended to include any Borrower Default Rate Incremental Amount payable or reasonably expected to become payable in such Borrower Fiscal Year as a result of such Event of Default, (B) if applicable, include in its proposed operating budget for the succeeding Borrower Fiscal Year any Borrower Default Rate Incremental Amount payable or reasonably expected to become payable in such Borrower Fiscal Year and take all steps necessary or desirable to obtain the approval of its board of commissioners for such proposed budget amount, and (C) provide written notice to the RRIF Lender regarding any action taken by its board of commissioners in respect of the foregoing.

Section 16.    Negative Covenants. The Borrower covenants and agrees as follows until the date the RRIF Note and the obligations of the Borrower under this Agreement (other than contingent indemnity obligations) are irrevocably paid in full in cash and the RRIF Lender no longer has any commitment to make disbursements to the Borrower, unless the RRIF Lender waives compliance in writing:

(a)    Indebtedness.

(i)    The Borrower shall not, without the prior written consent of the RRIF Lender, issue or incur indebtedness of any kind that is secured, in whole or in part, by all or any portion of the Collateral or that is otherwise payable, in whole or in part, from Contract Payments.

(ii)    The Borrower shall not issue any Obligations (including (1) any GANs, (2) any extension of any GANs, or (3) any amendment to the Working Capital Facility or any GANs that would increase the principal amount available or outstanding thereunder) without the prior written consent of the RRIF Lender, unless such indebtedness satisfies each of the following conditions:

1710417.19-WASSR01A - MSW

(A)     such indebtedness is secured solely by proceeds of the Federal Grants or other collateral that does not include or impair any portion of the Collateral;

(B)     the trustee or agent (on its own behalf and on behalf of the lenders or holders) with respect to such indebtedness shall have executed and delivered to the RRIF Lender a fully executed joinder to the Waiver (in the form attached to the Waiver);

(C)     such indebtedness shall not be subject to acceleration, whether following a default or event of default or in other circumstances;

(D)     the aggregate sum of (1) the principal of such indebtedness plus (2) the amount, if any, to be set aside in a reserve account to pay interest during construction on such indebtedness shall not exceed the maximum amount of Federal Grants pledged and available to secure repayment of such indebtedness;

(E)     if interest thereon is not paid on a current basis from Federal Grant proceeds that have been appropriated and are available to the Borrower or from funds immediately available to the Borrower and set aside for such purpose in the Borrower's then current operating budget, interest accrued on such indebtedness shall either be (1) capitalized until the date on which the Borrower begins receiving payment of the revenues pledged to repay such indebtedness or (2) paid from a capitalized interest reserve funded from the proceeds of such indebtedness; and

(F)     the final maturity date for such indebtedness shall not be later than the final payment date for the Federal Grants or such other funds that do not include any portion of the Collateral, in each case that constitute the collateral for, or source of funds for repayment of, such indebtedness.

Notwithstanding the foregoing, the Borrower may extend the Working Capital Facility for one or more time periods but in no event beyond the Substantial Completion Date without the prior written consent of the RRIF Lender, so long as (i) the Waiver at all times remains in full force and effect against each party thereto, (ii) the amount available under the Working Capital Facility during such extension shall not at any time exceed the remaining available amount under the FFGA, and (iii) the terms and conditions of the

44

Working Capital Facility Documents are in all material respects the same as those reflected in the Working Capital Facility Documents as of the Effective Date, other than changes to pricing, tenor (subject the time limitation noted above), interest rate mechanics, and bank regulatory provisions (including increased costs, tax withholding, indemnification, OFAC, sanctions, anti-money laundering, and "know your customer" provisions).

(iii)    The Borrower shall deliver to the RRIF Lender the documentation and information described in Section 15(b)(i) (*Copies of Documents*) by the time set forth in Section 15(b)(i) (*Copies of Documents*), prior to the incurrence or issuance of any indebtedness permitted under this Section 16(a) (*Indebtedness*).

(b)    No Lien Extinguishment; Adverse Amendments.

(i)    The Borrower shall not, and shall not permit any Person to, without the prior written consent of the RRIF Lender, either extinguish, impair, or transfer the Liens on the Collateral granted pursuant to the CASA.

(ii)    The Borrower shall not terminate, assign, amend, modify, replace, or supplement the Funding Agreement without the prior written consent of the RRIF Lender, except (1) to modify the schedule of Contract Payments in accordance with Section 2.01(g) of the Funding Agreement to cause such schedule to reflect changes to **Exhibit B** (*RRIF Debt Service*) implemented by the RRIF Lender and (2) to amend and restate the Funding Agreement to reflect the changes (and only the changes) set forth in Section 6.1 of the Direct Agreement. Without prior written consent of the RRIF Lender, the Borrower shall not terminate the Project Development Agreement or assign, amend, modify, replace, or supplement the Project Development Agreement in a manner that could adversely affect (A) the ability of the Borrower to comply with its requirements hereunder or under any other RRIF Loan Document, (B) the ability of any other party to the Project Development Agreement to comply with such party's requirements under the Project Development Agreement, (C) the ability of the Borrower to complete the Project, or (D) the RRIF Lender (in the RRIF Lender's determination) in connection with the RRIF Loan.

(c)    No Prohibited Liens.

(i)    Except for the Liens granted pursuant to the CASA, the Borrower shall not create, incur, assume or permit to exist any Lien on the Collateral or the Borrower's rights therein. The Borrower shall not collaterally assign any of its rights under or pursuant to any Fundamental Contract and shall not permit a Lien to encumber the Borrower's rights or privileges under any such Fundamental Contract, except pursuant to the CASA.

(ii)    The Borrower shall not (A) create, incur, or assume any Lien on the real property or real property interests included in the Project or (B) create, incur, assume or permit to exist, any Lien on any part of the Project not constituting real property, other

45

than (in the case of clause (B)) carriers', warehousemen's, mechanics', materialmen's, repairmen's and other like Liens imposed by law, arising in the ordinary course of business and securing obligations that are not overdue by more than thirty (30) days or are being contested by the Borrower in good faith by appropriate proceedings and so long as the Borrower shall have set aside adequate reserves with respect thereto in accordance with and to the extent required by GAAP, applied on a consistent basis.

