**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| STATE OF NEW JERSEY and STATE OF NEW YORK,<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>U.S. DEPARTMENT OF TRANSPORTATION, *et al.*,<br><br>　　　　　Defendants. | Civil Action No. 26-cv-939 |

---

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO DISMISS AND REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

---

**TABLE OF CONTENTS**

**PAGE**

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ...........................................................................................................1

BACKGROUND ............................................................................................................3

ARGUMENT.................................................................................................................6

   I.   THE TUCKER ACT DOES NOT BAR THIS COURT FROM ADJUDICATING THE
       STATES' APA CLAIMS. ....................................................................................... 6

   II.  THE STATES' APA CLAIMS ARE LIKELY TO SUCCEED...................................... 22

      A.  The September 30 Suspension Is Final Agency Action.................................... 22

      B.  The September 30 Suspension Is Unlawful. .................................................... 24

CONCLUSION.............................................................................................................25

i

# TABLE OF AUTHORITIES

**PAGE(S)**

**Cases**

*Abbott Labs. v. Gardner*,
  387 U.S. 136 (1967) ................................................................................................ 12

*Am. Acad. of Pediatrics v. HHS*,
  No. 25-4505, 2026 WL 80796 (D.D.C. Jan. 11, 2026) ...................................... 16, 19

*Am. Ass'n of Univ. Profs. v. Trump*,
  No. 25-7864, 2025 WL 3187762 (N.D. Cal. Nov. 14, 2025)................................. 7, 11

*American Association of Physics Teachers v. NSF*,
  804 F. Supp. 3d 45 (D.D.C. 2025) ......................................................................... 13

*Bennett v. Spear*,
  520 U.S. 154 (1997)........................................................................................... 22, 23

*Block v. Community Nutrition Institute*,
  467 U.S. 340 (1984)........................................................................................... 12, 13

*Bowen v. Massachusetts*,
  487 U.S. 879 (1988)................................................................................................ 19

*Climate United Fund v. Citibank, N.A.*,
  154 F.4th 809 (D.C. Cir. 2025) .............................................................................. 18

*Cmty. Legal Servs. v. HHS*,
  137 F.4th 932 (9th Cir. 2025)........................................................................... passim

*Cmty. Legal Servs. v. HHS*,
  155 F.4th 1099 (9th Cir. 2025).............................................................. 7, 8, 14, 19

*Crowley Gov't Servs. v. GSA*,
  38 F.4th 1099 (D.C. Cir. 2022) ...................................................................... 6, 8, 19

*Department of Education v. California*,
  604 U.S. 650 (2025).......................................................................................... passim

*Elev8 Baltimore v. Corp. for Nat'l & Cmty. Serv.*,
  804 F. Supp. 3d 524 (D. Md. 2025) ....................................................................... 16

*Elgin v. Department of Treasury*,
  567 U.S. 1 (2012)................................................................................................... 11

*Galette v. N.J. Transit Corp.*,
   146 S. Ct. 854 (2026)................................................................................................ 7

*Hess v. Port Auth. Trans-Hudson Corp.*,
   513 U.S. 30 (1994)................................................................................................... 7

*Illinois v. Noem*,
   No. 25-495, 2025 WL 3707011 (D.R.I. Dec. 22, 2025) ............................................ 17

*Ingersoll-Rand Co. v. United States*,
   780 F.2d 74 (D.C. Cir. 1985)............................................................................... 18, 20

*Louisiana v. Biden*,
   622 F. Supp. 3d 267 (W.D. La. 2022) ....................................................................... 23

*Mach Mining v. EEOC*,
   575 U.S. 480 (2015)................................................................................................... 8

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
   567 U.S. 209 (2012)................................................................................ 9, 10, 12, 15

*Megapulse v. Lewis*,
   672 F.2d 959 (D.C. Cir. 1982).............................................................................. 16, 17

*MTA v. Duffy*,
   No. 25-1413, 2026 WL 588117 (S.D.N.Y. Mar. 3, 2026)....................................... 7, 16, 17, 18

*Myun-Uk Choi v. Tower Research Capital*,
   890 F.3d 60 (2d Cir. 2018) ...................................................................................... 25

*National Institutes of Health v. American Public Health Association*,
   145 S. Ct. 2658 (2025)......................................................................................... passim

*New Jersey v. U.S. Dep't of Transp.*,
   No. 26-282 (2d Cir.)............................................................................................ 4, 5, 21

*New York v. Admin. for Children & Families*,
   No. 26-172, 2026 WL 673848 (S.D.N.Y. Mar. 10, 2026)...................................... passim

*New York v. Trump*,
   133 F.4th 51 (1st Cir. 2025) ..................................................................................... 24

*New York v. Trump*,
   No. 25-1236, 2026 WL 734941 (1st Cir. Mar. 16, 2026)........................................... 20

*New York v. Yellen*,
   15 F.4th 569 (2d Cir. 2021) .......................................................................... 10, 15

*NLRB v. Nexstar Media*,
   133 F.4th 201 (2d Cir. 2025) ............................................................................... 22

*Normandy Apts., Ltd. v. U.S. Dep't of Housing & Urban Dev.*,
   554 F.3d 1290 (10th Cir. 2009) ........................................................................... 18

*Perry Capital LLC v. Mnuchin*,
   864 F.3d 591 (D.C. Cir. 2017) ............................................................................. 19

*Presidential Gardens Assocs. v. United States ex rel. Sec'y of Housing & Urban Dev.*,
   175 F.3d 132 (2d Cir. 1999) ................................................................................ 20

*Randall v. United States*,
   95 F.3d 339 (4th Cir. 1996) ................................................................................... 7

*Rick's Mushroom Serv. v. United States*,
   521 F.3d 1338 (Fed Cir. 2008) ............................................................................ 13

*South Carolina v. Regan*,
   465 U.S. 367 (1984) ....................................................................................... 10, 15

*Thakur v. Trump*,
   163 F.4th 1198 (9th Cir. 2025) ............................................................................ 14

*Tootle v. Sec'y of Navy*,
   446 F.3d 167 (D.C. Cir. 2006) ....................................................................... passim

*U.S. Conference of Catholic Bishops v. U.S. Department of State*,
   770 F. Supp. 3d 155 (D.D.C. 2025) ..................................................................... 20

*United States v. Fausto*,
   484 U.S. 439 (1988) ...................................................................................... 11, 12

*Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*,
   778 F. Supp. 3d 440 (D.R.I. 2025) ...................................................................... 23

## Statutes and Regulations

2 C.F.R. § 1201.1 ..................................................................................................... 24

2 C.F.R. § 200.339 ............................................................................................. 19, 24

2 C.F.R. § 200.342 ................................................................................................... 24

28 U.S.C. § 1491.................................................................................................. 6, 8, 15

5 U.S.C. § 701..................................................................................................... 12

5 U.S.C. § 702..................................................................................................... 8, 9

**Other Authorities**

About the Comm'n, GDC (last visited Mar. 23, 2026),

   https://www.gatewayprogram.org/aboutthecommission-2.html. ................................................. 7

**INTRODUCTION**

In its brief, the Department of Transportation (DOT) remarkably does not attempt to deny the harms the States face from the unlawful September 30 suspension of funds for the Hudson Tunnel Project. But for the Court's TRO, which the Second Circuit declined to stay, the September 30 Suspension would imminently have forced the States to expend funds to secure dangerous active construction sites as well as left hundreds of people out of work. Instead, DOT continues to insist that the States have no forum whatsoever, here or in the Court of Federal Claims, to prevent or redress their independent Article III harms. DOT's jurisdictional arguments fare no better now than they did in earlier stages of this case or before the Second Circuit.

