UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------------X
                                         :

STATE OF NEW JERSEY, et al.,            :

                                    :

                Plaintiffs,    :

                                    :        26-CV-00939 (JAV)

     -v-                        :

                                    :        OPINION AND ORDER

UNITED STATES DEPARTMENT OF    :
TRANSPORTATION, et al.,        :

                                    :

                Defendants.   :

                                    :
---------------------------------------------------------------------X

JEANNETTE A. VARGAS, United States District Judge:

On September 30, 2025, the United States Department of Transportation ("DOT") abruptly announced that it was suspending federal funding to the Gateway Development Commission ("GDC"), a bi-state entity of New York and New Jersey, for a rail corridor initiative known as the Hudson Tunnel Project (the "September 30 Suspension"). The ostensible reason for the suspension of funds was to allow DOT to conduct a review of GDC's compliance with federal nondiscrimination laws. President Donald J. Trump, however, made contemporaneous statements indicating that he had personally made the decision to "terminate" funding for the Project "because the Democrats are so foolish – what they've done to the country." ECF No. 13-15 at 6. Although DOT has never made any determination of GDC noncompliance with federal law, the funding freeze was still in place as of February 2026.

On the cusp of a suspension-induced work stoppage that would have

eliminated hundreds of jobs, left active construction sites abandoned, and wreaked havoc on the Project's timeline and budgets, the State of New Jersey and the State of New York ("Plaintiffs" or "the States") brought this action under the Administrative Procedure Act ("APA").  The States sought emergency relief to prevent the imminent closure of the Hudson Tunnel Project.  The Court granted that temporary relief on February 6, 2026.

The States now request that the Court enter judgment setting aside the September 30 Suspension.  Defendants do not dispute that the suspension of federal grants flagrantly violates federal law.  They nonetheless seek dismissal of this action on the grounds that no federal court has jurisdiction over the States' claims for relief.

The Court rejects the notion that the States are without a remedy in such a situation.  Jurisdiction over Plaintiffs' APA claims regarding the suspension of GDC's federal grants lies in this Court.  Plaintiffs are entitled to judgment on their claim that the suspension of the grants was contrary to law.  Plaintiffs' remaining claims are dismissed for lack of subject matter jurisdiction.

## BACKGROUND

### A.    Findings of Fact

The $16.04 billion Hudson Tunnel Project is the largest federal investment into any rail transportation project in modern history.  ECF No. 13-1 ("Sincaglia Decl."), ¶ 8.  The Project comprises ten discrete, interconnected projects geared towards rehabilitating the existing 116-year-old North River Tunnel and

constructing a new northeast corridor rail tunnel called the Hudson River Tunnel. *Id.*, ¶¶ 8, 12.  The timing and sequencing of these projects is tightly coordinated to meet key corridor access windows, optimize tunnel productivity, align with permitting and environmental constraints, stage utility relocations, and ensure continuous constructability across state lines.  *Id.*, ¶ 13.  The current Hudson Tunnel Project program schedule is—or was—designed to place the new tunnel into service by 2035, followed by complete rehabilitation of the existing North River Tunnel thereafter.  ECF No. 13-2 ("Ullman Decl."), ¶ 13.  Alongside related initiatives, these efforts intend to double rail capacity between New Jersey and New York, a region "supporting 20% of the nation's economic output."  *Id.*, ¶¶ 8, 25.  Without the Hudson Tunnel Project, the North River Tunnel is at risk of system failures that could result in prolonged service disruptions.  *Id.*, ¶ 28.

In early 2023, the States, Amtrak, and GDC entered into a Project Development Agreement that tasked GDC with the development, design, and construction of the Hudson Tunnel Project.  *Id.*, ¶ 9; *see* ECF No. 13-8.  Pursuant to the Project Development Agreement, the States and Amtrak agreed to contribute equal one-third shares of the funding needed to support GDC's operating budget.  Sincaglia Decl., ¶ 9.  The Project Development Agreement also charged New Jersey and New York with additional responsibilities related to the Hudson Tunnel Project.  *Id.*, ¶ 17.

In 2024, Amtrak and the federal government agreed to provide full funding to GDC for the Hudson Tunnel Project through a capital funding agreement, three

3

grant agreements (the "GDC Grants"), and a set of loan agreements. Ullman Decl., ¶ 10; *see* ECF Nos. 56-1, 56-2, 56-3, 56-4. GDC obtained the loans through DOT's Build America Bureau's Railroad Rehabilitation and Improvement Financing Program (the "RRIF Loans"). Ullman Decl., ¶ 19; *see* ECF Nos. 56-5, 56-6, 56-7.

New York agreed to accept responsibility for making payments to support repayment of the RRIF loans. Ullman Decl., ¶ 22. Under a service contract dated March 31, 2024, New York agreed to reimburse GDC for its anticipated debt service payments to DOT—in theory, up to $2,850,000,000 in borrowed funds from DOT to finance completion of the Hudson Tunnel Project. *Id.*, ¶ 21. Between 2034 and 2073, New York is expected to make payments in the total amount of $2,695,096,408. *Id.*, ¶ 22.

Likewise, New Jersey agreed to accept responsibility for repaying the RRIF Loans. Sincaglia Decl., ¶ 37. Under the New Jersey Transit Funding Agreement No. RRIF – 2024-0052, dated July 8, 2024, New Jersey agreed to repay up to $703,052,143 to finance completion of the Hudson Tunnel Project. *Id.*, ¶ 36.

GDC broke ground on the Hudson Tunnel Project in 2023 and estimated that approximately 1,000 workers were on the Project as of January 2026. *Id.*, ¶ 11. As of early February 2026, GDC had drawn down $67,348,000 on available loan funds under the RRIF Loan Agreements, using that money for preliminary engineering and design, construction, acquisition of real property, and other eligible project costs under the RRIF Loan Agreements. Ullman Decl., ¶ 20.

On September 30, 2025, the eve of a federal government shutdown, DOT

notified GDC by letter that, "[i]n conjunction with the issuance" of a new interim final rule ("IFR") removing certain race- and sex-based presumptions from its Disadvantaged Business Enterprise ("DBE") program, DOT was "reviewing the projects it funds to ensure nondiscrimination."  ECF No. 13-11; *see Disadvantaged Business Enterprise Program and Disadvantaged Business Enterprise in Airport Concessions Program Implementation Modifications*, 90 Fed. Reg. 47969 (Oct. 3, 2025) (to be codified at 49 C.F.R. pts. 23, 26) ("DBE IFR").  DOT further specified that, "[p]ending completion of the review," which would "commence immediately," "no further disbursements for the [Hudson Tunnel] Project will be made."  Sep. 30 DOT Ltr.  GDC acknowledged receipt of DOT's letter on October 2, 2025, and replied that it "looks forward to working with [DOT] on this review."  ECF No. 13-16 ("Oct. 2 GDC Ltr.").

One day after the federal government shutdown began, on October 2, 2025, Office of Management and Budget ("OMB") Director Russell Vought declared that the Trump Administration would withhold roughly $18 billion from New York City infrastructure projects, including the Hudson Tunnel Project.  ECF No. 13-12 at 2, 4.  A DOT press release elaborated:  "Thanks to the Chuck Schumer and Hakeem Jeffries shutdown, however, []DOT's review . . . will take more time.  Without a budget, the Department has been forced to furlough the civil rights staff responsible for conducting this review."  ECF No. 13-13.

On October 7, 2025, DOT requested that GDC provide, within two weeks, additional information about its DBE policies and goals for the Hudson Tunnel

Project, to "ensure that disbursements for the Project" comport with "Equal Protection principles of the U.S. Constitution, Federal nondiscrimination requirements under civil rights law, . . . and Executive Order 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*." ECF No. 13-17 ("Oct. 7 DOT Ltr.").

In the following two weeks, the President of the United States provided other commentary. *See, e.g.*, ECF No. 13-14 (citing Greg Norman, *Trump tells Maria Bartiromo Democrats 'made one mistake' with government shutdown*, Fox Bus. (Oct. 17, 2025), https://perma.cc/254L-R4L2 (quoting President Trump saying, "We're cutting a $20 billion project that Schumer fought for 15 years to get, and I'm cutting the project. The project is gonna be dead. It's just pretty much dead right now.")); ECF No. 13-15 (quoting President Trump saying, "Russell Vought is really terminating tremendous numbers of Democrat projects. This is not only jobs; I mean the project in Manhattan – the project in New York. It's billions and billions of dollars that Schumer has worked 20 years to get. It's terminated. . . . It's terminated because the Democrats are so foolish . . . . Right now, there is no funding – because it's up to me.")).

On October 21, 2025, GDC supplied DOT with additional information, reaffirmed its commitment to "remain compliant with all applicable laws, regulations, and executive orders," and clarified that GDC is not a DBE-certifying agency. ECF No. 13-18 ("Oct. 21 GDC Ltr.") at 2, 5.

6

On December 1, 2025, however, DOT informed GDC that the agency, having "completed its initial civil rights administrative review" of the Hudson Tunnel Project, had identified a separate issue. *See* ECF No. 13-19 ("Dec. 1 DOT Ltr.") at 1. It concluded that "until this year, GDC had presumed contractors qualified to be a DBE if [they were] women or black, Hispanic, Asian, Native American-owned . . . in violation of the 49 CFR part 26 requirements in existence at the time the contracts were executed," which required a certifying body to subject a business to DBE review to ensure it met all other federal eligibility standards. *Id.* at 1-2 & n.1 (cleaned up). DOT wrote that it "intends to resume funding disbursements for the Project if GDC certifies in writing within 30 days of receipt of this letter that it accepts and will abide by the conditions identified in this letter." *Id.* at 2.

On December 8, 2025, GDC provided the "certification response requested by the []DOT within 30 days of GDC's receipt" of the December 1 DOT letter, specified that "*no* Project contracts have been awarded or procured by GDC based on the race, sex, ethnicity, or national origin of the contractor in violation of any applicable law," and further clarified that all "contracts between GDC and its prime contractors require any DBE utilized as a subcontractor to be DBE-certified in accordance with 49 CFR Part 26 . . . [even] prior to issuance of []DOT's [IFR]." ECF No. 13-20 ("Dec. 8 GDC Ltr."). GDC received no response to this letter and followed up on January 8, 2026, confirming that "no prime contractors were awarded contracts as a DBE" and that all DBE subcontractors had been properly certified. *See* ECF No. 13-21 ("Jan. 8 GDC Ltr."). On January 27, 2026, having still received

no response, GDC announced to contractors that it would need to suspend active construction work on February 6, 2026, if the September 30 Suspension remained in place. Sincaglia Decl., ¶ 49.

New Jersey and New York have already made significant investments in the Hudson Tunnel Project. New Jersey has invested nearly $500 million into the Project, and NJ Transit has already incurred substantial and unrecoverable costs in reliance on the Project, including the expenditure of significant funds and the dedication of extensive staff time to planning, coordination, design integration, service modeling, and operational contingencies specific to the Project. *Id.*, ¶¶ 17, 73. Similarly, New York has invested at least $49 million into the Project. Ullman Decl., ¶ 18.

## B.    Procedural History

On February 2, 2026, GDC brought a breach-of-contract suit in the Court of Federal Claims, as DOT did not disburse funds requested by GDC under the parties' six grant and loan agreements on October 1, 2025, November 3, 2025, December 1, 2025, January 2, 2026, and February 2, 2026. *Gateway Dev. Comm'n v. United* States, 180 Fed. Cl. 495, 505 (2026).