(iii) The Borrower shall not, without the prior written consent of the RRIF Lender, collaterally assign, pledge, or grant a Lien on any right, title or interest of the Borrower, whether now owned or hereafter acquired or arising, in or to (A) the Project Development Agreement, (B) any GDC Operations Funding Agreement, (C) any amounts paid or payable to the Borrower pursuant to any GDC Operations Funding Agreement, (D) any account in which such payments under any GDC Operations Funding Agreement is or may be deposited, or (E) any proceeds of the foregoing in whatever form; provided, that this Section 16(c) shall not restrict the Borrower from using amounts paid to the Borrower under any GDC Operations Funding Agreement to pay the Working Capital Lender amounts owed with respect to any loans or other amounts under the Working Capital Facility (including any extension thereof in conformance with Section 16(a)(ii)).

(d) Organizational Documents; Fiscal Year. The Borrower shall not at any time (i) amend or modify its Organizational Documents (or, with respect to the GDC Act, propose or support any such amendment or modification), other than any amendment or modification that (A) has been delivered to the RRIF Lender in accordance with Section 15(b)(v) (*Copies of Documents*) and (B) is not adverse to the interests of the RRIF Lender under the RRIF Loan Documents or in the Collateral, without the prior written consent of the RRIF Lender, or (ii) adopt any fiscal year other than the Borrower Fiscal Year, except (with respect to this sub-clause (ii)) with thirty (30) days' prior written notice to the RRIF Lender.

(e) No Payment with Federal Funds. The Borrower shall not pay any portion of RRIF Debt Service nor any other amount to the RRIF Lender or to the Federal Government pursuant to the RRIF Loan Documents with funds received directly or indirectly from the Federal Government; provided, however, that the Borrower may prepay the RRIF Loan in whole or in part, pursuant to, and in accordance with, Section 10 (*Prepayment*), with the proceeds of a validly issued federal credit instrument.

(f) Acquisitions; Change in Legal Structure; Sale of Assets; Transactions with Third Parties. The Borrower shall not, and shall not agree to:

(i) acquire by purchase or otherwise the business, property or fixed assets of, or equity interests or other evidence of beneficial ownership interests in, any Person (excluding purchases or other acquisitions of office inventory or equipment, each in the ordinary course of business);

(ii) reorganize, consolidate with, or merge into another Person;

(iii) sell, lease, or assign its rights in and to the Project or in and to a material portion of the assets constituting the Project; provided, that this clause shall not

46

restrict the Borrower's right or obligation to transfer the Project to Amtrak pursuant to and in accordance with the Project Development Agreement; or

(iv)      otherwise engage in a transaction with any other Person (including any other Governmental Authority of or in the State of New York or of or in the State of New Jersey) to the extent such transaction could reasonably be expected to have a Material Adverse Effect.

(g)      No Defeasance of RRIF Note.  The Borrower shall not defease the RRIF Note without the prior written consent of the RRIF Lender.

(h)      OFAC Compliance.

(i)      The Borrower shall not:

(A)      violate (1) any applicable Anti-Money Laundering Laws, (2) any applicable Sanctions, (3) any applicable Anti-Corruption Laws or (4) any applicable anti-drug trafficking or anti-terrorism laws, civil or criminal;

(B)      use the proceeds of the RRIF Loan for purposes other than those permitted by applicable law and as otherwise permitted under this Agreement, the other Related Documents and the Construction-Related Contracts; or

(C)      make a payment, directly or indirectly, to any Fundamental Contract Party, a SEP Agreement Party, or Construction-Related Contract Party that (1) to the Borrower's knowledge, has violated any of the laws referenced in Section 16(h)(i) (*OFAC Compliance*) or (2) is a Sanctioned Person.

(ii)      The Borrower shall procure that each of its directors, officers, employees, and agents, shall not, directly or indirectly, use the proceeds of the RRIF Loan or lend to, make any payment to, contribute or otherwise make available any funds to any affiliate, joint venture partner or other Person (A) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any applicable Anti-Corruption Laws, (B) in any manner that would result in the violation of any applicable Anti-Money Laundering Laws, (C) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country, or (D) in any other manner that would result in the violation of any Sanctions by any Person (including the Executive Director, the RRIF Lender, a Fundamental Contract Party, a SEP Agreement Party, or a Construction-Related Contract Party).

(i)      Hedging.  The Borrower shall not enter into any swap or hedging transaction, including inflation indexed swap transactions, "cap" or "collar" transactions, futures, or any other hedging transaction without the prior written consent of the RRIF Lender.

(j)      Insolvency-Related Activities.  The Borrower shall not consent to, provide support for, fail to oppose, or seek approval for any gubernatorial or legislative proposal, bill, statute, or order or other action by any Governmental Authority that would authorize or enable (i)

47

the Borrower to (A) seek the commencement of any voluntary bankruptcy or insolvency proceeding with respect to the Borrower or its assets and liabilities, under any Insolvency Law or (B) file a voluntary petition seeking liquidation, reorganization, an arrangement with creditors or an order for relief under any Insolvency Law, or (ii) the appointment of a receiver, trustee, liquidator, custodian, sequestrator, conservator or similar official for the Borrower or for all or a substantial part of the assets of the Borrower.

(k)    No Subsidiaries. The Borrower shall not establish any subsidiaries without the prior written consent of the RRIF Lender.

Section 17.    Indemnification. The Borrower shall indemnify the RRIF Lender and any official, employee, agent, advisor, or representative of the RRIF Lender (each such Person being herein referred to as an "**Indemnitee**") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities, fines, penalties, costs and expenses (including the fees, charges and disbursements of any counsel for any Indemnitee and the costs of environmental remediation), whether known, unknown, contingent or otherwise, incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (a) the execution, delivery and performance of this Agreement or any of the other Related Documents or Other Borrower Financing Documents, (b) the RRIF Loan or the use of the proceeds thereof, or (c) the violation of any law, rule, regulation, order, decree, judgment or administrative decision relating to the environment, the preservation or reclamation of natural resources, the management, release or threatened release of any hazardous material or to health and safety matters; in each case arising out of or in direct relation to the Project in its entirety; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities, fines, penalties, costs or related expenses are determined by a court of competent jurisdiction by final and non-appealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee.  In case any action or proceeding is brought against an Indemnitee by reason of any claim with respect to which such Indemnitee is entitled to indemnification hereunder, the Borrower shall be entitled, at its expense, to participate in the defense thereof; provided that such Indemnitee has the right to retain its own counsel, at the Borrower's expense, and such participation by the Borrower in the defense thereof shall not release the Borrower of any liability that it may have to such Indemnitee.  Any Indemnitee against whom any indemnity claim contemplated in this Section 17 is made shall be entitled, after consultation with the Borrower and upon consultation with legal counsel wherein such Indemnitee is advised that such indemnity claim is meritorious, to compromise or settle any such indemnity claim.  Any such compromise or settlement shall be binding upon the Borrower for purposes of this Section 17.  Nothing herein shall be construed as a waiver of any legal immunity that may be available to any Indemnitee.  To the extent permitted by applicable law, neither the Borrower nor the RRIF Lender shall assert, and each of the Borrower and the RRIF Lender hereby waives, any claim against any Indemnitee or the Borrower, respectively, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any of the other Related Documents, Other Borrower Financing Documents, the other transactions contemplated hereby and thereby, the RRIF Loan or the use of the proceeds thereof, provided that nothing in this sentence shall limit the Borrower's indemnity obligations to the extent such damages are included in any third party claim in connection with which an Indemnitee is entitled to indemnification hereunder.  All amounts due to any Indemnitee under this Section 17 shall be payable promptly upon demand therefor.  The obligations of the