DOT's principal argument—that the States may not seek redress for their own Article III injuries caused by unlawful agency actions—falls short for several reasons. First, the Tucker Act does not prevent noncontracting parties from bringing suit. As the D.C. Circuit explained decades ago, the Tucker Act does not create an exception to the APA's waiver of sovereign immunity where the Tucker Act's separate sovereign immunity waiver does not apply in the first place. The interim orders in *Department of Education v. California*, 604 U.S. 650 (2025), and *National Institutes of Health v. American Public Health Association*, 145 S. Ct. 2658 (2025), do not help DOT because they did not address whether noncontracting parties who cannot sue in the Court of Federal Claims must be left without any forum whatsoever to address their own independent and profound harms from unlawful agency action. Rather, noncontracting parties can sue under the APA just like other plaintiffs if they meet all of the other demanding requirements to bring such a suit.

Second, even setting aside the fact the States are noncontracting parties, the States' claims are not otherwise founded on contracts: their APA claims neither stem from contract rights nor seek contract remedies. Their claims are instead based in binding government-wide regulations

and the APA's demand for reasoned decisionmaking that an agency must make free from pretext. Those are standard APA claims, and they do not convert to contract claims merely because part of the factual harm involves a contract with DOT. After all, the Tucker Act and Justice Barrett's controlling *NIH* concurrence ask not whether a contract is somewhere involved, but whether the specific legal claims are themselves actually "founded … upon" it. And as to remedies, as this Court acknowledged, the States seek only a limited order from this Court that sets aside DOT's specific unlawful September 30 Suspension decision to withhold funds from GDC and prevents DOT from implementing that policy, not specific performance or an order requiring DOT to pay any monies. Vacating an unlawful agency decision is a classic APA remedy, not a contract one.

Finally, DOT's perfunctory defense of the September 30 Suspension from the APA claims is unavailing. The States challenge DOT's final decision to suspend funding pending the completion of its "compliance review"—they do not, as DOT misconceives, challenge the review itself. Nor does DOT seriously defend that decision. DOT does not refute that the September 30 Suspension is contrary to binding OMB regulations. And while DOT briefly asserts that it acted rationally, it provides a defense only of its decision to *review* GDC's compliance with certain regulations— not the decision to suspend funds while the review is pending. DOT thus offers zero response to the claims that DOT's shifting and post-hoc explanations are arbitrary and capricious because they demonstrate a lack of reasoned decisionmaking, reveal a failure to consider reliance interests and alternatives, and are in fact pretextual cover for purely political retaliation.

This Court should once again rule against an unlawful agency action that imperils one of the country's most critical infrastructure projects. It should deny DOT's motion and grant permanent relief vacating the September 30 Suspension.

**BACKGROUND**

Although the States rest on their original complaint and TRO motion for a recitation of the facts and arguments why DOT's September 30 indefinite suspension of grant and loan funding for the Hudson Tunnel Project was contrary to law and arbitrary and capricious, this section sets forth the factual and procedural developments since the States filed their opening papers.

This Court held oral argument on the States' motion on Friday, February 6. At the hearing, the States explained that the Tucker Act did not preclude this Court's jurisdiction over their claims, both because the States are not parties to DOT's own agreements with the Gateway Development Commission (GDC), and because the States do not rely on contract rights or seek such remedies. *See* Feb. 6, 2026 Transcript (OA.Tr.) at 5:6-22:18. On the latter point, the States emphasized that they sought only an order enjoining DOT from relying on the September 30 Suspension decision— not an order mandating payment of money. *Id.* at 19:16-20:2, 21:3-8. The States also specified that the relief they sought would not prevent DOT from relying on another reason to suspend funding; they simply sought an order enjoining the September 30 Suspension. *Id.* at 20:3-5.

This Court granted the TRO. ECF 45. The Court rejected DOT's contention that the Tucker Act barred review of the States' APA claims, emphasizing DOT "concede[d] that Plaintiffs could not themselves bring claims in the Court of Federal Claims, as they are not signatories to the underlying contracts." *Id.* at 8. This Court relied on longstanding caselaw that the Tucker Act does not provide "exclusive jurisdiction" in the Court of Federal Claims if "there is no jurisdiction" in that Court. *See id.* (quoting *Tootle v. Sec'y of Navy*, 446 F.3d 167, 176-77 (D.C. Cir. 2006)). And it found the Supreme Court's interim decisions finding other challenges subject to the Tucker Act distinguishable "as those cases concerned grant recipients who were able to pursue their claims in the Court of Federal Claims." *Id.* at 9 (discussing *NIH* and *Dep't of Educ.*). This Court agreed that

the States were "likely to succeed on the merits of their APA claim," noting that DOT did not even "challenge[]" the "merits of the claims." *Id.* It found the States "would suffer irreparable harm in the absence of an injunction," given unrecoverable costs the States would suffer "if GDC is forced to shut down its operations" that day. *Id.* It enjoined DOT "from implementing the September 30, 2025 suspension of federal disbursements for the Hudson Tunnel Project." *Id.* at 10.

The following day, Monday, February 9, DOT appealed the TRO to the Second Circuit and moved for a stay of the order pending appeal in both this Court and the Second Circuit. *See* ECF 48; *New Jersey v. U.S. Dep't of Transp.*, No. 26-282 (2d Cir.) ("CA2.Dkt.") No. 9. In its motions, DOT represented that "[u]nless this Court's order is stayed by 1:00 pm today, the government will be forced to disburse up to $200 million." ECF 48 at 3; *see also* CA2.Dkt. No. 9 at 2 (absent that stay, "the government will be forced to disburse those sums without any obvious mechanism for recover[y]"). This Court denied DOT's motion for a stay pending appeal, but granted a three-day administrative stay "to allow Defendants to seek a stay from the Second Circuit." ECF 49 at 2, 5. Judge Merriam of the Second Circuit issued an order referring DOT's emergency stay motion to a panel, without granting an administrative stay. CA2.Dkt. No. 18.