The following day, the States filed the instant suit challenging the September 30 Suspension as unlawful under the APA. *See* ECF No. 1 ("Compl."), ¶¶ 120-41. The States contend that the September 30 Suspension was arbitrary and capricious, contrary to law, and without observance of procedure required by law. *Id.,* ¶¶ 120-41; 5 U.S.C. § 706(2)(A), (D). Specifically, Plaintiffs claim that the September 30

8

Suspension violates federal regulations that dictate precisely whether, when, and how agencies can suspend disbursements of obliged grants. *See id.*, ¶¶ 120-41.

The States simultaneously filed a motion for emergency relief pursuant to Rule 65. *See* ECF No. 11. The States emphasized GDC's announcement that all work on the Hudson Tunnel Project would come to a halt by February 6, 2026, due to a lack of federal funding. ECF No. 12 ("PI Mem.") at 2-3, 8, 24. On February 6, 2026, the Court issued a temporary restraining order enjoining Defendants from implementing the September 30 Suspension pending a decision on Plaintiffs' motion for a preliminary injunction. ECF No. 45 ("TRO"). The Court held that Plaintiffs had established that they would suffer irreparable harm in the absence of an injunction and that they were likely to succeed on the merits. *Id.* at 9.

On February 9, 2026, the Government moved for a stay of the TRO before both this Court and the Second Circuit. ECF No. 47; *New Jersey v. U.S. Dep't of Transp.*, No. 26-282 (2d Cir.), ECF No. 9. That same day, this Court entered an administrative stay of the TRO until February 12, 2026, at 5:00 p.m., to allow Defendants time to seek a stay from the Second Circuit. ECF No. 49 at 5. The Second Circuit ultimately denied the stay. ECF No. 65.

The Court conferred with the parties regarding a procedure and schedule for adjudicating the pending motion for a preliminary injunction and Defendants' contemplated motion to dismiss. Plaintiffs and Defendants stipulated that the administrative record in this case consists of the regulatory correspondence attached to Plaintiffs' motion for a temporary restraining order and preliminary

9

injunction, as well as the evidence Defendants submitted in connection with their opposition to that motion, and that no further supplementation of the record was necessary. ECF No. 57 at 1. The parties also agreed that no evidentiary hearing was necessary with respect to the motion for a preliminary injunction. *Id.* at 2.

Plaintiffs further requested that the Court convert their preliminary injunction motion to an adjudication on the merits pursuant to Rule 65(a)(2). *Id.* The Government did not oppose this request but asked for leave to submit revised briefing in support of its motion to dismiss for lack of jurisdiction and in opposition to Plaintiffs' merits brief, as well as a reply brief. *Id.* at 3-4.

The Court ordered that Plaintiffs' preliminary injunction motion be consolidated with the merits pursuant to Rule 65(a)(2) of the Federal Rules of Civil Procedure. ECF No. 64. The Court then set a briefing schedule and a hearing date. *Id.* This Court held the hearing on April 16, 2026, and later ordered supplemental briefing. ECF No. 74.

## DISCUSSION

The strong presumption of judicial review to those allegedly suffering legal wrong from unlawful executive decisionmaking is a bedrock principle of our jurisprudence. *See, e.g.*, *Make the Road New York v. Wolf*, 962 F.3d 612, 623-24 (D.C. Cir. 2020). The Government contends that the Tucker Act deprives the States of access to any judicial forum to challenge agency action that violates federal law. ECF No. 69 ("Def. Mem.") at 7-22. But the Tucker Act is not a lock designed to bar Plaintiffs from *any* door. As the States are otherwise without recourse, the Court is

10

not deprived of jurisdiction over their claims that the Government violated federal regulations.

## A.    Standing

"As part of [their] burden [to establish jurisdiction], plaintiffs must establish that they have standing to sue." *Martin v. United Bridge Cap., LP*, No. 21-1790, 2022 WL 2166399, at \*2 (2d Cir. June 16, 2022) (summary order) (citing *Rajamin v. Deutsche Bank Nat'l Tr. Co.*, 757 F.3d 79, 84 (2d Cir. 2014)). "[T]he question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues. This inquiry involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." *Rajamin*, 757 F.3d at 84 (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). Although Defendants do not contest the States' Article III or prudential standing to sue, the Court has an obligation to consider these issues *sua sponte* because they implicate the Court's subject matter jurisdiction. *Phoenix Light SF Ltd. v. Bank of New York Mellon*, No. 14-CV-10104 (VEC), 2022 WL 92213, at \*2 (S.D.N.Y. Jan. 7, 2022), *aff'd*, 66 F.4th 365 (2d Cir. 2023).

To establish Article III standing, a party must show that (1) they have suffered an injury in fact, (2) the injury is fairly traceable to the challenged action of the defendant, and (3) it is likely that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). "[W]hen the plaintiff is not himself the object of the government action or inaction he challenges,

standing is not precluded, but it is ordinarily substantially more difficult to establish." *Id.* at 562 (cleaned up).

Plaintiffs have satisfied the first prong of the Article III standing inquiry. To meet this prong, Plaintiffs must point to an injury in fact that is "(a) concrete and particularized, . . . and (b) actual or imminent, not conjectural or hypothetical." *Rajamin*, 757 F.3d at 85 (quoting *Lujan*, 504 U.S. at 560). Plaintiffs have demonstrated that they suffered actual, concrete, and particularized harm from Defendants' September 30 Suspension before the Court entered its TRO and that they would suffer such harm again were the Court to dissolve its order. For instance, "[b]ecause GDC has had to fully draw down its line of credit" since the September 30 Suspension, its "interest payments have increased," thus increasing the size of the States' respective one-third shares of GDC's operating budget. Sincaglia Decl., ¶¶ 15, 22; *accord* Ullman Decl., ¶¶ 15, 22. "For standing purposes, a loss of even a small amount of money is ordinarily an injury." *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464 (2017) (cleaned up).

Plaintiffs have also satisfied the second and third prongs of the Article III standing inquiry. Were the September 30 Suspension to be reinstituted, GDC's available resources for the Project would be depleted within months, which would require the States to reimburse GDC for essential site security, supervision, and maintenance activities, to say nothing of worker terminations and suspension settlement liabilities, transit service disruptions, requalification and recertification of crews, and resequencing of work. Sincaglia Decl., ¶¶ 11, 63-65, 72; Ullman Decl.,

12

¶¶ 31-33; ECF No. 72-1 ("Kolluri Decl."), ¶ 14.  Further suspension of work on the Project will "at a minimum delay the Project and increase a substantial risk that the Project will be terminated altogether," which would not only delay the States' anticipated resiliency and economic benefits from the Project, but also "directly and immediately impact the ability to move passengers between New Jersey and New York," causing substantial harm to the States' economies and stripping the value of the States' upfront investments into the Project.  Ullman Decl., ¶¶ 15-18, 23-28; *see also Anderson Grp., LLC v. City of Saratoga Springs*, 805 F.3d 34, 46 (2d Cir. 2015) (loss of "up-front economic expenditures on a detailed development proposal for a specific piece [or pieces] of property" constitutes injury in fact); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 262 (1977) (expenditure of "thousands of dollars on the plans for [a public works project]" constitutes injury). As a "decision in [the States'] favor is likely to redress th[ose] losses," they have standing to sue.  *Czyzewski*, 580 U.S. at 464.

"In addition to this constitutional requirement, the Supreme Court has adverted to a prudential branch of standing, which includes the general prohibition on a litigant's raising another person's legal rights."  *B.B. by Rosenthal v. Hochul*, 166 F.4th 259, 279 (2d Cir. 2026) (quotation marks omitted) (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014)).  This mandate "normally bars litigants from asserting the rights or legal interests of others in

13

order to obtain relief from injury to themselves." *Warth*, 422 U.S. at 509.[1]

Limitations on third-party standing prevent Plaintiffs from seeking to enforce the terms of the Government's contracts with GDC, as Plaintiffs are neither a contracting party nor a third-party beneficiary under the various agreements. *See, e.g.*, *Hillside Metro Assocs., LLC v. JPMorgan Chase Bank, Nat'l Ass'n*, 747 F.3d 44, 49-50 (2d Cir. 2014); *see also Pac. Gas & Elec. Co. v. United States*, 838 F.3d 1341, 1346 (Fed. Cir. 2016) ("A plaintiff must be in privity with the United States to have standing to sue the sovereign on a contract claim." (citation omitted)).  Yet the States are not seeking to stand in the shoes of GDC.  They do not assert claims for breach of contract, and they disclaim reliance upon the terms of those contracts for relief.  They have brought this action to assert their own legal rights and interests under the APA, not GDC's legal rights under its contracts with the Government.  Accordingly, the third-party standing doctrine is not implicated in this case.

## B.    Subject Matter Jurisdiction

The Court's jurisdictional inquiry does not end there, however.  "It is well established that in any suit in which the United States is a defendant, a waiver of

---

[1] "The Supreme Court has recognized that a prudential standing requirement that exceeds the requirements of Article III 'is in some tension' with the Court's 'reaffirmation of the principle that a federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging.'" *B.B. by Rosenthal*, 166 F.4th at 279 (quoting *Lexmark*, 572 U.S. at 126).  Yet because the Supreme Court has also suggested that the third-party standing requirement might properly be classified as constitutional rather than prudential, *see Lexmark*, 572 U.S. at 126 n.3, the Second Circuit continues to treat third-party standing limitations as jurisdictional.  *B.B. by Rosenthal*, 166 F.4th at 279.

sovereign immunity with respect to the claim asserted is a prerequisite to subject matter jurisdiction." *Up State Fed. Credit Union v. Walker*, 198 F.3d 372, 374 (2d Cir. 1999). The APA provides such a waiver. *Id.* at 375. The APA authorizes suit by a "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702.

Yet the APA's waiver of sovereign immunity is limited in nature. *See, e.g.*, *Presidential Gardens Assocs. v. U.S. ex rel. Sec'y of Hous. & Urb. Dev.*, 175 F.3d 132, 143 (2d Cir. 1999); *Polanco v. U.S. Drug Enf't Admin.*, 158 F.3d 647, 652 (2d Cir. 1998). As relevant here, the APA's waiver of sovereign immunity extends only to actions that seek "relief other than money damages." 5 U.S.C. § 702. Moreover, judicial review is precluded under the APA if "any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." *Id.*

Finally, "[t]he APA explicitly requires that an agency action be final before a claim is ripe for review." *Air Espana v. Brien*, 165 F.3d 148, 152 (2d Cir. 1999) (citing 5 U.S.C. § 704); *see also Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882 (1990) ("When, as here, review is sought not pursuant to specific authorization in the substantive statute, but only under the general review provisions of the APA, the 'agency action' in question must be 'final agency action.'" (quoting 5 U.S.C. § 704)).[2]

---

[2] The Court notes that, although *Air Espana* deemed the final agency action requirement to be jurisdictional, 165 F.3d at 152, that holding has since been called into question, *see, e.g.*, *Sharkey v. Quarantillo*, 541 F.3d 75, 87 n.10 (2d Cir. 2008)

The Court considers the first two of these requirements together, as they are linked in cases such as this, where an APA action implicates an underlying contract.  The Court then considers whether the States challenge a final agency action.