48

Borrower under this Section 17 shall survive the payment or prepayment in full or transfer of the RRIF Note, the enforcement of any provision of this Agreement, the other Related Documents, or the Other Borrower Financing Documents, any amendments, waivers (other than amendments or waivers in writing with respect to this Section 17) or consents in respect hereof or thereof, any Event of Default, and any workout, restructuring or similar arrangement of the obligations of the Borrower hereunder or thereunder.

Section 18.    Sale of RRIF Loan. The RRIF Lender shall not sell the RRIF Loan at any time prior to the Substantial Completion Date.  At any time after Substantial Completion, the RRIF Lender may sell the RRIF Loan to another entity or reoffer the RRIF Loan into the capital markets only in accordance with the provisions of this Section 18.  Any such sale or reoffering shall be on such terms as the RRIF Lender shall deem acceptable in its sole discretion.  However, in making such sale or reoffering the RRIF Lender shall not change the terms and conditions of any RRIF Loan without the prior written consent of the Borrower in accordance with Section 29 (*Amendments and Waivers*).  The RRIF Lender shall provide, at least thirty (30) days prior to any sale or reoffering of the RRIF Loan, written notice to the Borrower of the RRIF Lender's intention to consummate such a sale or reoffering; provided, however, that no such notice shall be required during the continuation of any Event of Default.  The provision of any notice pursuant to this Section 18 shall not (x) obligate the RRIF Lender to sell nor (y) provide the Borrower with any rights or remedies in the event the RRIF Lender, for any reason, does not sell the RRIF Loan.

Section 19.    Events of Default and Remedies

(a)    An "**Event of Default**" shall exist under this Agreement if any of the following occurs:

(i)    Payment Default. The Borrower shall fail to pay (or cause to be paid) any amount of principal of or interest on the RRIF Loan (including RRIF Debt Service required to have been paid pursuant to the provisions of Section 9 (*Payment of Principal and Interest*)) when due and payable (each such failure, a "**Payment Default**").

(ii)    Covenant Default. The Borrower or the Funding Partner shall fail to observe or perform any covenant, agreement or obligation of the Borrower or the Funding Partner under this Agreement (including any payment of fees or other amounts (other than principal and interest) payable hereunder or thereunder), the RRIF Note or any other RRIF Loan Document to which it is a party (other than in the case of any Payment Default or any Development Default), and such failure shall not be cured within thirty (30) days after the earlier to occur of (A) receipt by the Borrower or the Funding Partner (as applicable) from the RRIF Lender of written notice thereof, (B) the Borrower's or the Funding Partner's knowledge (as applicable) of such failure, or (C) with respect to any non-payment of fees or amounts described above in this clause (ii), the date on which any such fees or amounts became due and payable; provided, however, that if such failure is capable of cure but cannot reasonably be cured within such thirty (30) day cure period, then no Event of Default shall be deemed to have occurred or be continuing under this Section 19(a)(ii) (*Covenant Default*), and such thirty (30) day cure period shall be extended by up to one hundred fifty (150) additional days, if and so long as (x) within such thirty (30) day cure period the Borrower or the Funding Partner shall commence actions reasonably designed

49

to cure such failure and shall diligently pursue such actions until such failure is cured, and (y) such failure is cured within one hundred eighty (180) days of the date specified in either (A) or (B) above, as applicable; provided, further, that no extension of the thirty (30) day cure period shall be permitted for any failure to pay any fee or other amount (excluding principal and interest) payable hereunder.

(iii)    Development Default.  A Development Default shall occur.

(iv)    Misrepresentation Default.  Any of the representations, warranties or certifications of the Borrower or the Funding Partner made in or delivered pursuant to the RRIF Loan Documents (or in any certificates delivered by the Borrower or the Funding Partner in connection with the RRIF Loan Documents) shall prove to have been false or misleading in any material respect when made or deemed made (or any representation and warranty that is subject to a materiality qualifier shall prove to have been false or misleading in any respect); provided that no Event of Default shall be deemed to have occurred under this Section 19(a)(iv) (*Misrepresentation Default*) if and so long as:

(A)    such misrepresentation is not intentional;

(B)    such misrepresentation is not a misrepresentation in respect of Section 13(h) (*No Debarment*), Section 13(j) (*Compliance with Federal Requirements*), Section 13(p) (*OFAC; Anti-Corruption Laws*), or Section 13(bb) (*Patriot Act*);

(C)    in the reasonable determination of the RRIF Lender, such misrepresentation has not had, and would not reasonably be expected to result in, a Material Adverse Effect;

(D)    in the reasonable determination of the RRIF Lender, the underlying issue giving rise to the misrepresentation is capable of being cured;

(E)    the underlying issue giving rise to the misrepresentation is cured by the Borrower or the Funding Partner, as applicable, within thirty (30) days from the date on which the Borrower or the Funding Partner, as applicable, first became aware (or reasonably should have become aware) of such misrepresentation; and

(F)    the Borrower (or the Funding Partner, if the applicable misrepresentation is in respect of the Funding Partner) diligently pursues such cure during such thirty (30) day period.