Both before and after DOT appealed the TRO, counsel for DOT and counsel for the States exchanged in a number of communications regarding the disbursements of funds. The States expressed concern that DOT had not made swift disbursements, specifically emphasizing not that the TRO required disbursements, but that it restrained the September 30 Suspension policy, and DOT itself had represented that "the funding freeze announced on September 30 was the *only* basis for those disbursements not to be released." *See* ECF 70-1 at 8; OA.Tr.26:5-6. The States raised the same concerns after DOT represented that it would be imminently "forced to disburse up to $200 million," ECF 48 at 3, but then made no such disbursements, *see* ECF 58 at 1-3 (seeking status

4

conference and expressing concerns that absent a new DOT policy, the agency's failure to make good on its statements raised concerns that it was "deliberately delay[ing]" compliance with the TRO). Ultimately, this Court indicated DOT was seemingly "in compliance" with the TRO, which was only an "invalidation of the suspension order," and this Court reiterated that "there was no order for [DOT] to actually disburse funds or disburse funds on a particular schedule … because it would not be appropriate to do so in an APA action." Feb. 13, 2026 Status Conference Transcript ("Status Tr.") at 7:11-21; *see also id.* at 10:4-6 (court explaining the only order it could or did "issue under the APA is to invalidate the administrative action that has been challenged"). On February 25, the States affirmed the TRO meant only DOT could "not withhold any reimbursements to GDC based on the September 30 suspension policy." CA2.Dkt. No. 23, Ex. 2.

The Second Circuit heard argument and issued a unanimous decision denying DOT's motion for a stay pending appeal on March 11. CA2.Dkt. No. 29. Applying the four-factor stay test, the Second Circuit found that DOT "fail[ed] to show the irreparable injury required to secure a stay pending appeal"; that DOT did not make a sufficiently strong Tucker Act argument to overcome that lack of irreparable harm; and that the balance of equities did not favor DOT. *Id.* at 2; *see also id.* (emphasizing that "DOT must do more than show that the merits of its jurisdictional challenge are debatable to secure a stay pending appeal … DOT has not done that here.").

5

**ARGUMENT**

**I.    THE TUCKER ACT DOES NOT BAR THIS COURT FROM ADJUDICATING THE STATES' APA CLAIMS.**

DOT incorrectly argues that New York and New Jersey have no recourse in any court even if its action flouted the APA and harms them. DOT contends that the Tucker Act, which provides the Court of Federal Claims with "exclusive jurisdiction" to adjudicate a contracting party's claim against the Federal Government that is "'at its essence' contractual," divests this Court of jurisdiction even though the States are not parties to the grant or loan agreements between DOT and GDC and do not raise contract claims. *Crowley Gov't Servs. v. GSA*, 38 F.4th 1099, 1106-07 (D.C. Cir. 2022). DOT's argument violates statutory text, common sense, and precedent.

1. First, the Tucker Act does not deprive this Court of jurisdiction because the Tucker Act does not grant the Court of Federal Claims jurisdiction over this case. *See* 28 U.S.C. § 1491(a)(1) (Claims Court "shall have jurisdiction to render judgment upon any claim against the United States founded … upon any express or implied contract with the United States"). DOT argues that the States cannot sue DOT in district court on their APA claims even if they cannot sue in the Court of Federal Claims.[1] ECF 69 at 14-23. But precedent and principles alike foreclose DOT's theory that the States have *no* forum to challenge plainly unlawful agency action indisputably harming them.

---

[1] DOT chastises the States for failing to at least *attempt* to litigate in the Claims Court as intended third-party beneficiaries, but that response fails. ECF 69 at 15 n.3. DOT does not argue that the States can actually sue there, and it does not deny it would oppose such a suit on jurisdictional grounds. DOT merely asserts that the States have not "tried to litigate their status" as third-party beneficiaries. *Id.* But there is no requirement that States bring a suit DOT does not actually believe is proper before this Court can exercise its jurisdiction to hear APA claims. Indeed, the Federal Circuit has emphasized "[t]hird party beneficiary status is an exceptional privilege" and "the requirements to demonstrate third-party beneficiary status are stringent." *Pac. Gas & Elec. Co. v. United States* 838 F.3d 1341, 1361 (Fed. Cir. 2016) (cleaned up). A party seeking to establish third-party beneficiary status must "prove that the contract not only reflects the express or implied intention to benefit the party, but that it reflects *an intention to benefit the party directly*." *Id.* (emphasis added) (cleaned up). DOT cites no contractual language that it thinks comes close. Moreover, to the extent DOT suggests that GDC can "stand in" for the States in its own suit, *see*

"[C]ourts 'categorically reject the suggestion that a federal district court can be deprived of jurisdiction by the Tucker Act when no jurisdiction lies in the Court of Federal Claims.'" *New York v. Admin. for Children & Families*, No. 26-172, 2026 WL 673848, at *11 (S.D.N.Y. Mar. 10, 2026) ("*ACF*") (quoting *Tootle*, 446 F.3d at 176). As the D.C. Circuit found two decades ago, "[t]here cannot be exclusive jurisdiction under the Tucker Act if there is no jurisdiction under the Tucker Act." *Tootle*, 446 F.3d at 177; *see id.* ("Put plainly, the Court of Federal Claims can have exclusive jurisdiction only with respect to matters that Congress has proclaimed are within its jurisdictional compass."); *see also, e.g.*, *Randall v. United States*, 95 F.3d 339, 346 (4th Cir. 1996) (agreeing that "to determine whether Plaintiff's suit is cognizable under the APA, the court must first examine whether he has an available remedy under the Tucker Act"); *MTA v. Duffy*, No. 25-1413, 2026 WL 588117, *27, 32 (S.D.N.Y. Mar. 3, 2026); *Am. Ass'n of Univ. Profs. v. Trump*, No. 25-7864, 2025 WL 3187762, *21-23 (N.D. Cal. Nov. 14, 2025) ("*AAUP*"). So if a plaintiff with standing to challenge an unlawful agency action cannot bring an action in the Claims Court, it can sue in district court on its necessarily non-contractual action. *See Cmty. Legal Servs. v. HHS*, 137 F.4th 932, 938-39 (9th Cir. 2025) ("*CLS*"); *Cmty. Legal Servs. v. HHS*, 155 F.4th 1099, 1106-07 (9th Cir. 2025) (Fletcher & Koh, JJ., concurring in the denial of rehearing en banc) ("*CLS II*").

There are good reasons multiple circuits reached these conclusions. Most importantly, the text and structure of the APA and Tucker Act refute DOT's argument. The APA waives sovereign

---

ECF 69 at 16 n.4, it is mistaken. GDC's board is comprised of more than representatives of New York and New Jersey. *See* About the Comm'n, GDC (last visited Mar. 23, 2026), https://www.gatewayprogram.org/aboutthecommission-2.html. Nor can DOT claim that GDC is the States' alter ego; interstate agencies are typically independent legal persons distinct from their creator States, not subject to their unilateral control. *See Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 40-43 (1994); *Galette v. N.J. Transit Corp.*, 146 S. Ct. 854, 869 (2026) ("In contrast to formal legal liability, an entity's practical financial relationship with the State … has less relevance" to whether it is a legally independent entity.). DOT does not genuinely suggest there is any forum in which it believes the States can seek redress for their independent injuries.

immunity for plaintiffs harmed by unlawful agency action "seeking relief other than money damages"—unless "any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." 5 U.S.C. § 702. And the Tucker Act *also* waives the Federal Government's sovereign immunity—by authorizing claims against federal agencies "founded … upon any express or implied contract" in the Claims Court. 28 U.S.C. § 1491(a)(1). It is this vesting of "exclusive jurisdiction" over such contract claims in the Claims Court that creates the limited exception to APA jurisdiction. *Crowley*, 38 F.4th at 1106. But that limited exception to APA jurisdiction cannot apply where the Tucker Act does not apply in the first place. After all, as a structural matter, the upshot of *two* independent sovereign immunity waivers cannot be that the injured claimant has *no* available forum; two positives do not create a negative. *See CLS II*, 155 F.4th at 1107 ("reject[ing] the notion that two sovereign immunity waivers, the Tucker Act and the APA, create a jurisdictional Catch-22 in which no court can consider [the States'] claims").