### 1.    Tucker Act

The APA's waiver of sovereign immunity for claims for equitable relief does not apply if "any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought."  5 U.S.C. § 702.  "This limitation on the APA's waiver of sovereign immunity 'prevents plaintiffs from exploiting the APA's waiver to evade limitations on suit contained in other statutes.'"  *Thakur v. Trump*, 176 F.4th 1187, 1197 (9th Cir. 2026) (quoting *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012)).

The Tucker Act is one such statute, vesting the Court of Federal Claims with jurisdiction to adjudicate claims against the United States "founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort."  28 U.S.C. § 1491(a)(1).  In suits involving such claims that seek more than $10,000 in damages, the jurisdiction of the Court of Federal Claims is exclusive of the federal district courts.

---

(collecting cases).  Although the Court discusses final agency action under the heading of jurisdiction, whether the Court treats it as "a question of statutory standing" or a threshold jurisdictional requirement does not alter the outcome.  *See Metro. Transp. Auth. v. Duffy*, 784 F. Supp. 3d 624, 656 n.53 (S.D.N.Y. 2025) ("*MTA*") (cleaned up).

*See* 28 U.S.C. § 1346(a)(2); *see also Up State*, 198 F.3d at 374 ("The [Tucker Act] waives sovereign immunity for contract disputes with the government and gives the Court of Federal Claims exclusive jurisdiction over such actions."). Unlike the APA, which is limited to actions seeking equitable and declaratory relief, "the Tucker Act [was] enacted," and "the Court of Claims was established . . . to open a judicial avenue for certain monetary claims against the United States." *United States v. Bormes*, 568 U.S. 6, 11 (2012); *see also United States v. Mitchell*, 463 U.S. 206, 216 (1983) (holding that a "claim must be one for money damages against the United States" to be "cognizable" under the Tucker Act). "The Tucker Act impliedly forbids relief other than remedies provided by the Court of Federal Claims for actions that arise out of a contract with the United States." *Up State*, 198 F.3d at 375 (cleaned up).

Courts have long struggled to differentiate between an action that is "in essence a contract claim over which the Court of Federal Claims has exclusive jurisdiction," *Atterbury v. U.S. Marshals Serv.*, 805 F.3d 398, 406 (2d Cir. 2015), and one that is "validly based on grounds other than a contractual relationship with the government," for which jurisdiction lies in the district courts, *id.* at 407 (citation omitted). In *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982), the D.C. Circuit articulated a two-prong test to distinguish a "disguised" Tucker Act claim from an APA claim properly brought before a district court. Under this test, courts are directed to examine "both [(1)] the source of the rights upon which the plaintiff bases its claims, and [(2)] the type of relief sought." *Id.* This test has been widely

17

embraced by the federal courts, including by the Second Circuit.  *See, e.g.*,

*Atterbury*, 805 F.3d at 406.

The Supreme Court has neither adopted nor rejected the *Megapulse* test, but

it has had occasion to consider the interplay between the APA and the Tucker Act,

most notably in the seminal case of *Bowen v. Massachusetts*, 487 U.S. 879 (1988).

*Bowen* did not concern a contract dispute, but its holding on the relationship

between the two statutes is nonetheless instructive.

In *Bowen*, the Commonwealth of Massachusetts sought review, under Section

702 of the APA, of a federal agency's disallowance of Medicaid reimbursements.  *See*

*id.* at 886-87, 890-91.  Massachusetts challenged the agency's past determination

that certain expenditures incurred in prior years were not reimbursable under

federal law, as well as the application of that policy prospectively.  *Id.,* 487 U.S. at

879.

Below, the First Circuit had held that the claims must be bifurcated, with the

challenge concerning the disallowance of reimbursement belonging exclusively in

the Court of Claims, and the challenge to future applications of the agency policy in

the district court.  *Com. of Mass. v. Sec'y of Health & Hum. Servs.*, 816 F.2d 796,

799-800 (1st Cir. 1987), *aff'd in part, rev'd in part sub nom., Bowen*, 487 U.S. 879

(1988).  The First Circuit reasoned:

> Where a grant-in-aid dispute concerns only money past
> due, and no statute specifically authorizes a suit in
> district court, the Tucker Act provides the only applicable
> waiver of sovereign immunity; the case must go to the
> Claims Court. . . .  But, where a grant-in-aid dispute
> concerns a legal question that has a significant,

18

> prospective effect on the ongoing relationship between the federal agency and the affected state, the Administrative Procedure Act grants the district court jurisdiction to provide injunctive and declaratory relief. The district court may not, however, consider the claim for money past due.

*Id.*

The Supreme Court granted certiorari on the question of whether Massachusetts had asserted a claim for "money damages" that could not be maintained under Section 702, and if not, whether the action was nonetheless barred under Section 704 of the APA because the Tucker Act provided an adequate remedy. *See Bowen*, 487 U.S. at 891. As to the first question, the Supreme Court distinguished between actions at law for damages and an equitable action for specific relief in concluding that Massachusetts' action to set aside an agency decision was not a claim for money damages, even if the result would be the payment of a monetary award. *See id.* at 893-901. With respect to whether the action properly belonged in the Court of Claims, the Supreme Court rejected the proposition that Section 704 "should be construed to bar review of the agency action in the District Court because monetary relief against the United States is available in the Claims Court under the Tucker Act," reasoning that "the remedy available to the State in the Claims Court is plainly not the kind of 'special and adequate review procedure' that will oust a district court of its normal jurisdiction under the APA." *Id.* at 904. The Supreme Court therefore held that the district court had jurisdiction over both the challenge to the agency order denying past

19

reimbursement and the claims for prospective relief under the APA. *See id.* at 882-83, 909.

In the past year, the Supreme Court has built on this jurisprudence with two brief, *per curiam* emergency stay orders that arose from the recent spate of cases challenging the termination of federal grants and funding: *Dep't of Educ. v. California*, 604 U.S. 650 (2025) (*per curiam*), and *Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658 (2025) ("*NIH*") (*per curiam*). Defendants rely heavily on these recent orders. *See, e.g.*, Def. Mem. at 8-10. "Although [the Supreme Court's] interim orders are not conclusive as to the merits, they inform how [lower] court[s] should exercise [their] equitable discretion in like cases." *Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025). An in-depth examination of these orders is therefore warranted.

*California* involved a suit by eight plaintiff states against the Department of Education ("DOE") and associated federal officials for DOE's abrupt, midstream termination of teacher-training and teacher-recruitment grants. *California v. U.S. Dep't of Educ.*, 769 F. Supp. 3d 75, 78-79 (D. Mass. 2025), *appeal dismissed sub nom.*, *California v. US Dep't of Educ.*, No. 25-1244, 2025 WL 2604596 (1st Cir. Apr. 23, 2025). The district court issued an injunction reinstating the grants, holding that the relief sought was equitable in nature and that the source of the rights was federal statutes and regulations, rather than the underlying contracts. *Id.* at 75-76. The Supreme Court granted DOE's application for a stay pending appeal, holding that the defendants were likely to succeed in establishing that the district court

20

lacked jurisdiction. *Dep't of Educ. v. California*, 604 U.S. at 651-52.

The entirety of the Supreme Court's reasoning as to jurisdiction is as follows:

> [T]he Government is likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA. . . .  The APA's waiver of sovereign immunity does not apply 'if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.'  5 U.S.C. § 702.  Nor does the waiver apply to claims seeking 'money damages.'  *Ibid.*  True, a district court's jurisdiction 'is not barred by the possibility' that an order setting aside an agency's action may result in the disbursement of funds.  *Bowen*[, 487 U.S. at 879].  But, as we have recognized, the APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money' along the lines of what the District Court ordered here.  *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212[] (2002).  Instead, the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on 'any express or implied contract with the United States.'  28 U.S.C. § 1491(a)(1).

*Id.* at 651.

The decision in *California* does not purport to apply the *Megapulse* source of rights test, as the lower courts had done.  But it does not spurn that analysis either. It similarly does not abrogate the holding in *Bowen* that "the remedy available . . . in the Claims Court is plainly not the kind of 'special and adequate review procedure' that will oust a district court of its normal jurisdiction under the APA." 487 U.S. at 904.  As a result, *California* has engendered some confusion in the lower courts as to how it should be applied in other cases involving challenges to grant terminations.  *See, e.g.*, *California v. U.S. Dep't of Educ.*, No. 25-CV-10548 (AK), 2025 WL 3165713, at *11 (D. Mass. Nov. 13, 2025) (collecting cases); *see also*

*President & Fellows of Harvard Coll. v. U.S. Dep't of Health & Hum. Servs.*, 798 F. Supp. 3d 77, 106 (D. Mass. 2025) (noting that the *California* decision does not "purport[] to explain how the case was distinguishable from *Bowen* or other related, longstanding precedents").

The *per curiam* order does provide a few helpful guideposts, however. First, *Bowen* remains good law. Second, *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204 (2002), controls the question of whether the reinstatement of contractual grant obligations constitutes a claim for equitable relief or money damages. *Great-West* stands for the proposition that an "injunction to compel the payment of money past due under a contract, or specific performance of a past due monetary obligation, was not typically available in equity." *Id.* at 210-11. As discussed, *Bowen* held that a claim for specific performance under a statute that resulted in the payment of money by the Government was not barred under Section 702 of the APA. *Bowen*, 487 U.S. at 880. It can be gleaned from the citation to *Great-West*, then, that *Bowen* is distinguishable from *California* because, in *Bowen*, there was no claim to enforce the terms and conditions of a contract.

The Supreme Court's second *per curiam* order, in *NIH*, provides additional insights. In *NIH*, sixteen plaintiff states, various public health organizations, and individual researchers brought suit against the National Institutes of Health ("NIH") and associated federal agencies and officials. The suit challenged both the internal NIH guidance that directed the agency to cease awarding grants or providing funding for research related to diversity, equity, and inclusion ("DEI"),

22

gender identity, or COVID-19, as well as the resulting termination of previously awarded federal research grants.  *See Massachusetts v. Kennedy*, 783 F. Supp. 3d 487, 490-91 (D. Mass. 2025); *Am. Pub. Health Ass'n v. Nat'l Insts. of Health*, 786 F. Supp. 3d 237, 245-49 (D. Mass. 2025).  The district court granted partial final judgment to the plaintiffs, *Massachusetts v. Kennedy*, No. 25-CV-10814 (WGY), 2025 WL 1747213, at *1-2 (D. Mass. June 23, 2025), and vacated the grant terminations and the internal guidance, *Am. Pub. Health Ass'n v. Nat'l Insts. of Health*, 791 F. Supp. 3d 119, 183 (D. Mass. 2025).

The First Circuit, relying on *Bowen*, 487 U.S. at 905, denied defendants' application for a stay, finding that "the district court clearly had jurisdiction to grant prospective relief that will govern the rather complex ongoing relationships between the Department and grant recipients," though the Court's "judgment vacating the grant terminations present[ed] a closer question."  *Am. Pub. Health Ass'n v. Nat'l Insts. of Health*, 145 F.4th 39, 50 (1st Cir. 2025) (cleaned up). Ultimately, however, the First Circuit concluded that the district court's vacatur of the grant terminations was closer to *Bowen* than to *Great-West* because the district court had ordered declaratory relief rather than payment of a contractual obligation.  *Id.* at 51.

The Supreme Court subsequently stayed the judgment vacating the Government's termination of research-related grants but otherwise denied the stay application.  *NIH*, 145 S. Ct. at 2660.  As to jurisdiction, the order stated only that the APA's "limited waiver of sovereign immunity does not provide the District Court

23

with jurisdiction to adjudicate claims based on the research-related grants or to order relief designed to enforce any obligation to pay money pursuant to those grants." *Id.* (cleaned up).