(v)    Judgments.  One or more judgments for the payment of money that are not otherwise fully covered by insurance (for which the insurer has acknowledged and not disputed coverage) shall be rendered against the Borrower, and the same (or any installment thereof that is due and payable) (A) shall remain undischarged for a period of thirty (30) consecutive days during which time period execution shall not be effectively stayed, provided, however, that if such undischarged judgment is capable of being discharged but cannot reasonably be discharged within such thirty (30) day cure period,

50

then no Event of Default shall be deemed to have occurred or be continuing under this Section 19(a)(v), and such thirty (30) day cure period shall be extended by up to sixty (60) additional days, if and so long as (x) within such thirty (30) day cure period the Borrower shall commence actions reasonably designed to discharge such judgment and (y) such judgment is discharged within ninety (90) days of the date of entry of such judgment, or (B) any action shall be legally taken by a judgment creditor to attach or levy upon any assets of the Borrower to enforce any such judgment.

(vi)    Failure to Maintain Existence.  The Borrower shall fail to maintain its existence as a body politic and corporate, a public authority and a government sponsored authority validly existing under the GDC Act, unless at or prior to the time the Borrower ceases to exist in such form a successor public agency or governing body has been created by the State of New York and the State of New Jersey pursuant to a valid and unchallenged law of the State of New York and of the State of New Jersey and that has succeeded to the assets of the Borrower and has assumed, by operation of law, all of the obligations of the Borrower under the RRIF Loan Documents and the Other Borrower Financing Documents, all on terms and conditions satisfactory to the RRIF Lender.

(vii)    Occurrence of a Bankruptcy Related Event.  (A) A Bankruptcy Related Event shall occur with respect to the Borrower or (B) a Bankruptcy Related Event shall occur with respect to any Fundamental Contract Party.

(viii)    Project Abandonment. (A) The Borrower shall abandon the Project, or (B) following the Substantial Completion Date, Amtrak shall abandon the Project or NJT shall cease commuter rail operations on the Project.

(ix)    Invalidity of RRIF Loan Documents. (A) Any RRIF Loan Document ceases to be in full force and effect (other than as a result of the termination thereof in accordance with its terms) or becomes void, voidable, illegal or unenforceable, or the Borrower or the Funding Partner contests in any manner the validity or enforceability of any RRIF Loan Document to which it is a party or denies it has any further liability under any RRIF Loan Document to which it is a party, or purports to revoke, terminate or rescind any RRIF Loan Document to which it is a party; or (B) the CASA ceases (other than as expressly permitted thereunder) to be effective to grant a valid and binding security interest on any material portion of the Collateral, including the Borrower's right, title, and interest in and to the Contract Payments, and with the priority purported to be created pursuant to the CASA.

(x)    GDC Act. Either statutory element of the GDC Act shall be repealed or shall be amended or modified in such a manner that could reasonably be expected to result in a Material Adverse Effect.

(xi)    Fundamental Contract Expiration or Termination.    Any Fundamental Contract shall have expired or shall have been terminated (whether by reason of a default thereunder or by mutual agreement of the parties thereto or otherwise), or for any reason shall have ceased to be in full force and effect.

51

1710417.19-WASSR01A - MSW

(b)     Upon the occurrence of any Bankruptcy Related Event with respect to the Borrower, (i) all obligations of the RRIF Lender hereunder with respect to the disbursement of any undisbursed amounts of the RRIF Loan shall automatically be deemed terminated, and (ii) the Borrower shall immediately repay any unexpended RRIF Loan proceeds disbursed to the Borrower under this Agreement.

(c)     Upon the occurrence of any other Event of Default, the RRIF Lender may (i) suspend or terminate all of its obligations hereunder with respect to the disbursement of any undisbursed amounts of the RRIF Loan and (ii) demand that the Borrower immediately repay any unexpended RRIF Loan proceeds disbursed to the Borrower under this Agreement, in which event the Borrower shall immediately repay any such unexpended RRIF Loan proceeds to the RRIF Lender.

(d)     Whenever any Event of Default hereunder shall have occurred and be continuing, the RRIF Lender shall be entitled and empowered to enforce all of its rights and remedies pursuant to the RRIF Loan Documents (directly or through the Collateral Agent) and may institute any actions or proceedings at law or in equity against the Borrower for the collection of any sums due and unpaid hereunder or under the RRIF Note, and may prosecute any such judgment or final decree against the Borrower and collect in the manner provided by law out of the property of the Borrower the moneys adjudged or decreed to be payable, and the RRIF Lender shall have all of the rights and remedies of a creditor, including all rights and remedies of a secured creditor under the Uniform Commercial Code, and may take such other actions at law or in equity as may appear necessary or desirable to collect all amounts due and unpaid hereunder or under the RRIF Note, or to enforce performance and observance of any obligation, agreement, or covenant of the Borrower under this Agreement or the RRIF Note; provided, that acceleration of the payment of the principal of, and interest on, the RRIF Loan (and corresponding RRIF Note) shall not be a remedy hereunder or under any other RRIF Loan Document.

(e)     Whenever any Event of Default hereunder shall have occurred and be continuing, the RRIF Lender may suspend or debar the Borrower from further participation in any Federal Government program administered by the RRIF Lender and to notify other departments and agencies of such default.

(f)     No action taken pursuant to this Section 19 (*Events of Default and Remedies*) shall relieve the Borrower from its obligations pursuant to this Agreement, the RRIF Note or the other RRIF Loan Documents, all of which shall survive any such action.

Section 20.     Accounting and Audit Procedures; Inspections; Reports and Records.

(a)     Accounting and Audit Procedures. The Borrower shall establish fiscal controls and accounting procedures sufficient to assure proper accounting for all Project-related transactions (including collection of Contract Payments, and any other revenues attributable to the Project, and RRIF Loan requisitions received and disbursements made with regard to the Project), so that audits may be performed to ensure compliance with and enforcement of this Agreement and each Other RRIF Loan Agreement.  The Borrower shall use accounting, audit and fiscal procedures conforming to GAAP, including, with respect to the RRIF Loan, accounting of

principal and interest payments, disbursements, prepayments and calculation of interest and principal amounts outstanding.