Logic and first principles are consistent with the text and structure. DOT's position "would mean that no court has jurisdiction to hear plaintiffs' claims"—even if they undisputedly suffer their own independent injuries from undisputedly unlawful actions. *CLS*, 137 F.4th at 939. But the view "that *neither* the Court of Federal Claims *nor* the District Court has jurisdiction to address" a party's harms "is, to say the least, troublesome." *Tootle*, 446 F.3d at 176. "Not only is this result contrary to common sense, but it also conflicts with the 'strong presumption favoring judicial review of administrative action' that is embodied in the APA." *CLS*, 137 F.4th at 939 (quoting *Mach Mining v. EEOC*, 575 U.S. 480, 486 (2015)). This is a perfect illustration: as DOT nowhere rebuts, the States suffer independent and profound Article III injuries from DOT's action—from a need to secure dangerous construction sites in their borders, to greater operational costs, to waste of their

8

lands, to delays in providing reliable rail service. Yet DOT claims that these sovereign parties suffering severe Article III harms have nowhere to go.

DOT's approach also contravenes how this Circuit and the Supreme Court have handled analogous statutes: by ensuring parties outside those statutory channeling schemes altogether still have a forum to bring their claims. For example, *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak* involved the Quiet Title Act, which waives sovereign immunity for quiet title suits brought against the Federal Government by plaintiffs asserting title to the land (except, as relevant, if a suit relates to Indian trust lands). 567 U.S. 209, 215-16 (2012). Patchak sued the Department of the Interior, alleging it had acted without lawful authority when it took title to a parcel of property near him for the benefit of an Indian tribe that intended to build a casino on the property. *Id.* at 211-14. While Patchak aimed to divest the Federal Government of its title to the land, he did not claim he had title—he brought an APA suit, not a quiet title action, to remedy independent Article III harms that the nearby casino would cause. *See id.* at 213. The Department of the Interior nevertheless argued the Quiet Title Act barred Patchak's suit, arguing that the Act's exclusion of claims related to Indian trust lands "impliedly forb[ade]" Patchak's APA claim seeking to divest a federal agency of its title to this land. *Id.* at 215 (quoting 5 U.S.C. § 702).

The Supreme Court rejected that argument because Patchak's claim was not a "quiet title" action—he was not asserting his own title, and it was irrelevant that both his suit and a quiet title suit would divest the Federal Government of its title. *Id* at 216-17. Although a plaintiff seeking to assert his *own* title to Indian trust lands would be barred from circumventing the Quiet Title Act's limitations by bringing an APA claim, *see id.* at 216, the Court rejected the argument that the Quiet Title Act's specific authorization of (certain) adverse quiet title claims also created some implicit bar on *other* plaintiffs who were seeking to oust the Federal Government's title but *not* to assert

9

their own. *See id.* at 220-21. The analogy is clear here: the States are not bringing any contract claims, seeking rights due to them under a contract, because they are not parties to any relevant contract with DOT. The Act's channeling rules for contracting parties' claims (like adverse title-holders' claims under the Quiet Title Act) thus cannot be read to bar the States' "different claim, seeking different relief, from the kind" the Tucker Act addresses. *Id* at 222.

The Second Circuit embraced similar logic in *New York v. Yellen*, 15 F.4th 569 (2d Cir. 2021). There, the court confronted a similar dispute under the Anti-Injunction Act (AIA), which—akin to the Tucker Act—channels tax challenges away from federal district courts. *See* 26 U.S.C. § 7421(a). New York and New Jersey challenged federal tax law based on their own Article III injuries, and the Federal Government responded that the AIA left them with no forum—claiming the AIA foreclosed district court jurisdiction even through the States could not pursue redress in tax court. *Yellen*, 15 F.4th at 574-75. The Second Circuit disagreed, explaining the AIA "was never intended to leave a party without *any* forum in which to assert its tax claims" and thus "does not apply to tax claims that the plaintiff could not assert elsewhere." *Id* at 577. (discussing *South Carolina v. Regan*, 465 U.S. 367, 373 (1984)). Because the "States [could not] assert their claims in a forum other than federal court," district court suits could proceed. *Id.* at 578. Of course, as DOT points out, *Yellen* is about a different statute. ECF 69 at 22-23. But it is illustrative of the same broader principle—just as Congress did not leave these States with no forum for their own injuries by channeling taxpayers' claims to refund suits, it did not leave States with no forum for their own Article III injuries by channeling contracting parties' claims to the Claims Court.

DOT's three main responses—seeking support from inapposite Supreme Court decisions, attempting to rebut the States' persuasive authorities, and pressing a consequentialist argument—all fall short. Initially, the cases DOT cites in support of its argument that no court has jurisdiction

10

over the States' claims are not to the contrary. As a threshold matter, this case is not "control[led]" by *Department of Education* and *NIH*, *contra* ECF 69 at 8-10, because neither addressed the situation of noncontracting parties. *See Dep't of Educ.*, 604 U.S. at 652 (plaintiffs "can recover any wrongfully withheld funds through suit in an appropriate forum"); *NIH*, 145 S. Ct. at 2662 n.1 (Barrett, J., concurring) (rebutting argument that plaintiffs will be left with no relief, since Court of Federal Claims and district court each has "authority to fully adjudicate the claims over which it has jurisdiction"). DOT implies that some *NIH* plaintiffs also had no contract with the Federal Government. ECF 69 at 18. But *NIH* simply did not "address the issue that there would be no forum that could hear the plaintiffs' claims," *AAUP*, 2025 WL 3187762, at \*22, and Justice Barrett's controlling concurrence shows the Court understood those plaintiffs as able to seek relief in the Claims Court, 145 S. Ct. at 2662 n.1. Indeed, while some *NIH* plaintiffs argued that that Claims Court lacked jurisdiction over their case, they did so on the theory that those grants were not "contracts," not on a noncontracting-party theory. *See APHA* Opp. to Appl. for Stay, 2025 WL 2244206, at \*25-30 (Aug. 1, 2025). Those interim orders do "not apply where Plaintiffs have no contractual relationship with the Government." *AAUP*, 2025 WL 3187762, at \*22 (cleaned up).