Yet *NIH* was accompanied by a number of concurring and dissenting opinions that help elucidate the rationale for the decision, however fractured. Four Justices voted to grant the stay application in full, and four Justices voted to deny the application in full. *Id.* The opinion authored by Chief Justice Roberts, and joined by three members of the Court, concluded that the district court had jurisdiction to vacate the challenged directive under the APA, and thus had jurisdiction to vacate the resulting grant terminations. *Id.* at 2662-63 (Roberts, C.J., concurring in part and dissenting in part). Justice Gorsuch, in contrast, joined by Justice Kavanaugh, rejected the First Circuit's attempt to distinguish *California* and *Great-West*, reasoning that the only legal injury claimed by plaintiffs stemmed "from the government's refusal to pay promised grants according to the terms and conditions that accompany them." *Id.* at 2663-64 (Gorsuch, J., concurring in part and dissenting in part). According to Justice Gorsuch, "[a]n order vacating the government's decision to terminate grants under the APA is in every meaningful sense an order requiring the government to pay those grants." *Id.* at 2664.

Justice Barrett, who voted to stay the judgment as it concerned the grant terminations but to deny the stay as to the vacatur of the guidance documents, was the controlling vote. *Id.* at 2660-62 (Barrett, J., concurring). Her concurring opinion distinguished—as the First Circuit had—between the District Court's

24

judgments regarding "challenges to the grant terminations," which Justice Barrett concluded belonged in the Court of Federal Claims—and APA claims seeking vacatur of internal agency guidance on arbitrary-and-capricious grounds. *Id.* at 2661-62. Justice Barrett reasoned that the internal policies may concern the award of grants, but that did not "transform a challenge to that guidance into a claim 'founded . . . upon' contract that only the CFC can hear." *Id.* at 2661 (quoting 28 U.S.C. § 1491(1)(a)).

In analyzing the issues presented by this case, the Court endeavors to harmonize *California* and *NIH* with the broader landscape of relevant Supreme Court precedent, including both *Bowen* and *Great-West*. The Court must do so, however, within the confines of the two-pronged *Megapulse* analysis adopted by this Circuit in *Atterbury*, as neither the Second Circuit nor the Supreme Court has abrogated that line of cases.

> ### 2.    Application of *Megapulse* Test

Under the *Megapulse* test, the Court must consider both the source of the rights upon which a claim is based and the type of relief sought. Plaintiffs assert that two different sets of rights have been affected by the September 30 Suspension, one stemming from the suspension of the GDC Grants and one from the suspension of the RRIF Loans. The Court must therefore analyze these claims separately.

> #### a.    GDC Grants

Between July and September 2024, DOT component agencies entered into three grant agreements with GDC related to the Hudson Tunnel Project. Sincaglia

25

Decl., ¶ 15; Ullman Decl., ¶ 10.  The first was a grant agreement with the Federal Transit Administration ("FTA") under the Capital Investment Grants Program, which awarded GDC $6.88 billion, pursuant to 49 U.S.C. § 5309(b) and (d).  *Id.*, ¶ 2(a); *see generally* ECF No. 56-1 (grant agreement).  FTA entered into a second grant agreement with GDC in the amount of $25 million, under the Rebuilding American Infrastructure with Sustainability and Equity Program.  ECF No. 56 ("Hawkins Decl."), ¶ 2(b); *see generally* ECF No. 56-2 (grant agreement).  The third grant was awarded to GDC by the Federal Railroad Administration under the Federal-State Partnership for Intercity Passenger Rail Program in the amount of $3.79 billion.  Hawkins Decl., ¶ 2(c); *see generally* ECF No. 56-4 (grant agreement).  Plaintiffs challenge the Defendants' decision to pause its reimbursements to GDC under all three of these grant agreements through the September 30 Suspension.

### i.    Source of the Right

The Court "must first properly characterize" a plaintiff's "asserted right before . . . proceed[ing] to identify its source."  *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1108 (D.C. Cir. 2022).  In *Crowley*, the D.C. Circuit rejected "the district court's characterization of the right in question as [the plaintiff's] alleged rights to certain monies," noting that the plaintiff had not brought a claim based "on a right to money owed by [defendants]" and had "explicitly disclaim[ed] any effort to vindicate such a right in district court."  *Id.* (cleaned up).  The D.C. Circuit thus adopted the plaintiff's characterization of his asserted right "to be free from government action beyond its congressional

authority." *Id.* (cleaned up).  In accordance with this precedent, the Court is guided by how Plaintiffs have framed their claim to relief in their pleadings.

With respect to the suspension of the GDC Grants, Plaintiffs similarly define the relevant right as the "right to be free from an agency action that violates statutory and regulatory constraints on federal agencies."  ECF No. 75 at 4:20-21. The source of that right is found in the federal regulations that dictate the terms agencies must follow to suspend federal grant disbursements—namely, Sections 200.339 and 200.342 of OMB's Uniform Grant Guidance, 2 C.F.R. pt. 200 *et seq.*  Compl., ¶¶ 125-28; PI Mem. at 12 n.3; ECF No. 71 ("Pl. Opp'n Mem.") at 19, 24; 2 C.F.R. §§ 200.339, 200.342; *cf. Bennett v. Ky. Dep't of Educ.*, 470 U.S. 656, 669 (1985) ("Unlike normal contractual undertakings, federal grant programs originate in and remain governed by statutory provisions expressing the judgment of Congress concerning desirable public policy.").  The States challenge "DOT's failure to follow binding, government-wide regulations and its decision to proffer no or pretextual reasoning."  Pl. Opp'n Mem. at 16.

Plaintiffs do not rely on, nor even cite, contractual language to support their claims.  *See id.* at 7-26; PI Mem. at 8-25.  The Court is not being called upon to determine if DOT violated its obligations under a contract to which the States are not even parties.  Instead, the only question presented with respect to the GDC Grants is whether DOT acted contrary to law when it failed to follow the federal regulations governing such a contract.  *See* PI Mem. at 12 n.3 (explaining why the action sounds in regulation rather than contract); *see also Md. Dep't of Hum. Res. v.*

*Dep't of Health & Hum. Servs.*, 763 F.2d 1441, 1449 (D.C. Cir. 1985) (holding that the Court of Federal Claims did not have exclusive jurisdiction where plaintiff's "claims arise under a federal grant program and turn on the interpretation of statutes and regulations rather than on the interpretation of an agreement negotiated by the parties").

The Second Circuit has made clear that violations of regulations are actionable under the APA. *Fed. Defs. of N.Y. v. Fed. Bureau of Prisons*, 954 F.3d 118, 130 (2d Cir. 2020). "Under deeply rooted principles of administrative law, not to mention common sense, government agencies are generally required to follow their own regulations." *Id.* (citing *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954)). "When agencies fail to do so, the APA (as developed by case law) gives aggrieved parties a cause of action to enforce compliance." *Id.* (citing *Webster v. Doe*, 486 U.S. 592, 602 n.7 (1988)). As the Second Circuit has explained, "such a cause of action under the APA stands independent of any other right to sue agencies for violations of a statute. It exists to bring an agency's conduct into conformity with existing valid regulations. . . ." *Id.* (cleaned up). Accordingly, given the regulatory grounding for the States' contrary-to-law claim, the first prong of the *Megapulse* test is satisfied.

Defendants counter that the source of the States' rights must be the Government's contracts with GDC because "the OMB regulations to which the States cite, 2 C.F.R. § 200.339, are relevant *only*" because of the federal government's obligation under the federal grants "to pay certain monies to GDC."

28

Def. Mem. at 11.  Yet "contract issues may arise in various types of cases where the action itself is not founded on a contract." *Crowley*, 38 F.4th at 1106-07 (cleaned up).

Courts have consistently found that "litigants may bring statutory and constitutional claims in federal district court even when the claims depend on the existence and terms of a contract with the government." *Robbins v. U.S. Bureau of Land Mgmt.*, 438 F.3d 1074, 1083 (10th Cir. 2006) (quoting *Transohio Sav. Bank v. Director, Off. of Thrift Supervision*, 967 F.2d 598, 610 (D.C. Cir. 1992), *abrogated on other grounds as recognized in*, *Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 620 (D.C. Cir. 2017)).  There are many types of claims that "presuppose[] the existence of a contract," but a district court is not thereby "deprive[d] . . . of jurisdiction it might otherwise have" so long as "the right [the plaintiff] seeks to vindicate is not a contract right" and the "action in district court only requires some reference to or incorporation of the contract."  *Crowley*, 38 F.4th at 1110 (cleaned up).

For example, the *Megapulse* court addressed and rejected the argument that an APA challenge linked to a government contract inherently sounds in contract, holding that "by the logical inference of its position the government could avoid injunctions against activities violative of a statutory duty simply by contracting not to engage in those activities." *Megapulse*, 672 F.2d at 971.  As the D.C. Circuit explained:

> It is one thing to rely on the generally recognized rule
> that a plaintiff cannot maintain a contract action in either
> the district court or the Court of Claims seeking specific
> performance of a contract.  It is quite another to claim, as

> the Government does in this case, that an agency action may not be enjoined, even if in clear violation of a specific statute, simply because that same action might also amount to a breach of contract.

*Id.* Such a position would allow the government to "creatively contract their way out of judicial reviewability of its actions, shielding itself by virtue of its contractual relationship with a party." *Climate United Fund v. Citibank, N.A.*, 778 F. Supp. 3d 90, 111 (D.D.C. 2025) ("*Climate United II*") (quotation marks omitted). Here, as in *Megapulse*, Defendants' theory of the case would "impermissibly narrow the court's ability to review agency action" by essentially rendering federal regulations governing agency contracts unenforceable under the APA. *Id.* (citing *Megapulse*, 672 F.2d at 971).

The Second Circuit has likewise confirmed that "the question of APA jurisdiction does not turn on whether the plaintiff could conceivably have based his claim on a government contract." *Atterbury*, 805 F.3d at 407. "Instead, the appropriate inquiry is whether the claim 'is validly based on grounds other than a contractual relationship with the government.'" *Id.* (quoting *Megapulse*, 672 F.2d at 968). Here, because the States' claims are grounded in alternative regulations, that inquiry favors the Court's jurisdiction.

Defendants' logic would immunize the government from any claim brought under Sections 200.339 and 200.342 of the Uniform Grant Guidance, which inherently presuppose contractual relationships with the federal government by establishing the terms and processes that the government must follow when interrupting funding awards. *See* 2 C.F.R. §§ 200.339, 200.342. As a D.C. District

30

Court has stated, "[t]hat cannot be, and is not, what Congress envisioned for judicial review under the APA.  Nor is it the law."  *Climate United II*, 778 F. Supp. 3d at 111.  Indeed, courts have consistently found these regulations justiciable.[3]

Accepting Defendants' position would also jettison judicial review of agency action in analogous circumstances exclusively to the Court of Federal Claims, an outcome the Supreme Court has scorned.  Citing the Claims Court's origins in the Federal Courts Improvement Act of 1982, the *Bowen* court found it "highly unlikely that Congress intended to designate an Article I court as the primary forum for judicial review of agency action that may involve questions of policy that can arise in cases such as these."  487 U.S. at 908 n.46 (citing 28 U.S.C. § 171(a)).