(b)    Inspections. So long as the RRIF Loan or any portion thereof shall remain outstanding and until five (5) years after the RRIF Loan shall have been paid in full, the RRIF Lender shall have the right, upon reasonable prior notice and during normal business hours, to visit and inspect any of the locations or properties of the Borrower, to examine its books of account and records, to make copies and extracts therefrom at the Borrower's expense, and to discuss the Borrower's affairs, finances and accounts with, and to be advised as to the same by, its officers and employees and its independent public accountants (and by this provision the Borrower irrevocably authorizes its independent public accountants to discuss with the RRIF Lender the affairs, finances and accounts of the Borrower, whether or not any representative of the Borrower is present, it being understood that nothing contained in this Section 20(b) (*Inspections*) is intended to confer any right to exclude any such representative from such discussions), all at such reasonable times and intervals as the RRIF Lender may desire.  The Borrower agrees to pay all out-of-pocket expenses incurred by the RRIF Lender in connection with the RRIF Lender's exercise of its rights under this Section 20(b) (*Inspections*) at any time when an Event of Default shall have occurred and be continuing.

(c)    Reports and Records.  The Borrower shall maintain and retain all files relating to the Project, the Fundamental Contracts, the Collateral (including the Contract Payments), and the RRIF Loan until three (3) years after the later of the date on which (i) all rights and duties hereunder and under this Agreement and the RRIF Note (including payments) have been fulfilled and any required audits have been performed and (ii) any litigation relating to the Project, the Collateral, the Contract Payments, each Other RRIF Loan, each Other RRIF Loan Agreement or this Agreement is finally resolved or, if the RRIF Lender has reasonable cause to extend such date, a date to be mutually agreed upon by the RRIF Lender and the Borrower.  The Borrower shall provide to the RRIF Lender in a timely manner all records and documentation relating to the Project or the Collateral or the Contract Payments that the RRIF Lender may reasonably request from time to time.

(d)    Required Audit. The Borrower shall have a single or program-specific audit conducted in accordance with 2 CFR Part 200 Subpart F and 31 U.S.C. § 7502 in 2024 and annually thereafter, except to the extent biennial audits are permitted for the Borrower pursuant to 2 CFR § 200.504 and 31 U.S.C. § 7502(b).  Upon reasonable notice, the Borrower shall cooperate fully in the conduct of any periodic or compliance audits conducted by the RRIF Lender, the USDOT, or designees thereof, pursuant to 49 CFR § 80.19, 31 U.S.C. § 7503(b), or 31 U.S.C. § 6503(h) and shall provide full access to any books, documents, papers or other records that are pertinent to the Project or the RRIF Loan, to the Secretary, or the designee thereof, for any such project or programmatic audit.

Section 21.    Financial Plan; Financial Statements.

(a)    Financial Plan. Until the RRIF Loan and each Other RRIF Loan has been repaid in full, the Borrower shall provide to the RRIF Lender and to the FTA Regional Office (on behalf of both Modal Grant Offices) a single annual Financial Plan (which Financial Plan will be used for purposes of this Agreement and each Other RRIF Loan Agreement) in a format to be

agreed upon by the Borrower, the RRIF Lender, FTA, and FRA. The Borrower shall provide the Financial Plan by not later than ninety (90) days after the beginning of each Borrower Fiscal Year. Each Financial Plan shall be consistent in all respects with the projections, assumptions and other information contained or reflected in the Base Case Financial Model.

(i)       Each Financial Plan shall be prepared in accordance with GAAP and shall meet the FTA Project Management Oversight Requirements, as amended from time to time, to the extent applicable.

(ii)       Together with each Financial Plan, the Borrower shall deliver (A) a certificate signed by the Borrower's Authorized Representative to the effect that the Financial Plan, including the assumptions and supporting documentation, is accurate and reasonable to the best of the Borrower's knowledge and belief, and (B) an electronic copy of a Revised Financial Model for the period from the Effective Date through the later of (i) the Final Maturity Date and (ii) the latest final maturity date under any Other RRIF Loan Agreement, based upon assumptions and projections with respect to the Contract Payments to be received, expenses and other financial aspects of the Project and the Collateral that shall reflect the prior experience and current status of the Project and the Contract Payments, and the expectations of the Borrower with respect to the Project and the Contract Payments to be received, as of the most recent practicable date prior to the delivery of such Revised Financial Model, together with a change log describing such changes.

(iii)       Unless otherwise agreed to by the RRIF Lender, FTA and FRA, each Financial Plan shall:

(A)       provide an updated cash flow statement showing, for the Borrower Fiscal Year most recently ended, (1) actual annual cash inflows (Contract Payments and other income) and (2) actual annual outflows (including all operating expenses, Capital Expenditures, replenishment of reserves, and other uses); and

(B)       provide a written narrative that (1) describes any material matters that may affect the future performance by the Borrower of its obligations under this Agreement and the causes thereof, including a summary of reports prepared by or on behalf of the Borrower relating to the Collateral, the Contract Payments, operational contracts, and third-party transactions; and (2) discusses contingency measures that will or may be taken to address any of the matters reported pursuant to this sub-clause (B).

(iv)       Unless otherwise agreed to by the RRIF Lender, FTA and FRA, prior to the Substantial Completion Date, each Financial Plan shall (in addition to the information required in Section 21(a)(iii) above):

(A)       provide the current estimate of Total Project Costs and the remaining cost to complete the Project, identify any significant cost changes since the previous Financial Plan, discuss the reasons for and implications of the cost changes, and include a summary table showing the history of

54

Total Project Costs by major activity or category in comparison to the Base Case Financial Model and the most recent Financial Plan (in the same format as utilized to report Total Project Costs in the monthly construction progress reports delivered pursuant to Section 22(b) (*Monthly Construction Progress Report*));

(B)    provide updates to the Construction Schedule, including major milestones for each phase of the Project (including an updated Projected Substantial Completion Date), and compare current milestone dates with the milestone dates in the Construction Schedule provided in the most recent Financial Plan, and discuss the reasons for any changes to the expected completion of these Project milestones (in the same format as utilized to report milestones in the monthly construction progress reports delivered pursuant to Section 22(b) (*Monthly Construction Progress Report*));

(C)    provide current estimates of sources and uses of funds for the Project, identify any significant funding changes since the most recent prior Financial Plan, discuss the reasons for and implications of such funding changes, and include a summary table showing the history of Project funding in comparison to the Base Case Financial Model and the most recent prior Financial Plan;

(D)    provide the total value of approved changes in Total Project Costs, and provide a listing of material individual changes, setting forth the rationale or need for such changes and describing the impact of such changes on the Project; and

(E)    contain a written narrative executive summary of the topics described in clauses (A) through (D) above since the Effective Date and since the date of the information included in the most recent Financial Plan, describing in reasonable detail all material matters that may affect the future performance of the Borrower's obligations under this Agreement.