The Civil Service Reform Act cases are likewise off point. *Elgin v. Department of Treasury* is inapposite because it stands only for the unremarkable proposition that where the plaintiff's claims *are* channeled by a statute into another specific forum that can hear the case, he must avail himself of that forum even if he would prefer district court. *See* 567 U.S. 1, 10 (2012). Likewise, the plaintiff in *United States v. Fausto* was covered by the CSRA, but the Act provided him no review of his claims. *See* 484 U.S. 439, 441-43 (1988). The Court, looking at the text, purpose, and structure of the Act, found the exclusion intentional. *Id.* at 443-51. That decision was specific to the CSRA, which covered Fausto and was intended to streamline and replace the previous

"outdated patchwork" of statutory remedies of which Fausto tried to avail himself. *Id.* at 444 (citation omitted). That is, although "Congress will be presumed to have intended judicial review of agency action to be available unless there is 'persuasive reason' to believe otherwise," the Court found such a reason in that case. *Id.* at 452 (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 140 (1967)). Here, by contrast, DOT identifies no equivalent statutory scheme that applies to noncontracting States' claims and shows Congress intended to deny them all judicial review. Instead, the Tucker Act waives immunity for claims by the parties with contract rights—the Act does not govern noncontracting parties who have been independently harmed by unlawful agency action.

Nor does *Block v. Community Nutrition Institute*, 467 U.S. 340 (1984), support DOT's argument. *Block* analyzed the Agricultural Marketing Agreement Act ("AMMA") to assess whether it precluded plaintiffs, consumers of dairy products, from bringing an APA claim alleging the Secretary of Agriculture's milk market orders had violated the AMMA. 467 U.S. at 341-46. It held the AMMA impliedly precluded consumers from bringing suit, so 5 U.S.C. § 701(a)(1) precluded the plaintiffs from bringing an APA suit for violations of that same statute. *Id.* at 345-48. But for one, as the Supreme Court found in *Patchak*, *Block*'s bar does not apply if a party is "bringing a different claim, seeking different relief [under the APA], from the kind the [non-APA statute] addresses." 567 U.S. at 222. The presence of "similar subject matter" does not "trigger a remedial statute's preclusive effect." *Id.* at 223. For another, the problem in *Block* was entirely different: the plaintiffs were making an APA contrary-to-law argument based on the agency's violations of the AMMA itself, the very statute under which they could not sue. That triggered another provision of the APA, Section 701(a)(1), that "preclude[s]" using the APA to obtain "judicial review" when the underlying substantive statute bars it. *Block*, 467 U.S. at 345. That is irrelevant: the States are not relying on the Tucker Act for their legal rights, since the Tucker Act is "a jurisdictional statute" that

provides no "substantive cause of action." *Rick's Mushroom Serv. v. United States*, 521 F.3d 1338, 1343 (Fed Cir. 2008). And finally, *Block* relied on an unusual and "delicate administrative scheme" under the AMMA in which "Congress intended to foreclose consumer participation in the regulatory process" itself. 467 U.S. at 347-48. It made sense that some party barred from the regulatory process was also barred from bringing a regulatory challenge. No such bar exists here.

DOT gets no further addressing persuasive precedents. DOT attempts to distinguish *Tootle* on its facts, arguing the Federal Government there tried to "have it both ways" by arguing that the Claims Court had no jurisdiction over Tootle's case because he requested equitable relief, and that the district court had no jurisdiction because his claim was really one for damages. ECF 69 at 20-21. But DOT is trying to have it both ways here too by arguing this Court should hold that it lacks jurisdiction over the States' claims *even if no other court has jurisdiction* to redress their injuries. And it was the very "suggestion that a federal district court can be deprived of jurisdiction by the Tucker Act when no jurisdiction lies in the Court of Federal Claims"—not the specific facts—that the D.C. Circuit "categorically" rejected. *Tootle*, 446 F.3d at 176-77; *see ACF*, 2026 WL 673848, at *11. The view "that a district court can be stripped of jurisdiction by the Tucker Act even when there is no jurisdiction in the Court of Federal Claims" remains "troublesome." *Tootle*, 446 F.3d at 176. Indeed, *Tootle*'s rejection of this argument has been uncontroversial for twenty years.[2]

DOT's treatment of the Ninth Circuit caselaw fares no better. First, DOT tries to distinguish *CLS* as turning on the fact that the plaintiffs' APA claims were based upon "statutory and regulatory violations, not any government contract," rather than on the fact that those plaintiffs lacked privity with the Federal Government. *CLS*, 137 F.4th at 937; *see* ECF 69 at 19-20. But *CLS* was clear that

---

[2] *American Association of Physics Teachers v. NSF*, 804 F. Supp. 3d 45 (D.D.C. 2025), is unpersuasive because it overlooks this binding D.C. Circuit precedent.

the Federal Government's argument was "unlikely to succeed for two reasons": first, that plaintiffs did not bring contract claims, and second and independently, that those plaintiffs had no right to bring contract suits as noncontracting parties. 137 F.4th at 937-39. The same is true here: the States bring claims based on statutory and regulatory violations, not a contract, *infra* at 15-19, and are noncontracting parties. Second, DOT suggests that *NIH* abrogated *CLS*. ECF 69 at 19-20. That is wrong: while the panel opinion in *CLS* issued before *NIH*, the *CLS* court reaffirmed its reasoning when it denied rehearing en banc after *NIH*. A statement by the judges in the panel majority provided detailed reasoning why *NIH* did not apply where, "[u]nlike in [*NIH*], Plaintiffs have no contractual relationship with the Government." *CLS II*, 155 F.4th at 1107. The reasoning was thoughtful, grappled with *NIH*, and is on all fours with this case. Finally, *Thakur v. Trump*, 163 F.4th 1198 (9th Cir. 2025), does not undercut the persuasive force of *Tootle* and *CLS*. Those plaintiffs argued (as DOT notes) that the Tucker Act cannot preclude their APA claims as noncontracting parties, but *Thakur* entirely ignored the fact they were noncontracting parties and did not cite or grapple with *CLS*. *See id.* at 1203-04. Its unreasoned conclusion has no persuasive weight.

DOT's consequentialist argument fails, too. DOT argues throughout its brief that permitting the States to obtain redress for their injuries here would open the floodgates to APA challenges by nonparty beneficiaries in an end-run around the Tucker Act. ECF 69 at 11, 15-17. But for one, the rule that "[t]here cannot be exclusive jurisdiction under the Tucker Act if there is no jurisdiction under the Tucker Act," *Tootle*, 446 F.3d at 177, has been clear for decades and DOT's parade of horribles has not materialized. For another, not every plaintiff could bring suit under these circumstances—a party still needs its *own* independent harms to bring suit, and it must show the Federal Government contravened some statute or regulation, not a contract. Still more, the equitable relief permitted by the APA is in most cases strictly limited in comparison to contract relief. The

14

prevailing party may win relief against an unlawful policy, but cannot obtain an order requiring money. *See NIH*, 145 S. Ct. at 2661 (Barrett, J., concurring). So the upshot of a victory in an APA case can well be that the agency will find new policy grounds to impose the same requirement, which it could not do if it lost the breach-of-contract case. Arguments analogous to those Defendants' press here did not carry the day in *Patchak*, *Regan*, or *Yellen*. *See, e.g.*, *Patchak*, 567 U.S. at 223-24 (noting the Federal Government's analogous circumvention arguments, whatever their strength, "must be addressed to Congress"). They should not carry the day here either.