Certainly, Plaintiffs cannot simply style their claims as APA claims to evade the Court of Federal Claims where the rights they seek to enforce exist only in contract, but the Uniform Grant Guidance's inextricable relationship with the GDC

---

[3] *See, e.g.*, *New York v. Trump*, 171 F.4th 1, 24 (1st Cir. 2026) ("[T]he States are likely to succeed in showing that OMB acted arbitrarily and capriciously by directing the Agency Defendants to freeze obligated funds in this immediate and categorical way."); *New York v. Trump*, 777 F. Supp. 3d 112, 117 (D.R.I. 2025) ("2 C.F.R. § 200.300(a)'s text is general and nothing within the regulation authorizes FEMA's imposition of the challenged manual review process—which essentially imposes an indefinite categorical pause on payments."), *reconsideration denied*, No. 25-CV-39 (JJM) (PAS), 2025 WL 1098966 (D.R.I. Apr. 14, 2025), *and aff'd*, 171 F.4th 1 (1st Cir. 2026); *Climate United Fund v. Citibank, N.A.*, 775 F. Supp. 3d 335, 348 (D.D.C. 2025) ("*Climate United I*") ("To be sure, agencies . . . may decide to end agreements or federal awards.  But those decisions must be made lawfully and in accordance with . . . the 'Remedies for Noncompliance' under 2 C.F.R. §§ 200.339–200.343, and in accordance with the APA."); *Climate United II*, 778 F. Supp. 3d at 101, 108-09 (adjudicating APA claim following termination of grants, which were awarded pursuant to "grant agreements that operate as contracts" between the plaintiffs and EPA, for alleged violations of the Uniform Grant Guidance, 2 C.F.R. pt. 200, including sections 200.339 and 200.342).

31

Grants is not in itself dispositive.  Indeed, Defendants commit the same "error[] in [their] examination of the source of the right" as the lower court in *Crowley*, wherein the D.C. Circuit found the district court had "misinterpreted *Megapulse* to impose a 'but-for' test for identifying the source of the right."  38 F.4th at 1109-10 (citation omitted); *see id.* ("Imposing such a test . . . contravenes *Megapulse*'s express rejection of the argument that the mere existence of such contract-related issues converts the action to one based on the contract.  Granted, Crowley's claim presupposes the existence of a contract, . . . [b]ut the right Crowley seeks to vindicate is not a contract right . . . ." (cleaned up)).

### ii.    Type of Relief Sought

As to the second prong of the *Megapulse* inquiry, "for claims against the United States founded . . . upon . . . any regulation of an executive department, a court must inquire whether the source of substantive law can fairly be interpreted as mandating compensation by the Federal Government for the damages sustained."  *Mitchell*, 463 U.S. at 218 (cleaned up).

With respect to the suspension of the GDC Grants, the "States do not . . . seek . . . monetary damages."  PI Mem. at 12 n.3.  They instead seek to set aside the directive issued on September 30, 2025, and to obtain injunctive relief, which would require Defendants to adhere to 2 C.F.R. § 200.339 in making suspension decisions and to make such suspension decisions according to "reasoned decision[-]making." *Id.*

The States do not ask for compensation, but rather for prospective relief

32

through vacatur of the September 30 Suspension policy, which dictates that "[p]ending completion of the review [of GDC's compliance with the DBE program], no further disbursements for the [Hudson Tunnel] Project will be made." Sep. 30 DOT Ltr. As Judge Broderick determined in a recent comparable case in this District, Plaintiffs "do not seek to reinstate any contractual grants, nor do they request money damages. . . . Instead, [they] seek to vacate the underlying agency policy . . . ." *New York v. Admin. for Child. & Fams.*, No. 26-CV-172 (VSB), 2026 WL 673848, at *13 (S.D.N.Y. Mar. 10, 2026) ("*ACF*").

This is exactly the type of remedy "at the heart of the APA's judicial review scheme." *New York v. Nat'l Sci. Found.*, 793 F. Supp. 3d 562, 594 (S.D.N.Y. 2025); *see also id.* at 594, 598 (holding that, while plaintiffs' proposed "order [for the Government] to pay money to individual grant holders" was "jurisdictionally problematic" and ultimately fatal to the motion for preliminary injunction, "that reasoning would not deprive this Court of jurisdiction to vacate an allegedly illegal agency policy, to enjoin an agency from terminating additional grants using that policy as the basis, or to bar the agency from relying on that policy when making decisions to award grants in the future" because "[s]uch requests for relief could not be left to the Court of Federal Claims," which "does not have the general equitable powers of a district court to grant prospective relief" (citation omitted)); *N.J. Conservation Found. v. Fed. Energy Regul. Comm'n*, 111 F.4th 42, 63 (D.C. Cir. 2024) ("Vacatur is the normal remedy when we are faced with unsustainable agency action." (cleaned up)).

"Defendants characterize Plaintiffs' claims as seeking reinstatement of the terminated agreement which Defendants construe as a claim for specific performance," a typical contractual remedy. *MTA*, 784 F. Supp. 3d at 665. But "the mere fact that an injunction would require the same governmental restraint that specific (non)performance might require in a contract setting is an insufficient basis to deny a district court the jurisdiction otherwise available . . . ." *Megapulse*, 672 F.2d at 971. True, Plaintiffs' requested permanent invalidation of the September 30 Suspension would deem unlawful the withholding of contracted-for funds because of that suspension, but the States do not demand an order that such funds be released, nor could they. *See Kidwell v. Dep't of Army, Bd. for Correction of Mil. Recs.*, 56 F.3d 279, 284 (D.C. Cir. 1995) ("A plaintiff does not 'in essence' seek monetary relief, however, merely because . . . success on the merits may obligate the United States to pay the complainant."). Indeed, the States take pains to make clear that their requested relief would not impact any grants terminated or funds withheld for reasons other than the September 30 Suspension they seek to vacate. *See* ECF No. 62 ("TRO Hr'g Tr.") at 19:24-20:4 (emphasizing that requested Court order would not reach "other reasons that [DOT] want[s] to deny funding," only that, "when [DOT] is processing disbursement requests, it can't rely on the illegal funding freeze that it announced [on] September 30th"); Pl. Opp'n Mem. at 19 (same).

*NIH* and *California* are consistent with this analysis. Whereas the *California* Court issued an emergency stay because it determined that the district court below had issued an order "to enforce a contractual obligation to pay money"

34

and "the Government [was thus] likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA," *California*, 604 U.S. at 651 (citation omitted), "[i]f a district court decides that agency guidance violates the APA, it may vacate the guidance, preventing the agency from using it going forward," *NIH*, 145 S. Ct. at 2662 n.1 (Barrett, J., concurring).  In her *NIH* concurrence, Justice Barrett reaffirmed that "[p]laintiffs frequently seek vacatur of internal agency guidance on arbitrary-and-capricious grounds in district court or directly in the D.C. Circuit."  *Id.* at 2661 (Barrett, J., concurring).  Accordingly, she concluded in that case that "the District Court was likely correct to conclude that it had jurisdiction to entertain an APA challenge to the guidance, and it would be confusing for our disposition of this application to suggest that the [Court of Federal Claims] is the right forum for that claim."  *Id.*; *accord Bowen*, 487 U.S. at 908 n.46 ("[I]t seems highly unlikely that Congress intended to designate [the Court of Federal Claims,] an Article I court[,] as the primary forum for judicial review of agency action" involving "questions of policy." (citing 28 U.S.C. § 171(a))).

Here, where Plaintiffs' rights derive from federal regulations, this Court has jurisdiction to entertain an APA challenge to vacate an unlawful agency action with prospective effect.  *ACF*, 2026 WL 673848, at *12-13 (holding that, consistent with *NIH*, "prospective challenges to vacate agency guidance, such as seeking to vacate a government's decision to freeze funding and enjoining the government from relying on its stated reasons to withhold payment are exactly the type of claims that belong in district court." (cleaned up)); *City of Chicago v. U.S. Dep't of Homeland Sec.*, 815

F. Supp. 3d 727, 746-47 (N.D. Ill. 2025) (distinguishing between claims based on termination of grants, which seek retrospective monetary relief and claims based on funding freezes that seek prospective relief).

This conclusion is no less demanded where the requested prospective relief is likely to trigger the flow of federal funds.  As the Supreme Court reiterated in *California*, "a district court's jurisdiction 'is not barred by the possibility' that an order setting aside an agency's action may result in the disbursement of funds." *California*, 604 U.S. at 651 (quoting *Bowen*, 487 U.S. at 910); *see also Bowen*, 487 U.S. at 901 (holding that even a "mandate . . . for the payment of money must not be confused with the question whether such payment, in these circumstances, is a payment of money as damages or as specific relief.").  Indeed, the Supreme Court has stated explicitly that it is "not willing to assume, categorically, that a naked money judgment against the United States will always be an adequate substitute for prospective relief fashioned in the light of the rather complex ongoing relationship between the parties." *Bowen*, 487 U.S. at 905.

To distinguish cases where "a naked money judgment against the United States" will suffice from cases requiring "prospective relief fashioned in light of the rather complex ongoing relationship between the parties," the *Bowen* court incorporated Judge Coffin's concurrence in *Massachusetts v. Departmental Grant Appeals Bd. of Health and Human Servs.*, 815 F.2d 778 (1st Cir. 1987).  *Bowen*, 487 U.S. at 905 & n.41.  As cited in *Bowen*, that concurrence characterized the "unique reimbursement of court-ordered abortions" to be "outside the APA's waiver of

36

sovereign immunity only because the requested relief '[was] unlikely to have any significant prospective effect upon the ongoing grant-in-aid relationship between the Commonwealth and the United States.'" *Id.* at 905 n.41 (quoting *Departmental Grant Appeals Bd.*, 815 F.2d at 789 (Coffin, J., concurring)).  Here, however, in contrast to *Departmental Grant Appeals Bd.*, the States' proposed vacatur of the September 30 Suspension is very likely to have a "significant prospective effect upon the ongoing grant-in-aid relationship" at hand.

Because the States are not seeking to compel the payment of money damages due under the GDC Grants, *Great-West* similarly does not mandate a contrary conclusion.  Plaintiffs, as non-contracting parties, could not sue to enforce any of the GDC Grants.  They instead bring this action under the APA to obtain equitable relief of the type that is typically available in a challenge to administrative action. Section 702's exclusion of claims for "money damages" thus does not pose an impediment to this suit.  *See City of Chicago*, 815 F. Supp. 3d at 745-46 (distinguishing *Great-West* as concerning retrospective claims to compel payment of money past due rather than prospective relief).

Accordingly, as to the GDC Grants, Plaintiffs have requested appropriate prospective relief under the APA, satisfying both *Megapulse* factors.

### iii.    *NIH* and *California*

Defendants argue that, notwithstanding this long line of authority to the contrary, the Supreme Court's recent stay orders in *NIH* and *California* conclusively foreclose any attempt to bring claims associated with grant

37

suspensions or terminations under the APA. Def. Mem. at 8-12. As discussed *supra*, the facts of this case are distinguishable from both *California* and *NIH*.