(b)    Financial Statements. The Borrower shall furnish to the RRIF Lender:

(i)    As soon as available, but no later than one hundred twenty (120) days after the end of each Borrower Fiscal Year, a copy of the audited income statement and balance sheet of the Borrower as of the end of such fiscal year and the related audited statements of operations and of cash flow of the Borrower for such fiscal year, setting forth in each case in comparative form the figures for the previous fiscal year, certified without a "going concern" or like qualification or exception, or qualification as to the scope of the audit, by an independent public accounting firm selected by the Borrower and which is reasonably acceptable to the RRIF Lender.

(ii)    All such financial statements shall be complete and correct in all material respects and shall be prepared in reasonable detail and in accordance with GAAP

55

applied consistently throughout the periods reflected therein (except for changes approved or required by the independent public accountants certifying such statements and disclosed therein).

(iii)        The Borrower shall furnish to the RRIF Lender, together with each delivery of annual audited financial statements of the Borrower pursuant to this Section 21(b), a certificate signed by the chief executive officer or chief financial officer of the Borrower or any Borrower's Authorized Representative, stating whether or not, to the Borrower's knowledge, during the quarterly or annual period (as the case may be) covered by such financial statements, there occurred any Event of Default or event that, with the giving of notice or the passage of time or both, would become an Event of Default, and, if any such Event of Default or other event shall have occurred during such period, the nature of such Event of Default or other event and the actions that the Borrower has taken or intends to take in respect thereof.

Section 22.    Oversight and Monitoring.

(a)        Project Development, Design and Construction.  Each of the RRIF Lender and each Modal Grant Office shall have the right in its sole discretion to monitor (or direct its agents to monitor) the development, including environmental compliance, design, right-of-way acquisition, and construction of the Project.  The Borrower shall cooperate in good faith with the RRIF Lender and the Modal Grant Offices in the conduct of such monitoring by promptly providing the RRIF Lender and the Modal Grant Offices with such reports, documentation or other information as shall be requested by the RRIF Lender and the Modal Grant Offices, or its agents, including any consulting engineer reports, documentation or information.

(b)        Monthly Construction Progress Report.  On or before the thirtieth (30th) business day following the end of each calendar month during the Construction Period, the Borrower shall deliver to the RRIF Lender and the FTA Regional Office on behalf of both Modal Grant Offices, a single report that will be used for purposes of this Agreement and each Other RRIF Loan Agreement (in a format to be agreed upon by the Borrower, the RRIF Lender, FTA, and FRA), that:

(i)        summarizes key changes, events, or issues that occurred during the prior month and a projection of key milestones and decisions that will occur in the next three (3) months;

(ii)        specifies the amount of Total Project Costs expended since the Effective Date as well as during such calendar month and the amount of Total Project Costs estimated to be required to complete the Project and provides a revised Project Budget updated through the end of such calendar month, reflecting any material change orders granted or pending under the Construction-Related Contracts with respect to any cost increases, any use of contingency and remaining unallocated project contingency;

(iii)        demonstrates that the Borrower has sufficient funds (including funds on hand and funds obtainable without undue delay or conditions that cannot reasonably be satisfied by the Borrower as and when such funds are needed) to complete the Project,

56

1710417.19-WASSR01A - MSW

taking into account any changes to the amount of Total Project Costs that are reflected in such monthly construction progress report;

(iv)        provides (A) an assessment of the overall construction progress of the Project since the date of the last report and since the Effective Date, together with an assessment of how such progress compares to the Construction Schedule; and (B) to the extent there have been any events or occurrences (e.g., delayed equipment deliveries, permit delays, material change orders, etc.), that have had, or are anticipated to have, an adverse impact on the Construction Schedule and the meeting of critical dates thereunder, a detailed narrative description of steps being taken (or proposed to be taken) to address such adverse impacts on the Construction Schedule, including the use of any schedule float or increase in hours worked in a day and the identification of critical path items; and

(v)        provides a discussion or analysis of such other matters related to the Project as the RRIF Lender may reasonably request.

(c)        Federal Grant Agreement Material Reports.  Simultaneously with, or promptly after, delivery to either Modal Grant Office of material reports required under any Federal Grant Agreement, the Borrower shall deliver a copy of such material report to the RRIF Lender in the same form and format as delivered to the applicable Modal Grant Office (to the extent not already delivered to the RRIF Lender).

(d)        Recovery Plan.  If the monthly construction progress report described in Section 22(b)(i) (*Monthly Construction Progress Report*) or the monthly report issued pursuant to the FTA Project Management Oversight Requirements, as applicable, indicates either a failure to maintain the Construction Schedule, including a failure to achieve Substantial Completion by the Projected Substantial Completion Date or actual or projected Eligible Project Cost in excess of the Eligible Project Costs reflected in the Project Budget, or both, then the Borrower shall notify the RRIF Lender and the FTA Regional Office of such failure and shall, upon request by the RRIF Lender or the FTA Regional Office, provide the RRIF Lender and the FTA Regional Office within forty-five (45) days of receipt of such request (or such later date as may be specified in the request), a Recovery Plan for review by the RRIF Lender and the FTA Regional Office and approval by the FTA Regional Office in consultation with the RRIF Lender.

(e)        Requested Information.  The Borrower shall, at any time while the RRIF Loan remains outstanding, promptly deliver to the RRIF Lender such additional information regarding the business, financial, legal or organizational affairs of the Borrower or regarding the Project, the Collateral or the Contract Payments as the RRIF Lender may from time to time reasonably request, including copies of agreements, documentation and other information related thereto requested by the RRIF Lender. The Borrower shall respond, and use commercially reasonable efforts to cause the Fundamental Contract Parties, SEP Agreement counterparties, and Construction-Related Contract Parties to respond, to the RRIF Lender's inquiries regarding the construction of the Project.  The RRIF Lender has the right, in its sole discretion, to retain a financial oversight advisor, under a contract with the RRIF Lender and at the Borrower's cost (as provided in Section 28 (*Fees and Expenses*)), to carry out the provisions of this Section 22(e).

57

Section 23.    No Personal Recourse.  No official, employee or agent of the RRIF Lender, the Borrower, the Funding Partner, or any Person executing this Agreement or any of the other RRIF Loan Documents shall be personally liable on this Agreement or such other RRIF Loan Documents by reason of the issuance, delivery or execution hereof or thereof.