Regardless, the practical consequences of DOT's position are substantially worse than the consequences about which it speculates. DOT's view would leave noncontracting parties who have undisputed Article III harms due to the Federal Government's unlawful actions unable to vindicate their own rights, at the mercy of whether the contracting party makes a business decision to bring its own suit. This case is a perfect example. DOT says the States have no way to avoid the extraordinary harms they would be left with, but that this Court need not worry because GDC is "capable and motivated" to pursue its Court of Federal Claims action. ECF 69 at 16-17 & n.4. But a contracting party might not pursue a noncontracting party's interests for any number of reasons, even if it has a winning legal argument. A repeat player might make a business judgment that the benefits of suing over a particular contract do not outweigh possible detriments to its broader relationship with the federal agency. And in that case, DOT's position will leave third parties who have their own harms holding the bag—such as, in this non-hypothetical example, the costs of securing massive active construction sites.

2. Second, the States are not otherwise pursuing contract claims. Even assuming the Tucker Act bars *some* claims by noncontracting States, DOT must show *these* claims are "founded … upon" a contract. 28 U.S.C. § 1491(a)(1); *NIH*, 145 S. Ct. at 2661 (Barrett J., concurring) (agreeing

15

even if an action "relate[s] to grants," that does not "transform a challenge to that [action] into a claim 'founded ... upon' contract that only the CFC can hear"). The "classification of a particular action as one which is or is not 'at its essence' a contract action depends both on the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought." *Megapulse v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982); *see also CLS*, 137 F.4th at 937-38 (same). That test applies straightforwardly here to show that the States' claims are not contractual. While "both" *Megapulse* factors must be satisfied "to find that jurisdiction was appropriate in the Court of Claims," *MTA*, 2026 WL 588117, at *29; *Am. Acad. of Pediatrics v. HHS*, No. 25-4505, 2026 WL 80796, at *10 (D.D.C. Jan. 11, 2026), this case satisfies neither.

a. Even assuming the "source of the right" can be contractual if "no contract exists between plaintiffs and the [Federal] Government," *but see CLS*, 137 F.4th at 937-38, these claims are based on "statutory and regulatory violations," not contractual ones, *id.* The States' claims sound in the APA, including DOT's failure to follow binding, government-wide regulations and its decision to proffer no or pretextual reasoning—not on contract terms DOT and GDC signed. Indeed, the States' complaint and causes of action are indifferent to whether GDC's contract terms restate these requirements or provide additional ones. Instead, they offer classic APA theories: an agency action contravened the regulations that bind it, and an agency failed to give proper reasoning for a final decision. *See CLS*, 137 F.4th at 938 (suit can proceed where "plaintiffs seek to enforce compliance with statutes and regulations," a "matter beyond the scope of the Tucker Act's exclusive jurisdiction"). This standard claim that an agency refused to follow binding APA requirements is not founded on the terms of a contract. *See, e.g., Elev8 Baltimore v. Corp. for Nat'l & Cmty. Serv.*, 804 F. Supp. 3d 524, 547 (D. Md. 2025) (distinguishing claims "founded on individual contracts" from claims that the agency "failed to observe procedures required by statute and regulation").

16

Because DOT cannot deny that the Complaint and the causes of action rely on regulations and arbitrary-and-capricious decisionmaking, DOT erroneously shifts focus to the undisputed fact that the factual chain of *harm* involves a contract. According to DOT, if there is no "freestanding constitutional, statutory, or regulatory obligation requiring the Government to provide funding to the Hudson Tunnel Project" and instead that underlying funding obligation comes from a contract, any claim the Federal Government acted unlawfully in freezing funds is contractual. ECF 69 at 10. But "the mere fact that a contract is involved does not divest the district court of jurisdiction." *ACF*, 2026 WL 673848, at *11; *see also Megapulse*, 672 F.2d at 967-68 (rejecting argument that "any case requiring some reference to or incorporation of a contract is necessarily on the contract and therefore directly within the Tucker Act"). Said another way, the question is not whether a contract is one factual ingredient of the plaintiff's claim, but what provides the "source of the rights" on which the plaintiff relies. *Megapulse*, 672 F.2d at 968. Here, as explained above, it is "statutes and regulations," *CLS*, 137 F.4th at 938; the Tucker Act "does not apply here because 'these are not challenges to the terms and conditions of an executed grant agreement, but rather to the imposition of an allegedly unlawful condition on continued funding.'" *ACF*, 2026 WL 673848, at *13 (quoting *Illinois v. Noem*, No. 25-495, 2025 WL 3707011, at *7 (D.R.I. Dec. 22, 2025)) (cleaned up). That is why another court in this District rejected an identical DOT argument where the plaintiff "d[id] not sue to enforce" an agreement and the suit was "indifferent to the terms and conditions of that agreement." *MTA*, 2026 WL 588117, at *29. So too here.

DOT's argument also runs headlong into Justice Barrett's controlling concurrence in *NIH*. While Justice Barrett explained that the challenge to those grant terminations could not proceed in district court, she agreed those plaintiffs could challenge guidance related to their grants in district court under the APA. 145 S. Ct. at 2661-62 (Barrett, J., concurring). But those plaintiffs too would

suffer harms from the guidance only because it related to a grant or contract between them and the Federal Government. Absent the grant agreements, the *NIH* plaintiffs would have had no cause of action. Yet their claims that the agency's policies violated the APA were not contractual and could proceed in district court. So the fact that there was no underlying freestanding constitutional, statutory, or regulatory obligation requiring the Federal Government to provide funding cannot be the jurisdictional test. That is, that the existence of a contract is a part of the plaintiff's case "does not convert a claim asserting rights based on federal regulations into one which is, 'at its essence,' a contract claim." *Normandy Apts., Ltd. v. U.S. Dep't of Housing & Urban Dev.*, 554 F.3d 1290, 1299-1300 (10th Cir. 2009).

DOT's remaining cases are unavailing. To support the agency's argument that claims based on violations of OMB regulations are contractual, it cites *Climate United Fund v. Citibank, N.A.*, 154 F.4th 809 (D.C. Cir. 2025), *reh'g en banc granted, opinion vacated*, No. 25-5122, 2025 WL 3663661 (D.C. Cir. Dec. 17, 2025), and *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 75 (D.C. Cir. 1985). ECF 69 at 11-12. But the panel opinion in *Climate United* was vacated by the circuit's order granting rehearing en banc. And *Ingersoll-Rand* dealt with a termination "for convenience" in which the federal agency invoked a contract clause in its termination, which could be challenged "based solely on contract principles." 780 F.2d at 78. Here, adjudication of the States' claims does not require reference to contract terms or principles. *See MTA*, 2026 WL 588117, at *31 (rejecting a comparison to *Ingersoll-Rand* where claims were not "entirely contained within the terms of the contract"). And on the States' arbitrary and capricious claim, DOT cites *Department of Education* and *NIH*. ECF 69 at 12. But consistent with *NIH*, courts have rejected the argument that a contract is the "source of the rights" where plaintiffs challenge unlawful *policies* affecting contracts and grants—including funding freeze policies. *See, e.g.*, *MTA*, 2026 WL 588117, at *28-29; *ACF*, 2026