*First*, in contrast to the claims in *California*, where "the terms and conditions of each individual grant award [were] at issue," *California v. Dep't of Educ.*, 132 F.4th 92, 96-97 (1st Cir. 2025), Plaintiffs have disclaimed any reliance upon the terms and conditions of the GDC Grants, Pl. Opp'n Mem. at 16-17. This is a critical distinction. *See, e.g.*, *New York v. Trump*, No. 25-CV-00039 (JJM) (PAS), 2025 WL 1098966, at *2 (D.R.I. Apr. 14, 2025); *Rhode Island v. Trump*, 781 F. Supp. 3d 25, 40 (D.R.I. 2025). Whereas the *California* plaintiffs' claims depended on the terms of their individual grants with the government, the States' claims here stem only from the September 30 Suspension's alleged inconsistencies with the federal Uniform Grant Guidance, 2 C.F.R. pt. 200 *et seq.*, particularly Sections 200.339 and 200.342. An action "seeking to vacate a government's decision to freeze funding and enjoining the government from relying on its stated reasons to withhold payment are exactly the type of claims that belong in district court." *ACF*, 2026 WL 673848, at *12 (cleaned up).

*Second*, the order and judgment stayed by the Supreme Court in *California* and *NIH* did not rest upon violations of free-standing statutes or regulations. Rather, the district courts had determined that the grant terminations were arbitrary and capricious in violation of Section 706(2)(A) of the APA. *See California*, 769 F. Supp. 3d at 76-78; *Massachusetts*, 2025 WL 1747213, at *1. Courts have long drawn distinctions between APA claims that rest on violations of

38

independent legal provisions and arbitrary-and-capricious claims. *See, e.g., United Aeronautical Corp. v. U.S. Air Force*, 80 F.4th 1017, 1026 (9th Cir. 2023) ("If rights and remedies are *statutorily* or *constitutionally* based, then districts courts have jurisdiction; if rights and remedies are *contractually* based then only the Court of Federal Claims does, even if the plaintiff formally seeks injunctive relief."); *A.B.A. v. U.S. Dep't of Just.*, 783 F. Supp. 3d 236, 245 (D.D.C. 2025) (distinguishing *California* because plaintiffs there did not assert constitutional claim); *Harris Cnty., Tex. v. Kennedy*, 786 F. Supp. 3d 194, 207 (D.D.C. 2025) ("The only claim before the Supreme Court in that case was that the government's mass termination of grants was arbitrary and capricious under the APA. . . .  The Supreme Court's order therefore says nothing about whether constitutional claims like this one must be funneled to the Court of Federal Claims simply because they implicate a contract.").

*Third*, Plaintiffs are not parties to the GDC Grants, which "materially alter[s] the jurisdictional analysis." *Climate United II*, 778 F. Supp. 3d at 110.  The plaintiffs in *California* maintained privity of contract with the federal government and were thus able to pursue their claims in the Court of Federal Claims. *See California*, 604 U.S. at 652 (plaintiffs "can recover any wrongfully withheld funds through suit in an appropriate forum").  In the instant case, the federal government has no privity of contract with the States, only with GDC.  The States therefore cannot proceed in the Court of Federal Claims. *Park Props. Assocs., L.P. v. United States*, 916 F.3d 998, 1002 (Fed. Cir. 2019) ("Under the Tucker Act, the Court of Federal Claims has jurisdiction only if there is privity of contract between plaintiffs

39

and the government."); *Cmty. Legal Servs. in E. Palo Alto v. U.S. Dep't of Health & Hum. Servs.*, 155 F.4th 1099, 1106 (9th Cir. 2025) ("*CLS*") (denying rehearing *en banc*) ("No such privity exists here between Plaintiffs and the Government. Thus, unlike the claims in *NIH* and [*California*], the Court of Federal Claims's jurisdiction does not cover this dispute."); *Am. Ass'n of Univ. Professors v. Trump*, 815 F. Supp. 3d 907, 957 (N.D. Cal. 2025) ("The Tucker Act is inapplicable for the additional reason that Plaintiffs cannot bring a breach of contract claim as non-parties to the grant agreements at issue."), *appeal dismissed*, No. 26-263, 2026 WL 1049175 (9th Cir. Feb. 11, 2026). The source of Plaintiffs' rights cannot be said to sound in contract where they are not parties to any of the relevant contracts and cannot bring a claim for breach of contract.[4]

Similarly, because the States cannot bring an action in the Court of Federal Claims under the Tucker Act, the Tucker Act cannot serve to divest this Court of jurisdiction. As the D.C. Circuit has aptly observed, "[t]here cannot be exclusive jurisdiction under the Tucker Act if there is no jurisdiction under the Tucker Act." *Tootle v. Sec'y of Navy*, 446 F.3d 167, 177 (D.C. Cir. 2006); *see also Crowley*, 38 F.4th

---

[4] Defendants argue halfheartedly in a footnote that the States could attempt to bring suit in the Court of Federal Claims as intended third party beneficiaries of the GDC contract. Def. Mem. at 15 n.3. The Federal Circuit has emphasized that "[t]hird party beneficiary status is an exceptional privilege" and "the requirements to demonstrate third-party beneficiary status are stringent." *Pac. Gas & Elec. Co. v. United States*, 838 F.3d 1341, 1361 (Fed. Cir. 2016) (cleaned up). A party seeking to establish third-party beneficiary status must "prove that the contract not only reflects the express or implied intention to benefit the party, but that it reflects an intention to benefit the party directly." *Id.* Notably, Defendants have pointed to no language in the GDC Grants that would support such a finding. Def. Mem. at 14 n.15.

at 1109 ("Because a plaintiff could not bring this type of tort action in [the Court of Federal Claims] in the first place, that Court would not have exclusive jurisdiction of them."); *cf. Atterbury*, 805 F.3d at 407 (in holding that Tucker Act did not preclude suit, noting that plaintiff was not a party to underlying contract and had "no standing to assert that it was breached").

The Court recognizes that the Ninth Circuit recently reached a different conclusion with respect to non-contracting parties in *Thakur v. Trump*. In doing so, however, the Ninth Circuit did not analyze this issue. It stated only that "plaintiffs in *NIH* also included non-parties to the grant agreements, and the Supreme Court's reasoning did not turn on whether the plaintiffs were parties to the contracts at issue. . . . We are bound by the Court's holding." 176 F.4th at 1199. The Court does not find this decision persuasive.

It is correct that the Supreme Court's decision in *NIH* did not distinguish between contracting and non-contracting parties. But this is because the issue of non-contracting parties was never raised in *NIH*, as demonstrated by an examination of the briefs filed by the parties before the Supreme Court.[5] It is well established that "[q]uestions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so

---

[5] *See generally* Application to Stay the Judgments of the United States District Court for the District of Massachusetts and Request for an Immediate Administrative Stay, *NIH*, 145 S. Ct. 2658 (2025) (No. 25A103); Respondent States' Opposition to the Application for a Stay, *NIH*, 145 S. Ct. 2658 (2025) (No. 25A103); *APHA* Respondents' Opposition to Application for Stay, *NIH*, 145 S. Ct. 2658 (2025) (No. 25A103); Reply in Support of Application for a Stay, *NIH*, 145 S. Ct. 2658 (2025) (No. 25A103).

decided as to constitute precedents." *Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 170 (2004) (quoting *Webster v. Fall*, 266 U.S. 507, 511 (1925)); *see also United States v. L. A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 38 (1952) ("The effect of the omission was not there raised in briefs or argument, nor discussed in the opinion of the Court.  Therefore, the case is not a binding precedent on this point.").

Defendants suggest that the fact that the States would have no forum to press their claims is a feature, rather than a bug, of the Tucker Act jurisdictional scheme.  *See* Def. Mem. at 14-16.  That is, they attempt to equate the Tucker Act with the types of comprehensive statutes that operate to divest federal district courts of jurisdiction, such as the Civil Service Reform Act ("CSRA") at issue in *Elgin v. Dep't of Treasury*, 567 U.S. 1 (2012), and *United States v. Fausto*, 484 U.S. 439 (1988), and the Agricultural Marketing Agreement Act of 1937 ("AMAA"), the subject of *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340 (1984).  Def. Mem. at 15-16, 21-22.

This argument does not bear close scrutiny.  In *Fausto*, for example, the Supreme Court relied upon "[t]he comprehensive nature of the CSRA, the attention that it gives throughout to the rights of nonpreference excepted service employees, and the fact that it does not include them in provisions for administrative and judicial review," as well as the overall statutory structure, as evidence that Congress made a deliberate decision to deny judicial review to that class of employee.  484 U.S. at 448; *id.* at 448-49 ("It seems to us evident that the absence of provision for these employees to obtain judicial review is not an uninformative

42

consequence of the limited scope of the statute, but rather manifestation of a considered congressional judgment that they should not have statutory entitlement to review for adverse action of the type governed by Chapter 75.").  In *Elgin*, the Supreme Court applied the familiar *Thunder Basin* test to determine whether it is "fairly discernible" from the CSRA's "elaborate framework," which "prescribes in great detail the protections and remedies applicable to adverse personnel actions against federal employees," that employees can only seek relief for constitutional claims in accordance with the CSRA's channeling provisions.  567 U.S. at 10-12 (cleaned up).  Similarly, in *Block*, the Supreme Court held that the AMAA's "complex scheme" for the development, adoption, and review of milk market orders by the Secretary of Agriculture, handlers, and producers, but which included no role for milk consumers, impliedly precluded consumers from obtaining judicial review over challenges to the Secretary of Agriculture's milk market orders.  *Block*, 467 U.S. at 346-48 ("In a complex scheme of this type, the omission of such a provision is sufficient reason to believe that Congress intended to foreclose consumer participation in the regulatory process.").

The Tucker Act's one-sentence jurisdictional grant is hardly comparable to the comprehensive statutory frameworks of the CSRA or the AMAA.  *Compare* Tucker Act, 28 U.S.C. § 1491 (2024), *with* Agricultural Marketing Agreement Act of 1937, 7 U.S.C. § 601 *et seq.*, *and* Civil Service Reform Act of 1978, 5 U.S.C. § 1101 *et seq.*  Nothing in the Tucker Act evinces a deliberate and considered congressional

choice to divest federal district courts over claims for regulatory violations brought by non-contracting third parties.

In making this argument, the Government fundamentally misapprehends the nature of the Tucker Act.  The Tucker Act, unlike the CSRA or the AMAA, "itself does not create a substantive cause of action," but is a grant of jurisdiction and a waiver of sovereign immunity over a delimited category of claims against the United States.  *Lummi Tribe of the Lummi Rsrv., Wash. v. United States*, 870 F.3d 1313, 1317 (Fed. Cir. 2017).  Specifically, the Tucker Act waives sovereign immunity to the extent "a separate source of substantive law . . . creates the right to money damages" against the Government, but where that separate source of law is not "money-mandating," jurisdiction does not lie in the Court of Federal Claims.  *Id.* Where the Tucker Act's jurisdiction ends, the federal district court's jurisdiction begins.  The Court of Federal Claims, for example, lacks jurisdiction over claims concerning "[c]ontracts that expressly disavow money damages, plea agreements in criminal cases, and cooperative agreements are not money-mandating contracts." *Hous. Auth. of City of New Haven v. United States*, 140 Fed. Cl. 773, 786 (2018) (cleaned up).  But the Tucker Act's exclusive jurisdiction over money-mandating contracts does not thereby bar litigants from advancing a claim for breach of such agreements in any other court.  *See, e.g., Metro. Transp. Auth. v. Duffy*, No. 25-CV-1413 (LJL), 2026 WL 588117, at *27 (S.D.N.Y. Mar. 3, 2026).