Section 24.    No Third Party Rights.  The parties hereby agree that neither this Agreement or any Other RRIF Loan Agreement creates any third party rights against the Borrower, the Federal Government, the RRIF Lender, FTA, or FRA solely by virtue of the RRIF Loan, and the Borrower agrees to indemnify and hold the RRIF Lender, the Servicer (if any), the Executive Director, and the Federal Government harmless, to the extent permitted by law and in accordance with Section 17 (*Indemnification)*, from any lawsuit or claim arising in law or equity solely by reason of the RRIF Loan, and that no third party creditor or creditors of the Borrower shall have any right against the RRIF Lender with respect to the RRIF Loan or any RRIF Loan Document.

Section 25.    Borrower's Authorized Representative.  The Borrower shall at all times have appointed a Borrower's Authorized Representative by designating such Person or Persons from time to time to act on the Borrower's behalf pursuant to a written certificate furnished to the RRIF Lender and the Servicer, if any, containing the specimen signature or signatures of such Person or Persons and signed by the Borrower.

Section 26.    RRIF Lender's Authorized Representative.

(a)    The RRIF Lender shall at all times have appointed the RRIF Lender's Authorized Representative by designating such Person or Persons from time to time to act on the RRIF Lender's behalf pursuant to a written certificate furnished to the Borrower and the Servicer, if any, containing the specimen signature or signatures of such Person or Persons and signed by the RRIF Lender.

(b)    Pursuant to the delegation of authority, dated July 20, 2016, from the Secretary to the Under Secretary of Transportation for Policy, the further delegation of authority, dated July 20, 2016, from the Under Secretary of Transportation for Policy to the Executive Director of the Build America Bureau, the further delegation of authority, dated August 31, 2016 (the "**Delegation**") by the Executive Director of the Build America Bureau to the Director of the Credit Office of the Build America Bureau, the Director of the Credit Office of the Build America Bureau has been delegated the authority to enter into contracts and sign all contractual and funding documents (with the exception of the term sheets and credit agreements) necessary to implement the Act, including entering into technical amendments to, and restatements of, term sheets and credit agreements that do not materially impair the credit quality of the revenues pledged to repay the RRIF Lender.  Pursuant to the Delegation, the Director of the Credit Office of the Build America Bureau may act and serve as the RRIF Lender's Authorized Representative under this Agreement, in addition to the Executive Director of the Build America Bureau for the purposes set forth herein.

Section 27.    Servicer. The RRIF Lender may from time to time designate another entity or entities to perform, or assist the RRIF Lender in performing, the duties of the Servicer or specified duties of the RRIF Lender under this Agreement or the RRIF Note. The RRIF Lender shall give the Borrower written notice of the appointment of any successor or additional Servicer

58

and shall enumerate the duties or any change in duties to be performed by any Servicer.  Any references in this Agreement or in any other RRIF Loan Document to the RRIF Lender shall be deemed to be a reference to the Servicer with respect to any duties which the RRIF Lender shall have delegated to such Servicer.  The RRIF Lender may at any time assume the duties of any Servicer under this Agreement and under each other RRIF Loan Document.  The Borrower shall cooperate and respond to any reasonable request of the Servicer for information, documentation or other items reasonably necessary for the performance by the Servicer of its duties hereunder.

Section 28.    Fees and Expenses.

(a)    Commencing in Federal Fiscal Year ("**FFY**") 2025 and continuing thereafter each year throughout the term of this Agreement, the Borrower shall pay to the RRIF Lender a servicing fee on or before the fifteenth (15th) of November.  The RRIF Lender shall establish the amount of this annual fee in accordance with this Section 28, and the RRIF Lender or the Servicer, if any, shall notify the Borrower of the amount, at least thirty (30) days before payment is due.

(b)    In establishing the amount of the fee, the RRIF Lender will adjust the previous year's base amount in proportion to the percentage change in CPI.  For the FFY 2025 calculation, the RRIF Lender will use the FFY 2024 base amount of $16,500.00, which applies to other RRIF borrowers, as the previous year's base amount.  The RRIF Lender will calculate the percentage change in the CPI, before seasonal adjustment, from August of the previous year to August of the current year and will then adjust the previous year's base amount in proportion to the CPI percentage change.  To calculate the amount of the fee, the RRIF Lender shall round the current year's base amount using increments of $500.  Results with the ending integers between 250-499 or between 750-999 shall be rounded upward, and results with the ending integers between 001-249 or between 501-749 shall be rounded downward.  The CPI adjustments in the following years shall begin with the base amount, not the rounded fee.

(c)    The Borrower agrees, whether or not the transactions hereby contemplated shall be consummated, to reimburse the RRIF Lender on demand from time to time, within thirty (30) days after receipt of any invoice from the RRIF Lender, for any and all fees, costs, charges, and expenses incurred by it (including the reasonable fees, costs, and expenses of its legal counsel, financial advisors, auditors, and any technical or other consultants and advisors, such reasonableness determined in accordance with Part 31 of the Federal Acquisition Regulation) in connection with the negotiation, preparation, execution, delivery, administration, and performance of this Agreement and the other RRIF Loan Documents and the transactions hereby and thereby contemplated, including reasonable attorneys', and engineers' fees and professional costs, including all such fees, costs, and expenses incurred as a result of or in connection with:

(i)    the enforcement of or attempt to enforce any provision of this Agreement or any of the other RRIF Loan Documents;

(ii)    any amendment, modification, or requested amendment or modification of, waiver, consent, or requested waiver or consent under or with respect to, or the protection or preservation of any right or claim under or with respect to, this Agreement, any other Related Document, any Other Borrower Financing Document, or the

59

Collateral, or advice in connection with the administration, preservation in full force and effect, and enforcement of this Agreement or any other Related Document or Other Borrower Financing Document, or the rights of the RRIF Lender hereunder or thereunder;

(iii)        any ongoing oversight and monitoring of the RRIF Loan, the Borrower or the Project by the RRIF Lender as provided for herein or in any other RRIF Loan Document; and

(iv)        any work-out, restructuring, or similar arrangement of the obligations of the Borrower under this Agreement or the other RRIF Loan Documents, including during the pendency of one or more Events of Default.

The obligations of the Borrower under this Section 28 (*Fees and Expenses*) shall survive the payment or prepayment in full or transfer of the RRIF Note, the enforcement of any provision of this Agreement or the other RRIF Loan Documents, any such amendments, waivers or consents, any Event of Default, and any such workout, restructuring, or similar arrangement.