18

WL 673848, at *13; *Am. Acad. of Pediatrics*, 2026 WL 80796, at *11; *CLS II*, 155 F.4th at 1103-04. This was a specific and independent decision to adopt a funding freeze policy, full of irrational and pretextual rationales the APA prohibits.

b. The "type of relief sought" strongly confirms that the States are not pursuing a disguised breach-of-contract claim. The States did not request "prototypical contract remed[ies]" of damages or of specific performance, *Crowley*, 38 F.4th at 1110, nor seek a permanent bar on freezing funds. Instead, their order requested this Court restrain implementation of the September 30 Suspension, given the legal infirmities in that final agency action. *See* ECF 11; OA.Tr.19:7-22:18. It did not require DOT to disburse funds if DOT relied on anything *other than* the Suspension. Nor is their relief requested "determined by reference to the terms of the contract." *Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 619 (D.C. Cir. 2017). Instead, the upshot is simply that if DOT believes a freeze merited, it must adhere to the procedures for suspensions in 2 C.F.R. § 200.339 and act on reasoned decisionmaking. *See* OA.Tr.19:23-20:2 (States agreeing that when DOT "is processing disbursement requests, it can't rely on the illegal funding freeze that it announced [on] September 30th," but order would not reach "other reasons that they want to deny funding"). And that is what this Court did: it enjoined DOT "from implementing the September 30, 2025 suspension of federal disbursements for the Hudson Tunnel Project," ECF 45 at 10, but did not require DOT to pay any monies or prevent DOT from suspending payments based on a new or different policy.

To the extent DOT complied by disbursing funds because it could not make findings that satisfied Section 200.339 or cite any reasoned basis, that does not turn this APA case into a contract one. As the Supreme Court has held, "a district court's jurisdiction 'is not barred by the possibility' that an order setting aside an agency's action may result in the disbursement of funds." *Dep't of Educ.*, 604 U.S. at 651 (citing *Bowen v. Massachusetts*, 487 U.S. 879, 910 (1988)). If an unlawful

19

policy is the only thing preventing contract funds from flowing, money can flow as a consequence of enjoining the unlawful policy. The First Circuit recently held just that, explaining that an order barring the Federal Government from "'implementing' or 'giving effect to' the proscribed funding freezes" was not "an order 'to enforce a contractual obligation to pay money.'" *New York v. Trump*, No. 25-1236, 2026 WL 734941, at *19 (1st Cir. Mar. 16, 2026) (quoting *Dep't of Educ.*, 604 U.S. at 651); *see also ACF*, 2026 WL 673848, at *13 (a suit "to vacate the underlying agency policy so that a funding freeze and drawdown restriction do not affect their future access to funds" seeks "exact[ly the] type of remedy 'that [is] at the heart of the APA's judicial review scheme'").

None of the cases DOT cites are supportive. The States do not seek an order "reinstating" a terminated contract, *Ingersoll-Rand*, 780 F.2d at 79, nor "specific performance" or "the equivalent of … money damages," *Presidential Gardens Assocs. v. United States ex rel. Sec'y of Housing & Urban Dev.*, 175 F.3d 132, 143 (2d Cir. 1999) (cleaned up). And even if Justice Gorsuch's partial concurrence in *NIH* spoke for the full Court, his suggestion that an "order vacating the government's decision to terminate grants" is effectively "an order requiring the government to pay those grants" has no bearing here: the States do not seek reinstatement of a terminated grant, but rather to set aside one specific policy decision to freeze all project funding. 145 S. Ct. at 2664 (Gorsuch, J., concurring in part and dissenting in part).  For the same reason, DOT's reliance on *U.S. Conference of Catholic Bishops v. U.S. Department of State*, 770 F. Supp. 3d 155, 163 (D.D.C. 2025), in which the court found that it lacked jurisdiction to enjoin the termination of contracts for refugee resettlement, is unavailing. Unlike the plaintiffs there, the States do not seek reinstatement of any

20

funding award—instead, as in *New York v. Trump* and *ACF*, the States ask the Court to enjoin the one specific unlawful suspension decision that DOT adopted on September 30.[3]

If any doubt remained for DOT as to the scope of the TRO the States had sought and this Court granted, this Court cleared it up. This Court emphasized the relief it had issued "was basically an invalidation of the suspension order," not specific performance or any "order for them to actually disburse funds or disburse funds on a particular schedule," which this Court confirmed "would not be appropriate … in an APA action." Status Tr. 7:14-18; *see also id.* at 9:25-10:6 ("[M]y order simply says to invalidate the suspension. It doesn't order that all past reimbursements are due by Monday at X time or a schedule. And that was something that was discussed at the conference, that that would be an inappropriate order. The only order that can issue under the APA is to invalidate the administrative action that has been challenged."). Consistent with the proposed order, the TRO, and this Court's clarification, the States themselves subsequently reiterated the same understanding to counsel for DOT: seeking only a promise that DOT would "comply with the TRO while it remains in effect, meaning they will not withhold any reimbursements to GDC *based on the September 30 suspension policy*." CA2.Dkt. No. 23, Ex. 2 (emphasis added).

---

[3] DOT claims the States' actions subsequent to the TRO show that the States were really seeking monetary disbursements, ECF 69 at 13 n.1, but it misunderstands that course of conduct. When GDC had not received disbursements for days after the Court issued its TRO, the States contacted counsel about DOT's compliance because of *DOT's* representations that "the funding freeze announced on September 30 was the *only* basis for those disbursements not to be released." ECF No. 70-1 at 8. The States' subsequent communications likewise raised concerns, based on DOT's representations that "the money was about to be disbursed without a stay by 1 p.m. on Monday," that DOT had deliberately delayed compliance with the TRO—namely, that it had not adopted a new policy, but was still implementing the September 30 Suspension. ECF 58 at 3. Put bluntly, lack of disbursements raised concerns that DOT was unlawfully maintaining the September 30 Suspension specifically because the agency itself had confirmed the September 30 Suspension was the only thing preventing it from disbursing funds to GDC. *See, e.g.*, ECF 70-1 at 8; OA.Tr.26:5-6.

21

The States pursued, and continue to pursue, an order under the APA enjoining and vacating one unlawful September 30 Suspension, not an order of specific performance or damages. That is all this Court granted, as this Court has emphasized at the status conference and in the TRO itself. The narrow nature of this relief confirms this is an APA case, not a contract case.

## II.    THE STATES' APA CLAIMS ARE LIKELY TO SUCCEED.

Although DOT briefly defends its final agency action against (some of) the States' claims, its defense falls short. The barebones nature of the defense reflects that Defendants lack confidence that they can win on the merits if their jurisdictional argument is rejected. This is unsurprising as the September 30 Suspension is clearly final agency action, which violated binding regulations and rested on arbitrary and pretextual reasoning.

### A.    The September 30 Suspension Is Final Agency Action.

DOT's decision to indefinitely suspend all Project funds falls within the APA's "generous review provisions" for final agency actions. *Bennett v. Spear*, 520 U.S. 154, 163 (1997). An agency action is final if two conditions are met: the action (1) "mark[s] the consummation of the agency's decisionmaking process," and (2) it determines "rights or obligations" or is an action "from which legal consequences will flow." *Id.* at 177-78 (cleaned up); *NLRB v. Nexstar Media*, 133 F.4th 201, 204 (2d Cir. 2025). DOT has little to say on finality, and the brief argument its makes misses the mark—misunderstanding the actual contours of the challenge.