Defendants also complain that allowing third parties to pursue an APA action in federal district court for violations of 2 C.F.R. § 200.339 when the

44

contracting parties are precluded from doing so will lead to duplicative litigation with inconsistent and even conflicting outcomes, particularly as those third parties could potentially obtain remedies that are unavailable to the contracting parties, who are limited in the Court of Federal Claims to monetary damages. Def. Mem. at 16-17. This argument has some intuitive appeal. By allowing this suit to proceed, the Court affords the States rights to relief that the GDC could not have vindicated in its Court of Federal Claims action for retrospective damages, which was largely dismissed as moot in light of Defendants' subsequent disbursements to GDC after the Court issued the TRO in this case. *Gateway*, 180 Fed. Cl. at 501, 516. Defendants suggest this posture frustrates legislative intent to channel claims grounded in contract to a single forum. Def. Mem. at 16-17, 22.

Perhaps, were this case otherwise in equipoise, such an argument would be persuasive. Congress and binding precedent make clear, however, that it is not: "[t]he policies of the APA take precedence over the purposes of the Tucker Act." *Bowen*, 487 U.S. at 908 n.46 (citation omitted). "In the conflict between two statutes, established principles of statutory construction mandate a broad construction of the APA and a narrow interpretation of the Tucker Act. The Court of Claims is a court of limited jurisdiction, because its jurisdiction is statutorily granted and it is to be strictly construed." *Id.*; *see also Tennessee ex rel. Leech v. Dole*, 749 F.2d 331, 335 (6th Cir. 1984) ("In determining whether the Court of Claims has exclusive jurisdiction in this case, we must therefore 'be careful not to subvert [the] congressional objectives underlying the enactment of the judicial

45

review statute by allowing the government to give an overly expansive scope to the notion of claim[s] "founded upon" a contract."' (quoting Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 4101 (1978))).

While the Government's concerns are not insubstantial, the APA and the Tucker Act have robust guardrails to protect against district court overreach and duplicative litigation.  These include 28 U.S.C. § 1500, which divests the Court of Federal Claims of jurisdiction "of any claim for or in respect to which the plaintiff or his assignee has pending in any other court any suit or process against the United States."  In *United States v. Tohono O'Odham Nation*, the Supreme Court held that Section 1500 barred the exercise of jurisdiction by the Court of Federal Claims over a Tucker Act claim where a plaintiff's related APA suit was pending in a district court.  563 U.S. 307, 317-18 (2011); *see The Tohono O'odham Nation v. United States*, 79 Fed. Cl. 645, 646-53 (2007).  Given that the instant case is before the district court, not the Court of Federal Claims, and the States are not even eligible to appear before the Court of Federal Claims, Section 1500 is not implicated here. *See id.* at 328 (Sotomayor, J., concurring) ("Parallel actions seeking the same or duplicative relief, or different forms of relief that are available entirely in one court, are redundant; actions seeking different forms of relief that Congress has made available exclusively in different courts are not.").

The APA also imposes limits on the parties who can invoke its protections. Under Section 702, only those who have suffered a "legal wrong"—that is, an "invasion of a legally protected right," *see, e.g., Seeger v. U.S. Dep't of Def.*, 306 F.

46

Supp. 3d 265, 276 (D.D.C. 2018) (quoting *Pa. R. Co. v. Dillon*, 335 F.2d 292, 294 (D.C. Cir. 1964))—or those who have been "adversely affected or aggrieved by agency action within the meaning of a relevant statute" can invoke the protections of the statute. 5 U.S.C. § 702. The zone-of-interests doctrine provides a further bulwark against suit by insufficiently interested parties by ensuring that "a statutory cause of action extends only to plaintiffs whose interests fall within the zone of interests protected by the law invoked." *Lexmark*, 572 U.S. at 129 (cleaned up). "In cases where the plaintiff is not itself the subject of the contested regulatory action, the test denies a right of review if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987).[6] The Second Circuit has extended this doctrine to agency regulations where an APA claim is predicated on regulatory violations. *Fed. Defs. of N.Y.*, 954 F.3d at 130 ("[W]hen an aggrieved party invokes the APA's right to sue an agency for failing to adhere to its own valid regulations, the zone-of-interests inquiry—like the cause of action that it seeks to delineate—should focus on the regulations that were allegedly violated.").[7]

---

[6] Defendants have not directly raised a zone-of-interest challenge in the instant case. "Although courts traditionally viewed the zone-of-interests doctrine as part of the 'prudential branch of standing,' the Supreme Court recently clarified in *Lexmark* that the doctrine has no jurisdictional import." *Moya v. U.S. Dep't of Homeland Sec.*, 975 F.3d 120, 139 (2d Cir. 2020) (Carney, J., concurring in part) (quoting *Lexmark*, 572 U.S. at 126-27). Accordingly, any such argument is waived.

[7] To the extent the Government is suggesting that the GDC stands as an alter ego to the States, there has been no evidence put forward on the record to support this

47

The conclusion that the States must be permitted to challenge the unlawful termination of the GDC Grants in federal district court is consistent with the APA's "basic presumption of judicial review for one suffering legal wrong because of agency action." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020) (cleaned up). This Court "categorically rejects the suggestion that a federal district court can be deprived of jurisdiction by the Tucker Act when no jurisdiction lies in the Court of Federal Claims." *Tootle*, 446 F.3d at 176. "Two sovereign immunity waivers, the Tucker Act and the APA," cannot "create a jurisdictional Catch-22 in which no court can consider Plaintiffs' claims." *CLS*, 155 F.4th at 1107. This Court therefore has jurisdiction to consider Plaintiff's claim that the September 30 Suspension was contrary to law insofar as concerns the GDC Grants.

### b.    RRIF Loans

The RRIF Loans stand on a different footing. The States concede that the federal regulations upon which the States rely for their contrary-to-law argument do not apply to the RRIF loans; those regulations only pertain to federal grants. ECF No. 77 at 1. Moreover, the States are unable to point to any independent

---

contention. Although GDC was created by statute by the States, N.J. Stat. Ann. § 32:36-2; N.Y. Unconsol. Laws, § 6299-i (McKinney), its board comprises representatives beyond the States, *see* About the Comm'n, GDC (last visited June 25, 2026), https://perma.cc/4RWH-8J7R, and interstate agencies are typically legally independent of their creator States, *see Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 40-43 (1994); *Galette v. N.J. Transit Corp.*, 607 U.S. 509, 525 (2026) ("In contrast to formal legal liability, an entity's practical financial relationship with the State . . . has less relevance [to whether it is a legally independent entity].").

48

source of federal law that was violated by the suspension of the RRIF loans. *Id.* at 1-4. The States therefore rely on the APA itself as its source of rights, arguing that the APA grants a substantive right against arbitrary and capricious government action. *Id.*

The Second Circuit, however, has held to the contrary. "The APA is merely a procedural vehicle for review of agency action; it does not confer a substantive right to be free from arbitrary agency action." *Furlong v. Shalala*, 156 F.3d 384, 394 (2d Cir. 1998). Because "the APA is not itself a free-standing source of rights," courts must look elsewhere for an "independent source of rights" to satisfy the first prong of the *Megapulse* test. *Atterbury*, 805 F.3d at 408.

Consistent with these precedents, a number of courts have expressed doubt as to whether the termination of a government contract can ever be brought as an arbitrary and capricious claim under the APA. *See, e.g.*, *Vera Inst. of Just. v. U.S. Dep't of Just.*, 805 F. Supp. 3d 12, 30 (D.D.C. 2025); *Harris Cnty.*, 786 F. Supp. 3d at 215-17. Certainly, reliance upon the APA as the source of rights under the *Megapulse* test leads to a confounding circularity of logic. The *Megapulse* test is designed to ensure that an APA claim is legitimately based upon an independent source of law and thus is not barred by the Tucker Act's exclusive jurisdiction over contract claims. *Megapulse*, 672 F.2d at 968; *see also Atterbury*, 805 F.3d at 408 (purpose of two-pronged *Megapulse* test is to "distinguish[] APA claims from 'disguised' Tucker Act claims"). If the APA itself could provide that source of rights, then the *Megapulse* test seems destined to consume itself, a logical ouroboros.

A divided panel of the D.C. Circuit recently examined whether a claim that the termination of a federal contract was arbitrary and capricious could be extricated from a claim for relief on the contract.  Although the decision was vacated and a rehearing *en banc* has been granted, the reasoning of the majority opinion is persuasive:

> To the extent the grantees argue the government acted arbitrarily by failing to follow the terms of the grant agreements, that argument can be evaluated only by reference to and incorporation of the agreements.  The source of the right asserted is therefore not truly independent of the contracts.
>
> To the extent the grantees argue the terminations were arbitrary regardless of whether they were permitted under the agreements, that challenge turns, in substance, on principles of federal contract law.  That law prohibits the government from dishonoring, with impunity, its contractual obligations even when a contract allows the government to terminate for convenience.  The grantees' argument that the termination was arbitrary and capricious is simply a claim that EPA breached the grant agreements by terminating with impunity.  That claim must be brought in the Court of Federal Claims.

*Climate United Fund v. Citibank, N.A.*, 154 F.4th 809, 823 (D.C. Cir. 2025) (cleaned up), *reh'g en banc granted, opinion vacated*, No. 25-5122, 2025 WL 3663661 (D.C. Cir. Dec. 17, 2025).

Applying the *Megapulse* test to the RRIF Loans yields the same result. Whether the suspension of the RRIF Loans is arbitrary and capricious cannot be determined without reference to the contractual terms and conditions.  If the action taken by DOT is consistent with the provisions of the contract, then it is hard to conceive how the suspension could be arbitrary and capricious.  Conversely, if the

RRIF Loans were suspended in contravention of particular contractual provisions, then the action is little more than a disguised breach of contract claim. The Court therefore lacks jurisdiction over the RRIF Loan claims.

### 3. Final Agency Action

Having determined that Plaintiffs' claims with respect to the GDC Grants do not fall within the Tucker Act's exclusive jurisdiction, Plaintiffs must overcome one final roadblock. Plaintiffs can only proceed under the APA if their challenge is to "final agency action." 5 U.S.C. § 704. The September 30 Suspension easily meets this standard.

The word "action" in Section 704 is meant to "cover comprehensively every manner in which an agency may exercise its power." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001). In *Bennett v. Spear*, 520 U.S. 154 (1997), the Supreme Court "distilled from [its] precedents two conditions that generally must be satisfied for agency action to be 'final' under the APA." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016). The action must (1) "mark the consummation of the agency's decision[-]making process—it must not be of a merely tentative or interlocutory nature," and (2) "be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* (citation omitted).

"The Supreme Court has interpreted the finality element in a pragmatic way." *Sharkey*, 541 F.3d at 88 (quotation marks omitted) (quoting *Fed. Trade Comm'n v. Standard Oil Co. of Cal.*, 449 U.S. 232, 239 (1980)). "[I]f an agency has

51

issued a 'definitive statement of its position, determining the rights and obligations of the parties,' the agency's action is final notwithstanding 'the possibility of further proceedings in the agency' on related issues. . . ." *Id.* at 89 (brackets omitted) (quoting *Bell v. New Jersey*, 461 U.S. 773, 779-80 (1983)). Indeed, Section 704 of the APA dictates that "a ruling may be final whether or not it may be subject to appeal or reconsideration 'unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative.'" *Lunney v. United States*, 319 F.3d 550, 554 (2d Cir. 2003) (quoting 5 U.S.C § 704).