Section 29.    Amendments and Waivers.  No amendment, modification, termination, or waiver of any provision of this Agreement or any other RRIF Loan Document shall in any event be effective without the written consent of each of the parties hereto or thereto, as applicable.

Section 30.    Governing Law.  This Agreement shall be governed by the federal laws of the United States of America if and to the extent such federal laws are applicable and the internal laws of the State of New York, if and to the extent such federal laws are not applicable.

Section 31.    Severability.  In case any provision in or obligation under this Agreement or any other RRIF Loan Document shall be invalid, illegal, or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

Section 32.    Successors and Assigns.  This Agreement and each other RRIF Loan Document shall be binding upon the parties hereto and thereto and their respective permitted successors and assigns and shall inure to the benefit of the parties hereto and thereto and their permitted successors and assigns.  Neither the Borrower's rights or obligations hereunder or thereunder nor any interest herein or therein may be assigned, delegated, or transferred by the Borrower without the prior written consent of the RRIF Lender.

Section 33.    Remedies Not Exclusive.  No remedy conferred herein or in any other RRIF Loan Document or reserved to the RRIF Lender is intended to be exclusive of any other available remedy or remedies, but each and every such remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute.

Section 34.    Delay or Omission Not Waiver.  No delay or omission of the RRIF Lender to exercise any right or remedy provided hereunder or under any other RRIF Loan Document upon a default of the Borrower (except a delay or omission pursuant to a written waiver) shall impair any such right or remedy or constitute a waiver of any such default or acquiescence therein.  Every right and remedy given by this Agreement, each other RRIF Loan Document, or by law to the

60

1710417.19-WASSR01A - MSW

RRIF Lender may be exercised from time to time, and as often as may be deemed expedient by the RRIF Lender.

Section 35.    Counterparts; Electronic Signatures.  This Agreement and any amendments, waivers, consents or supplements hereto or in connection herewith may be executed in any number of counterparts and by the different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute one and the same instrument; signature pages may be detached from multiple separate counterparts and attached to a single counterpart so that all signature pages are physically attached to the same document.  Electronic delivery of an executed counterpart of a signature page of this Agreement or of any document or instrument delivered in connection herewith in accordance with Section 36 (*Notices*) shall be effective as delivery of an original executed counterpart of this Agreement or such other document or instrument, as applicable.  Each party acknowledges and agrees that it may execute this Agreement, and any amendment, modification, or waiver hereto, using Electronic Signatures.  Such Electronic Signatures are intended to authenticate this writing and to have the same force and effect as handwritten signatures.

Section 36.    Notices.  Notices hereunder and under each other RRIF Loan Document shall be (a) in writing, (b) effective as provided below and (c) given by (i) nationally recognized courier service, (ii) hand delivery, or (iii) email, in each case to:

| If to the RRIF Lender: | Build America Bureau |
| | United States Department of Transportation |
| | Room W12-402 |
| | 1200 New Jersey Avenue, SE |
| | Washington, D.C. 20590 |
| | Attention:  Director, Office of Credit Programs |
| | Email:  BureauOversight@dot.gov |
| | |
| If to the FTA Regional Office: | Federal Transit Administration |
| | Region II Office |
| | One Bowling Green, Room 429 |
| | New York, NY 10004 |
| | Attention:  Michael Culotta, Regional Administrator |
| | Email:  Michael.Culotta@dot.gov |

<table>
<tr><td>If to the Borrower:</td><td>Gateway Development Commission<br>120 Broadway – 10th Floor<br>New York, NY 10271<br>Attention: General Counsel<br>Email: Notices@Gatewayprogram.org</td></tr>
</table>

Unless otherwise instructed by the RRIF Lender's Authorized Representative, all notices to the RRIF Lender should be made by email to the email address noted above for the RRIF Lender. Notices required to be provided herein shall be provided to such different addresses or to such further parties as may be designated from time to time by a Borrower's Authorized Representative, with respect to notices to the Borrower, or by the RRIF Lender's Authorized Representative, with respect to notices to the RRIF Lender or the Servicer. Each such notice, request or communication shall be effective (x) if delivered by hand or by nationally recognized courier service, when delivered at the address specified in this Section 36 (or in accordance with the latest unrevoked written direction from the receiving party) and (y) if given by email, when such email is delivered to the address specified in this Section 36 (or in accordance with the latest unrevoked written direction from the receiving party); provided that notices received on a day that is not a Business Day or after 5:00 p.m. Eastern Time on a Business Day will be deemed to be effective on the next Business Day.

Section 37.    Effectiveness. This Agreement shall be effective on the Effective Date.

Section 38.    Termination. This Agreement shall terminate upon the irrevocable payment in full in cash of the Outstanding RRIF Loan Balance, together with all accrued interest and fees with respect thereto; provided, however, that the indemnification requirements of Section 17 (*Indemnification)*, the reporting and record keeping requirements of Sections 20(b) (*Inspections*) and (c) (*Reports and Records*), and the payment requirements of Section 28 (*Fees and Expenses*) shall survive the termination of this Agreement as provided in such sections.

Section 39.    Integration.    This Agreement and each other RRIF Loan Document constitute the entire contract between the parties relating to the subject matter hereof and thereof and supersedes any and all previous agreements and understandings, oral or written, relating to the subject matter hereof and thereof.

1710417.19-WASSR01A - MSW

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first written above.

**GATEWAY DEVELOPMENT COMMISSION**

By: _____

Name: Kris Kolluri

Title:   Chief Executive Officer


**UNITED STATES DEPARTMENT OF TRANSPORTATION**, acting by and through the Executive Director of the Build America Bureau


By: _____

Name:  Dr. Morteza Farajian

Title:    Executive Director

[*Signature Page to RRIF Loan Agreement (Port Authority Funding Agreement)*]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first written above.

**GATEWAY DEVELOPMENT COMMISSION**

By: _____
Name: Kris Kolluri
Title:   Chief Executive Officer

**UNITED STATES DEPARTMENT OF TRANSPORTATION**, acting by and through the Executive Director of the Build America Bureau

By: _____
Name:  Dr. Morteza Farajian
Title:    Executive Director

[*Signature Page to RRIF Loan Agreement (Port Authority Funding Agreement)*]

Case 1:26-cv-00939-JAV    Document 55-5    Filed 02/11/26    Page 76 of 129

Case 1:26-cv-00939-JAV    Document 55-5    Filed 02/11/26    Page 89 of 129