There is no doubt that DOT made a final decision to suspend funds: its September 30 letter stated that "[p]ending completion of the review, no further disbursements for the Project will be made." ECF 13-11; ECF 13-13 (October 1 release reiterating "project reimbursements cannot be processed"). DOT does not argue that its decision to suspend funds was tentative, that there was ongoing consideration regarding whether to suspend funds, that there was an internal appeals process, or anything like that. Instead, DOT argues the underlying *review* of GDC's compliance with

22

DBE-related requirements is nonfinal. But DOT's response is conflating two different decisions: a regulatory review, which is ongoing, and its independent decision to suspend funding pending that review—a decision DOT expressed clearly and implemented immediately, and which did not include any opportunity to seek further review. *See Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, 778 F. Supp. 3d 440, 467 (D.R.I. 2025) (finding finality where "there [were] no further steps the agencies need[ed] to take to determine whether they [would] freeze th[e] funding"). DOT's decision to suspend funding—the sole action the States challenge here—was "the consummation of [DOT's] decisionmaking process." *Bennett*, 520 U.S. at 177-78 (cleaned up). Although DOT responds that the Suspension was "to be temporary" given the nature of the review, ECF 69 at 24-25, the length of time of the Suspension does not undermine the finality of the decision to impose it. *See Louisiana v. Biden*, 622 F. Supp. 3d 267, 291-92 (W.D. La. 2022). Regardless, the "temporary" Suspension was already in effect for months when the States sued.

And DOT's decision to suspend funding pending an indefinite review is an action "from which legal consequences … flow[ed]," *Bennett*, 520 U.S. at 177-78 (cleaned up): its effect was that "project reimbursements [could] not be processed," ECF 13-13. *See also Woonasquatucket*, 778 F. Supp. 3d at 468 (finding that "'legal consequences' surely flow, given that grant recipients cannot access previously awarded funds"). As a result of DOT's funding freeze, GDC was forced to self-finance by drawing down its reserves and credit line, ECF 13-1 ¶ 21, and then to issue stop-work orders suspending active construction and putting the Project in stasis on February 6, 2026, *id.* ¶¶ 49, 58-61; Ex. 1 ¶ 6.[4] Because it is difficult and time-consuming to re-mobilize construction sites, it took several weeks after the work suspension was lifted to fully restore active construction

---

[4] Citations to "Ex. 1" refer to the Declaration of Kris Kolluri, Exhibit 1 to the Declaration of Lauren E. Van Driesen.

status—delays that will compound across the Project's schedule. Ex. 1 ¶¶ 8, 9. And but for this Court's issuance of the TRO, work on the Project would still be suspended, with hundreds out of work. ECF 13-1 ¶¶ 58-61. Where an agency's decision to suspend funds pending a "review" has such direct consequences, it is final and subject to review. *See New York v. Trump*, 133 F.4th 51, 66-68 (1st Cir. 2025) (agency actions to implement "categorical funding freezes without regard and contrary to legal authority" pursuant to an OMB guidance were final); *Woonasquatucket*, 778 F. Supp. 3d at 467 (plaintiffs had "a strong likelihood of proving that the funding freezes constitute final agency action" as a "breadth of caselaw supports this conclusion," including "emerging consensus of district courts recently hearing cases about different aspects of federal funding freezes"). DOT addresses neither these compelling facts nor this "emerging consensus" of cases.

### B.      The September 30 Suspension Is Unlawful.

DOT's September 30 Suspension is contrary to law and relies on arbitrary and capricious reasoning. *See* ECF 12 at 14-18 (contrary-to-law); *id.* at 19-23 (arbitrary-and-capricious).

Initially, DOT does not respond to the contrary-to-law claim. As the States explained, the September 30 Suspension contravenes multiple federal regulations that limit whether and when a federal agency may freeze grant payments based only on findings of specific noncompliance rather than investigations into noncompliance, *see* 2 C.F.R. § 200.339, § 1201.1, and require agencies to provide grant recipients with an opportunity to object and provide information challenging DOT's action, *see id.* § 200.342. DOT's brief never disputes the contrary-to-law claim, explains how its action satisfied these regulatory requirements, or addresses the regulations at all. DOT says only that its reasons for its action were "rational," ECF 69 at 25, but the quality of an agency's reasoning cannot save its violations of binding regulations.

24

In any event, DOT does not seriously respond to the arbitrary-and-capricious claim either. DOT trains its fire on arguing that it had sufficiently good reasons for engaging in a review of DBE noncompliance. *See* ECF 69 at 26 ("In an effort to ensure compliance with the revised regulation, DOT began a review of its projects. This decision to start its project review with one of its largest infrastructure initiatives was not arbitrary or capricious."). But that goes to DOT's unchallenged decision to engage in a regulatory review. It does not address why DOT needed to suspend funds pending that review. It does not address DOT's failure to provide contemporaneous reasons for the Suspension. It does not address DOT's post hoc and shifting reasoning for the Suspension.  It does not address DOT's failure to consider reliance interests or alternatives. And it does not address or deny that DOT's stated reasons were pretext for its true reason: to punish the Senate and House minority leaders—who represent New York—as leverage for policy disputes and in retaliation for refusing to accede to the President's budget. Any one of these reasons provides a dispositive basis to find an APA violation. And DOT waived making a response to them all. *See Myun-Uk Choi v. Tower Research Capital*, 890 F.3d 60, 69 n.5 (2d Cir. 2018).

## CONCLUSION

This Court should deny DOT's motion to dismiss and enter relief in Plaintiffs' favor.

Date: March 31, 2026

Respectfully Submitted,

**JENNIFER DAVENPORT**
ATTORNEY GENERAL OF NEW JERSEY

Jeremy M. Feigenbaum
*Solicitor General*
Shankar Duraiswamy
*Deputy Solicitor General*
By */s/ Janine S. Balekdjian*
Janine S. Balekdjian
Jake Mazeitis
Amanda McElfresh
Amanda I. Morejón
Lauren E. Van Driesen
*Deputy Attorneys General*

Office of the Attorney General
25 Market Street
Trenton, NJ 08625
(862) 350-5800
Shankar.Duraiswamy@njoag.gov

*Counsel for the State of New Jersey*

**LETITIA JAMES**
ATTORNEY GENERAL OF NEW YORK

By */s/ Rabia Muqaddam*
Rabia Muqaddam
*Chief Counsel for Federal Initiatives*
Jessica Ranucci
*Special Counsel*
Stephen Thompson
*Special Counsel*

New York Office of the Attorney General
28 Liberty St.
New York, NY 10005
rabia.muqaddam@ag.ny.gov
(212) 617-8883

*Counsel for the State of New York*

26

## LOCAL RULE 7.1(C) CERTIFICATE

Pursuant to Local Civil Rule 7.1(c), the above-named counsel certifies that this memorandum complies with the word-count limitation of this Court's Local Civil Rules. As measured by the word processing system used to prepare it, this memorandum contains 8,735 words.