### a.    *Bennett* Prong One

The parties disagree as to which Government "decision" the Court should evaluate under the first *Bennett* condition. The Government claims its decision has not yet occurred—that the September 30 Suspension is merely an "initial step in a review process" and thus a non-reviewable "tentative" or "interlocutory" action pending complete review of the Project's compliance with agency guidance. Def. Mem. at 23-24. The States argue that the September 30 Suspension's indefinite freeze of Project disbursements marks the "consummation" of DOT's decision-making process because DOT has "arrived at a definitive position on the issue" by withholding funds for the foreseeable future from GDC. PI Mem. at 13 (quoting *Nat'l Lab. Rels. Bd. v. Nexstar Media Inc.*, 133 F.4th 201, 204 (2d Cir. 2025)).

DOT's review of GDC's compliance with the Department's DBE guidance is not the challenged agency action in this case; the agency's suspension of funds is. Further, an agency action can satisfy the "consummation" prong "notwithstanding

the agency's characterization of the [action] as an interim" one. *Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 78 (D.C. Cir. 2020); *accord MTA*, 784 F. Supp. 3d at 660 ("An agency may not transform final decisions into nonfinal decisions and thereby forestall judicial review simply by creating an opportunity for informal revision that offers a mere possibility of success." (cleaned up)).

Prior to the Court's TRO, the September 30 Suspension decision was clearly operative pending DOT's review of GDC's DBE procedures. *See* Sep. 30 DOT Ltr. ("Pending completion of the review," to "commence immediately," "no further disbursements for the [Hudson Tunnel] Project will be made." (emphasis omitted)). While that decision is subject to reconsideration upon DOT's completion of the review, and Defendants contend that "the intention of the suspension was to be temporary," ECF No. 73 ("Def. Reply") at 9, these factors are inapposite. "[A]n interim agency resolution counts as final agency action despite the potential for a different permanent decision . . . [because] the interim resolution is the final word from the agency on what will happen up to the time of any different permanent decision." *Nat. Res. Def. Council*, 955 F.3d at 78; *Salazar v. King*, 822 F.3d 61, 83-84 (2d Cir. 2016) ("The APA does not require that the challenged agency action be the agency's final word on the matter for it to be 'final' for the purposes of judicial review." (quoting *Sackett v. Env't Prot. Agency*, 566 U.S. 120, 126 (2012))). Indeed, by the Government's logic, an agency could indefinitely withhold funds without judicial review of its actions so long as it professed an intention to change course, contrary to the APA's presumption of judicial review. *See Prutehi Litekyan: Save*

*Ritidian v. U.S. Dep't of Airforce*, 128 F.4th 1089, 1109 (9th Cir. 2025) ("Most, if not all, agency decisions incorporate some contingencies, but that is not enough to shield them from judicial review."), *cert. granted sub nom.*, *Dep't of the Air Force v. Prutehi Guahan*, 224 L. Ed. 2d 174 (Mar. 9, 2026).

Accordingly, *Bennett* prong one is satisfied. *See also ACF*, 2026 WL 673848, at *15 (finding finality where restriction on access to Administration for Children and Families funds was "'effective today,' as part of a program compliance review"); *Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, 778 F. Supp. 3d 440, 467 (D.R.I. 2025) (finding finality where "there [were] no further steps the agencies need[ed] to take to determine whether they [would] freeze th[e] funding"); *Louisiana v. Biden*, 622 F. Supp. 3d 267, 291-92 (W.D. La. 2022) ("'[F]inal agency action' does not have to be defined as permanent to be considered final." (quoting *Texas v. United States*, 809 F.3d 134, 163-64 (5th Cir. 2015))).

### b.    *Bennett* Prong Two

"For the second prong, the core question is whether the result of the agency's decision[-]making process is one that will directly affect the parties." *Salazar*, 822 F.3d at 82 (cleaned up). "'[L]egal consequences' surely flow, given that grant recipients cannot access previously awarded funds." *Woonasquatucket*, 778 F. Supp. 3d at 468 (quoting *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 808 (2024)).

The September 30 Suspension has clearly directly affected the States. As a result of the September 30 Suspension, GDC's legal and administrative costs

54

increased, and it had to self-finance by drawing down its credit line.  Sincaglia Decl., ¶¶ 22, 24, 57.  Due in large part to these changes, GDC's operating budget— paid for by the States—increased from $56.382 million in Fiscal Year 2025 to $77.567 million in Fiscal Year 2026.  *Id.*  Stop-work orders then suspended active construction and put the Project in stasis on February 6, 2026.  *Id.*, ¶¶ 49, 58-61; Kolluri Decl., ¶ 6.  Abandoned active construction sites also present public health and safety risks that require funding by the States for site security and maintenance.  Sincaglia Decl., ¶¶ 58-59.  After the work suspension was lifted, fully remobilizing the construction sites took several weeks, which compounded delays to the Project's schedule.  Kolluri Decl., ¶¶ 8-9.  The States thus satisfy *Bennett* prong two.

Accordingly, the September 30 Suspension constitutes final agency action. *Accord New York v. Trump*, 133 F.4th 51, 66-68 (1st Cir. 2025) (denying defendants' stay motion because they failed to make a strong showing that agency actions to implement "categorical funding freezes without regard and contrary to legal authority" pursuant to OMB guidance were not "final"); *ACF*, 2026 WL 673848, at *15 (collecting cases holding funding conditions and freezes to constitute final agency action); *Fed. Emergency Mgmt. Agency*, 801 F. Supp. at 89 n.6 (same); *Woonasquatucket*, 778 F. Supp. 3d at 467 (holding that plaintiffs had "strong likelihood of proving that the funding freezes constitute final agency action" given "breadth of caselaw support[ing] this conclusion," including "emerging consensus of

55

district courts recently hearing cases about different aspects of federal funding freezes").

## C.    Merits

And now we reach the light at the end of the proverbial tunnel, a discussion of the merits of Plaintiffs' APA claim as it pertains to the GDC Grants. The APA authorizes courts to set aside agency actions that are, *inter alia*, contrary to law, without observance of procedure required by law, or arbitrary and capricious. 5 U.S.C. § 706(2)(A), (D). Plaintiffs contend that Defendants acted contrary to federal regulations that establish precisely whether, when, and how agencies can suspend disbursements of obligated grants. PI Mem. at 14-18. Relying almost entirely on their jurisdictional arguments, Defendants practically concede that the suspension of the GDC Grants decision was unlawful. Indeed, other than the section headings in their briefs that conclusorily assert "The Suspension of Disbursements Was Not Contrary to Law," Def. Mem. at 25; *accord* Def. Reply at 9, Defendants make no attempt to justify their actions as consistent with the governing federal regulations. They have therefore waived any argument to the contrary. *See, e.g.*, *City of Syracuse v. Onondaga Cnty.*, 464 F.3d 297, 308 (2d Cir. 2006) (litigant waives argument raised only in argument heading); *Espinoza v. Foundry Workers LLC*, 792 F. Supp. 3d 344, 353 (E.D.N.Y. 2025) ("[W]here a party refers to an issue in only a perfunctory manner, unaccompanied by any effort at developed argumentation, it must be deemed waived—or, more precisely, forfeited.").

An agency action is "contrary to law" where the agency does not "act in accordance with the law governing" that particular action. *Sissel v. Wormuth*, 77 F.4th 941, 947 (D.C. Cir. 2023). Further, as a general matter, an agency acts contrary to law when it acts "contrary to existing valid regulations." *Accardi*, 347 U.S. at 267-68; *Fed. Defs. of N.Y.*, 954 F.3d at 130 (holding party can sue under APA to "bring an agency's conduct into [regulatory] conformity"); *see, e.g., Afr. Cmtys. Together v. Lyons*, 799 F. Supp. 3d 362, 386 (S.D.N.Y. 2025), *modified on other grounds*, No. 25-CV-6366 (PKC), 2026 WL 1382944 (S.D.N.Y. May 18, 2026).

The suspension of the GDC Grants violated federal regulations and thus was contrary to law within the meaning of the APA. Section 200.339 of the Uniform Grant Guidance establishes the terms by which agencies may interrupt grant funding. 2 C.F.R. § 200.339. It provides:

> The Federal agency . . . may implement specific conditions if the recipient or subrecipient fails to comply with the U.S. Constitution, Federal statutes, regulations, or terms and conditions of the Federal award. . . . When the Federal agency . . . determines that noncompliance cannot be remedied by imposing specific conditions, the Federal agency . . . may take one or more of the following actions:
>
> (a) Temporarily withhold payments until the recipient or subrecipient takes corrective action.
>
> (b) Disallow costs for all or part of the activity associated with the noncompliance of the recipient or subrecipient.
>
> (c) Suspend or terminate the Federal award in part or in its entirety.
>
> (d) Initiate suspension or debarment proceedings . . . .

> (e) Withhold further Federal funds (new awards or continuation funding) for the project or program.
>
> (f) Pursue other legally available remedies.

*Id.* Section 200.339 is explicit that an agency may take remedial actions only where it first determines that a recipient "fail[ed] to comply" with applicable laws, not when it merely initiates a compliance inquiry. *Id.* Pursuant to the regulation, DOT could "implement specific conditions" if GDC had acted unlawfully. Only if DOT determines that no corrective conditions could remedy the noncompliance may it withhold payments until corrective action is taken. *Id.*

The September 30 Suspension skipped right to payment suspension without any finding that GDC had violated the law. *See* Sep. 30 DOT Ltr. This was clearly contrary to Section 200.339 of the Uniform Grant Guidance. *See Porwancher v. Nat'l Endowment for the Humans.*, 792 F. Supp. 3d 107, 114 (D.D.C. 2025) (finding high likelihood of success on merits of contrary to law claim where "[t]he [grant termination] notice was supposed to indicate 'that noncompliance cannot be remedied by imposing additional conditions' on the award," but "didn't" (quoting 2 C.F.R. § 200.339(c))).

Further, grantees must be afforded process prior to grant termination, including "an opportunity to object and provide information challenging the action." 2 C.F.R. § 200.342. Yet DOT provided no opportunity for GDC to appeal the September 30 Suspension. *See* Sep. 30 DOT Ltr.; Oct. 7 DOT Ltr.; Dec. 1 DOT Ltr. This is clearly contrary to law. *See, e.g.*, *Porwancher*, 792 F. Supp. 3d at 114 (finding high likelihood of success on merits of contrary to law claim where "[t]he

58

[agency] was supposed to provide [plaintiff] with a right to appeal [his grant termination]" (citing 2 C.F.R. § 200.342)).

Accordingly, the Court finds the September 30 Suspension violated Sections 200.339 and 200.342 of the Uniform Grant Guidance.

## CONCLUSION

For the reasons stated, the Court grants judgment to Plaintiffs with respect to Count I of their Complaint as it pertains to the GDC Grants. The Court declares that the September 30 Suspension was contrary to law insofar as it suspended disbursements under the GDC Grants in violation of the Uniform Grant Guidance. The Court orders that the September 30 Suspension be vacated and set aside. Defendants are enjoined from relying upon the September 30 Suspension prospectively with respect to the GDC Grants. The Court otherwise dismisses the claims against Defendants for lack of subject matter jurisdiction.

The Clerk of Court is instructed to enter judgment in accordance with this Opinion and Order and close the case.

SO ORDERED.

Dated:  June 29, 2026
      New York, New York

_____
JEANNETTE A. VARGAS
United States District Judge

59